1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION

3

4    KAM DEVELOPMENT, LLC,            Case No. 3:20-CV-02024-JJH
                                      Toledo, Ohio
5              Plaintiff,

6         vs.                         **FRIDAY, OCTOBER 2, 2020**

7

     MARCO'S FRANCHISING, LLC,        **\*\* VOLUME 1 OF 3 \*\***
8                                     **(Pages 1-199)**
               Defendant.
9

10

     **REDACTED** TRANSCRIPT OF VIDEO EVIDENTIARY HEARING PROCEEDINGS
11            BEFORE THE HONORABLE JEFFREY J. HELMICK
                  UNITED STATES DISTRICT JUDGE
12

13

14

15

     Official Court Reporter:   Stacey L. Kiprotich, RMR, CRR
16                              United States District Court
                                1716 Spielbusch Avenue, Suite 120
17                              Toledo, Ohio 43604
                                (419) 213-5520
18

19

20

21

22

     Proceedings recorded by mechanical stenography, transcript
23   produced by computer-aided transcription.

24

25

```
1    APPEARANCES:

2

3    For Plaintiff:        Brent M. Davis, Esquire,
                           Justin M. Klein, Esquire,
4                          Marks & Klein
                           63 Riverside Avenue
5                          Red Bank, New Jersey 07701
                           732-747-7100
6

7                          Peter R. Silverman, Esquire
                           Shumaker, Loop & Kendrick
8                          1000 Jackson Street
                           Toledo, Ohio 43604
9                          419-321-1307

10   Also Present:         Andrew Joseph Hunter
                           Mike Hunter
11

12                               -   -   -

13

     For Defendant:        W. Barry Blum, Esquire,
14                         Aaron S. Blynn, Esquire,
                           Genovese Joblove & Battista
15                         100 Southeast Second Street, 44th Floor
                           Miami, Florida 33131
16                         305-349-2300

17

                           Carrie E. Thiem, Esquire,
18                         Tucker Ellis
                           175 South Third Street, Suite 520
19                         Columbus, Ohio 43215
                           614-358-9717
20

     Also Present:         Tony Libardi, President and COO
21                         Todd Watson, General Counsel

22

23

24

25
```

# I N D E X

**PLAINTIFF'S WITNESSES**                                          **PAGE**

1.   ANDREW JOSEPH HUNTER

          DIRECT EXAMINATION BY MR. DAVIS:      77, 83, 107
          EXAMINATION BY MR. BLUM:                         82
          EXAMINATION BY THE COURT:                       106
          CROSS-EXAMINATION BY MR. BLUM:                  145


**DEFENDANT'S WITNESSES**

 (NONE)

**REDACTED PAGES FILED UNDER SEAL:**

PAGE 86, LINE 5 THROUGH PAGE 87, LINE 15
PAGE 136, LINE 9 THROUGH PAGE 136, LINE 18
PAGE 175, LINE 21 THROUGH PAGE 176, LINE 25

**FRIDAY, OCTOBER 2, 2020**

**- - -**

**(PROCEEDINGS COMMENCED AT 10:16 A.M.)**

**- - -**

10:16:17   5        THE COURT:  Well, let me start, if I may, by

6   saying good morning.  And I know we have a number of people

7   on the call, so please be patient here for purposes of

8   introduction at the outset.

9        My plan is simply to identify one or more counsel for

10:16:32  10   each side at the outset, and then ask if you would identify

11   any other counsel that you have on the call, any in-house

12   counsel you might have, any representatives or potential

13   witnesses that you might have in turn.

14        These are, at best, circumstances sometimes difficult

10:16:47  15   to manage, and the larger number of participants we have

16   sometimes drives the complexity of the call.  So let's all

17   be patient with one another as we move forward here, and

18   I'll ask for your patience with me as well.

19        At the outset, I see both Brent Davis and Justin Klein

10:17:07  20   on first on behalf of plaintiff.  This is kind of how you

21   are appearing on my screen.

22        I see Mr. Klein is muted.  Mr. Davis is not.  So I'm

23   going to jump to the assumption that perhaps Mr. Davis will

24   speak first on behalf of plaintiff.  And, Mr. Davis, I'd

10:17:23  25   simply ask that you identify who is on the call, Mr.

1    Silverman or other counsel, potential representatives and so

2    forth, and then we'll do the same in kind on the defense

3    side here momentarily.

4        Mr. Davis.

10:17:35  5             MR. DAVIS:  Thank you, Your Honor.  Good

6    morning.

7             THE COUR:  Good morning.

8             MR. DAVIS:  Yes.  My name is Brent Davis.  I'm

9    with the firm Marks & Klein, counsel for Plaintiff KAM.

10:17:46  10    With me is Justin Klein, and Peter Silverman are local

11    counsel, and also with us are Andy and Mike Hunter who are

12    the sole members of the KAM Development, LLC.

13             THE COURT:  Very well.

14             MR. DAVIS:  And they are the only potential

10:18:04  15    witnesses that KAM has today.

16             THE COURT:  Very good.  My greetings to all

17    counsel, and also Andy and Mike Hunter as well who are on

18    the call together as well at the outset.

19        I should note, by the way, before I switch to the

10:18:20  20    defense side here, which I will do momentarily, you might

21    see an entry for "Chambers Helmick" that appears on your

22    screen.  That is my courtroom deputy, Amy Schroeder, so it's

23    customary she doesn't appear by video.  She's muted at the

24    moment but she's monitoring these proceeding.  She's also

10:18:34  25    the host of the Zoom call.

1    And you will also note that our court reporter,

2    Stacey, is also on the line as well.  I normally check in

3    with her, and I was remiss in doing so when I first came in.

4    Stacey, I'm assuming you can hear me okay.

10:18:52  5    THE COURT REPORTER:  Yes, Judge.  Thank you.

6    THE COURT:  And Mr. Davis as well I hope?

7    THE COURT REPORTER:  Yes, I can hear Mr.

8    Davis.

9    THE COURT:  Very good.  And Stacey is not --

10:19:02  10   she's very kind, but she is not bashful, so if she has

11   difficulty taking down the record today because we are

12   talking over one another or too fast or the connection is

13   garbled, you will hear from her, which I encourage.  So just

14   know that that's always a possibility and hopefully not

10:19:19  15   necessary as we go forward here today.

16   So let me switch to the defense side, if I might.  I

17   started with the plaintiff because they are the party that

18   has the burden in this case, usually in all matters or all

19   things.  Mr. Blum, I think I can see you.  It's nice to

10:19:35  20   associate a face with a voice finally, even if it is virtual

21   and at some distance moving forward.  I offer you good

22   morning, and I ask you to identify any participants you

23   might have on the call, sir.

24   MR. BLUM:  Thank you, Your Honor, and good

10:19:50  25   morning to you and the same.  Again, I'm Barry Blum for the

1    record, and with us today is my partner, Aaron Blynn.  I see

2    he is muted, but Aaron is not admitted pro hac vice, but he

3    has been helping, and so he will participate -- not

4    participate, but will attend, and he is also clearly my

10:20:14 5    technology consultant because my VCR is blinking 12:00

6    o'clock all the time.

7         And also is Tony Libardi, who is the president and COO

8    of Marco's and our corporate representative.  He will be a

9    witness.  He is also present.

10:20:33 10         And also Todd Watson.  Mr. Watson is not going to be a

11    witness today.  He is the general counsel of the company,

12    and the company is based in Ohio, and he is, you know,

13    registered to represent the company in Ohio, et cetera, but,

14    again, will be serving as counsel and assisting me in that

10:20:54 15    regard.

16         And also Carrie Thiem, who is local counsel in Ohio,

17    and she is also there with us.

18              THE COURT:  Very good.  Welcome.

19              MR. BLUM:  Thank you, Your Honor.

10:21:08 20              THE COURT:  Welcome to all.  Thank you for

21    being on.

22         You might also see Christopher Pollack as well entered

23    with the large prominent "C."  That is one of my law clerks

24    who is also in attendance today at the hearing.  So he will

10:21:22 25    be monitoring these proceedings as well throughout.

1        So, look, we all know that at least initially at the

2   outset on the K-A-M case, on the KAM case, that this has

3   been scheduled for a hearing on request for preliminary

4   injunction.

10:21:39  5        There is a TRO currently in effect over objection from

6   the defense, which I note, again, at the outset.

7        There is also a pending challenge to jurisdiction in

8   this case as well, which I've addressed briefly in the

9   interim.

10:21:52  10        But moving forward from here, it was my anticipation

11   that in light of next week's expiration of the TRO that's in

12   effect, that this would be a hearing moving forward with

13   regard to plaintiff's request primarily for preliminary

14   injunction on the KAM case moving forward.  So the burden

10:22:15  15   clearly lies with the plaintiff in this particular case.

16        Mr. Davis, why don't I recognize you first and ask:

17   Can you tell me, briefly, how it is you intend to proceed

18   today procedurally, factually?  Can you just give me an

19   overview?  I think you mentioned that Andy and Mike Hunter

10:22:32  20   might be the only witnesses that are going to testify, but

21   maybe give me an idea of what that looks like.  I know there

22   was some question, maybe a little bit of a flurry of

23   exhibits or something that occurred last night or follow

24   through today by email.  There may be some dispute regarding

10:22:49  25   those.  I don't know.  But could you kind of give me an

1    overview of what it is you intend to present?

2                    MR. DAVIS:  Yes, Your Honor.  And just to

3    clarify, defendant has stated that there is no issue on

4    jurisdiction anymore, that they are asserting that the

10:23:10  5    members of Marco's, when you drill down, there are no

6    residents of South Carolina, so I do not believe that's an

7    issue anymore, unless Mr. Blum wants to correct me

8    otherwise.

9                    THE COURT:  I'll hear from him in a moment --

10:23:22 10                    MR. DAVIS:  Okay.

11                    THE COURT:  -- if that's okay.

12        You can keep your powder dry, Mr. Blum, and I will

13    hear from you in a moment.

14                    MR. DAVIS:  But so, Your Honor, KAM has

10:23:35 15    presented its testimony and exhibits already in its filings.

16    We're prepared to call Mike Hunter, although his testimony

17    will be limited to his declaration which was rather concise.

18    So if -- I mean, certainly leaving the option of defendant

19    to cross-examine him, unless the Court feels it is

10:24:04 20    absolutely necessary or the Court would like to hear from

21    Mike Hunter, we would just rest on his testimony on the

22    declaration submitted.

23                    THE COURT:  Okay.

24                    MR. DAVIS:  We do intend to call Andy Hunter

10:24:21 25    to flesh out the (indiscernible).

1          (Court Reporter clarification)

2                MR. DAVIS:  To flesh out his testimony.

3          Is that any better if I get any closer?

4                THE COURT REPORTER:  Yes, sir.

10:24:46  5                MR. DAVIS:  Thank you.

6          Andy Hunter will be testifying to the contents of his

7      declaration (indiscernible).

8                (Court Reporter clarification)

9                MR. DAVIS:  The contents of his three

10:25:01 10     declarations that have been filed (indiscernible) in this

11      matter.

12                (Court Reporter clarification)

13                MR. DAVIS:  Oh, my goodness.  This is going to

14      be a problem.

10:25:10 15                MR. BLUM:  Your Honor, this is Mr. Blum.  I

16      think there's a technology issue.  I'm having trouble

17      hearing Mr. Davis.  I don't know if the court reporter is.

18                THE COURT:  Well, she certainly hasn't been

19      bashful about saying so, yes --

10:25:23 20                MR. BLUM:  Right, right.

21                THE COURT:  -- as I predicted and as I

22      encourage.

23          So why don't we -- Mr. Davis --

24                MR. DAVIS:  Your Honor, let me see if I can

10:25:35 25     switch over to the microphone in my laptop.

|   |   |
|---|---|
| 1 | THE COURT:  Okay.  Your audio just improved |
| 2 | significantly, Mr. Davis.  I'm not quite sure why, but at |
| 3 | least for a moment there. |
| 4 | MR. DAVIS:  How was that?  I opened my laptop. |
| 10:25:48 5 | THE COURT:  That's better.  My guess is it's |
| 6 | probably clam shelled and the microphone isn't as exposed as |
| 7 | it -- |
| 8 | MR. DAVIS:  Oh, you know what, Your Honor? |
| 9 | We'll do it like this.  This is perfect. |
| 10:25:58 10 | THE COURT:  Okay.  I think that is fine, and |
| 11 | if you don't hear from us otherwise, I'm going to assume |
| 12 | that Mr. Blum is okay with it and the court reporter is okay |
| 13 | with it as well.  You were dropping out a bit towards the |
| 14 | end, as she described, but it was just enough with the |
| 10:26:12 15 | volume up that I could still make out what you were saying, |
| 16 | but that doesn't necessarily mean everyone else can or that |
| 17 | it makes for a good record. |
| 18 | So let's try this because it seems to be an |
| 19 | improvement, and if you could pick up -- I know you were |
| 10:26:24 20 | talking about Andy Hunter as a potential witness, but you |
| 21 | were also talking about testimony consistent with the |
| 22 | declaration.  Anything else to add on that topic?  Because I |
| 23 | want to make sure that we're all clear and the record is |
| 24 | complete. |
| 10:26:37 25 | MR. DAVIS:  No, Your Honor.  And, of course, |

1    with asking the Court's permission, I would be handling any

2    of the direct examination of the Hunters, and then Mr. Klein

3    would be handling cross-examination of any of defendant's

4    witnesses.

10:26:59  5              THE COURT:  Fair enough.  Sounds like a

6    reasonable way to proceed moving forward.  Let me interrupt

7    you at this point and turn to defense, if I might, and I

8    will start with Mr. Blum.  Go ahead, Mr. Davis.  I'm sorry.

9              MR. DAVIS:  I'm sorry.  And there was an

10:27:15 10  overriding housekeeping kind of issue that I wanted to turn

11   it over to Mr. Klein to address.

12             THE COURT:  Okay.  Very good.  Mr. Klein,

13   let's give you the floor here.

14             MR. KLEIN:  Good morning, Your Honor.  Thank

10:27:28 15  you.  Is the audio okay?

16             THE COURT:  Sounds good so far.  Thank you.

17             MR. KLEIN:  So just in terms of proceeding

18   with the hearing, as Mr. Davis said, he's going to handle

19   Mr. Hunter's direct examination.

10:27:43 20      Your Honor is correct, there was a flurry of emails

21   that went back and forth with respect to some of the

22   exhibits, as we made clear to Amy this morning.  We are

23   going to object to the introduction of a large portion of

24   the exhibits that they intend to use as being entirely

10:28:02 25  outside of the scope of the hearing that we have before

1      Your Honor today.  If you prefer we handle that now, that's

2      fine, or we can kind of go through some of these

3      housekeeping issues.

4                  THE COURT:  I guess I would suggest at this

10:28:17  5      point, since there are potential exhibits that might be

6      offered by the defense, that perhaps we simply deal with

7      them in due course.  That is -- go ahead, Mr. Klein.  Do you

8      see some particular -- other than you knowing my ruling at

9      the outset, do you see any particular advantage to handling

10:28:34 10      those out of sequence; that is, before the defense is given

11      the floor to present their case?

12                  MR. KLEIN:  Yeah.  That's a fair question,

13      Your Honor.  I think it's just the -- and I guess we can

14      wait until their cross-examination on -- it really is going

10:28:52 15      to depend on how we approach the direct examination of Mr.

16      Hunter in terms of whether or not he needs to address

17      certain issues on his direct examination.

18          And, you know, for Your Honor's benefit, yesterday

19      morning we were notified by the Hunters that Marco's -- a

10:29:13 20      Marco's employee was sent out to investigate certain of

21      their franchised locations, and spent the better part of

22      Wednesday evening and all day Thursday going through and

23      investigating certain of the franchised locations which are

24      not parties to this lawsuit.

10:29:36 25          As a result of those investigates, Marco's identified

1    certain what they believe to be operational defaults and, in

2    fact, unilaterally shut down one of the locations of the

3    Hunters without good cause, basing it on some issue that

4    they perceived.

10:29:57  5    Last night at around midnight, we received only an

6    exhibit list, and not exhibits, of about 27 exhibits, about

7    two thirds of which we think relate to these operational

8    issues.  At about 9:15 this morning, our anticipation was

9    correct, because the parties sent over what I think Mr.

10:30:26 10    Blum's emails said, dozens and dozens of photos which relate

11    to these stores.

12    It is our position that to the extent that this

13    evidence intends to be introduced, it is entirely outside of

14    the scope of the proceeding that is before Your Honor, which

10:30:44 15    is limited to the default notice that Marco's sent our

16    clients in August.  And that to the extent that they are

17    going to follow up on the comment that they made in their

18    late-night submission on Thursday -- on Wednesday into

19    Thursday morning that our client's operations are, quote,

10:31:06 20    "disgraceful," I think that that is intended to do nothing

21    but prejudice our clients before Your Honor.  And I know

22    Your Honor is well familiar with the facts, the amount of

23    filings that we put before Your Honor over the last couple

24    of weeks.  It's entirely outside of the scope of this

10:31:27 25    hearing, and we don't think it's appropriate to spend time

1    and energy on whether or not there is, you know, dust on the

2    floors at the Valentine location.

3         All that being said, Your Honor, one of the locations

4    was, in fact, shut down yesterday.  It was shut down based

10:31:51  5    on a mistake.  And we reached out to counsel yesterday and

6    we said, "There was a mistake.  You shouldn't have shut this

7    down."  They claimed that -- and Mr. Hunter can talk about

8    this in his testimony if he has to -- that one of the make

9    lines had mold and mildew on it.  It turns out that the mold

10:32:08  10    and mildew was actually grease which was cleaned with a rag.

11    And that store as of this morning, Your Honor, remains shut

12    down, closed for business, unable to serve his customers

13    last evening, unable to serve his customers today, and that

14    presumably will be part of a separate application before

10:32:26  15    Your Honor.  But I think the focus of the evidence that is

16    purportedly going to be put forward by defendants is

17    entirely outside of the scope, and we would just ask for

18    direction from Your Honor as to whether or not we need to

19    address that in our direct.

10:32:42  20         THE COURT:  All right.  So a couple of things

21    first.  Is the plaintiff suggesting in any way that

22    defendants have violated the temporary restraining order

23    that was in effect that I previously granted?

24         MR. KLEIN:  So, Your Honor, I raised that

10:33:00  25    issue with Mr. Joblove yesterday.  I raised that issue --

1    Mr. Joblove raised that issue directly with Mr. Blum.  We

2    identified it in our filing, our late-night filing -- I'm

3    not sure if Your Honor has had an opportunity to see it --

4    that we filed last evening.  And I think -- while I want to

10:33:22  5    argue to Your Honor that they have violated the TRO based on

6    the request that they asked for and we agreed to, I would

7    need to be very careful arguing to Your Honor that they

8    violated the black letter of the TRO that you ultimately

9    entered.

10:33:45  10    What we argued to Your Honor in our papers last night

11    is that they certainly violated the TRO with their filing on

12    Wednesday night by disparaging our clients in a public

13    filing, which is a third party to this Court, and also that

14    they violated the spirit of the TRO on the heels of

10:34:04  15    maintaining status quo and not interfering with our

16    franchisees.  These locations that they interfered with are

17    franchised locations of KAM, and they certainly interfered

18    well beyond the scope of what they have done in the previous

19    relationship with KAM in terms of this ambush investigation

10:34:31  20    that they did, interfering with not only our operations, but

21    also with our employees, one of whom had a panic attack last

22    evening, is doing okay, but based on the manner with which

23    this was all handled.

24    And just so Your Honor is aware, we brought this to

10:34:47  25    the attention of Mr. Joblove and Mr. Blum as early as noon

1    yesterday afternoon.  And as it stands right now, nothing

2    has been rectified.

3                    THE COURT:  Okay.  So I guess at the outset, a

4    couple of observations.

10:35:03  5         One is that if there is going to be the suggestion

6    that somehow a contempt citation or some type of direction

7    against the defendant is appropriate under the TRO, I need

8    to know with some clarity if that's the case.

9         The other thing I guess I would say is you're

10:35:22  10   suggesting it went beyond this, but I guess I would have

11   expected or not been surprised that Marco's might wish to do

12   some inspection or review of the affected premises in light

13   of the status of this litigation at the moment.  Mr. Klein,

14   you seem to be suggesting that this went beyond that.

10:35:40  15        So let me, if I might, turn to Mr. Blum for a moment.

16   Mr. Blum, I'm not going to curtail anything by way of an

17   opening statement or presentation by you later, if you wish,

18   or even now, but let me start and focus in a bit, if I

19   might, on our order of progression here today.

10:36:01  20        The exhibits to which the plaintiffs are objecting,

21   and there's kind of a broad characterization of what that

22   was in terms of perhaps their lateness, their relevance and

23   scope as it regards this, are those items that you would

24   anticipate using in cross-examination of one or both of the

10:36:21  25   Hunters, if they would testify here today, sir?

1          MR. BLUM:  Yes, Your Honor.  I believe we

2      would use some of it in cross-examination.  And in that

3      instance, they probably are scripted really also in the

4      nature of a rebuttal.  So I would --

10:36:40    5          THE COURT:  Mr. Blum, let me interrupt.  I'm

6      only interrupting you because my focus is:  Is it going to

7      be helpful to the parties if we talk about the propriety of

8      admissibility of those exhibits now?  Or do you want an

9      opportunity to lay a foundation with regard to those

10:36:55   10      exhibits with the witness or otherwise?  That's really where

11      I'm going because --

12          MR. BLUM:  Right, right, right.

13          THE COURT:  -- I want you to know what you can

14      and cannot use if we go into witness testimony moving

10:37:07   15      forward on the case.  So that's the spirit in which I'm

16      asking you these questions, sir.

17          MR. BLUM:  Right.  I understand, Your Honor.

18      And I think we can address it in the context when they come

19      up, because it is very important that they be addressed in

10:37:20   20      that context because, with all respect, the presentation

21      there has many, many misstatements.  In fact, just for

22      example, Your Honor, that it was an ambush.  In fact, there

23      were communications in July and August in which these

24      deficiencies were noted, and in fact Marco's was obligated

10:37:43   25      to go back and verify compliance because KAM had represented

1    that all these deficiencies had been cured.  And, in fact,

2    Your Honor, what these exhibits will show is a very

3    troubling situation.  So this is not an ambush.  This is a

4    follow up to a process.

10:38:02  5        Mr. Klein also said that these places are franchised

6    locations of KAM.  There's no such thing.  Franchise

7    agreements are between Marco's Franchising and franchisees.

8    KAM has no right to enforce the franchise agreements.  All

9    they do is report to us the situation, and if there needs to

10:38:25 10   be action taken, including to protect the public, okay,

11   Your Honor, that is totally Marco's responsibility.

12        And, in fact, what the testimony will be, will be that

13   the verifications from KAM, despite these deficiency

14   notices, were, in our view, inaccurate, and it was

10:38:50 15   appropriate for the franchisor to go out and verify the

16   franchisee's compliance.  But we can address that.  And it

17   is very important for context, Your Honor, because frankly

18   KAM has to be -- it demonstrates why the requested relief is

19   totally inappropriate.

10:39:06 20        This relationship is so ruptured because of what

21   Marco's feels is intentional malfeasance by KAM to protect

22   its own interests ahead of the franchise brand, that that

23   goes to the very important part -- very important elements

24   of the case.

10:39:28 25        But it should be taken up in context because -- I

1    don't want to start arguing, but I feel I have to in the

2    context of you can decide, Your Honor, if need be, whether

3    it was grease or it was something else, or whether it was

4    mold or whether it was some type of growth.  You can decide

10:39:48  5    whether the dead insects on the floor were grease or not.

6    That is for you to decide, but it has to be in the context,

7    Your Honor.  And Mr. Libardi will be able to put that in

8    context too, and perhaps Mr. Hunter will on

9    cross-examination.

10:40:03 10              THE COURT:  Well, Mr. Blum, let me ask you

11    because both Mr. Hunters are present here today.  And Mr.

12    Davis made reference to the intent to call one, but perhaps

13    a feeling it might not be necessary to call, I think, Mike

14    Hunter in this matter because of the declaration that was

10:40:24 15    issued, but that there might be some interest in

16    cross-examination by the defense.

17         So part of what I want to do is see how we start in

18    terms of framing presentation of the evidence by the

19    plaintiffs here today.  And so, Mr. Blum, would it be your

10:40:42 20    intention to want to have the opportunity to question both

21    Andy and Mike Hunter?

22              MR. BLUM:  Your Honor, in my case in chief, I

23    would like to reserve the right to at least question Mike

24    Hunter.  I understand they are going to call Andy Hunter is

10:41:00 25    my understanding.  Again, it is my understanding that Andy

1    Hunter is the person who is more involved in the operations

2    side, and Mike Hunter may have a role that's limited, and

3    that development side would be relevant perhaps to our case

4    in chief if they don't believe that it is relevant.

5        So, obviously, if they put on -- if they are just

6    going to offer Mr. Hunter for what's in his declaration in

7    their case, I will limit my cross to that.  But I would then

8    at least have him be available -- whether he has to stay

9    on -- I may want to call him directly in my case for --

10                   THE COURT:  Right.  And --

11                   MR. BLUM:  -- expand on --

12                   THE COURT:  Okay.  Right.  And what I'm trying

13   to avoid is any problems in terms of presentation of

14   evidence and order and so forth.  So if it is likely you are

15   going to want to question to some extent both Andy and Mike

16   Hunter, I think the plaintiff ought to know that.  It might

17   inform Mr. Davis' decision of whether or not to call them on

18   direct, or whether or not to wait to see if you wish to call

19   them as if on cross, and so that's why I asked at the

20   outset.

21       And I think with regard to the exhibits that are at

22   issue, I think I'm going to have to hear argument and

23   presentation about those before they are presented.  We can

24   take some time and can do that now.  Although, candidly,

25   there is a part of me that thinks, well, no, let's let some

1    development occur with regard to testimony going forward

2    here at this point; and then, Mr. Blum, if you feel the need

3    to use those exhibits with regard to your cross-examination

4    before you get to your case in chief, then why don't we

10:42:44  5    pause and indicate that those exhibits are -- there's some

6    contentiousness about the appropriateness of those exhibits,

7    and we can take a break at that point to discuss them.

8         Does it sound like a plan, Mr. Blum?

9              MR. BLUM:  Yes, Your Honor, it does.  I think

10:43:00  10    it is appropriate.

11        And just for clarification for the plaintiff's side,

12    whether I need to call Mr. Mike Hunter in my case and the

13    extent of the examination may depend some on Mr. Andy

14    Hunter's testimony and cross.  I mean, he may be able to

10:43:19  15    clarify roles.

16              THE COURT:  Fair enough, fair enough.  So

17    that's fine.  I get that as well.

18        So let me ask you, if I might, there was reference

19    made earlier with regard to the issue of jurisdiction as

10:43:32  20    well.  Where does that stand from the defense standpoint

21    today?

22              MR. BLUM:  Yes, Your Honor.  We have notified

23    the other side that we withdraw any objection to

24    jurisdiction.

10:43:44  25        The facts are these:  It was our understanding up

1    until fairly recently, actually after we first met, that a

2    person in the chain of the ownership of Marco's was a South

3    Carolina domiciliary, and they were.  And when we kind of

4    rushed in and had the first hearing, I made the

10:44:07 5    communication to my client that probably was maybe not

6    specific enough to confirm that the ownership was the same

7    and they did that.  However, after we met, I said, "Well we

8    also need to confirm the citizenship," and we learned that

9    that person who used to be in South Carolina had recently

10:44:25 10    moved out of South Carolina, and therefore, you know -- at

11    the time, my question was "Is the ownership the same?"  And

12    the answer was "Yes," and that would have created a South

13    Carolina citizenship, but we have confirmed later that

14    person moved.

10:44:41 15                THE COURT:  Okay.  That's fine, Mr. Blum.  I'm

16    not challenging --

17                MR. BLUM:  No.  We have no --

18                THE COURT:  -- your good faith with regard to

19    that issue.  I just want to know to the extent that there is

10:44:52 20    a challenge that exists on the record by way of dismissal or

21    request for dismissal, do you wish to withdraw that?  Or do

22    you wish me to deny it at this time?

23                MR. BLUM:  Yes, Your Honor, we will withdraw

24    that based on our new information.  We do not believe at

10:45:12 25    this time that there is an issue with diversity

1    jurisdiction.  Specifically, the defendant is not, to our

2    understanding, a citizen of South Carolina, and it is our

3    understanding that both of the -- or that the plaintiff is a

4    citizen only of South Carolina.

10:45:29  5          THE COURT:  All right.  Mr. Davis or Mr.

6    Klein, do you wish to be heard on the issue of jurisdiction

7    in terms of where it stands now?

8          MR. DAVIS:  No, Your Honor.  As I stated

9    earlier, that was the representation that was made to us, so

10:45:42  10   the Court having jurisdiction in this matter is not in

11   question anymore.

12         MR. KLEIN:  I just think as a housekeeping

13   issue, Your Honor, I just -- that that motion is pending and

14   the return date is probably looming, so I think for

10:45:57  15   housekeeping purposes --

16         THE COURT:  I think I just heard Mr. Blum say

17   there was no objection and that they were withdrawing that

18   motion.

19         MR. KLEIN:  Okay.  I just wanted to make sure

10:46:06  20   that will be denied as moot or whatever just so that the

21   record is reflected appropriately.

22         THE COURT:  Well, I think they have the right

23   to withdraw, if they wish to withdraw at this point, in

24   which case the issue is no longer before the Court, or I can

10:46:17  25   dismiss it, but it would be without prejudice.

1          Mr. Blum, if your preference is withdrawing, then

2     we'll note it as withdrawn.

3                    MR. BLUM:  We'll withdrawn that motion based

4     on the new understanding.

10:46:29  5                    THE COURT:  Very well.  It's not really

6     waivable, subject matter jurisdiction.  If it would come to

7     my attention or the plaintiff's attention or defense's

8     attention later that it was a problem, I think that we have

9     to address it.

10:46:39 10          Mr. Davis, do you want to be heard further on this

11    issue?

12                    MR. DAVIS:  Yes, Your Honor.  I actually think

13    we're kind of making a bigger deal out of this than we have

14    to because the motion was filed on the original compliant,

10:46:50 15    which was mooted then, the motion to dismiss, when we filed

16    the amended complaint.

17          So there actually isn't -- if I understand the

18    procedure correctly, I don't believe there actually is a

19    pending motion to dismiss based on subject matter -- or

10:47:09 20    diversity jurisdiction.

21                    MR. BLUM:  Mr. Davis gets the vote for

22    procedure today, Your Honor.  I think that probably is

23    technically right.

24                    THE COURT:  Right.  But that may or may not be

10:47:23 25    true.  But at the same time, to the extent it may not be

1    dispositive or it may not be abundantly clear, I think it's

2    better if it is withdrawn so that there is nothing currently

3    on the record that might in some way constitute a challenge

4    to jurisdiction.  So whether that is technically true or

10:47:43  5    not, we will note the request and grant the request of the

6    defense to withdraw any challenge with regard to

7    jurisdiction at this time.

8         Does that satisfy, Mr. Davis?

9              MR. DAVIS:  I defer to Your Honor.

10:47:54 10              THE COURT:  Well, I just think it is cleaner

11    if it is off the docket rather than arguing later whether or

12    not that motion is somehow still pending or still has some

13    status.  Okay?

14              MR. DAVIS:  I agree.  I think that was my

10:48:07 15    point.

16              THE COURT:  Okay.  Very good, Mr. Klein.  So

17    it will be noted withdrawn at the request of the defendant

18    at this time, and therefore, the issue of subject matter

19    jurisdiction, I believe, is no longer before me as a

10:48:18 20    potential issue with regard to my jurisdiction and authority

21    with regard to this case.

22              MR. DAVIS:  I apologize to the Court.  This

23    animal as you probably can see (indiscernible).

24              (Discussion held off the record)

10:48:48 25              THE COURT:  So at this point, in light of Mr.

1     Blum's position, maybe that better informs plaintiff's

2     strategy moving forward with regard to presentation of

3     evidence.

4          Mr. Davis, what say you?

10:49:01  5          MR. DAVIS:  Your Honor, I think that the issue

6     of these alleged operational defaults is important to

7     resolve before any evidence is presented.  I think there is

8     a couple of things that I think are unclear factually; that

9     the locations that were targeted over the last two days are

10:49:27 10    owned by affiliated companies of KAM.  Essentially,

11    Your Honor, these are actual locations that are owned by the

12    Hunters.  They have never -- and the issue is the default

13    notices that were issued, and the basis for defendant's

14    position that KAM was in default was limited to three areas:

10:49:58 15    failure to meet their development schedule; the Jeremiah's

16    Agreement; and the violation of the requirements to

17    communicate a certain way.

18          At no point prior to the filing of this lawsuit did

19    Marco's ever take the position that KAM was in default for

10:50:24 20    failure to inspect their stores correctly.

21          And I don't think the timing of this -- the timing of

22    these spot inspections, which the Hunters can discuss that

23    there has never been an unannounced inspection in their

24    stores before, and the fact that it was clearly done with

10:50:50 25    the intention of trying to create another reason for Marco's

1    to be able to default KAM.

2         Now, look, the fact that -- first of all, we haven't

3    had any opportunity to review anything involving the

4    evidence regarding these inspections.  You know, there are

10:51:15  5    hundreds of pictures, if I understand correctly, or at least

6    dozens that we haven't been able to look at and discuss with

7    our client.

8         But the issues before the Court have to do with the

9    Charlotte NOD and the Columbia NOD, and these types of

10:51:34 10    operations deficiencies were never part of those notices of

11    default.

12         So I just think that it's completely irrelevant, it's

13    prejudicial, it's inflammatory --

14              THE COURT:  Okay.  Hold on.  Hold on for a

10:51:51 15    second.  I understand your position, I do, I believe.  Let

16    me ask this:  Clearly the defense thinks that their actions

17    were appropriate within the context and the evidence that

18    they received in their inspection.  If you want to resolve

19    that issue, I guess my question is this:  Is your position

10:52:15 20    that none of that evidence, argument has anything to do with

21    what's before the Court today?  I understand that you're

22    claiming to some extent surprise in terms of the timing and

23    so forth.  And I guess I just want to know in what posture

24    is it that you're suggesting -- are you just suggesting that

10:52:35 25    I should hear or see that evidence now in argument and

1    determine whether or not it has any bearing on the

2    determination immediately before the Court with regard to

3    the preliminary injunction request?

4              MR. DAVIS:  I think that, Your Honor, we

10:52:51   5    should, yes, that it's -- our main argument is that it's

6    irrelevant.

7         Now, Marco's may issue another default, a notice of

8    default based on these alleged deficiencies, and then that's

9    a separate issue, because there would still be a 30-day cure

10:53:13  10    period, et cetera, et cetera.  The reason they denied the

11    renewal of the Columbia Agreement was limited to those three

12    things, and that and the Charlotte NOD is what we're here in

13    front of the Court today.  These other arguments is just

14    completely extraneous, and it's just simply meant to

10:53:33  15    disparage the Hunters.

16              THE COURT:  Well, I think, Mr. Blum, despite

17    my original intention or plan to wait with regard to this,

18    I'm not sure about the wisdom of that in light of

19    plaintiff's position, which is not a ruling or determination

10:53:47  20    on the validity of your evidence and argument, but it might

21    affect the sequencing or order in which we wish to do this.

22         Mr. Blum, with regard -- look, nobody wants to hear

23    this, but with regard to timeliness and an opportunity to

24    view these, I can reconvene this hearing on Monday, which

10:54:07  25    may be the last thing anyone wants, by the way.  But

1    nevertheless, I can make time on Monday to reconvene, which

2    is prior to the expiration of the TRO, if that's helpful.

3    That may cure in the short run any objection by plaintiff

4    that they haven't had sufficient opportunity to review the

10:54:24  5    evidence and discuss it with their clients.

6        It does not resolve the issue of whether or not that

7    evidence is somehow material or relevant to my determination

8    moving forward, and the plaintiff is advancing both

9    arguments in essence; that, Judge, we haven't had an

10:54:41 10    opportunity to analyze this evidence, if you are going to

11    let it in or consider it.  And the problem is if I'm trying

12    to make a relevance determination, we can make arguments in

13    the abstract about whether or not such evidence should be

14    considered.  Or defendant might push, understandably to say,

10:54:57 15    "No, we think we should look at it and allow us to argue why

16    we think it's relevant to your determination, Judge."  Right

17    now, I don't know a lot about that in terms of what's been

18    presented or what's being argued moving forward.

19        So, Mr. Klein, I don't mean to cut you out of this

10:55:16 20    conversation.  I went back to Mr. Davis, frankly, because we

21    were going back to witness testimony on direct, and he was

22    going to handle that direct.

23        So I don't know if you folks have a position.  Perhaps

24    you would like to confer for a moment about how to proceed

10:55:32 25    forward.

1          My concern is if Mr. Blum intends to try, and I'd let

2     him, to some extent, review any exhibits or evidence which

3     he has disclosed recently, you are going to cry foul, not

4     just because of the lack of relevance or materiality of that

10:55:55 5     evidence to these issues or the issue before me, but because

6     you're also going to say, "Judge, our clients haven't had an

7     opportunity to review this information carefully, neither

8     have we, or to further investigate or advise them along

9     those lines."

10:56:07 10          I mean, I'm not sure where that puts you moving

11     forward.  If I make a determination that I'll allow inquiry

12     with regard to some of that evidence, you may have a

13     legitimate argument about the timeliness of disclosure of

14     that evidence, which if Mr. Blum asked me to do so, I could

10:56:26 15     allow you an opportunity to review that evidence.

16          What that means is the people that want to be on this

17     call or need to be on this call would need to make

18     themselves available on Monday if I did that.  But I want to

19     make sure, particularly given recent developments in the

10:56:43 20     last 24 to 48 hours, I want to make sure that I have a good

21     idea about what happened here and about what the arguments

22     are for and against admission of that or use of that

23     evidence.

24          Mr. Davis, Mr. Klein, would you care to discuss this?

10:56:58 25     Maybe we should take a short recess.  And I would ask the

1    defense to discuss the issue and presentation and timing,

2    and I would ask the plaintiff to discuss it as well moving

3    forward.

4         How would you prefer to do this?  We can break you out

10:57:14  5    in separate meeting rooms without anyone else, any other

6    participants.  So, for example, I could break you out so

7    that it would be Mr. Davis, Mr. Klein, and Andy and Mike

8    Hunter so that you could talk in a meeting room separately.

9    I could do the same thing on the defense side, or you can

10:57:32 10   stop your video, mute your microphones, and you can talk by

11   telephone or whatever means you wish.  But I would propose

12   that we take a brief break just for you to discuss

13   strategically how it is you feel I should proceed today, or

14   whether or not I ought to consider reconvening on Monday.  I

10:57:52 15   will make time.  I can't speak for anybody else's schedule

16   on this call, of course, but I will make time.  So I'm going

17   to suggest that we take maybe just a 10-minute break, folks,

18   for you to discuss that, or it can be 15 minutes.  Mr.

19   Davis, is that desirable, the break part?  Is that desirable

10:58:10 20   or no?

21              MR. DAVIS:  Yeah.  I don't think we

22   necessarily need 15 minutes, Your Honor.  I think five would

23   be sufficient, and I think the breakout room would work

24   fine, and I would ask that you include Mr. Silverman as

10:58:21 25   well.

```
 1              THE COURT:  All right.  Fair enough.  And I

 2    didn't mean to ignore Mr. Silverman.  Sorry about that,

 3    Pete.  So why don't we do this, because logistically this

 4    might take a little bit longer than you think, why don't we

 5    try and reconvene at 11:10 a.m. Eastern.  It's now about

 6    10:57 a.m. Eastern.  Let's try to reconvene at 11:10 a.m.

 7    Eastern.  And I'll ask Ms. Schroeder at this point -- you

 8    will receive an invite on your screen or through your

 9    software that will ask if you want to join a breakout

10    session.  And if we could get Mr. Davis, Mr. Klein, Mr.

11    Silverman, and Andy and Mike Hunter as well broken out into

12    a subgroup, that would be fine.

13         On the defense side, Mr. Blum -- Ms. Schroeder, can we

14    do more than one breakout room at the same time?  I don't

15    even know the answer to that question.  We may be able to.

16              COURTROOM DEPUTY:  Judge, I should be able to

17    and I will start with plaintiff's side and then get them

18    into a room.

19              MR. WATSON:  We can just do it by phone.  I'll

20    just call Barry.

21              MR. BLUM:  If Ms. Schroeder could do that,

22    that would be good, Your Honor.

23              THE COURT:  All right.  Patience, everyone.

24    And then you will need to signal to her when you are

25    concluded with your breakout session and wish to join this
```

1       main session again.  I will mute my microphone and

2       deactivate my camera at this time, ad so we'll stand

3       adjourned and off the record at this time.  Thank you all

4       for your patience.

10:59:46   5                       -  -  -

6                     (Recess was taken at 10:59 a.m.)

7                       -  -  -

8                     (Cour reconvened at 11:11 a.m.)

9                       -  -  -

11:11:08  10            THE COURT:  Okay.  I'm back.  I see that all

11      of you are.  And I've heard that you've resembled, having

12      had sufficient time to discuss simply status and next steps

13      in terms of moving forward.  I heard Stacey weigh in with

14      the mute reminder moving forward.

11:11:24  15          So let me ask first of plaintiffs, if I might.  And

16      Mr. Klein, I see that you are muted.  So, Mr. Davis, did you

17      have an opportunity to confer?  And how would you suggest we

18      proceed moving forward today, if at all?

19                  MR. DAVIS:  Yes, Your Honor.  We have, and

11:11:39  20      thank you for that opportunity.  Plaintiff is proposing the

21      following:  That defendant makes a proffer of how this

22      evidence of the store inspections in the last 48 hours are

23      relevant to the Columbia NOD and the Charlotte NOD, notice

24      of default, and the Court rules on the issue; and then

11:12:12  25      plaintiff is ready to proceed either way the Court rules.

1    And we would just reserve the right that, if necessary, that

2    we are allowed to present some rebuttal exhibits to the

3    Court, if we deem it necessary.

4             THE COURT:  And what would your timing be on

11:12:30 5    that, Mr. Davis, just so I'm clear?  When you indicate --

6    well, here's my concern:  Is plaintiff going to withdraw any

7    objection to the lack of timeliness of submission of the

8    exhibits?  Because my anticipation was that there might be

9    the suggestion by the defense that, you know, "Judge, can we

11:12:57 10   have a brief adjournment, whether it's today or until

11   Monday, whatever it is, with regard to an opportunity to

12   review those exhibits and review those exhibits with Andy

13   and Mike Hunter moving forward."  I guess I just want a

14   little clarification on how you would see this flowcharted

11:13:15 15   in light of what you just told me.

16             MR. DAVIS:  Thank you, Your Honor.  No, we're

17   prepared to deal with it as best we can at the moment.

18   There may be a few documents, such as state health

19   inspection reports, that I think we could get to the Court

11:13:31 20   very quickly, you know, within an hour or two of the hearing

21   being concluded.

22             THE COURT:  Okay.  Mr. Blum, might I hear from

23   you?  You were unmuted, sir.  Now you are muted.  Mr. Blum,

24   you are muted, I'm afraid.  Mr. Blum, can you hear me?

11:13:57 25   That's okay.

1                    MR. BLUM:  Okay.  Sorry.

2                    THE COURT:  You were already unmuted.  Go

3       ahead.  That's fine.  But start over again, please.

4                    MR. BLUM:  Right.  Your Honor, our review is

11:14:06  5       this:  We appreciate the chance to make a proffer to explain

6       to the Court the true facts here, but, you know, the issues

7       are not as limited as Mr. Davis suggested.

8            Here's the reality, Your Honor, and how this is

9       relevant, and I guess our view is this:  It's up to the

11:14:29 10      Court and I guess the defense if they think they need more

11      time to review these specific pictures, you know, all this

12      late notice.  Your Honor, most of these exhibits did not

13      exist until late yesterday, all right, and they came in all

14      kind of forms.

11:14:43 15           But the notion, and which was said about seven times

16      about notice and ambush, and I think there was a word about

17      maybe an attack or something like that.  Here's the reality,

18      our exhibits that they do have, show this:  On July 24,

19      Marco's said --

11:15:05 20                   THE COURT:  Mr. Blum, let me interrupt.  Let

21      me interrupt because I'm still trying to address the

22      fundamental question, which is how will we proceed

23      procedurally here today before we get into the substance of

24      argument about relevancy or materiality with regard to the

11:15:19 25      evidence you've identified.  What's your thinking there,

1    sir?

2              MR. BLUM:  I think the best use today is to go

3    forward to the extent we can.  We can hear from the Hunters,

4    we can hear from Mr. Libardi, and we can hear from any other

11:15:32  5    witnesses, as far as we get, because that will give the

6    Court the framework of this and the context and when you see

7    all of our various exhibits, okay, to show -- to put this in

8    relevance.  If the Court says, "I don't want to look or see

9    these pictures," or "They should get time to look at them,"

11:15:50 10    at that point Your Honor could make it.  I don't think we

11    should lose the time today.

12         But the context of this is critical because while they

13    are saying we went in front of the hearing, and Your Honor

14    suggested that, you know, no matter -- the reality of it is,

11:16:05 15    Your Honor, yesterday was a deadline that was set for these

16    inspections on August 31; so this hearing kind of came in

17    afterward, all right.  We said on August 31, you have until

18    30 days, until October 1, to fix up all these problems, and

19    we're going to come in and look at them and make sure --

11:16:23 20              THE COURT:  So, Mr. Blum, I'm sorry to

21    interrupt again.  But procedurally for today, I gather what

22    you're suggesting then is that plaintiff proceed forward

23    with calling one or both witnesses, if they choose, and that

24    I will then, what, confront the issue of the appropriateness

11:16:38 25    of the use of the exhibits prior to your -- or during your

1    cross-examination?  I just want to make sure I understand

2    what it is you're proposing exactly.

3              MR. BLUM:  Right, right.  Well, perhaps during

4    my cross-examination of either of the Hunters may have

11:16:53  5    partly to do with these issues, and at that point,

6    Your Honor can either say, "Look, I want to hear it," or "I

7    want to think about it," and I will move on to something

8    else.  But at least we'll build that record today, so if we

9    come back Monday, it is a very small issue.

11:17:06  10              THE COURT:  Okay.  All right.

11              MR. BLUM:  And Mr. Libardi will also lay a lot

12    of context for this.  Whether the Court looks at the

13    pictures or not, so be it, and, you know, because there's so

14    much context here, Your Honor, because --

11:17:20  15              THE COURT:  All right.  But, Mr. Blum, I think

16    it is a little -- the reason I'm trying to nail you down on

17    this is because it seems to be a bit at odds at what

18    plaintiff is proposing, which seems to be, "Judge, if they

19    want to use these items, that the Court ought to deal with

11:17:34  20    them now so that we know what they are and what's coming in

21    and for what purpose," because they are obviously not in

22    agreement that they ought to be considered by me for the

23    determination that's before me now, which is their

24    preliminary injunction request.

11:17:48  25         Mr. Davis.

1          MR. DAVIS:  Yes, Your Honor.  That's right.

2     It is just simply we would like a proffer on the relevance

3     of these -- the evidence regarding these inspections in the

4     last few days, and how they directly relate to the notices

11:18:05  5     of default, which were the alleged reasons for defendant's

6     refusal to tender a renewal of the Columbia Agreement, and

7     then the notice of default that was issued for Charlotte two

8     days after the TRO was entered, that's what's in front of

9     the Court today.

11:18:29  10          These other issues of the store deficiencies, I

11     don't -- I can't see how they are related to what's in front

12     of the Court today, which is why I think a proffer would be

13     necessary.  And Mr. Blum may totally convince me, and I may

14     go, "We withdraw any objection."  But without any kind of

11:18:51  15     explanation on how they are related to those defaults, and,

16     frankly, how they are not trying to manufacture additional

17     defaults after the fact, but that's neither here nor there

18     as to the relevance of the evidence to the issue today.

19          MR. BLUM:  Your Honor, may I?  Maybe I could

11:19:11  20     clear this up.

21          THE COURT:  Sure.  Go ahead, Mr. Blum.

22          MR. BLUM:  We disagree that our -- that the

23     issues here are these narrowly kinds of things, because they

24     are asking, as Your Honor knows, for extraordinary relief of

11:19:23  25     an injunction based on an alleged breach of contract, okay,

1   not typical relief, but extraordinary relief.  We've all

2   briefed all of those issues.  Okay.

3       Part of the consideration has to be can Your Honor

4   force us to live for another five years in Columbia and for

11:19:42  5   another year in Charlotte with an area representative that

6   we have lost all faith and confidence in, and that we

7   believe -- we believe -- has falsified documents and has

8   lied to us about the state of their -- okay.  I don't want

9   to -- but that is our belief, and that is important in all

11:20:00  10   the cases as to whether Your Honor can force us to live with

11   that.

12       Here's another thing:  On July 24th, when Marco's

13   Franchising gave notice to the Hunters as franchisees of all

14   these problems, they sent a notice of deficiency to KAM

11:20:17  15   saying "You are not doing your job with OSEs and doing --

16   and following up, et cetera."  It's a deficiency process,

17   and that's a little bit of a process.  And then there was a

18   follow up that says, "It's still not fixed and you have

19   30 days until October 1st" -- to the franchisees -- "to fix

11:20:37  20   this" and now we've gone in.

21       As part of that process, Your Honor, we have

22   uncovered -- and Mr. Libardi will testify to this, he can

23   testify to this -- shocking things that this representative

24   of ours is falsifying documents, has gave a store a 94,

11:20:55  25   Your Honor, that is in horrendous shape.  It was 59, 59, 59,

1    and then when they needed it, all of a sudden it was 94.

2        And, in fact, you know, the evidence will show the

3    score on a real basis was nine percent, perhaps the lowest

4    in the history of OSEs.  And Mr. Libardi will talk to you

11:21:21 5    about how this impacts the relationship between a

6    representative.  We all -- again, it's coupled with you

7    already know that they've gone off and, you know, found a

8    new, you know, soulmate.  But beyond that, they are not --

9    we can't have them represent our brand.  If they are

11:21:43 10    representing our brand in the way that Mr. Libardi now knows

11    they are, it's outrageous.

12        And then here's the last part of the injunctive

13    relief:  Because of these situations, it will show the Court

14    why it's inappropriate to grant injunctive relief, because

11:21:59 15    you are going to be looking at mold, and bad pizza dough,

16    and broken gaskets, I think, and dead insects, and broken

17    toilet seats for every week for the next week because Mr.

18    Libardi is not going to allow the brand to be run like this.

19    So that's why you can't get involved.  If we're wrong, sue

11:22:23 20    our brains out, get money damages.  They have two businesses

21    that have 10 years of operating history, so that's why it's

22    relevant.

23        This goes to the Court's ability to force us to live

24    with people that, Your Honor, the evidence will show, you

11:22:40 25    know, it turns your stomach to think of some kids in

1    Charlotte.  By the way, the investigations were -- and they

2    were all in the Charlotte market, all right, and they were

3    put on notice of deficiency in July in that.

4         So, again, it's so relevant because the injunctive

11:23:00  5    relief that Your Honor is being asked to -- is telling

6    Marco's to give this faithless representative the right to

7    run its brand when Mr. Libardi has now looked at it and is

8    aghast and will explain to you how they have falsified

9    documents, doing reports at two different stores eight

11:23:23 10    minutes apart despite that it's a 20-minute drive between

11    them, but both of them got 94 and 95.  So that's the kind of

12    stuff that Mr. Libardi says, "I can't have a

13    representative -- I couldn't -- if this was my employee,

14    they would have been fired yesterday."

11:23:38 15         And, Your Honor, the stuff about ambush is absurd.

16    The testimony will be that the -- some of the employees were

17    so thankful that someone was there listening to them,

18    finally.

19              THE COURT:  All right.  Let me say this,

11:23:54 20    because, again, what I'm really trying to do is structure

21    what makes sense moving forward in terms of orderly

22    presentation of evidence and argument.

23         Mr. Davis, I think I'm persuaded that it would make

24    sense to address these issues with regard to the propriety

11:24:11 25    of the proposed exhibits and line of inquiry at the outset

1    that the defense proposes in this case.  I think you are

2    right about that.  That seems to be what makes sense;

3    otherwise, it affects the structure, perhaps, of your direct

4    examination moving forward with regard to the exhibits, and

11:24:30 5    it certainly affects Mr. Blum's strategy with regard to

6    cross-examination in the case as well.  So it seems to me it

7    would make sense for me to address this issue at the outset

8    as I believe you were proposing.

9        If we're comfortable proceeding in that fashion, I

11:24:47 10   think that's what we ought to do, at which point I would

11   give Mr. Blum and his team the floor to say, okay, what is

12   it that you propose to introduce, and how is it that it

13   bears on my decision-making short run here, and obviously

14   I'm going to hear from both sides moving forward with regard

11:25:06 15   to that issue.

16       But it's not going away.  At some point, I have to

17   rule on this because the defense is insistent, as is the

18   plaintiff, that it is not part of what I ought to consider

19   for determination here.  And so I think I need to make that

11:25:23 20   determination at the outset.

21       So, Mr. Davis, is that acceptable as a way to proceed?

22            MR. DAVIS:  Absolutely, Your Honor.  Thank

23   you.

24            THE COURT:  All right.  Mr. Blum, I want to

11:25:35 25   give you the floor then.  I don't know that I'd characterize

1    this as a proffer exactly, but, yes, in the sense that what

2    is it that you propose to introduce that is new to the case,

3    and by "new" I mean not part of the original filings in the

4    case moving forward.  What does that look like in terms of

11:25:55  5    exhibits?  And it may not be your fort, but perhaps Aaron

6    can help us here, I don't know, but is it possible then --

7    we can give you the capability of sharing the screen so that

8    we can all be looking at the same exhibit at the same time.

9    So that's how I suggest we proceed.

11:26:15 10        I would ask the plaintiffs to hold their fire at this

11    point and pay attention and take notes, and at some point,

12    we'll have some back and forth with regard to counsel on

13    what we're seeing.

14        So what is it that you propose you are going to ask

11:26:34 15    about by way of report or photographs or other evidence?

16    And let's see it, let's have it identified.  And whether --

17    I'm comfortable with counsel proffer at this point without

18    proper foundation that would ordinarily take place through a

19    witness.  In other words, if we're talking about issues of

11:26:55 20    timing, authenticity and so forth, I don't particularly want

21    to go there now.  I don't think we need to at this point.  I

22    think that the overarching disagreement here is whether or

23    not it's appropriate for me to consider these based upon the

24    issue or issues before me now.

11:27:13 25        Okay.  So, yes, is it -- I'm sorry.  Is it Mr. Blynn?

1    I always seem to mispronounce everyone's last name.

2          MR. BLUM:  He was trying to get me I think.

3    Okay.  Again, this is Mr. Blum, again, for the court

4    reporter.

11:27:29 5    I do want to add one point to my prior discourse, and

6    then I will have maybe a proposal.

7          We believe that also the -- this evidence also goes to

8    the public interest factor of injunctive relief because if

9    Your Honor were to grant an injunction, you would be

11:27:52 10    declaring that a Marco's Pizza location in the Charlotte

11    market operated in a way that this one is operated, and is

12    fine, and you can subject the people of Charlotte to that

13    health and safety risk.

14          Here's my proposal -- it's hard for me to go through

11:28:12 15    them.  There are a lot of pictures.  Mr. Libardi -- I would

16    proffer Mr. Libardi who is a, you know, 35-year restaurant

17    veteran, to talk through the specific photos and explain the

18    problems that we found.

19          Here is the issue, Your Honor, and why it reflects the

11:28:32 20    overall relevance, and then Mr. Libardi can talk about why

21    it's so important.  Again, we gave them notice in the July

22    at the restaurant at the franchisee level, okay.  It was

23    just only outright.  The AR has no involvement in that,

24    although we also sent them a notice of deficiency saying

11:28:49 25    "You are not doing your OSEs," which are Operations Systems

1    Evaluations, all right, you know, where they are supposed to

2    go in and make sure everything is going well.  "You are not

3    doing them right because"; for example, we put on -- we saw

4    that there were repeated violations that even KAM's own

11:29:09  5    people were identifying and not being fixed.  We get those

6    reports.  So we put them on a notice and we put KAM on a

7    notice of deficiency.  But that's a process, a notice of

8    deficiency, we put the franchisee out.

9         And then on August 31, we said, "Mr. Franchisees, you

11:29:26  10    are still not fixing these.  You've got 30 days, which is

11    October 1st."  And it is our obligation as franchisor, not

12    KAM's, our obligation at that point to go in and determine

13    whether it was done because we're the only ones that can

14    terminate a franchise agreement because we're the only party

11:29:44  15    to it.

16         Now, as part of that process, we kind of did some due

17    diligence and found astonishing things that a restaurant --

18    which, Your Honor, these pictures will show is very

19    challenged, let's say that -- got a 94 percent.  And

11:30:02  20    three days ago, Andy Hunter sent an email saying "This place

21    is great.  It's in great shape.  Don't worry about it.  It

22    doesn't have any problems, no deficiencies."

23         Your Honor, what Mr. Libardi is going to tell you is:

24    "I cannot abide by having these people be my representative

11:30:21  25    if this is what my brand looks like in Charlotte."

1                    THE COURT:  Okay.  Mr. Blum, let me --

2                    MR. BLUM:  Wait.  Hold on.  Another thing,

3      Your Honor.  Mr. Davis' argument is the "Animal House"

4      defense:  "Hey, you messed up.  You trusted us."  We did

11:30:34  5      trust them for a long time, but even their --

6                    THE COURT:  Mr. Blum, Mr. Blum, you've made a

7      suggestion with regard to how we might proceed involving Mr.

8      Libardi.  Let me hear from Mr. Davis at this point with

9      regard to a response, because what I had suggested is that

11:30:52 10      counsel proffer the evidence, along with any argument in

11      support.  It doesn't mean I'm opposed to Mr. Libardi

12      testifying, but I am a little bit concerned about scope at

13      this point.

14          Mr. Davis.

11:31:05 15                    MR. DAVIS:  Your Honor, I think it's very

16      simple.  I mean -- and as much as Mr. Blum has been talking,

17      I haven't heard him say how these investigations -- whatever

18      they want to call them -- yesterday, the day before, are

19      related to the issues before the Court.

11:31:25 20          Now, I did hear him say that these deficiencies date

21      back to July.  Well, that predates both of the NODs.  So if

22      they were very concerned about this back then, they still

23      didn't use it as a reason to default KAM under either

24      agreement, and I still -- I don't think we need to look at

11:31:52 25      anything.  I don't think we need to hear from any witnesses.

1    I just think we need to pass the threshold:  How is this

2    relevant to the motion before the Court?

3         And the only thing I do want to address factually, if

4    he's saying -- if their response yesterday when we suggested

11:32:13  5    that they were violating the TRO because of these stores'

6    operations, their response was the owners of the stores are

7    not parties to the litigation, and therefore, aren't covered

8    by the TRO.

9         So now I'm hearing, though, that this store level

11:32:35 10    stuff should count toward the public interest argument on

11    KAM because they are their stores.  So they can't have it

12    both ways.  So either these stores are covered by KAM and

13    under the TRO, or they are unrelated; and then they don't

14    have to worry about violating the TRO, and they should be

11:32:56 15    considered as part of the public interest.

16              THE COURT:  Okay.  Mr. Blum.

17              MR. BLUM:  Your Honor, yeah, this is very,

18    very important.  I think you are trying to -- Mr. Klein --

19    or Mr. Davis just said, "Oh, these go all the way back to

11:33:11 20    July.  If they were very, very concerned, they should have

21    acted."

22         We were very, very concerned.  We sent a notice of

23    deficiency to the franchisees, who are the Hunters, and we

24    also sent one to KAM saying "You guys don't seem to be doing

11:33:23 25    your job," as I said, the "Animal House" defense.  The

1  reason it wasn't in the default: Because on August 25th,

2  the KAM people went in, and they list a store that was

3  previously a 59, became magically a 94, and the other one

4  became a 95. Okay. So KAM falsified documents and said,

11:33:49  5  "Everything is fine."

6  However, when we kind of dissect it a little bit more,

7  we said, "There are some things that aren't fixed here."

8  And we said on August 31, "You still have some other issues.

9  We're going to come in. By October 1st, they need to be

11:34:02  10  fixed," because now it's in our hands because it's above

11  KAM's level.

12  And in that due diligence of getting ready for that

13  role that we owe our franchisees and our entire system --

14  one food born illness at Marco's shuts down the business,

11:34:19  15  okay. We went in and we found that -- you know -- we saw

16  that these August 25 documents were dummied up. Impossible

17  to do, eight minutes apart for restaurants that are

18  20 minutes apart. And also that if -- they got a 94,

19  Your Honor. When you see these pictures, Mr. Libardi said a

11:34:40  20  94, the person who went out -- and here's what happened:

21  Wednesday night, someone went to one restaurant and

22  yesterday that same person, a very experienced, skilled

23  operation's person went to two more, and they were horrible,

24  and it's what the testimony is going to show and Mr. Libardi

11:34:59  25  is going to say, which further shows that KAM has been

1   falsifying records and has been essentially, in Marco's

2   view, lying to protect their interest.

3        How can you say -- they want you to force us to live

4   five more years with these guys and not to terminate things.

11:35:19  5   The reason they are not in the default letter is because

6   they lied in their August 25 -- I'm sorry.  Mr. Libardi can

7   walk you through it.  Your Honor, we can be here for hours

8   because his knowledge is almost infinite and the problems

9   here are astronomical.

11:35:37 10       So to say that -- again, and you've got to go back to

11   the public interest.  Your Honor is going to be entering an

12   order saying:  "This is what the people of Charlotte, North

13   Carolina, have to put up with."  And when you see it, I

14   think it will give you pause.

11:35:51 15                  THE COURT:  Mr. Davis.

16                  MR. DAVIS:  Again, Your Honor, I thought we

17   were still discussing the issue of how we were going to

18   proceed with this.  But what I have not heard from Mr. Blum

19   is any explanation on how it's relevant to the issue before

11:36:08 20   the Court, except for now this idea that it goes to the

21   public interest.

22        But, again, I didn't hear him address as saying, well,

23   what goes to the public interest, what entities are these.

24   And, you know, it's a semantics game that, "Well, we're fine

11:36:27 25   because they weren't included in the TRO, but now we want to

1    use this evidence and slam KAM."

2         And, you know, I'm trying not to get into arguing

3    about the evidence itself because, just so it's clear, KAM

4    vehemently denies the picture that's being painted, because

11:36:47 5    all three of these stores received passing grades from the

6    state department of health very shortly before the last two

7    dates.

8         But that aside, I thought we were still discussing how

9    we were going to proceed.  So is Mr. Blum objecting to

11:37:02 10   making a proffer?  Or was that his proffer?  Because if it

11   was his proffer, I didn't hear how this evidence is relevant

12   to the motion at hand.

13                  MR. BLUM:  Your Honor, we can --

14                  THE COURT:  Mr. Blum.

11:37:15 15                  MR. BLUM:  -- make a proffer, and I'm

16   proposing that we do it through Mr. Libardi instead of me

17   trying to explain to you the intricacies of restaurant

18   operations, and food safety, and dangerous chemicals --

19   unapproved dangerous chemicals, and that's kind of the

11:37:34 20   approach.  This cannot not be heard.

21        This was, you know -- they are on -- hold on one

22   second.  This was in -- as I said, this issue of not

23   following up on action plans and fixing identified problems

24   was specifically communicated to KAM in July on a deficiency

11:37:53 25   notice.  And then they kind of in August said, "Oh, yeah.

1    It's all perfect now."  The store went from 59, miraculously

2    to 94, and we still noticed some deficiencies even taking

3    KAM at its word.  But then when we looked behind that word,

4    they have -- basically Mr. Libardi has said, "The only

11:38:17  5    conclusion is that KAM has affirmatively lied to us," and

6    this is the perspective.  This is important as to whether

7    you can grant injunctive relief.  It is a false statement to

8    say it's either covered by the TRO or not.  Our ability --

9    Marco's ability to enforce standards in a restaurant has

11:38:37  10    nothing to do with this case if those franchisees don't

11    listen.  However, if in that process we find that KAM has

12    been falsifying records and not representing us as we need

13    to be represented, we're allowed to bring that up in this

14    case.  I don't think Your Honor's TRO stands for the

11:38:58  15    proposition that if a Marco's person goes in and finds

16    health hazards in a restaurant with its own franchisee, it

17    has to say, "Hey, hands off.  Judge Helmick said feed the

18    kids the bad pizza."  And we know you didn't do that,

19    Your Honor.  This is our brand.

11:39:16  20                    THE COURT:  Mr. Davis.

21                    MR. DAVIS:  Your Honor, I can respond to this

22    very simply.

23                    MR. BLUM:  (Indiscernible.)

24                    THE COURT:  Stop, stop, everybody.  Let's just

11:39:21  25    make sure one at a time, please.  I thought, Mr. Blum, that

53

1    you were finished, so I introduced Mr. Davis.

2              MR. BLUM:  That's all right.

3              THE COURT:  Mr. Davis.

4              MR. DAVIS:  Yes, Your Honor.  Simply put, the

11:39:32  5    public interest argument doesn't hold water because of this:

6    If the Court were to not grant an injunction, those stores

7    would still be in existence because they have a franchise

8    agreement with Marco's, and it would be an entirely separate

9    issue to shut those stores down completely in order to

11:39:55  10   terminate those franchise agreements.

11         If the Court were to enter an injunction, again, if

12   Marco's wants to pursue these individual franchises, they

13   are free to do that, we are not saying they are not.  What

14   we're just saying is, is that exactly, this is a straw man

11:40:10  15   argument, and they keep wanting to bring up the details and

16   trying to use these words, "disgusting," blah, blah, blah.

17   We're trying to not get into the weeds on that right now,

18   Your Honor.  It's just, simply put, there is no relevance,

19   because their public policy argument, which is the only

11:40:26  20   thing they put forward on how it's relevant, fails because

21   the decision of the Court of preliminary injunction will

22   have no impact on whether those stores remain open or not.

23              MR. BLUM:  Your Honor, one last point, please.

24              THE COURT:  Sure.

11:40:40  25              MR. BLUM:  Is that Mr. Davis just said, "Look,

1    if you grant an injunction, there's no difference.  These

2    stores will still be open."  They will be, but they will be

3    under different supervision.  And he said, "Marco's can come

4    in and enforce anything it wants."  That's very interesting,

11:40:55  5    because last night Mr. Klein sent me a letter saying if the

6    Marco's person shows up, we're calling the police.  I'll

7    will send you that email, Your Honor.  So they're calling

8    the police when Marco's comes in.  But now he says, "Oh, no.

9    Marco's is welcome to come in, just grant us an injunction."

11:41:15 10        This is the reality.  This is the reality, Your Honor.

11    You know, Mr. Klein last night said if Ms. Laura, who is the

12    person that inspected -- "We're going to call the police and

13    have her arrested, and she's not welcome in any of our

14    stores."  And so now Mr. Davis is telling me, "Oh, geez.

11:41:31 15    Everything is hunky-dory."  And that's what Mr. Libardi is

16    going to talk about, that it's unworkable.

17              MR. DAVIS:  Your Honor, he's

18    mischaracterizing --

19              THE COURT:  Mr. Davis.

11:41:40 20              MR. DAVIS:  -- what I said, simply, when I

21    said, "Marco's can go in and inspect."  And if we feel there

22    is a contractual problem with it or -- you know, we can deal

23    with that whether it be before Your Honor or in some other

24    method.  That's what I was saying, not that we don't have --

11:41:59 25              THE COURT:  Mr. Davis, let me just ask.  So

1    are you taking issue with the appropriateness of Mr.

2    Libardi, Mr. Libardi testifying or being used to explain

3    these documents?  Are you concerned that this drifts into

4    some type of opinion testimony?  Or to the extent -- because

11:42:19  5    what I had anticipated was:  "Here's the exhibit that we

6    propose, here's what it represents, and here's why it's

7    relevant to the Court's determination now and appropriate

8    for the Court's determination now."  And that's what I have

9    anticipated, and I had invited that through counsel.  Mr.

11:42:39 10    Blum is indicating that he would like to introduce that

11    evidence or explain that evidence really, frankly, for the

12    purposes of this proffer, to me through Mr. Libardi.  Are

13    you objecting to that?

14              MR. DAVIS:  I am, Your Honor, and this is

11:42:54 15    why -- maybe not so much objecting by just putting this way:

16    If the Court is going to allow Marco's to go on the record

17    and even in the idea of presenting this evidence and then

18    going through and getting to make all the testimonial

19    accusations and use the kind of language that Mr. Blum has

11:43:23 20    been using, then that is the same as just putting it on the

21    record, and testimony, and us objecting to its relevance and

22    the Court ruling on it later.

23        I thought that it would save time and resources if we

24    dealt with the issue as a whole, without getting into the

11:43:40 25    specifics, is this evidence of the last two days relevant to

1       the notices of default that Marco's was relying on and that

2       this motion is about.

3            And, again, I'm even suggesting that at this point,

4       they haven't issued any notices of default to KAM on these

11:44:03  5   investigations.  And it may very well be they do and then we

6       have to make another challenge, or they can make a motion to

7       set aside the restraints.

8            But at this point, one, the issue is not moot because

9       they haven't actually issued anything to KAM that they are

11:44:24  10  in default because of this.

11           Two, the defaults in question were well established in

12      August.  They've been discussed in September by letter, and

13      then we had to file the motion and the TRO was entered.

14           The question before the Court is whether that TRO

11:44:44  15  should be converted to a preliminary injunction based upon

16      the facts and law that have been presented in the paper.

17           If we spend time hearing about this sideshow, because

18      it's not relevant, then we might as well hear it and we'll

19      put our objections down.  It just seems to me that we're

11:45:02  20  arguing about procedure while arguing about the merits.  So

21      the way, Your Honor, I think makes the most sense -- and

22      just, again, you know, we don't want to take up Your Honor's

23      whole day here -- is either -- they've made their proffer, I

24      think, on how it's relevant.  You know, we've made our

11:45:23  25  position pretty well known why we don't think it's relevant.

1    And if it's going to entail talking about specifics, then if

2    the Court is not inclined to prohibit this evidence

3    altogether based on relevance, then they should just come up

4    in the course and we will renew our objections.

11:45:45    5    THE COURT:  Mr. Blum, seems to be a bit of a

6    change in terms of a suggestion in how to proceed by the

7    plaintiff.

8    MR. BLUM:  Yes, Your Honor.  I'm not sure

9    exactly kind of how we are.  But, again, if we haven't made

11:46:02    10    our proffer, I've tried.  But my proffer is you need to hear

11    from one of the parties that they are asking you to grant an

12    extraordinary injunction against, forcing them to deal with

13    KAM.  And to say that this is a sideshow kind of speaks

14    volumes, Your Honor.

11:46:28    15    From Marco's point of view and everything we've said

16    in our papers, this is the only thing that this case is

17    about:  Our brand, how it's presented, and are you going to

18    force us to have an agent, a representative, someone who

19    does what we have to do, replaces our employees who is going

11:46:50    20    to allow our brand to be presented in the way that Mr.

21    Libardi saw it yesterday.  And for them to say you can't

22    hear that is just outrageous.  It kind of shows that's how

23    faithless KAM is.

24    THE COURT:  All right.  Well, a couple of

11:47:13    25    things --

1          MR. BLUM:  (Indiscernible) disturbed about

2     what this store looks like, not defending it --

3          THE COURT:  Okay.

4          MR. BLUM:  -- and saying there's nothing

11:47:20  5     wrong.

6          THE COURT:  Okay.  But, Mr. Blum, a couple of

7     things.  First, the equitable relief I've already entered

8     and for which plaintiff is asking me to extend at least

9     during the pendency of this case does not prohibit in any

11:47:37 10     way, as near as I can tell, defendants from filing new

11     notices of default based on information that they've

12     received since the filing of a lawsuit in this case, or

13     things that have come to their attention.

14          Second, nothing about my order now, or should I enter

11:47:56 15     one by way of preliminary injunction, permits the state

16     department of health in North Carolina or the county

17     department of health from shutting down the restaurant.  It

18     in no way endorses or says that it's okay for those

19     restaurants to remain open and continue to operate.

11:48:16 20          The issue or question was:  What is the relationship

21     between the plaintiffs and the defendant, which doesn't --

22     which is not carte blanche to keep restaurants open or

23     operational if they are deficient.  Those matters can be

24     brought to the Court's attention.  If for some reason a

11:48:40 25     preliminary injunction, if it were granted, and I'm not

1    there, Mr. Blum, believe me, but if it were granted in this

2    case, I don't see the cataclysmic public harm that has no

3    remedy by administrative agency or by law otherwise or even

4    by me in revisiting it later.

11:49:01  5         Some of this seems to go to credibility or a

6    credibility determination.  I'm not sure whether that's

7    appropriate for presentation of this evidence here in terms

8    of ought the Hunters to be trusted with regard to what they

9    have done or what they have represented.  That seems to be

11:49:18  10   something that is weaving through here as well.

11         What I don't want to do is get in a position where Mr.

12   Libardi is giving, in essence, expert testimony with regard

13   to what all this means and how it affects Marco's brand

14   specifically when the notice of default and the issues

11:49:37  15   before me are frankly narrower than that.

16         I mean, some of the hyperbole that's been suggested

17   here I think is inappropriate in terms of what my authority

18   is, or whether or not that's the final word or how enduring

19   it is moving forward.

11:49:56  20        I don't think it's necessarily warranted based on what

21   little I have heard.  But I have yet to see anything,

22   specifically, proffered with regard to the horrors that you

23   are alleging exist.  And I'm not suggesting you are not

24   accurately representing; it's just that we haven't got

11:50:20  25   there.  And I saw this more as of a legal argument by way of

1    proffer of evidence and to the issues of why it is relevant

2    and appropriate for my consideration now.  That's how I have

3    viewed this.  And so I didn't want to necessarily, you know,

4    break off into -- into a sub-hearing about what the defense

11:50:42  5    allegations are about how badly this damages their brand.

6          It seems to me that would be more appropriate for a

7    proffer or presentation by the defense after the plaintiff

8    has presented its evidence moving forward.  And if that

9    involves you recalling or calling in your case in chief the

11:51:02  10    Hunters, perhaps, so be it, moving forward.

11          But I wonder if at this point we shouldn't get back to

12    where we were originally with regard to the evidence in the

13    case and I shouldn't hear from them, and you can approach

14    them for cross.  And the scope or the extent to which I let

11:51:26  15    you get into those other matters that we've been discussing

16    now for an hour and half or better, I think, in terms of how

17    we're going to proceed, without me taking a single piece of

18    evidence or testimony so far, I think hence part of my

19    reason for suggesting an adjournment until Monday, if the

11:51:45  20    parties are so inclined.

21          I'm inclined to say let's move forward at this point

22    and let the plaintiff put on their evidence and testimony.

23    I'll deal with your cross in due course.  I may defer your

24    use of that evidence during cross-examination now, but not

11:52:02  25    prohibit you from questioning them later again, if

1        appropriate, with that evidence.  And maybe you call Mr.

2        Libardi then in your case in chief in terms of moving

3        forward, and if you need to circle back, I will consider

4        that.

11:52:20   5              MR. BLUM:  I guess that's fine, Your Honor.

6        Maybe I misunderstood.  I thought we were -- I thought

7        that's kind of what we had proposed.  But then they said,

8        "Let's resolve it up front," and I agree.  That's why you

9        needed the context.  That's fine.  That was my plan, to put

11:52:36  10        Mr. Libardi on.

11              The only other point I want to make here, Your Honor,

12        is I don't think Your Honor said this -- I think Your Honor

13        was sort of, you know, trying to think about how to advance

14        the case, which is good.  But I just want to say, again, the

11:52:49  15        relief you're being asked to grant is not if -- you can't be

16        so limited to what's in this default.

17              The factors are what they are.  And I just want to ask

18        Your Honor, and I know you're keeping an open mind, but

19        there was a suggestion based on what Mr. Davis said and

11:53:06  20        Your Honor kind of said about the department of health.  We

21        can't fall into a trap that the Marco's brand standard says

22        if the department of health doesn't shut you down, you know,

23        you're in compliance, and that's part of the issue here that

24        I think they are trying to suggest.

11:53:21  25              But, again, it's fine.  If we want to proceed, I'll

1   establish my foundation through KAM, through Mr. Hunter, and

2   then, you know, my plan was to put Mr. Libardi on in my

3   case.  And he has a lot of -- he has other things to talk

4   about, and then when we get to that issue, we can get to it.

11:53:41 5   But that's fine.

6            THE COURT:  Mr. Davis, acceptable as a way to

7   proceed at the moment?

8            MR. DAVIS:  I guess so, Your Honor.  I thought

9   I was -- you know what, Your Honor?  We've spent enough time

11:53:59 10   on this.  I don't want to take the time to make argument of

11   counsel on why -- again, what they are suggesting how the

12   Hunters run their business is ridiculous.

13        But that being said, I'm just unclear on whether or

14   not -- so you are allowing this testimony to come in on

11:54:18 15   their case when they present their case?  Or are you

16   reserving?

17            THE COURT:  I think frankly -- well, I'm

18   reserving.  The fact -- look, the question is some of this

19   is just semantics.  Do we want to handle, as an initial

11:54:35 20   matter, the matter of the proffer for a determination of a

21   ruling from the Court before any evidence is presented?  Or

22   do we want to wait so that the proponent of that evidence,

23   the defendant in this case, has an opportunity to say,

24   "Judge, we think this is relevant"?  The plaintiff says,

11:54:51 25   "No, it's not."  And it's, like, okay, make your showing.

1    Give me your best shot as to why you think this evidence

2    ought to come in to the defense after you've presented your

3    evidence, you, the plaintiff, have presented your evidence,

4    and I can make a determination.

11:55:08  5    If not, if I rule adversely to the defense, they've

6    made their proffer as to what that evidence would be that I

7    excluded, they would say, improperly.

8    I mean, I don't think there is anything particularly

9    novel here in terms of what I'm discussing or suggesting.  I

11:55:26  10   think the only issue that this boils down to is:  Do we deal

11   with an evidentiary matter that lies with the defense case

12   in terms of being the proponent of the evidence, do we deal

13   with that by way of proffer and ruling at the outset?  Or do

14   we commence the preliminary injunction hearing with the

11:55:44  15   plaintiff who has the burden, and I reach that issue with

16   regard to the defense in due course, including with that

17   argument?  To me, that's pretty much where we are in terms

18   of what we left.  I'm not going to preclude the defense from

19   making at least a proffer of what they think the evidence

11:56:00  20   would be and why it's appropriate and ought to be admitted.

21   The only question is I think the timing about when I take

22   that proffer and when I render a ruling about use of that

23   evidence.

24   It's not -- I'm not a juror.  And whatever is going to

11:56:17  25   be shown to me, I assure you, I've seen far worse as a judge

1    and in my practice previously as a criminal defense lawyer.

2    I mean, whatever it is I'm going to be shown isn't going to

3    so shock my conscience that it's going to prejudice the

4    plaintiffs.  I can pretty much assure you of that.

11:56:35  5        So I don't -- I'm happy to hear from you, Mr. Davis,

6    but for a while now all I've been trying to determine is

7    what is it that I'm being asked to consider, and when is it

8    appropriate for me to consider it.  That's really all I've

9    been trying to get at for the last 90 minutes or so that

11:56:55 10    we've been discussing this issue, and there still seems to

11    be no accord among the parties, which I had hoped, about how

12    we ought to proceed procedurally.

13            MR. DAVIS:  I understand.

14            THE COURT:  Am I wrong?  I understand that's

11:57:08 15    my characterization, Mr. Davis.  But if I'm wrong, tell me

16    why I'm wrong.  Otherwise, there's a part of me that says,

17    no, let's roll with the plaintiff's evidence and see where

18    we go.

19            MR. DAVIS:  And that's fine, Your Honor.  My

11:57:23 20    confusion --

21            THE COURT:  Okay.

22            MR. DAVIS:  -- was I was presenting it as if

23    the proffer is going to include putting pictures on the

24    screen and having Mr. Libardi talk about the specifics of

11:57:36 25    their allegations in the investigations, then we should just

1    proceed and we'll object to it.

2         But if a proffer would, again, be how is the -- any

3    evidence relating to these investigations that occurred in

4    the last 48 hours or so are relevant to the issue of whether

11:57:59 5    the Columbia Agreement -- because essentially what the

6    preliminary injunction is looking for, number one, in the

7    Columbia Agreement, because as Your Honor knows, it was

8    about to expire of its own terms, and there is a question to

9    the Court on whether or not KAM was in full compliance with

11:58:24 10   the Columbia Agreement, which would have triggered an

11   automatic renewal based on a couple of different terms that

12   are discussed in all the papers.

13        And then we brought the Columbia Agreement into the

14   case -- I'm sorry -- the Charlotte Agreement into the case

11:58:42 15   when, after the TRO was entered, Marco's gave the notice of

16   default for Charlotte.  The Charlotte Agreement has a year

17   or so, give or take, months.  It is less than a year I think

18   at this point.

19        So what we're asking for in the injunctive relief here

11:59:12 20   is that for a declaratory judgment that whether or not KAM

21   was in compliance with the Columbia Agreement, and until

22   that determination is made, that the agreement remain in

23   force.

24        And it would be the same for Charlotte, that if we're

11:59:33 25   still arguing about whether or not plaintiff was in

1    compliance with the Charlotte Agreement based on the

2    Charlotte NOD, that they can't -- that the agreement would

3    remain in force until the Court made its final determination

4    on that.

11:59:55  5        I just don't understand how any of that evidence that

6    they're talking about has any bearing on that relief,

7    because if they issue another notice of default, that's a

8    separate issue.

9        All the preliminary injunctions we are asking for have

12:00:08 10   to do with those issues and just simply that they didn't

11   just shut KAM out of their systems based on those defaults.

12   So that's pretty much as succinctly as I can put it,

13   Your Honor.  And I think that that decision -- that the

14   proffer can be made without getting into the specifics of

12:00:27 15   exactly what they want to talk about, about how that

16   evidence plays on the (indiscernible).

17                (Court Reporter clarification)

18                MR. DAVIS:  How that evidence relates to the

19   relief sought in the preliminary injunction.

12:00:47 20                THE COURT:  And I understand that's -- I guess

21   what I'm asking for here is a little forbearance to say, as

22   is typical in cases, I know the least about this case as

23   anybody on this call.  That is usually by design; right?

24   But I know the least about this.  So when it comes to what

12:01:07 25   that evidence is -- and I understand, Mr. Davis, you're

1    talking about a threshold issue of whether or not it is

2    relevant to the Court's determination here.  And what you

3    don't want is a lot of what you might perceive as

4    mudslinging about your clients and their operation, which I

12:01:23  5    get.  I'm fairly immune to that I guess is the first

6    observation I would make.  And the second observation is I

7    don't know what I don't know in terms of what's there.

8         So to some extent, they get to say or present "This is

9    what we have, and here's why it's relevant, Judge."  And

12:01:49 10    it's not -- I wouldn't be hearing it for purposes of -- I

11    don't think you should fear, Mr. Davis, on behalf of your

12    client, that I'm going to be so shocked that it's going to

13    influence my judgment with regard to the appropriateness of

14    admission of that evidence I guess is what I'm trying to

12:02:07 15    reassure you.

16         But I also think that defendant, regardless of how I

17    rule on the admissibility of the evidence they are

18    suggesting I ought to consider, they have a right to proffer

19    that evidence and proffer argument as well in an attempt to

12:02:22 20    convince me that I should allow it and admit it and consider

21    it.  And even if I decide against them adversely, they have

22    a right to make their record.

23         I guess that's kind of my bottom line in terms of how

24    I deal with evidence, is I don't want to shut them down to

12:02:37 25    the point where they say, "Well, he didn't even look at it,"

1    or "We didn't get to introduce it into the record in a way

2    that the Judge could consider it later or that the court of

3    appeals could consider it later."  So I guess that's kind of

4    where I am.

12:02:50  5    So I guess what I propose is:  In the absence of a

6    break until Monday, and none of the parties have said that

7    they wanted to do that now -- that is, at this point in the

8    proceedings -- maybe we should move forward with regard to

9    presentation of evidence as the plaintiff had anticipated.

12:03:10  10    Mr. Davis.

11    MR. DAVIS:  Your Honor, we're ready to

12    proceed, and we will make our objection, and we're confident

13    that you will --

14    THE COURT:  All right.

12:03:20  15    MR. DAVIS:  -- give relevant information

16    consideration after hearing the information.

17    THE COURT:  Mr. Klein, would you like to be

18    heard any further?

19    MR. KLEIN:  No.

12:03:31  20    THE COURT:  All right.  No, I just wasn't

21    sure.  You unmuted, so that is often my signal from counsel

22    that you want to say something.

23    MR. KLEIN:  I was just going to say let's

24    proceed.  We're ready to go.

12:03:43  25    THE COURT:  All right.  Thank you.

1        So, with that, Mr. Davis, anything by way of

2   introductory statement?  Or would you prefer to just call a

3   witness or witnesses at this time?

4                MR. DAVIS:  Your Honor, you are going to

12:03:55 5   probably be extremely upset with me for saying this, but

6   we've been at this for two hours.  Can we take a short break

7   to take care of biological needs before we start presenting

8   evidence?

9                THE COURT:  I think it's pretty hard to deny

12:04:10 10   that request from any lawyer or participant with regard to

11   any proceeding.  So why don't we -- it's about 12:03.  Why

12   don't we endeavor to get back on and we're ready to go

13   within 10 minutes, so let's say by 12:15 if possible.

14        Aaron did you want to say something?

12:04:30 15                MR. BLYNN:  Yes, Your Honor.  I will be very

16   quick because nature calls for me as well.  But as far as

17   planning ahead, will you be hearing opening from both

18   parties before the introduction of any evidence?  Or it's

19   going to hear it and --

12:04:42 20                THE COURT:  I don't know.  Well, I had gone

21   there a long time ago, but we had never gotten to the point

22   where there might be something by way of introductory

23   statements.

24        So let's hear from Mr. Davis about whether or not he's

12:04:52 25   going to do that.  Frankly, I would hope at this stage of

1    the litigation that we could forego opening statements.  I'm

2    not going to preclude it, but I think where we are right now

3    with regard to the need to take some evidence, issues

4    concerning proffer and potential evidence from the defense

12:05:09  5    as well, testimony and exhibits, I think what I recommend is

6    we do that.

7          Having said that, I'm not going to forego opening

8    statements or introductory statements by both sides, if they

9    wish, because I frankly think it's your right as a litigant,

12:05:26 10    and decorum would kind of approve of it.

11          I would just say in light of the volume of briefing

12    that exists right now, and the argument that we've had today

13    with regard to issues, relevance and so forth, and my duty

14    moving forward, we've covered a fair amount of ground at

12:05:44 15    this point, certainly with regard to some of the proposed

16    evidence.  But I will leave it to you folks to discuss that

17    and think about that, and I will abide by your decision.

18          I do have to tell you, I am marrying my niece tomorrow

19    and there is a rehearsal later this afternoon.  So at some

12:06:07 20    point, we have to conclude this for the day, and whether

21    that's at 4:00 o'clock or whenever that might be, I can't

22    give you into the evening because there's a rehearsal I need

23    to attend later today.

24          So with that heads up or warning, potentially, and

12:06:28 25    that gives us maybe the better part of four hours or more

1   anyway -- which I never thought we would need, by the way,

2   but now I'm not quite so sure -- why don't we take a brief

3   break for 10 minutes or so and then try to reconvene.

4        Mr. Klein.

12:06:44 5            MR. KLEIN:  Yes, Your Honor.  Thank you.  We

6   are going to go forego any opening statements.  I will take

7   my seven-page outline and I will, you know, save it for

8   another day, and we will be as concise as we can be with Mr.

9   Hunter.  The Court has sufficient amount of paper already in

12:07:01 10  front of it, and our goal on his direct is to supplement

11  what we've already put in front of you, so hopefully four

12  hours should be more than enough time.  Thank you.

13           THE COURT:  All right.  Just so you know, on

14  the defense side, if plaintiff isn't going to make an

12:07:19 15  opening statement, then I would ask that we wait and defer

16  any opening statement from the defense until after the close

17  of evidence in the case in chief presented by plaintiff.

18       Mr. Blum, fair enough?

19           MR. BLUM:  That's fine, Your Honor.  But I

12:07:35 20  think, you know, on the weight of the evidence, my opening

21  was about 12 pages of notes.  So I think I --

22           THE COURT:  But, I mean, is it really

23  necessary that I hear that now in light of plaintiff's

24  intent to go forward without opening statement?

12:07:51 25           MR. BLUM:  No.

1          THE COURT:  Okay.

2          MR. BLUM:  Which Hunter are they going to put

3    on first?

4          THE COURT:  Mr. Davis.

12:07:59  5          MR. DAVIS:  Well, it simply depends on whether

6    or not defendant has any objection to just having Mr. Mike

7    Hunter's declaration, you know, considered as read as part

8    of the record, and we'll stipulate to the admission of

9    Exhibits 1, 2 and 3, which are Marco's 2010 Area Rep FDD,

12:08:29 10    the Columbia Agreement and the Charlotte Agreement.

11          THE COURT:  Mr. Blum, do you want to think

12    about that during the break?

13          MR. BLUM:  Yeah.  If they're proffering his

14    declaration, which I guess is Docket 5-2, I might have two

12:08:45 15    or three questions of cross, Your Honor, that's all, just to

16    clarify issues there all based on if this were his

17    testimony.

18          MR. DAVIS:  Then I would --

19          THE COURT:  I guess the affidavit will not

12:08:58 20    suffice with the extent then -- based on what I just heard.

21          MR. BLUM:  No.  But, I mean, it will

22    suffice --

23              (Court Reporter clarification)

24          MR. BLUM:  I'll suffice that that is going to

12:09:12 25    be their direct and I will -- my cross would just be on the

1     issues in his declaration, nothing else.

2               THE COURT:  Mr. Davis, you could reserve the

3     right to then ask questions depending on what's revealed

4     from that brief cross, if you prefer to do that.

12:09:29  5               MR. DAVIS:  Thank you, Your Honor.  Then what

6     I would suggest is that we first proceed with Andy Hunter,

7     and then Mike Hunter can quote/unquote "take the stand" for

8     as much as it is on a Zoom, and Mr. Blum can conduct his

9     cross, and then if I have any redirect, I will proceed with

12:09:47  10    that then.

11          My only question is:  Then there is no objection to

12    the admission of Plaintiff's Exhibits 1, 2 or 3 that it sent

13    to the Court yesterday, Mr. Blum?

14               THE COURT:  Mr. Blum.

12:09:59  15               MR. BLUM:  No objection to those.

16               THE COURT:  Very well.

17               MR. DAVIS:  Okay.  Then when we come back, we

18    can proceed with Andy Hunter.

19               THE COURT:  Sure.  Let's take about 10

12:10:06  20    minutes, and then we will resume.  Mr. Blum, I'm sorry, what

21    there something before we break?

22               MR. BLUM:  Will Andy Hunter be live, not just

23    a proffer of the declaration; right?

24               MR. DAVIS:  Correct.  We're actually going to,

12:10:17  25    yeah.

1           MR. BLUM:  Thank you.

2           THE COURT:  Very good.  All right.  We'll be

3    in recess for about 10 minutes, folks.  Thank you.

4           MR. DAVIS:  Thank you, Your Honor.

12:10:22  5                    -  -  -

6              (Recess taken at 12:10 p.m.)

7                    -  -  -

8            (Court reconvened at 12:25 p.m.)

9                    -  -  -

12:10:24 10          THE COURT:  Are we ready to resume on the

11   record, counsel, Mr. Davis?

12           MR. DAVIS:  Yes, we're all here.  If defense

13   is ready to go, we can move.

14           THE COURT:  Mr. Blum, are you ready?

12:25:41 15          MR. BLUM:  Yes, Your Honor.  Let's see.  Is

16   everyone back?  Is Mr. Libardi back?

17           THE COURT:  Yes.

18           MR. BLUM:  Okay.  Yes, Your Honor.  We are.

19           THE COURT:  He's back as well.  All right.

12:25:53 20       So we're back on the record after a brief recess in

21   the case.  It's my understanding that the plaintiffs will

22   proceed forward now with presentation of evidence in support

23   for their request of essentially continuing the TRO by way

24   of a preliminary injunction in this particular case.

12:26:08 25          Do I understand that based upon, Mr. Davis, the

1    affidavit of Mike Hunter and exhibits, and the agreement

2    that was just reached, that you will not be asking him any

3    questions at this point initially, but will allow Mr. Blum

4    to ask some questions on cross?

12:26:28  5          MR. DAVIS:  That is correct, Your Honor.  And

6    I think it would make sense if we just wait until after Andy

7    Hunter testifies first.  And then essentially what we will

8    be doing is calling Mike Hunter, you know, have, you know --

9    and we've all agreed what his direct was, and then Mr. Blum

12:26:45 10   can --

11          THE COURT:  All right.  So you want to call

12    Andy Hunter first?

13          MR. DAVIS:  Yes, Your Honor.

14          THE COURT:  All right.  Very good.  And that

12:26:51 15   will be on your questioning on direct; is that right?

16          MR. DAVIS:  That is correct, Your Honor.

17          THE COURT:  All right.  Very good.  And Mr.

18    Hunter -- well, first of all, I guess I should ask.  Are you

19    Andy Hunter?

12:27:02 20          THE WITNESS:  Yes, that is me.

21          THE COURT:  All right.  Very good.  And, sir,

22    are you prepared to take an oath at this time?

23          THE WITNESS:  Yes.

24          THE COURT:  All right.  Would you raise your

12:27:10 25   right hand for me, please.

```
 1                          -   -   -

 2              (Witness was sworn)

 3                          -   -   -

 4              THE COURT:  You can lower your hand, sir.

 5   Thank you.  You are now under oath.  Can you tell me where

 6   are you physically in terms of location?  Are you -- what

 7   city or town are you located in right now?

 8              THE WITNESS:  I'm in Charlotte, North

 9   Carolina.

10              THE COURT:  Very good.  And you understand

11   that you are under oath?

12              THE WITNESS:  Yes, I do.

13              THE COURT:  All right.  And at the outset, may

14   I ask you, would you state your full name for the record,

15   please, slowly.

16              THE WITNESS:  My full name is Andrew Joseph

17   Hunter.

18              THE COURT:  Very good.  And, with that, I'm

19   going to turn questioning over to your lawyer, Mr. Davis,

20   for direct examination.  Mr. Davis.

21              MR. DAVIS:  Thank you, Your Honor.  I would

22   just ask, if it wasn't done already, that we're moving

23   Plaintiff's Exhibits 1, 2 and 3 into evidence.

24              THE COURT:  Based upon the agreement of

25   counsel just before our break, those exhibits will be
```

**Andrew Joseph Hunter (Direct)**

1    admitted without objection.

2         MR. DAVIS:  Thank you, Your Honor.

3         **DIRECT EXAMINATION OF ANDREW JOSEPH HUNTER**

4    **BY MR. DAVIS:**

12:28:23 5    **Q**    Good morning, Andy.

6    **A**    Good morning.

7    **Q**    Just as a quick background, because there's a couple

8    of the exhibits that were just entered, Exhibit 2 is what's

9    been referred to as the Columbia Agreement.  Approximately

12:28:41 10   when did KAM Development, Inc., which we'll just refer to as

11   KAM going forward, about approximately when did KAM enter

12   into that agreement?

13   **A**    September of 2010.

14   **Q**    And in September of 2010 and the months or years

12:29:04 15   previous, was your father involved with any other franchise

16   systems in addition to Marco's?

17   **A**    Yes, he was.

18   **Q**    And could you tell us what system or systems that was?

19   **A**    Yeah.  He was a Subway franchisee in Tallahassee,

12:29:23 20   Florida, which is where we are from.

21   **Q**    And you were named as an operating manager of KAM

22   pursuant to the Columbia Agreement that was signed in

23   September of 2010; is that correct?

24   **A**    Yeah.  At the time, there were three principals and we

12:29:47 25   were all responsible for our duties and responsibilities in

78

**Andrew Joseph Hunter (Direct)**

1    that agreement.

2    **Q**    Okay.  What were you doing in September of 2010 at the

3    time you entered -- at the time KAM entered into the

4    Columbia Agreement?

12:30:02 5    **A**    I was a college student.  I was a gymnast at the

6    college of William & Mary.

7    **Q**    And that's a Division I school; correct?

8    **A**    It is, yes.

9    **Q**    Between your academic studies and your time that you

12:30:23 10    needed to spend with the athletics, were you able at that

11    time to give full-time attention, to the Columbia Agreement?

12    **A**    No, I was not.

13    **Q**    And was Marco's aware of that at the time?

14    **A**    They were.  They met us -- we had a meeting on campus

12:30:47 15    at William &  Mary.

16    **Q**    Okay.  So based upon the 10 years or so that you've

17    been involved with Marco's through KAM, what's your

18    understanding of the full-time expectations that are in the

19    Columbia Agreement and the Charlotte Agreement?

12:31:07 20    **A**    Sure.  It's that the highly trained personnel, between

21    the principals and employees, that that is our commitment;

22    that the entity as a whole has to use best efforts, you

23    know, the 40 hours a week language that's in there.

24    **Q**    And back at the beginning of the Charlotte Agreement,

12:31:34 25    who was handling most of the AR duties at that time for KAM?

**Andrew Joseph Hunter (Direct)**

1    **A**    At the beginning of the Charlotte Agreement, that was

2    in -- I believe we added that at the end of 2011.

3    **Q**    I'm sorry.  I misspoke.  At the beginning of your

4    relationship -- KAM's relationship with Marco's, the

12:31:58 5    Columbia Agreement, the first agreement.

6    **A**    Yeah.  Okay.  It was mostly my father and our original

7    partner, Kerry.

8                    (Court Reporter clarification)

9    **A**    His name is Kerry Nohle was our original partner.

12:32:21 10    **Q**    And when did Mr. Nohle cease being involved with?

11    **A**    I believe that was in the beginning of 2013.

12    **Q**    Okay.  What year did you graduate from William &

13    Mary?

14    **A**    In May of 2011.

12:32:38 15    **Q**    Okay.  And what did you do at that time, after you

16    graduated from William & Mary?

17    **A**    Graduated on a Sunday, drove home on Monday, went to

18    Marco's training on Tuesday.

19    **Q**    So after you finished and obtained your degree, then

12:32:59 20    you began to work with KAM, and did you start taking over

21    any of the AR duties under the Columbia Agreement?

22    **A**    Sure.  I think that evolved over time, that, you know,

23    at that point there were no stores, so the scope of work was

24    limited to development only.  But over time, yes, of course,

12:33:22 25    all of the partners were involved.

**Andrew Joseph Hunter (Direct)**

1  **Q**   And that would be true under the Charlotte Agreement

2  as well?

3  **A**   That's correct.

4  **Q**   So you've already stated, if I'm remembering

12:33:37  5  correctly, somewhere around 2013, the third partner for KAM

6  was no longer involved in the business?

7  **A**   That's correct.

8  **Q**   Okay.  So I think did there come a time after 2013

9  that any other individuals became highly trained personnel

12:33:58  10  for KAM?

11  **A**   Yes.  We had a number of people that we put through

12  that training, and two of them are currently on staff with

13  us.  The others, their time -- they had time with us and

14  have since left, and we have a third that's in progress

12:34:19  15  currently.

16  **Q**   Okay.  So as of -- well, let's take it back to the --

17  let's say in August of 2020, how many highly trained

18  personnel did KAM have?

19  **A**   Beyond my father and myself, we had two others, two

12:34:50  20  employees.

21  **Q**   And who are they?

22  **A**   Joey Weathers and Steven Weathers.

23  **Q**   And when did Joey Weathers complete the necessary

24  training for Marco's to become a highly trained personnel?

12:35:07  25  **A**   It was either 2014 or 2015.

**Andrew Joseph Hunter (Direct)**

1    **Q**    And how about Steven Weathers?

2    **A**    He went in 2016.

3    **Q**    Okay.  And I'm going to show you -- and am I able to

4    share my screen?  I know that Amy is hosting the Zoom

12:35:22 5    session?

6                    THE COURT:  Yeah, if you are not already, she

7    can make that available to you now.  Amy, if you would now

8    please check.

9                    COURTROOM DEPUTY:  Counsel should have access

12:35:33 10    to shearing their screen.

11                    MR. DAVIS:  Let me see if I can do that.

12    **BY MR. DAVIS:**

13    **Q**    Andy, I'm going to show you what's been previously

14    marked as Plaintiff's Exhibit Number 4 that was submitted to

12:35:50 15    chambers and opposing counsel yesterday.  Are you familiar

16    with this document?

17    **A**    I am, yes.

18    **Q**    Can you tell us what it is?

19    **A**    This is the Marco's University Online platform.  That

12:36:08 20    platform houses all of the operational aspects of the

21    business.  This is where we go to actually conduct, for

22    example, the OSEs, the visitations that are required every

23    60 days.

24                    MR. DAVIS:  At this time, Your Honor, we would

12:36:32 25    like to move Plaintiff's Exhibit 4 into evidence.

**Andrew Joseph Hunter (Examination by Mr. Blum)**

1        THE COURT:  Mr. Blum.

2        I'm sorry, I can't hear you, sir; you are still muted.

3        MR. BLUM:  May I voir dire the witness of

4    this?

12:36:46  5        THE COURT:  Sure, briefly.  Go ahead.

6        MR. BLUM:  Okay.

7        **EXAMINATION OF ANDREW JOSEPH HUNTER**

8    **BY MR. BLUM:**

9    **Q**    Mr. Hunter, the information under the area "Role" on

12:36:57 10   this exhibit, for Mike Hunter it says, "Owner/Supervisor."

11   Do you see that?

12   **A**    Yes, I see that.

13   **Q**    Okay.  Who inputs that information?

14   **A**    Marco's does.

12:37:09 15   **Q**    Who does?

16   **A**    Marco's.

17   **Q**    Okay.  Mr. Weathers and Mr. Penta, do they actually

18   own any of KAM?

19   **A**    No, they do not.

12:37:20 20   **Q**    You and your father are the only actual, I guess,

21   members of KAM since it is an LLC, and maybe your spouses;

22   is that right?

23   **A**    Yes, it's the two of us.

24   **Q**    Okay.  So is it just the two of you?

12:37:38 25   **A**    That's correct.

**Andrew Joseph Hunter (Direct)**

1  **Q**    Okay.

2              MR. BLUM:  Okay.  Nothing further, Your Honor.

3              THE COURT:  Is there any objection to

4  admission of Exhibit 4.

12:37:50  5              MR. BLUM:  No objection to it.

6              THE COURT:  Very well.  Then Exhibit 4 will be

7  admitted without objection.  You can proceed, Mr. Davis.

8              MR. DAVIS:  Thank you, Your Honor.

9  **BY MR. DAVIS:**

12:38:02 10  **Q**    Andy, so as opposing counsel has kind of already

11  mentioned, so your father, Mike Hunter, is listed as

12  owner/supervisor and AR/AR-OFC; is that correct?

13  **A**    Yes.

14  **Q**    Okay.  And the AR/AR-OFC, what does that indicate?

12:38:25 15  **A**    Stands for area rep-operational field consultant.

16  That is the title for folks who are certified to do the OSE,

17  the store visitation inspections.

18  **Q**    Okay.  So according to Marco's records here shown in

19  Exhibit 4, there are four people who are qualified as an

12:38:51 20  AR-OFC.

21              MR. BLUM:  Wait a minute.  Okay.  Go ahead.

22  **A**    Yes.  There are four people, yes.

23  **Q**    Okay.  Now I have to figure out how to unshare this.

24              Okay.  Do both Joey and Steven Weathers work at least

12:39:26 25  40 hours a week dedicated to KAM and its related Marco's

**Andrew Joseph Hunter (Direct)**

1    Franchising?

2    **A**    They do, yes.

3    **Q**    And I'm going to show you what has been previously

4    marked as Plaintiff's Exhibit 5.  And have you been able to

12:40:05  5    review Exhibit 5 before just seeing it on the screen now?

6    **A**    I am familiar with this document, yes.

7              MR. DAVIS:  Oh, Your Honor, pursuant to a

8    forthcoming protective order that the parties that are in

9    the midst of discussing, the plaintiff has designated

12:40:27  10    Exhibit 5 as confidential, and we would ask that the exhibit

11    itself and the testimony related thereto be marked as

12    confidential in anticipation of the protective order being

13    granted.

14              THE COURT:  Mr. Blum.

12:40:49  15              MR. BLUM:  No objection subject to the

16    confidentiality, Your Honor.  (Indiscernible).

17              (Court Reporter clarification)

18              THE COURT:  All right.  No, he just asked

19    whether or not he was muted or not.  I think that was more

12:41:05  20    to him than to us.  So I think that's fine.

21        He indicated there's no objection to this.  I just

22    want to be clear, is there a time frame here in terms of

23    issuance of this manual?  Is this still in effect, Mr.

24    Davis?  Can you help us here?

12:41:19  25              MR. DAVIS:  Yes, absolutely.  These -- all the

**Andrew Joseph Hunter  (Direct)**

1    things we were going to discuss, I was going to discuss now

2    with Andy.

3              THE COURT:  All right.  That's fine.  No,

4    that's fine.  As long as that's going to be developed so

12:41:30  5    that I have some idea, that's fine.  I will go ahead and

6    admit the exhibit as requested without object, but it's is

7    subject to the confidentiality agreement and treatment

8    that's been described.

9         And so I assume -- let me ask Amy.  Amy, is Exhibit 5,

12:41:49 10   is this exhibit currently on the public docket?  Mr. Davis,

11   do you know?

12              MR. DAVIS:  It is not, Your Honor.  It was

13   filed -- plaintiff anticipated that it was going to be

14   filing a number of documents, this was one of them.  The

12:42:04 15   Jeremiah issue is another one.  So we asked to file them

16   under seal.  And they were -- redacted versions were filed

17   in the public filing, and then the full versions were

18   emailed to chambers and opposing counsel and then filed

19   under seal.

12:42:23 20              THE COURT:  That's fine, Mr. Davis.  So my

21   concern was only I wanted to make sure that we didn't need

22   to do anything with regard to the public record at this time

23   without a confidentiality agreement being -- or order being

24   in place.  So I think you've addressed that for me.

12:42:37 25        So it will be admitted subject to that.  However, it

**Andrew Joseph Hunter (Direct)**

1    will not be filed on the public docket because it will be

2    subject to a confidentiality agreement that will be

3    submitted at later time.  Thank you.

4                   MR. DAVIS:  Thank you, Your Honor.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Andrew Joseph Hunter (Direct)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    **BY MR. DAVIS:**

17    **Q**     And are you aware, Andy, of other current Marco's area

18    representatives besides KAM that have other businesses

19    outside of their AR Agreements?

12:45:29 20    **A**     Certainly.  I think from the inception of the area rep

21    program, one of the strategies was to go recruit folks who

22    had experience and not --

23              MR. BLUM:  Your Honor, I was muted.  I

24    apologize.  I want to note an objection to the question as

12:45:46 25    to relevance, as to outside business activities.  Or I don't

**Andrew Joseph Hunter (Direct)**

1    understand the relevance of that to this inquiry.

2              THE COURT:  Mr. Davis.

3              MR. DAVIS:  Your Honor, it's clearly relevant,

4    as it's Marco's position that the Jeremiah's Agreement makes

12:46:08  5    it impossible for KAM to devote full-time efforts to the

6    Area Representative Agreement.  That's their position.  And

7    this evidence is relevant to that in that there are plenty

8    of current Marco's ARs that have other business interests

9    and are still, presumably because Marco's hasn't terminated

12:46:36 10    them, acceptable to fulfill their full-time obligations.

11              MR. BLUM:  So, Your Honor, the question is

12    about other people, and does he know of other people.  And

13    there's another issue about, I'm sorry, about other outside

14    business interests.  In fact, there's certain other

12:46:58 15    interests they are specifically allowed.  I mean, they

16    operate franchises as well.

17       So I just -- and I also have a concern about the basis

18    for his testimony of what other people are doing.

19              THE COURT:  So I will overrule the objection

12:47:15 20    in terms of the initial portion of his answer, which was,

21    yes, he is aware that there are other people similarly

22    situated in their relationship with Marco's as KAM who have

23    other outside business interests.  I will permit that, at

24    least, for the limited purpose of exactly what Mr. Davis

12:47:34 25    said, which is it is not -- or apparently, at least by

89

**Andrew Joseph Hunter (Direct)**

1  practice, there is not a prohibition by Marco's to them

2  doing that.  And Mr. Blum may concede that, I don't know.

3  But regardless, I will admit it for that purpose.

4      However, his answer kind of drifted into speculation

12:47:54  5  with regard to what Marco's intended or likes or prefers or

6  why that might be desirable.  I think, without further

7  foundation, I will sustain the objection with regard to that

8  later portion of the answer.

9      But, Mr. Davis, you can try and lay a foundation or

12:48:11  10  rephrase, if you wish.

11  **BY MR. DAVIS:**

12  **Q**    Let's go back to do you have knowledge of any other

13  current ARs, specifically, who also have other full-time

14  commitments outside of their AR duties?

12:48:34  15  **A**    Yes.

16  **Q**    And who would that be, or multiple people, if it is?

17  **A**    Sure.  You know, I think there's many.  But some of

18  the first ones that come to my mind are Tim Brown.  He's the

19  chief of operations for Marco's.  He has a territory.  He's

12:48:56  20  an AR.  I believe it's Tony Horn is -- his primary business

21  is in insurance.

22              MR. BLUM:  What was that name?

23  **A**    Tony Horn.  Those are just a couple that come off the

24  top of my mind.  My father knows -- I think he has more

12:49:22  25  knowledge about other area reps around the country and their

**Andrew Joseph Hunter (Direct)**

1    other dealings than I do.

2    **Q**    Thanks.

3         So let's just start talking about the development of

4    the Columbia territory.  So you enter into -- "you" meaning

12:49:47  5    KAM -- KAM enters into the Columbia Agreement in September

6    of 2010.  What steps does KAM start taking to develop

7    territory?

8    **A**    The first step is to go through training, and then to

9    find real estate and open the first store and really using

12:50:09  10    that as a launchpad to grow the rest of the market.

11    **Q**    What is the extent of the training provided by Marco's

12    with regards to the sale of franchises to franchisees,

13    finding area reps?

14    **A**    There is a video on Marco's University, and there is

12:50:30  15    an FAQ PDF file that goes with it.

16    **Q**    And have you seen the video?

17    **A**    Yes.

18    **Q**    And about approximately how long is this video?

19    **A**    Ten minutes.

12:50:43  20    **Q**    And the FAQ, can you give us an idea of its length?

21    **A**    A page or two.  I don't remember it being very

22    lengthy.

23    **Q**    Is there any other required training from Marco's for

24    ARs when it comes to sales for -- when it comes to sales of

12:51:04  25    franchises?

**Andrew Joseph Hunter (Direct)**

1    **A**    No.

2    **Q**    So after -- you said you began your training as soon

3    as you graduated college.  What steps did KAM take after

4    they completed the training required for the ARs?

12:51:21  5    **A**    The steps that we took for operating the business and

6    developing the territory?

7    **Q**    Yes.

8    **A**    Sure.  So we had a commitment of 35 stores over the

9    course of our first term of 10 years.  And the first order

12:51:38  10    of business was we had a group, JHD, JH Development, LLC or

11    JHD, that was interested in buying us out.  And we said,

12    "We're not interested in that, but we would entertain a

13    master franchise agreement, or as Marco's call them, Area

14    Developer Agreements."  And so we sold our -- the first

12:52:02  15    store we opened in Columbia to that group, along with a

16    development agreement for the remaining 16 stores for the

17    entirety of the Columbia DMA, 17 stores total.

18    **Q**    So let's take a step back there and explain some of

19    those terms.  So within the Columbia territory of the

12:52:27  20    Columbia group, you sold a development agreement to JHD?

21    **A**    Right.  It's an interaction between Marco's and the

22    franchisee.  But, yes, it's in our area.  It is coupled with

23    the sale of the store that we had opened in Columbia prior.

24                    MR. BLUM:  Your Honor, just for the record,

12:52:52  25    can we get a time frame and which market that's in, if it's

**Andrew Joseph Hunter (Direct)**

1    just in one of them?

2          THE COURT:  I think that's fair, Mr. Blum.

3       Mr. Davis, do you want to handle that?

4          MR. DAVIS:  Yeah, I thought we had.

12:53:02  5    **BY MR. DAVIS:**

6    **Q**    We were talking about this was in -- we're talking

7    about the Columbia territory with this; correct, Andy?

8    **A**    That's correct.

9    **Q**    Okay.  And can you talk about the differences between

12:53:18  10   an Area Development Agreement and an Area Representative

11   Agreement?

12   **A**    Sure.  An Area Developer Agreement is an agreement for

13   multiple franchise stores; whereas, an Area Rep Agreement is

14   purchasing the rights to develop that territory with the

12:53:41  15   expectation to conduct franchise sales and franchise support

16   and earn a portion of those ongoing royalties.

17   **Q**    So this Area Development Agreement that JHD entered

18   into with Marco's, that territory was completely subsumed by

19   the Columbia Agreement territory?

12:54:09  20   **A**    That's correct.

21   **Q**    So their development of stores would account for

22   your -- KAM's required number of stores?

23   **A**    That's correct.  There was an overlap that it was our

24   area rep territory and now JHD's area developer territory.

12:54:29  25   **Q**    And once JHD entered this Area Developer Agreement

**Andrew Joseph Hunter (Direct)**

1  with Marco's, was KAM allowed to develop stores within JHD's

2  territory?

3  **A**     Only with JHD as the franchisee.

4              (Court Reporter clarification)

12:54:54  5  **A**     Yes.  JHD is the franchisee.  JH Development, LLC is

6  the entity.

7  **Q**     So, in other words, if there was a particular town or

8  city, or part of the city, in that territory defined under

9  the JHD's Agreement that JHD wasn't developing, you couldn't

12:55:17  10  step in an develop yourself through KAM or through another

11  franchisee?

12  **A**     No.  They had the exclusive rights to that under

13  their --

14              MR. BLUM:  Your Honor, might I just -- I'm

12:55:28  15  sorry.  I was on mute again.  May I just -- I let it go so

16  far, and I know with a nonjury, it's not typically a big

17  deal, but it is pretty leading question.

18              THE COURT:  I think that's probably a fair

19  objection and comment, Mr. Davis.  I will sustain the

12:55:44  20  objection.  I understand some of them are merely direction

21  or redirection with regard to exhibits, some may be issues

22  that are not in controversy.  But to the extent that you can

23  stay away from the leading questions, that would be

24  advisable.  Thank you.

12:55:59  25              MR. DAVIS:  Absolutely, Your Honor.  Thank

**Andrew Joseph Hunter (Direct)**

1    you.

2          Okay.  So can the court reporter just read back my

3    last question so I know what I was supposed to ask kind of

4    more in a better form?

12:57:24  5                        (Record read)

6                MR. DAVIS:  Thank you very much.

7    **BY MR. DAVIS:**

8    **Q**    Was there a restriction placed on KAM regarding

9    development within undeveloped potential areas under the JHD

12:57:38 10   territory?

11   **A**    Sure.  So their agreement encompasses about two thirds

12   of our territory.  Initially, they purchased the rights of

13   the entire Columbia DMA.  And to clarify, our Columbia

14   Agreement contains two DMAs:  Columbia and Greenville.  They

12:58:01 15   then amended that to add six additional stores in the

16   Greenville DMA for a total of 22.  So they had the vast

17   majority of our territory was under their exclusive rights

18   to develop as a franchisee.

19          And in 2015, they fell behind on their development

12:58:19 20   agreement.  Starting in 2016, they were officially behind

21   their schedule.  And we had brought this to the attention of

22   JHD and to Marco's throughout the process, as that's part of

23   our role, to, you know, engage with franchisees, and

24   particularly JHD with all these stores that they've

12:58:45 25   committed to, to keep them on track.

**Andrew Joseph Hunter (Direct)**

1        And so it became evident that at first certain areas

2    of the territory, they did not want to -- they didn't want

3    to give up the rights to.  So we would uncover a site, or we

4    would have a prospective franchisee express their interest,

12:59:09  5    and we would go to JHD and say, "Hey, we have this site," or

6    "Hey, we have this franchisee that would like to develop

7    this area."  And in each instance, from 2014 throughout

8    2015, they said, "No.  We do not want to give up any of our

9    exclusivity.  We'll do the stores."

12:59:29 10    And at the end of 2015 going into missing the official

11    deadline of the end of 2015 or January 1st of '16, that

12    position changed to say, "We don't want -- we're not going

13    to do the stores, but we don't want anybody else to do

14    them."

12:59:45 15    So we went to Marco's and ended up meeting with them

16    in San Antonio with all the executives and the development

17    team to discuss that.  And we had an agreement, as a result

18    of that meeting, to give JHD a right of first refusal, that

19    for stores within their development agreement, that we would

13:00:12 20    be allowed to develop those and give JHD the first right to

21    actually be the franchisee, and if they pass, for us to move

22    on to the next franchisee.  And that was important because

23    there's a lag time between, you know, when you actually --

24    when the store opens versus finding the site, finding the

13:00:36 25    right franchisee.  And so if we were going to put our

**Andrew Joseph Hunter (Direct)**

1     efforts towards finding the real estate, finding, you

2     know -- discussing the opportunity with prospects, that we

3     wanted to have that assurance that we could continue, you

4     know, our rights under our agreement to develop this area.

13:00:58  5         So we reached that agreement at that San Antonio

6     meeting in April, and it just took a couple months for us to

7     uncover an opportunity and easily, and we had a franchise

8     group who was interested in that as well.  So we presented

9     it to JHD for the right of first refusal and Marco's

13:01:18 10    reneged; they would not allow us to develop it and let JHD

11    continue on as normal.

12    **Q**    So did there come a time when you mentioned that

13    JHD -- you mentioned there was a time when JHD was behind in

14    their development agreement as of the end of 2015, beginning

13:01:44 15   of 2016.  How many stores were they behind in their

16    development?

17    **A**    They were two behind at the start of 2016.

18    **Q**    And where was KAM in relation to its development

19    schedule at the same time?

13:02:01 20   **A**    We were ahead by one.

21    **Q**    And that was despite JHD being behind by two?

22    **A**    Right.  And presumably that -- it was our

23    understanding that we were ahead by one, yes.

24    **Q**    Did there come a time when Marco's revised the total

13:02:23 25   number of stores JHD was to develop under their agreement?

**Andrew Joseph Hunter (Direct)**

1      **A**      Yes.  So that came in the spring of 2018, and we were

2      approached prior to that by the chief development officer at

3      the time, John Ramsey, and we had a phone call and some

4      correspondence with President Tony Libardi.  He might have

13:02:52  5      had -- I don't remember his role at the time.  He might not

6      have been president.  But we were made aware that there was

7      intent to revise their schedule.  And all this time, we had

8      said, "We just want to be able to develop our territory,

9      that, you know, right now you're preventing us from doing

13:03:13 10     that.  So please relinquish this area, or, again, as we had

11     agreed, at least let us proceed with the right of first

12     refusal so that we can get these stores on the board."

13             And so in the 2018, there was a revision.  JHD was

14     relinquished territory that they had added on in the

13:03:34 15     amendment, the six stores for -- in the Greenville DMA, so

16     that freed up three locations there for us to develop

17     because they had developed three out of the six.  And then

18     they relinquished some counties in Columbia, one of which

19     could hold a store, so that gave us the ability to develop

13:03:57 20     four stores that were previously tied up under the JHD

21     Agreement.  And they reduced the JHD number of stores

22     that -- the committed number of stores down by five stores.

23     So they were holding JHD to a standard that was one less

24     than what we were held to as the area rep.  That went into

13:04:25 25     effect, again, to our objection, in 2018 and throughout the

**Andrew Joseph Hunter  (Direct)**

1    course of the JHD Agreement, which lasted until 2019, the

2    end of 2019.

3    **Q**    So just to kind of put some fine points on that.  So

4    in 2018, Marco's reduced the number of stores being required

13:04:53  5    to be developed by JHD from 22 to 17?

6         Do I understand that correctly?  Andy, did I

7    understand your testimony correctly that Marco's reduced

8    JHD's develop requirement from 22 to 17 stores?

9    **A**    Yes.  I was taking a moment to think.  And, yes, it

13:05:19 10   was reduced by five.  So, yes, that's correct, they reduced

11   it back to 17.

12   **Q**    I just assumed it was a -- you didn't hear me because

13   of the Zoom.  I'm sorry.

14        And that resulted in several counties being

13:05:34 15   relinquished back to KAM for KAM to be able to develop

16   stores?

17   **A**    That's correct.

18                  MR. BLUM:  Your Honor -- never mind.  Go

19   ahead.

13:05:45 20   **Q**    And did I understand your testimony correctly that as

21   a result of those relinquished counties, KAM would be able

22   to develop four stores?

23   **A**    That's correct.

24   **Q**    And would KAM have been able to develop any other

13:06:04 25   additional stores in the relinquished areas from the JHD

**Andrew Joseph Hunter (Direct)**

1    territory?

2    **A**    No.

3    **Q**    Okay.  Did there come a time where KAM requested that

4    their development schedule be altered?

13:06:22  5    **A**    Yes.  So, you know, we lost that two and a

6    half year -- or going into 2018, which is when we made this

7    request, at that point we had lost, you know, two and a half

8    years of being able to develop this restricted area that was

9    exclusive to JHD.  And we broached the subject and actually

13:06:46  10    reached agreement with Tony in writing to extend -- to give

11    us two more years to our own development schedule.

12    **Q**    Andy, if I can interrupt you for one second just to

13    clarify for the record.  When you say, "Tony," who are you

14    referring to?

13:07:05  15    **A**    That's Tony Libardi.

16    **Q**    Thank you.  Please continue your answer.  I'm sorry,

17    but I wanted to make the record clear.

18    **A**    Yeah.  So the next step after that email, that written

19    confirmation in July of 2018 was for us to work through our

13:07:23  20    development representative, Steve Hoza, and finalize that

21    agreement.  And when we got the revised schedule, it was

22    incorrect.  It did not match what we had agreed to in

23    writing via email previously, and it also had other

24    adjustments to our contract outside of the development

13:07:47  25    schedule.  And when we brought those topics up saying, you

**Andrew Joseph Hunter (Direct)**

1   know, look, we have a culture of accountability and we want

2   to put our money where our mouth is and actually show that

3   we are committed to developing this territory on this

4   timeline, you know, it was as a favor to Marco's.  And so

13:08:15  5   when they refused to correct the schedule to the one that we

6   had agreed to, and also remove the other changes to the

7   agreement that they were trying to make, we decided to let

8   it go, again, because they had refused.  And we viewed it as

9   a gesture of us, you know, wanting to be accountable for

13:08:35 10   developing the rest of our territory.

11   **Q**    Okay.  So when did JHD's Area Development Agreement

12   expire?

13   **A**    So after the revision, originally Columbia was

14   scheduled to be through 2017, I believe, right.  And then

13:08:56 15   they had the amendment adding Greenville and put it to the

16   end of 2019.  Then it was revised again in '18 and removed

17   the three stores in Greenville, the one in Columbia, and it

18   kept the same timeline, however, of December 31st of 2019.

19   **Q**    So after all the changes and amendments between

13:09:23 20   Marco's and JHD, JHD's Agreement finally terminated as

21   expired as of the end of 2019?

22   **A**    That's correct.

23   **Q**    Okay.  Did JHD meet its commitment to the number of

24   stores that were originally required under the JHD

13:09:46 25   Agreement?

**Andrew Joseph Hunter (Direct)**

1  **A**     No.  It didn't meet the number of original stores, and

2  it did not meet the number of revised stores on this last

3  revision.  When they ended 2019, they were one short of that

4  revised number.

13:10:03  5  **Q**     Okay.  And how many were they short from the original

6  number?

7  **A**     That would have been two short in Columbia.  Yeah, two

8  short in the Columbia DMA.

9  **Q**     In spite of all that, how many stores did KAM have

13:10:27  10  open at the end of 2019?

11  **A**     28.  28 out of 35.

12  **Q**     And was it your understanding at that time that KAM

13  was timely and keeping up with its development schedule to

14  have 28 stores open by the end of 2019?

13:10:52  15  **A**     Yes.

16  **Q**     Okay.  At the end of 2019 -- I'm going to actually

17  show you what's been previously marked as Plaintiff's

18  Exhibit 6.  And have you had an opportunity to review

19  Plaintiff's Exhibit Number 6 prior to today?

13:11:26  20  **A**     Yes.  I have seen this letter before, yes.

21  **Q**     Can you tell us what this letter is?

22  **A**     It's a congratulatory letter on our development from

23  2019, and it asks us to get with Ron Stilwell to discuss a

24  plan for 2020.

13:11:50  25  **Q**     Okay.  And who sent this letter?

**Andrew Joseph Hunter (Direct)**

1     **A**     Tony Libardi did.

2     **Q**     Okay.  And Tony Libardi, again, for the record is who?

3     **A**     That's the president and COO of Marco's currently.

4     **Q**     And the letter was sent to who?

13:12:09  5     **A**     It was sent to KAM Development with the attention to

6     my father and me.

7     **Q**     And what's the date of the letter?

8     **A**     December 20th of 2019.

9             MR. DAVIS:  Your Honor, I ask that Plaintiff's

13:12:26  10   Exhibit Number 6 be moved into evidence.

11            THE COURT:  Mr. Blum.

12            MR. BLUM:  No objection, Your Honor.

13            THE COURT:  Admitted without objection.

14   **BY MR. DAVIS:**

13:12:38  15   **Q**     And, again, I'm going to ask you to read the first

16   paragraph of Plaintiff's Exhibit Number from Tony Libardi.

17   **A**     "Congratulations on the development results in this

18   market for 2019.  We recognize your team's efforts in

19   opening two new stores this year, exceeding your development

13:13:03  20   commitment of one store."

21   **Q**     We're going to, in a few minutes, talk about KAM's

22   development of the Columbia territory of 2020, we're going

23   to get to that.  But I think it is important just for

24   clarity sake to continue on kind of chronologically with

13:13:32  25   KAM's interactions with Marco's.

**Andrew Joseph Hunter  (Direct)**

1    So I'm going to show you Plaintiff's Exhibit Number 2

2   that's been previously entered.  And on page -- and I will

3   be putting it up on the screen in a second as soon as I find

4   it.  It is page 4 of Exhibit Number 2.  Now I have to share

13:14:12 5   it.  So this is the Columbia Agreement, Exhibit Number 2.

6   And I want to draw your attention to Section 2.2.1 at the

7   bottom of page 4.  And can you please read that section for

8   the record?

9   **A**    Yes.  "Area Representative shall give franchisor

13:14:49 10   written notice of Franchisee's election to renew no fewer

11   than three (3) months, no more twelve (12) months before the

12   end of the initial term (Franchisor will provide Franchisee

13   notice of the pending expiration to allow Franchisee time to

14   timely notify Franchisor of its desire to renew.)"

13:15:09 15   **Q**    Okay.  I'm going to show you what's been previously

16   marked -- well, let me ask you this before we get there:

17   Did there come a time that KAM sent the written requirement

18   as required under that provision of the Columbia Agreement?

19   **A**    I don't recall ever seeing notice from the franchisor

13:15:48 20   about our expiration, but, yes, we sent in notification of

21   our desire to renew.

22   **Q**    Thank you.  I'm going to show you what's been

23   previously marked as Plaintiff's Exhibit 7.  And can you --

24   are you familiar with this document?

13:16:21 25   **A**    Yes.  I am the author of this document.

**Andrew Joseph Hunter (Direct)**

1  **Q**    Okay.  Can you tell us, it's is a letter from you to

2  who?

3  **A**    To Tony Libardi, president of Marco's.

4  **Q**    And what is the purpose of this letter?

13:16:35  5  **A**    The purpose of this letter is to renew our Columbia AR

6  Agreement.

7  **Q**    Can you read the first sentence of the second

8  paragraph that starts with "I am writing"?

9  **A**    "I am writing to give notice to you that we wish to

13:16:56  10  exercise our option to renew our Area Representative

11  Agreement between Marco's Franchising, LLC and KAM

12  Development, LLC dated September 10th, 2010."

13  **Q**    Okay.  And what's the date of the letter?

14  **A**    May 14th, 2020.

13:17:13  15  **Q**    Okay.  Is that more than three months prior to the

16  expiration of the Columbia Agreement?

17  **A**    Yes, it is.

18           MR. DAVIS:  Okay.  Your Honor, we would like

19  to move Plaintiff's Exhibit Number 7 into evidence.

13:17:29  20           THE COURT:  Mr. Blum, any objection?

21           MR. BLUM:  Your Honor, I'm just -- I know it

22  is up on the screen.  I'm just looking at the exhibit.  Is

23  that the complete exhibit that refers to an attachment?  I

24  just want to make sure what we're looking at.

13:17:45  25           THE COURT:  Fair enough.  This appears to be

**Andrew Joseph Hunter (Direct)**

1      just one page.

2                  MR. BLUM:  Right.  And it says, "We are

3      requesting the corresponding addendum."  Is that supposed to

4      be attached to renewal agreements?  Was that supposed to be

13:18:06  5      included in this letter?  That's just what I don't

6      understand.  Was this letter freestanding, Mr. Hunter, I

7      guess, would be the questioning.

8                  THE COURT:  Mr. Davis, that's a fair point for

9      clarification I think.  And if you don't know, please ask

13:18:16 10      your witness.

11                  MR. DAVIS:  I do know, but I will just ask,

12      Your Honor.

13      **Q**      Is this the entirety of Exhibit Number 7?

14      **A**      Yes, it is.

13:18:28 15      **Q**      Okay.  And when you're talking about the corresponding

16      addendum to be attached to the renewal agreements, can you

17      tell us what that references?

18      **A**      Sure.  As part of the revisional process of the area

19      rep agreements, the new form of agreement was formally

13:18:52 20      announced by Tony Libardi in 2018.  And it was advertised,

21      if you will, as including an addendum that could not be

22      included as part of the main part of that document, but

23      could be requested and then provided upon renewal to go with

24      the contract.  It was a contract plus the addendum that you

13:19:25 25      could get if you request.

**Andrew Joseph Hunter (Examination by the Court)**

1    **Q**    And Marco's had drafted that addendum?

2    **A**    That's correct.

3    **Q**    And did they provide it to the area reps ahead of time

4    for the area reps to review?

13:19:39 5    **A**    When it was announced?

6    **Q**    Yes.  Well, in other words, prior to sending Exhibit 7

7    on May 14th, 2020, had you actually seen the corresponding

8    addendum?

9    **A**    Yes, from the 2018 version, the original version.

13:20:06 10                    MR. DAVIS:  Okay.  If that satisfies

11    counsel --

12                    THE COURT:  Well, let me just ask, Mr. Davis,

13    if I might, ask Mr. Hunter.

14                    **EXAMINATION OF ANDREW JOSEPH HUNTER**

13:20:13 15    **BY THE COURT:**

16    **Q**    Mr. Hunter, this document on your letterhead that's

17    been identified here as Plaintiff's Exhibit 7, in what form

18    or in what way -- how was this transmitted to the recipient

19    Mr. Libardi?  Was it emailed?  Was it mailed by U.S. mail?

13:20:33 20    Was it faxed?  Can you tell?

21    **A**    USPS certified mail.

22    **Q**    And could you just go back to Mr. Blum's question?  He

23    may be satisfied.  I just want to make sure that the record

24    is clear.  Is this the only page, the only document that was

13:20:48 25    transmitted to Mr. Libardi at that time?

**Andrew Joseph Hunter (Direct)**

1    **A**    It is, yes, a one-page letter.

2    **Q**    All right.  So there were no enclosures or attachments

3    or anything of that nature?

4    **A**    No.  No, Your Honor.

13:20:59 5            THE COURT:  All right.  Mr. Blum, anything

6    further with regard to --

7            MR. BLUM:  That answers the question.  Thank

8    you.

9            THE COURT:  Any objection to admission of this

13:21:04 10   exhibit?

11           MR. BLUM:  No objection.

12           THE COURT:  Exhibit 7 will be admitted without

13   objection.

14           MR. DAVIS:  Thank you, Your Honor.

13:21:19 15   **BY MR. DAVIS:**

16   **Q**    Did KAM receive any response to Exhibit Number 7?

17   **A**    I did not, no.

18   **Q**    After you sent Exhibit Number 7 in May of 2020, did

19   anyone from KAM ever talk to you after that about renewal?

13:21:47 20   **A**    Yes.  And I should say then that the renewal really

21   started with that December of 2019 letter from Marco's

22   Franchising, that we followed that to get with Ron Stilwell,

23   and that renewal process began right away in the beginning

24   of 2020, and that involved --

13:22:09 25   **Q**    Okay.

**Andrew Joseph Hunter (Direct)**

1  **A**    I'm sorry.

2  **Q**    Let's go back to Number 6.  Well, maybe we should talk

3  about are you referring to the second paragraph of

4  Exhibit 6?

13:22:28  5  **A**    Yes.

6  **Q**    Okay.  Can you read that into record, please?

7  **A**    "As we enter the new year, we need to establish a

8  development plan with you to ensure your remaining

9  obligation of six stores will be satisfied prior to the

13:22:42  10  expiration/renewal date of your AR Agreement, which is dated

11  September 10th, 2020.  To that end, please provide a plan

12  for your 2020 development by January 15th, 2020, including

13  detailed actions you will take to achieve the six store

14  requirement."

13:22:59  15  **Q**    So your understanding, KAM's understanding based on

16  upon this communication from Marco's president and COO, was

17  that -- does it say you had exceeded your development

18  commitment for 2019; is that correct?

19  **A**    That's correct.

13:23:29  20  **Q**    And that KAM was required to open six more stores by

21  September 10th, 2020?

22  **A**    I don't think it says to open the stores in this

23  letter.

24  **Q**    Oh.  It says the obligation.  So you had an obligation

13:23:45  25  of six stores prior to September 10th, 2020.  Is that a fair

**Andrew Joseph Hunter (Direct)**

1    reading?

2    **A**    Yes, it is.

3    **Q**    Okay.  And then I'm going to now ask you to read the

4    paragraph that starts "it is also our intention."

13:24:10  5    **A**    "It is also our intention to conduct a market

6    optimization study for this territory, so that we can

7    establish a reasonable development schedule for the upcoming

8    renewal term.  Ron Stilwell's team will provide additional

9    details on this process shortly."

13:24:27  10    **Q**    And did there come a time where -- well, who is Ron

11    Stilwell?  Why don't we -- just so we know.

12    **A**    Ron Stilwell is the current chief development officer

13    for Marco's.

14    **Q**    And did there come a time that Ron Stilwell or his

13:24:43  15    team contacted KAM about the development schedule for the

16    renewal of the Columbia Agreement?

17    **A**    Yes.  That process started in the very beginning of

18    2020.

19    **Q**    And did there come a time -- well, let me ask you

13:25:10  20    this:  During those talks, were there a discussion of the

21    number of stores you would have to -- KAM would have to

22    develop in the five-year renewal?

23    **A**    Yes.  So we talked about the plan for -- went through

24    that market optimization process with his team, and then we

13:25:30  25    discuss the development schedule, the renewal term, which

**Andrew Joseph Hunter (Direct)**

1   was two years for the first three years of that five-year

2   term, and then one for the last two.  So two, two, two, one,

3   one, for a total of eight stores.

4   **Q**    Did there come a time when you asked KAM again after

13:25:59 5  you sent Exhibit 7, was there any time you followed up with

6   anybody at Marco's regarding the renewal paperwork?

7   **A**    Yes.  After I didn't receive a response from my

8   certified letter to Tony Libardi, I followed up with Ron

9   Stilwell, and he assured us that we were in queue, that to

13:26:24 10 be patient; there were others in front of us.  And after

11  following up again of not hearing back from anybody, he put

12  us in touch with Ashley Weis at the legal department.  I had

13  to follow up several times to get a response from her and

14  actually never got a response.  We received a deficiency

13:26:49 15 notice instead.

16  **Q**    And going to turn your attention to what's been

17  premarked as Plaintiff's Exhibit 8.  Are you familiar with

18  this document?

19  **A**    Yes, I am.

13:27:21 20 **Q**    Okay.  Is this the notice of deficiency that you just

21  referenced in your testimony?

22  **A**    Yes, it is.

23              MR. BLUM:  Mr. Davis, this is exhibit number

24  what?

13:27:32 25             MR. DAVIS:  Number 8.

**Andrew Joseph Hunter (Direct)**

1          MR. BLUM:  Okay.  Thank you.

2     **BY MR. DAVIS:**

3     **Q**     And it was sent -- who was it sent by?  Let me see if

4     I can get to the bottom.

13:27:46  5     **A**     It was sent by Anthony Libardi, president and chief

6     operating officer of Marco's.

7     **Q**     And it was sent to?

8     **A**     KAM Development, LLC.

9     **Q**     And to whose attention?

13:28:02 10     **A**     Attention Mike Hunter and Andy Hunter.

11     **Q**     And, again, the date was?

12     **A**     July 24th, 2020.

13     **Q**     So prior to receiving this -- or maybe I should take

14     care of housekeeping first.

13:28:19 15          MR. DAVIS:  Your Honor, we move that Exhibit 8

16     be offered into evidence.

17               THE COURT:  Mr. Blum.

18               MR. BLUM:  No objection, Your Honor.

19               THE COURT:  Admitted without objection.

13:28:30 20               MR. DAVIS:  Thank you, Your Honor.

21     **BY MR. DAVIS:**

22     **Q**     So prior to receiving this notice of deficiency dated

23     July 24th, 2020, prior to that date, had anyone from Marco's

24     ever indicated that there was a question to the Columbia

13:28:58 25     Agreement being renewed?

**Andrew Joseph Hunter (Direct)**

1    **A**    No, not at all.

2    **Q**    So you testified that after you followed up with

3    Ashley Weis several times about the renewal, you said you

4    never received any response from her; is that accurate?

13:29:17  5    **A**    No.  The next thing that I got was this deficiency

6    notice.

7    **Q**    Okay.  So this deficiency notice, without going into

8    the detail of every -- of the four or five deficiencies that

9    are listed in that, maybe less, what actions did KAM take in

13:29:56  10    response to receiving this notice of deficiency, if any?

11    **A**    Sure.  You know, we immediately began to address the

12    issues, I would say, regardless of our own opinion to their

13    merit.  We were -- what I expressed was we want to comply

14    and do whatever it is that you need, and that's the path

13:30:24  15    that we went forward for the three that are mentioned.

16    **Q**    And did you take steps to quote/unquote "cure" --

17    well, let me rephrase the question.

18        Did KAM take steps to address each and every

19    deficiency listed in Exhibit Number 8?

13:30:50  20    **A**    Yes.

21    **Q**    Did you communicate those actions to Marco's?

22    **A**    I did, yes.

23    **Q**    And did you receive any response from Marco's

24    regarding the steps KAM took to address these issues?

13:31:10  25    **A**    No.  There was no finality to it, no.

**Andrew Joseph Hunter (Direct)**

1    **Q**    But when you communicated that you had taken action to

2    address all of these -- well, the number of deficiencies,

3    you didn't receive any response from KAM whether they

4    accepted or denied your action?

13:31:38  5    **A**    That's right.  We had, you know, some correspondence

6    just about the content and to clarify what exactly was

7    needed.  But as far as a demonstration or a confirmation

8    from Marco's of having them -- you know, me expressing we've

9    done everything that you asked, there was no response to

13:32:00  10    that.  They didn't say, "We agree, you've cured them all,"

11    or "No, you haven't."  There was just -- there was no

12    response.

13    **Q**    And so during this time, you know, after receiving

14    this letter, the notice of deficiencies on July 24th, 2020,

13:32:38  15    did KAM take any more action regarding receiving the renewal

16    paperwork for the Columbia Agreement?

17    **A**    Yes.  I am paraphrasing.  I wrote to say, "We'll get

18    the issues addressed.  Please send us the agreement and the

19    corresponding addendum for our review."  And that escalated

13:33:04  20    into a refusal to do that and more defaults.

21    **Q**    Well, let's take that one step at a time.

22          So who were you directing those requests to as far as

23    receiving the renewal paperwork?  Not necessarily addressing

24    the issues in the notice of deficiency, but when it came

13:33:30  25    time to asking again for the renewal paperwork, who at KAM

**Andrew Joseph Hunter (Direct)**

1    were those communications directed to?

2         I'm sorry.  Who at Marco's were those communications

3    directed to?

4    **A**    They were directed to Ashley Weis and I believe the

13:33:47 5    legal team in general.

6    **Q**    And did there come a time when you finally got a

7    response regarding the renewal paperwork from Marco's?

8    **A**    Yes.

9    **Q**    And what was that response?

13:33:59 10   **A**    "We're not providing you any agreements, and you

11   should expect a default letter."  Actually, it was "You

12   should expect a deficiency letter regarding development,"

13   and it turned out to actually be a notice of default.

14   **Q**    And I'm going to turn your attention to what's been

13:34:21 15   previously marked as Plaintiff's Exhibit Number 9, and I'm

16   actually getting the hang of this now.

17        I have on the screen now Plaintiff's Exhibit Number 9.

18   Is this the default for the Columbia Agreement that you just

19   referenced in your last answer?

13:34:48 20   **A**    Yes, it is.

21   **Q**    Okay.  And what does it state?

22   **A**    The date is August 13th, 2020.

23   **Q**    Do you remember what the expiration of the Columbia

24   Agreement was?

13:35:08 25   **A**    September 10th, 2020.

**Andrew Joseph Hunter (Direct)**

1  **Q**     So approximately 28 days before the expiration of the

2  Columbia Agreement, Marco's informed you for the first time

3  that they were not intending to renew the agreement?

4  **A**     That's correct, yes.

13:35:34 5  **Q**     And the letter was sent to KAM Development, LLC?

6  **A**     Yes, it was.

7  **Q**     And who sent this on behalf of Marco's?

8  **A**     Anthony Libardi, president and chief operating

9  officer.

13:35:54 10            MR. DAVIS:  Your Honor, we ask that

11  Plaintiff's Exhibit Number 9 be moved into evidence.

12                THE COURT:  Mr. Blum.

13                MR. BLUM:  No objection.

14                THE COURT:  It will be admitted without

13:36:08 15  objection.

16                MR. DAVIS:  Thank you, Your Honor.

17  **BY MR. DAVIS:**

18  **Q**     I'm sure we're going to talk about each of the alleged

19  defaults in a bit.  But did KAM respond to Marco's we'll

13:36:37 20  call that the Columbia NOD?  Did KAM --

21                (Court Reporter clarification).

22                MR. DAVIS:  NOD, standing for notice of

23  default to make it clear.

24  **Q**     Did KAM respond to the Columbia NOD at any time?

13:36:58 25  **A**     Yes.  Our counsel responded.

**Andrew Joseph Hunter (Direct)**

1    **Q**    Okay.  And I'm going to turn your attention just to

2    what's been perviously marked as -- I'm sorry.  Let me just

3    make sure I have the right number in here.  I knew

4    technology would hang me up eventually.

13:37:55 5        Okay.  So I'm going to show you what's been previously

6    marked as Plaintiff's 10.

7        Is everyone seeing a document that has the Marks &

8    Klein heading?  Okay.

9        Andy, are you familiar with this document?

13:38:23 10   **A**    I am, yes.  It's the response.

11   **Q**    Okay.  So this is the response from counsel that you

12   just referenced in one of your recent answers?

13   **A**    That's correct.

14   **Q**    Okay.  And what is the date of this?

13:38:38 15   **A**    September 2nd, 2020.

16   **Q**    And what -- well, withdrawn.

17            MR. DAVIS:  I guess at this point we move,

18   Your Honor, that Exhibit 10 be moved into evidence --

19   admitted into evidence.

13:39:10 20            THE COURT:  Mr. Blum.

21            MR. BLUM:  No objection, Your Honor.

22            THE COURT:  Admitted without objection.

23   **BY MR. DAVIS:**

24   **Q**    So what was your understanding that the Exhibit 10 --

13:39:26 25   what was its purpose and what was its contents, if you could

**Andrew Joseph Hunter (Direct)**

1    just roughly, briefly summarize?

2    **A**    Its purpose and its content shows that there were not

3    any defaults and that we should -- per the terms of our

4    agreement, we should be given our renewal documents.

13:39:53  5    **Q**    And, again, can you tell us the date that this was

6    sent?

7    **A**    September 2nd, 2020.

8    **Q**    So eight days before the expiration of the Columbia

9    Agreement?

13:40:13  10    **A**    That's correct.

11    **Q**    Okay.  Did KAM ever receive a response to Exhibit 10,

12    the September 2nd letter?

13    **A**    No.  It went ignored.  There was no substantive

14    response.

13:40:37  15    **Q**    So what did KAM do as the expiration of the Columbia

16    Agreement approached?

17    **A**    File a claim.

18    **Q**    The instant lawsuit that we're all here talking about

19    today; correct?

13:40:54  20    **A**    That's the one, yes.

21    **Q**    And do you recall the Court entered the TRO against

22    Marco's in its initial ruling on KAM's original motion for

23    preliminary injunction?  Do you remember that?

24    **A**    I do, yes.

13:41:27  25    **Q**    And do you remember the date that occurred?

**Andrew Joseph Hunter  (Direct)**

1    **A**    I believe that hearing was on September 11th.

2    **Q**    After the hearing and after the Court entered the TRO,

3    did you ever receive any more correspondence from Marco's?

4    **A**    I did.  I received a notice of default for our

13:41:58 5    Charlotte territory.

6    **Q**    Okay.  Going to show you what's been previously marked

7    for identification as Plaintiff's Exhibit 11.  Is this the

8    notice of default that you just referenced in your previous

9    answer?

13:42:31 10    **A**    Yes, this is it.

11    **Q**    Okay.  And what's the date of this letter?

12    **A**    September 15th, 2020.

13    **Q**    And which agreement is this a notice of default for?

14    **A**    This is for the Charlotte Agreement.

13:42:52 15    **Q**    Had you ever received any previous communications

16    regarding the contents and the alleged default under the

17    Charlotte Agreement?  Had you ever received anything like

18    that in the months before the Charlotte NOD as we refer to

19    this document as?

13:43:13 20    **A**    In the months prior to receiving this document?

21    **Q**    Yes.

22    **A**    No.

23    **Q**    Okay.

24              MR. DAVIS:  And, Your Honor, we would like to

13:43:27 25    have Plaintiff's Exhibit 11 moved into evidence.

**Andrew Joseph Hunter (Direct)**

1          THE COURT:  Mr. Blum.

2              MR. BLUM:  No objection, Your Honor.

3              THE COURT:  Admitted without objection.

4     **BY MR. DAVIS:**

13:43:39 5    **Q**    Okay.  So we're going to talk about these deficiencies

6     a little more in depth, but were there similarities between

7     the Columbia NOD and the Charlotte NOD?

8     **A**    Yes.  It lists the exact same three defaults.

9     **Q**    Okay.  I'm going to -- before we talk about the

13:44:09 10   specific default -- oh, I shouldn't have done that.  I

11    apologize.

12          I'm going to turn your attention back to Exhibit 2 the

13    Columbia Agreement, and if I could draw your attention again

14    to the bottom of page 4, Section 2.2.  Can you just read

13:44:53 15   Section 2.2, that first paragraph?

16    **A**    It says:  "Renewal.  Area Representative may, at its

17    option, renew this agreement for four (4) additional terms

18    of five (5) years each.  Renewal shall be automatic subject

19    only to the following conditions, all of which must be met

13:45:10 20   before renewal."

21    **Q**    And as we've already discussed, the requirement of

22    Section 2.2.1 is to give Marco's written notice of your

23    election to renew; is that correct?

24    **A**    That's correct.

13:45:29 25   **Q**    And KAM satisfied this requirement?

**Andrew Joseph Hunter (Direct)**

1    **A**    Yes.

2    **Q**    Okay.  Moving to the top of page 5, Section 2.2.2.

3    Can you just read -- well, why don't you read the whole

4    provision so there is no complaint.  Andy, could you read

13:46:08  5    the paragraph?

6    **A**    Oh, I'm sorry.  You want me to read 2.2.2?

7    **Q**    Yes.

8    **A**    Okay.  "Area Representative shall not be in material

9    default of any provision of this Agreement, any amendment to

13:46:21 10    this Agreement, any successor to this Agreement, or any

11    other agreement between Area Representative and Franchisor

12    or its subsidiaries and affiliates.  If Area Representative

13    is currently in default but is able to cure, and so cures

14    during this time periods proved herein, then the renewal

13:46:40 15    shall not be otherwise preclude."

16    **Q**    Thank you.  And is it your understanding that this

17    provision is kind of what we're arguing about when it comes

18    to the Columbia Agreement?

19    **A**    Yes, I agree with that.

13:46:53 20    **Q**    Okay.  So we'll move down to Section 2.2.3.  Is KAM

21    current on all monetary obligations owed to Marco's?

22    **A**    Yes.

23    **Q**    So KAM has satisfied the requirement for renewal in

24    Section 2.2.3?

13:47:14 25    **A**    Yes.

**Andrew Joseph Hunter (Direct)**

1    **Q**    All right.  Can you just read the first paragraph, the

2    first sentence in Section 2.2.4?

3    **A**    "Area representative shall execute Franchisor's

4    then-current form of area representative agreement."

13:47:32 5    **Q**    And is KAM prepared to do that?

6    **A**    We are prepared to do that.

7    **Q**    Okay.  Section 2.2.5, can you read that?

8    **A**    "Area Representatives shall pay the Renewal Fee

9    (defined below)."

13:47:53 10    **Q**    Is KAM prepared to do that?

11    **A**    Yes.

12    **Q**    Can you read section 2.2.6?

13    **A**    "Area Representative and its principals shall execute

14    a general release, in a form prescribed by Franchisor, of

13:48:03 15    any and all claims against Franchisor and its subsidiaries

16    and affiliates, and their respect officers, directors,

17    agents, and employees."

18    **Q**    And is KAM prepared to do that?

19    **A**    Yes.

13:48:17 20    **Q**    And finally, Section 2.2.7, can you please read that?

21    **A**    "Area Representative and its personnel shall comply

22    with Franchisor's then-current training requirements."

23    **Q**    And is KAM prepared to do that?

24    **A**    Yes.

13:48:33 25    **Q**    Going to turn our attention back to the Columbia

**Andrew Joseph Hunter (Direct)**

1    Notice of Default, which has been entered as Plaintiff's

2    Exhibit 9.

3         You testified earlier that there were three claimed

4    defaults in both the Columbia NOD and the Charlotte NOD; is

13:49:08  5    that correct?

6    **A**    That is correct.

7    **Q**    So what was the first claimed default in the Columbia

8    NOD?

9    **A**    Failure to meet the development schedule.

13:49:24  10   **Q**    So I'm going to have you read -- okay.  Why don't we

11   do this:  It's accurate that this says that KAM will still

12   not meet its requirement of 35 stores opened in the new

13   territory; is that accurate?

14   **A**    Can you say that again, Giles?  I'm sorry.

13:49:59  15   **Q**    Basically, this first default is saying that KAM

16   failed to have 35 stores opened by September 10th, 2020.  Is

17   that a summation of what the first claim of default is?

18   **A**    Yes.

19   **Q**    So let's talk about that in the Columbia territory.

13:50:27  20        So we talked about it a little bit before that KAM had

21   ended 2019 with having 29 stores open.  Am I remembering

22   that correctly?

23   **A**    I thought it was 28.

24   **Q**    All right.  So I stand corrected.  So you had 28

13:50:56  25   stores opened at the end of 2019.  How many stores has KAM

**Andrew Joseph Hunter (Direct)**

1    opened in 2020?

2    **A**    Six.

3    **Q**    Okay.  And let's break that down.  So how many

4    physical locations are open and operating that were opened

13:51:26  5    and operated in 2020?

6    **A**    Of those six, two of them are open and operating.

7    **Q**    Now, so there's a -- I'm going to turn your attention

8    back to -- and I apologize because one of my devices, the

9    battery died, so I've got to fly blind on one thing.  All

13:52:10  10    right.

11    I'm going to turn your attention to Section 5.3.2 of

12    the Columbia Agreement, Exhibit Number 2, on page 15.  So

13    can you read -- Andy, can you read Section 5.3.2 through

14    Section A?  We'll stop there.

13:52:53  15    **A**    "A Development Schedule will be considered as having

16    been met as to a particular target at the earliest of the

17    following:  (a) when the corresponding store is open and the

18    initial franchise fee is fully earned by Franchisor; (b)

19    when the Store" --

13:53:07  20    **Q**    Stop you there under A.  We're going to take these

21    individually.

22    **A**    Yep.

23    **Q**    Two of the stores that KAM has developed in 2020 would

24    fall under Section A?

13:53:24  25    **A**    That's right, yes.

**Andrew Joseph Hunter  (Direct)**

1    **Q**    Can you read now all of Subsection (b)?

2    **A**    "When the store is not yet open, but the franchisee

3    for that Store has paid the Franchisor the entire initial

4    franchise fee due under the franchise agreement for that

13:53:44 5    Store, provided, however, that the Store must actually open

6    within one year after the original deadline under the

7    Development Schedule, and further provided that Area

8    Representative may only exercise its right under this clause

9    "b" once during the Term of this Agreement."

13:54:04 10    **Q**    So let's start here.  Had KAM ever exercised its right

11    under Section 5.3.2(b) for the Columbia Agreement prior to

12    2020?

13    **A**    No.

14    **Q**    Okay.  And so we have two stores that fall under

13:54:26 15    Subsection (a).  How many stores fall under Subsection (b)

16    for 2020 development for KAM?

17    **A**    I believe it's four.

18    **Q**    Okay.  And can you explain that?  So there are four

19    locations located in the Columbia territory.  And for those

13:55:09 20    four stores, have franchise agreements been signed for those

21    store locations?

22    **A**    Yes.

23    **Q**    And has the initial franchise fee for each of those

24    four agreements been signed?

13:55:19 25    **A**    Yes.

**Andrew Joseph Hunter (Direct)**

1    **Q**    And then so between Subsection (a) and Subsection (b),

2    you've identified five stores, and you identified six stores

3    total as being developed in 2020.  So does the final store

4    fall under Subsection (c)?

13:55:47  5    **A**    Yes.

6    **Q**    Let me ask you this:  So even with the COVID pandemic,

7    KAM was able to physically open two locations in 2020?

8    **A**    That's right, yes.  This was in the previous area that

9    was under the JHD exclusive territory.  So it was

13:56:25  10    relinquished and then we developed them with a different

11    franchisee.

12    **Q**    Okay.  I'm going to turn your attention back to

13    Exhibit Number 9, page 2, heading Number 2.  Can you

14    summarize your understanding of the second claimed default

13:57:14  15    under the Columbia Agreement in the Columbia NOD?

16    **A**    Yes.  It says -- the gist is that KAM has failed to

17    properly communicate the development activity that's going

18    on in our territory.

19    **Q**    And was that addressed in the July notice of

13:57:35  20    deficiency?

21    **A**    No, it was not.

22    **Q**    It was not.  Okay.

23         Did you have any communications with anybody at

24    Marco's regarding this alleged default for failing to

13:57:59  25    communicate properly with Marco's?

**Andrew Joseph Hunter  (Direct)**

1    **A**    Yes.  We had a phone call with Tony Libardi a day or

2    so after we received this letter, and he indicated in that

3    call that this default number two was basically a nonissue.

4    **Q**    And have you reviewed defendant's briefs that they

13:58:30  5    filed regarding this motion?

6    **A**    Can you clarify what you're --

7    **Q**    Okay.  You're aware that Marco's has filed briefs in

8    response to this motion?

9    **A**    Right, the entirety.

13:58:52  10    **Q**    Right.  And have you read that?

11    **A**    Yes.

12    **Q**    Okay.  And do you recall if Marco's (indiscernible).

13                    (Court Reporter clarification)

14    **Q**    I'm sorry.  So in your reading of the briefs filed by

13:59:24  15    Marco's, do you recall if they mentioned in any way or

16    challenged your curing of this alleged default regarding

17    communication?

18    **A**    I don't believe they included anything about this one.

19    I don't recall anything in their briefs about this.

13:59:42  20    **Q**    Okay.  And then that's also the second grounds for

21    default in the Charlotte NOD?

22    **A**    Yes, that's correct.

23    **Q**    Okay.  So let's go back before we tackle the third

24    grounds for default in both the Charlotte and the Columbia

14:00:16  25    NOD because they can be dealt with together.

**Andrew Joseph Hunter (Direct)**

1          Exhibit 11, which was served on -- which was provided

2    to you or sent to you after filing the instant lawsuit also

3    said that you failed to meet your development obligations

4    under the Charlotte Agreement; right?

14:00:35  5    **A**    That's right.

6    **Q**    So moving down -- so not to belabor the point because

7    this has already been briefed, how many locations was KAM

8    required to develop in 2020 under the Charlotte Agreement?

9    **A**    Under the Charlotte Agreement, I believe the total

14:01:35 10    number by then is 26.

11    **Q**    Besides the total number, how many specifically in

12    2020 was KAM supposed to develop?

13    **A**    Well, there's -- I think there's two different -- I'm

14    not sure which one you're referring to, if you are referring

14:02:03 15    to the development schedule that's listed in the Charlotte

16    ARA, that number I don't know without looking at it, or if

17    you mean the number that Marco's put in one of these notices

18    to us.

19    **Q**    All right.  Well, maybe we should talk about this

14:02:30 20    then.  So if you look at -- if you look at the top of page 2

21    on of Plaintiff's Exhibit 11, Marco's is claiming how

22    many -- does this refresh your memory as to how many units

23    Marco's was expecting KAM to develop in the Charlotte

24    territory for 2020?

14:03:07 25    **A**    This is -- this requirement of opening additional

**Andrew Joseph Hunter (Direct)**

1    three new units by December 31st of 2020 was put into a

2    notice to us in 2019 that just came out of thin air.

3    **Q**    Okay.  So maybe we should talk about it then.  So were

4    there changes made, or any adjustments made to the

14:03:45  5    development schedule under the Charlotte Agreement since it

6    was entered into in 2011?

7    **A**    Sure.  So in 2018, I believe it was August, we

8    received a notice of concern about our development in

9    Charlotte.  And I consulted with the development team and,

14:04:12 10    under their advice, was able to obtain a meeting with the

11    executives and the development team at the upcoming AR

12    meeting in Atlanta a couple months after that.  And so we

13    met in person, and the gist of that meeting was there is

14    many different reasons why a store might fall through,

14:04:35 15    whether it's, you know, not agreeable terms with the

16    landlord, it doesn't make financial sense because of rents

17    or whatever other provisions, or in the instance of us

18    having franchisees choose another brand at the 11th hour

19    instead of deciding to move forward with Marco's after we

14:04:56 20    presented sites.  We went over all of those things with them

21    at that meeting and had a general agreement that we

22    shouldn't force locations to be open simply for the sake of

23    opening them; they have to make sense, and the franchisee

24    has to have a reasonable chance of success there.

14:05:12 25            As a result of that meeting, my understanding was that

**Andrew Joseph Hunter (Direct)**

1    the expectation was for us to continue to grow and that our

2    process was solid and just, you know, let the fruits of that

3    labor bear.

4         And we then received a -- actually, the next thing

14:05:38 5    that happened is we had -- at the time, we were working on

6    the development agreement with another group in Charlotte,

7    and that took many months to get across the finish line.  It

8    finally did in December of that year.

9         A few days later, we received a default.  So it came

14:05:59 10   out of -- I was surprised by that for two reasons:  One,

11   because we had just met with all of the decision-makers in

12   person at the Atlanta meeting a couple months prior; and the

13   second was that we just signed this development agreement

14   for eight stores, seven of which were in the Charlotte area.

14:06:16 15   We then responded to the notice of default to say,

16   "Hey, I think this was an error because we've -- we have

17   this development.  One, we had just spoken; but, two, we had

18   just signed up a seven-store deal in Charlotte, and so there

19   is no development default."

14:06:44 20   They ended up responding to that and that's where this

21   plan came from, that they said, "We are not going to rescind

22   the default, but we acknowledge that you cured it right

23   away, and here's the plan for 2019, 2020 and 2021."

24   **Q**   Okay.  So what was KAM's understanding of the

14:07:10 25   requirements under that plan going forward of how many

**Andrew Joseph Hunter  (Direct)**

1   stores KAM had to develop in 2020?

2   **A**     So there would have been three in 2020.  I believe it

3   says four in '19, three in '20, and four in '21.

4   **Q**     And how many stores did KAM develop in 2020 that had

5   actually opened?

6   **A**     We have one so far that's actually opened.  If we look

7   at that development agreement at seven, we opened up several

8   others in 2019.  I believe the total was four additional and

9   then plus this one in 2020.  So that's -- I believe that's

10  12 stores opened in the last two years.

11  **Q**     And are there any other stores at any stage of

12  development in the Charlotte territory for 2020?

13  **A**     Certainly.  We have one that is in the final stages of

14  permitting and should be able to begin construction shortly,

15  and another site that's been approved that we are in the

16  franchise agreement process.

17  **Q**     Let's take the second store.  When you say

18  "construction," do you mean that to build the building from

19  the ground up?  Is that what you mean by construction would

20  begin?

21  **A**     No.  It is a build-out.  So the building is completed,

22  and we will begin the build-out of our particular space

23  within that building.

24  **Q**     I will represent to you and to the Court that in

25  defendant's last filing, they represented that you were

**Andrew Joseph Hunter (Direct)**

1    not -- well, let me take a step back, and then I'll get

2    opposing counsel jumping out of their chairs because I see

3    they are paying attention.

4         That second store is going to be in a shopping

14:09:37  5    development owned by Publix Super Market; is that correct?

6    **A**    That's correct.

7    **Q**    Okay.  And in their brief, the defendants made the

8    representation that they don't believe that you are going to

9    have access to the building in time to open for 2020.

14:10:00  10         MR. DAVIS:  I would ask opposing counsel if

11    they disagree with that representation.

12         MR. BLUM:  I will object to the form.  I think

13    what we've said is that the lease, that they've given the

14    technical rights to have it until the 31st.  We don't when

14:10:15  15    they are going to have it.  But we do agree that we don't

16    think it will be in time to complete it.  But the statement

17    was that the -- we understand that the lease says it doesn't

18    have to be turned over until December 31.

19         MR. DAVIS:  And that's fine.

14:10:29  20    **BY MR. DAVIS:**

21    **Q**    When is KAM going to have access to begin the

22    build-out on the Publix store?

23    **A**    Shortly.  The most recent communication we have is it

24    will be this month and they're working on it to have it over

14:10:48  25    to us.

**Andrew Joseph Hunter  (Direct)**

1    **Q**     And in your experience, how long does it take between

2    a build-out and having the store open?

3    **A**     It varies, but within 60 days is typical.

4    **Q**     And is the franchise fee fully paid for that second

14:11:07  5    location?

6    **A**     Yes, it is.

7    **Q**     And then you spoke of a third location in which the

8    site has been approved.  Can you tell us about that?

9    **A**     Yes, it is a former Jet's Pizza space, and the

14:11:24 10    equipment is in place, and we have approval to use that

11    equipment.  So it is as close to turnkey as you can get --

12    it's a remodel -- to get the store open.

13    **Q**     And has KAM paid the franchise fee for that location

14    yet?

14:11:42 15    **A**     No.  We've asked for the franchise agreement.

16    **Q**     But have you been given it?

17    **A**     No.

18    **Q**     Okay.  If you were given the franchise agreement, you

19    would pay the fee?

14:11:53 20    **A**     Yes.

21    **Q**     And if you were given the franchise agreement, you

22    could have that store open and operational by the end of

23    2020?

24    **A**     Yes.

14:12:03 25    **Q**     So I'm going to then look one last time.  This is

**Andrew Joseph Hunter (Direct)**

1    Exhibit 11, so this is the Charlotte NOD.  Can you summarize

2    what the third and final default, alleged default, that

3    Marco's claims against you, against KAM?

4    **A**    Yes.  It is referring to the full-time management of

14:12:51  5    the business and that we are not meeting that requirement,

6    in addition to one of the sections that it references.  My

7    understanding in reading this is that Marco's interpretation

8    is that we don't have the ability to open up any other type

9    of business without their approval.

14:13:19  10    **Q**    And did they specifically reference another franchise

11    system?

12    **A**    Yes.  They referenced Jeremiah's Italian Ice.

13    **Q**    And does Jeremiah's Italian Ice sell pizza as a main

14    menu item?

14:13:40  15    **A**    No, they do not.

16    **Q**    Do they sell pizza at all?

17    **A**    No.

18    **Q**    May I ask, has KAM entered into an agreement with

19    Jeremiah's?

14:13:55  20    **A**    No, KAM has not.

21            MR. DAVIS:  I'm going to ask that before I

22    open up Exhibit 12 -- well, it doesn't matter if I open it

23    up; we're not in public.

24            Exhibit 12 also been designated confidential, subject

14:14:25  25    to the protective order.  And KAM has filed the full copy

**Andrew Joseph Hunter (Direct)**

1    under seal, has filed a redaction for the public filing with

2    this motion, and has redacted the portions of its brief that

3    directly reference this Exhibit 12.  So I would ask the

4    Court that we designate this portion of the public hearing

14:15:04 5    as confidential and keep Exhibit 12 from being publicly

6    published.

7                    THE COURT:  Mr. Blum, at this point, any

8    objection?

9                    MR. BLUM:  Subject to our position that this

14:15:19 10    is not confidential.  It actually has been provided to

11    different states and the like.  They did not give the same

12    protection to our Area Representative Agreement, but I know

13    that there is an order.  So I guess, you know, at this point

14    given the prior proceedings, I guess there is no choice to

14:15:38 15    do it.  I don't think it's necessary or even appropriate,

16    but we are in a -- there has been some agreement that we

17    would do that.  So I guess ultimately no objection, other

18    than lack of need or --

19                    MR. DAVIS:  I can address that, Your Honor.

14:15:59 20                    THE COURT:  Go ahead, Mr. Davis.

21                    MR. DAVIS:  It is simple.  The reason why the

22    Area Representative Agreement between KAM and Marco's would

23    not need confidential protection is because they're both

24    parties to this action.  The reason this is designated

14:16:19 25    confidential is because of the parties that -- the parties

**Andrew Joseph Hunter (Direct)**

1    to this agreement, neither of them are parties to the

2    action.  So those third parties don't deserve -- there's no

3    need to have an agreement between two third parties

4    displayed publicly when simply --

14:16:41   5           THE COURT:  Okay.  All right.  At this point,

6    I will permit it.  But I think the broader point is just

7    because they are not parties doesn't mean the document is

8    not entitled to protection moving forward as a general

9    matter.

14:16:59  10       But in light of your discussions previously and Mr.

11   Blum's current position, we can proceed in that fashion.

12   However, frankly, what would always be subject to a request

13   that it be unsealed or unprotected at a later time, but I

14   think we're fine proceeding for the moment in this

14:17:19  15   proceeding pursuant to your request and that agreement.

16       Let me interrupt for a moment, though before we go any

17   further.  Any idea about how much longer, Mr. Davis, you

18   might be with your witness Mr. Hunter?

19           MR. DAVIS:  Five minutes.

14:17:35  20           THE COURT:  I'm sorry?

21           MR. DAVIS:  Five minutes, less perhaps.

22           THE COURT:  I'm asking for the benefit of

23   everyone, and in particular Stacey.  Are you okay to go a

24   little bit longer before a break?  Or do you need a break

14:17:41  25   now?

**Andrew Joseph Hunter (Direct)**

1          THE COURT REPORTER:  No.  I can wait.  Thank

2     you, Judge.

3          THE COURT:  Okay.  Mr. Davis.  Thank you.  Go

4     ahead, please proceed.

14:17:51  5          MR. DAVIS:  And if it pleases the Court, that

6     is a real five minutes, not a lawyer five minutes.

7          THE COURT:  We shall see, Mr. Davis.  Go

8     ahead.

9

10

11

12

13

14

15

16

17

18

19     **BY MR. DAVIS:**

14:18:54 20     **Q**     How does Bullfrog go about trying to sell Jeremiah's

21     franchise?

22          MR. BLUM:  You broke up there.  How does

23     Jeremiah's go about?

24     **Q**     Yeah.  How does Bullfrog go about attempting to sell

14:19:14 25     Jeremiah's franchise?

**Andrew Joseph Hunter (Direct)**

1    **A**    Sure.  There's a lead funnel of prospective

2    franchisees who express interest in the Jeremiah's brand.

3    And those are then, after I believe an initial vetting

4    process, they are introduced to the area rep to continue the

14:19:35  5    sales process.

6    **Q**    And is that a similar process on how KAM gets its

7    leads for the Marco's franchisees or potential Marco's

8    franchisees?

9    **A**    It is, yeah.

14:19:55  10    **Q**    Okay.  Has KAM or Bullfrog ever been approached by an

11    individual simply looking to buy a franchise without giving

12    any specification of what franchise they are interested in?

13    **A**    No.  They've always been specific to the brand that

14    they are expressing their interest in.

14:20:17  15    **Q**    So because there's some similar ownership between

16    Bullfrog and KAM, so how would -- let me ask it this way:

17    Has KAM ever attempted to sell a Jeremiah's franchise --

18    **A**    No.

19    **Q**    -- to -- let me finish the question -- to a Marco's

14:20:46  20    lead?

21    **A**    No.

22                    (Court Reporter clarification)

23    **A**    It is "no," KAM has not sold or attempted to sell a

24    prospective Marco's franchisee any other franchise except

14:21:21  25    for Marco's.

**Andrew Joseph Hunter (Direct)**

1  **Q**    And has Bullfrog ever attempted to sell a potential

2  Jeremiah's franchisee a Marco's franchise?

3  **A**    No, sir.

4           MR. DAVIS:  So I think that's all I have for

14:21:44 5  Mr. Hunter at this time, Your Honor.  Plaintiff does reserve

6  the right to recall Mr. Hunter based upon what the evidence

7  is presented and allowed by the Court in defendant's case in

8  chief.

9           THE COURT:  I think that's fair.  And, Mr.

14:22:09 10  Davis, I will take back my earlier slander.  You did keep

11  your question to within five minutes.  So I will retract

12  that previously.

13      Folks, let's take a brief break.  We've been at it for

14  about two hours since our last break.  And I would like to

14:22:28 15  give the court reporter and everyone else a break moving

16  forward.

17      Mr. Blum, will you be ready for cross-examination with

18  this witness after the break, sir?

19           MR. BLUM:  Will I be ready?  Yes.

14:22:39 20           THE COURT:  Ready to conduct cross-examination

21  after the break?

22           MR. BLUM:  Yes, Your Honor.

23           THE COURT:  All right.  We'll resume with

24  that.

14:22:45 25      So let me instruct, Mr. Hunter.  I don't know your

1      level of experience or sophistication.  You are not to

2      discuss your testimony or anticipated testimony moving

3      forward before your testimony is completed here today.

4          Do you understand?

14:23:00  5          THE WITNESS:  Yes.

6          THE COURT:  All right.  Very good.  And so,

7      with that admonition, sir, we'll go ahead and take a break

8      for, oh, let's try and get back within 10 or 15 minutes so

9      we can resume at that time.  Okay.  Thank you.  Thank you,

14:23:20 10     everyone.

11                  -  -  -

12              (Recess taken at 2:23 p.m.)

13                  -  -  -

14              (Court reconvened at 2:37 p.m.)

14:23:24 15                  -  -  -

16          THE COURT:  How are we doing, folks, in terms

17     of reassembly?  Do we have pretty much everyone that we need

18     at this point?  It sure looks like it.

19          MR. BLUM:  I think Mr. Blynn was heading back

14:37:49 20     to his --

21          THE COURT:  There he is.

22          MR. BLUM:  He's in the studio with the books

23     in the back.

24          THE COURT:  And I'm not quite sure about Mr.

14:37:56 25     Klein.  Mr. Davis, are we okay doing forward?

1          MR. DAVIS:  We're okay, Your Honor.  Can I

2     make a quick housekeeping --

3          THE COURT:  Sure.

4          MR. DAVIS:  So there's also the issue of Tenn

14:38:12 5     Slices which I think can be dealt with pretty quickly.  Tenn

6     Slices provided the termination agreement of the Jeremiah's

7     Agreement at issue in that case to counsel yesterday.  Tenn

8     Slices will be happy to withdraw the motion for preliminary

9     injunction once we receive written confirmation of that.

14:38:35 10    Marco's has rescinded the termination and has restored Tenn

11    Slices full access to their computer system.

12          THE COURT:  Mr. Blum, are you comfortable

13    commenting on that at this point?  Or what is your thinking?

14          MR. BLUM:  Your Honor, look, I -- what we

14:38:51 15    agreed to was that the termination agreement that they sent

16    us was sufficient proof of the cure that they asserted which

17    was that Mr. Davis is no longer with -- Brad Davis is no

18    longer with the contract with the Jeremiah's system, and we

19    will proceed according to the contract, and so that they

14:39:18 20    have cured the breach, the default.

21          THE COURT:  Okay.  So, Mr. Davis, is that

22    sufficient assurance for you and your client at this point

23    moving forward?  Or no?

24          MR. DAVIS:  Well, Your Honor, can we have it

14:39:32 25    in writing so that we can confirm that --

1          THE COURT:  Okay.

2          MR. DAVIS:  -- their access is going to be

3   restored.  What I suggest, Your Honor, is that we just keep

4   the TRO in place until I get the written confirmation and

14:39:42  5   the access is restored, and then Tenn Slices will withdraw

6   their motion for preliminary injunction.

7          MR. BLUM:  Your Honor, I don't believe in Tenn

8   Slices there was a TRO entered because there was a

9   jurisdictional problem.  I'm not sure.

14:39:55  10          MR. DAVIS:  That is not true, Your Honor.  The

11   Tenn Slices Complaint properly pleads jurisdiction, and the

12   Court can take jurisdiction on the basis of the pleading.

13   If they want to talk about the jurisdictional issue, we sent

14   them correspondence regarding the discovery we needed to

14:40:12  15   take to determine the domicile of Marco's Franchising.  I --

16          MR. KLEIN:  Time out, Giles.  Giles, just one

17   second.

18      I think Mr. Blum is partially right there.  The Court

19   did not enter the TRO on the basis that this hearing was

14:40:29  20   going to proceed today on this Friday.  And if the Court

21   deemed it necessary to have the hearing on the TRO today,

22   then the Court was going to entertain that.

23      There was nothing, except for the Court's acceptance

24   of jurisdiction on the face of the pleading, which is what

14:40:51  25   Your Honor did during our last call, and it had nothing to

1      do with jurisdictional basis.  And the Court actually

2      directed us to confer with counsel on discovery relating to

3      the jurisdictional issue.  We sent a letter to Mr. Blum.

4      They've objected to comply with our requested schedule on

14:41:11  5      discovery issues.  But I'd rather complete the KAM hearing

6      than belabor the Court with those issues.

7                  THE COURT:  Mr. Klein, that is consistent with

8      my intent and recollection in terms of what next steps were

9      with regard to that Tenn Slices lawsuit.

14:41:30  10                  MR. BLUM:  Your Honor, actually we filed a

11      supplemental brief that kind of laid it out that the Court

12      has to resolve the jurisdictional issue before it can do

13      anything.  You can't have what they call hypothetical

14      jurisdiction.

14:41:43  15          However, on the discovery, they proposed a 75-day

16      discovery period.  I said, "Look, I will send you our

17      membership list and the correspondence from the woman in

18      Tennessee, a 72-year-old widow college professor saying,

19      yes, I live in Tennessee and, yes, I'm the trustee."  And

14:42:02  20      they said, "No.  We want to go through 75 days of

21      discovery."

22          So I don't understand the issue here.  And based on

23      that, which we will file immediately, Your Honor -- again,

24      it's moot because we have accepted their cure.  And my point

14:42:15  25      on Tenn Slices is just that -- Mr. Davis wants to say and

1    we're going to turn people on.

2        The contract specifically says what happens if we

3    default them, assume control over the territory and then

4    they cure.  It says what happens, and it doesn't say cut

14:42:32  5    back the access as soon as we demand it.  It happens, it's

6    based on the next calendar quarter, or rather the next

7    calendar period, et cetera.  We're going to comply with the

8    agreement.

9        So that's all I'm trying to say.  I don't think

14:42:43  10   there's a fight here, but I don't think the Court has

11   jurisdiction to see if there is a fight here.  So I don't

12   understand why every point has to be so contentious.

13       We will comply with our obligations under the

14   agreement that arise as effect of us now receiving on

14:43:01  15   October 2nd a document effective as of September 13th that

16   gives us comfort as to the supposed cure.  And that's what

17   we're going to do.  So I don't understand what the fight is.

18                THE COURT:  Mr. Klein, Mr. Davis.

19                MR. DAVIS:  Your Honor, that's fine.  I mean,

14:43:22  20   we don't need to discuss the jurisdictional issue now.

21                THE COURT:  Right.

22                MR. DAVIS:  I think we can proceed with KAM.

23                THE COURT:  Right.  And gentlemen, for better

24   or worse for you, you are going to be talking to me again

14:43:35  25   soon anyway in terms of next steps on this litigation in

1    both cases as we proceed forward.  Okay?

2         So if we can, why don't we redirect and get back to

3    Mr. Hunter and his testimony regarding the KAM case at this

4    point.

14:43:52 5         And, Mr. Hunter, let me just tell you, I say this to

6    every witness, so don't read anything into it.  I just

7    remind you that you are still under oath.  I do that after

8    every break with a witness when they are still sworn and

9    still on the witness stand as it were moving forward.

14:44:09 10        And with that, Mr. Blum, are you ready to proceed with

11   cross-examination at this time?

12                  MR. BLUM:  I am, Your Honor.  And, Your

13   Honor --

14                  THE COURT:  Please proceed.  Go ahead.

14:44:18 15                  MR. BLUM:  Your Honor, I don't know if there

16   is an instruction.  You know, I think in this day and age,

17   there's a new instruction that the witness should not have

18   any email or texts or anything or any other kind of -- not

19   suggesting he is, but just to remind him of that.

14:44:32 20                  THE COURT:  Well, I think prior to the break,

21   I made it very clear to him generally that he was not to

22   communicate in any way or discuss his testimony.

23                  MR. BLUM:  Okay.

24                  THE COURT:  To me that includes any means,

14:44:43 25   which would be text messaging, carrier pigeon, telephone,

**Andrew Joseph Hunter (Cross)**

1    frankly moving forward anything.  So I think he's been

2    admonished to that regard.  And, Mr. Hunter, you understand

3    all of that; right?

4                    THE WITNESS:  I do, yes.

14:44:58  5                    THE COURT:  Okay.  I thought as much.  Very

6    well.  So done.  And, Mr. Blum, then, whenever you are

7    ready.

8                    MR. BLUM:  Thank you, Your Honor.

9            **CROSS-EXAMINATION OF ANDREW JOSEPH HUNTER**

14:45:02 10   **BY MR. BLUM:**

11   **Q**    Good afternoon, Mr. Hunter.  My name is Barry Blum and

12   I represent Marco's Franchising in this case.

13   **A**    Good afternoon.

14   **Q**    You are one of the -- I think you just said that you

14:45:17 15   are one of the two members, principals, of KAM; correct?

16   **A**    That's correct.

17   **Q**    And is it a 50/50 ownership, you and your father?

18   **A**    Yes, it is.

19   **Q**    And Mike Hunter, for the record, is your father;

14:45:32 20   correct?

21   **A**    That's correct.

22   **Q**    Okay.  Now, at KAM, what is your principal role?  What

23   do you handle at KAM?

24   **A**    I can handle all of the responsibilities as well as my

14:45:52 25   father can.  Typically, my dad really likes the construction

**Andrew Joseph Hunter (Cross)**

1     side and working with prospects, and I have focus more on

2     the operational side of the business.  But, like I said, we

3     work together and we both can do all of it.

4     **Q**     And is it fair to say you're both sort of trained or

14:46:17  5     able or qualified.  But is it accurate that in the natural

6     course of things, you are sort of the person most involved

7     in operations, or much more than your father is?

8     **A**     Today, yes.

9     **Q**     Yes.  Okay.  And you said your father is involved a

14:46:42  10    lot in the construction side.  Who handles the what we call

11    development here:  locating sites, figuring out, you know,

12    whether there is available properties on a specific site?

13    **A**     Sure.  I would say that dad has done more of that

14    throughout the course of this term, but we both tag team it.

14:47:07  15    We don't have a rigid division of responsibility.

16    **Q**     You do understand, sir, right, that the AR Agreement

17    that you had in Columbia and that you have in Charlotte

18    requires either that you or your father, one of the

19    principals, to devote full time and best efforts to managing

14:47:41  20    the overall AR business; right?

21              MR. DAVIS:  Objection.  Mischaracterizing the

22    terms of the agreement and calls for a legal conclusion as

23    to interpret the terms of the contract.

24              MR. BLUM:  I'm asking for his understanding as

14:48:01  25    our representative.

**Andrew Joseph Hunter (Cross)**

1      THE COURT:  I agree.  I will overrule the

2 objection and allow him to answer it, if he can.

3 **A**    No.  That is not my understanding.  It gives the clear

4 ability for us to employ highly trained personnel, as we've

14:48:17 5 done, to fulfill those two obligations:  franchise sales

6 and/or franchise support.

7 **Q**    Okay, sir.

8      MR. BLUM:  Am I able to share a screen, Ms.

9 Court Reporter?

14:48:29 10      THE COURT:  You should be able to, and our

11 courtroom deputy can give you that power if you need it.

12      MR. BLUM:  Oh.  I think I do have it.  Good.

13 **BY MR. BLUM:**

14 **Q**    All right.  Mr. Hunter, I want to show you what I

14:48:43 15 think was marked as Defendant's Exhibit 2.  I think it was

16 Plaintiff's, maybe, Exhibit 1.  But this is the Area

17 Representative Agreement for Columbia.  And you went over

18 this earlier.

19      Did that work?  See, I may need Mr. Blynn in here

14:49:05 20 pretty soon.  I'm screen sharing, so where does it show up?

21      THE COURT:  Mr. Blum, we can see from Marco's

22 Franchising -- well, we could.

23      MR. BLUM:  This is actually what I wanted to

24 see.  I don't know if this is -- there it is.

14:49:19 25      (Discussion held off the record between Mr.

**Andrew Joseph Hunter (Cross)**

1    Blum and Mr. Blynn).

2    **BY MR. BLUM:**

3    **Q**    So confirm that you all can see the Area

4    Representative Agreement?

14:49:59 5    **A**    Yes.

6                    THE COURT:  Appears to be, yes.

7    **Q**    Okay.  All right.  So, Mr. Hunter, if you can look at

8    5.2, and I want you to read -- I'm just showing off now.

9        Okay.  I just want you to read the sentence I just

14:50:21 10   highlighted, 5.2?

11   **A**    Yes.  "If Area Representative is a corporation,

12   partnership, limited liability company, or a limited

13   liability partnership, such management must be by one of

14   Area Representative's principals who is designated to

14:50:36 15   supervise the operation of the business contemplated under

16   this Agreement and who has been previously approved by

17   Franchisor, (the 'Operating Partner')."

18   **Q**    So, right, only you and your dad are the only

19   principals or owners of KAM; correct?

14:50:55 20   **A**    Yes.  We are the only principals.

21   **Q**    Now, there is a reference to highly trained personnel

22   who can do other things, but this agreement requires --

23   well, let's go back.

24        KAM is a limited liability company; correct?

14:51:08 25   **A**    It is.

**Andrew Joseph Hunter (Cross)**

1   **Q**     All right.  So then this management, which is -- and

2   it is described as the active full time management of KAM's

3   business must be by one of the principals, you or your dad;

4   correct?

14:51:24  5   **A**     That's what this sentence says.

6   **Q**     Right.  Okay.  Now, in fact, as you say, you two have

7   shared -- split the duties.  You do more of the operations;

8   he does more of the development and real estate, and it may

9   be -- is that right?

14:51:44  10   **A**     Could you rephrase the question?

11   **Q**     You two in the 10 years have sort of divided the

12   duties, even though you both can do all off it.  You are

13   more on the operation's side, and he's more on the

14   development and real estate side is kind of what you all

14:52:00  15   have divided up the roles; correct?

16   **A**     Generally speaking, yes.

17   **Q**     And I think you call called it a tag team; right?

18   **A**     Yes.

19   **Q**     All right.  Good.

14:52:28  20          Part of the role of an area representative, as you

21   understand it, is to oversee operations at the store within

22   its territory; correct?

23   **A**     It is to support the operations of the franchise

24   stores.

14:52:48  25   **Q**     Correct, right.

**Andrew Joseph Hunter (Cross)**

1    And part of supporting the operations at the franchise

2    stores is conducting what are called OSEs; correct?

3    **A**    That's correct.

4    **Q**    Okay.  So do you agree, sir, that one of the

14:53:09  5    obligations of KAM, under either the Charlotte or the

6    Columbia Area Representative Agreement, was to physically

7    conduct OSEs, which are Operations Systems Evaluations;

8    correct?

9    **A**    Yes.

14:53:31  10    **Q**    And you would also agree, sir, would you not, that --

11    and that's required by the agreement; correct?

12    **A**    Franchise support is, yes.

13    **Q**    So if KAM said, "Well, we're not doing any OSEs," you

14    would not be complying with the agreement; correct?

14:53:53  15    **A**    Right.

16    **Q**    Right.  And you would also agree that KAM is required

17    under its agreement to actually submit those OSE reports

18    that are -- that go up to Marco's Franchising; correct?

19    **A**    Yes.

14:54:10  20    **Q**    All right.  And that's done online or on, you know,

21    some program, active computer program; correct?

22    **A**    Yes.

23    **Q**    KAM, as an area representative, is required under its

24    Area Representative Agreement to file truthful OSE reports,

14:54:35  25    would you not?

**Andrew Joseph Hunter (Cross)**

1   **A**   Certainly, yes.

2   **Q**   All right.  And KAM is also -- part of its function is

3   to monitor and ensure that any specific store in its

4   territory is actually operating to all Marco's brand

14:55:00 5   standards; correct?

6   **A**   Could you just -- could you say that again?  I'm

7   not --

8   **Q**   Yes.  You would agree, would you not, that an area

9   representative such as KAM, its responsibility is to conduct

14:55:17 10   these OSEs as part of an obligation to ensure that a

11   specific store is operating to all Marco's brand standard,

12   and if not, to refer that up to Marco's Franchising?

13   **A**   Yes.  I don't -- you know, we're not responsible for

14   the operation of a franchise store, and I can't make a

14:55:45 15   franchisee do anything.  But generally speaking, yes, that

16   inspection is something that we have to do, and it's aligned

17   with the brand standards that we then communicate to

18   corporate by submitting the form.

19   **Q**   Correct.  But also, you know, it's not just sort of

14:56:02 20   quote/unquote "ratting them out" to corporate.  You are

21   supposed to teach and coach and see if you can fix it on the

22   ground as well; correct?

23   **A**   That's correct.

24   **Q**   Okay.  So then, sir, you would agree that if KAM or

14:56:19 25   any AR hypothetically filed a false OSE saying that it had

**Andrew Joseph Hunter (Cross)**

1    done an OSE at store one, two, three, four when it had not

2    done so, that would not -- that would with be inconsistent

3    with its contractual obligations; correct?

4    **A**    Certainly, yes.  We wouldn't tolerate that.

14:56:44  5    **Q**    Right.  And also, sir, you would agree that if an area

6    representative, including KAM, filed an OSE saying that a

7    store was run well and scored in the mid 94 percent, when,

8    in fact, that store was not operating at that level, or even

9    presented health and safety issues, that would not be

14:57:12  10   consistent with KAM's obligations under the AR Agreement,

11   would it?

12   **A**    We don't see the score on our side, so I'm not privy

13   to that.  And the inspections are done every 60 days, so

14   we're capturing a moment in time.

14:57:30  15   **Q**    Right, right.  Okay.  But if KAM captures a moment in

16   time and the store is really operating poorly, it would be

17   inconsistent with KAM's obligations under the agreement to

18   fill out items on the report that suggest that it is

19   operating at a very, very high level; correct?

14:57:49  20   **A**    Sure.  I think this goes back to your previous

21   question that it should be truthful.

22   **Q**    Correct.  Right, right, right.  All right.  Okay, sir.

23        And, by the way, you mentioned during your cross [sic]

24   that you believe, and I wrote it down:  You believe that

14:58:17  25   Marco's Franchising position is that -- I think you used

**Andrew Joseph Hunter (Cross)**

1    "we," but you were referring -- again, you can't open any

2    other type of business.  Do you remember that answer you

3    gave?

4    **A**    I do, yes.

14:58:31  5    **Q**    Okay.  On what do you base that, "any other type of

6    business"?

7    **A**    Based on the default letter that was sent --

8    **Q**    Okay.

9    **A**    -- and the section that was referenced.

14:58:41  10   **Q**    Okay.  All right, sir.  And you said you are aware of

11   other area representatives that might do some other types of

12   business; correct?

13   **A**    Certainly.  There were a lot of us that were recruited

14   from other brands initially to join Marco's.

14:59:05  15   **Q**    All right.  And, in fact, your father was a Subway

16   franchisee when he came into Marco's; correct?

17   **A**    Yes.  He was a multi-unit operator.

18   **Q**    He wasn't an area representative for Subway, was he?

19   **A**    No, he was not.

14:59:17  20   **Q**    Okay.  And you are not aware of any other Marco's

21   Franchising area representative that operates an area

22   representative business for another brand, except the ones

23   that Marco's has defaulted; right?

24   **A**    Am I -- I'm not aware of anyone else except the ones

14:59:41  25   who have been defaulted.  Is that what you're asking?

**Andrew Joseph Hunter (Cross)**

1  **Q**    Right, right.  In other words, Mr. Davis and his Tenn

2  Slices and perhaps I want to call it American Eagle, Mr.

3  Corcoran.  Other than those who were involved with

4  Jeremiah's, let's say that.

14:59:59  5      Let me ask:  Are you aware of any Marco's area

6  representatives who is an area representative for any

7  concept other than Jeremiah's?

8  **A**    Sure.  I don't want to -- I want to make sure I have

9  this right:  That area representative is the term that

15:00:15 10  Marco's uses.  Other brands use development agent.  But the

11  concept is that you are a growth partner to help grow the

12  brand.  And, yes, I am aware of others that are in that type

13  of role.

14  **Q**    Okay.  Oh, you are.  And who are they, sir?

15:00:32 15  **A**    That would be Tim Larson.

16  **Q**    Tim Larson?

17  **A**    Yes.

18  **Q**    Okay.  All right, sir.  Well, earlier you mentioned

19  two names, and one of them was someone you said was it Thorn

15:00:53 20  or Horn was in the insurance business?

21  **A**    Tony Horn.

22  **Q**    Tony Horn.  Do you know if Tony Horn individually is

23  an area representative for Marco's?

24  **A**    I'm sure he operates under an entity, but I have not

15:01:05 25  seen his agreement, so I don't know.

**Andrew Joseph Hunter (Cross)**

1    **Q**    And does he have partners?

2    **A**    I would assume so, yes.

3    **Q**    Okay.  And do you know if his partners, if they are

4    involved in the Marco's business?

15:01:18 5    **A**    I think his partner is Tim Brown.

6    **Q**    Okay.  All right, sir.  Thank you.  I want to

7    direct -- and I hope I have the exhibit right, and Mr. Davis

8    can correct me if I'm wrong.  I want to take you to this

9    July 24th letter, a notice of deficiency that KAM received

15:02:20 10   from Marco's Franchising.  Do you recall the discussion of

11   that letter?

12   **A**    Yes, I do.

13   **Q**    And I'm opening that up here.  Is that open now?

14   **A**    I do not see it.  Okay.  Yes.

15:02:45 15   **Q**    Okay.  So that's a notice of deficiency that you

16   received on July 24th.  And you received it at KAM

17   Development as the area representative; correct?

18   **A**    Yes.

19   **Q**    And it shows a notice of deficiency and refers to it

15:03:04 20   as a default on both the Columbia and Charlotte Agreements;

21   correct?

22   **A**    Yes.

23   **Q**    And it talks about, number one, it says,

24   "Recommendation of unapproved technology vendors," and then

15:03:19 25   it talks about "P&L Reviews."  Do I understand, sir, that

**Andrew Joseph Hunter (Cross)**

1    you were not -- Marco's was asserting that KAM was not

2    performing required P&L reviews, which are reviews with

3    franchisees of their financial performance over various

4    periods of time; correct?

15:03:42  5    **A**    That is the allegation, correct.

6    **Q**    And, sir, do those get reported on OSEs when you do

7    that?  Or are they on a separate report?

8    **A**    Separate report.

9    **Q**    Okay.  And do you know how many times a year you're

15:03:58 10    required to do P&L reviews with franchisees?

11    **A**    I believe the manual states quarterly.

12    **Q**    Okay.  Is it quarterly, or five times a year?

13    **A**    I believe it was quarterly.

14    **Q**    Okay.  And then the third one says -- specifically

15:04:17 15    refers to "OSE Visits," and it includes this "Unauthorized

16    AR-OFC."  Do you see that?

17    **A**    Yes.

18    **Q**    Okay.  And then it refers to at the bottom of page 2

19    about OSE visits not in compliance with our requirements;

15:04:36 20    pictures not being submitted; nine stores have failing OSE

21    scores, repeated violations for cleanliness, failing to

22    complete action plans.  Do you see those assertions?

23    **A**    I do, yes.

24    **Q**    So what Marco's is saying there on July 24th is you

15:04:57 25    were not doing your job as an AR with respect to certain

**Andrew  Joseph  Hunter  (Cross)**

1    restaurants in your territory; correct?

2    **A**    That's the allegation, yes.

3    **Q**    Okay.  And if, in fact, there are stores that have

4    failing OSE scores and repeated violations for cleanliness

15:05:16  5    and aren't following their action plans, only Marco's can

6    take action against the franchisee; right?

7    **A**    Only Marco's can take action against the franchisee,

8    yes.

9    **Q**    Yes.

15:05:29  10    **A**    Yes.  The AR was not privy to the franchise agreement.

11    **Q**    Right.  Because KAM is not a party to any franchise

12    agreement; correct?

13    **A**    Right.

14    **Q**    Your responsibility as Marco's representative is to

15:05:44  15    kind of bubbled up to Marco's and try to ensure that these

16    people are doing what they are supposed to be doing, but if

17    not, refer it up to Marco's; correct?

18    **A**    That's correct, yes.

19    **Q**    Okay.  And what they're saying here is that nine

15:05:59  20    stores have failing OSE scores, repeated violations, failing

21    to complete action plans.  Because enforcing action plans is

22    sort of your responsibility to Marco's; correct?

23    **A**    Can you clarify that, "enforcing the action plans"?

24    **Q**    Well, the way the process works is you go in and you

15:06:20  25    do it, an OSE, and there's some problems in a store, there's

1    actually an action plan that's automatically generated that

2    kind of says, look, this issue, if it's a serious issue of,

3    you know, cleanliness or expired product, that needs to be

4    clean up right away.  If it's something like, well, somebody

15:06:42 5    wasn't wearing their hat that day, that might be way down at

6    the bottom.  But you are supposed to put together an action

7    plan that says within, you know, a couple days, fix this

8    problem within, you know -- train your crew on this, and

9    everybody gets assigned responsibilities, and that's how you

15:06:57 10    all address the problems; correct?

11    **A**    Sort of.

12    **Q**    Correct.

13    **A**    I think the -- when the OSEs first came out, the

14    spirit of the action plan was to pick the big rocks, so to

15:07:14 15    speak, and focus on those to have incremental improvement.

16         Since then, the process has changed, and I don't know

17    the exact intricacies to this.  But some of the items, if

18    not all, are auto generated from the OSE to the action plan.

19    **Q**    All right.  And the purpose is that the franchisee

15:07:35 20    operator is given a specific action plan that says do this,

21    do this, do this.  And your role in that is to make sure

22    that the next time you are there, you have to confirm that

23    the franchisee is fulfilling the action plan; right?

24    **A**    Yeah.  Coach, influence.

15:07:53 25    **Q**    Right.

**Andrew Joseph Hunter (Cross)**

1   **A**    Yes.

2   **Q**    And also verify that they said they were going to fix

3   this problem in 10 days, and it has or has not been fixed;

4   correct?

15:08:04  5   **A**    I think if it's something serious, we would do a

6   follow-up visit for that.  And I think that some of these

7   items, you know, if it says to clean your reproofing

8   cabinet, it could be fixed the next day, and now 59 more

9   days go by until the inspection and it's dirty again; so I

15:08:27 10  don't think it's fair to characterize that as, you know, a

11  store that's out of compliance again.  These are things

12  that -- you know, it's a restaurant and it's a continuous

13  process, particularly when it comes to some of the cleaning

14  items.

15:08:43 15  **Q**    If we go back to the July 24th default or delinquency

16  default notice that KAM received, what Marco's was saying

17  was that there are things that are appearing report, after

18  report, after report, and they don't seem to be getting

19  fixed, and that is on you versus Marco's.  Isn't that what

15:09:11 20  they're saying?

21         MR. DAVIS:  Objection.  Is he asking what his

22  understanding of what Marco's was saying?  Or is he actually

23  asking him what Marco's is saying, because he wouldn't have

24  any idea.

15:09:25 25         MR. BLUM:  His understanding.

1   **A**    My understanding of their allegation in that letter

2   towards KAM?

3   **Q**    Well, is it -- what they are saying here is that

4   KAM -- it's ultimately the franchisee's responsibility to

5   fix whatever violations there were, whatever shortcomings

6   there were in the store.

7       But between Marco's and KAM, it's your job, KAM's, to

8   enforce that and to ensure that that is happening.  And

9   that's what they're complaining about, you having the same

10   things repeat, and repeat, and repeat; correct?

11   **A**    That's their allegation, if that's your question --

12   **Q**    Right, right.

13   **A**    -- yes, the scenario.

14   **Q**    Okay.  All right.  Great.  All right, sir.  And they

15   actually do say there that several of these noncompliant

16   stores are owned directly by you, meaning the Hunters;

17   right?

18   **A**    I'm sorry.  It says that in this letter?

19   **Q**    Yes.

20   **A**    These stores are in --

21   **Q**    First sentence of the last paragraph here on this.

22   **A**    Yes, it says that.

23   **Q**    How many stores do you and your father or affiliated

24   stores do you have, sir?

25   **A**    I believe at the time of this letter, it was eight.

**Andrew Joseph Hunter (Cross)**

1    Might have been -- I don't recall if the ninth store opened.

2    Actually I do.  It was eight at the time of this letter and

3    now we have nine.

4    **Q**    Okay.  So you all have eight to nine.  And does that

15:11:00  5    span both territories?  Or is that all in one of the

6    territories?

7    **A**    No.  They are all only in Charlotte DMA.

8    **Q**    All in the Charlotte territory.  Good.  Okay.  All

9    right.  Sir, you're familiar with store 8196?

15:11:39  10    **A**    Yes.

11    **Q**    And is that one of your affiliated stores?

12    **A**    It is, yes.

13    **Q**    And where is that located, sir?

14    **A**    In Rock Hill, South Carolina.

15:11:50  15    **Q**    Okay.  And who is the general manager there right now?

16    **A**    Jazmine.

17    **Q**    Okay.  And do you have a last name for Jazmine?

18    **A**    Jenerette.

19    **Q**    Jenerette.  And when was Jazmine Jenerette hired?

15:12:08  20          THE COURT:  Mr. Hunter, could you spell her

21    last name, please?

22    **A**    J-e-n-e-r-e-t-t-e.

23          THE COURT:  All right.  Mr. Blum, do you want

24    to go ahead ask your question, please.

15:12:25  25    **BY MR. BLUM:**

**Andrew Joseph Hunter (Cross)**

1    **Q**    My question is when was Ms. Jenerette hired?

2    **A**    You know, I'm not sure exactly.  She's worked for us

3    for at least a year.  I don't know exactly beyond that.

4    **Q**    And how long has she been a restaurant general

15:12:43  5    manager?

6    **A**    Six months, perhaps.  I'm not exactly sure, but that's

7    my best estimate.

8    **Q**    Okay.  Sir, when was the last time you were physically

9    in store 8196?

15:13:03  10    **A**    Maybe two weeks ago.

11    **Q**    Two weeks ago?

12    And when you were there, did you do any kind of OSE or

13    evaluation?

14    **A**    No.

15:13:19  15    **Q**    Did you do any kind of teaching or operations

16    coaching?

17    **A**    I don't recall the specific visit.  Typically when I

18    go and visit stores, our own stores, there could be several

19    different reasons for that.  One is to go and physically

15:13:42  20    help out and work.  Others are to fix little things here and

21    there.  Others are just simply to pop in and show my face

22    and keep store moral up and, you know, take little

23    observations obviously while I'm there.  But in this

24    specific instance, I don't even recall this last visit.  It

15:14:05  25    wasn't anything that sticks in my mind.

**Andrew Joseph Hunter (Cross)**

1    **Q**    So when you were there about two weeks ago, you did

2    then look at sort of the condition of the store,

3    cleanliness, et cetera?

4    **A**    Again, sure.  I don't think there was anything that

15:14:22  5    stuck out in my mind.

6    **Q**    Did you note the presence of any unapproved chemicals

7    in the store?

8    **A**    No, I did not.

9    **Q**    Did you notice the presence of any black mold on any

15:14:31  10    refrigerators?

11    **A**    No, I did not.

12    **Q**    Did you notice any torn gaskets on refrigerators that

13    were affecting the ability to keep temperatures?

14    **A**    No.

15:14:43  15    MR. DAVIS:  Objection, Your Honor, to this

16    line of questioning just to preserve the record.  Just this

17    is entirely irrelevant to -- as we've discussed ad nauseam

18    earlier.  I just want to get the objection on the record.

19    THE COURT:  I will note the objection at this

15:15:00  20    time and give you a continuing objection along those lines

21    with regard to relevance.

22    Mr. Blum, you can continue this line of questioning,

23    if you wish.

24    **BY MR. BLUM:**

15:15:07  25    **Q**    Sir, as you sit here today on store 8196, do you have

**Andrew Joseph Hunter (Cross)**

```
 1    any information about sort of the history of its OSE

 2    evaluations?

 3    A    Can you clarify what you mean?

 4    Q    Well, do you know was 8196 one of the nine stores that

 5    had failing OSE scores as of July 24th?

 6    A    We don't see the scores on the OSE.

 7    Q    You don't see any scores on it?

 8    A    No.

 9    Q    How is it that a franchisee -- well, do you see it as

10    the AR?

11    A    No.  That's what I mean.  We were not privy to any

12    number score.

13    Q    Does the franchisee see the score eventually?

14    A    No.

15    Q    Does the franchisee know whether or not they have a

16    passing or failing score?

17    A    No.

18    Q    Okay.  There's a color scheme that you all use instead

19    of using numerical numbers; right?

20    A    Yes.

21    Q    Red, yellow, green; right?

22    A    Yeah.  Different sections will be green, yellow, red,

23    yes.

24    Q    And if a store shows up and has a lot of reds on it,

25    that would indicate both to the AR and the franchisee that
```

**Andrew Joseph Hunter (Cross)**

1    it had some problems; correct?

2    **A**    That it had some problems, yes.

3    **Q**    And if it was all green, it would show that the

4    evaluation was a good store; correct?

15:16:40 5    **A**    Yeah, it would show that the yes/no questions were

6    marked as yes.

7    **Q**    Okay.  When you got this in July 24th, did you respond

8    to Marco's in any way specifically to this July 24th letter?

9    **A**    Yes.

15:17:06 10    **Q**    Okay.  How did you respond?

11    **A**    I emailed, again, I believe it was Ashley Weis,

12    perhaps the legal team as a whole, to state, "Thank you.  We

13    will get these addressed and corrected right away, and to

14    please send our AR Agreement with the corresponding addendum

15:17:35 15    or amendment."

16    **Q**    Did you -- in this period of time, in any of that

17    conversation, did you mention to anyone at Marco's by

18    July 24th that you had signed an Area Representative

19    Agreement with Jeremiah's?

15:17:49 20    **A**    No, because I wasn't breaking any covenants of my

21    agreement.

22    **Q**    But, well, if you weren't doing anything wrong, why

23    didn't you just say, "Hey, it's an interesting thing; I'm

24    moving into Jeremiah's"?

15:18:01 25    **A**    For the same reason I don't tell them specifics about

**Andrew Joseph Hunter (Cross)**

1      my personal life.  There is no entitlement to that

2      information.

3      **Q**    Okay.  Isn't it a fact, sir, that someone from Marco's

4      actually specifically asked you right around this time,

15:18:20   5      "Hey, are you involved somehow with Jeremiah's?" and you

6      refused to answer?

7      **A**    I wouldn't say I refused to answer.  I was going along

8      the process of renewal and obtaining that, and that was

9      sidetracked by last-minute defaults, and so I turned to

15:18:42  10      counsel.

11      **Q**    I'm sorry.  What was sidetracked by last-minute

12      defaults?

13      **A**    The process of us going through our renewal.

14      **Q**    Okay.  But my question was:  Isn't it true that right

15:18:55  15      at the end of July, someone from Marco's specifically was on

16      a phone call with you and said, "Andy, are you and your dad

17      involved with Jeremiah's?" and you refused to answer the

18      question?

19      **A**    On that call, I did not answer the question because,

15:19:10  20      like I said before, it wasn't pertinent.  It was frankly

21      none of their business.

22      **Q**    Okay.  So it's, like, a personal thing.  So if he

23      would have said, "Hey, how are your kids?" you would have

24      said, "None of your business"?

15:19:27  25      **A**    I don't know what I would have said.

**Andrew Joseph Hunter (Cross)**

1    **Q**    All right, sir.  Okay.  Now, I'll stop sharing that.

2         All in July 24th -- I want to show you another

3    document.  July 24th, same day.  This is actually a letter

4    from Marco's Franchising, right, to KAM 8196, LLC?

15:20:17 5    "Attention Michael Hunter & Andrew J. Hunter."  Is KAM 8196,

6    LLC an entity that you and your father own and operate a

7    specific store?

8    **A**    Yes.  I don't remember the specifics, how this

9    happened, if we formed a -- I think we changed the name.

15:20:39 10   It's Hunter 8196, but it was previously KAM 8196.

11   **Q**    All right.  By the way, the 12414 Chesley Drive is the

12   same address as used for KAM?

13   **A**    No.  We tried repeatedly to update that address to our

14   current address --

15:20:57 15   **Q**    All right.

16   **A**    -- to no avail.

17   **Q**    So you did receive a July 24th notice of deficiency

18   default sent to KAM, and in this same day you got a notice

19   of deficiency default for this restaurant 8196; correct?

15:21:16 20   **A**    Yes, we received this as well.

21   **Q**    All right.  And, now, this is a letter sent to you in

22   your franchisee status, and it relates to some specific

23   problems with this restaurant.  And it's your understanding,

24   sir, right, that this franchise is one of the franchises

15:21:46 25   that Marco's was referring to in the July 24th notice to

**Andrew Joseph Hunter (Cross)**

1    KAM, right, that was not performing well; correct?

2    **A**    Yes.

3    **Q**    Okay.  And this talks about you have to comply with

4    operating standards and procedures, and it identified

15:22:05  5    specific problems based on a July 1, 2020, visit; is that

6    right?

7    **A**    Yes.  Yep, it's a visit done by Steven Weathers.

8    **Q**    Right.  And it talks about guest services, it talks

9    about cleaning and sanitation; correct?

15:22:23  10    **A**    Yes.

11    **Q**    "Sidewalk has buildup in front of door"; right?

12    Correct?  Do you see that?

13    **A**    Yes, I do.

14    **Q**    And "Oven fan filters are dirty, broken, missing"?

15:22:38  15    **A**    Yes.

16    **Q**    And "Sanitation is a serious issue and must be

17    corrected within 14 days to ensure the safety of our

18    customers"; right?

19    **A**    I see that, yes.

15:22:45  20    **Q**    And Mr. Weathers works for KAM; correct?

21    **A**    Correct.

22    **Q**    All right.  And then the next thing is "No log has not

23    been filled out for three or more days in the last 30 days."

24    What does that mean, sir?

15:23:01  25    **A**    This is referring to the online dough log that's

**Andrew Joseph Hunter (Cross)**

1    listed in the Marco's University Online platform.

2    **Q**    Okay.  And it's a requirement for a store to fill that

3    out; correct?

4    **A**    Yes.  Typically stores have a dough log in the store

15:23:25 5    that we fill out.  And part of my calibration on receiving

6    this letter with the operations team is that the log in the

7    store is moot, and, yes, they are requiring it to be filled

8    out on the MUO platform.

9    **Q**    Okay.  And what information goes in the dough log,

15:23:49 10    sir?

11    **A**    Different temperatures of the flour, the air, the air

12    temperature, the water, the ending dough temperature,

13    information about the batch of flour.  I think it's a lot

14    number, and then who's performing.

15:24:20 15    **Q**    And temperature is one of the requirements for the

16    dough log; correct?

17    **A**    Yes.

18    **Q**    And that is for food quality and potentially a safety

19    issue, is it not?

15:24:34 20    **A**    For making dough?  No.  It's a food quality issue.

21    **Q**    Okay.  And so the yeast -- it's not a food safety

22    quality with respect to the yeast and any other type of

23    issues?  So you think it's just a food quality issue?

24    **A**    Yes.

15:24:48 25    **Q**    Okay.  And then "Daily sanitation log is not

**Andrew Joseph Hunter (Cross)**

1    consistently used."  What is the daily sanitation log, sir?

2    **A**    It's a log that's on MUO to -- the sanitizer water

3    must be replaced, and so you log when you do that throughout

4    the day.

15:25:10  5    **Q**    All right.  And that's supposed to be filled out

6    daily; correct?

7    **A**    More.  It's multiple times a day.

8    **Q**    All right.  Now, this report, this letter from Marco's

9    says, "Sanitation is a serious issue and must be corrected

15:25:30  10   within 14 days."  Did you take any specific action to make

11   sure these sanitation issues were resolved in 14 days?

12   **A**    Yes.  We were to resolve these right away.

13   **Q**    Okay.  And that was in your role as the franchisee;

14   correct?

15:25:52  15   **A**    There's an overlap to that, obviously.  This letter is

16   about us as a franchisee.

17   **Q**    Okay.

18   **A**    But the idea of supporting the stores, right, if it's

19   our own store, then I'm wearing both hats.

15:26:14  20   **Q**    Okay.  And then, sir, I'm going to show you an

21   August 31 letter.  Just for the record, this is part of

22   plaintiffs -- I just want to get the right exhibit number.

23          Mr. Blynn, you might be able to weigh in on this.

24          Yeah.  Do you recall receiving this August 31

15:26:48  25   follow-up?  It's actually Plaintiff's Exhibit 14.

**Andrew Joseph Hunter (Cross)**

1    **A**    I do recall.

2    **Q**    Okay.  So this is --

3                MR. DAVIS:  Sorry to interrupt.  Can we clean

4    up the record that it's not part of Plaintiff's 14; it's

15:27:01 5    Defendant's 14?

6                MR. BLUM:  It is Defendant's 14.  That's

7    correct.

8                MR. DAVIS:  And I just want to put an

9    objection to the relevance of these communications with a

15:27:13 10    separate entity that's a franchisee level because of

11    relevance.  I don't understand how this is relevant to KAM,

12    LLC.

13                THE COURT:  Well, I will note your objection.

14    Although, I think Mr. Hunter's testimony was just with

15:27:33 15    regard to this matter he was wearing two hats, so there may

16    be some overlap here.  I will note your objection, but I'll

17    overrule it at this time.

18    **BY MR. BLUM:**

19    **Q**    Do you know if during the month of August, KAM, as an

15:27:48 20    AR, went out and did an OSE at this 8196?  Do you know?

21    **A**    I'm sorry.  Can you just say that again?

22    **Q**    Do you know as you sit here today, during the month of

23    August 2020, after the July 24th notices of deficiency

24    default were sent to both KAM and this store 8196, did KAM,

15:28:21 25    the AR, go out and do a follow-up OSE at 8196?

**Andrew Joseph Hunter (Cross)**

1    **A**    We did an OSE as the normal cadence of business, that

2    it's due every 60.

3    **Q**    Okay.

4    **A**    But that sounds right.  Yes, I would imagine that that

15:28:37 5    was done.

6    **Q**    Okay.  So you didn't do any -- it was just the normal

7    60-day period if it wasn't spawned necessarily by these

8    default notices?

9    **A**    No.  The cure to the default notices was to provide

15:28:54 10    Milton Molina with the evidence that he required, and we did

11    that as a result of the first deficiency notice.  And my

12    correspondence with him with regards to the second notice

13    was to say, "Please refer to my previous emails and my

14    previous statements."  So that was the chain of events with

15:29:19 15    regards to this second deficiency notice.

16    **Q**    Okay.  All right, sir.  On this deficiency notice, or

17    the second one -- August 31 -- that went to the restaurant,

18    the franchisee, and to you and your father, Marco's says,

19    "These deficiencies have to be corrected within 30 days of

15:29:39 20    the date of this letter."  Do you see it's in bold down at

21    the bottom?

22    **A**    Yes.

23    **Q**    So 30 days from the date of this letter was

24    October 1st, yesterday; correct?

15:29:48 25    **A**    Yes.

**Andrew Joseph Hunter (Cross)**

1    **Q**    Okay.  And you would agree that Marco's has the right

2    to confirm that these deficiencies are cured at the

3    restaurant operated by its franchisee; right?

4    **A**    The process was for me to get with Milton, and we did

15:30:11  5    all of those things on the first notice.  So this second one

6    should never have been sent.  And my correspondence with

7    Milton after that, explaining to him that I had already sent

8    the questions that he was asking me before, then went -- the

9    correspondence stopped, similar to the previous deficiency

15:30:32 10    letter with regard to KAM.  There was no official finality

11    to that, other than I presented the information that Milton

12    asked for and said, "I believe we have cured everything."

13    **Q**    Are you saying -- you're not saying though, are you,

14    sir, that Marco's Franchising has to get your permission to

15:30:49 15    go in and see how a franchise restaurant is operating and if

16    it's complying with its obligations and curing deficiencies;

17    right?

18    **A**    I believe their franchise agreement gives them the

19    ability to visit the stores as they wish.

15:31:06 20    **Q**    Right, right, right.  Okay, sir.  I want you to look

21    down further here to make this smaller.  Mr. Steven

22    Weathers, he works, again, for your company; correct?

23    **A**    Yes.

24    **Q**    KAM; right?

15:31:28 25    **A**    Right.

**Andrew Joseph Hunter (Cross)**

1  **Q**    Let me ask you this:  How many employees does KAM

2  Development have, not at the restaurant, not at the

3  franchisee level, but KAM Development?

4  **A**    We have two employees that are highly trained

15:31:54  5  personnel, and those are all the folks that work directly

6  with area rep business.

7  **Q**    And is that Mr. Weathers?

8  **A**    And, actually, I take that back.  I'm sorry.

9        There are three.  And, yes -- were you going to

15:32:11  10  ask? -- one of them is Steven Weathers, another is Joey

11  Weathers, and another is Kevin Legg.

12  **Q**    Kevin?

13  **A**    Kevin Legg, L-e-g-g.

14  **Q**    All right.  Okay.  Steven and Joey Weathers, they are

15:32:28  15  related somehow?

16  **A**    They are brothers.

17  **Q**    Okay.  Good.  All right.  And so they are the only

18  three employees -- well, your father and yourself I guess

19  aren't necessarily employees, but they are the only other

15:32:42  20  people who are employed by KAM?

21  **A**    I believe so.  Again, just from a practical

22  standpoint, yes.  As of just way of an example:  If we're

23  opening a new franchise store, we might have myself or Joey

24  or Steven, plus others, to help support that opening --

15:33:00  25  **Q**    Okay.

**Andrew Joseph Hunter (Cross)**

1   **A**     -- help.  Right.  So it's not -- we'll pull people

2   from time to time to assist further from our own stores.

3   So, again, there's not a pure black and white delineation.

4   However, these two individuals, yes.

15:33:24 5   **Q**     All right.  I guess then I don't know if this is as

6   simple as that.  But they are sort of the three who get

7   their paychecks from KAM Development, even though they might

8   chip in with franchisee openings and the like?

9   **A**     I don't -- I'm not involved in the payroll, so I can't

15:33:46 10   confirm if they are being paid from KAM.  Each of our stores

11   has a separate entity.  We have a mother company.

12        But that's -- to answer your question, I don't -- I

13   have not seen our payroll records.  I don't know -- I can't

14   confirm if KAM is the entity that they are getting paid out

15:34:07 15   of.  I believe it's just whatever their home, you know, we

16   designated as their home store, so to speak.

17   **Q**     Now, you have an entity, it's called Bullfrog

18   Development, LLC?  Is that the name of the company that you

19   formed to sign the deal with Jeremiah's?

15:34:24 20   **A**     Yes.

21

22

23

24

25

**Andrew Joseph Hunter  (Cross)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

15:35:45  25

**Andrew Joseph Hunter (Cross)**

1  **Q**    Okay.  Do you recognize the document that's on the

2  screen there, the operating systems evaluation?  It's from

3  1-22-20.  Do you recognize this type of document?

4  **A**    This type of OSE, yes.

15:36:15  5  **Q**    Okay.  And is this something that's generated from the

6  OSEs that's done by KAM at various restaurants?

7  **A**    Yes.

8  **Q**    Okay.  And this specific restaurant, again, it relates

9  to a specific restaurant -- which is this 8196 -- and these

15:36:41  10  are all the different items that it goes through that might

11  get you plus or minus points, or red or yellow or green;

12  correct?

13  **A**    Can you clarify the question?

14  **Q**    Well, all of these various items:  Weekly cleaning

15:36:54  15  checklist, hood exterior dirt, hood interior dirt, it's all

16  part of a systems evaluation that's done?  Every time you go

17  into a restaurant, these are the items that the evaluator

18  has to look at and go to teach on; correct?

19  **A**    Yes.  Those are the -- I believe there's 500 some

15:37:20  20  items and "yes" or "no."

21  **Q**    All right.  Now, let me stop share and move on to

22  something else.

23      All right, sir.  I'm going to move on to a different

24  area.  But I want to ask you one other thing:  Store 8425,

15:37:41  25  are you familiar with that store?

**Andrew Joseph Hunter (Cross)**

1    **A**    I am, yes.

2    **Q**    Okay.  Where is that located?

3    **A**    Indian Land, South Carolina.

4    **Q**    Indian Land, okay.  And, sir, who is the general

15:37:53  5    manager at that store?

6    **A**    Zyair.

7    **Q**    Zyair.  And how long has Zyair been with the

8    organization?

9    **A**    I believe about three our four months.

15:38:05  10    **Q**    And do you have Zyair's last name?

11    **A**    I don't recall off the top of my head.

12    **Q**    Okay.  When was the last time you were physically in

13    the 8425 Indian Land, South Carolina.  I mean, Indian Land

14    South Carolina or North Carolina?

15:38:38  15    **A**    South Carolina.

16    **Q**    South Carolina.  Okay.

17    **A**    I don't know if this was the last time, but I recall

18    going to put the hours of operation sign.  We ordered a new

19    one and put that on there.  So sometime after the deficiency

15:38:57  20    notice.  Probably that would have been August.

21    **Q**    After July 24th or --

22    **A**    Right.

23    **Q**    -- or August 31st?

24    **A**    No.  We had them all cured on the 1st.  After the 1st,

15:39:15  25    it was completed.

**Andrew Joseph Hunter (Cross)**

1    **Q**    Okay.  In that visit, did you notice whether there

2    were thermometers or any thermometers in that store?

3    **A**    Yes, they were there.

4    **Q**    Okay.  Are you aware that as of Wednesday night there

15:39:29 5    were no thermometers in the store?

6    **A**    We were missing the one thermometer for making dough,

7    specifically, for probing flour and the ending dough

8    temperature.  We have a separate thermometer for the water,

9    and it can take the air temperature as well, and we had that

15:40:00 10    cured immediately.  Sometimes thermometers break or go

11    missing.  Because we're multi-unit operators, we carry a lot

12    of smallwares, and uniforms, and equipment, and things like

13    that on hand so that when things like that happen during the

14    course of business, we are not waiting on an order; we can

15:40:19 15    just supplement it straightaway from our own supply.

16    **Q**    And is that what you understand happened on Wednesday

17    night there, it was just that it hadn't gotten resupplied

18    yet?

19    **A**    Yeah, that's right.

15:40:39 20    **Q**    How did you learn of the problem that there were no

21    thermometers in the store on Wednesday night?

22    **A**    From Joey Weathers.

23    **Q**    Okay.  And he got it from Ms. Laura who was the

24    Marco's person who went to visit, right, and noted that

15:40:58 25    there were no thermometers?

**Andrew Joseph Hunter (Cross)**

1    **A**    That's right.

2              MR. DAVIS:  Your Honor, just, again, noting

3    the continuing objection to this line of questioning on the

4    basis of relevance.

15:41:08  5              MR. KLEIN:  And it mischaracterizes his

6    testimony.  He said there were thermometers.  There was one

7    missing.

8              MR. BLUM:  All right.  I think we got the

9    answer.  And the answer is, "Yes," that's how we learned of

15:41:21 10   it.  That was the question.  But okay --

11             THE COURT:  Wait.  Mr. Blum, if I may.  I just

12   want to make sure we're clear here.  First of all, with

13   regard to the objections, yes, I'll certainly note the

14   continuing objection with regard to relevancy.

15:41:35 15       So is this store one that is where the Hunters serve

16   or are in the capacity of a franchisee as well?

17             MR. BLUM:  Yes, Your Honor, it is.  That was

18   theirs.  8196 and 8425 -- they all go by store numbers --

19   are the two that I have.  81 -- 8425.  I'm sorry.  I'm

15:41:58 20  getting confused.

21       8196 and 8425 are the only two I've spoken about.

22   They are both Hunter operated restaurants, and they are

23   two --

24             THE COURT:  Just making sure.

15:42:10 25             MR. BLUM:  They are two of the three that

**Andrew Joseph Hunter (Cross)**

1    received a visit on Wednesday and Thursday that there's been

2    a tiff about.

3              THE COURT:  Okay.  You can proceed for now

4    with regard to this store.

15:42:25  5              MR. BLUM:  All right.  I'm going to move on to

6    a different topic for now, and I just want to make sure I

7    hit the right exhibits.

8    **BY MR. BLUM:**

9    **Q**    All right.  Mr. Hunter, I'm going to show you what is

15:42:57  10   Defendant's Exhibit 7, an August 27, 2018, letter from

11   Marco's Franchising to KAM Development.  Do you recall

12   testifying about this?  You said you got a notice of concern

13   in late 2018 about the development.

14             MR. DAVIS:  Your Honor, can counsel put it on

15:43:18  15   the screen?  Because, again, we haven't really seen these

16   documents, so I would just like to be able to see what he's

17   talking about.

18             MR. BLUM:  It's not on the screen?

19             THE COURT:  Coming up now.  Okay.  It's now up

15:43:33  20   on the screen for the record.

21             MR. BLUM:  It is on the screen?  Okay.

22   **BY MR. BLUM:**

23   **Q**    You talked earlier I think when Mr. Davis was

24   questioning you, and you made reference to the Charlotte

15:43:44  25   territory and an issue coming up about your development at

**Andrew Joseph Hunter (Cross)**

1     the end of 2018.  And actually you just testified about it,

2     a notice of concern that was received that you sort of

3     disagreed with.  Do you recall that testimony?

4     **A**     Yes.  I did testify about this document, yes.

15:44:01  5     **Q**     All right.  And it's August 27, 2018, and it says that

6     there's a problem, there is an issue of -- because at the

7     end of 2018, you were supposed to have 22, and you only had

8     15 locations, and that you were not in compliance with your

9     development schedule for Charlotte as of this time according

15:44:27  10    to Marco's; correct?

11    **A**     It was that I would not be in compliance by the end

12    of -- so far.  But for my annual development, there was more

13    stores to develop for that year, yes.

14    **Q**     Fair enough.  By the end of 2018, the position was you

15:44:45  15    needed 22 and that there was concern you weren't going to

16    get there; right?  Is that a fair characterization?

17    **A**     I'm sorry.  I'm just looking at the document.

18    **Q**     I can make it smaller, give you some space.

19    **A**     I'm not sure if it's -- just glancing at that, I'm not

15:45:14  20    sure I understand the difference between the left side and

21    the right side in terms of, you know, was it the obligation

22    of 22 or to have four stores more on the board that year.

23    **Q**     All right.  Well, then maybe let me go through it.  As

24    I understand what this is saying, is that for 2018, you had

15:45:37  25    an obligation to develop or open four new stores, and you

**Andrew Joseph Hunter (Cross)**

1    hadn't opened any.  And on the right side, it says in total

2    at the end of 2018, you were supposed to have 22 and you

3    only had -- so far you only had 15, assuming you opened

4    none.  So you were four behind on 2018 and seven behind on

15:46:00  5    the overall development schedule, according to Marco's, this

6    notice; right?  Is that what it says?

7    **A**    Yes.  It's not factual, but that's what it says.

8    **Q**    Correct, right.  I understand your position.  And I

9    think you said you pushed back on this, and then there were

15:46:16  10   discussions.

11        And isn't it a fact, sir, that you -- that you then

12   sort of made a development -- presented a development plan

13   to Marco's for, and I think you said, four restaurants in

14   2019, three in 2020, and that was actually approved by

15:46:47  15   Marco's; correct?

16   **A**    No.  I did not present the plan.  That was the plan

17   that was provided to us in the 2019 letter where Marco's

18   refuses to rescind the default but acknowledges that it was

19   already cured.

15:47:04  20   **Q**    Okay.  All right.  Well, let me show you.  Is this the

21   letter that you are referring to, sir, the February 26th,

22   2019, letter?

23   **A**    Yes.

24   **Q**    Okay.  All right.  The first sentence of that letter

15:47:20  25   says, "Thank you for kindly submitting your proposal to cure

**Andrew Joseph Hunter (Cross)**

1    the development default in your AR territory," as noted in

2    our later exhibit.  So are you saying that you actually did

3    not submit a proposal?

4    **A**    No.  We discussed our processes, all the things that

15:47:40 5    we do, the shows we attend, how we manage prospective leads,

6    and all the way to extensive discussions about real estate

7    and how we find sites.  There was no -- that's what the

8    meeting was about, was that plan -- of that process, rather.

9    **Q**    And, sir, isn't it true that in Charlotte what part of

15:48:10 10    the dispute that you had over whether or not you were in

11    compliance is that you were claiming in the Charlotte

12    Agreement a provisional credit for a seven-store development

13    agreement that you had negotiated with a franchise group;

14    right?

15:48:29 15    **A**    Again, we don't sign those agreements.  They are

16    strictly between the franchisee and the franchisor, Marco's.

17    **Q**    Right.

18    **A**    And it had been something that was in the works for

19    several months.  And, I'm sorry, I forgot if that answered

15:48:50 20    your question or not.

21    **Q**    Well, but this seven-store development agreement is

22    one that you or maybe your father, or you and your father

23    together were the driving force behind and that you had sort

24    of presented to Marco's?  And ultimately the deal was signed

15:49:07 25    with Marco's though; right?  This was kind of your prospect,

**Andrew Joseph Hunter (Cross)**

1    your developer; right?

2    **A**    In the sense that this prospective franchisee was an

3    existing franchisee in the system and was interested in

4    doing multiple stores in our area.  So in the sense that

15:49:27  5    we're talking about our territory, it was our prospect.

6    **Q**    And that franchisee was Brad Davis; is that right?

7    **A**    It was BDM, LLC and Brad to defer.

8    **Q**    Right.  But Brad Davis was involved in that group;

9    correct?

15:49:46  10    **A**    He was at this time, yes.

11    **Q**    Okay.  And he was the same Brad Davis who was the --

12    is an AR, or works with an AR, Tenn Slices, and has signed

13    an agreement with Jeremiah's; correct?

14    **A**    That's the same Brad Davis.

15:50:05  15    **Q**    That's the same Brad Davis.  And he had signed a

16    seven-store development agreement in when?  2018?

17    **A**    Yeah.  I believe it was for eight stores and seven of

18    them were in the Charlotte DMA.

19    **Q**    Okay.  Right, right.  So seven -- eight stores, and

15:50:25  20    seven in Charlotte and one in the Columbia; right?

21    **A**    Correct.  One in the Columbia Agreement.

22    **Q**    All right.  How many of those eight stores have

23    opened?

24    **A**    One is physically open and in operation.

15:50:41  25    **Q**    Okay.  One out of the eight.  And there was a

**Andrew Joseph Hunter (Cross)**

1    requirement in that development agreement that Mr. Davis

2    open one in 2019, at least; right?

3    **A**    That's right.

4    **Q**    And he did not do that?

15:50:53  5    **A**    No.  That's the one that is open.  He did do that.

6    **Q**    He didn't open it in 2019.  He opened it in 2020;

7    right?

8    **A**    No.  He opened in 2019.

9    **Q**    Okay.  What date was that, sir?

15:51:08 10    **A**    I don't recall.  I know it's in the Denver location,

11    Denver, North Carolina.

12    **Q**    All right, sir.  So had the development agreement that

13    you all sort of procured and was signed with Marco's for the

14    eight stores, it's true that Mr. Davis and his group are not

15:51:39 15    in compliance with their development obligations under that

16    development agreement, are they?

17    **A**    They are in compliance in that they had one store to

18    open in 2019 and they opened that one store.

19    **Q**    You are saying that that agreement is -- they are

15:51:55 20    current on that agreement?  Is that your testimony?

21    **A**    Yes.  My understanding is that there was a commitment

22    of one year and -- one store in 2019, and they opened the

23    Denver location last year.

24                    (Court Reporter clarification)

15:52:23 25                    THE WITNESS:  One store to be opened in 2019.

**Andrew Joseph Hunter (Cross)**

1  **BY MR. BLUM:**

2  **Q**     This letter, which actually comes from Mr. Libardi,

3  right, the president and CEO, at the bottom of page 1

4  states -- and I understand you said that you never really

15:52:41  5  submitted a plan.  But he said, to summarize, "Your approved

6  plan requires you to complete the following in order to meet

7  your total commitment:  Open four new units in December 31,

8  2019"; correct?

9  **A**     That's what it states.

15:52:57 10  **Q**     And it says -- actually the second bullet point under

11  there says, "This must include one additional location

12  within Brad Davis' development area, other than 8525, as

13  required by that agreement's development schedule" --

14  **A**     That's --

15:53:16 15  **Q**     -- "in order to maintain the provisional credits under

16  5.3.2."  Do you see that?

17  **A**     I see that.

18  **Q**     Okay.  So the agreement that was ultimately signed off

19  on by Marco's said you had to open four units, talked about

15:53:31 20  the Davis, and it actually gave you the option to maintain

21  provisional credits.  You specifically addressed those;

22  correct?

23  **A**     You mentioned that this is a signed agreement.  This

24  is just a notice that they sent to us.  There is no

15:53:51 25  agreement.  There is no signatures.

**Andrew Joseph Hunter (Cross)**

1    **Q**    Okay.  Well, there is Mr. Libardi's signature saying

2    you submitted a plan and it's approved; right?

3    **A**    Yeah.  I'm sorry.  His signature is on here, yes.  We

4    didn't -- we didn't submit a plan.

15:54:08  5    **Q**    And then it says, "Open three new additional units by

6    December 31, 2020"; correct?

7    **A**    It states that, yes.

8    **Q**    Okay.  "This must include two locations within Brad

9    Davis' development area as required by that development and

15:54:23  10    schedule"; correct?

11    **A**    Yes.

12    **Q**    Okay.  And you've testified that so far one is opened

13    and you have two more in some type of process; correct?

14    **A**    Yes.

15:54:37  15    **Q**    And the one that opened, who was the franchisee on

16    that?

17    **A**    BDM.

18    **Q**    Okay.  Brad Davis?

19    **A**    No.

15:54:45  20    **Q**    Is the other two -- or your group; correct?

21    **A**    Okay.  I'm sorry.  Are you referring to the Brad Davis

22    development agreement?

23    **Q**    Yes.

24    **A**    Could you restate the question?

15:54:56  25    **Q**    I'm sorry.  It says that you -- of the three units

**Andrew Joseph Hunter (Cross)**

1    that you are supposed to open in 2020, two of them had to be

2    within Brad Davis' development area.  Is the one that's

3    opened, is that in Brad Davis' development area?

4    **A**    No.

15:55:18  5    **Q**    All right.

6    **A**    The one that is open is not in Brad Davis' area.

7    **Q**    All right.  Are the other two that you referred to as

8    being in process, are they in Brad Davis' development area?

9    **A**    The other two that we have referred to previously, no.

15:55:34 10   **Q**    Okay.  And then you also have an obligation to open

11   four more units by December 7, 2021, and that's -- it

12   doesn't say December 31 because you expire on December 7;

13   right?

14   **A**    It's not an obligation; it's a notice from Marco's.

15:55:54 15   **Q**    Okay.  All right, sir.  And what do you believe is the

16   obligation?

17   **A**    Well, our Area Rep Agreement has a development

18   schedule, and if you look at this requirement that they just

19   put to us, you know, when they sent this letter, it mentions

15:56:30 20   four for '19, three for '20, and four for '21.

21   **Q**    All right.  Well, is it not true, sir, that at the end

22   of -- as of 2018, you had 15 stores open, and this required

23   you to open 11 more for a total of 26?

24   **A**    This is where the math just doesn't add up.  And this

15:57:02 25   has been, you know -- part of how we have conducted this is

**Andrew  Joseph  Hunter  (Cross)**

1       that we want to maintain a good relationship with Marco's,

2       and sometimes nitpicking over mistakes don't really go

3       anywhere.  They don't help us and they can damage us.  And

4       so 26 stores, no.  I mean, we bought a -- our territory is

15:57:33 5    for 29 stores.  And the 15 stores open, that's also

6       incorrect.  That's not the right number.

7       **Q**     Well, you tell me, sir.  What is the -- your KAM, in

8       its view, what is your development obligation as to the

9       number of stores by the end of 2020?

15:57:55 10   **A**     I believe it's 26.

11      **Q**     Okay.  And how many do you have open right now?

12      **A**     I believe 26.

13      **Q**     You have 26 stores open in the territory?

14      **A**     Open in the sense of how it's defined in our Area Rep

15:58:14 15   Agreement.

16      **Q**     I'm talking about open for business, operating for

17      business.

18      **A**     I don't know how many are open for business.  I would

19      have to take a look at the sheet.

15:58:34 20   **Q**     Okay.  Sir, are you disputing the fact that you have

21      an obligation to have three new stores open in 2020, as

22      stated in Mr. Libardi's letter dated March 26th --

23      February 26th, 2019?

24      **A**     I think this letter is a plan that Marco's created for

15:58:59 25   us, and our obligation is what is in our agreement.

**Andrew Joseph Hunter (Cross)**

1   **Q**    Okay.  I will come back to that.  All right, sir.

2          Now, I want to stop sharing that.  All right, sir, I

3   want to --

4                    MR. DAVIS:  Your Honor, since we're obviously

15:59:38  5   at a breaking point in theme for the cross, I know that

6   Your Honor mentioned that you had a 4:00 o'clock hard stop.

7   So perhaps --

8                    THE COURT:  I can go a little longer, but not

9   much, frankly --

15:59:53  10                    MR. DAVIS:  Right.  So my point is, Your

11   Honor --

12                    THE COURT:  -- past 4:00 p.m.

13                    MR. DAVIS:  -- it appears we're not going to

14   finish today.  So, you know, depending on, I mean, if Mr.

16:00:03  15   Blum had five more minutes with Andy, I have, like, three

16   questions that I would need to redirect and we could be done

17   with him.  But I don't know how much Mr. Blum intends more

18   to ask him.

19                    THE COURT:  Mr. Blum, where are you --

16:00:17  20                    MR. BLUM:  I have a lot --

21                    THE COURT:  -- as best you can tell?

22                    MR. BLUM:  I have a lot more than five

23   minutes, Judge.  And although I have one more topic that

24   might take just five or ten, and that might be a convenient

16:00:28  25   stop.  And it kind of follows from what we were just talking

1    about, so it would be better to get that done now.  And then

2    if that is a convenient breaking time, then we could pick it

3    up Monday.

4                    THE COURT:  Yeah.  Under no circumstances can

16:00:39  5    I go past 4:30, it's just not possible.

6                    MR. BLUM:  All right.  It will not take that

7    long, Judge.

8                    THE COURT:  But, I am sorry, do you have an

9    estimate on how much longer your cross will be in total?

16:00:51  10                    MR. BLUM:  This next topic will be 10 to

11   15 minutes.

12                    THE COURT:  And then what about after that?

13   Do you have an idea, Mr. Blum?  I know it's hard to tell,

14   but --

16:01:00  15                    MR. BLUM:  Yeah, it's hard to tell --

16                    THE COURT:  -- as best you can estimate.

17                    MR. BLUM:  -- because of his testimony changed

18   a lot.  And it's kind of one of those things if I had more

19   time, which you're not giving me, it might be much shorter,

16:01:10  20   but --

21                    THE COURT:  Mr. Blum, I don't appreciate the

22   characterization of the witness's testimony, so please keep

23   those comments to yourself.

24                    MR. BLUM:  No, no.  Maybe if I had more time

16:01:23  25   to organize myself to frame it down, that's all I'm saying.

1    I'm just saying if I -- you know, his cross raised a bunch

2    of issues, and I had a note, and they may conflict with my

3    other notes.

4         So I would say I have probably an hour maybe, and it

16:01:49  5    could be less after I get through this next topic.  But,

6    again, once I, over the weekend, start to kind of organize

7    the different notes, it may be shorter than that.  But. . .

8         THE COURT:  Mr. Davis, any thoughts from your

9    perspective on whether or not we ought to cover one more

16:02:06  10    category with Mr. Blum and this witness before we recess?

11         MR. DAVIS:  I do, Your Honor.  I think, again,

12    you know, you're going to be officiating your niece's

13    wedding.  And instead of you being pressured on time, and

14    since we have to carry over cross to Monday anyway, I don't

16:02:25  15    see what difference it makes if he continues the rest of his

16    cross on Monday or does five or ten more minutes and does

17    another hour on Monday.

18         THE COURT:  Mr. Blum, I tend to agree.  And

19    since you'd probably appreciate the time anyway to look over

16:02:40  20    things, compose things a bit better before you continue your

21    cross-examination, maybe now is a good time for us to break

22    and so --

23         MR. BLUM:  That's great.  That's fine,

24    Your Honor.  I thought you were asking if I could fill up 15

16:02:55  25    minutes or so, that would be good, but I don't have to.  I'm

1    just saying I could have a breaking point, but if Your Honor

2    wants to wait, that's fine.

3                    THE COURT:  No.  I appreciate the suggestion

4    that you do that.  But the bottom line is, you're not going

16:03:08  5    to finish your cross in the next 20 or 30 minutes.

6                    MR. BLUM:  Oh, no.

7                    THE COURT:  All right.  And unlike some

8    judges, I'm not imposing time limitations with regard to how

9    long you folks are taking with witnesses.

16:03:23  10         So at this point why don't we adjourn the hearing.

11    And would you check your calendars, please, for Monday,

12    October 5th.  I would love for you to rescue me from a

13    Judges meeting at 10:00 a.m. that day, but I don't think I

14    can miss that, and particularly in COVID days,

16:03:44  15    unfortunately, because there's important things we have to

16    discuss besides our routine matters, and that's at 10:00

17    o'clock.  I would think the earliest I could begin on Monday

18    would be noon, would be 12:00 p.m.  So I would propose we

19    begin about then or in the early afternoon so that we can

16:04:05  20    conclude that day, that afternoon.

21         Mr. Blum.

22                    MR. BLUM:  Yes, Your Honor, I have a telephone

23    hearing with Judge Carr, your colleague Judge Carr, that I

24    think my guess it will be a half an hour, but that --

16:04:19  25                    THE COURT:  I'm sorry.  What time, Mr. Blum?

1          MR. BLUM:  At noon actually.

2          THE COURT:  Okay.  I can probably get you out

3     of that, but we could also start at 12:30 or 1:00,

4     potentially.

16:04:30   5      Mr. Davis, what say you?

6          MR. DAVIS:  Plaintiffs will make themselves

7     available to the Court for its convenience.

8          THE COURT:  Mr. Klein, you want to weigh in at

9     all?

16:04:40  10          MR. KLEIN:  I defer to Mr. Davis.

11          THE COURT:  All right.  Mr. Blum, let's just

12     let you do your conference.  And as a matter of safety and

13     precaution on the timing, why don't we say 1:00 p.m., and if

14     you need some assistance with Judge Carr because that is

16:05:00  15     cutting it too close for you, just let me know moving

16     forward.  Otherwise, I would say let's go ahead and adjourn

17     and then reconvene at 1:00 o'clock p.m. Eastern on Monday,

18     October 5th.

19      Anything else we need to discuss before we conclude on

16:05:16  20     the record today, gentlemen?  Mr. Davis, on behalf of the

21     plaintiff, or Mr. Klein.

22          MR. DAVIS:  Nothing further for the record,

23     Your Honor.

24          THE COURT:  Okay.  All right.  Mr. Blum,

16:05:29  25     anything from your team on your side?

1          MR. BLUM:  Nothing, Your Honor.  Aaron?

2          MR. BLYNN:  No.

3          THE COURT:  I'm not suggesting there should

4     be.  I have you here, so we might as well talk whether it's

16:05:44  5     on the record or off the record.

6          Is there anything we need to discuss off the record,

7     which I would normally consider just scheduling-related

8     matters, Mr. Davis?

9          MR. DAVIS:  No.  I was just going to

16:05:54  10     congratulate you again off the record, Your Honor.  That's

11     all.

12          THE COURT:  Okay.  Thanks.  I appreciate that.

13          Mr. Blum, anything that we should talk about?

14          MR. BLUM:  If we're planning on Monday, when I

16:06:05  15     have to get through with Mr. Hunter, are they going to put

16     Mike Hunter on?  Or have they covered that?

17          THE COURT:  Let's find out if anything

18     changes.  The last I recall is that you have two or three

19     questions on cross in light of his affidavit and the

16:06:24  20     exhibits, but I don't know.  I suppose they could change

21     their mind.  Mr. Davis, Mr. Klein, any --

22          MR. KLEIN:  The only thing I would address,

23     Judge, is that closure.  That store is still closed, and,

24     you know, I don't know what Marco's can do to get that store

16:06:40  25     reopened.  But the response that we received was, you know,

1    they will put it on the schedule to get it reopened.

2        The person who approved the opening or -- I'm sorry --

3    approved the closing advised us that she was not approved to

4    do the opening.  So we just need that store reopened.  I

16:06:56  5    mean, we're getting -- we already lost all of today.

6            THE COURT:  All right.  So message conveyed to

7    folks from Marco's who are on.  And I would hope they would

8    have an update for you as soon as possible, whether that's

9    today or over the weekend or certainly by Monday, in terms

16:07:14 10    of what their response is to your concern on that request.

11    Okay?

12            MR. KLEIN:  Thank you, Judge.

13            THE COURT:  Are you asking me to do something

14    more, Mr. Klein?

16:07:22 15            MR. KLEIN:  I don't have a motion for you, but

16    if you could order them to open it, that would be ideal.

17            THE COURT:  I think that may be a little

18    beyond my equitable powers, so I will decline to do so at

19    this time, and hopefully the matter will resolve itself in

16:07:38 20    some fashion without judicial involvement moving forward.

21            MR. KLEIN:  Thank you, Judge.

22            THE COURT:  So, Mr. Hunter, I appreciate your

23    participation and patience here today.  I will remind you

24    again about the oath and your continuing duty moving forward

16:07:54 25    until Monday.

1        And, Mr. Blum, I guess I just say for the record I'm

2   not overly concerned about Mr. Hunter's conduct as a

3   witness.  So to the extent you might have expressed some

4   dismay, I guess I just want to indicate I think he's been a

16:08:14   5   largely fairly compliant witness during this time.

6                   MR. BLUM:  No.  I don't mean to suggest that,

7   Your Honor.  I just know it's a new thing in the COVID

8   world.  You never had to -- you know, people are always on

9   their phones, at least my kids are.  So I -- you know, in

16:08:28  10   today's --

11                   THE COURT:  No, no, no.  Mr. Blum, I was

12   addressing the comment that you made just a few moments ago,

13   not the fact that you were concerned about him being

14   admonished about communication.  So that's to what I was

16:08:41  15   referring just now.

16                   MR. BLUM:  Might I say, Your Honor, no.  I'm

17   essentially talking about myself.  I said, "If I had more

18   time, I might" -- you know, there is a famous quote from it:

19   "Here's a ten-page letter.  If I had more time, it would be

16:08:54  20   two pages."

21                   THE COURT:  I hear you completely, and it's

22   true if you are giving a speech or whatever it is, I agree

23   with you wholeheartedly.  I may have misheard you --

24                   MR. BLUM:  Right, right, right.

16:09:04  25                   THE COURT:  I may have misheard you or

1    misheard your characterization moving forward.  If so, I

2    stand corrected.

3                    MR. BLUM:  All right.

4                    THE COURT:  So we'll stand adjourned at this

16:09:14  5    time.  We'll reconvene 1:00 p.m. on Monday, October 5th.

6    Thank you all very much.  Be safe, please, and enjoy your

7    weekend if you can.

8                    MR. KLEIN:  Have a great weekend.

9                    MR. DAVIS:  Thank you, Your Honor.

10                    MR. BLUM:  Everyone stay safe.

11               (Proceedings concluded at 4:09 p.m.)

12                            -  -  -

13                    **C E R T I F I C A T E**

14         I certify that the foregoing is a correct transcript
       of the record of proceedings in the above-entitled matter
15     prepared from my stenotype notes.

16              */s/ Stacey L. Kiprotich*            *6/30/2021*
                STACEY L. KIPROTICH, RMR, CRR           DATE

17

18

19

20

21

22

23

24

25

**'**

**'16** [1] - 95:11
**'18** [1] - 100:16
**'19** [2] - 130:3, 189:20
**'20** [2] - 130:3, 189:20
**'21** [2] - 130:3, 189:20
**'Operating** [1] -
148:17

**/**

**/s** [1] - 199:16

**0**

**07701** [1] - 2:5

**1**

**1** [9] - 1:7, 3:3, 37:18,
72:9, 73:12, 76:23,
147:16, 168:5, 187:3
**1-199** [1] - 1:8
**1-22-20** [1] - 177:3
**10** [15] - 41:21, 69:13,
71:3, 73:19, 74:3,
78:16, 91:9, 116:6,
116:18, 116:24,
117:11, 139:8,
149:11, 159:3,
192:10
**10-minute** [1] - 32:17
**100** [1] - 2:15
**1000** [1] - 2:8
**106** [1] - 3:5
**107** [1] - 3:4
**10:00** [2] - 194:13,
194:16
**10:16** [1] - 4:3
**10:57** [1] - 33:6
**10:59** [1] - 34:6
**10th** [6] - 104:12,
108:11, 108:21,
108:25, 114:25,
122:16
**11** [6] - 118:7, 118:25,
127:1, 127:21,
133:1, 189:23
**11:10** [2] - 33:5, 33:6
**11:11** [1] - 34:8
**11th** [2] - 118:1,
128:18
**12** [7] - 71:21, 103:11,
130:10, 133:22,
133:24, 134:3, 134:5
**120** [1] - 1:16
**12414** [1] - 167:11
**12:00** [2] - 7:5, 194:18
**12:03** [1] - 69:11

**12:10** [1] - 74:6
**12:15** [1] - 69:13
**12:25** [1] - 74:8
**12:30** [1] - 195:3
**136** [2] - 3:12
**13th** [2] - 114:22,
143:15
**14** [7] - 168:17,
170:10, 170:11,
170:25, 171:4,
171:5, 171:6
**145** [1] - 3:6
**14th** [2] - 104:14,
106:7
**15** [11] - 3:12, 32:18,
32:22, 123:12,
139:8, 182:8, 183:3,
189:22, 190:5,
192:11, 193:24
**15th** [2] - 108:12,
118:12
**16** [1] - 91:16
**17** [4] - 91:17, 98:5,
98:8, 98:11
**1716** [1] - 1:16
**175** [2] - 2:18, 3:13
**176** [1] - 3:13
**18** [1] - 3:12
**1:00** [4] - 195:3,
195:13, 195:17,
199:5
**1st** [7] - 40:19, 46:11,
49:9, 95:11, 172:24,
178:24

**2**

**2** [16] - 1:6, 4:1, 72:9,
73:12, 76:23, 77:8,
103:1, 103:4, 103:5,
119:12, 123:12,
125:13, 127:20,
147:15, 156:18
**2.2** [2] - 119:14,
119:15
**2.2.1** [2] - 103:6,
119:22
**2.2.2** [2] - 120:2, 120:6
**2.2.3** [2] - 120:20,
120:24
**2.2.4** [1] - 121:2
**2.2.5** [1] - 121:7
**2.2.6** [1] - 121:12
**2.2.7** [1] - 121:20
**20** [2] - 49:18, 194:5
**20-minute** [1] - 42:10
**2010** [2] - 72:9, 77:13,
77:14, 77:23, 78:2,
90:6, 104:12
**2011** [3] - 79:2, 79:14,

128:6
**2013** [3] - 79:11, 80:5,
80:8
**2014** [2] - 80:25, 95:7
**2015** [6] - 80:25,
94:19, 95:8, 95:10,
95:11, 96:14
**2016** [4] - 81:2, 94:20,
96:15, 96:17
**2017** [1] - 100:14
**2018** [20] - 97:1, 97:13,
97:25, 98:4, 99:6,
99:19, 105:20,
106:9, 128:7,
181:10, 181:13,
182:1, 182:5, 182:7,
182:14, 182:24,
183:2, 183:4,
185:16, 189:22
**2019** [30] - 98:1, 98:2,
100:16, 100:18,
100:21, 101:3,
101:10, 101:14,
101:16, 101:23,
102:8, 102:18,
107:21, 108:18,
122:21, 122:25,
128:2, 129:23,
130:8, 183:14,
183:17, 183:22,
186:2, 186:6, 186:8,
186:18, 186:22,
186:25, 187:8,
190:23
**2020** [51] - 1:6, 4:1,
80:17, 101:24,
102:22, 104:14,
106:7, 107:18,
107:24, 108:11,
108:12, 108:21,
108:25, 109:18,
111:12, 111:23,
113:14, 114:22,
114:25, 116:15,
117:7, 118:12,
122:16, 123:1,
123:5, 123:23,
124:12, 124:16,
125:3, 125:7, 127:8,
127:12, 127:24,
128:1, 129:23,
130:1, 130:2, 130:4,
130:9, 130:12,
131:9, 132:23,
168:5, 171:23,
183:14, 186:6,
186:6, 189:1, 190:9,
190:21
**2021** [2] - 129:23,
189:11

**20th** [1] - 102:8
**21** [1] - 3:13
**213-5520** [1] - 1:17
**22** [7] - 94:16, 98:5,
98:8, 182:7, 182:15,
182:22, 183:2
**24** [2] - 31:20, 36:18
**24th** [18] - 40:12,
111:12, 111:23,
113:14, 155:9,
155:16, 156:24,
159:15, 164:5,
165:7, 165:8,
165:18, 167:2,
167:3, 167:17,
167:25, 171:23,
178:21
**25** [3] - 3:13, 49:16,
50:6
**25th** [1] - 49:1
**26** [6] - 127:10,
189:23, 190:4,
190:10, 190:12,
190:13
**26th** [3] - 183:21,
190:22, 190:23
**27** [3] - 14:6, 181:10,
182:5
**28** [6] - 101:11,
101:14, 115:1,
122:23, 122:24
**29** [2] - 122:21, 190:5
**2:23** [1] - 139:12
**2:37** [1] - 139:14
**2nd** [4] - 116:15,
117:7, 117:12,
143:15

**3**

**3** [5] - 1:7, 72:9, 73:12,
76:23, 103:11
**30** [7] - 37:18, 40:19,
46:10, 168:23,
172:19, 172:23,
194:5
**30-day** [1] - 29:9
**305-349-2300** [1] -
2:16
**31** [11] - 37:16, 37:17,
46:9, 49:8, 131:18,
170:21, 170:24,
172:17, 187:7,
188:6, 189:12
**31st** [4] - 100:18,
128:1, 131:14,
178:23
**33131** [1] - 2:15
**35** [4] - 91:8, 101:11,
122:12, 122:16

**35-year** [1] - 45:16
**3:20-CV-02024-JJH**
[1] - 1:4

**4**

**4** [9] - 81:14, 81:25,
83:4, 83:6, 83:19,
103:4, 103:7,
119:14, 119:17
**40** [2] - 78:23, 83:25
**419** [1] - 1:17
**419-321-1307** [1] - 2:9
**43215** [2] - 2:19
**43604** [2] - 1:17, 2:8
**44th** [1] - 2:15
**48** [3] - 31:20, 34:22,
65:4
**4:00** [3] - 70:21, 191:6,
191:12
**4:09** [1] - 199:11
**4:30** [1] - 192:5

**5**

**5** [7] - 3:12, 84:4, 84:5,
84:10, 85:9, 119:18,
120:2
**5-2** [1] - 72:14
**5.2** [2] - 148:8, 148:10
**5.3.2** [3] - 123:11,
123:13, 187:16
**5.3.2(b** [1] - 124:11
**50/50** [1] - 145:17
**500** [1] - 177:19
**520** [1] - 2:18
**59** [6] - 40:25, 49:3,
52:1, 159:8
**5th** [3] - 194:12,
195:18, 199:5

**6**

**6** [5] - 101:18, 101:19,
102:10, 108:2, 108:4
**6/30/2021** [1] - 199:16
**60** [4] - 81:23, 132:3,
152:13, 172:2
**60-day** [1] - 172:7
**614-358-9717** [1] -
2:19
**63** [1] - 2:4

**7**

**7** [12] - 103:23, 104:19,
105:13, 106:6,
106:17, 107:12,
107:16, 107:18,
110:5, 181:10,
189:11, 189:12

**72-year-old** [1] - 142:18
**732-747-7100** [1] - 2:5
**75** [1] - 142:20
**75-day** [1] - 142:15
**77** [1] - 3:4

## 8

**8** [4] - 110:17, 110:25, 111:15, 112:19
**81** [1] - 180:19
**8196** [15] - 161:9, 162:9, 163:25, 164:4, 167:4, 167:5, 167:10, 167:19, 171:20, 171:24, 171:25, 177:9, 180:18, 180:21
**82** [1] - 3:5
**83** [1] - 3:4
**8425** [5] - 177:24, 178:13, 180:18, 180:19, 180:21
**8525** [1] - 187:12
**86** [1] - 3:12
**87** [1] - 3:12

## 9

**9** [6] - 3:12, 114:15, 114:17, 115:11, 122:2, 125:13
**90** [1] - 64:9
**94** [9] - 40:24, 41:1, 42:11, 46:19, 49:3, 49:18, 49:20, 52:2, 152:7
**95** [2] - 42:11, 49:4
**9:15** [1] - 14:8

## A

**a)** [1] - 124:15
**A.M** [1] - 4:3
**a.m** [6] - 33:5, 33:6, 34:6, 34:8, 194:13
**Aaron** [5] - 7:1, 7:2, 44:5, 69:14, 196:1
**aaron** [1] - 2:14
**abide** [2] - 46:24, 70:17
**ability** [8] - 41:23, 52:8, 52:9, 97:19, 133:8, 147:4, 163:13, 173:19
**able** [23] - 20:7, 22:14, 28:1, 28:6, 33:15, 33:16, 78:10, 81:3, 84:4, 97:8, 98:15, 98:21, 98:24, 99:8,

120:13, 125:7, 128:10, 130:14, 146:5, 147:8, 147:10, 170:23, 181:16
**above-entitled** [1] - 199:14
**absence** [1] - 68:5
**absolutely** [4] - 9:20, 43:22, 84:25, 93:25
**abstract** [1] - 30:13
**absurd** [1] - 42:15
**abundantly** [1] - 26:1
**academic** [1] - 78:9
**acceptable** [3] - 43:21, 62:6, 88:10
**acceptance** [1] - 141:23
**accepted** [2] - 113:4, 142:24
**access** [7] - 81:9, 131:9, 131:21, 140:11, 141:2, 141:5, 143:5
**accord** [1] - 64:11
**according** [4] - 83:18, 140:19, 182:9, 183:5
**account** [1] - 92:21
**accountability** [1] - 100:1
**accountable** [1] - 100:9
**accurate** [4] - 112:4, 122:11, 122:13, 146:5
**accurately** [1] - 59:24
**accusations** [1] - 55:19
**achieve** [1] - 108:13
**acknowledge** [1] - 129:22
**acknowledges** [1] - 183:18
**acted** [1] - 48:21
**action** [21] - 19:10, 51:23, 113:1, 113:4, 113:15, 134:24, 135:2, 156:22, 157:5, 157:6, 157:7, 157:21, 157:23, 158:1, 158:6, 158:14, 158:18, 158:20, 158:23, 170:10
**actions** [4] - 28:16, 108:13, 112:9, 112:21
**active** [2] - 149:2, 150:21
**activities** [1] - 87:25

**activity** [1] - 125:17
**actual** [2] - 27:11, 82:20
**ad** [2] - 34:2, 163:17
**add** [4] - 11:22, 45:5, 94:15, 189:24
**added** [2] - 79:2, 97:14
**addendum** [8] - 105:3, 105:16, 105:21, 105:24, 106:1, 106:8, 113:19, 165:14
**adding** [1] - 100:15
**addition** [2] - 77:16, 133:6
**additional** [9] - 39:16, 94:15, 98:25, 109:8, 119:17, 127:25, 130:8, 187:11, 188:5
**address** [21] - 12:11, 13:16, 15:19, 18:18, 19:16, 25:9, 36:21, 42:24, 43:7, 48:3, 50:22, 112:11, 112:18, 112:24, 113:2, 134:19, 158:10, 167:12, 167:13, 167:14, 196:22
**addressed** [7] - 8:8, 18:19, 85:24, 113:18, 125:19, 165:13, 187:21
**addressing** [2] - 113:23, 198:12
**adjourn** [2] - 194:10, 195:16
**adjourned** [2] - 34:3, 199:4
**adjournment** [2] - 35:10, 60:19
**adjustments** [2] - 99:24, 128:4
**administrative** [1] - 59:3
**admissibility** [2] - 18:8, 67:17
**admission** [6] - 31:22, 67:14, 72:8, 73:12, 83:4, 107:9
**admit** [3] - 67:20, 85:6, 89:3
**admitted** [12] - 7:2, 63:20, 77:1, 83:7, 85:25, 102:13, 107:12, 111:19, 115:14, 116:19, 116:22, 119:3
**admonished** [2] -

145:2, 198:14
**admonition** [1] - 139:7
**advance** [1] - 61:13
**advancing** [1] - 30:8
**advantage** [1] - 13:9
**adversely** [2] - 63:5, 67:21
**advertised** [1] - 105:20
**advice** [1] - 128:10
**advisable** [1] - 93:24
**advise** [1] - 31:8
**advised** [1] - 197:3
**affect** [1] - 29:21
**affected** [1] - 17:12
**affecting** [1] - 163:13
**affects** [3] - 43:3, 43:5, 59:13
**affidavit** [3] - 72:19, 75:1, 196:19
**affiliated** [3] - 27:10, 160:23, 161:11
**affiliates** [2] - 120:12, 121:16
**affirmatively** [1] - 52:5
**afraid** [1] - 35:24
**afternoon** [6] - 17:1, 70:19, 145:11, 145:13, 194:19, 194:20
**age** [1] - 144:16
**agency** [1] - 59:3
**agent** [2] - 57:18, 154:10
**agents** [1] - 121:17
**aghast** [1] - 42:8
**ago** [6] - 46:20, 69:21, 162:10, 162:11, 163:1, 198:12
**agree** [15] - 26:14, 61:8, 113:10, 120:19, 131:15, 147:1, 150:4, 150:10, 150:16, 151:8, 151:24, 152:5, 173:1, 193:18, 198:22
**agreeable** [1] - 128:15
**agreed** [6] - 16:6, 75:9, 97:11, 99:22, 100:6, 140:15
**Agreement** [86] - 27:16, 29:11, 39:6, 65:5, 65:7, 65:10, 65:13, 65:14, 65:16, 65:21, 66:1, 72:10, 77:9, 77:22, 78:4, 78:11, 78:19, 78:24, 79:1, 79:5, 79:21, 80:1, 88:4, 88:6,

90:5, 92:10, 92:11, 92:12, 92:13, 92:17, 92:19, 92:25, 93:9, 94:14, 97:21, 98:1, 100:11, 100:20, 100:25, 103:5, 103:18, 104:6, 104:11, 104:16, 108:10, 109:16, 111:25, 113:16, 114:18, 114:24, 115:2, 117:9, 117:16, 118:14, 118:17, 119:13, 120:9, 120:10, 120:18, 123:12, 124:9, 124:11, 125:15, 127:4, 127:8, 127:9, 128:5, 134:12, 134:22, 140:7, 146:16, 147:17, 148:4, 148:16, 150:6, 150:24, 152:10, 165:14, 165:19, 184:12, 185:21, 189:17, 190:15
**agreement** [80] - 38:22, 46:14, 47:24, 53:8, 65:22, 66:2, 75:1, 76:24, 77:12, 78:1, 79:5, 85:7, 85:23, 86:2, 91:13, 91:16, 91:20, 92:12, 94:11, 94:20, 95:17, 95:19, 96:4, 96:5, 96:14, 96:25, 99:10, 99:21, 100:7, 105:19, 113:18, 115:3, 117:4, 118:13, 119:17, 120:11, 121:4, 124:4, 128:21, 129:6, 129:13, 130:7, 130:16, 132:15, 132:18, 132:21, 133:18, 134:16, 135:1, 135:3, 135:15, 140:6, 140:15, 143:8, 143:14, 146:22, 148:22, 150:11, 150:14, 150:17, 152:17, 154:25, 157:10, 157:12, 165:21, 173:18, 184:13, 184:21, 185:13, 185:16, 186:1, 186:12, 186:16, 186:19, 186:20,

187:18, 187:23,
187:25, 188:22,
190:25
**agreement's** [1] -
187:13
**Agreements** [3] -
87:19, 91:14, 155:20
**agreements** [10] -
19:7, 19:8, 53:10,
105:4, 105:16,
105:19, 114:10,
124:20, 124:24,
184:15
**ahead** [20] - 12:8,
13:7, 19:22, 36:3,
39:21, 69:17, 82:5,
83:21, 85:5, 96:20,
96:23, 98:19, 106:3,
134:20, 136:4,
136:8, 139:7,
144:14, 161:24,
195:16
**aided** [1] - 1:23
**air** [4] - 128:2, 169:11,
179:9
**aligned** [1] - 151:16
**allegation** [4] - 156:5,
157:2, 160:1, 160:11
**allegations** [2] - 60:5,
64:25
**alleged** [9] - 27:6,
29:8, 39:5, 39:25,
115:18, 118:16,
125:24, 126:16,
133:2
**alleging** [1] - 59:23
**allow** [11] - 30:15,
31:11, 31:15, 41:18,
55:16, 57:20, 67:20,
75:3, 96:10, 103:13,
147:2
**allowed** [6] - 35:2,
52:13, 88:15, 93:1,
95:20, 138:7
**allowing** [1] - 62:14
**almost** [1] - 50:8
**altered** [1] - 99:4
**altogether** [1] - 57:3
**ambush** [5] - 16:19,
18:22, 19:3, 36:16,
42:15
**amended** [2] - 25:16,
94:15
**amendment** [4] -
97:15, 100:15,
120:9, 165:15
**amendments** [1] -
100:19
**American** [1] - 154:2
**amount** [3] - 14:22,

70:14, 71:9
**Amy** [6] - 5:22, 12:22,
81:4, 81:7, 85:9
**analyze** [1] - 30:10
**andrew** [1] - 2:10
**Andrew** [2] - 76:16,
167:5
**ANDREW** [5] - 3:3,
77:3, 82:7, 106:14,
145:9
**andy** [1] - 10:6
**Andy** [34] - 5:11, 5:17,
8:19, 9:24, 11:20,
20:21, 20:24, 20:25,
21:15, 22:13, 32:7,
33:11, 35:12, 46:20,
73:6, 73:18, 73:22,
75:6, 75:12, 75:19,
77:5, 81:13, 83:10,
85:2, 87:17, 92:7,
98:6, 99:12, 111:10,
116:9, 120:4,
123:13, 166:16,
191:15
**Animal** [2] - 47:3,
48:25
**animal** [1] - 26:23
**announced** [2] -
105:20, 106:5
**annual** [1] - 182:12
**answer** [17] - 23:12,
33:15, 88:20, 89:4,
89:8, 99:16, 114:19,
118:9, 147:2, 153:2,
166:6, 166:7,
166:17, 166:19,
175:12, 180:9
**answered** [1] - 184:19
**answers** [2] - 107:7,
116:12
**Anthony** [2] - 111:5,
115:8
**anticipate** [1] - 17:24
**anticipated** [5] - 55:5,
55:9, 68:9, 85:13,
139:2
**anticipation** [4] - 8:10,
14:8, 35:8, 84:12
**Antonio** [2] - 95:16,
96:5
**anyway** [4] - 71:1,
143:25, 193:14,
193:19
**apart** [3] - 42:10,
49:17, 49:18
**apologize** [4] - 26:22,
87:24, 119:11, 123:8
**appeals** [1] - 68:3
**appear** [1] - 5:23
**APPEARANCES** [1] -

2:1
**appearing** [2] - 4:21,
159:17
**application** [1] - 15:14
**appreciate** [6] - 36:5,
192:21, 193:19,
194:3, 196:12,
197:22
**approach** [3] - 13:15,
51:20, 60:13
**approached** [3] - 97:2,
117:16, 137:10
**appropriate** [14] -
14:25, 17:7, 19:15,
22:10, 28:17, 44:23,
55:7, 59:7, 60:2,
60:6, 61:1, 63:20,
64:8, 134:15
**appropriately** [1] -
24:21
**appropriateness** [4] -
22:6, 37:24, 55:1,
67:13
**approval** [2] - 132:10,
133:9
**approve** [1] - 70:10
**approved** [9] - 130:15,
132:8, 148:16,
183:14, 187:5,
188:2, 197:2, 197:3
**April** [1] - 96:6
**AR** [25] - 45:23, 78:25,
79:21, 83:20, 87:19,
89:14, 89:20, 104:5,
108:10, 128:11,
146:16, 146:20,
151:25, 152:10,
156:16, 156:25,
157:10, 164:10,
164:25, 165:14,
171:20, 171:25,
184:1, 185:12
**AR-OFC** [2] - 83:20,
156:16
**AR/AR** [2] - 83:12,
83:14
**AR/AR-OFC** [2] -
83:12, 83:14
**ARA** [1] - 127:16
**area** [50] - 40:5, 82:9,
83:15, 87:17, 87:20,
89:25, 90:13, 91:22,
92:24, 95:7, 96:4,
97:10, 97:24, 99:8,
103:9, 105:18,
106:3, 106:4,
119:16, 120:8,
121:3, 121:4, 121:8,
121:21, 125:8,
129:14, 137:4,

149:20, 150:23,
151:8, 152:5,
153:11, 153:18,
153:21, 154:5,
154:6, 154:9,
154:23, 155:17,
174:6, 177:24,
185:4, 187:12,
188:9, 189:2, 189:3,
189:6, 189:8
**Area** [26] - 72:9, 88:6,
91:13, 92:10, 92:12,
92:13, 92:17, 92:25,
100:11, 104:10,
120:11, 120:12,
121:13, 124:7,
134:12, 134:22,
147:16, 148:3,
148:11, 148:14,
150:6, 150:24,
165:18, 189:17,
190:14
**areas** [4] - 27:14, 94:9,
95:1, 98:25
**argue** [2] - 16:5, 30:15
**argued** [2] - 16:10,
30:18
**arguing** [8] - 16:7,
20:1, 26:11, 51:2,
56:20, 65:25, 120:17
**argument** [19] - 21:22,
28:20, 28:25, 29:5,
29:20, 31:13, 36:24,
42:22, 47:3, 47:10,
48:10, 53:5, 53:15,
53:19, 59:25, 62:10,
63:17, 67:19, 70:12
**arguments** [4] - 29:13,
30:9, 30:12, 31:21
**arise** [1] - 143:14
**arrested** [1] - 54:13
**ARs** [4] - 88:8, 89:13,
90:24, 91:4
**Ashley** [4] - 110:12,
112:3, 114:4, 165:11
**aside** [2] - 51:8, 56:7
**aspects** [1] - 81:20
**asserted** [1] - 140:16
**asserting** [2] - 9:4,
156:1
**assertions** [1] -
156:22
**assigned** [1] - 158:9
**assist** [1] - 175:2
**assistance** [1] -
195:14
**assisting** [1] - 7:14
**associate** [1] - 6:20
**assume** [4] - 11:11,
85:9, 143:3, 155:2

**assumed** [1] - 98:12
**assuming** [2] - 6:4,
183:3
**assumption** [1] - 4:23
**assurance** [2] - 96:3,
140:22
**assure** [2] - 63:25,
64:4
**assured** [1] - 110:9
**astonishing** [1] -
46:17
**astronomical** [1] -
50:9
**AT** [1] - 4:3
**athletics** [1] - 78:10
**Atlanta** [2] - 128:12,
129:12
**attached** [2] - 105:4,
105:16
**attachment** [1] -
104:23
**attachments** [1] -
107:2
**attack** [2] - 16:21,
36:17
**attempt** [1] - 67:19
**attempted** [3] -
137:17, 137:23,
138:1
**attempting** [1] -
136:24
**attend** [3] - 7:4, 70:23,
184:5
**attendance** [1] - 7:24
**attention** [24] - 16:25,
25:7, 25:8, 44:11,
58:13, 58:24, 78:11,
94:21, 102:5, 103:6,
110:16, 111:9,
111:10, 114:14,
116:1, 119:12,
119:13, 121:25,
123:7, 123:11,
125:12, 131:3, 167:5
**audio** [2] - 11:1, 12:15
**August** [23] - 14:16,
18:23, 37:16, 37:17,
46:9, 49:1, 49:8,
49:16, 50:6, 51:25,
56:12, 80:17,
114:22, 128:7,
170:21, 170:24,
171:19, 171:23,
172:17, 178:20,
178:23, 181:10,
182:5
**authenticity** [1] -
44:20
**author** [1] - 103:25
**authority** [2] - 26:20,

59:17
**auto** [1] - 158:18
**automatic** [2] - 65:11, 119:18
**automatically** [1] - 158:1
**avail** [1] - 167:16
**available** [5] - 21:8, 31:18, 81:7, 146:12, 195:7
**Avenue** [2] - 1:16, 2:4
**avoid** [1] - 21:13
**aware** [12] - 16:24, 78:13, 87:17, 88:21, 97:6, 126:7, 153:10, 153:20, 153:24, 154:5, 154:12, 179:4

### B

**background** [1] - 77:7
**bad** [2] - 41:15, 52:18
**badly** [1] - 60:5
**Bank** [1] - 2:5
**Barry** [4] - 2:13, 6:25, 33:20, 145:11
**base** [1] - 153:5
**based** [29] - 7:12, 15:4, 16:5, 16:22, 23:24, 25:3, 25:19, 29:8, 39:25, 44:23, 56:15, 57:3, 58:11, 59:20, 61:19, 65:11, 66:1, 66:11, 72:16, 72:20, 74:25, 76:24, 78:16, 108:15, 138:6, 142:22, 143:6, 153:7, 168:5
**bashful** [2] - 6:10, 10:19
**basing** [1] - 14:3
**basis** [7] - 27:13, 41:3, 88:17, 141:12, 141:19, 142:1, 180:4
**batch** [1] - 169:13
**battery** [1] - 123:9
**Battista** [1] - 2:14
**BDM** [2] - 185:7, 188:17
**bear** [1] - 129:3
**bearing** [2] - 29:1, 66:6
**bears** [1] - 43:13
**became** [4] - 49:3, 49:4, 80:9, 95:1
**become** [1] - 80:24
**BEFORE** [1] - 1:11
**began** [4] - 79:20, 91:2, 107:23, 112:11
**begin** [6] - 130:14,

130:20, 130:22, 131:21, 194:17, 194:19
**beginning** [7] - 78:24, 79:1, 79:3, 79:11, 96:14, 107:23, 109:17
**behalf** [5] - 4:20, 4:24, 67:11, 115:7, 195:20
**behind** [10] - 52:3, 94:19, 94:20, 96:13, 96:15, 96:17, 96:21, 183:4, 184:23
**belabor** [2] - 127:6, 142:6
**belief** [1] - 40:9
**below)** [1] - 121:9
**benefit** [2] - 13:18, 135:22
**best** [9] - 4:14, 35:17, 37:2, 63:1, 78:22, 146:19, 162:7, 191:21, 192:16
**better** [11] - 10:3, 11:5, 13:21, 26:2, 27:1, 60:16, 70:25, 94:4, 143:23, 192:1, 193:20
**between** [22] - 19:7, 41:5, 42:10, 58:21, 78:9, 78:20, 91:21, 92:9, 95:23, 100:19, 104:11, 119:6, 120:11, 125:1, 132:1, 134:22, 135:3, 137:15, 147:25, 160:7, 182:20, 184:16
**beyond** [7] - 16:18, 17:10, 17:14, 41:8, 80:19, 162:3, 197:18
**big** [2] - 93:16, 158:14
**bigger** [1] - 25:13
**biological** [1] - 69:7
**bit** [13] - 8:22, 11:13, 17:18, 33:4, 38:17, 40:17, 47:12, 49:6, 57:5, 115:19, 122:20, 135:24, 193:20
**black** [3] - 16:8, 163:9, 175:3
**blah** [3] - 53:16
**blanche** [1] - 58:22
**blind** [1] - 123:9
**blinking** [1] - 7:5
**blum** [1] - 51:14
**BLUM** [126] - 3:5, 3:6, 6:24, 7:19, 10:15, 10:20, 18:1, 18:12,

18:17, 20:22, 21:11, 22:9, 22:22, 23:17, 23:23, 25:3, 25:21, 33:21, 36:1, 36:4, 37:2, 38:3, 38:11, 39:19, 39:22, 45:2, 47:2, 48:17, 51:13, 51:15, 52:23, 53:2, 53:23, 53:25, 57:8, 58:1, 58:4, 61:5, 71:19, 71:25, 72:2, 72:13, 72:21, 72:24, 73:15, 73:22, 74:1, 74:15, 74:18, 82:3, 82:6, 82:8, 83:2, 83:5, 83:21, 84:15, 87:23, 88:11, 89:22, 91:24, 93:14, 98:18, 102:12, 104:21, 105:2, 107:7, 107:11, 110:23, 111:1, 111:18, 115:13, 116:21, 119:2, 131:12, 134:9, 136:22, 138:19, 138:22, 139:19, 139:22, 140:14, 141:7, 142:10, 144:12, 144:15, 144:23, 145:8, 145:10, 146:24, 147:8, 147:12, 147:13, 147:23, 148:2, 159:25, 161:25, 163:24, 171:6, 171:18, 180:8, 180:17, 180:25, 181:5, 181:8, 181:18, 181:21, 181:22, 187:1, 191:20, 191:22, 192:6, 192:10, 192:15, 192:17, 192:24, 193:23, 194:6, 194:22, 195:1, 196:1, 196:14, 198:6, 198:16, 198:24, 199:3, 199:10
**Blum** [96] - 2:13, 6:19, 6:25, 9:7, 9:12, 10:15, 11:12, 12:8, 16:1, 16:25, 17:15, 17:16, 18:5, 20:10, 20:19, 22:2, 22:8, 23:15, 24:16, 25:1, 29:16, 29:22, 31:1, 31:14, 33:13, 35:22, 35:23, 35:24, 36:20, 37:20, 38:15, 39:13,

39:21, 43:11, 43:24, 45:3, 47:1, 47:6, 47:16, 48:16, 50:18, 51:9, 52:25, 55:10, 55:19, 57:5, 58:6, 59:1, 71:18, 72:11, 73:8, 73:13, 73:14, 73:20, 74:14, 75:3, 75:9, 82:1, 84:14, 89:2, 92:2, 102:11, 104:20, 107:5, 111:17, 115:12, 116:20, 119:1, 134:7, 138:17, 140:12, 141:18, 142:3, 144:10, 145:6, 145:11, 147:21, 148:1, 161:23, 163:22, 180:11, 191:15, 191:17, 191:19, 192:13, 192:21, 193:10, 193:18, 194:21, 194:25, 195:11, 195:24, 196:13, 198:1, 198:11
**Blum's** [5] - 14:10, 27:1, 43:5, 106:22, 135:11
**BLYNN** [2] - 69:15, 196:2
**Blynn** [6] - 2:14, 7:1, 44:25, 139:19, 147:19, 170:23
**Blynn)** [1] - 148:1
**board** [2] - 97:12, 182:22
**boils** [1] - 63:10
**bold** [1] - 172:20
**books** [1] - 139:22
**born** [1] - 49:14
**bottom** [9] - 67:23, 103:7, 111:4, 119:14, 156:18, 158:6, 172:21, 187:3, 194:4
**bought** [1] - 190:4
**Brad** [15] - 140:17, 185:6, 185:7, 185:8, 185:11, 185:14, 185:15, 187:12, 188:8, 188:18, 188:21, 189:2, 189:3, 189:6, 189:8
**brains** [1] - 41:20
**brand** [20] - 19:22, 41:9, 41:10, 41:18, 42:7, 46:25, 52:19, 57:17, 57:20, 59:13,

60:5, 61:21, 128:18, 137:2, 137:13, 151:4, 151:11, 151:17, 153:22, 154:12
**brands** [2] - 153:14, 154:10
**breach** [2] - 39:25, 140:20
**break** [26] - 22:7, 32:4, 32:6, 32:12, 32:17, 32:19, 60:4, 68:6, 69:6, 71:3, 72:12, 73:21, 76:25, 123:3, 135:24, 138:13, 138:14, 138:15, 138:18, 138:21, 139:7, 144:8, 144:20, 179:10, 193:21
**breaking** [4] - 165:20, 191:5, 192:2, 194:1
**breakout** [4] - 32:23, 33:9, 33:14, 33:25
**brent** [1] - 2:3
**Brent** [2] - 4:19, 5:8
**brief** [9] - 32:12, 35:10, 71:2, 73:4, 74:20, 131:7, 134:2, 138:13, 142:11
**briefed** [2] - 40:2, 127:7
**briefing** [1] - 70:11
**briefly** [4] - 8:8, 8:17, 82:5, 117:1
**briefs** [4] - 126:4, 126:7, 126:14, 126:19
**bring** [2] - 52:13, 53:15
**broached** [1] - 99:9
**broad** [1] - 17:21
**broader** [1] - 135:6
**broke** [1] - 136:22
**broken** [4] - 33:11, 41:16, 168:14
**brothers** [1] - 174:16
**brought** [5] - 16:24, 58:24, 65:13, 94:21, 99:25
**Brown** [2] - 89:18, 155:5
**bubbled** [1] - 157:15
**build** [6] - 38:8, 130:18, 130:21, 130:22, 131:22, 132:2
**build-out** [4] - 130:21, 130:22, 131:22, 132:2

*building* [4] - 130:18, 130:21, 130:23, 131:9
*buildup* [1] - 168:11
*bullet* [1] - 187:10
*Bullfrog* [6] - 136:20, 136:24, 137:10, 137:16, 138:1, 175:17
*bunch* [1] - 193:1
*burden* [3] - 6:18, 8:14, 63:15
*business* [32] - 15:12, 49:14, 62:12, 80:6, 81:21, 87:25, 88:8, 88:14, 88:23, 89:20, 91:5, 91:10, 133:5, 133:9, 146:2, 146:20, 148:15, 149:3, 153:2, 153:6, 153:12, 153:22, 154:20, 155:4, 166:21, 166:24, 172:1, 174:6, 179:14, 190:16, 190:17, 190:18
*businesses* [2] - 41:20, 87:18
*buy* [1] - 137:11
*buying* [1] - 91:11
*BY* [31] - 3:4, 3:5, 3:5, 3:6, 77:4, 81:12, 82:8, 83:9, 87:16, 89:11, 92:5, 94:7, 102:14, 106:15, 107:15, 111:2, 111:21, 115:17, 116:23, 119:4, 131:20, 136:19, 145:10, 147:13, 148:2, 161:25, 163:24, 171:18, 181:8, 181:22, 187:1

**C**

*cabinet* [1] - 159:8
*cadence* [1] - 172:1
*calendar* [2] - 143:6, 143:7
*calendars* [1] - 194:11
*calibration* [1] - 169:5
*camera* [1] - 34:2
*campus* [1] - 78:14
*candidly* [1] - 21:24
*cannot* [2] - 18:14, 46:24, 51:20
*capability* [1] - 44:7
*capacity* [1] - 180:16
*captures* [1] - 152:15

*capturing* [1] - 152:14
*care* [3] - 31:24, 69:7, 111:14
*careful* [1] - 16:7
*carefully* [1] - 31:7
*Carolina* [18] - 9:6, 23:3, 23:9, 23:10, 23:13, 24:2, 24:4, 50:13, 58:16, 76:9, 161:14, 178:3, 178:13, 178:14, 178:15, 178:16, 186:11
*Carr* [3] - 194:23, 195:14
*Carrie* [2] - 2:17, 7:16
*carrier* [1] - 144:25
*carry* [2] - 179:11, 193:14
*carte* [1] - 58:22
*case* [47] - 6:18, 8:2, 8:8, 8:14, 8:15, 13:11, 17:8, 18:15, 19:24, 20:22, 21:3, 21:7, 21:9, 22:4, 22:12, 24:24, 26:21, 43:1, 43:6, 44:2, 44:4, 52:10, 52:14, 57:16, 58:9, 58:12, 59:2, 60:9, 60:13, 61:2, 61:14, 62:3, 62:15, 62:23, 63:11, 65:14, 66:22, 71:17, 74:21, 74:24, 138:7, 140:7, 144:3, 145:12
*Case* [1] - 1:4
*cases* [3] - 40:10, 66:22, 144:1
*cataclysmic* [1] - 59:2
*category* [1] - 193:10
*cease* [1] - 79:10
*CEO* [1] - 187:3
*certain* [8] - 13:17, 13:20, 13:23, 14:1, 27:17, 88:14, 95:1, 156:25
*certainly* [13] - 9:18, 10:18, 16:11, 16:17, 43:5, 70:15, 87:20, 130:13, 151:1, 152:4, 153:13, 180:13, 197:9
*certified* [3] - 83:16, 106:21, 110:8
*certify* [1] - 199:14
*cetera* [6] - 7:13, 29:10, 40:16, 143:7, 163:3
*chain* [2] - 23:2, 172:14

*chairs* [1] - 131:2
*challenge* [5] - 8:7, 23:20, 26:3, 26:6, 56:6
*challenged* [2] - 46:19, 126:16
*challenging* [1] - 23:16
*Chambers* [1] - 5:21
*chambers* [2] - 81:15, 85:18
*chance* [2] - 36:5, 128:24
*change* [2] - 57:6, 196:20
*changed* [4] - 95:12, 158:16, 167:9, 192:17
*changes* [4] - 100:6, 100:19, 128:4, 196:18
*characterization* [5] - 17:21, 64:15, 182:16, 192:22, 199:1
*characterize* [2] - 43:25, 159:10
*Charlotte* [54] - 28:9, 29:12, 34:23, 39:7, 40:5, 42:1, 42:2, 45:10, 45:12, 46:25, 50:12, 65:14, 65:16, 65:24, 66:1, 66:2, 72:10, 76:8, 78:19, 78:24, 79:1, 80:1, 118:5, 118:14, 118:17, 118:18, 119:7, 122:4, 126:21, 126:24, 127:4, 127:8, 127:9, 127:15, 127:23, 128:5, 128:9, 129:6, 129:14, 129:18, 130:12, 133:1, 146:17, 150:5, 155:20, 161:7, 161:8, 181:24, 182:9, 184:9, 184:11, 185:18, 185:20
*check* [3] - 6:2, 81:8, 194:11
*checklist* [1] - 177:15
*chemicals* [3] - 51:18, 51:19, 163:6
*Chesley* [1] - 167:11
*chief* [12] - 20:22, 21:4, 22:4, 60:9, 61:2, 71:17, 89:19, 97:2, 109:12, 111:5,

115:8, 138:8
*chip* [1] - 175:8
*choice* [1] - 134:14
*choose* [2] - 37:23, 128:18
*Christopher* [1] - 7:22
*chronologically* [1] - 102:24
*circle* [1] - 61:3
*circumstances* [2] - 4:14, 192:4
*citation* [1] - 17:6
*citizen* [2] - 24:2, 24:4
*citizenship* [2] - 23:8, 23:13
*city* [3] - 76:7, 93:8
*claim* [2] - 117:17, 122:17
*claimed* [4] - 15:7, 122:3, 122:7, 125:14
*claiming* [3] - 28:22, 127:21, 184:11
*claims* [2] - 121:15, 133:3
*clam* [1] - 11:6
*clarification* [14] - 10:1, 10:8, 10:12, 22:11, 35:14, 66:17, 72:23, 79:8, 84:17, 93:4, 105:9, 126:13, 137:22, 186:24
*clarification)* [1] - 115:21
*clarify* [10] - 9:3, 22:15, 72:16, 94:13, 99:13, 113:6, 126:6, 157:23, 164:3, 177:13
*clarity* [2] - 17:8, 102:24
*clause* [1] - 124:8
*clean* [3] - 158:4, 159:7, 171:3
*cleaned* [1] - 15:10
*cleaner* [1] - 26:10
*cleaning* [3] - 159:13, 168:9, 177:14
*cleanliness* [4] - 156:21, 157:4, 158:3, 163:3
*clear* [13] - 11:23, 12:22, 26:1, 35:5, 39:20, 51:3, 84:22, 99:17, 106:24, 115:23, 144:21, 147:3, 180:12
*clearly* [5] - 7:4, 8:15, 27:24, 28:16, 88:3
*clerks* [1] - 7:23
*client* [4] - 23:5, 28:7,

67:12, 140:22
*client's* [1] - 14:19
*clients* [6] - 14:16, 14:21, 16:12, 30:5, 31:6, 67:4
*close* [3] - 71:16, 132:11, 195:15
*closed* [2] - 15:12, 196:23
*closer* [1] - 10:3
*closing* [1] - 197:3
*closure* [1] - 196:23
*coach* [2] - 151:21, 158:24
*coaching* [1] - 162:16
*colleague* [1] - 194:23
*college* [4] - 78:5, 78:6, 91:3, 142:18
*color* [1] - 164:18
*Columbia* [69] - 28:9, 29:11, 34:23, 39:6, 40:4, 65:5, 65:7, 65:10, 65:13, 65:21, 72:10, 77:9, 77:22, 78:4, 78:11, 78:19, 79:5, 79:21, 90:4, 90:5, 91:15, 91:17, 91:19, 91:20, 91:23, 92:7, 92:19, 94:13, 94:14, 97:18, 100:13, 100:17, 101:7, 101:8, 102:22, 103:5, 103:18, 104:5, 104:16, 109:16, 111:24, 113:16, 114:18, 114:23, 115:2, 115:20, 115:24, 117:8, 117:15, 119:7, 119:13, 120:18, 121:25, 122:4, 122:7, 122:19, 123:12, 124:11, 124:19, 125:15, 126:24, 146:17, 147:17, 150:6, 155:20, 185:20, 185:21
*Columbus* [1] - 2:19
*comfort* [1] - 143:16
*comfortable* [3] - 43:9, 44:17, 140:12
*coming* [3] - 38:20, 181:19, 181:25
*commence* [1] - 63:14
*COMMENCED* [1] - 4:3
*comment* [3] - 14:17, 93:19, 198:12

**commenting** [1] - 140:13

**comments** [1] - 192:23

**commitment** [7] - 78:21, 91:8, 100:23, 102:20, 108:18, 186:21, 187:7

**commitments** [1] - 89:14

**committed** [3] - 94:25, 97:22, 100:3

**communicate** [6] - 27:17, 112:21, 125:17, 125:25, 144:22, 151:17

**communicated** [2] - 51:24, 113:1

**communication** [5] - 23:5, 108:16, 126:17, 131:23, 198:14

**communications** [6] - 18:23, 114:1, 114:2, 118:15, 125:23, 171:9

**companies** [1] - 27:10

**company** [8] - 7:11, 7:12, 7:13, 148:12, 148:24, 173:22, 175:11, 175:18

**complaining** [1] - 160:9

**Complaint** [1] - 141:11

**complaint** [2] - 25:16, 120:4

**complete** [8] - 11:24, 80:23, 104:23, 131:16, 142:5, 156:22, 157:21, 187:6

**completed** [4] - 91:4, 130:21, 139:3, 178:25

**completely** [5] - 28:12, 29:14, 53:9, 92:18, 198:21

**complexity** [1] - 4:16

**compliance** [13] - 18:25, 19:16, 61:23, 65:9, 65:21, 66:1, 156:19, 159:11, 182:8, 182:11, 184:11, 186:15, 186:17

**compliant** [2] - 25:14, 198:5

**comply** [6] - 112:13, 121:21, 142:4,

143:7, 143:13, 168:3

**complying** [2] - 150:14, 173:16

**compose** [1] - 193:20

**computer** [3] - 1:23, 140:11, 150:21

**computer-aided** [1] - 1:23

**concede** [1] - 89:2

**concept** [2] - 154:7, 154:11

**concern** [9] - 31:1, 35:6, 85:21, 88:17, 128:8, 181:12, 182:2, 182:15, 197:10

**concerned** [7] - 47:12, 47:22, 48:20, 48:22, 55:3, 198:2, 198:13

**concerning** [1] - 70:4

**concise** [2] - 9:17, 71:8

**conclude** [3] - 70:20, 194:20, 195:19

**concluded** [3] - 33:25, 35:21, 199:11

**conclusion** [2] - 52:5, 146:22

**condition** [1] - 163:2

**conditions** [1] - 119:19

**conduct** [8] - 73:8, 81:21, 92:15, 109:5, 138:20, 150:7, 151:9, 198:2

**conducted** [1] - 189:25

**conducting** [1] - 150:2

**confer** [3] - 30:24, 34:17, 142:2

**conference** [1] - 195:12

**confidence** [1] - 40:6

**confident** [1] - 68:12

**confidential** [7] - 84:10, 84:12, 133:24, 134:5, 134:10, 134:23, 134:25

**confidentiality** [4] - 84:16, 85:7, 85:23, 86:2

**confirm** [8] - 23:6, 23:8, 140:25, 148:3, 158:22, 173:2, 175:10, 175:14

**confirmation** [4] - 99:19, 113:7, 140:9, 141:4

**confirmed** [1] - 23:13

**conflict** [1] - 193:2

**confront** [1] - 37:24

**confused** [1] - 180:20

**confusion** [1] - 64:20

**congratulate** [1] - 196:10

**congratulations** [1] - 102:17

**congratulatory** [1] - 101:22

**connection** [1] - 6:12

**conscience** [1] - 64:3

**consider** [12] - 30:11, 32:14, 43:18, 44:23, 61:3, 64:7, 64:8, 67:18, 67:20, 68:2, 68:3, 196:7

**consideration** [1] - 40:3, 60:2, 68:16

**considered** [5] - 30:14, 38:22, 48:15, 72:7, 123:15

**consistent** [3] - 11:21, 142:7, 152:10

**consistently** [1] - 170:1

**constitute** [1] - 26:3

**construction** [5] - 130:14, 130:18, 130:19, 145:25, 146:10

**consultant** [2] - 7:5, 83:15

**consulted** [1] - 128:9

**contacted** [1] - 109:15

**contains** [1] - 94:14

**contemplated** [1] - 148:15

**contempt** [1] - 17:6

**content** [2] - 113:6, 117:2

**contentious** [1] - 143:12

**contentiousness** [1] - 22:6

**contents** [4] - 10:6, 10:9, 116:25, 118:16

**context** [13] - 18:18, 18:20, 19:17, 19:25, 20:2, 20:6, 20:8, 28:17, 37:6, 37:12, 38:12, 38:14, 61:9

**continue** [9] - 58:19, 96:3, 96:11, 99:16, 102:24, 129:1, 137:4, 163:22, 193:20

**continues** [1] - 193:15

**continuing** [5] - 74:23, 163:20, 180:3,

180:14, 197:24

**continuous** [1] - 159:12

**contract** [8] - 39:25, 99:24, 105:24, 140:18, 140:19, 143:2, 146:23

**contractual** [2] - 54:22, 152:3

**control** [1] - 143:3

**controversy** [1] - 93:22

**convenience** [1] - 195:7

**convenient** [2] - 191:24, 192:2

**conversation** [2] - 30:20, 165:17

**converted** [1] - 56:15

**conveyed** [1] - 197:6

**convince** [2] - 39:13, 67:20

**COO** [4] - 2:20, 7:7, 102:3, 108:16

**copy** [1] - 133:25

**corcoran** [1] - 154:3

**corporate** [3] - 7:8, 151:18, 151:20

**corporation** [1] - 148:11

**correct** [105] - 9:7, 12:20, 14:9, 73:24, 75:5, 75:16, 77:23, 78:7, 80:3, 80:7, 82:25, 83:12, 92:7, 92:8, 92:20, 92:23, 98:10, 98:17, 98:23, 100:5, 100:22, 106:2, 108:18, 108:19, 115:4, 116:13, 117:10, 117:19, 119:23, 119:24, 122:5, 122:6, 126:22, 131:5, 131:6, 145:15, 145:16, 145:20, 145:21, 148:19, 148:24, 149:4, 149:15, 149:22, 149:25, 150:2, 150:3, 150:8, 150:11, 150:14, 150:18, 150:21, 151:5, 151:19, 151:22, 151:23, 152:3, 152:19, 152:22, 153:12, 153:16, 155:8, 155:17, 155:21, 156:4, 156:5, 157:1,

157:12, 157:17, 157:18, 157:22, 158:10, 158:12, 159:4, 160:10, 165:1, 165:4, 167:19, 168:1, 168:9, 168:12, 168:20, 168:21, 169:3, 169:16, 170:6, 170:14, 171:7, 172:24, 173:22, 177:12, 177:18, 182:10, 183:8, 183:15, 185:9, 185:13, 185:21, 187:8, 187:22, 188:6, 188:10, 188:13, 188:20, 199:14

**corrected** [6] - 122:24, 165:13, 168:17, 170:9, 172:19, 199:2

**correctly** [8] - 25:18, 27:20, 28:5, 80:5, 98:6, 98:7, 98:20, 122:22

**correspondence** [8] - 97:4, 113:5, 118:3, 141:14, 142:17, 172:12, 173:6, 173:9

**corresponding** [6] - 105:3, 105:15, 106:7, 113:19, 123:17, 165:14

**Counsel** [1] - 2:21

**counsel** [32] - 4:9, 4:11, 4:12, 5:1, 5:9, 5:11, 5:17, 7:11, 7:14, 7:16, 15:5, 44:12, 44:17, 47:10, 55:9, 62:11, 68:21, 74:11, 76:25, 81:9, 81:15, 83:10, 85:18, 106:11, 115:25, 116:11, 131:2, 131:10, 140:7, 142:2, 166:10, 181:14

**count** [1] - 48:10

**counties** [3] - 97:18, 98:14, 98:21

**country** [1] - 89:25

**county** [1] - 58:16

**couple** [13] - 14:23, 15:20, 17:4, 27:8, 57:24, 58:6, 65:11, 77:7, 89:23, 96:6, 128:12, 129:12, 158:7

**coupled** [2] - 41:6,

91:22
*Cour* [1] - 34:8
*COUR* [1] - 5:7
*course* [12] - 11:25,
13:7, 32:16, 57:4,
60:23, 63:16, 79:24,
91:9, 98:1, 146:6,
146:14, 179:14
*COURT* [207] - 1:1,
3:5, 4:5, 5:13, 5:16,
6:5, 6:6, 6:7, 6:9,
7:18, 7:20, 9:9, 9:11,
9:23, 10:4, 10:18,
10:21, 11:1, 11:5,
11:10, 12:5, 12:12,
12:16, 13:4, 15:20,
17:3, 18:5, 18:13,
20:10, 21:10, 21:12,
22:16, 23:15, 23:18,
24:5, 24:16, 24:22,
25:5, 25:24, 26:10,
26:16, 26:25, 28:14,
29:16, 33:1, 33:23,
34:10, 35:4, 35:22,
36:2, 36:20, 37:20,
38:10, 38:15, 39:21,
42:19, 43:24, 47:1,
47:6, 48:16, 50:15,
51:14, 52:20, 52:24,
53:3, 53:24, 54:19,
54:25, 57:5, 57:24,
58:3, 58:6, 62:6,
62:17, 64:14, 64:21,
66:20, 68:14, 68:17,
68:20, 68:25, 69:9,
69:20, 71:13, 71:22,
72:1, 72:4, 72:11,
72:19, 73:2, 73:14,
73:16, 73:19, 74:2,
74:10, 74:14, 74:17,
74:19, 75:11, 75:14,
75:17, 75:21, 75:24,
76:4, 76:10, 76:13,
76:18, 76:24, 81:6,
82:1, 82:5, 83:3,
83:6, 84:14, 84:18,
85:3, 85:20, 88:2,
88:19, 92:2, 93:18,
102:11, 102:13,
104:20, 104:25,
105:8, 106:12,
106:15, 107:5,
107:9, 107:12,
111:17, 111:19,
115:12, 115:14,
116:20, 116:22,
119:1, 119:3, 134:7,
134:20, 135:5,
135:20, 135:22,
136:1, 136:3, 136:7,
138:9, 138:20,

138:23, 139:6,
139:16, 139:21,
139:24, 140:3,
140:12, 140:21,
141:1, 142:7,
143:18, 143:21,
143:23, 144:14,
144:20, 144:24,
145:5, 147:1,
147:10, 147:21,
148:6, 161:20,
161:23, 163:19,
171:13, 180:11,
180:24, 181:3,
181:19, 191:8,
191:12, 191:19,
191:21, 192:4,
192:8, 192:12,
192:16, 192:21,
193:8, 193:18,
194:3, 194:7,
194:25, 195:2,
195:8, 195:11,
195:24, 196:3,
196:12, 196:17,
197:6, 197:13,
197:17, 197:22,
198:11, 198:21,
198:25, 199:4
*court* [8] - 6:1, 10:17,
11:12, 45:3, 68:2,
94:2, 115:21, 138:15
*Court* [69] - 1:15, 1:16,
9:19, 9:20, 10:1,
10:8, 10:12, 16:13,
24:10, 24:24, 26:22,
28:8, 28:21, 29:2,
29:13, 34:24, 34:25,
35:3, 35:19, 36:6,
36:10, 37:6, 37:8,
38:12, 38:19, 39:9,
39:12, 41:13, 47:19,
48:2, 50:20, 53:6,
53:11, 53:21, 55:16,
55:22, 56:14, 57:2,
62:21, 65:9, 66:3,
66:17, 71:9, 72:23,
73:13, 74:8, 79:8,
84:17, 93:4, 117:21,
118:2, 126:13,
130:24, 134:4,
136:5, 137:22,
138:7, 139:14,
141:12, 141:18,
141:20, 141:22,
142:1, 142:6,
142:11, 143:10,
147:9, 186:24, 195:7
*Court's* [7] - 12:1,
41:23, 55:7, 55:8,
58:24, 67:2, 141:23

*courtroom* [2] - 5:22,
147:11
*COURTROOM* [2] -
33:16, 81:9
*covenants* [1] -
165:20
*cover* [1] - 193:9
*covered* [5] - 48:7,
48:12, 52:8, 70:14,
196:16
*COVID* [3] - 125:6,
194:14, 198:7
*create* [1] - 27:25
*created* [2] - 23:12,
190:24
*credibility* [2] - 59:5,
59:6
*credit* [1] - 184:12
*credits* [2] - 187:15,
187:21
*crew* [1] - 158:8
*criminal* [1] - 64:1
*critical* [1] - 37:12
*CROSS* [2] - 3:6,
145:9
*cross* [34] - 9:19, 12:3,
13:14, 17:24, 18:2,
20:9, 20:16, 21:7,
21:19, 22:3, 22:14,
38:1, 38:4, 43:6,
60:14, 60:23, 60:24,
72:15, 72:25, 73:4,
73:9, 75:4, 138:17,
138:20, 144:11,
152:23, 191:5,
192:9, 193:1,
193:14, 193:16,
193:21, 194:5,
196:19
*cross-examination*
[15] - 12:3, 13:14,
17:24, 18:2, 20:9,
20:16, 22:3, 38:1,
38:4, 43:6, 60:24,
138:17, 138:20,
144:11, 193:21
*CROSS-
EXAMINATION* [2] -
3:6, 145:9
*cross-examine* [1] -
9:19
*CRR* [2] - 1:15, 199:16
*cry* [1] - 31:3
*culture* [1] - 100:1
*cure* [10] - 29:9, 30:3,
112:16, 120:13,
140:16, 142:24,
143:4, 143:16,
172:9, 183:25
*cured* [9] - 19:1,

113:10, 129:22,
140:20, 173:2,
173:12, 178:24,
179:10, 183:19
*cures* [1] - 120:13
*curing* [2] - 126:16,
173:16
*current* [10] - 87:17,
88:8, 89:13, 109:12,
120:21, 121:4,
121:22, 135:11,
167:14, 186:20
*curtail* [1] - 17:16
*customary* [1] - 5:23
*customers* [3] - 15:12,
15:13, 168:18
*cut* [2] - 30:19, 143:4
*cutting* [1] - 195:15

## D

*dad* [5] - 145:25,
146:13, 148:18,
149:3, 166:16
*Daily* [1] - 169:25
*daily* [2] - 170:1, 170:6
*damage* [1] - 190:3
*damages* [2] - 41:20,
60:5
*dangerous* [2] - 51:18,
51:19
*DATE* [1] - 199:16
*date* [15] - 24:14,
47:20, 102:7,
104:13, 108:10,
111:11, 111:23,
114:22, 116:14,
117:5, 117:25,
118:11, 172:20,
172:23, 186:9
*dated* [4] - 104:12,
108:10, 111:22,
190:22
*dates* [1] - 51:7
*davis* [3] - 38:25,
52:20, 54:19
*DAVIS* [127] - 3:4, 5:5,
5:8, 5:14, 9:2, 9:10,
9:14, 9:24, 10:2,
10:5, 10:9, 10:13,
10:24, 11:4, 11:8,
11:25, 12:9, 24:8,
25:12, 26:9, 26:14,
26:22, 27:5, 29:4,
32:21, 34:19, 35:16,
39:1, 43:22, 47:15,
50:16, 52:21, 53:4,
54:17, 54:20, 55:14,
62:8, 64:13, 64:19,
64:22, 66:18, 68:11,

68:15, 69:4, 72:5,
72:18, 73:5, 73:17,
73:24, 74:4, 74:12,
75:5, 75:13, 75:16,
76:21, 77:2, 77:4,
81:11, 81:12, 81:24,
83:8, 83:9, 84:7,
84:25, 85:12, 86:4,
87:16, 88:3, 89:11,
92:4, 92:5, 93:25,
94:6, 94:7, 102:9,
102:14, 104:18,
105:11, 106:10,
107:14, 107:15,
110:25, 111:2,
111:15, 111:20,
111:21, 115:10,
115:16, 115:17,
115:22, 116:17,
116:23, 118:24,
119:4, 131:10,
131:19, 131:20,
133:21, 134:19,
134:21, 135:19,
135:21, 136:5,
136:19, 138:4,
140:1, 140:4,
140:24, 141:2,
141:10, 143:19,
143:22, 146:21,
159:21, 163:15,
171:3, 171:8, 180:2,
181:14, 191:4,
191:10, 191:13,
193:11, 195:6,
195:22, 196:9, 199:9
*Davis* [97] - 2:3, 4:19,
4:22, 4:23, 4:24, 5:4,
5:8, 6:6, 6:8, 8:16,
10:17, 10:23, 11:2,
12:8, 12:18, 20:12,
24:5, 25:10, 25:21,
26:8, 27:4, 30:20,
31:24, 32:7, 32:19,
33:10, 34:16, 35:5,
36:7, 42:23, 43:21,
47:8, 47:14, 48:19,
50:15, 53:1, 53:3,
53:25, 54:14, 54:25,
61:19, 62:6, 64:5,
64:15, 66:25, 67:11,
68:10, 69:11, 69:24,
72:4, 73:2, 74:11,
74:25, 76:19, 76:20,
83:7, 84:24, 85:10,
85:20, 88:2, 88:24,
89:9, 92:3, 93:19,
105:8, 106:12,
110:23, 134:20,
135:17, 136:3,
136:7, 138:10,

139:25, 140:17, 140:21, 142:25, 143:18, 154:1, 155:7, 181:23, 185:6, 185:8, 185:11, 185:14, 185:15, 186:1, 186:14, 187:20, 188:18, 188:21, 193:8, 195:5, 195:10, 195:20, 196:8, 196:21
**Davis** [7] - 21:17, 187:12, 188:9, 189:2, 189:3, 189:6, 189:8
**davis'** [1] - 47:3
**days** [26] - 27:9, 37:18, 39:4, 39:8, 40:19, 46:10, 46:20, 55:25, 81:23, 115:1, 117:8, 129:9, 132:3, 142:20, 152:13, 158:7, 159:3, 159:9, 168:17, 168:23, 170:10, 170:11, 172:19, 172:23, 194:14
**deactivate** [1] - 34:2
**dead** [2] - 20:5, 41:16
**deadline** [3] - 37:15, 95:11, 124:6
**deal** [14] - 13:6, 25:13, 35:17, 38:19, 54:22, 57:12, 60:23, 63:10, 63:12, 67:24, 93:17, 129:18, 175:19, 184:24
**dealings** [1] - 90:1
**dealt** [3] - 55:24, 126:25, 140:5
**December** [11] - 100:18, 102:8, 107:21, 128:1, 129:8, 131:18, 187:7, 188:6, 189:11, 189:12
**decide** [4] - 20:2, 20:4, 20:6, 67:21
**decided** [1] - 100:7
**deciding** [1] - 128:19
**decision** [6] - 21:17, 43:13, 53:21, 66:13, 70:17, 129:11
**decision-makers** [1] - 129:11
**decision-making** [1] - 43:13
**declaration** [10] - 9:17, 9:22, 10:7,

11:22, 20:14, 21:6, 72:7, 72:14, 73:1, 73:23
**declarations** [1] - 10:10
**declaratory** [1] - 65:20
**declaring** [1] - 45:10
**decline** [1] - 197:18
**decorum** [1] - 70:10
**dedicated** [1] - 83:25
**deem** [1] - 35:3
**deemed** [1] - 141:21
**default** [61] - 14:15, 27:12, 27:14, 27:19, 28:1, 28:11, 29:7, 29:8, 34:24, 39:5, 39:7, 47:23, 49:1, 50:5, 56:1, 56:4, 56:10, 58:11, 59:14, 61:16, 65:16, 66:7, 114:11, 114:13, 114:18, 115:23, 118:4, 118:8, 118:13, 118:16, 119:10, 120:9, 120:13, 122:7, 122:15, 122:17, 125:14, 125:24, 126:3, 126:16, 126:21, 126:24, 129:9, 129:15, 129:19, 129:22, 133:2, 140:20, 143:3, 153:7, 155:20, 159:15, 159:16, 167:18, 167:19, 171:24, 172:8, 172:9, 183:18, 184:1
**Default** [1] - 122:1
**defaulted** [2] - 153:23, 153:25
**defaults** [13] - 14:1, 27:6, 39:15, 39:17, 56:11, 66:11, 113:20, 115:19, 117:3, 119:8, 122:4, 166:9, 166:12
**Defendant** [2] - 1:8, 2:13
**defendant** [11] - 9:3, 9:18, 17:7, 24:1, 26:17, 30:14, 34:21, 58:21, 62:23, 67:16, 72:6
**defendant's** [6] - 12:3, 27:13, 39:5, 126:4, 130:25, 138:7
**DEFENDANT'S** [1] - 3:8

**Defendant's** [4] - 147:15, 171:5, 171:6, 181:10
**defendants** [4] - 15:16, 15:22, 58:10, 131:7
**defending** [1] - 58:2
**defense** [32] - 5:2, 5:20, 6:16, 8:6, 12:7, 13:6, 13:10, 20:16, 22:20, 26:6, 28:16, 32:1, 32:9, 33:13, 35:9, 36:10, 43:1, 43:17, 47:4, 48:25, 60:4, 60:7, 63:2, 63:5, 63:11, 63:16, 63:18, 64:1, 70:4, 71:14, 71:16, 74:12
**defense's** [1] - 25:7
**defer** [5] - 26:9, 60:23, 71:15, 185:7, 195:10
**deficiencies** [15] - 18:24, 19:1, 28:10, 29:8, 39:10, 46:22, 47:20, 52:2, 112:8, 113:2, 113:14, 119:5, 172:19, 173:2, 173:16
**deficiency** [30] - 19:13, 40:14, 40:16, 42:3, 45:24, 46:7, 46:8, 48:23, 51:24, 110:14, 110:20, 111:22, 112:5, 112:7, 112:10, 112:19, 113:24, 114:12, 125:20, 155:9, 155:15, 155:19, 167:17, 167:19, 171:23, 172:11, 172:15, 172:16, 173:9, 178:19
**deficient** [1] - 58:23
**defined** [3] - 93:8, 121:9, 190:14
**degree** [1] - 79:19
**delineation** [1] - 175:3
**delinquency** [1] - 159:15
**demand** [1] - 143:5
**demonstrates** [1] - 19:18
**demonstration** [1] - 113:7
**denied** [3] - 24:20, 29:10, 113:4
**denies** [1] - 51:4
**Denver** [3] - 186:10, 186:11, 186:23

**deny** [2] - 23:22, 69:9
**department** [6] - 51:6, 58:16, 58:17, 61:20, 61:22, 110:12
**depth** [1] - 119:6
**DEPUTY** [2] - 33:16, 81:9
**deputy** [2] - 5:22, 147:11
**described** [3] - 11:14, 85:8, 149:2
**deserve** [1] - 135:2
**design** [1] - 66:23
**designate** [1] - 134:4
**designated** [5] - 84:9, 133:24, 134:24, 148:14, 175:16
**desirable** [3] - 32:19, 89:6
**desire** [2] - 103:14, 103:21
**despite** [4] - 19:13, 29:16, 42:10, 96:21
**detail** [1] - 112:8
**detailed** [1] - 108:13
**details** [2] - 53:15, 109:9
**determination** [17] - 29:2, 29:19, 30:7, 30:12, 30:16, 31:11, 38:23, 43:19, 43:20, 55:7, 55:8, 59:6, 62:20, 63:4, 65:22, 66:3, 67:2
**determine** [4] - 29:1, 46:12, 64:6, 141:15
**develop** [26] - 90:6, 92:14, 93:1, 93:10, 94:18, 95:6, 95:20, 96:4, 96:10, 96:25, 97:8, 97:16, 97:19, 98:8, 98:15, 98:22, 98:24, 99:8, 109:22, 127:8, 127:12, 127:23, 130:1, 130:4, 182:13, 182:25
**developed** [6] - 85:4, 97:17, 98:5, 123:23, 125:3, 125:10
**Developer** [3] - 91:14, 92:12, 92:25
**developer** [2] - 92:24, 185:1
**developing** [4] - 91:6, 93:9, 100:3, 100:10
**development** [78] - 21:3, 22:1, 27:15, 79:24, 90:3, 91:16, 91:20, 92:21, 94:9,

94:19, 95:16, 95:19, 96:14, 96:16, 96:18, 97:2, 99:4, 99:11, 99:20, 99:24, 101:13, 101:22, 102:17, 102:19, 102:22, 108:8, 108:12, 108:17, 109:7, 109:12, 109:15, 109:25, 114:12, 122:9, 124:16, 125:17, 127:3, 127:15, 128:5, 128:8, 128:9, 128:11, 129:6, 129:13, 129:17, 129:19, 130:7, 130:12, 131:5, 146:11, 149:8, 149:14, 154:10, 181:13, 181:25, 182:9, 182:12, 183:5, 183:12, 184:1, 184:12, 184:21, 185:16, 186:1, 186:12, 186:15, 186:16, 187:12, 187:13, 188:9, 188:22, 189:2, 189:3, 189:8, 189:17, 190:8
**DEVELOPMENT** [1] - 1:4
**Development** [19] - 5:12, 77:10, 91:10, 92:10, 92:17, 93:5, 100:11, 102:5, 104:12, 111:8, 115:5, 123:15, 124:7, 155:17, 174:2, 174:3, 175:7, 175:18, 181:11
**developments** [1] - 31:19
**devices** [1] - 123:8
**devote** [2] - 88:5, 146:19
**died** [1] - 123:9
**difference** [3] - 54:1, 182:20, 193:15
**differences** [1] - 92:9
**different** [14] - 42:9, 54:3, 65:11, 125:10, 127:13, 128:14, 134:11, 162:19, 164:22, 169:11, 177:10, 177:23, 181:6, 193:7
**difficult** [1] - 4:14
**difficulty** [1] - 6:11

diligence [2] - 46:17, 49:12
dire [1] - 82:3
direct [15] - 12:2, 12:19, 13:15, 13:17, 15:19, 21:18, 30:21, 30:22, 43:3, 71:10, 72:25, 75:9, 75:15, 76:20, 155:7
DIRECT [2] - 3:4, 77:3
directed [4] - 114:1, 114:3, 114:4, 142:2
directing [1] - 113:22
direction [3] - 15:18, 17:6, 93:20
directly [6] - 16:1, 21:9, 39:4, 134:3, 160:16, 174:5
directors [1] - 121:16
dirt [2] - 177:15
dirty [2] - 159:9, 168:14
disagree [2] - 39:22, 131:11
disagreed [1] - 182:3
disagreement [1] - 44:22
disclosed [1] - 31:3
disclosure [1] - 31:13
discourse [1] - 45:5
discovery [6] - 141:14, 142:2, 142:5, 142:15, 142:16, 142:21
discuss [22] - 22:7, 27:22, 28:6, 30:5, 31:24, 32:1, 32:2, 32:12, 32:18, 34:12, 70:16, 85:1, 95:17, 101:23, 109:25, 139:2, 143:20, 144:22, 194:16, 195:19, 196:6
discussed [5] - 56:12, 65:12, 119:21, 163:17, 184:4
discussing [7] - 50:17, 51:8, 60:15, 63:9, 64:10, 84:9, 96:2
discussion [2] - 109:20, 155:10
Discussion [2] - 26:24, 147:25
discussions [3] - 135:10, 183:10, 184:6
disgraceful - 14:20
disgusting [1] - 53:16
dismay [1] - 198:4

dismiss [3] - 24:25, 25:15, 25:19
dismissal [2] - 23:20, 23:21
disparage [1] - 29:15
disparaging [1] - 16:12
displayed [1] - 135:4
dispositive [1] - 26:1
dispute [2] - 8:24, 184:10
disputing [1] - 190:20
dissect [1] - 49:6
distance [1] - 6:21
DISTRICT [3] - 1:1, 1:1, 1:11
District [1] - 1:16
disturbed [1] - 58:1
diversity [2] - 23:25, 25:20
divided [2] - 149:11, 149:15
division [1] - 146:15
DIVISION [1] - 1:2
Division [1] - 78:7
DMA [7] - 91:17, 94:13, 94:16, 97:15, 101:8, 161:7, 185:18
DMAs [1] - 94:14
Docket [1] - 72:14
docket [3] - 26:11, 85:10, 86:1
document [19] - 81:16, 84:6, 103:24, 103:25, 105:22, 106:16, 106:24, 110:18, 116:7, 116:9, 118:19, 118:20, 135:7, 143:15, 167:3, 177:1, 177:3, 182:4, 182:17
documents [10] - 35:18, 40:7, 40:24, 42:9, 49:4, 49:16, 55:3, 85:14, 117:4, 181:16
domicile [1] - 141:15
domiciliary [1] - 23:3
done [20] - 16:18, 27:24, 46:13, 59:9, 76:22, 113:9, 119:10, 145:6, 146:13, 147:5, 150:20, 152:1, 152:2, 152:13, 168:7, 172:5, 177:6, 177:16, 191:16, 192:1
door [1] - 168:11

dory [1] - 54:15
dough [9] - 41:15, 168:25, 169:4, 169:9, 169:12, 169:16, 169:20, 179:6, 179:7
down [24] - 6:11, 9:5, 14:2, 15:4, 15:7, 15:12, 38:16, 49:14, 53:9, 56:19, 58:17, 61:22, 63:10, 67:24, 97:22, 120:20, 123:3, 127:6, 152:24, 158:5, 172:20, 173:21, 192:25
dozens [3] - 14:10, 28:6
drafted [1] - 106:1
draw [2] - 103:6, 119:13
drifted [1] - 89:4
drifts [1] - 55:3
drill [1] - 9:5
drive [1] - 42:10
Drive [1] - 167:11
drives [1] - 4:16
driving [1] - 184:23
dropping [1] - 11:13
drove [1] - 79:17
dry [1] - 9:12
due [7] - 13:7, 46:16, 49:12, 60:23, 63:16, 124:4, 172:2
dummied [1] - 49:16
during [15] - 37:25, 38:3, 58:9, 60:24, 72:12, 109:20, 113:13, 120:14, 124:9, 141:25, 152:23, 171:19, 171:22, 179:13, 198:5
dust [1] - 15:1
duties [6] - 77:25, 78:25, 79:21, 89:14, 149:7, 149:12
duty [2] - 70:13, 197:24

— E —

Eagle [1] - 154:2
earliest [2] - 123:16, 194:17
early [1] - 16:25, 194:19
earn [1] - 92:16
earned [1] - 123:18
easily [1] - 96:7

Eastern [4] - 33:5, 33:6, 33:7, 195:17
effect [6] - 8:5, 8:12, 15:23, 84:23, 97:25, 143:14
effective [1] - 143:15
efforts [5] - 78:22, 88:5, 96:1, 102:18, 146:19
eight [13] - 42:9, 49:17, 110:3, 117:8, 129:14, 160:25, 161:2, 161:4, 185:17, 185:19, 185:22, 185:25, 186:14
either [10] - 34:25, 38:4, 38:6, 47:23, 48:12, 52:8, 56:23, 80:25, 146:18, 150:5
election [2] - 103:10, 119:23
elements [1] - 19:23
Ellis [1] - 2:18
email [6] - 8:24, 46:20, 54:7, 99:18, 99:23, 144:18
emailed [3] - 85:18, 106:19, 165:11
emails [3] - 12:20, 14:10, 172:13
employ [1] - 147:4
employed [1] - 174:20
employee [2] - 13:20, 42:13
employees [10] - 16:21, 42:16, 57:19, 78:21, 80:20, 121:17, 174:1, 174:4, 174:18, 174:19
enclosures [1] - 107:2
encompasses [1] - 94:11
encourage [2] - 6:13, 10:22
end [23] - 11:14, 79:2, 95:10, 95:11, 96:14, 98:2, 100:16, 100:21, 101:10, 101:14, 101:16, 103:12, 108:11, 122:25, 132:22, 166:15, 182:1, 182:7, 182:11, 182:14, 183:2, 189:21, 190:9
endeavor [1] - 69:12
ended [4] - 95:15, 101:3, 122:21,

129:20
ending [2] - 169:12, 179:7
endorses [1] - 58:18
enduring [1] - 59:18
energy [1] - 15:1
enforce [4] - 19:8, 52:9, 54:4, 160:8
enforcing [2] - 157:21, 157:23
engage [1] - 94:23
enjoy [1] - 199:6
ensure [10] - 108:8, 151:3, 151:10, 157:15, 160:8, 168:17
entail [1] - 57:1
enter [6] - 53:11, 58:14, 77:11, 90:4, 108:7, 141:19
entered [18] - 7:22, 16:9, 39:8, 56:13, 58:7, 65:15, 77:8, 78:3, 92:17, 92:25, 103:2, 117:21, 118:2, 122:1, 128:6, 133:18, 141:8
entering [1] - 50:11
enters [1] - 90:5
entertain [2] - 91:12, 141:22
entire [3] - 49:13, 94:13, 124:3
entirely [6] - 12:24, 14:13, 14:24, 15:17, 53:8, 163:17
entirety [1] - 91:17, 105:13, 126:9
entities [1] - 50:23
entitled [2] - 135:8, 199:14
entitlement [1] - 166:1
entity [8] - 78:22, 93:6, 154:24, 167:6, 171:10, 175:11, 175:14, 175:17
entry [1] - 5:21
equipment [3] - 132:10, 132:11, 179:12
equitable [2] - 58:7, 197:18
error [1] - 129:16
escalated [1] - 113:19
Esquire [6] - 2:3, 2:3, 2:7, 2:13, 2:14, 2:17
essence [2] - 30:9, 59:12
essentially [6] - 27:10, 50:1, 65:5, 74:23,

*75:7, 198:17*
**establish** *[3] - 62:1, 108:7, 109:7*
**established** *[1] - 56:11*
**estate** *[5] - 90:9, 96:1, 149:8, 149:14, 184:6*
**estimate** *[3] - 162:7, 192:9, 192:16*
**et** *[6] - 7:13, 29:10, 40:16, 143:7, 163:3*
**evaluation** *[4] - 162:13, 165:4, 177:2, 177:16*
**evaluations** *[1] - 164:2*
**Evaluations** *[2] - 46:1, 150:7*
**evaluator** *[1] - 177:17*
**evening** *[5] - 13:22, 15:13, 16:4, 16:22, 70:22*
**events** *[1] - 172:14*
**eventually** *[2] - 116:4, 164:13*
**evidence** *[87] - 14:13, 15:15, 20:18, 21:14, 27:3, 27:7, 28:4, 28:17, 28:20, 28:25, 29:20, 30:5, 30:7, 30:10, 30:13, 31:2, 31:5, 31:12, 31:14, 31:15, 31:23, 34:22, 36:25, 39:3, 39:18, 41:2, 41:24, 42:22, 44:15, 45:7, 47:10, 51:1, 51:3, 51:11, 55:11, 55:17, 55:25, 57:2, 59:7, 60:1, 60:8, 60:12, 60:18, 60:22, 60:24, 61:1, 62:21, 62:22, 63:1, 63:3, 63:6, 63:12, 63:19, 63:23, 64:17, 65:3, 66:5, 66:16, 66:18, 66:25, 67:14, 67:17, 67:19, 67:24, 68:9, 69:8, 69:18, 70:3, 70:4, 70:16, 71:17, 71:20, 74:22, 76:23, 81:25, 88:7, 102:10, 104:19, 111:16, 115:11, 116:18, 116:19, 118:25, 138:6, 172:10*
**evident** *[1] - 95:1*
**evidentiary** *[1] - 63:11*
**EVIDENTIARY** *[1] - 1:10*

**evolved** *[1] - 79:22*
**exact** *[2] - 119:8, 158:17*
**exactly** *[10] - 38:2, 44:1, 53:14, 57:9, 66:15, 88:24, 113:6, 162:2, 162:3, 162:6*
**EXAMINATION** *[8] - 3:4, 3:5, 3:5, 3:6, 77:3, 82:7, 106:14, 145:9*
**examination** *[22] - 12:2, 12:3, 12:19, 13:14, 13:15, 13:17, 17:24, 18:2, 20:9, 20:16, 22:3, 22:13, 38:1, 38:4, 43:4, 43:6, 60:24, 76:20, 138:17, 138:20, 144:11, 193:21*
**examine** *[1] - 9:19*
**example** *[5] - 18:22, 32:6, 46:3, 81:22, 174:22*
**exceeded** *[1] - 108:17*
**exceeding** *[1] - 102:19*
**except** *[5] - 50:20, 137:24, 141:23, 153:22, 153:24*
**excluded** *[1] - 63:7*
**exclusive** *[4] - 93:12, 94:17, 99:9, 125:9*
**exclusivity** *[1] - 95:9*
**execute** *[2] - 121:3, 121:13*
**executives** *[1] - 95:16, 128:11*
**exercise** *[2] - 104:10, 124:8*
**exercised** *[1] - 124:10*
**Exhibit** *[53] - 77:8, 81:14, 81:25, 83:4, 83:6, 83:19, 84:4, 84:5, 84:10, 85:9, 101:18, 101:19, 102:10, 102:16, 103:1, 103:4, 103:5, 103:23, 104:19, 105:13, 106:6, 106:17, 107:12, 107:16, 107:18, 108:4, 110:5, 110:17, 111:15, 112:19, 114:15, 114:17, 115:11, 116:18, 116:24, 117:11, 118:7, 118:25, 119:12, 122:2, 123:12,*

*125:13, 127:1, 127:21, 133:1, 133:22, 133:24, 134:3, 134:5, 147:15, 147:16, 170:25, 181:10*
**exhibit** *[14] - 14:6, 44:8, 55:5, 82:10, 84:10, 85:6, 85:10, 104:22, 104:23, 107:10, 110:23, 155:7, 170:22, 184:2*
**exhibits** *[34] - 8:23, 9:15, 12:22, 12:24, 13:5, 14:6, 17:20, 18:8, 18:10, 19:2, 21:21, 22:3, 22:5, 22:6, 31:2, 35:2, 35:8, 35:12, 36:12, 36:18, 37:7, 37:25, 42:25, 43:4, 44:5, 70:5, 75:1, 76:25, 77:8, 93:21, 181:7, 196:20*
**Exhibits** *[3] - 72:9, 73:12, 76:23*
**exist** *[2] - 36:13, 59:23*
**existence** *[1] - 53:7*
**existing** *[1] - 185:3*
**exists** *[2] - 23:20, 70:12*
**expand** *[1] - 21:11*
**expect** *[2] - 114:11, 114:12*
**expectation** *[2] - 92:15, 129:1*
**expectations** *[1] - 78:18*
**expected** *[1] - 17:11*
**expecting** *[1] - 127:23*
**experience** *[3] - 87:22, 132:1, 139:1*
**experienced** *[1] - 49:22*
**expert** *[1] - 59:12*
**expiration** *[9] - 8:11, 30:2, 103:13, 103:20, 104:16, 114:23, 115:1, 117:8, 117:15*
**expiration/renewal** *[1] - 108:10*
**expire** *[3] - 65:8, 100:12, 189:12*
**expired** *[2] - 100:21, 158:3*
**explain** *[8] - 36:5, 42:8, 45:17, 51:17, 55:2, 55:11, 91:18, 124:18*

**explaining** *[1] - 173:7*
**explanation** *[2] - 39:15, 50:19*
**exposed** *[1] - 11:6*
**express** *[2] - 95:4, 137:2*
**expressed** *[2] - 112:13, 198:3*
**expressing** *[1] - 113:8, 137:14*
**extend** *[2] - 58:8, 99:10*
**extensive** *[1] - 184:6*
**extent** *[16] - 14:12, 14:16, 21:15, 22:13, 23:19, 25:25, 28:22, 31:2, 37:3, 55:4, 60:14, 67:8, 72:20, 90:11, 93:22, 198:3*
**exterior** *[1] - 177:15*
**extraneous** *[1] - 29:14*
**extraordinary** *[3] - 39:24, 40:1, 57:12*
**extremely** *[1] - 69:5*

## F

**face** *[3] - 6:20, 141:24, 162:21*
**fact** *[41] - 14:2, 15:4, 18:21, 18:22, 18:24, 19:1, 19:12, 27:24, 28:2, 39:17, 41:2, 62:18, 88:14, 149:6, 152:8, 153:15, 157:3, 166:3, 183:11, 190:20, 198:13*
**factor** *[1] - 45:8*
**factors** *[1] - 61:17*
**facts** *[4] - 14:22, 22:25, 36:6, 56:16*
**factual** *[1] - 183:7*
**factually** *[3] - 8:18, 27:8, 48:3*
**failed** *[3] - 122:16, 125:16, 127:3*
**failing** *[8] - 125:24, 156:20, 156:21, 157:4, 157:20, 164:5, 164:16*
**fails** *[1] - 53:20*
**failure** *[3] - 27:15, 27:20, 122:9*
**fair** *[17] - 12:5, 13:12, 22:16, 33:1, 70:14, 71:18, 92:2, 93:18, 104:25, 105:8, 108:25, 138:9, 146:4, 159:10,*

*182:14, 182:16*
**fairly** *[3] - 23:1, 67:5, 198:5*
**faith** *[2] - 23:18, 40:6*
**faithless** *[2] - 42:6, 57:23*
**fall** *[6] - 61:21, 123:24, 124:14, 124:15, 125:4, 128:14*
**false** *[2] - 52:7, 151:25*
**falsified** *[3] - 40:7, 42:8, 49:4*
**falsifying** *[3] - 40:24, 50:1, 52:12*
**familiar** *[8] - 14:22, 81:15, 84:6, 103:24, 110:17, 116:9, 161:9, 177:25*
**famous** *[1] - 198:18*
**fan** *[1] - 168:14*
**FAQ** *[2] - 90:15, 90:20*
**far** *[12] - 12:16, 37:5, 60:18, 63:25, 69:16, 93:16, 113:7, 113:22, 130:6, 182:12, 183:3, 188:12*
**fashion** *[3] - 43:9, 135:11, 197:20*
**fast** *[1] - 6:12*
**father** *[20] - 77:15, 79:6, 80:19, 82:20, 83:11, 89:24, 102:6, 145:17, 145:19, 145:25, 146:7, 146:9, 146:18, 153:15, 160:23, 167:6, 172:18, 174:18, 184:22*
**favor** *[1] - 100:4*
**faxed** *[1] - 106:20*
**FDD** *[1] - 72:9*
**fear** *[1] - 67:11*
**February** *[1] - 183:21, 190:23*
**Fee** *[1] - 121:8*
**fee** *[6] - 123:18, 124:4, 124:23, 132:4, 132:13, 132:19*
**feed** *[1] - 52:17*
**fell** *[1] - 94:19*
**few** *[5] - 35:18, 39:4, 102:21, 129:9, 198:12*
**fewer** *[1] - 103:10*
**field** *[1] - 83:15*
**fight** *[3] - 143:10, 143:11, 143:17*
**figure** *[1] - 83:23*
**figuring** *[1] - 146:11*

*file* [6] - 56:13, 85:15, 90:15, 117:17, 142:23, 150:24
*filed* [16] - 10:10, 16:4, 25:14, 25:15, 85:13, 85:16, 85:18, 86:1, 126:5, 126:7, 126:14, 133:25, 134:1, 142:10, 151:25, 152:6
*FILED* [1] - 3:11
*filing* [12] - 16:2, 16:11, 16:13, 27:18, 58:10, 58:12, 85:14, 85:17, 127:2, 130:25, 134:1
*filings* [3] - 9:15, 14:23, 44:3
*fill* [4] - 152:18, 169:2, 169:5, 193:24
*filled* [3] - 168:23, 169:7, 170:5
*filters* [1] - 168:14
*final* [5] - 59:18, 66:3, 125:3, 130:13, 133:2
*finality* [2] - 112:25, 173:10
*finalize* [1] - 99:20
*finally* [6] - 6:20, 42:18, 100:20, 114:6, 121:20, 129:8
*financial* [2] - 128:16, 156:3
*fine* [27] - 11:10, 13:2, 22:17, 23:15, 32:24, 33:12, 36:3, 45:12, 49:5, 50:24, 61:5, 61:9, 61:25, 62:5, 64:19, 71:19, 84:20, 85:3, 85:4, 85:5, 85:20, 98:3, 131:19, 135:14, 143:19, 193:23, 194:2
*finish* [4] - 129:7, 137:19, 191:14, 194:5
*finished* [2] - 53:1, 79:19
*fire* [1] - 44:10
*fired* [1] - 42:14
*firm* [1] - 5:9
*first* [45] - 4:20, 4:24, 6:3, 8:16, 15:21, 23:1, 23:4, 28:2, 34:15, 58:7, 67:5, 72:3, 73:6, 75:7, 75:12, 75:18, 79:5, 89:18, 90:8, 90:9, 91:9, 91:14, 95:1, 95:18, 95:20, 96:9,

97:11, 102:15, 104:7, 110:1, 111:14, 115:2, 119:15, 121:1, 121:2, 122:7, 122:15, 122:17, 158:13, 160:21, 172:11, 173:5, 180:12, 183:24
*five* [20] - 32:22, 40:4, 50:4, 97:22, 98:10, 109:22, 110:1, 112:8, 119:18, 125:2, 135:19, 135:21, 136:6, 138:11, 156:12, 191:15, 191:22, 191:24, 193:16
*five-year* [2] - 109:22, 110:1
*fix* [7] - 37:18, 40:19, 151:21, 158:7, 159:2, 160:5, 162:20
*fixed* [7] - 40:18, 46:5, 49:7, 49:10, 159:3, 159:8, 159:19
*fixing* [2] - 46:10, 51:23
*flesh* [2] - 9:25, 10:2
*floor* [5] - 12:13, 13:11, 20:5, 43:11, 43:25
*Floor* [1] - 2:15
*floors* [1] - 15:2
*Florida* [2] - 2:15, 77:20
*flour* [3] - 169:11, 169:13, 179:7
*flowcharted* [1] - 35:14
*flurry* [2] - 8:22, 12:20
*fly* [1] - 123:9
*focus* [5] - 15:15, 17:18, 18:6, 146:1, 158:15
*folks* [11] - 30:23, 32:17, 70:16, 74:3, 83:16, 87:21, 138:13, 139:16, 174:5, 194:9, 197:7
*follow* [8] - 8:23, 14:17, 19:4, 40:18, 110:13, 159:6, 170:25, 171:25
*follow-up* [3] - 159:6, 170:25, 171:25
*followed* [4] - 107:22, 110:5, 110:8, 112:2
*following* [8] - 34:21, 40:16, 51:23,

110:11, 119:19, 123:17, 157:5, 187:6
*follows* [1] - 191:25
*food* [6] - 49:14, 51:18, 169:18, 169:20, 169:21, 169:23
*forbearance* [1] - 66:21
*force* [9] - 40:4, 40:10, 41:23, 50:3, 57:18, 65:23, 66:3, 128:22, 184:23
*forcing* [1] - 57:12
*forego* [3] - 70:1, 70:7, 71:6
*foregoing* [1] - 199:14
*forgot* [1] - 184:19
*form* [7] - 94:4, 105:19, 106:17, 121:4, 121:14, 131:12, 151:18
*formally* [1] - 105:19
*formed* [2] - 167:9, 175:19
*former* [1] - 132:9
*forms* [1] - 36:14
*fort* [1] - 44:5
*forth* [7] - 5:2, 12:21, 21:14, 28:23, 44:12, 44:20, 70:13
*forthcoming* [1] - 84:8
*forward* [52] - 4:17, 6:15, 6:21, 8:10, 8:12, 8:14, 12:6, 15:16, 18:15, 22:1, 27:2, 30:8, 30:18, 30:25, 31:11, 32:3, 34:13, 34:14, 34:18, 35:13, 37:3, 37:22, 42:21, 43:4, 43:14, 44:4, 53:20, 59:19, 60:8, 60:10, 60:21, 61:3, 68:8, 70:14, 71:24, 74:22, 77:11, 112:15, 128:19, 129:25, 135:8, 138:16, 139:3, 139:25, 140:23, 144:1, 144:9, 145:1, 195:16, 197:20, 197:24, 199:1
*foul* [1] - 31:3
*foundation* [5] - 18:9, 44:18, 62:1, 89:7, 89:9
*four* [26] - 70:25, 71:11, 83:19, 83:22, 97:20, 98:22, 112:8, 119:17, 124:17,

124:18, 124:20, 124:24, 130:3, 130:8, 152:1, 178:9, 182:22, 182:25, 183:4, 183:13, 187:7, 187:19, 189:11, 189:20
*frame* [2] - 84:22, 91:25, 192:25
*framework* [1] - 37:6
*framing* [1] - 20:18
*franchise* [44] - 19:6, 19:8, 19:22, 46:14, 53:7, 53:10, 77:15, 91:13, 92:13, 92:15, 96:7, 123:18, 124:4, 124:20, 124:23, 130:16, 132:4, 132:13, 132:15, 132:18, 132:21, 133:10, 136:21, 136:25, 137:11, 137:12, 137:17, 137:24, 138:2, 147:5, 147:6, 149:23, 150:1, 150:12, 151:14, 157:10, 157:11, 167:24, 173:15, 173:18, 174:23, 184:13
*franchised* [4] - 13:21, 13:23, 16:17, 19:5
*franchisee* [43] - 45:22, 46:8, 52:16, 77:19, 91:22, 93:3, 93:5, 93:11, 94:18, 95:4, 95:6, 95:21, 95:22, 95:25, 124:2, 125:11, 128:23, 137:24, 138:2, 151:15, 153:16, 157:6, 157:7, 158:19, 158:23, 164:9, 164:13, 164:15, 164:25, 167:22, 170:13, 170:16, 171:10, 172:18, 173:3, 174:3, 175:8, 180:16, 184:16, 185:2, 185:3, 185:6, 188:15
*Franchisee* [2] - 103:12, 103:13
*franchisee's* [2] - 19:16, 160:4
*Franchise's* [1] - 103:10
*franchisees* [16] -

124:18, 124:20,
*follows* [1] - 191:25

16:16, 19:7, 40:13, 40:19, 46:9, 48:23, 49:13, 52:10, 90:12, 94:23, 128:18, 137:2, 137:7, 137:8, 156:3, 156:10
*franchises* [5] - 53:12, 88:16, 90:12, 90:25, 167:24
*Franchising* [16] - 19:7, 40:13, 84:1, 104:11, 107:22, 141:15, 145:12, 147:22, 150:18, 151:12, 152:25, 153:21, 155:10, 167:4, 173:14, 181:11
*FRANCHISING* [1] - 1:7
*Franchisor* [8] - 103:12, 103:14, 120:11, 121:14, 121:15, 123:18, 124:3, 148:17
*franchisor* [5] - 19:15, 46:11, 103:9, 103:19, 184:16
*Franchisor's* [2] - 121:3, 121:22
*frankly* [12] - 19:17, 30:20, 39:16, 55:11, 59:15, 62:17, 69:25, 70:9, 135:12, 145:1, 166:20, 191:9
*free* [1] - 53:13
*freed* [1] - 97:16
*freestanding* [1] - 105:6
*Friday* [1] - 141:20
*FRIDAY* [2] - 1:6, 4:1
*front* [9] - 29:13, 37:13, 39:8, 39:11, 61:8, 71:10, 71:11, 110:10, 168:11
*fruits* [1] - 129:2
*fulfill* [2] - 88:10, 147:5
*fulfilling* [1] - 158:23
*full* [14] - 65:9, 76:14, 76:16, 78:11, 78:18, 85:17, 88:5, 88:10, 89:13, 133:4, 133:25, 140:11, 146:19, 149:2
*full-time* [6] - 78:11, 78:18, 88:5, 88:10, 89:13, 133:4
*fully* [2] - 123:18, 132:4

**function** [1] - 151:2
**fundamental** [1] - 36:22
**funnel** [1] - 137:1

## G

**game** [1] - 50:24
**garbled** [1] - 6:13
**gaskets** [2] - 41:16, 163:12
**gather** - 37:21
**geez** [1] - 54:14
**General** [1] - 2:21
**general** [8] - 7:11, 114:5, 121:14, 128:21, 135:8, 161:15, 162:4, 178:4
**generally** [3] - 144:21, 149:16, 151:15
**generated** [3] - 158:1, 158:18, 177:5
**Genovese** [1] - 2:14
**gentlemen** [2] - 143:23, 195:20
**gesture** [1] - 100:9
**Giles** [3] - 122:14, 141:16
**gist** [2] - 125:16, 128:13
**given** [9] - 13:10, 31:19, 117:4, 131:13, 132:16, 132:18, 132:21, 134:14, 158:20
**glancing** [1] - 182:19
**goal** [1] - 71:10
**goodness** [1] - 10:13
**grades** [1] - 51:5
**graduate** [1] - 79:12
**graduated** [3] - 79:16, 79:17, 91:3
**grant** [9] - 26:5, 41:14, 45:9, 52:7, 53:6, 54:1, 54:9, 57:11, 61:15
**granted** [4] - 15:23, 58:25, 59:1, 84:13
**grease** [3] - 15:10, 20:3, 20:5
**great** [5] - 46:21, 160:14, 193:23, 199:8
**green** [4] - 164:21, 164:22, 165:3, 177:11
**Greenville** [5] - 94:14, 94:16, 97:15, 100:15, 100:17
**greetings** [1] - 5:16

**ground** [3] - 70:14, 130:19, 151:22
**grounds** [2] - 126:20, 126:24
**group** [9] - 91:10, 91:15, 91:20, 96:8, 129:6, 184:13, 185:8, 186:14, 188:20
**grow** [3] - 90:10, 129:1, 154:11
**growth** [2] - 20:4, 154:11
**guess** [33] - 11:5, 13:4, 13:13, 17:3, 17:9, 17:10, 28:19, 28:23, 35:13, 36:9, 36:10, 61:5, 62:8, 66:20, 67:5, 67:14, 67:23, 68:3, 68:5, 72:14, 72:19, 75:18, 82:20, 105:7, 116:17, 134:13, 134:14, 134:17, 174:18, 175:5, 194:24, 198:1, 198:4
**guest** [1] - 168:8
**guys** [2] - 48:24, 50:4
**gymnast** [1] - 78:5

## H

**hac** [1] - 7:2
**half** [4] - 60:16, 99:6, 99:7, 194:24
**hand** [4] - 51:12, 75:25, 76:4, 179:13
**handle** [7] - 12:18, 13:1, 30:22, 62:19, 92:3, 145:23, 145:24
**handled** [1] - 16:23
**handles** [1] - 146:10
**handling** [4] - 12:1, 12:3, 13:9, 78:25
**hands** [2] - 49:10, 52:17
**hang** [2] - 114:16, 116:4
**happy** [2] - 64:5, 140:8
**hard** [5] - 45:14, 69:9, 191:6, 192:13, 192:15
**harm** [1] - 59:2
**hat** [1] - 158:5
**hats** [2] - 170:19, 171:5
**hazards** [1] - 52:16
**head** [1] - 178:11
**heading** [3] - 116:8,

125:13, 139:19
**heads** [1] - 70:24
**health** [9] - 35:18, 45:13, 51:6, 52:16, 58:16, 58:17, 61:20, 61:22, 152:9
**hear** [33] - 6:4, 6:7, 6:13, 9:9, 9:13, 9:20, 11:11, 21:22, 28:25, 29:22, 35:22, 35:24, 37:3, 37:4, 38:6, 43:14, 47:8, 47:20, 47:25, 50:22, 51:11, 56:18, 57:10, 57:22, 60:13, 64:5, 69:19, 69:24, 71:23, 82:2, 98:12, 198:21
**heard** [11] - 24:6, 24:16, 25:10, 34:11, 34:13, 47:17, 50:18, 51:20, 59:21, 68:18, 72:20
**hearing** [28] - 7:24, 8:3, 8:12, 10:17, 12:18, 12:25, 14:25, 23:4, 29:24, 35:20, 37:13, 37:16, 48:9, 56:17, 60:4, 63:14, 67:10, 68:16, 69:17, 110:11, 118:1, 118:2, 134:4, 141:19, 141:21, 142:5, 194:10, 194:23
**HEARING** [1] - 1:10
**heels** [1] - 16:14
**held** [3] - 26:24, 97:24, 147:25
**Helmick** [2] - 5:21, 52:17
**HELMICK** [1] - 1:11
**help** [7] - 44:6, 84:24, 154:11, 162:20, 174:24, 175:1, 190:3
**helpful** [2] - 18:7, 30:2
**helping** [1] - 7:3
**hence** [1] - 60:18
**herein** [1] - 120:14
**high** [1] - 152:19
**highlighted** [1] - 148:10
**highly** [7] - 78:20, 80:9, 80:17, 80:24, 147:4, 148:21, 174:4
**Hill** [1] - 161:14
**hired** [2] - 161:19, 162:1
**history** [3] - 41:4, 41:21, 164:1
**hit** [1] - 181:7

**hold** [7] - 28:14, 44:10, 47:2, 51:21, 53:5, 97:19
**holding** [1] - 97:23
**home** [3] - 79:17, 175:15, 175:16
**Honor** [185] - 5:5, 6:24, 7:19, 9:2, 9:14, 10:15, 10:24, 11:8, 11:25, 12:14, 12:20, 13:1, 13:13, 14:14, 14:21, 14:22, 14:23, 15:3, 15:11, 15:15, 15:18, 15:24, 16:3, 16:5, 16:7, 16:10, 16:24, 18:1, 18:17, 18:22, 19:2, 19:11, 19:17, 20:2, 20:7, 20:22, 22:9, 22:22, 23:23, 24:8, 24:13, 25:12, 25:22, 26:9, 27:5, 27:11, 29:4, 32:22, 33:22, 34:19, 35:16, 36:4, 36:8, 36:12, 37:10, 37:13, 37:15, 38:6, 38:14, 39:1, 39:19, 39:24, 40:3, 40:10, 40:21, 40:25, 41:24, 42:5, 42:15, 43:22, 45:9, 45:19, 46:18, 46:23, 47:3, 47:15, 48:17, 49:19, 50:7, 50:11, 50:16, 51:13, 52:19, 52:21, 53:4, 53:18, 53:23, 54:7, 54:10, 54:17, 54:23, 55:14, 56:21, 57:8, 57:14, 61:5, 61:11, 61:12, 61:18, 61:20, 62:8, 62:9, 64:19, 65:7, 66:13, 68:11, 69:4, 69:15, 71:5, 71:19, 72:15, 73:5, 74:4, 74:15, 74:18, 75:5, 75:13, 75:16, 76:21, 77:2, 81:24, 83:2, 83:8, 84:7, 84:16, 85:12, 86:4, 87:23, 88:3, 88:11, 91:24, 93:14, 93:25, 98:18, 102:9, 102:12, 104:18, 104:21, 105:12, 107:4, 107:14, 111:15, 111:18, 111:20, 115:10, 115:16, 116:18, 116:21, 118:24, 119:2, 134:19, 138:5, 138:22, 140:1,

140:14, 140:24, 141:3, 141:7, 141:10, 141:25, 142:10, 142:23, 143:19, 144:12, 144:13, 144:15, 145:8, 163:15, 180:2, 180:17, 181:14, 191:4, 191:6, 191:11, 193:11, 193:24, 194:1, 194:22, 195:23, 196:1, 196:10, 198:7, 198:16, 199:9
**Honor's** [3] - 13:18, 52:14, 56:22
**HONORABLE** [1] - 1:11
**hood** [2] - 177:15
**hope** [4] - 6:6, 69:25, 155:7, 197:7
**hoped** [1] - 64:11
**hopefully** [3] - 6:14, 71:11, 197:19
**Horn** [6] - 89:20, 89:23, 154:20, 154:21, 154:22
**horrendous** [1] - 40:25
**horrible** [1] - 49:23
**horrors** [1] - 59:22
**host** [1] - 5:25
**hosting** [1] - 81:4
**hour** [6] - 35:20, 60:16, 128:18, 193:4, 193:17, 194:24
**hours** [11] - 31:20, 34:22, 50:7, 65:4, 69:6, 70:25, 71:12, 78:23, 83:25, 138:14, 178:18
**House** [2] - 47:3, 48:25
**house** [1] - 4:11
**housekeeping** [6] - 12:10, 13:3, 24:12, 24:15, 111:14, 140:2
**houses** [1] - 81:20
**Hoza** [1] - 99:20
**hundreds** [1] - 28:5
**hunky** [1] - 54:15
**hunky-dory** [1] - 54:15
**HUNTER** [5] - 3:3, 77:3, 82:7, 106:14, 145:9
**Hunter** [67] - 2:10, 2:10, 5:11, 5:17,

8:19, 9:16, 9:21, 9:24, 10:6, 11:20, 13:16, 15:7, 20:8, 20:14, 20:21, 20:24, 21:1, 21:2, 21:6, 21:16, 22:12, 32:8, 33:11, 35:13, 46:20, 71:9, 72:2, 73:6, 73:7, 73:18, 73:22, 75:1, 75:7, 75:8, 75:12, 75:18, 75:19, 76:17, 82:9, 82:10, 83:11, 105:6, 106:13, 106:16, 111:10, 135:18, 138:5, 138:6, 138:25, 144:3, 144:5, 145:2, 145:11, 145:19, 147:14, 148:7, 161:20, 167:5, 167:10, 180:22, 181:9, 196:15, 196:16, 197:22
**hunter** [1] - 62:1
**Hunter's** [5] - 12:19, 22:14, 72:7, 171:14, 198:2
**Hunters** [17] - 12:2, 13:19, 14:3, 17:25, 20:11, 27:12, 27:22, 29:15, 37:3, 38:4, 40:13, 48:23, 59:8, 60:10, 62:12, 160:16, 180:15
**hyperbole** [1] - 59:16
**hypothetical** [1] - 142:13
**hypothetically** [1] - 151:25

### I

**Ice** [2] - 133:12, 133:13
**idea** [10] - 8:21, 31:21, 50:20, 55:17, 85:5, 90:20, 135:17, 159:24, 170:18, 192:13
**ideal** [1] - 197:16
**identification** [1] - 118:7
**identified** [9] - 13:25, 16:2, 36:25, 44:16, 51:23, 106:17, 125:2, 168:4
**identify** [4] - 4:9, 4:10, 4:25, 6:22
**identifying** [1] - 46:5
**ignore** [1] - 33:2

**ignored** [1] - 117:13
**illness** [1] - 49:14
**imagine** [1] - 172:4
**immediately** [4] - 29:2, 112:11, 142:23, 179:10
**immune** [1] - 67:5
**impact** [1] - 53:22
**impacts** [1] - 41:5
**important** [12] - 18:19, 19:17, 19:23, 27:6, 40:9, 45:21, 48:18, 52:6, 95:22, 102:23, 194:15
**imposing** [1] - 194:8
**impossible** [2] - 49:16, 88:5
**improperly** [1] - 63:7
**improved** [1] - 11:1
**improvement** [2] - 11:19, 158:15
**in-house** [1] - 4:11
**inaccurate** [1] - 19:14
**inappropriate** [3] - 19:19, 41:14, 59:17
**Inc** [1] - 77:10
**inception** [1] - 87:20
**inclined** [3] - 57:2, 60:20, 60:21
**include** [4] - 32:24, 64:23, 187:11, 188:8
**included** [4] - 50:25, 105:5, 105:22, 126:18
**includes** [2] - 144:24, 156:15
**including** [5] - 19:10, 63:16, 105:21, 108:12, 152:6
**inconsistent** [2] - 152:2, 152:17
**incorrect** [2] - 99:22, 190:6
**incremental** [1] - 158:15
**Indian** [4] - 178:3, 178:4, 178:13
**indicate** [5] - 22:5, 35:5, 83:14, 164:25, 198:4
**indicated** [3] - 84:21, 111:24, 126:2
**indicating** [1] - 55:10
**indiscernible** [3] - 10:10, 52:23, 58:1
**indiscernible)** [6] - 9:25, 10:7, 26:23, 66:16, 84:16, 126:12
**individual** [2] - 53:12, 137:11

**individually** [2] - 123:21, 154:22
**individuals** [2] - 80:9, 175:4
**infinite** [1] - 50:8
**inflammatory** [1] - 28:13
**influence** [2] - 67:13, 158:24
**inform** [1] - 21:17
**information** [12] - 23:24, 31:7, 58:11, 68:15, 68:16, 82:9, 82:13, 164:1, 166:2, 169:9, 169:13, 173:11
**informed** [1] - 115:2
**informs** [1] - 27:1
**initial** [8] - 62:19, 88:20, 103:12, 117:22, 123:18, 124:3, 124:23, 137:3
**injunction** [22] - 8:4, 8:14, 29:3, 38:24, 39:25, 45:9, 53:6, 53:11, 53:21, 54:1, 54:9, 56:15, 57:12, 58:15, 58:25, 63:14, 65:6, 66:19, 74:24, 117:23, 140:9, 141:6
**injunctions** [1] - 66:9
**injunctive** [6] - 41:12, 41:14, 42:4, 45:8, 52:7, 65:19
**inputs** [1] - 82:13
**inquiry** [3] - 31:11, 42:25, 88:1
**insects** [2] - 20:5, 41:16
**insistent** [1] - 43:17
**inspect** [2] - 27:20, 54:21
**inspected** [1] - 54:12
**inspection** [6] - 17:12, 27:23, 28:18, 35:19, 151:16, 159:9
**inspections** [7] - 27:22, 28:4, 34:22, 37:16, 39:3, 83:17, 152:13
**instance** [4] - 18:3, 95:7, 128:17, 162:24
**instant** [2] - 117:18, 127:2
**instead** [5] - 51:16, 110:15, 128:19, 164:18, 193:13
**instruct** [1] - 138:25
**instruction** [2] - 144:16, 144:17

**insurance** [2] - 89:21, 154:20
**intend** [4] - 8:17, 9:1, 9:24, 12:24
**intended** [2] - 14:20, 89:5
**intending** [1] - 115:3
**intends** [3] - 14:13, 31:1, 191:17
**intent** [4] - 20:12, 71:24, 97:7, 142:8
**intention** [5] - 20:20, 27:25, 29:17, 109:4, 109:5
**intentional** [1] - 19:21
**interaction** [1] - 91:21
**interactions** [1] - 102:25
**interest** [12] - 20:15, 45:8, 48:10, 48:15, 50:2, 50:11, 50:21, 50:23, 53:5, 95:4, 137:2, 137:14
**interested** [5] - 91:11, 91:12, 96:8, 137:12, 185:3
**interesting** [2] - 54:4, 165:23
**interests** [5] - 19:22, 88:8, 88:14, 88:15, 88:23
**interfered** [2] - 16:16, 16:17
**interfering** [2] - 16:15, 16:20
**interim** [1] - 8:9
**interior** [1] - 177:15
**interpret** [1] - 146:23
**interpretation** [1] - 133:7
**interrupt** [8] - 12:6, 18:5, 36:20, 36:21, 37:21, 99:12, 135:16, 171:3
**interrupting** [1] - 18:6
**intricacies** [2] - 51:17, 158:17
**introduce** [4] - 43:12, 44:2, 55:10, 68:1
**introduced** [2] - 14:13, 53:1, 137:4
**introduction** [3] - 4:8, 12:23, 69:18
**introductory** [3] - 69:2, 69:22, 70:8
**investigate** [2] - 13:20, 31:8
**investigates** [1] - 13:25
**investigating** [1] -

13:23
**investigation** [1] - 16:19
**investigations** [5] - 42:1, 47:17, 56:5, 64:25, 65:3
**invite** [1] - 33:8
**invited** [1] - 55:9
**involved** [16] - 21:1, 41:19, 77:15, 78:17, 79:10, 79:25, 80:6, 107:24, 146:6, 146:9, 154:3, 155:4, 166:5, 166:17, 175:9, 185:8
**involvement** [2] - 45:23, 197:20
**involves** [1] - 60:9
**involving** [2] - 28:3, 47:7
**irrelevant** [3] - 28:12, 29:6, 163:17
**issuance** [1] - 84:23
**issue** [69] - 9:3, 9:7, 10:16, 12:10, 14:3, 15:25, 16:1, 21:22, 22:19, 23:19, 23:25, 24:6, 24:13, 24:24, 25:11, 26:18, 26:20, 27:5, 27:12, 28:19, 29:7, 29:9, 30:6, 31:5, 32:1, 34:24, 37:24, 38:9, 39:18, 43:7, 43:15, 44:24, 45:19, 50:17, 50:19, 51:22, 53:9, 55:1, 55:24, 56:8, 58:20, 61:23, 62:4, 63:10, 63:15, 64:10, 65:4, 66:7, 66:8, 67:1, 85:15, 88:13, 140:4, 140:7, 141:13, 142:3, 142:12, 142:22, 143:20, 158:2, 168:16, 169:19, 169:20, 169:23, 170:9, 181:25, 182:6
**issued** [5] - 20:15, 27:13, 39:7, 56:4, 56:9
**issues** [33] - 13:3, 13:17, 14:8, 28:8, 31:5, 36:6, 38:5, 39:10, 39:23, 40:2, 42:24, 44:19, 44:24, 47:19, 49:8, 59:14, 60:1, 66:10, 70:3, 70:13, 72:16, 73:1, 93:21, 112:12,

112:24, 113:18, 113:24, 142:5, 142:6, 152:9, 169:23, 170:11, 193:2

**Italian** [2] - 133:12, 133:13

**item** [1] - 133:14

**items** [10] - 17:23, 38:19, 152:18, 158:17, 159:7, 159:14, 177:10, 177:14, 177:17, 177:20

**itself** [3] - 51:3, 84:11, 197:19

## J

**J-e-n-e-r-e-t-t-e** [1] - 161:22

**Jackson** [1] - 2:8

**January** [2] - 95:11, 108:12

**Jazmine** [3] - 161:16, 161:17, 161:19

**JEFFREY** [1] - 1:11

**Jenerette** [4] - 161:18, 161:19, 162:1

**Jeremiah** [1] - 85:15

**Jeremiah's** [21] - 27:15, 88:4, 133:12, 133:13, 133:19, 136:20, 136:23, 136:25, 137:2, 137:17, 138:2, 140:6, 140:18, 154:4, 154:7, 165:19, 165:24, 166:5, 166:17, 175:19, 185:13

**Jersey** [1] - 2:5

**Jet's** [1] - 132:9

**JH** [2] - 91:10, 93:5

**JHD** [32] - 91:10, 91:11, 91:20, 92:17, 92:25, 93:3, 93:5, 93:9, 94:9, 94:22, 94:24, 95:5, 95:18, 95:20, 96:9, 96:10, 96:13, 96:21, 96:25, 97:13, 97:20, 97:21, 97:23, 98:1, 98:5, 98:25, 99:9, 100:20, 100:23, 100:24, 125:9

**JHD's** [6] - 92:24, 93:1, 93:9, 98:8, 100:11, 100:20

**job** [4] - 40:15, 48:25,

156:25, 160:7

**Joblove** [4] - 2:14, 15:25, 16:1, 16:25

**Joey** [7] - 80:22, 80:23, 83:24, 174:10, 174:14, 174:23, 179:22

**John** [1] - 97:3

**join** [3] - 33:9, 33:25, 153:14

**Joseph** [2] - 2:10, 76:16

**JOSEPH** [5] - 3:3, 77:3, 82:7, 106:14, 145:9

**JUDGE** [1] - 1:11

**judge** [1] - 63:25

**Judge** [20] - 6:5, 30:9, 30:16, 31:6, 33:16, 35:9, 38:18, 52:17, 62:24, 67:9, 68:2, 136:2, 191:23, 192:7, 194:23, 195:14, 196:23, 197:12, 197:21

**judges** [1] - 194:8

**Judges** [1] - 194:13

**judgment** [2] - 65:20, 67:13

**judicial** [1] - 197:20

**July** [29] - 18:23, 36:18, 40:12, 42:3, 45:21, 47:21, 48:20, 51:24, 99:19, 111:12, 111:23, 113:14, 125:19, 155:9, 155:16, 156:24, 159:15, 164:5, 165:7, 165:8, 165:18, 166:15, 167:2, 167:3, 167:17, 167:25, 168:5, 171:23, 178:21

**jump** [1] - 4:23

**jumping** [1] - 131:2

**jurisdiction** [18] - 8:7, 9:4, 22:19, 22:24, 24:1, 24:6, 24:10, 25:6, 25:20, 26:4, 26:7, 26:19, 26:20, 141:11, 141:12, 141:24, 142:14, 143:11

**jurisdictional** [6] - 141:9, 141:13, 142:1, 142:3, 142:12, 143:20

**juror** [1] - 63:24

**Justin** [2] - 4:19, 5:10

**justin** [1] - 2:3

## K

**KAM** [177] - 1:4, 5:9, 5:12, 5:15, 8:2, 8:14, 9:14, 16:17, 16:19, 18:25, 19:6, 19:8, 19:13, 19:18, 19:21, 27:10, 27:14, 27:19, 28:1, 40:14, 46:6, 47:23, 48:11, 48:12, 48:24, 49:2, 49:4, 49:25, 51:1, 51:3, 51:24, 52:3, 52:5, 52:11, 56:4, 56:9, 57:13, 57:23, 62:1, 65:9, 65:20, 66:11, 77:10, 77:11, 77:21, 78:3, 78:17, 78:25, 79:20, 80:5, 80:10, 80:18, 82:18, 82:21, 83:25, 87:18, 88:5, 88:22, 90:5, 90:6, 91:3, 93:1, 93:10, 94:8, 96:18, 98:15, 98:21, 98:24, 99:3, 101:9, 101:12, 102:5, 103:17, 104:11, 107:16, 107:19, 108:20, 109:15, 109:21, 110:4, 111:8, 112:9, 112:18, 112:24, 113:3, 113:15, 113:25, 115:5, 115:19, 115:20, 115:24, 117:11, 117:15, 119:25, 120:20, 120:23, 121:5, 121:10, 121:18, 121:23, 122:11, 122:15, 122:20, 122:25, 123:23, 124:10, 124:16, 125:7, 125:16, 127:7, 127:12, 127:23, 130:1, 130:4, 131:21, 132:13, 133:3, 133:18, 133:20, 133:25, 134:22, 137:6, 137:10, 137:16, 137:17, 137:23, 142:5, 143:22, 144:3, 145:15, 145:22, 145:23, 148:19, 148:24, 150:5, 150:13, 150:16, 150:23,

151:2, 151:9, 151:24, 152:6, 152:15, 155:9, 155:16, 156:1, 157:11, 159:16, 160:2, 160:4, 160:7, 167:4, 167:5, 167:10, 167:12, 167:18, 168:1, 168:20, 171:11, 171:19, 171:24, 173:10, 173:24, 174:1, 174:3, 174:20, 175:7, 175:10, 175:14, 177:6, 181:11, 190:7

**KAM's** [14] - 46:4, 46:12, 49:11, 79:4, 92:22, 102:21, 102:25, 108:15, 117:22, 129:24, 149:2, 152:10, 152:17, 160:7

**keep** [10] - 9:12, 53:15, 58:22, 94:25, 134:5, 138:10, 141:3, 162:22, 163:13, 192:22

**keeping** [2] - 61:18, 101:13

**Kendrick** [1] - 2:7

**kept** [1] - 100:18

**Kerry** [2] - 79:7, 79:9

**Kevin** [3] - 174:11, 174:12, 174:13

**kids** [4] - 41:25, 52:18, 166:23, 198:9

**kind** [43] - 4:20, 5:2, 6:10, 8:25, 12:10, 13:2, 17:21, 23:3, 25:13, 36:14, 37:16, 39:14, 42:11, 46:16, 49:6, 51:19, 51:25, 55:19, 57:9, 57:13, 57:22, 61:7, 61:20, 67:23, 68:3, 70:10, 83:10, 89:4, 94:3, 98:3, 102:24, 120:17, 142:11, 144:18, 149:14, 157:15, 158:2, 162:12, 162:15, 184:25, 191:25, 192:18, 193:6

**kindly** [1] - 183:25

**kinds** [1] - 39:23

**Kiprotich** [2] - 1:15, 199:16

**KIPROTICH** [1] - 199:16

**Klein** [32] - 2:3, 2:4, 4:19, 4:22, 5:9, 5:10, 12:2, 12:11, 12:12, 13:7, 17:13, 19:5, 24:6, 26:16, 30:19, 31:24, 32:7, 33:10, 34:16, 48:18, 54:5, 54:11, 68:17, 71:4, 116:8, 139:25, 142:7, 143:18, 195:8, 195:21, 196:21, 197:14

**KLEIN** [17] - 12:14, 12:17, 13:12, 15:24, 24:12, 24:19, 68:19, 68:23, 71:5, 141:16, 180:5, 195:10, 196:22, 197:12, 197:15, 197:21, 199:8

**knowing** [1] - 13:8

**knowledge** [3] - 50:8, 89:12, 89:25

**known** [1] - 56:25

**knows** [4] - 39:24, 41:10, 65:7, 89:24

## L

**L-e-g-g** [1] - 174:13

**labor** [1] - 129:3

**lack** [3] - 31:4, 35:7, 134:18

**lag** [1] - 95:23

**laid** [1] - 142:11

**Land** [4] - 178:3, 178:4, 178:13

**landlord** [1] - 128:16

**language** [2] - 55:19, 78:23

**laptop** [2] - 10:25, 11:4

**large** [2] - 7:23, 12:23

**largely** [1] - 198:5

**larger** [1] - 4:15

**Larson** [2] - 154:15, 154:16

**last** [43] - 8:23, 14:5, 14:23, 15:13, 16:4, 16:10, 16:21, 27:9, 29:25, 31:20, 34:22, 39:4, 41:12, 45:1, 51:6, 53:23, 54:5, 54:11, 55:25, 64:9, 65:4, 94:3, 101:2, 110:2, 114:19, 130:10, 130:25, 132:25, 138:14, 141:25, 160:21, 161:17, 161:21,

162:8, 162:24,
166:9, 166:11,
168:23, 178:10,
178:12, 178:17,
186:23, 196:18
**last-minute** [2] -
166:9, 166:11
**lasted** [1] - 98:1
**late** [5] - 14:18, 16:2,
36:12, 36:13, 181:13
**late-night** [2] - 14:18,
16:2
**lateness** [1] - 17:22
**launchpad** [1] - 90:10
**Laura** [2] - 54:11,
179:23
**law** [3] - 7:23, 56:16,
59:3
**lawsuit** [6] - 13:24,
27:18, 58:12,
117:18, 127:2, 142:9
**lawyer** [4] - 64:1,
69:10, 76:19, 136:6
**lay** [3] - 18:9, 38:11,
89:9
**lead** [2] - 137:1,
137:20
**leading** [2] - 93:17,
93:23
**leads** [2] - 137:7,
184:5
**learn** [1] - 179:20
**learned** [2] - 23:8,
180:9
**lease** [2] - 131:13,
131:17
**least** [17] - 8:1, 11:3,
20:23, 21:8, 28:5,
38:8, 58:8, 63:19,
66:22, 66:24, 83:24,
88:24, 88:25, 97:11,
162:3, 186:2, 198:9
**leave** [1] - 70:16
**leaving** [1] - 9:18
**left** [3] - 63:18, 80:14,
182:20
**legal** [5] - 59:25,
110:12, 114:5,
146:22, 165:12
**Legg** [2] - 174:11,
174:13
**legitimate** [1] - 31:13
**length** [1] - 90:20
**lengthy** [1] - 90:22
**less** [5] - 65:17, 97:23,
112:9, 135:21, 193:5
**letter** [55] - 16:8, 50:5,
54:5, 56:12, 101:20,
101:21, 101:22,
101:25, 102:4,

102:7, 104:1, 104:4,
104:5, 104:13,
105:5, 105:6, 107:1,
107:21, 108:23,
110:8, 113:14,
114:11, 114:12,
115:5, 117:12,
118:11, 126:2,
142:3, 153:7, 155:9,
155:11, 160:1,
160:18, 160:25,
161:2, 165:8, 167:3,
167:21, 169:6,
170:8, 170:15,
170:21, 172:20,
172:23, 173:10,
181:10, 183:17,
183:21, 183:22,
183:24, 187:2,
189:19, 190:22,
190:24, 198:19
**letterhead** [1] - 106:16
**level** [8] - 45:22, 48:9,
49:11, 139:1, 152:8,
152:19, 171:10,
174:3
**liability** [3] - 148:12,
148:13, 148:24
**Libardi** [47] - 2:20,
7:7, 20:7, 37:4,
38:11, 40:22, 41:4,
41:10, 41:18, 42:7,
42:12, 45:15, 45:16,
45:20, 46:23, 47:8,
47:11, 49:19, 49:24,
50:6, 51:16, 52:4,
54:15, 55:2, 55:12,
57:21, 59:12, 61:2,
61:10, 62:2, 64:24,
74:16, 97:4, 99:15,
102:1, 102:2,
102:16, 104:3,
105:20, 106:19,
106:25, 110:8,
111:5, 115:8, 126:1,
187:2
**Libardi's** [2] - 188:1,
190:22
**lied** [3] - 40:8, 50:6,
52:5
**lies** [2] - 8:15, 63:11
**life** [1] - 166:1
**light** [9] - 8:11, 17:12,
26:25, 29:18, 35:15,
70:11, 71:23,
135:10, 196:19
**likely** [1] - 21:14
**limit** [1] - 21:7
**limitations** [1] - 194:8
**limited** [12] - 9:17,

14:15, 21:2, 27:14,
29:11, 36:7, 61:16,
79:24, 88:24,
148:12, 148:24
**LINE** [6] - 3:12, 3:12,
3:13
**line** [8] - 6:2, 42:25,
67:23, 129:7,
163:16, 163:22,
180:3, 194:4
**lines** [3] - 15:9, 31:9,
163:20
**list** [3] - 14:6, 49:2,
142:17
**listed** [5] - 83:11,
112:9, 112:19,
127:15, 169:1
**listen** [1] - 52:11
**listening** [1] - 42:17
**lists** [1] - 119:8
**litigant** [1] - 70:9
**litigation** [4] - 17:13,
48:7, 70:1, 143:25
**live** [6] - 40:4, 40:10,
41:23, 50:3, 73:22,
142:19
**LLC** [15] - 1:4, 1:7,
5:12, 82:21, 91:10,
93:5, 104:11,
104:12, 111:8,
115:5, 167:4, 167:6,
171:12, 175:18,
185:7
**local** [2] - 5:10, 7:16
**located** [4] - 76:7,
124:19, 161:13,
178:2
**locating** [1] - 146:11
**location** [9] - 15:2,
45:10, 76:6, 132:5,
132:7, 132:13,
186:10, 186:23,
187:11
**locations** [18] - 13:21,
13:23, 14:2, 15:3,
16:16, 16:17, 19:6,
27:9, 27:11, 97:16,
123:4, 124:19,
124:21, 125:7,
127:7, 128:22,
182:8, 188:8
**log** [10] - 168:22,
168:25, 169:4,
169:6, 169:9,
169:16, 169:25,
170:1, 170:2, 170:3
**logistically** [1] - 33:3
**look** [26] - 8:1, 28:2,
28:6, 29:22, 30:15,
37:8, 37:9, 37:19,

44:4, 47:24, 62:18,
67:25, 100:1,
127:20, 130:6,
132:25, 140:14,
148:7, 158:2, 163:2,
173:20, 177:18,
189:18, 190:19,
193:19
**Look** [2] - 38:6, 53:25,
142:16
**looked** [2] - 42:7, 52:3
**looking** [8] - 41:15,
44:8, 65:6, 104:22,
104:24, 127:16,
137:11, 182:17
**looks** [5] - 8:21, 38:12,
46:25, 58:2, 139:18
**looming** [1] - 24:14
**Loop** [1] - 2:7
**lose** [1] - 37:11
**lost** [4] - 40:6, 99:5,
99:7, 197:5
**love** [1] - 194:12
**lower** [1] - 76:4
**lowest** [1] - 41:3
**lying** [1] - 50:2

**M**

**magically** [1] - 49:3
**mail** [2] - 106:19,
106:21
**mailed** [1] - 106:19
**main** [4] - 29:5, 34:1,
105:22, 133:13
**maintain** [3] - 187:15,
187:20, 190:1
**maintaining** [1] -
16:15
**majority** [1] - 94:17
**makers** [1] - 129:11
**malfeasance** [1] -
19:21
**man** [1] - 53:14
**manage** [2] - 4:15,
184:5
**management** [4] -
133:4, 148:13,
149:1, 149:2
**manager** [4] - 77:21,
161:15, 162:5, 178:5
**managing** [1] - 146:19
**manner** [1] - 16:22
**manual** [2] - 84:23,
156:11
**manufacture** [1] -
39:16
**March** [1] - 190:22
**MARCO'S** [1] - 1:7
**Marco's** [171] - 7:8,

9:5, 13:19, 13:20,
13:25, 14:15, 17:11,
18:24, 19:7, 19:11,
19:21, 23:2, 27:19,
27:25, 29:7, 36:19,
40:12, 42:6, 45:10,
49:14, 50:1, 52:9,
52:15, 53:8, 53:12,
54:3, 54:6, 54:8,
54:9, 54:21, 55:16,
56:1, 57:15, 59:13,
61:21, 65:15, 72:9,
77:16, 78:13, 78:17,
79:4, 79:18, 80:24,
81:19, 82:14, 82:16,
83:18, 83:25, 87:17,
88:4, 88:8, 88:9,
88:22, 89:1, 89:5,
89:19, 90:11, 90:14,
90:23, 91:13, 91:21,
92:18, 93:1, 94:22,
95:15, 96:9, 96:24,
98:4, 98:7, 100:4,
100:20, 102:3,
102:25, 104:3,
104:11, 106:1,
107:21, 108:16,
109:13, 110:6,
111:6, 111:23,
112:21, 112:23,
113:8, 114:2, 114:7,
115:2, 115:7,
115:19, 117:22,
118:3, 119:22,
120:21, 125:24,
125:25, 126:7,
126:12, 126:15,
127:17, 127:21,
127:23, 128:19,
133:3, 133:7,
134:22, 137:7,
137:19, 137:24,
137:25, 138:2,
140:10, 141:15,
145:12, 147:21,
150:18, 151:4,
151:11, 151:12,
152:25, 153:14,
153:16, 153:20,
153:23, 154:5,
154:10, 154:23,
155:4, 155:10,
156:1, 156:24,
157:5, 157:7,
157:14, 157:15,
157:17, 157:22,
159:16, 159:19,
159:22, 159:23,
160:7, 165:8,
165:17, 166:3,
166:15, 167:4,

167:25, 169:1, 170:8, 172:18, 173:1, 173:14, 179:24, 181:11, 182:10, 183:5, 183:13, 183:15, 183:17, 184:16, 184:24, 184:25, 186:13, 187:19, 189:14, 190:1, 190:24, 196:24, 197:7

**marked** [12] - 81:14, 84:4, 84:11, 101:17, 103:16, 103:23, 114:15, 116:2, 116:6, 118:6, 147:15, 165:6

**Market** [1] - 131:5

**market** [7] - 42:2, 45:11, 90:10, 91:25, 102:18, 109:5, 109:24

**marks** [1] - 2:4

**Marks** [2] - 5:9, 116:7

**marrying** [1] - 70:18

**Mary** [4] - 78:6, 78:15, 79:13, 79:16

**master** [1] - 91:13

**match** [1] - 99:22

**material** [2] - 30:7, 120:8

**materiality** [2] - 31:4, 36:24

**math** [1] - 189:24

**matter** [16] - 10:11, 20:14, 24:10, 25:6, 25:19, 26:18, 37:14, 62:20, 63:11, 133:22, 135:9, 171:15, 195:12, 197:19, 199:14

**matters** [5] - 6:18, 58:23, 60:15, 194:16, 196:8

**mean** [28] - 9:18, 11:16, 22:14, 30:19, 31:10, 33:2, 44:3, 47:11, 47:16, 59:16, 63:8, 64:2, 71:22, 72:21, 88:15, 127:17, 130:18, 130:19, 135:7, 143:19, 164:3, 164:11, 168:24, 178:13, 190:4, 191:14, 197:5, 198:6

**meaning** [2] - 90:4, 160:16

**means** [4] - 31:16,

32:11, 59:13, 144:24

**meant** [1] - 29:14

**mechanical** [1] - 1:22

**meet** [8] - 27:15, 100:23, 101:1, 101:2, 122:9, 122:12, 127:3, 187:6

**meeting** [15] - 32:5, 32:8, 78:14, 95:15, 95:18, 96:6, 128:10, 128:12, 128:13, 128:21, 128:25, 129:12, 133:5, 184:8, 194:13

**members** [4] - 5:12, 9:5, 82:21, 145:15

**membership** [1] - 142:17

**memory** [1] - 127:22

**mention** [1] - 165:17

**mentioned** [10] - 8:19, 83:11, 96:12, 96:13, 112:15, 126:15, 152:23, 154:18, 187:23, 191:6

**mentions** [1] - 189:19

**menu** [1] - 133:14

**merely** [1] - 93:20

**merit** [1] - 112:13

**merits** [1] - 56:20

**message** [1] - 197:6

**messaging** [1] - 144:25

**messed** [1] - 47:4

**met** [7] - 23:1, 23:7, 78:14, 119:19, 123:16, 128:13, 129:11

**method** [1] - 54:24

**Miami** [1] - 21:13

**Michael** [1] - 167:5

**microphone** [3] - 10:25, 11:6, 34:1

**microphones** [1] - 32:10

**mid** [1] - 152:7

**midnight** [1] - 14:5

**midst** [1] - 84:9

**might** [50] - 4:12, 4:13, 5:20, 6:16, 6:23, 7:22, 8:20, 12:7, 13:5, 17:11, 17:15, 17:19, 20:13, 20:15, 21:16, 22:18, 26:3, 29:20, 30:14, 33:4, 34:15, 35:8, 35:22, 47:7, 56:18, 67:3, 69:22, 70:21, 72:14, 89:6, 93:14, 97:4, 97:5, 106:13,

128:14, 135:18, 153:11, 158:5, 161:1, 170:23, 174:23, 175:7, 177:10, 191:24, 192:19, 196:4, 198:3, 198:16, 198:18

**Mike** [24] - 2:10, 5:11, 5:17, 8:19, 9:16, 9:21, 20:13, 20:21, 20:23, 21:2, 21:15, 22:12, 32:7, 33:11, 35:13, 72:6, 73:7, 75:1, 75:8, 82:10, 83:11, 111:10, 145:19, 196:16

**mildew** [2] - 15:9, 15:10

**Milton** [4] - 172:10, 173:4, 173:7, 173:11

**mind** [7] - 61:18, 89:18, 89:24, 98:18, 162:25, 163:5, 196:21

**minus** [1] - 177:11

**minute** [3] - 83:21, 166:9, 166:11

**minutes** [24] - 32:18, 32:22, 42:10, 49:17, 49:18, 64:9, 69:13, 71:3, 73:20, 74:3, 90:19, 102:21, 135:19, 135:21, 136:6, 138:11, 139:8, 191:15, 191:23, 192:11, 193:16, 193:25, 194:5

**miraculously** [1] - 52:1

**mischaracterizes** [1] - 180:5

**mischaracterizing** [2] - 54:18, 146:21

**misheard** [3] - 198:23, 198:25, 199:1

**mispronounce** [1] - 45:1

**miss** [1] - 194:14

**missing** [5] - 95:10, 168:14, 179:6, 179:11, 180:7

**misspoke** [1] - 79:3

**misstatements** [1] - 18:21

**mistake** [2] - 15:5, 15:6

**mistakes** [1] - 190:2

**misunderstood** [1] -

61:6

**mold** [5] - 15:9, 20:4, 41:15, 163:9

**Molina** [1] - 172:10

**moment** [14] - 5:24, 9:9, 9:13, 11:3, 17:13, 17:15, 30:24, 35:17, 62:7, 98:9, 135:14, 135:16, 152:14, 152:15

**momentarily** [2] - 5:3, 5:20

**moments** [1] - 198:12

**Monday** [20] - 29:24, 30:1, 31:18, 32:14, 35:11, 38:9, 60:19, 68:6, 79:17, 192:3, 193:14, 193:16, 193:17, 194:11, 194:17, 195:17, 196:14, 197:9, 197:25, 199:5

**monetary** [1] - 120:21

**money** [2] - 41:20, 100:2

**monitor** [1] - 151:3

**monitoring** [2] - 5:24, 7:25

**month** [3] - 131:24, 171:19, 171:22

**months** [14] - 65:17, 77:14, 96:6, 103:11, 104:15, 118:18, 118:20, 128:12, 129:7, 129:12, 162:6, 178:9, 184:19

**moot** [4] - 24:20, 56:8, 142:24, 169:7

**mooted** [1] - 25:15

**moral** [1] - 162:22

**morning** [13] - 4:6, 5:6, 5:7, 6:22, 6:25, 12:14, 12:22, 13:19, 14:8, 14:19, 15:11, 77:5, 77:6

**most** [5] - 36:12, 56:21, 78:25, 131:23, 146:6

**mostly** [1] - 79:6

**mother** [1] - 175:11

**motion** [19] - 24:13, 24:18, 25:3, 25:14, 25:15, 25:19, 26:12, 48:2, 51:12, 56:2, 56:6, 56:13, 117:22, 126:5, 126:8, 134:2, 140:8, 141:6, 197:15

**mouth** [1] - 100:2

**move** [15] - 4:17, 38:7, 60:21, 68:8, 74:13,

81:25, 95:21, 104:19, 111:15, 116:17, 120:20, 128:19, 177:21, 177:23, 181:5

**moved** [6] - 23:10, 23:14, 102:10, 115:11, 116:18, 118:25

**moving** [38] - 6:21, 8:10, 8:12, 8:14, 12:6, 18:14, 27:2, 30:8, 30:18, 31:10, 32:2, 34:13, 34:14, 34:18, 35:13, 42:21, 43:4, 43:14, 44:4, 59:19, 60:8, 60:10, 61:2, 70:14, 76:22, 120:2, 127:6, 135:8, 138:15, 139:2, 140:23, 144:9, 145:1, 165:24, 195:15, 197:20, 197:24, 199:1

**MR** [273] - 3:4, 3:5, 3:6, 5:5, 5:8, 5:14, 6:24, 7:19, 9:2, 9:10, 9:14, 9:24, 10:2, 10:5, 10:9, 10:13, 10:15, 10:20, 10:24, 11:4, 11:8, 11:25, 12:9, 12:14, 12:17, 13:12, 15:24, 18:1, 18:12, 18:17, 20:22, 21:11, 22:9, 22:22, 23:17, 23:23, 24:8, 24:12, 24:19, 25:3, 25:12, 25:21, 26:9, 26:14, 26:22, 27:5, 29:4, 32:21, 33:19, 33:21, 34:19, 35:16, 36:1, 36:4, 37:2, 38:3, 38:11, 39:1, 39:19, 39:22, 43:22, 45:2, 47:2, 47:15, 48:17, 50:16, 51:13, 51:15, 52:21, 52:23, 53:2, 53:4, 53:23, 53:25, 54:17, 54:20, 55:14, 57:8, 58:1, 58:4, 61:5, 62:8, 64:13, 64:19, 64:22, 66:18, 68:11, 68:15, 68:19, 68:23, 69:4, 69:15, 71:5, 71:19, 71:25, 72:2, 72:5, 72:13, 72:18, 72:21, 72:24, 73:5, 73:15, 73:17, 73:22, 73:24, 74:1, 74:4, 74:12, 74:15, 74:18, 75:5,

75:13, 75:16, 76:21, 77:2, 77:4, 81:11, 81:12, 81:24, 82:3, 82:6, 82:8, 83:2, 83:5, 83:8, 83:9, 83:21, 84:7, 84:15, 84:25, 85:12, 86:4, 87:16, 87:23, 88:3, 88:11, 89:11, 89:22, 91:24, 92:4, 92:5, 93:14, 93:25, 94:6, 94:7, 98:18, 102:9, 102:12, 102:14, 104:18, 104:21, 105:2, 105:11, 106:10, 107:7, 107:11, 107:14, 107:15, 110:23, 110:25, 111:1, 111:2, 111:15, 111:18, 111:20, 111:21, 115:10, 115:13, 115:16, 115:17, 115:22, 116:17, 116:21, 116:23, 118:24, 119:2, 119:4, 131:10, 131:12, 131:19, 131:20, 133:21, 134:9, 134:19, 134:21, 135:19, 135:21, 136:5, 136:19, 136:22, 138:4, 138:19, 138:22, 139:19, 139:22, 140:1, 140:4, 140:14, 140:24, 141:2, 141:7, 141:10, 141:16, 142:10, 143:19, 143:22, 144:12, 144:15, 144:23, 145:8, 145:10, 146:21, 146:24, 147:8, 147:12, 147:13, 147:23, 148:2, 159:21, 159:25, 161:25, 163:15, 163:24, 171:3, 171:6, 171:8, 171:18, 180:2, 180:5, 180:8, 180:17, 180:25, 181:5, 181:8, 181:14, 181:18, 181:21, 181:22, 187:1, 191:4, 191:10, 191:13, 191:20, 191:22, 192:6, 192:10,

192:15, 192:17, 192:24, 193:11, 193:23, 194:6, 194:22, 195:1, 195:6, 195:10, 195:22, 196:1, 196:2, 196:9, 196:14, 196:22, 197:12, 197:15, 197:21, 198:6, 198:16, 198:24, 199:3, 199:8, 199:9, 199:10
**mudslinging** [1] - 67:4
**multi** [2] - 153:17, 179:11
**multi-unit** [2] - 153:17, 179:11
**multiple** [4] - 89:16, 92:13, 170:7, 185:4
**MUO** [2] - 169:8, 170:2
**must** [9] - 119:19, 124:5, 148:13, 149:3, 168:16, 170:3, 170:9, 187:11, 188:8
**mute** [4] - 32:10, 34:1, 34:14, 93:15
**muted** [9] - 4:22, 5:23, 7:2, 34:16, 35:23, 35:24, 82:2, 84:19, 87:23

## N

**nail** [1] - 38:16
**name** [12] - 5:8, 45:1, 76:14, 76:16, 79:9, 89:22, 145:11, 161:17, 161:21, 167:9, 175:18, 178:10
**named** [1] - 77:21
**names** [1] - 154:19
**narrower** [1] - 59:15
**narrowly** [1] - 39:23
**natural** [1] - 146:5
**nature** [3] - 18:4, 69:16, 107:3
**nauseam** [1] - 163:17
**near** [1] - 58:10
**necessarily** [7] - 11:16, 32:22, 59:20, 60:3, 113:23, 172:7, 174:19
**necessary** [10] - 6:15, 9:20, 20:13, 35:1, 35:3, 39:13, 71:23, 80:23, 134:15, 141:21

**need** [40] - 15:18, 16:7, 17:7, 20:2, 22:2, 22:12, 23:8, 31:17, 32:22, 33:24, 36:10, 43:19, 44:21, 47:24, 47:25, 48:1, 49:9, 52:12, 57:10, 61:3, 70:3, 70:22, 71:1, 85:21, 108:7, 112:14, 134:18, 134:23, 135:3, 135:24, 139:17, 143:20, 147:11, 147:19, 191:16, 195:14, 195:19, 196:6, 197:4
**needed** [6] - 41:1, 61:9, 78:10, 113:7, 141:14, 182:15
**needs** [4] - 13:16, 19:9, 69:7, 158:3
**negotiated** [1] - 184:13
**never** [11] - 27:12, 27:23, 28:10, 69:21, 71:1, 98:18, 110:14, 112:4, 173:6, 187:4, 198:8
**nevertheless** [1] - 30:1
**New** [1] - 2:5
**new** [19] - 23:24, 25:4, 41:8, 44:2, 44:3, 58:10, 102:19, 105:19, 108:7, 122:12, 128:1, 144:17, 174:23, 178:18, 182:25, 187:7, 188:5, 190:21, 198:7
**next** [17] - 8:11, 34:12, 41:17, 95:22, 99:18, 112:5, 129:4, 142:8, 143:6, 143:25, 158:22, 159:8, 168:22, 192:10, 193:5, 194:5
**nice** [1] - 6:19
**niece** [1] - 70:18
**niece's** [1] - 193:12
**night** [12] - 8:23, 14:5, 14:18, 16:2, 16:10, 16:12, 49:21, 54:5, 54:11, 179:4, 177:9, 179:21
**nine** [6] - 41:3, 156:20, 157:19, 161:3, 161:4, 164:4
**ninth** [1] - 161:1
**nitpicking** [1] - 190:2

**nobody** [1] - 29:22
**NOD** [19] - 28:9, 29:12, 34:23, 66:2, 115:20, 115:22, 115:24, 118:18, 119:7, 122:4, 122:8, 125:15, 126:21, 126:25, 133:1
**Nohle** [2] - 79:9, 79:10
**noncompliant** [1] - 160:15
**None** [1] - 166:24
**none** [4] - 28:20, 68:6, 166:21, 183:4
**NONE** [1] - 3:9
**nonissue** [1] - 126:3
**nonjury** [1] - 93:16
**noon** [3] - 16:25, 194:18, 195:1
**normal** [3] - 96:11, 172:1, 172:6
**normally** [2] - 6:2, 196:7
**North** [5] - 50:12, 58:16, 76:8, 178:14, 186:11
**NORTHERN** [1] - 1:1
**note** [12] - 5:19, 6:1, 8:6, 25:2, 26:5, 87:24, 163:6, 163:19, 171:13, 171:16, 180:13, 193:2
**noted** [4] - 18:24, 26:17, 179:24, 184:1
**notes** [5] - 44:11, 71:21, 193:3, 193:7, 199:15
**nothing** [12] - 14:20, 17:1, 26:2, 52:10, 58:4, 58:14, 73:1, 83:2, 141:23, 141:25, 195:22, 196:1
**Notice** [1] - 122:1
**notice** [62] - 14:15, 29:7, 34:23, 36:12, 36:16, 39:7, 40:13, 40:14, 42:3, 45:21, 45:24, 46:6, 46:7, 48:22, 51:25, 59:14, 65:15, 66:7, 103:10, 103:13, 103:19, 104:9, 110:15, 110:20, 111:22, 112:6, 112:7, 112:10, 113:14, 113:24, 114:13, 115:22, 118:4, 118:8, 118:13,

119:22, 125:19, 128:2, 128:8, 129:15, 155:9, 155:15, 155:19, 159:16, 163:9, 163:12, 167:17, 167:18, 167:25, 172:11, 172:12, 172:15, 172:16, 173:5, 178:20, 179:1, 181:12, 182:2, 183:6, 187:24, 189:14
**noticed** [1] - 52:2
**notices** [11] - 19:14, 27:13, 28:10, 39:4, 56:1, 56:4, 58:11, 127:17, 171:23, 172:8, 172:9
**notification** [1] - 103:20
**notified** [2] - 13:19, 22:22
**notify** [1] - 103:14
**noting** [1] - 180:2
**notion** [1] - 36:15
**novel** [1] - 63:9
**Number** [19] - 81:14, 101:19, 102:10, 102:16, 103:1, 103:4, 103:5, 104:19, 105:13, 107:16, 107:18, 108:2, 112:19, 114:15, 114:17, 115:11, 123:12, 125:13
**number** [31] - 4:6, 4:15, 65:6, 80:11, 85:14, 92:22, 96:25, 97:21, 97:22, 98:4, 100:23, 101:1, 101:2, 101:4, 101:6, 109:21, 110:23, 110:25, 113:2, 116:3, 126:3, 127:10, 127:11, 127:16, 127:17, 155:23, 164:12, 169:14, 170:22, 190:6, 190:9
**numbers** [2] - 164:19, 180:18
**numerical** [1] - 164:19

## O

**o'clock** [5] - 7:6, 70:21, 191:6, 194:17, 195:17
**oath** [5] - 75:22, 76:5,

76:11, 144:7, 197:24
**object** [4] - 12:23, 65:1, 85:6, 131:12
**objected** [1] - 142:4
**objecting** [5] - 17:20, 51:9, 55:13, 55:15, 55:21
**objection** [50] - 8:5, 22:23, 24:17, 30:3, 35:7, 39:14, 68:12, 72:6, 73:11, 73:15, 77:1, 83:3, 83:5, 83:7, 84:15, 84:21, 87:24, 88:19, 89:7, 93:19, 93:20, 97:25, 102:12, 102:13, 104:20, 107:9, 107:11, 107:13, 111:18, 111:19, 115:13, 115:15, 116:21, 116:22, 119:2, 119:3, 134:8, 134:17, 146:21, 147:2, 159:21, 163:15, 163:18, 163:19, 163:20, 171:9, 171:13, 171:16, 180:3, 180:14
**objections** [3] - 56:19, 57:4, 180:13
**obligated** [1] - 18:24
**obligation** [14] - 46:11, 46:12, 108:9, 108:24, 151:10, 182:21, 182:25, 189:10, 189:14, 189:16, 190:8, 190:21, 190:25
**obligations** [11] - 88:10, 120:21, 127:3, 143:13, 147:5, 150:5, 152:3, 152:10, 152:17, 173:16, 186:15
**observation** [2] - 67:6
**observations** [2] - 17:4, 162:23
**obtain** [1] - 128:10
**obtained** [1] - 79:19
**obtaining** [1] - 166:8
**obviously** [6] - 21:5, 38:21, 43:13, 162:23, 170:15, 191:4
**occur** [1] - 22:1
**occurred** [3] - 8:23, 65:3, 117:25
**OCTOBER** [2] - 1:6, 4:1

**October** [9] - 37:18, 40:19, 46:11, 49:9, 143:15, 172:24, 194:12, 195:18, 199:5
**odds** [1] - 38:17
**OF** [7] - 1:1, 1:7, 1:10, 77:3, 82:7, 106:14, 145:9
**OFC** [4] - 83:12, 83:14, 83:20, 156:16
**offer** [2] - 6:21, 21:6
**offered** [2] - 13:6, 111:16
**officer** [4] - 97:2, 109:12, 111:6, 115:9
**officers** [1] - 121:16
**Official** [1] - 1:15
**official** [2] - 95:10, 173:10
**officially** [1] - 94:20
**officiating** [1] - 193:12
**often** [1] - 68:21
**OHIO** [1] - 1:1
**Ohio** [7] - 1:4, 1:17, 2:8, 2:19, 7:12, 7:13, 7:16
**once** [4] - 92:25, 124:9, 140:9, 193:6
**one** [105] - 4:9, 4:17, 6:12, 7:23, 14:2, 15:3, 15:8, 16:21, 17:5, 17:24, 20:12, 33:14, 37:23, 45:5, 45:11, 48:24, 49:3, 49:14, 49:21, 51:21, 52:25, 53:23, 56:8, 57:11, 58:15, 65:6, 85:14, 85:15, 87:21, 92:1, 96:20, 96:23, 97:18, 97:23, 99:12, 100:5, 100:17, 101:3, 102:20, 105:1, 107:1, 110:2, 110:3, 113:21, 116:12, 117:20, 123:8, 123:9, 124:6, 126:18, 127:14, 127:17, 129:10, 129:17, 130:6, 130:9, 130:13, 132:25, 133:6, 141:16, 145:14, 145:15, 146:18, 148:13, 149:3, 150:4, 152:1, 154:19, 155:23, 156:14, 161:5, 161:11, 162:19, 164:4, 167:24,

169:15, 172:17, 173:5, 174:10, 177:24, 178:19, 179:6, 180:6, 180:15, 184:22, 185:20, 185:21, 185:24, 185:25, 186:2, 186:5, 186:17, 186:18, 186:22, 186:25, 187:11, 188:12, 188:15, 189:2, 189:6, 191:23, 192:18, 193:9
**one-page** [1] - 107:1
**ones** [4] - 46:13, 89:18, 153:22, 153:24
**ongoing** [1] - 92:16
**Online** [2] - 81:19, 169:1
**online** [2] - 150:20, 168:25
**open** [48] - 53:22, 54:2, 58:19, 58:22, 61:18, 90:9, 101:10, 101:14, 108:20, 108:22, 122:21, 123:4, 123:6, 123:17, 124:2, 124:5, 125:7, 128:22, 131:9, 132:2, 132:12, 132:22, 133:8, 133:22, 153:1, 155:13, 182:25, 185:24, 186:2, 186:5, 186:6, 186:18, 187:7, 187:19, 189:1, 189:6, 189:10, 189:22, 189:23, 190:5, 190:11, 190:13, 190:14, 190:16, 190:18, 190:21, 197:16
**Open** [1] - 188:5
**opened** [24] - 11:4, 91:15, 91:23, 122:12, 122:16, 122:25, 123:1, 123:4, 130:5, 130:6, 130:7, 130:10, 161:1, 183:1, 183:3, 185:23, 186:6, 186:8, 186:18, 186:22, 186:25, 188:12, 188:15, 189:3
**opening** [17] - 17:17, 69:17, 70:1, 70:7,

71:6, 71:15, 71:16, 71:20, 71:24, 102:19, 127:25, 128:23, 155:13, 174:23, 174:24, 197:2, 197:4
**openings** [1] - 175:8
**opens** [1] - 95:24
**operate** [3] - 58:19, 88:16, 167:6
**operated** [5] - 45:11, 123:5, 173:3, 180:22
**operates** [2] - 153:21, 154:24
**operating** [16] - 41:21, 77:21, 91:5, 111:6, 115:8, 123:4, 123:6, 151:4, 151:11, 152:8, 152:16, 152:19, 168:4, 173:15, 177:2, 190:16
**operation** [5] - 67:4, 148:15, 151:14, 178:18, 185:24
**operation's** [2] - 49:23, 149:13
**operational** [8] - 14:1, 14:7, 27:6, 58:23, 81:20, 83:15, 132:22, 146:2
**Operations** [2] - 45:25, 150:7
**operations** [14] - 14:19, 16:20, 21:1, 28:10, 48:6, 51:18, 89:19, 146:7, 149:7, 149:21, 149:23, 150:1, 162:15, 169:6
**operator** [2] - 153:17, 158:20
**operators** [1] - 179:11
**opinion** [2] - 55:4, 112:12
**opportunity** [16] - 16:3, 18:9, 20:20, 28:3, 29:23, 30:4, 30:10, 31:7, 31:15, 34:17, 34:20, 35:11, 62:23, 96:2, 96:7, 101:18
**opposed** [1] - 47:11
**opposing** [5] - 81:15, 83:10, 85:18, 131:2, 131:10
**optimization** [2] - 109:6, 109:24
**option** [4] - 9:18, 104:10, 119:17, 187:20

**order** [17] - 15:22, 17:19, 21:14, 29:21, 50:12, 53:9, 58:14, 84:8, 84:12, 85:23, 91:9, 133:25, 134:13, 179:14, 187:6, 187:15, 197:16
**ordered** [1] - 178:18
**orderly** [1] - 42:21
**ordinarily** [1] - 44:18
**organization** [1] - 178:8
**organize** [2] - 192:25, 193:6
**original** [10] - 25:14, 29:17, 44:3, 79:6, 79:9, 101:1, 101:5, 106:9, 117:22, 124:6
**originally** [3] - 60:12, 100:13, 100:24
**OSE** [21] - 83:16, 150:17, 150:24, 151:25, 152:1, 152:6, 156:15, 156:19, 156:20, 157:4, 157:20, 157:25, 158:18, 162:12, 164:1, 164:5, 164:6, 171:20, 171:25, 172:1, 177:4
**OSEs** [11] - 40:15, 41:4, 45:25, 81:22, 150:2, 150:7, 150:13, 151:10, 156:6, 158:13, 177:6
**otherwise** [8] - 9:8, 11:11, 18:10, 43:3, 59:3, 64:16, 120:15, 195:16
**ought** [12] - 21:16, 32:14, 38:19, 38:22, 43:10, 43:18, 59:8, 63:2, 63:20, 64:12, 67:18, 193:9
**outline** [1] - 71:7
**outrageous** [2] - 41:11, 57:22
**outright** [1] - 45:23
**outset** [14] - 4:8, 4:10, 4:19, 5:18, 8:2, 8:6, 13:9, 17:3, 21:20, 42:25, 43:7, 43:20, 63:13, 76:13
**outside** [10] - 12:25, 14:13, 14:24, 15:17, 87:19, 87:25, 88:13, 88:23, 89:14, 99:24
**Oven** [1] - 168:14

**overall** [3] - 45:20, 146:20, 183:5
**overarching** [1] - 44:22
**overlap** [3] - 92:23, 170:15, 171:16
**overly** [1] - 198:2
**overriding** [1] - 12:10
**overrule** [3] - 88:19, 147:1, 171:17
**oversee** [1] - 149:21
**overview** [2] - 8:19, 9:1
**owe** [1] - 49:13
**owed** [1] - 120:21
**own** [12] - 19:22, 46:4, 52:16, 65:8, 82:18, 99:11, 112:12, 162:18, 167:6, 170:19, 175:2, 179:15
**owned** [4] - 27:10, 27:11, 131:5, 160:16
**Owner/Supervisor** [1] - 82:10
**owner/supervisor** [1] - 83:12
**owners** [2] - 48:6, 148:19
**ownership** [5] - 23:2, 23:6, 23:11, 137:15, 145:17

**P**

**P&L** [3] - 155:25, 156:2, 156:10
**p.m** [10] - 74:6, 74:8, 139:12, 139:14, 191:12, 194:18, 195:13, 195:17, 199:5, 199:11
**page** [16] - 71:7, 90:21, 103:2, 103:4, 103:7, 105:1, 106:24, 107:1, 119:14, 120:2, 123:12, 125:13, 127:20, 156:18, 187:3, 198:19
**PAGE** [7] - 3:2, 3:12, 3:12, 3:13
**Pages** [1] - 1:8
**pages** [2] - 71:21, 198:20
**PAGES** [1] - 3:11
**paid** [5] - 124:3, 132:4, 132:13, 175:10, 175:14
**painted** [1] - 51:4

**pandemic** [1] - 125:6
**panic** [1] - 16:21
**paper** [2] - 56:16, 71:9
**papers** [3] - 16:10, 57:16, 65:12
**paperwork** [5] - 110:6, 113:16, 113:23, 113:25, 114:7
**paragraph** [8] - 102:16, 104:8, 108:3, 109:4, 119:15, 120:5, 121:1, 160:21
**paraphrasing** [1] - 113:17
**part** [34] - 13:21, 15:14, 19:23, 20:17, 21:25, 28:10, 32:19, 40:3, 40:21, 41:12, 43:18, 44:3, 46:16, 48:15, 60:18, 61:23, 64:16, 70:25, 72:7, 93:8, 94:22, 105:18, 105:22, 149:20, 150:1, 151:2, 151:10, 169:5, 170:21, 171:4, 177:16, 184:9, 189:25
**partially** [1] - 141:18
**participant** [1] - 69:10
**participants** [3] - 4:15, 6:22, 32:6
**participate** [2] - 7:3, 7:4
**participation** [1] - 197:23
**particular** [8] - 8:15, 13:8, 13:9, 74:24, 93:7, 123:16, 130:22, 135:23
**particularly** [6] - 31:19, 44:20, 63:8, 94:24, 159:13, 194:14
**parties** [17] - 13:24, 14:9, 18:7, 48:7, 57:11, 60:20, 64:11, 68:6, 69:18, 84:8, 134:24, 134:25, 135:1, 135:2, 135:3, 135:7
**partly** [1] - 38:5
**partner** [6] - 7:1, 79:7, 79:9, 80:5, 154:11, 155:5
**Partner')** [1] - 148:17
**partners** [3] - 79:25, 155:1, 155:3
**partnership** [2] -

148:12, 148:13
**party** [4] - 6:17, 16:13, 46:14, 157:11
**pass** [2] - 48:1, 95:21
**passing** [2] - 51:5, 164:16
**past** [2] - 191:12, 192:5
**path** [1] - 112:14
**patience** [4] - 4:18, 33:23, 34:4, 197:23
**patient** [3] - 4:7, 4:17, 110:10
**pause** [2] - 22:5, 50:14
**pay** [3] - 44:11, 121:8, 132:19
**paychecks** [1] - 175:7
**paying** [1] - 131:3
**payroll** [2] - 175:9, 175:13
**PDF** [1] - 90:15
**pendency** [1] - 58:9
**pending** [5] - 8:7, 24:13, 25:19, 26:12, 103:13
**Penta** [1] - 82:17
**people** [21] - 4:6, 31:16, 41:24, 45:12, 46:5, 46:24, 49:2, 50:12, 80:11, 83:19, 83:22, 88:12, 88:18, 88:21, 89:16, 143:1, 157:16, 174:20, 175:1, 198:8
**per** [1] - 117:3
**perceive** [1] - 67:3
**perceived** [1] - 14:4
**percent** [3] - 41:3, 46:19, 152:7
**perfect** [2] - 11:9, 52:1
**performance** [1] - 156:3
**performing** [3] - 156:2, 168:1, 169:14
**perhaps** [17] - 4:23, 13:6, 17:22, 20:8, 20:12, 21:3, 30:23, 38:3, 41:3, 43:3, 44:5, 60:10, 135:21, 154:2, 162:6, 165:12, 191:7
**period** [5] - 29:10, 142:16, 143:7, 165:16, 172:7
**periods** [2] - 120:14, 156:4
**permission** [2] - 12:1, 173:14
**permit** [2] - 88:23, 135:6

**permits** [1] - 58:15
**permitting** [1] - 130:14
**person** [15] - 21:1, 23:2, 23:9, 23:14, 49:20, 49:22, 49:23, 52:15, 54:6, 54:12, 128:13, 129:12, 146:6, 179:24, 197:2
**personal** [2] - 166:1, 166:22
**personnel** [8] - 78:20, 80:9, 80:18, 80:24, 121:21, 147:4, 148:21, 174:5
**perspective** [2] - 52:6, 193:9
**persuaded** [1] - 42:23
**pertinent** [1] - 166:20
**perviously** [1] - 116:2
**Pete** [1] - 33:3
**Peter** [2] - 2:7, 5:10
**phone** [3] - 33:19, 97:3, 126:1, 166:16
**phones** [1] - 198:9
**photographs** [1] - 44:15
**photos** [2] - 14:10, 45:17
**physical** [1] - 123:4
**physically** [7] - 76:6, 125:7, 150:6, 162:8, 162:19, 178:12, 185:24
**pick** [3] - 11:19, 158:14, 192:2
**picture** [1] - 51:4
**pictures** [9] - 28:5, 36:11, 37:9, 38:13, 45:15, 46:18, 49:19, 64:23, 156:20
**piece** [1] - 60:17
**pigeon** [1] - 144:25
**pizza** [4] - 41:15, 52:18, 133:13, 133:16
**Pizza** [2] - 45:10, 132:9
**place** [5] - 44:18, 46:20, 85:24, 132:10, 141:4
**placed** [1] - 94:8
**places** [1] - 19:5
**plaintiff** [31] - 4:20, 4:24, 6:17, 8:15, 15:21, 21:16, 24:3, 30:3, 30:8, 32:2, 34:20, 34:25, 35:6, 37:22, 38:18, 43:18, 57:7, 58:8, 60:7,

60:22, 62:24, 63:3, 63:15, 65:25, 68:9, 71:14, 71:17, 84:9, 85:13, 138:5, 195:21
**Plaintiff** [3] - 1:5, 2:3, 5:9
**plaintiff's** [8] - 8:13, 22:11, 25:7, 27:1, 29:19, 33:17, 64:17, 71:23
**PLAINTIFF'S** [1] - 3:2
**Plaintiff's** [25] - 73:12, 76:23, 81:14, 81:25, 84:4, 101:17, 101:19, 102:9, 102:16, 103:1, 103:23, 104:19, 106:17, 110:17, 114:15, 114:17, 115:11, 116:6, 118:7, 118:25, 122:1, 127:21, 147:16, 170:25, 171:4
**plaintiffs** [9] - 17:20, 20:19, 34:15, 44:10, 58:21, 64:4, 74:21, 170:22, 195:6
**plan** [27] - 4:9, 22:8, 29:17, 61:9, 62:2, 101:24, 108:8, 108:11, 109:23, 129:21, 129:23, 129:25, 158:1, 158:7, 158:14, 158:18, 158:20, 158:23, 183:12, 183:16, 184:8, 187:5, 187:6, 188:2, 188:4, 190:24
**planning** [2] - 69:17, 196:14
**plans** [5] - 51:23, 156:22, 157:5, 157:21, 157:23
**platform** [4] - 81:19, 81:20, 169:1, 169:8
**plays** [1] - 66:16
**pleading** [2] - 141:12, 141:24
**pleads** [1] - 141:11
**pleases** [1] - 136:5
**plenty** [1] - 88:7
**plus** [4] - 105:24, 130:9, 174:24, 177:11
**point** [55] - 12:7, 13:5, 22:2, 22:7, 24:23, 26:15, 26:25, 27:18, 33:7, 37:10, 38:5,

43:10, 43:16, 44:11, 44:17, 44:21, 45:5, 46:12, 47:8, 47:13, 53:23, 56:3, 56:8, 57:15, 60:11, 60:21, 61:11, 65:18, 67:25, 68:7, 69:21, 70:15, 70:20, 75:3, 79:23, 99:7, 105:8, 116:17, 127:6, 134:7, 134:13, 135:5, 135:6, 139:18, 140:13, 140:22, 142:24, 143:12, 144:4, 187:10, 191:5, 191:10, 194:1, 194:10
**points** [2] - 98:3, 177:11
**police** [3] - 54:6, 54:8, 54:12
**policy** [1] - 53:19
**Pollack** [1] - 7:22
**poorly** [1] - 152:16
**pop** [1] - 162:21
**portion** [5] - 12:23, 88:20, 89:8, 92:16, 134:4
**portions** [1] - 134:2
**position** [18] - 14:12, 27:1, 27:14, 27:19, 28:15, 28:19, 29:19, 30:23, 56:25, 59:11, 88:4, 88:6, 95:12, 134:9, 135:11, 152:25, 182:14, 183:8
**possibility** [1] - 6:14
**possible** [4] - 44:6, 69:13, 192:5, 197:8
**posture** [1] - 28:23
**potential** [10] - 4:12, 5:1, 5:14, 11:20, 13:5, 26:20, 70:4, 94:9, 137:7, 138:1
**potentially** [3] - 70:24, 169:18, 195:4
**powder** [1] - 9:12
**power** [1] - 147:11
**powers** [1] - 197:18
**practical** [1] - 174:21
**practice** [2] - 64:1, 89:1
**precaution** [1] - 195:13
**preclude** [3] - 63:18, 70:2, 120:15
**predates** [1] - 47:21
**predicted** [1] - 10:21
**prefer** [4] - 13:1, 32:4,

69:2, 73:4
**preference** [1] - 25:1
**prefers** [1] - 89:5
**prejudice** [3] - 14:21, 24:25, 64:3
**prejudicial** [1] - 28:13
**preliminary** [16] - 8:3, 8:13, 29:3, 38:24, 53:21, 56:15, 58:15, 58:25, 63:14, 65:6, 66:9, 66:19, 74:24, 117:23, 140:8, 141:6
**premarked** [1] - 110:17
**premises** [1] - 17:12
**prepared** [9] - 9:16, 35:17, 75:22, 121:5, 121:6, 121:10, 121:18, 121:23, 199:15
**prescribed** [1] - 121:14
**presence** [2] - 163:6, 163:9
**present** [8] - 7:9, 9:1, 13:11, 20:11, 35:2, 62:15, 67:8, 183:16
**Present** [2] - 2:10, 2:20
**presentation** [12] - 17:17, 18:20, 20:18, 21:13, 21:23, 27:2, 32:1, 42:22, 59:7, 60:7, 68:9, 74:22
**presented** [19] - 9:15, 21:23, 27:7, 30:18, 56:16, 57:17, 57:20, 60:8, 62:21, 63:2, 63:3, 71:17, 96:8, 128:20, 138:7, 152:9, 173:11, 183:12, 184:24
**presenting** [3] - 55:17, 64:22, 69:7
**preserve** [1] - 163:16
**President** [2] - 2:20, 97:4
**president** [8] - 7:7, 97:6, 102:3, 104:3, 108:16, 111:5, 115:8, 187:3
**pressured** [1] - 193:13
**presumably** [3] - 15:14, 88:9, 96:22
**pretty** [9] - 56:25, 63:17, 64:4, 66:12, 69:9, 93:17, 139:17, 140:5, 147:20
**preventing** [1] - 97:9
**previous** [9] - 16:18,

77:15, 118:8, 118:15, 125:8, 152:20, 172:13, 172:14, 173:9
**previously** [19] - 15:23, 49:3, 64:1, 81:13, 84:3, 97:20, 99:23, 101:17, 103:2, 103:15, 103:23, 114:15, 116:5, 118:6, 135:10, 138:12, 148:16, 167:10, 189:9
**primarily** [1] - 8:13
**primary** [1] - 89:20
**principal** [1] - 145:22
**principals** [9] - 77:24, 78:21, 121:13, 145:15, 146:19, 148:14, 148:19, 148:20, 149:3
**privy** [3] - 152:12, 157:10, 164:11
**pro** [1] - 7:2
**probing** [1] - 179:7
**problem** [9] - 10:14, 25:8, 30:11, 54:22, 141:9, 158:8, 159:3, 179:20, 182:6
**problems** [13] - 21:13, 37:18, 40:14, 45:18, 46:22, 50:8, 51:23, 157:25, 158:10, 165:1, 165:2, 167:23, 168:5
**procedurally** [4] - 8:18, 36:23, 37:21, 64:12
**procedure** [3] - 25:18, 25:22, 56:20
**procedures** [1] - 168:4
**proceed** [36] - 8:17, 12:6, 30:24, 32:13, 34:18, 34:25, 36:22, 37:22, 43:21, 44:9, 47:7, 50:18, 51:9, 57:6, 60:17, 61:25, 62:7, 64:12, 65:1, 68:12, 68:24, 73:6, 73:9, 73:18, 74:22, 83:7, 97:11, 135:11, 136:4, 140:19, 141:20, 143:22, 144:1, 144:10, 144:14, 181:3
**proceeding** [7] - 5:24, 12:17, 14:14, 43:9, 69:11, 135:14, 135:15

**PROCEEDINGS** [2] - 1:10, 4:3
**proceedings** [4] - 7:25, 68:8, 134:14, 199:14
**Proceedings** [2] - 1:22, 199:11
**process** [27] - 19:4, 40:16, 40:17, 40:21, 46:7, 46:16, 52:11, 94:22, 105:18, 107:23, 109:9, 109:17, 109:24, 129:2, 130:16, 137:4, 137:5, 137:6, 157:24, 158:16, 159:13, 166:8, 166:13, 173:4, 184:8, 188:13, 189:8
**processes** [1] - 184:4
**procured** [1] - 186:13
**produced** [1] - 1:23
**product** [1] - 158:3
**professor** [1] - 142:18
**proffer** [30] - 34:21, 36:5, 39:2, 39:12, 44:1, 44:17, 45:16, 47:10, 51:10, 51:11, 51:15, 55:12, 56:23, 57:10, 60:1, 60:7, 62:20, 63:6, 63:13, 63:19, 63:22, 64:23, 65:2, 66:14, 67:18, 67:19, 70:4, 73:23
**proffered** [1] - 59:22
**proffering** [1] - 72:13
**program** [3] - 87:21, 150:21
**progress** [1] - 80:14
**progression** [1] - 17:19
**prohibit** [3] - 57:2, 58:9, 60:25
**prohibition** [1] - 89:1
**prominent** [1] - 7:23
**proof** [1] - 140:16
**proper** [1] - 44:18
**properly** [3] - 125:17, 125:25, 141:11
**properties** [1] - 146:12
**proponent** [2] - 62:22, 63:12
**proposal** [4] - 45:6, 45:14, 183:25, 184:3
**propose** [7] - 32:11, 43:12, 44:2, 44:14, 55:6, 68:5, 194:18
**proposed** [4] - 42:25, 61:7, 70:15, 142:15
**proposes** [1] - 43:1

**proposing** [5] - 34:20, 38:2, 38:18, 43:8, 51:16
**proposition** [1] - 52:15
**propriety** [2] - 18:7, 42:24
**prospect** [2] - 184:25, 185:5
**prospective** [5] - 95:4, 137:1, 137:24, 184:5, 185:2
**prospects** [2] - 96:2, 146:1
**protect** [3] - 19:10, 19:21, 50:2
**protection** [3] - 134:12, 134:23, 135:8
**protective** [3] - 84:8, 84:12, 133:25
**proved** [1] - 120:14
**provide** [5] - 103:12, 106:3, 108:11, 109:8, 172:9
**provided** [8] - 90:11, 105:23, 124:5, 124:7, 127:1, 134:10, 140:6, 183:17
**providing** [1] - 114:10
**provision** [4] - 103:18, 120:4, 120:9, 120:17
**provisional** [3] - 184:12, 187:15, 187:21
**provisions** [1] - 128:17
**public** [18] - 16:12, 19:10, 45:8, 48:10, 48:15, 50:11, 50:21, 50:23, 53:5, 53:19, 59:2, 85:10, 85:17, 85:22, 86:1, 133:23, 134:1, 134:4
**publicly** [2] - 134:5, 135:4
**published** [1] - 134:6
**Publix** [2] - 131:5, 131:22
**pull** [1] - 175:1
**purchased** [1] - 94:12
**purchasing** [1] - 92:14
**pure** [1] - 175:3
**purportedly** [1] - 15:16
**purpose** [8] - 38:21, 88:24, 89:3, 104:4, 104:5, 116:25, 117:2, 158:19

**purposes** [4] - 4:7, 24:15, 55:12, 67:10
**pursuant** [3] - 77:22, 84:7, 135:15
**pursue** [1] - 53:12
**push** [1] - 30:14
**pushed** [1] - 183:9
**put** [37] - 14:23, 15:16, 20:7, 21:5, 37:7, 42:3, 46:3, 46:6, 46:8, 50:13, 53:4, 53:18, 53:20, 56:19, 60:22, 61:9, 62:2, 66:12, 71:11, 72:2, 80:11, 95:25, 98:3, 100:2, 100:15, 110:11, 127:17, 128:1, 136:8, 171:8, 178:18, 178:19, 181:14, 189:19, 196:15, 197:1
**puts** [1] - 31:10
**putting** [4] - 55:15, 55:20, 64:23, 103:3

## Q

**qualified** [2] - 83:19, 146:5
**quality** [4] - 169:18, 169:20, 169:22, 169:23
**quarter** [1] - 143:6
**quarterly** [3] - 156:11, 156:12, 156:13
**questioning** [8] - 60:25, 75:15, 76:19, 105:7, 163:16, 163:22, 180:3, 181:24
**questions** [10] - 18:16, 72:15, 73:3, 75:3, 75:4, 93:23, 165:5, 173:8, 191:16, 196:19
**queue** [1] - 110:9
**quick** [3] - 69:16, 77:7, 140:2
**quickly** [2] - 35:20, 140:5
**quite** [3] - 11:2, 71:2, 139:24
**quo** [1] - 16:15
**quote** [2] - 14:19, 198:18
**quote/unquote** [3] - 73:7, 112:16, 151:20

## R

**rag** [1] - 15:10

**raise** [1] - 75:24
**raised** [4] - 15:24, 15:25, 16:1, 193:1
**Ramsey** [1] - 97:3
**rather** [5] - 9:17, 26:11, 142:5, 143:6, 184:8
**ratting** [1] - 151:20
**reach** [1] - 63:15
**reached** [4] - 15:5, 75:2, 96:5, 99:10
**read** [25] - 72:7, 94:2, 94:5, 102:15, 103:7, 104:7, 108:6, 109:3, 119:14, 120:3, 120:4, 120:6, 121:1, 121:7, 121:12, 121:20, 122:10, 123:13, 124:1, 126:10, 144:6, 148:8, 148:9
**reading** [3] - 109:1, 126:14, 133:7
**ready** [13] - 34:25, 49:12, 68:11, 68:24, 69:12, 74:10, 74:13, 74:14, 138:17, 138:19, 138:20, 144:10, 145:7
**real** [7] - 41:3, 90:9, 96:1, 136:6, 149:8, 149:14, 184:6
**reality** [5] - 36:8, 36:17, 37:14, 54:10
**really** [15] - 13:14, 18:3, 18:10, 25:5, 42:20, 55:11, 64:8, 71:22, 90:9, 107:20, 145:25, 152:16, 181:15, 187:4, 190:2
**reason** [11] - 27:25, 29:10, 38:16, 47:23, 49:1, 50:5, 58:24, 60:19, 134:21, 134:24, 165:25
**reasonable** [3] - 12:6, 109:7, 128:24
**reasons** [4] - 39:5, 128:14, 129:10, 162:19
**reassembly** [1] - 139:17
**reassure** [1] - 67:15
**rebuttal** [2] - 18:4, 35:2
**recalling** [1] - 60:9
**receive** [9] - 33:8, 107:16, 110:7, 112:23, 113:3, 117:11, 118:3,

140:9, 167:17
**received** [21] - 14:5, 28:18, 51:5, 58:12, 110:14, 112:4, 118:4, 118:15, 118:17, 126:2, 128:8, 129:4, 129:9, 155:9, 155:16, 159:16, 167:20, 181:1, 182:2, 196:25
**receiving** [10] - 111:13, 111:22, 112:10, 113:13, 113:15, 113:23, 118:20, 143:14, 169:5, 170:24
**recent** [3] - 31:19, 116:12, 131:23
**recently** [3] - 23:1, 23:9, 31:3
**recess** [7] - 31:25, 34:6, 74:3, 74:6, 74:20, 139:12, 193:10
**recipient** [1] - 106:18
**recognize** [4] - 8:16, 102:18, 177:1, 177:3
**recollection** [1] - 142:8
**recommend** [1] - 70:5
**Recommendation** [1] - 155:24
**reconvene** [7] - 29:24, 30:1, 33:5, 33:6, 71:3, 195:17, 199:5
**reconvened** [3] - 34:8, 74:8, 139:14
**reconvening** [1] - 32:14
**Record** [1] - 94:5
**record** [41] - 6:11, 7:1, 11:17, 11:23, 23:20, 24:21, 26:3, 26:24, 34:3, 38:8, 55:16, 55:21, 67:22, 68:1, 72:8, 74:11, 74:20, 76:14, 85:22, 91:24, 99:13, 99:17, 102:2, 103:8, 106:23, 108:6, 145:19, 147:25, 163:16, 163:18, 170:21, 171:4, 181:20, 195:20, 195:22, 196:5, 196:6, 196:10, 198:1, 199:14
**recorded** [1] - 1:22
**records** [4] - 50:1, 52:12, 83:18, 175:13

**recruit** [1] - 87:21
**recruited** [1] - 153:13
**rectified** [1] - 17:2
**red** [3] - 164:21, 164:22, 177:11
**Red** [1] - 2:5
**redacted** [2] - 85:16, 134:2
**REDACTED** [2] - 1:10, 3:11
**redaction** [1] - 134:1
**redirect** [3] - 73:9, 144:2, 191:16
**redirection** [1] - 93:21
**reds** [1] - 164:24
**reduced** [5] - 97:21, 98:4, 98:7, 98:10
**refer** [5] - 77:10, 118:18, 151:12, 157:17, 172:13
**reference** [6] - 20:12, 22:18, 133:10, 134:3, 148:21, 181:24
**referenced** [6] - 110:21, 114:19, 116:12, 118:8, 133:12, 153:9
**references** [2] - 105:17, 133:6
**referred** [3] - 77:9, 189:7, 189:9
**referring** [11] - 99:14, 108:3, 127:14, 133:4, 153:1, 167:25, 168:25, 183:21, 188:21, 198:15
**refers** [4] - 104:23, 155:19, 156:15, 156:18
**reflected** [1] - 24:21
**reflects** [1] - 45:19
**refresh** [1] - 127:22
**refrigerators** [2] - 163:10, 163:12
**refusal** [5] - 39:6, 95:18, 96:9, 97:12, 113:20
**refused** [5] - 100:5, 100:8, 166:6, 166:7, 166:17
**refuses** [1] - 183:18
**regard** [51] - 7:15, 8:13, 18:9, 21:21, 22:1, 22:3, 22:19, 23:18, 26:6, 26:20, 26:21, 27:2, 29:2, 29:17, 29:22, 29:23, 31:12, 35:11, 36:24,

42:24, 43:4, 43:5, 43:14, 44:12, 47:7, 47:9, 59:8, 59:12, 59:22, 60:12, 63:16, 67:13, 68:8, 69:10, 70:3, 70:13, 70:15, 85:22, 89:5, 89:7, 93:21, 107:6, 142:9, 145:2, 163:21, 171:15, 173:10, 180:13, 180:14, 181:4, 194:8
**regarding** [15] - 8:24, 28:4, 39:3, 94:8, 110:6, 112:24, 113:15, 114:7, 114:12, 118:16, 125:24, 126:5, 126:16, 141:14, 144:3
**regardless** [3] - 67:16, 89:3, 112:12
**regards** [3] - 17:23, 90:12, 172:12, 172:15
**registered** [1] - 7:13
**rehearsal** [2] - 70:19, 70:22
**relate** [3] - 14:7, 14:10, 39:4
**related** [7] - 39:11, 39:15, 47:19, 83:25, 84:11, 174:15, 196:7
**relates** [3] - 66:18, 167:22, 177:8
**relating** [2] - 65:3, 142:2
**relation** [1] - 96:18
**relationship** [8] - 16:19, 19:20, 41:5, 58:20, 79:4, 88:22, 190:1
**release** [1] - 121:14
**relevance** [17] - 17:22, 30:12, 31:4, 37:8, 39:2, 39:18, 45:20, 53:18, 55:21, 57:3, 70:13, 87:25, 88:1, 163:21, 171:9, 171:11, 180:4
**relevancy** [2] - 36:24, 180:14
**relevant** [26] - 21:3, 21:4, 30:7, 30:16, 34:23, 36:9, 41:22, 42:4, 48:2, 50:19, 51:11, 53:20, 55:7, 55:25, 56:18, 56:24, 56:25, 60:1, 62:24, 65:4, 67:2, 67:9,

*68:15, 88:3, 88:7, 171:11*

**relief** *[14] - 19:18, 39:24, 40:1, 41:13, 41:14, 42:5, 45:8, 52:7, 58:7, 61:15, 65:19, 66:6, 66:19*

**relinquish** *[1] - 97:10*

**relinquished** *[6] - 97:14, 97:18, 98:15, 98:21, 98:25, 125:10*

**relying** *[1] - 56:1*

**remain** *[4] - 53:22, 58:19, 65:22, 66:3*

**remaining** *[2] - 91:16, 108:8*

**remains** *[1] - 15:11*

**remedy** *[1] - 59:3*

**remember** *[7] - 90:21, 97:5, 114:23, 117:23, 117:25, 153:2, 167:8*

**remembering** *[2] - 80:4, 122:21*

**remind** *[3] - 144:7, 144:19, 197:23*

**reminder** *[1] - 34:14*

**remiss** *[1] - 6:3*

**remodel** *[1] - 132:12*

**remove** *[1] - 100:6*

**removed** *[1] - 100:16*

**render** *[1] - 63:22*

**reneged** *[1] - 96:10*

**renew** *[9] - 57:4, 103:10, 103:14, 103:21, 104:5, 104:10, 115:3, 119:17, 119:23*

**Renewal** *[2] - 119:16, 121:8*

**renewal** *[26] - 29:11, 39:6, 65:11, 105:4, 105:16, 105:23, 107:19, 107:20, 107:23, 109:8, 109:16, 109:22, 109:25, 110:6, 112:3, 113:15, 113:23, 113:25, 114:7, 117:4, 119:18, 119:20, 120:14, 120:23, 166:8, 166:13*

**renewed** *[1] - 111:25*

**rents** *[1] - 128:16*

**reopened** *[3] - 196:25, 197:1, 197:4*

**rep** *[7] - 83:15, 87:20, 92:24, 97:24, 105:19, 137:4, 174:6*

**Rep** *[4] - 72:9, 92:13, 189:17, 190:14*

**rep-operational** *[1] - 83:15*

**repeat** *[3] - 160:10*

**repeated** *[4] - 46:4, 156:21, 157:4, 157:20*

**repeatedly** *[1] - 167:13*

**rephrase** *[3] - 89:10, 112:17, 149:10*

**replaced** *[1] - 170:3*

**replaces** *[1] - 57:19*

**report** *[9] - 19:9, 44:15, 152:18, 156:7, 156:8, 159:17, 159:18, 170:8*

**reported** *[1] - 156:6*

**Reporter** *[14] - 1:15, 10:1, 10:8, 10:12, 66:17, 72:23, 79:8, 84:17, 93:4, 115:21, 126:13, 137:22, 147:9, 186:24*

**reporter** *[6] - 6:1, 10:17, 11:12, 45:4, 94:2, 138:15*

**REPORTER** *[4] - 6:5, 6:7, 10:4, 136:1*

**reports** *[5] - 35:19, 42:9, 46:6, 150:17, 150:24*

**represent** *[4] - 7:13, 41:9, 130:24, 145:12*

**representation** *[3] - 24:9, 131:8, 131:11*

**representative** *[24] - 7:8, 40:5, 40:23, 41:6, 42:6, 42:13, 46:24, 57:18, 99:20, 121:3, 121:4, 146:25, 149:20, 150:23, 151:9, 152:6, 153:18, 153:21, 153:22, 154:6, 154:9, 154:23, 155:17, 157:14*

**Representative** *[19] - 88:6, 92:10, 103:9, 104:10, 119:16, 120:8, 120:11, 120:12, 121:13, 121:21, 124:8, 134:12, 134:22, 147:17, 148:4, 148:11, 150:6, 150:24, 165:18*

**Representative's** *[1] - 148:14*

**representatives** *[5] - 4:12, 5:1, 87:18, 153:11, 154:6*

**Representatives** *[1] - 121:8*

**represented** *[4] - 18:25, 52:13, 59:9, 130:25*

**representing** *[3] - 41:10, 52:12, 59:24*

**represents** *[1] - 55:6*

**reproofing** *[1] - 159:7*

**reps** *[4] - 89:25, 90:13, 106:3, 106:4*

**request** *[16] - 8:3, 8:13, 16:6, 23:21, 26:5, 26:17, 29:3, 38:24, 69:10, 74:23, 99:7, 105:25, 135:12, 135:15, 197:10*

**requested** *[5] - 19:18, 85:6, 99:3, 105:23, 142:4*

**requesting** *[1] - 105:3*

**requests** *[1] - 113:22*

**required** *[18] - 81:22, 90:23, 91:4, 92:22, 98:4, 100:24, 103:18, 108:20, 127:8, 150:11, 150:16, 150:23, 156:2, 156:10, 172:10, 187:13, 188:9, 189:22*

**requirement** *[12] - 98:8, 103:17, 108:14, 119:21, 119:25, 120:23, 122:12, 127:25, 133:5, 169:2, 186:1, 189:18*

**requirements** *[5] - 27:16, 121:22, 129:25, 156:19, 169:15*

**requires** *[3] - 146:18, 148:22, 187:6*

**requiring** *[1] - 169:7*

**rescind** *[2] - 129:21, 183:18*

**rescinded** *[1] - 140:10*

**rescue** *[1] - 194:12*

**resembled** *[1] - 34:11*

**reserve** *[4] - 20:23, 35:1, 73:2, 138:5*

**reserving** *[2] - 62:16, 62:18*

**residents** *[1] - 9:6*

**resolve** *[7] - 27:7, 28:18, 30:6, 61:8, 142:12, 170:12, 197:19*

**resolved** *[1] - 170:11*

**resources** *[1] - 55:23*

**respect** *[5] - 12:21, 18:20, 121:16, 156:25, 169:22*

**respond** *[5] - 52:21, 115:19, 115:24, 165:7, 165:10*

**responded** *[2] - 115:25, 129:15*

**responding** *[1] - 129:20*

**response** *[22] - 47:9, 48:4, 48:6, 107:16, 110:7, 110:13, 110:14, 112:4, 112:10, 112:23, 113:3, 113:9, 113:12, 114:7, 114:9, 116:10, 116:11, 117:11, 117:14, 126:8, 196:25, 197:10*

**responsibilities** *[3] - 77:25, 145:24, 158:9*

**responsibility** *[6] - 19:11, 146:15, 151:9, 157:14, 157:22, 160:4*

**responsible** *[2] - 77:25, 151:13*

**rest** *[4] - 9:21, 90:10, 100:10, 193:15*

**restate** *[1] - 188:24*

**restaurant** *[19] - 45:16, 45:22, 46:17, 49:21, 51:17, 52:9, 52:16, 58:17, 159:12, 162:4, 167:19, 167:23, 172:17, 173:3, 173:15, 174:2, 177:8, 177:9, 177:17*

**restaurants** *[7] - 49:17, 58:19, 58:22, 157:1, 177:6, 180:22, 183:13*

**restored** *[3] - 140:10, 141:3, 141:5*

**restraining** *[1] - 15:22*

**restraints** *[1] - 56:7*

**restricted** *[1] - 99:8*

**restriction** *[1] - 94:8*

**result** *[5] - 13:25, 95:17, 98:21,*

*128:25, 172:11*

**resulted** *[1] - 98:14*

**results** *[1] - 102:17*

**resume** *[4] - 73:20, 74:10, 138:23, 139:9*

**resupplied** *[1] - 179:17*

**retract** *[1] - 138:11*

**return** *[1] - 24:14*

**revealed** *[1] - 73:3*

**review** *[14] - 17:12, 28:3, 30:4, 31:2, 31:7, 31:15, 35:12, 36:4, 36:11, 84:5, 101:18, 106:4, 113:19*

**reviewed** *[1] - 126:4*

**Reviews** *[1] - 155:25*

**reviews** *[3] - 156:2, 156:10*

**revise** *[1] - 97:7*

**revised** *[5] - 96:24, 99:21, 100:16, 101:2, 101:4*

**revision** *[3] - 97:13, 100:13, 101:3*

**revisional** *[1] - 105:18*

**revisiting** *[1] - 59:4*

**ridiculous** *[1] - 62:12*

**rights** *[7] - 92:14, 93:12, 94:12, 94:17, 95:3, 96:4, 131:14*

**rigid** *[1] - 146:15*

**risk** *[1] - 45:13*

**Riverside** *[2] - 2:4*

**RMR** *[2] - 1:15, 199:16*

**Rock** *[1] - 161:14*

**rocks** *[1] - 158:14*

**role** *[9] - 21:2, 49:13, 94:23, 97:5, 145:22, 149:20, 154:13, 158:21, 170:13*

**Role** *[1] - 82:9*

**roles** *[2] - 22:15, 149:15*

**roll** *[1] - 64:17*

**Ron** *[7] - 101:23, 107:22, 109:8, 109:10, 109:12, 109:14, 110:8*

**room** *[4] - 32:8, 32:23, 33:14, 33:18*

**rooms** *[1] - 32:5*

**roughly** *[1] - 117:1*

**routine** *[1] - 194:16*

**royalties** *[1] - 92:16*

**rule** *[3] - 43:17, 63:5, 67:17*

**rules** *[2] - 34:24, 34:25*

**ruling** [7] - 13:8, 29:19, 55:22, 62:21, 63:13, 63:22, 117:22
**run** [6] - 30:3, 41:18, 42:7, 43:13, 62:12, 152:7
**ruptured** [1] - 19:20
**rushed** [1] - 23:4

**S**

**safe** [2] - 199:6, 199:10
**safety** [7] - 45:13, 51:18, 152:9, 168:17, 169:18, 169:21, 195:12
**sake** [2] - 102:24, 128:22
**sale** [2] - 90:12, 91:23
**sales** [5] - 90:24, 92:15, 137:5, 147:5
**San** [2] - 95:16, 96:5
**sanitation** [4] - 168:9, 169:25, 170:1, 170:11
**Sanitation** [2] - 168:16, 170:9
**sanitizer** [1] - 170:2
**satisfied** [4] - 106:23, 108:9, 119:25, 120:23
**satisfies** [1] - 106:10
**satisfy** [1] - 26:8
**save** [2] - 55:23, 71:7
**saw** [4] - 46:3, 49:15, 57:21, 59:25
**scenario** [1] - 160:13
**Schedule** [2] - 123:15, 124:7
**schedule** [24] - 27:15, 32:15, 94:21, 96:19, 97:7, 99:4, 99:11, 99:21, 99:25, 100:5, 101:13, 109:7, 109:15, 109:25, 122:9, 127:15, 128:5, 142:4, 182:9, 183:5, 187:13, 188:10, 189:18, 197:1
**scheduled** [2] - 8:3, 100:14
**scheduling** [1] - 196:7
**scheduling-related** [1] - 196:7
**scheme** [1] - 164:18
**school** [1] - 78:7
**Schroeder** [4] - 5:22, 33:7, 33:13, 33:21

**scope** [9] - 12:25, 14:14, 14:24, 15:17, 16:18, 17:23, 47:12, 60:14, 79:23
**score** [5] - 41:3, 152:12, 164:12, 164:13, 164:16
**scored** [1] - 152:7
**scores** [6] - 156:21, 157:4, 157:20, 164:5, 164:6, 164:7
**screen** [18] - 4:21, 5:22, 33:8, 44:7, 64:24, 81:4, 81:10, 84:5, 103:3, 104:22, 114:17, 147:8, 147:20, 177:2, 181:15, 181:18, 181:20, 181:21
**scripted** [1] - 18:3
**seal** [3] - 85:16, 85:19, 134:1
**SEAL** [1] - 3:11
**seats** [1] - 41:17
**second** [20] - 28:15, 51:22, 58:14, 67:6, 99:12, 103:3, 104:7, 108:3, 125:14, 126:20, 129:13, 130:17, 131:4, 132:4, 141:17, 172:12, 172:15, 172:17, 173:5, 187:10
**Second** [2] - 2:15
**section** [3] - 103:7, 121:12, 153:9
**Section** [15] - 103:6, 119:14, 119:15, 119:22, 120:2, 120:20, 120:24, 121:2, 121:7, 121:20, 123:11, 123:13, 123:14, 123:24, 124:11
**sections** [2] - 133:6, 162:22
**see** [55] - 4:19, 4:22, 5:21, 6:19, 7:1, 7:22, 10:24, 13:8, 13:9, 16:3, 20:17, 21:18, 26:23, 28:25, 34:10, 34:16, 35:14, 37:6, 37:8, 39:11, 44:16, 49:19, 50:13, 59:2, 59:21, 64:17, 74:15, 81:11, 82:11, 82:12, 111:3, 131:2, 136:7, 143:11, 147:19, 147:21, 147:24,

148:3, 151:21, 152:12, 155:14, 156:16, 156:22, 164:6, 164:7, 164:9, 164:13, 168:12, 168:19, 172:20, 173:15, 181:16, 187:16, 187:17, 193:15
**seeing** [4] - 44:13, 84:5, 103:19, 116:7
**seem** [4] - 17:14, 45:1, 48:24, 159:18
**sell** [7] - 133:13, 133:16, 136:20, 136:24, 137:17, 137:23, 138:1
**semantics** [2] - 50:24, 62:19
**send** [4] - 54:7, 113:18, 142:16, 165:14
**sending** [1] - 106:6
**sense** [12] - 42:21, 42:24, 43:2, 43:7, 44:1, 56:21, 75:6, 128:16, 128:23, 185:2, 185:4, 190:14
**sent** [36] - 13:20, 14:9, 14:15, 40:14, 45:24, 46:20, 48:22, 48:24, 54:5, 73:12, 101:25, 102:4, 102:5, 103:17, 103:20, 107:18, 110:5, 111:3, 111:5, 111:7, 115:5, 115:7, 117:6, 127:2, 140:15, 141:13, 142:3, 153:7, 167:18, 167:21, 171:24, 173:6, 173:7, 187:24, 189:19
**sentence** [6] - 104:7, 121:2, 148:9, 149:5, 160:21, 183:24
**separate** [10] - 15:14, 29:9, 32:5, 53:8, 66:8, 156:7, 156:8, 171:10, 175:11, 179:8
**separately** [1] - 32:8
**September** [18] - 56:12, 77:13, 77:14, 77:23, 78:2, 90:5, 104:12, 108:11, 108:21, 108:25, 114:25, 116:15, 117:7, 117:12, 118:1, 118:12,

122:16, 143:15
**sequence** [1] - 13:10
**sequencing** [1] - 29:21
**serious** [4] - 158:2, 159:5, 168:16, 170:9
**serve** [3] - 15:12, 15:13, 180:15
**served** [1] - 127:1
**services** [1] - 168:8
**serving** [1] - 7:14
**session** [4] - 33:10, 33:25, 34:1, 81:5
**set** [2] - 37:15, 56:7
**seven** [12] - 36:15, 71:7, 129:14, 129:18, 130:7, 183:4, 184:12, 184:21, 185:16, 185:17, 185:19, 185:20
**seven-page** [1] - 71:7
**seven-store** [4] - 129:18, 184:12, 184:21, 185:16
**several** [7] - 98:14, 110:13, 112:3, 130:7, 160:15, 162:18, 184:19
**shall** [9] - 103:9, 119:18, 120:8, 120:15, 121:3, 121:8, 121:13, 121:21, 136:7
**shape** [2] - 40:25, 46:21
**share** [4] - 81:4, 103:4, 147:8, 177:21
**shared** [1] - 149:7
**sharing** [4] - 44:7, 147:20, 167:1, 191:2
**shearing** [1] - 81:10
**sheet** [1] - 190:19
**shelled** [1] - 11:6
**shock** [1] - 64:3
**shocked** [1] - 67:12
**shocking** [1] - 40:23
**shopping** [1] - 131:4
**short** [8] - 30:3, 31:25, 43:13, 69:6, 101:3, 101:5, 101:7, 101:8
**shortcomings** [1] - 160:5
**shorter** [2] - 192:19, 193:7
**shortly** [4] - 51:6, 109:9, 130:14, 131:23
**shot** [1] - 63:1
**show** [27] - 19:2,

36:18, 37:7, 41:2, 41:13, 41:24, 46:18, 49:24, 81:3, 81:13, 84:3, 100:2, 101:17, 103:1, 103:15, 103:22, 116:5, 118:6, 147:14, 147:20, 162:21, 165:3, 165:5, 167:2, 170:20, 181:9, 183:20
**showing** [2] - 62:25, 148:8
**shown** [3] - 63:25, 64:2, 83:18
**shows** [7] - 49:25, 54:6, 57:22, 117:2, 155:19, 164:24, 184:5
**Shumaker** [1] - 2:7
**shut** [3] - 14:2, 15:4, 15:6, 15:11, 53:9, 61:22, 66:11, 67:24
**shuts** [1] - 49:14
**shutting** [1] - 58:17
**sic** [1] - 152:23
**side** [22] - 4:10, 5:3, 5:20, 6:16, 21:2, 21:3, 22:11, 22:23, 32:9, 33:13, 33:17, 71:14, 146:1, 146:2, 146:10, 149:13, 149:14, 152:12, 182:20, 182:21, 183:1, 195:25
**sides** [2] - 43:14, 70:8
**sideshow** [2] - 56:17, 57:13
**sidetracked** [2] - 166:9, 166:11
**sidewalk** [1] - 168:11
**sign** [3] - 175:19, 178:18, 184:15
**signal** [2] - 33:24, 68:21
**signature** [2] - 188:1, 188:3
**signatures** [1] - 187:25
**signed** [12] - 77:22, 124:20, 124:24, 129:13, 129:18, 165:18, 184:24, 185:12, 185:15, 186:13, 187:18, 187:23
**significantly** [1] - 11:2
**Silverman** [6] - 2:7, 5:1, 5:10, 32:24, 33:2, 33:11

**similar** [3] - 137:6, 137:15, 173:9
**similarities** [1] - 119:6
**similarly** [1] - 88:21
**simple** [3] - 47:16, 134:21, 175:6
**simply** [16] - 4:9, 4:25, 13:6, 29:14, 34:12, 39:2, 52:22, 53:4, 53:18, 54:20, 66:10, 72:5, 128:22, 135:4, 137:11, 162:21
**single** [1] - 60:17
**sit** [2] - 163:25, 171:22
**site** [6] - 95:3, 95:5, 95:24, 130:15, 132:8, 146:12
**sites** [3] - 128:20, 146:11, 184:7
**situated** [1] - 88:22
**situation** [2] - 19:3, 19:9
**situations** [1] - 41:13
**six** [11] - 94:15, 97:15, 97:17, 108:9, 108:13, 108:20, 108:25, 123:2, 123:6, 125:2, 162:6
**skilled** [1] - 49:22
**slam** [1] - 51:1
**slander** [1] - 138:10
**Slices** [11] - 140:5, 140:6, 140:8, 140:11, 141:5, 141:8, 141:11, 142:9, 142:25, 154:2, 185:12
**slowly** [1] - 76:15
**small** [1] - 38:9
**smaller** [2] - 173:21, 182:18
**smallwares** [1] - 179:12
**software** [1] - 33:9
**sold** [3] - 91:14, 91:20, 137:23
**sole** [1] - 5:12
**solid** [1] - 129:2
**someone** [6] - 42:17, 49:21, 57:18, 154:19, 166:3, 166:15
**sometime** [1] - 178:19
**sometimes** [4] - 4:14, 4:16, 179:10, 190:2
**somewhere** [1] - 80:5
**soon** [6] - 91:2, 103:3, 143:5, 143:25, 147:20, 197:8
**sophistication** [1] -

139:1
**sorry** [36] - 12:8, 12:9, 33:2, 36:1, 37:20, 44:25, 50:6, 65:14, 73:20, 79:3, 82:2, 88:13, 93:15, 98:13, 99:16, 108:1, 114:2, 116:2, 120:6, 122:14, 126:14, 135:20, 160:18, 166:11, 171:3, 171:21, 174:8, 180:19, 182:17, 184:19, 188:3, 188:21, 188:25, 192:8, 194:25, 197:2
**sort** [14] - 61:13, 146:4, 146:6, 149:11, 151:19, 157:22, 158:11, 163:2, 164:1, 175:6, 182:2, 183:12, 184:23, 186:13
**sought** [1] - 66:19
**soulmate** [1] - 41:8
**sound** [1] - 22:8
**sounds** [3] - 12:5, 12:16, 172:4
**South** [14] - 2:18, 9:6, 23:2, 23:9, 23:10, 23:12, 24:2, 24:4, 161:14, 178:3, 178:13, 178:14, 178:15, 178:16
**Southeast** [1] - 2:15
**space** [3] - 130:22, 132:9, 182:18
**span** [1] - 161:5
**spawned** [1] - 172:7
**speaking** [2] - 149:16, 151:15
**speaks** [1] - 57:13
**specific** [17] - 23:6, 36:11, 45:17, 119:10, 137:13, 146:12, 151:3, 151:11, 158:20, 162:17, 162:24, 167:7, 167:22, 168:5, 170:10, 177:8, 177:9
**specifically** [15] - 24:1, 51:24, 59:14, 59:22, 88:15, 89:13, 127:11, 133:10, 143:2, 156:14, 165:8, 166:4, 166:15, 179:7, 187:21
**specification** [1] -

137:12
**specifics** [6] - 55:25, 57:1, 64:24, 66:14, 165:25, 167:8
**speculation** [1] - 89:4
**speech** [1] - 198:22
**spell** [1] - 161:20
**spend** [3] - 14:25, 56:17, 78:10
**spent** [2] - 13:21, 62:9
**Spielbusch** [1] - 1:16
**spirit** [3] - 16:14, 18:15, 158:14
**spite** [1] - 101:9
**split** [1] - 149:7
**spoken** [2] - 129:17, 180:21
**spot** [1] - 27:22
**spouses** [1] - 82:21
**spring** [1] - 97:1
**Stacey** [7] - 1:15, 6:2, 6:4, 6:9, 34:13, 135:23, 199:16
**STACEY** [1] - 199:16
**staff** [1] - 80:12
**stage** [2] - 69:25, 130:11
**stages** [1] - 130:13
**stand** [7] - 22:20, 34:2, 73:7, 122:24, 144:9, 199:2, 199:4
**standard** [3] - 61:21, 97:23, 151:11
**standards** [4] - 52:9, 151:5, 151:17, 168:4
**standing** [1] - 115:22
**standpoint** [2] - 22:20, 174:22
**stands** [4] - 17:1, 24:7, 52:14, 83:15
**start** [15] - 4:5, 12:8, 17:18, 20:1, 20:17, 33:17, 36:3, 69:7, 79:20, 90:3, 90:6, 96:17, 124:10, 193:6, 195:3
**started** [3] - 6:17, 107:21, 109:17
**starting** [1] - 94:20
**starts** [2] - 104:8, 109:4
**state** [7] - 35:18, 40:8, 51:6, 58:15, 76:14, 114:21, 165:12
**statement** [7] - 17:17, 52:7, 69:2, 71:15, 71:16, 71:24, 131:16
**statements** [6] - 69:23, 70:1, 70:8, 71:6, 172:14

**STATES** [2] - 1:1, 1:11
**states** [5] - 134:11, 156:11, 187:4, 187:9, 188:7
**States** [1] - 1:16
**status** [6] - 16:15, 17:13, 26:13, 34:12, 167:22
**stay** [3] - 21:8, 93:23, 199:10
**stenography** [1] - 1:22
**stenotype** [1] - 199:15
**step** [6] - 90:8, 91:18, 93:10, 99:18, 113:21, 131:1
**steps** [9] - 34:12, 90:6, 91:3, 91:5, 112:16, 112:18, 112:24, 142:8, 143:25
**Steve** [1] - 99:20
**Steven** [8] - 80:22, 81:1, 83:24, 168:7, 173:21, 174:10, 174:14, 174:24
**sticks** [1] - 162:25
**still** [25] - 11:15, 26:12, 29:9, 36:21, 40:18, 46:10, 47:22, 47:24, 49:8, 50:17, 51:8, 52:2, 53:7, 54:2, 64:10, 65:25, 82:2, 84:23, 88:9, 122:11, 144:7, 144:8, 144:9, 196:23
**Stilwell** [6] - 101:23, 107:22, 109:11, 109:12, 109:14, 110:9
**Stilwell's** [1] - 109:8
**stipulate** [1] - 72:8
**stomach** [1] - 41:25
**stop** [10] - 32:10, 52:24, 123:14, 123:20, 167:1, 177:21, 191:2, 191:6, 191:25
**stopped** [1] - 173:9
**store** [75] - 15:11, 34:22, 39:10, 40:24, 48:9, 49:2, 52:1, 58:2, 83:17, 90:9, 91:15, 91:23, 95:24, 97:19, 102:20, 108:13, 123:17, 124:2, 124:21, 125:3, 128:14, 129:18, 130:17, 131:4, 131:22, 132:2, 132:12,

132:22, 149:21, 151:3, 151:11, 151:14, 152:1, 152:7, 152:8, 152:16, 157:25, 159:11, 160:6, 161:1, 161:9, 162:9, 162:22, 163:2, 163:7, 163:25, 164:24, 165:4, 167:7, 169:2, 169:4, 169:7, 170:19, 171:24, 174:23, 175:16, 177:24, 177:25, 178:5, 179:2, 179:5, 179:21, 180:15, 180:18, 181:4, 184:12, 184:21, 185:16, 186:17, 186:18, 186:22, 186:25, 196:23, 196:24, 197:4
**Store** [4] - 123:19, 124:3, 124:5
**stores** [101] - 14:11, 27:20, 27:24, 42:9, 48:6, 48:11, 48:12, 51:5, 53:6, 53:9, 53:22, 54:2, 54:14, 79:23, 91:8, 91:16, 91:17, 92:13, 92:21, 92:22, 93:1, 94:15, 94:24, 95:9, 95:13, 95:19, 96:15, 96:25, 97:12, 97:15, 97:20, 97:21, 97:22, 98:4, 98:8, 98:16, 98:22, 98:25, 100:17, 100:24, 101:1, 101:2, 101:9, 101:14, 102:19, 108:9, 108:20, 108:22, 108:25, 109:21, 110:3, 122:12, 122:16, 122:21, 122:25, 123:23, 124:14, 124:15, 124:20, 125:2, 129:14, 130:1, 130:4, 130:10, 130:11, 149:24, 150:2, 156:20, 157:3, 157:20, 160:16, 160:20, 160:23, 160:24, 161:11, 162:18, 164:4, 169:4, 170:18, 173:19, 175:2, 175:10, 182:13,

*182:22, 182:25, 185:4, 185:17, 185:19, 185:22, 186:14, 189:22, 190:4, 190:5, 190:9, 190:13, 190:21*
**stores'** [1] - 48:5
**straightaway** [1] - 179:15
**strategically** [1] - 32:13
**strategies** [1] - 87:21
**strategy** [2] - 27:2, 43:5
**straw** [1] - 53:14
**Street** [3] - 2:8, 2:15, 2:18
**strictly** [1] - 184:16
**structure** [2] - 42:20, 43:3
**stuck** [1] - 163:5
**student** [1] - 78:5
**studies** [1] - 78:9
**studio** [1] - 139:22
**study** [1] - 109:6
**stuff** [3] - 42:12, 42:15, 48:10
**sub** [1] - 60:4
**sub-hearing** [1] - 60:4
**subgroup** [1] - 33:12
**subject** [13] - 25:6, 25:19, 26:18, 45:12, 84:15, 85:7, 85:25, 86:2, 99:9, 119:18, 133:24, 134:9, 135:12
**submission** [2] - 14:18, 35:7
**submit** [3] - 150:17, 184:3, 188:4
**submitted** [6] - 9:22, 81:14, 86:3, 156:20, 187:5, 188:2
**submitting** [2] - 151:18, 183:25
**Subsection** [6] - 124:1, 124:15, 125:1, 125:4
**subsidiaries** [2] - 120:12, 121:15
**substance** [1] - 36:23
**substantive** [1] - 117:13
**subsumed** [1] - 92:18
**Subway** [3] - 77:19, 153:15, 153:18
**success** [1] - 128:24
**successor** [1] - 120:10
**succinctly** [1] - 66:12

**sudden** [1] - 41:1
**sue** [1] - 41:19
**suffice** [3] - 72:20, 72:22, 72:24
**sufficient** [6] - 30:4, 32:23, 34:12, 71:9, 140:16, 140:22
**suggest** [9] - 13:4, 32:17, 34:17, 44:9, 61:24, 73:6, 141:3, 152:18, 198:6
**suggested** [5] - 36:7, 37:14, 47:9, 48:4, 59:16
**suggesting** [14] - 15:21, 17:10, 17:14, 28:24, 37:22, 56:3, 59:23, 60:19, 62:11, 63:9, 67:18, 144:19, 196:3
**suggestion** [6] - 17:5, 35:9, 47:7, 57:6, 61:19, 194:3
**Suite** [2] - 1:16, 2:18
**summarize** [4] - 117:1, 125:14, 133:1, 187:5
**summation** [1] - 122:17
**Sunday** [1] - 79:17
**Super** [1] - 131:5
**supervise** [1] - 148:15
**supervision** [1] - 54:3
**supplement** [2] - 71:10, 179:15
**supplemental** [1] - 142:11
**supply** [1] - 179:15
**support** [7] - 47:11, 74:22, 92:15, 147:6, 149:23, 150:12, 174:24
**supporting** [2] - 150:1, 170:18
**suppose** [1] - 196:20
**supposed** [13] - 46:1, 94:3, 105:3, 105:4, 127:12, 143:16, 151:21, 157:16, 158:6, 170:5, 182:7, 183:2, 189:1
**surprise** [1] - 28:22
**surprised** [2] - 17:11, 129:10
**sustain** [2] - 89:7, 93:19
**switch** [3] - 5:19, 6:16, 10:25
**sworn** [2] - 76:2, 144:8

**system** [6] - 49:13, 77:18, 133:11, 140:11, 140:18, 185:3
**systems** [5] - 66:11, 77:16, 77:18, 177:2, 177:16
**Systems** [2] - 45:25, 150:7

## T

**tackle** [1] - 126:23
**tag** [2] - 146:14, 149:17
**talks** [6] - 109:20, 155:23, 155:25, 168:3, 168:8
**Tallahassee** [1] - 77:19
**target** [1] - 123:16
**targeted** [1] - 27:9
**teach** [2] - 151:21, 177:18
**teaching** [1] - 162:15
**team** [13] - 43:11, 95:17, 109:8, 109:15, 109:24, 114:5, 128:9, 128:11, 146:14, 149:17, 165:12, 169:6, 195:25
**team's** [1] - 102:18
**technical** [1] - 131:14
**technically** [2] - 25:23, 26:4
**technology** [4] - 7:5, 10:16, 116:4, 155:24
**telephone** [3] - 32:11, 144:25, 194:22
**temperature** [5] - 169:12, 169:15, 179:8, 179:9
**temperatures** [2] - 163:13, 169:11
**temporary** [1] - 15:22
**ten** [4] - 90:19, 191:24, 193:16, 198:19
**ten-page** [1] - 198:19
**tend** [1] - 193:18
**tender** [1] - 39:6
**Tenn** [11] - 140:4, 140:5, 140:7, 140:10, 141:5, 141:7, 141:11, 142:9, 142:25, 154:1, 185:12
**Tennessee** [2] - 142:18, 142:19
**term** [7] - 91:9,

*103:12, 109:8, 109:25, 110:2, 146:14, 154:9*
**Term** [1] - 124:9
**terminate** [3] - 46:14, 50:4, 53:10
**terminated** [2] - 88:9, 100:20
**termination** [3] - 140:6, 140:10, 140:15
**terms** [38] - 12:17, 13:16, 16:19, 17:22, 20:18, 21:13, 24:7, 28:22, 30:17, 34:13, 42:21, 44:4, 57:6, 59:7, 59:17, 60:16, 61:2, 63:9, 63:12, 63:17, 65:8, 65:11, 67:7, 67:23, 76:6, 84:22, 88:20, 91:19, 117:3, 119:17, 128:15, 139:16, 142:8, 143:25, 146:22, 146:23, 182:21, 197:9
**territories** [2] - 161:5, 161:6
**territory** [42] - 89:19, 90:4, 90:7, 91:6, 91:19, 92:7, 92:14, 92:18, 92:19, 92:24, 93:2, 93:8, 94:10, 94:12, 94:17, 95:2, 97:8, 97:14, 99:1, 100:3, 100:10, 102:22, 109:6, 118:5, 122:13, 122:19, 124:19, 125:9, 125:18, 127:24, 130:12, 143:3, 149:22, 151:4, 157:1, 161:8, 181:25, 184:1, 185:5, 190:4, 190:13
**testified** [4] - 112:2, 122:3, 182:1, 188:12
**testifies** [1] - 75:7
**testify** [5] - 8:20, 17:25, 40:22, 40:23, 182:4
**testifying** [4] - 10:6, 47:12, 55:2, 181:12
**testimonial** [1] - 55:18
**testimony** [37] - 9:15, 9:16, 9:21, 10:2, 11:21, 15:8, 18:14, 19:12, 22:1, 22:14, 30:21, 42:16, 49:24, 55:4, 55:21, 59:12,

*60:18, 60:22, 62:14, 70:5, 72:17, 84:11, 88:18, 98:7, 98:20, 110:21, 139:2, 139:3, 144:3, 144:22, 171:14, 180:6, 182:3, 186:20, 192:17, 192:22*
**text** [1] - 144:25
**texts** [1] - 144:18
**thankful** [1] - 42:17
**THE** [216] - 1:11, 3:5, 4:5, 5:7, 5:13, 5:16, 6:5, 6:6, 6:7, 6:9, 7:18, 7:20, 9:9, 9:11, 9:23, 10:4, 10:18, 10:21, 11:1, 11:5, 11:10, 12:5, 12:12, 12:16, 13:4, 15:20, 17:3, 18:5, 18:13, 20:10, 21:10, 21:12, 22:16, 23:15, 23:18, 24:5, 24:16, 24:22, 25:5, 25:24, 26:10, 26:16, 26:25, 28:14, 29:16, 33:1, 33:23, 34:10, 35:4, 35:22, 36:2, 36:20, 37:20, 38:10, 38:15, 39:21, 42:19, 43:24, 47:1, 47:6, 48:16, 50:15, 51:14, 52:20, 52:24, 53:3, 53:24, 54:19, 54:25, 57:5, 57:24, 58:3, 58:6, 62:6, 62:17, 64:14, 64:21, 66:20, 68:14, 68:17, 68:20, 68:25, 69:9, 69:20, 71:13, 71:22, 72:1, 72:4, 72:11, 72:19, 73:2, 73:14, 73:16, 73:19, 74:2, 74:10, 74:14, 74:17, 74:19, 75:11, 75:14, 75:17, 75:20, 75:21, 75:23, 75:24, 76:4, 76:8, 76:10, 76:12, 76:13, 76:16, 76:18, 76:24, 81:6, 82:1, 82:5, 83:3, 83:6, 84:14, 84:18, 85:3, 85:20, 88:2, 88:19, 92:2, 93:18, 102:11, 102:13, 104:20, 104:25, 105:8, 106:12, 106:15, 107:5, 107:9, 107:12, 111:17, 111:19, 115:12, 115:14, 116:20,*

116:22, 119:1, 119:3, 134:7, 134:20, 135:5, 135:20, 135:22, 136:1, 136:3, 136:7, 138:9, 138:20, 138:23, 139:5, 139:6, 139:16, 139:21, 139:24, 140:3, 140:12, 140:21, 141:1, 142:7, 143:18, 143:21, 143:23, 144:14, 144:20, 144:24, 145:4, 145:5, 147:1, 147:10, 147:21, 148:6, 161:20, 161:23, 163:19, 171:13, 180:11, 180:24, 181:3, 181:19, 186:25, 191:8, 191:12, 191:19, 191:21, 192:4, 192:8, 192:12, 192:16, 192:21, 193:8, 193:18, 194:3, 194:7, 194:25, 195:2, 195:8, 195:11, 195:24, 196:3, 196:12, 196:17, 197:6, 197:13, 197:17, 197:22, 198:11, 198:21, 198:25, 199:4

**theirs** [1] - 180:18
**theme** [1] - 191:5
**themselves** [2] - 31:18, 195:6
**then-current** [2] - 121:4, 121:22
**therefore** [3] - 23:10, 26:18, 48:7
**thereto** [1] - 84:11
**thermometer** [2] - 179:6, 179:8
**thermometers** [7] - 179:2, 179:5, 179:10, 179:21, 179:25, 180:6
**they've** [9] - 41:7, 56:12, 56:23, 58:11, 63:5, 94:24, 131:13, 137:13, 142:4
**Thiem** [2] - 2:17, 7:16
**thin** [1] - 128:2
**thinking** [2] - 36:25, 140:13

**thinks** [2] - 21:25, 28:16
**third** [9] - 16:13, 80:5, 80:14, 126:23, 132:7, 133:2, 135:2, 135:3, 156:14
**Third** [1] - 2:18
**thirds** [2] - 14:7, 94:11
**Thorn** [1] - 154:19
**thoughts** [1] - 193:8
**three** [33] - 10:9, 27:14, 29:11, 46:20, 51:5, 72:15, 77:24, 97:16, 97:17, 100:17, 103:11, 104:15, 110:1, 112:15, 119:8, 122:3, 128:1, 130:2, 130:3, 152:1, 168:23, 174:9, 174:18, 175:6, 178:9, 180:25, 183:14, 188:5, 188:25, 189:20, 190:21, 191:15, 196:18
**threshold** [2] - 48:1, 67:1
**THROUGH** [3] - 3:12, 3:12, 3:13
**throughout** [6] - 7:25, 94:22, 95:7, 97:25, 146:14, 170:3
**Thursday** [4] - 13:22, 14:18, 14:19, 181:1
**tied** [1] - 97:20
**tiff** [1] - 181:2
**Tim** [4] - 89:18, 154:15, 154:16, 155:5
**timeline** [2] - 100:4, 100:18
**timeliness** [3] - 29:23, 31:13, 35:7
**timely** [2] - 101:13, 103:14
**timing** [8] - 27:21, 28:22, 32:1, 35:4, 44:20, 63:21, 195:13
**title** [1] - 83:16
**today** [44] - 5:15, 6:11, 6:15, 7:1, 7:11, 7:24, 8:18, 8:24, 13:1, 15:13, 17:19, 17:25, 20:11, 20:19, 22:21, 25:22, 28:21, 29:13, 32:13, 34:18, 35:10, 36:23, 37:2, 37:11, 37:21, 38:8, 39:9, 39:12, 39:18, 70:12,

70:23, 101:19, 117:19, 139:3, 141:20, 141:21, 146:8, 163:25, 171:22, 191:14, 195:20, 197:5, 197:9, 197:23
**today's** [1] - 198:10
**Todd** [2] - 2:21, 7:10
**together** [5] - 5:18, 126:25, 146:3, 158:6, 184:23
**toilet** [1] - 41:17
**Toledo** [3] - 1:4, 1:17, 2:8
**tolerate** [1] - 152:4
**tomorrow** [1] - 70:18
**Tony** [16] - 7:7, 89:20, 89:23, 97:4, 99:10, 99:13, 99:15, 102:1, 102:2, 102:16, 104:3, 105:20, 110:8, 126:1, 154:21, 154:22
**tony** [2] - 2:20, 154:22
**took** [4] - 91:5, 96:6, 112:24, 129:7
**top** [4] - 89:24, 120:2, 127:20, 178:11
**topic** [5] - 11:22, 181:6, 191:23, 192:10, 193:5
**topics** [1] - 99:25
**torn** [1] - 163:12
**total** [12] - 91:17, 94:16, 96:24, 110:3, 125:3, 127:9, 127:11, 130:8, 183:1, 187:7, 189:23, 192:9
**totally** [3] - 19:11, 19:19, 39:13
**touch** [1] - 110:12
**toward** [1] - 48:10
**towards** [3] - 11:13, 96:1, 160:2
**town** [2] - 76:7, 93:7
**track** [1] - 94:25
**train** [1] - 158:8
**trained** [8] - 78:20, 80:9, 80:17, 80:24, 146:4, 147:4, 148:21, 174:4
**training** [9] - 79:18, 80:12, 80:24, 90:8, 90:11, 90:23, 91:2, 91:4, 121:22
**TRANSCRIPT** [1] - 1:10
**transcript** [2] - 1:22,

199:14
**transcription** [1] - 1:23
**transmitted** [2] - 106:18, 106:25
**trap** [1] - 61:21
**treatment** [1] - 85:7
**tried** [2] - 57:10, 167:13
**triggered** [1] - 65:10
**TRO** [26] - 8:5, 8:11, 16:5, 16:8, 16:11, 16:14, 17:7, 30:2, 39:8, 48:5, 48:8, 48:13, 48:14, 50:25, 52:8, 52:14, 56:13, 56:14, 65:15, 74:23, 117:21, 118:2, 141:4, 141:8, 141:19, 141:21
**trouble** [1] - 10:16
**troubling** [1] - 19:3
**true** [10] - 25:25, 26:4, 36:6, 80:1, 141:10, 166:14, 184:9, 186:14, 189:21, 198:22
**trust** [1] - 47:5
**trusted** [2] - 47:4, 59:8
**trustee** [1] - 142:19
**truthful** [2] - 150:24, 152:21
**try** [8] - 11:18, 31:1, 33:5, 33:6, 71:3, 89:9, 139:8, 157:15
**trying** [21] - 21:12, 27:25, 30:11, 36:21, 38:16, 39:16, 42:20, 45:2, 48:18, 51:2, 51:17, 53:16, 53:17, 61:13, 61:24, 64:6, 64:9, 67:14, 100:7, 136:20, 143:9
**Tucker** [1] - 2:18
**Tuesday** [1] - 79:18
**turn** [14] - 4:13, 12:7, 12:10, 17:15, 76:19, 110:16, 114:14, 116:1, 119:12, 121:25, 123:7, 123:11, 125:12, 143:1
**turned** [3] - 114:13, 131:18, 166:9
**turnkey** [1] - 132:11
**turns** [2] - 15:9, 41:25
**twelve** [1] - 103:11
**two** [68] - 14:7, 27:9, 35:20, 39:7, 41:20, 42:9, 49:23, 51:6,

55:25, 56:11, 69:6, 72:14, 80:12, 80:19, 82:23, 82:24, 90:21, 94:11, 94:14, 96:17, 96:21, 99:5, 99:7, 99:11, 101:7, 102:19, 110:1, 110:2, 123:6, 123:23, 124:14, 125:7, 126:3, 127:13, 129:10, 129:17, 130:10, 135:3, 138:14, 145:15, 147:5, 149:6, 149:11, 152:1, 154:19, 162:10, 162:11, 163:1, 171:15, 174:4, 175:4, 180:19, 180:21, 180:23, 180:25, 188:8, 188:13, 188:20, 189:1, 189:7, 189:9, 196:18, 198:20
**type** [11] - 17:6, 20:4, 55:4, 133:8, 153:2, 153:5, 154:12, 169:22, 177:3, 177:4, 188:13
**types** [2] - 28:9, 153:11
**typical** [3] - 40:1, 66:22, 132:3
**typically** [4] - 93:16, 145:25, 162:17, 169:4

## U

**U.S** [1] - 106:19
**ultimately** [5] - 16:8, 134:17, 160:4, 184:24, 187:18
**unable** [2] - 15:12, 15:13
**unannounced** [1] - 27:23
**unapproved** [3] - 51:19, 155:24, 163:6
**Unauthorized** [1] - 156:15
**unclear** [2] - 27:8, 62:13
**uncover** [2] - 95:3, 96:7
**uncovered** [1] - 40:22
**UNDER** [1] - 3:11
**under** [52] - 17:7, 47:23, 48:13, 54:3, 76:5, 76:11, 79:21,

80:1, 82:9, 85:16, 85:19, 93:8, 93:12, 94:9, 94:17, 96:4, 96:25, 97:20, 100:24, 103:18, 118:16, 123:20, 123:24, 124:4, 124:6, 124:8, 124:11, 124:14, 124:15, 125:4, 125:9, 125:15, 127:4, 127:8, 127:9, 128:5, 128:10, 129:25, 134:1, 143:13, 144:7, 148:15, 150:5, 150:17, 150:23, 152:10, 152:17, 154:24, 186:15, 187:10, 187:15, 192:4

**understandably** [1] - 30:14
**undeveloped** [1] - 94:9
**unfortunately** [1] - 194:15
**uniforms** [1] - 179:12
**unilaterally** [1] - 14:2
**unit** [2] - 153:17, 179:11
**UNITED** [2] - 1:1, 1:11
**United** [1] - 1:16
**units** [7] - 127:22, 128:1, 187:7, 187:19, 188:5, 188:25, 189:11
**University** [3] - 81:19, 90:14, 169:1
**unless** [2] - 9:7, 9:19
**unlike** [1] - 194:7
**unmuted** [3] - 35:23, 36:2, 68:21
**unprotected** [1] - 135:13
**unrelated** [1] - 48:13
**unsealed** [1] - 135:13
**unshare** [1] - 83:23
**unworkable** [1] - 54:16
**up** [66] - 11:15, 11:19, 14:17, 18:19, 19:4, 19:25, 22:25, 36:9, 37:18, 39:20, 40:16, 40:18, 47:4, 49:16, 50:13, 51:23, 52:13, 53:15, 54:6, 56:22, 57:3, 61:8, 70:24, 95:3, 95:8, 95:15, 97:16, 97:20, 99:25,

101:13, 103:3, 104:22, 110:5, 110:8, 110:11, 110:13, 112:2, 116:4, 129:18, 129:20, 130:7, 130:19, 133:8, 133:22, 133:23, 136:22, 147:20, 149:15, 150:18, 151:12, 155:13, 157:15, 157:17, 158:4, 159:6, 162:22, 164:24, 170:25, 171:4, 171:25, 181:19, 181:25, 189:24, 192:3, 193:24
**upcoming** [2] - 109:7, 128:11
**update** [2] - 167:13, 197:8
**upset** [1] - 69:5
**uses** [1] - 154:10
**USPS** [1] - 106:21

---

## V

**Valentine** [1] - 15:2
**validity** [1] - 29:20
**varies** [1] - 132:3
**various** [4] - 37:7, 156:3, 177:6, 177:14
**vast** [1] - 94:16
**VCR** [1] - 7:5
**vehemently** [1] - 51:4
**vendors** [1] - 155:24
**verifications** [1] - 19:13
**verify** [3] - 18:25, 19:15, 159:2
**version** [2] - 106:9
**versions** [2] - 85:16, 85:17
**versus** [2] - 95:24, 159:19
**veteran** [1] - 45:17
**vetting** [1] - 137:3
**via** [1] - 99:23
**vice** [1] - 7:2
**VIDEO** [1] - 1:10
**video** [5] - 5:23, 32:10, 90:14, 90:16, 90:18
**view** [6] - 19:14, 29:24, 36:9, 50:2, 57:15, 190:8
**viewed** [2] - 60:3, 100:8
**violated** [5] - 15:22, 16:5, 16:8, 16:11,

16:14
**violating** [2] - 48:5, 48:14
**violation** [1] - 27:16
**violations** [5] - 46:4, 156:21, 157:4, 157:20, 160:5
**virtual** [1] - 6:20
**visit** [10] - 159:6, 162:17, 162:18, 162:24, 168:5, 168:7, 173:19, 179:1, 179:24, 181:1
**visitation** [1] - 83:17
**visitations** [1] - 81:22
**Visits** [1] - 156:15
**visits** [1] - 156:19
**voice** [1] - 6:20
**voir** [1] - 82:3
**volume** [2] - 11:15, 70:11
**VOLUME** [1] - 1:7
**volumes** [1] - 57:14
**vote** [1] - 25:21
**vs** [1] - 1:6

---

## W

**wait** [11] - 13:14, 21:18, 29:17, 47:2, 62:22, 71:15, 75:6, 83:21, 136:1, 180:11, 194:2
**waiting** [1] - 179:14
**waivable** [1] - 25:6
**walk** [1] - 50:7
**wants** [7] - 9:7, 29:22, 29:25, 53:12, 54:4, 142:25, 194:2
**warning** [1] - 70:24
**warranted** [1] - 59:20
**water** [4] - 53:5, 169:12, 170:2, 179:8
**WATSON** [1] - 33:19
**Watson** [3] - 2:21, 7:10
**ways** [1] - 48:12
**wearing** [3] - 158:5, 170:19, 171:15
**Weathers** [14] - 80:22, 80:23, 81:1, 82:17, 83:24, 168:7, 168:20, 173:22, 174:7, 174:10, 174:11, 174:14, 179:22
**weaving** [1] - 59:10
**wedding** [1] - 193:13
**Wednesday** [8] - 13:22, 14:18, 16:12,

49:21, 179:4, 179:16, 179:21, 181:1
**weeds** [1] - 53:17
**week** [4] - 41:17, 78:23, 83:25
**week's** [1] - 8:11
**weekend** [4] - 193:6, 197:9, 199:7, 199:8
**weekly** [1] - 177:14
**weeks** [4] - 14:24, 162:10, 162:11, 163:1
**weigh** [3] - 34:13, 170:23, 195:8
**weight** [1] - 71:20
**Weis** [4] - 110:12, 112:3, 114:4, 165:11
**welcome** [4] - 7:18, 7:20, 54:9, 54:13
**WESTERN** [1] - 1:2
**whereas** [1] - 92:13
**white** [1] - 175:3
**whole** [5] - 55:24, 56:23, 78:22, 120:3, 165:12
**wholeheartedly** [1] - 198:23
**widow** [1] - 142:18
**William** [4] - 78:6, 78:15, 79:12, 79:16
**wisdom** [1] - 29:18
**wish** [15] - 17:11, 17:17, 21:18, 23:21, 23:22, 24:6, 24:23, 29:21, 32:11, 33:25, 70:9, 89:10, 104:9, 163:23, 173:19
**withdraw** [10] - 22:23, 23:21, 23:23, 24:23, 26:6, 35:6, 39:14, 140:8, 141:5
**withdrawing** [2] - 24:17, 25:1
**withdrawn** [5] - 25:2, 25:3, 26:2, 26:17, 116:16
**WITNESS** [8] - 75:20, 75:23, 76:8, 76:12, 76:16, 139:5, 145:4, 186:25
**witness** [19] - 7:9, 7:11, 11:20, 18:10, 18:14, 30:21, 44:19, 69:3, 82:3, 105:10, 135:18, 138:18, 144:6, 144:8, 144:9, 144:17, 193:10, 198:3, 198:5
**Witness** [1] - 76:2

**witness's** [1] - 192:22
**WITNESSES** [2] - 3:2, 3:8
**witnesses** [9] - 4:13, 5:15, 8:20, 12:4, 37:5, 37:23, 47:25, 69:3, 194:9
**woman** [1] - 142:17
**wonder** [1] - 60:11
**word** [4] - 36:16, 52:3, 59:18
**words** [5] - 44:19, 53:16, 93:7, 106:6, 154:1
**works** [5] - 157:24, 168:20, 173:22, 184:18, 185:12
**world** [1] - 198:8
**worry** [2] - 46:21, 48:14
**worse** [2] - 63:25, 143:24
**writing** [5] - 99:10, 99:23, 104:8, 104:9, 140:25
**written** [6] - 99:18, 103:10, 103:17, 119:22, 140:9, 141:4
**wrote** [2] - 113:17, 152:24

---

## Y

**year** [18] - 40:5, 65:16, 65:17, 79:12, 99:6, 102:19, 108:7, 109:22, 110:1, 124:6, 129:8, 156:9, 156:12, 162:3, 182:13, 182:22, 186:22, 186:23
**years** [13] - 40:4, 41:21, 50:4, 77:14, 78:16, 91:9, 99:8, 99:11, 110:1, 119:18, 130:10, 149:11
**yeast** [2] - 169:21, 169:22
**yellow** [3] - 164:21, 164:22, 177:11
**yes/no** [1] - 165:5
**yesterday** [16] - 13:18, 15:4, 15:5, 15:25, 17:1, 36:13, 37:15, 42:14, 47:18, 48:4, 49:22, 57:21, 73:13, 81:15, 140:7, 172:24
**yourself** [3] - 93:10, 174:18, 192:23

## Z

**Zoom** [4] - 5:25, 73:8, 81:4, 98:13
**Zyair** [3] - 178:6, 178:7
**Zyair's** [1] - 178:10