1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

KAM DEVELOPMENT, LLC,                    Case No. 3:20-CV-02024-JJH
                                         Toledo, Ohio
          Plaintiff,

     vs.                                 **THURSDAY, OCTOBER 8, 2020**

MARCO'S FRANCHISING, LLC,                **\*\* VOLUME 4 OF 4 \*\***
                                         **(Pages 389-573)**
          Defendant.


**REDACTED** TRANSCRIPT OF VIDEO EVIDENTIARY HEARING PROCEEDINGS
          BEFORE THE HONORABLE JEFFREY J. HELMICK
                UNITED STATES DISTRICT JUDGE




Official Court Reporter:   Stacey L. Kiprotich, RMR, CRR
                           United States District Court
                           1716 Spielbusch Avenue, Suite 120
                           Toledo, Ohio 43604
                           (419) 213-5520




Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1    APPEARANCES:

2

3    For Plaintiff:          **Brent M. Davis, Esquire,**
                             **Justin M. Klein, Esquire,**
4                            Marks & Klein
                             63 Riverside Avenue
5                            Red Bank, New Jersey 07701
                             732-747-7100
6

7                            **Nicholas A. Huckaby, Esquire**
                             Shumaker, Loop & Kendrick
8                            1000 Jackson Street
                             Toledo, Ohio 43604
9                            419-321-1307

10   Also Present:           Andrew Joseph Hunter
                             Mike Hunter
11

12                                 -   -   -

13

     For Defendant:          **W. Barry Blum, Esquire,**
14                           **Aaron S. Blynn, Esquire,**
                             Genovese Joblove & Battista
15                           100 Southeast Second Street, 44th Floor
                             Miami, Florida 33131
16                           305-349-2300

17

                             **Carrie E. Thiem, Esquire,**
18                           Tucker Ellis
                             175 South Third Street, Suite 520
19                           Columbus, Ohio 43215
                             614-358-9717

20

     Also Present:           Tony Libardi, President and COO
21                           Todd Watson, General Counsel

22

23

24

25

1
                              **I N D E X**

2

        **PLAINTIFF'S WITNESSES**                              **PAGE**
3

        (NONE)
4

5

6       **DEFENDANT'S WITNESSES**                              **PAGE**

7       1.  ANTHONY MICHAEL LIBARDI
              CONTINUED DIRECT EXAMINATION BY MR. BLUM:     392
8             CROSS-EXAMINATION BY MR. DAVIS:               464
              REDIRECT EXAMINATION BY MR. BLUM:             497
9             RECROSS-EXAMINATION BY MR. DAVIS:             501
              FURTHER REDIRECT EXAMINATION BY MR. BLUM:     504
10

11      2.  ASHLEY WEIS
              DIRECT EXAMINATION BY MR. BLUM:               518
12            CROSS-EXAMINATION BY MR. DAVIS:               543
              REDIRECT EXAMINATION BY MR. BLUM:             550
13

14

        **REDACTED PAGES FILED UNDER SEAL:**
15

        PAGE 394, LINE 13 THROUGH PAGE 401, LINE 6
16      PAGE 412, LINE 18 THROUGH PAGE 416, LINE 24
        PAGE 466, LINE 18 THROUGH PAGE 469, LINE 1
17      PAGE 498, LINE 10 THROUGH PAGE 498, LINE 23

18

19

20

21

22

23

24

25

**Libardi (Continued Direct)**

**Thursday, October 8, 2020**

1

**- - -**

2

**(Proceedings commenced at 11:46 a.m.)**

3

**- - -**

4

11:46:59  5       THE COURT:  So, Angela, are you good tagging

6  out at this point?

7       MS. NIXON:  Yep.  Glad everything is okay,

8  Stacey.

9       THE COURT:  Thanks very much, Angela.

11:47:10  10       MS. NIXON:  No problem.

11       THE COURT:  Stacey, I think you may owe Angela

12  one, just saying.

13     But why don't we move forward with Mr. Blum's

14  questioning whenever he's ready.  Sorry for the

11:47:22  15  interruption, Mr. Blum.

16   **CONTINUED DIRECT EXAMINATION OF ANTHONY MICHAEL LIBARDI**

17  **BY MR. BLUM:**

18  **Q**     All right, sir.  Mr. Libardi, in the AR Agreement, an

19  Area Representative Agreement or an Area Representative

11:47:40  20  Manual, does Marco's dictate what hours their office has to

21  be open or where their office is or how big their office is

22  or anything to that effect?

23  **A**     No, sir.

24  **Q**     Does it -- does it dictate what kind of clothes they

11:48:06  25  where when they are in the office?

**Libardi  (Continued Direct)**

1     **A**      No, sir.

2     **Q**      Does it dictate which local brokers or developers it

3     can communicate with?

4     **A**      No.  We don't dictate who they have to deal with, no,

11:48:18  5     sir.

6                     MR. BLUM:  And excuse me one second, Your

7     Honor.  I was having a technology problem that Mr. Blynn may

8     be able to help me with.  One second.

9                     THE COURT:  Sure.

11:48:59 10                     (Pause in the proceedings)

11                     MR. BLUM:  Okay.  Thank you, Your Honor.  As

12    expected, I think Mr. Blynn has helped us out here.

13    **BY MR. BLUM:**

14    **Q**      I'm going to try to share.  Does that work there?  I'm

11:49:26 15    showing you the -- make it a little smaller -- the Area

16    Representative Manual.  This is actually Plaintiff's

17    Exhibit 5.  Do you recognize this document?  It's 140 pages

18    long, but do you recognize this?  It appears to be the

19    current Area Representative Manual for Marco's.

11:49:46 20    **A**      I do, sir.

21                     MR. DAVIS:  Your Honor, can I just ask for a

22    clarification?  Plaintiff submitted this document under the

23    anticipated protective order because the Area Representative

24    Manual clearly states, I think on the second or third page,

11:50:07 25    that KAM is required to keep its contents confidential.

**Libardi (Continued Direct)**

1      Is Marco's waiving that so we don't have to go to a

2   confidential portion of the record?

3               THE COURT:  Mr. Blum.

4               MR. BLUM:  No, Your Honor.  We would like

11:50:22  5   to -- in fair form, we would like to keep this confidential

6   and stay consistent with the order that I guess will be

7   entered in the same thing.

8               THE COURT:  All right.  And subject to that

9   order, I'll just indicate to Stacey:  Please mark this

11:50:38 10   portion of the transcript accordingly pursuant to our past

11   practice with regard to these matters.  And from there, you

12   can resume when you're ready, Mr. Blum.

13

14

15

16

17

18

19

20

21

22

23

24

25

Libardi  (Continued Direct)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Libardi  (Continued Direct)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Libardi  (Continued Direct)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Libardi  (Continued Direct)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Libardi  (Continued Direct)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Libardi  (Continued Direct)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Libardi  (Continued Direct)**

**BY MR. BLUM:**

**Q**    All right.  Mr. Libardi, when is it that you first learned that the Hunters, Andy Hunter and Mike Hunter, had got involved in some agreement with the Jeremiah's Italian Ice System?

**A**    I don't recall the exact date, but it would be late July, I suspect, early August.

**Q**    Okay.  And how is it that you came across that information?

**A**    Oh.  We were told by a franchisee within the Hunters' territory that the Hunters became area reps for Jeremiah's Ice.

**Q**    And you didn't know that before that time?

**A**    No, sir.

**Q**    Okay, sir.  And did you or anyone else at Marco's inquire to the Hunters about whether this information was accurate?

**A**    Yes, sir, multiple times.

**Q**    Okay.  And can you explain what happened there?

**Libardi  (Continued Direct)**

1    **A**      Well, I will share my experience with them when I

2    asked the previous conversations Andy Hunter had with part

3    of the executive team and why they refused to answer whether

4    or not they were area representatives for Jeremiah's.  And

12:02:48  5    when I asked Andy the question why do they refuse to answer,

6    he gave that answer in his testimony:  He said, "Because

7    it's none of your business."

8    **Q**      Okay.  And in your view, was it, quote, "your

9    business" if the Hunters were involved as area

12:03:09  10   representatives for a different concept?

11   **A**      Yes, sir, absolutely.

12   **Q**      Why is that, sir?

13   **A**      Well, because we place a lot of loyalty and trust in

14   or area reps.  They have access to vital information of our

12:03:23  15   franchisees, our locations, our sales volumes, our

16   profitability, our balance sheets across their entire

17   territory, as well as all of our goodwill, assets, manuals,

18   training platforms, communications.  They have access to all

19   of that.  So, again, there is a high level of loyalty and

12:03:44  20   trust that's associated with area reps.  And, again,

21   performing the same role for another company in the same

22   territory is just not acceptable.

23   **Q**      And are there concerns, sir, at Marco's about

24   confidentiality of information?

12:04:05  25   **A**      Yes, sir.  We can say it is by chance or dumb luck,

**Libardi  (Continued Direct)**

1    but the two Jeremiah's Ice that we know of being developed,

2    one is inside a Marco's in the Tennessee Slices area by Brad

3    Davis.  They approached one of our franchisees and sold a

4    Jeremiah's Ice to that franchisee, and they are demising the

12:04:26  5    current Marco's to a smaller footprint to accommodate the

6    Jeremiah's Ice.

7         The second location we know about in Spring, Texas, is

8    next door to a Marco's Franchising in the same plaza.

9    Again, it could be convenience, but I suspect not.  And so,

12:04:42 10    again, we know of franchisees that were approached by the

11    now known four area representatives, to include the Hunters,

12    about becoming franchisees for Jeremiah's Ice, in direct

13    conflict of what their obligation to Marco's is.

14              MR. DAVIS:  Objection, Your Honor.  I would

12:05:03 15    like that entire answer stricken on this.

16         Mr. Libardi just testified, if I understood his

17    testimony correctly, that none of those things were done by

18    the Hunters; so I don't see what the relevance is.

19              THE COURT:  Mr. Blum.

12:05:17 20              MR. BLUM:  The issue is -- well, we don't know

21    if anything has been done by the Hunters.  But the issue is

22    what is the concern of Marco's and why does an area

23    representative or its operating partners being the area

24    representatives of another thing, why is it inconsistent

12:05:36 25    with the role of devoting full time, and best efforts to

**Libardi  (Continued Direct)**

1    Marco's.  Mr. Hunter's question was "We just got this off

2    the ground.  We haven't done this," but, you know, there's a

3    10-year term.  So it's really why is this critical to

4    Marco's and why is it -- why does it affect the AR

12:06:01  5    relationship, impact it.

6              MR. DAVIS:  May I respond, Your Honor?

7              THE COURT:  Well, sure.  Go ahead.

8              MR. DAVIS:  As Mr. Blum just said, "We don't

9    know what the Hunters did."  So what another AR that may be

12:06:16  10    involved in Jeremiah's did, none of that can be placed upon

11    the Hunters.  They didn't take that action.  This hearing is

12    about the Hunters, and I think it should be limited to what

13    the Hunters did.

14              MR. BLUM:  Your Honor -- I'm sorry.  Mr.

12:06:29  15    Davis, you finished there?

16              MR. DAVIS:  I assume I am now, so go ahead.

17              MR. BLUM:  Your Honor, it's not just about the

18    Hunters.  It's about whether what the Hunters have done and

19    these other people have done is a breach of the AR

12:06:46  20    Agreement.  And the examples for the other folks explain why

21    it is an inconsistent position to be in, so it --

22              THE COURT:  Mr. Blum, with that clarification,

23    I'm going to overrule the objection and allow it for the

24    limited purpose of explaining from Mr. Libardi, why

12:07:05  25    generally he might have concern on behalf of Marco's with

**Libardi (Continued Direct)**

1    regard to those other relationships, clearly noting that it

2    doesn't apply to the Hunters specifically in this case as

3    developed.

4                    MR. BLUM:  All right.

12:07:21  5                    THE COURT:  So I understand the purpose for

6    which it was offered and that it is limited in terms of how

7    it might affect or not affect what the Hunters did or did

8    not do -- KAM did or did not do in this case.  You can

9    proceed.

12:07:35  10                    MR. BLUM:  Fair enough.

11   **BY MR. BLUM:**

12   **Q**    Mr. Libardi, you said that you learned about the

13   Hunters being a Jeremiah's area representative from a

14   franchisee; is that correct?

12:07:51  15  **A**    That's correct, yes, sir.

16   **Q**    Was that franchisee in one of the Hunters'

17   territories?

18   **A**    Yes, sir.

19   **Q**    Okay.  And, sir, does the very fact that that

12:08:02  20  franchisee was aware of the Hunters now being involved as an

21   area representative of Jeremiah's create any concerns for

22   Marco's as to the Hunters' ability to comply with the

23   requirements of the Area Representative Manual regarding

24   culture and leadership and development, et cetera?

12:08:25  25                    MR. DAVIS:  Objection; calls for speculation.

**Libardi  (Continued Direct)**

1    If he wants to testify to anything that KAM or the Hunters

2    have done, that's one thing.  But to speculate what might

3    happen isn't proper.

4            THE COURT:  I will sustain as asked, the

12:08:41  5    objection.

6    **BY MR. BLUM:**

7    **Q**    All right.  Sir, does the fact that a Marco's

8    franchisee who is in the Hunters' territory and thus is

9    being represented or is being supervised or managed by the

12:09:05 10    Hunters as the area representative, does the fact that that

11    person knows the Hunters are with Jeremiah's create concerns

12    for you as to the Hunters' ability to perform under their

13    Area Representative Agreement?

14            MR. DAVIS:  Same objection, Your Honor.  It is

12:09:27 15    still calling for speculation.

16            THE COURT:  I'm going to overrule it.  I will

17    allow him to answer.

18    **A**    It is my belief that inevitably they will be calling

19    winners and losers.  For example, when there is a great site

12:09:47 20    available in their territory, who gets it?  Is it Marco's?

21    Or is it Jeremiah's Ice?  If there's a great candidate

22    available, who gets that candidate?  Is it Marco's?  Or is

23    it Jeremiah's Ice?

24        They have access, as I said, to every store's sales

12:10:07 25    levels, day part sales levels.  They have access to profit

**Libardi  (Continued Direct)**

1    and loss statements to all of our franchisees.  They have

2    access to balance sheets of all of our franchisees.  They

3    know where available capital may be within the franchisee

4    footprint that they operated.

12:10:26  5         And so soliciting potentially franchisees -- and,

6    again, we know its happened, not by the Hunters at this

7    point, but we know its happened with other area reps from

8    Jeremiah's to Marco's where they've solicited our

9    franchisees to build Jeremiah's Ice rather than what their

12:10:45 10   obligation to their contract is, to build another Marco's,

11   and the growth of Marco's.  So it is in direct conflict, as

12   would be, by the way, if you bring that down to the retail

13   level.  They can't -- a franchisee can't own and operate

14   another Domino's, as a good example, for the same reasons.

12:11:08 15   **Q**    Is that because at the retail level, Domino's and

16   Marco's Pizza are direct competitors; correct?

17   **A**    That's correct, yes.

18   **Q**    Okay.  And do you consider that Marco's is a direct

19   competitor of Jeremiah's Ice at the area representative or

12:11:28 20   franchisee or franchise development level?

21   **A**    Yes, sir.  As an example, Andy Hunter testified that

22   his father was a Subway franchisee.  We recruited his father

23   as an area rep and a franchisee for Marco's.  There's no

24   conflict there at the franchisee level.  He was not an area

12:11:45 25   representative for Subway, which would have been a conflict.

408

**Libardi (Continued Direct)**

1    And so, again, yes, there is a conflict because the role is

2    selling franchises, and that's what they sell as area reps

3    as part of their responsibilities, and it is the same at

4    Jeremiah's, same candidates, same development, the same

12:12:05  5    capital structure.

6              MR. DAVIS:  Objection.  Just called for

7    opinion testimony, Your Honor.

8              THE COURT:  I disagree.  Overruled.  I will

9    allow it.

12:12:15 10    **Q**    Thank you, sir.  All right, sir.  You testified that

11    you have learned that there are perhaps four Marco's area

12    representatives who at one point, at least, had signed up as

13    area representatives for Jeremiah's; is that right?

14    **A**    That's correct.

12:13:06 15    **Q**    Okay.  Sir, did any of those area representatives

16    contact you or anyone else at Marco's in advance of signing

17    the Area Representative Agreement with Jeremiah's?

18    **A**    No, sir.

19    **Q**    Okay.

12:13:19 20              MR. DAVIS:  Objection, Your Honor.  So sorry

21    to keep having to object, but why are we talking about

22    anybody but KAM and the Hunters?

23              THE COURT:  Mr. Blum.

24              MR. BLUM:  Because, again, Your Honor, this is

12:13:31 25    about the Area Representative Agreement and the area

**Libardi (Continued Direct)**

1    representative relationship, and they are all signing the

2    same system.  And it's whether -- it all goes to Marco's

3    understanding of what the area representative relationship

4    means and whether it's been breached by anyone signing an

12:13:56  5    area representative with someone else.

6                   THE COURT:  Is it Marco's position that the

7    agreement provides some form of exclusivity that would

8    prohibit the Hunters in engaging in possibly being area reps

9    or franchisees or developers from another franchise or

12:14:14  10    from --

11                   MR. BLUM:  Yes, Your Honor, it is.

12                   THE COURT:  -- another organization?

13                   MR. BLUM:  It is.  The testimony will be, and

14    has been, and arguments made, that the Area Representative

12:14:29  15    Agreement requires that the operating partners or the

16    Hunters -- not any employees of theirs -- manage the

17    business on a full-time basis, and that those same people

18    also devote full time, energy, and best efforts to promoting

19    the Marco's brand.

12:14:49  20        And as Mr. Libardi's testimony began to establish,

21    that that is not possible.  By "full time" there, he's

22    talking about hours, but also to devote full time, energy,

23    and best efforts.  Because at some point they have the same

24    obligation to devote the best efforts to growing the

12:15:12  25    Jeremiah's brand, and those two things are inconsistent.

**Libardi (Continued Direct)**

1        And all I was going to do -- I can limit it to the

2    Hunters, Your Honor.  My question was have any of these

3    people, including the Hunters, come to Mr. Libardi in

4    advance and said, "We're going to do this.  Is this okay?"

12:15:29 5    What would have been Marco's response?

6                    THE COURT:  Mr. Davis.

7                    MR. DAVIS:  If that's the limited purpose,

8    he's already asked Mr. Libardi if the Hunters told them at

9    any time before they were asked.  So if that's the purpose,

12:15:42 10    it's been covered, so I would add asked and answered as part

11    of it.

12                    MR. BLUM:  I did ask if he told them in

13    advance.  But the question was:  Had the Hunters come to him

14    in advance and said, "We are going to sign up as an area

12:15:54 15    representative for Jeremiah's.  Is that okay with Marco's?

16    Is that consistent with your expectations of us?  Is that

17    consistent with our agreement?"  I want to explore what Mr.

18    Libardi would have said and why.

19                    MR. DAVIS:  That's a completely different

12:16:10 20    question than what I objected to, Your Honor.  His question

21    was, "Did they approach."

22                    THE COURT:  Right.  I suppose, I mean, one is

23    it may or may not be speculative or a hypothetical.  The

24    other one is "Did they approach?"  And so why don't you ask

12:16:27 25    that question, moving forward.

411

**Libardi (Continued Direct)**

1          MR. BLUM:  I think I did say, "Did they

2    advance."

3    **BY MR. BLUM:**

4    **Q**    Did the Hunters specifically approach you before they

12:16:37 5    signed with Jeremiah's?

6    **A**    No, sir.

7    **Q**    Okay.  And my question is:  Had they done so, would

8    you have approved or would you have said that that is

9    consistent with the obligations under the AR Agreement?

12:16:54 10          MR. DAVIS:  Objection; calls for speculation.

11          MR. BLUM:  From Marco's point of view.

12          THE COURT:  I will permit it.  I will permit

13    it.  Overruled.

14    **A**    I'm sorry.  Could you ask the question again, Barry?

12:17:06 15    **Q**    Had the Hunters, specifically, come to you in advance

16    of signing with Jeremiah's and said, "Mr. Libardi, we are

17    going to sign an Area Representative Agreement with

18    Jeremiah's Italian Ice for Columbia and Charlotte, would you

19    have explained to them that that was or was not consistent

12:17:33 20    with the AR Agreement with Marco's?

21    **A**    Yes, sir.  I would have raised the same objections.

22    **Q**    Okay.  And is that for the reasons you explained about

23    before that you talked about earlier -- I don't want to put

24    words in your mouth -- that there is an inconsistency in

12:17:50 25    representing two different brands at the same level?

**Libardi  (Continued Direct)**

1    **A**    I would argue it's not possible.

2    **Q**    It's not possible for them to devote full time,

3    energy, and best efforts and full-time management to the

4    Marco's AR business, if they are representing as the area

12:18:18  5    representative of a different brand in the same market?

6    **A**    Correct.

7    **Q**    All right, sir.  I don't know if we put this up, but

8    have you been made aware that the Jeremiah's --

9    MR. BLUM:  I want to talk specifically about

12:18:49  10    some provisions of the Jeremiah's Agreement, Your Honor.  I

11    don't know if this needs to be marked confidential or not.

12    MR. DAVIS:  Yes, Your Honor.  We designated

13    the Jeremiah's contract confidential.  So, yes, we would

14    like this testimony to be marked confidential.

12:19:06  15    THE COURT:  It will be so marked moving

16    forward.  Thank you.

17    MR. BLUM:  Okay.  Thank you.

18

19

20

21

22

23

24

25

**Libardi  (Continued Direct)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Libardi  (Continued Direct)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Libardi  (Continued Direct)**

 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Libardi  (Continued Direct)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    BY MR. BLUM:

**Libardi  (Continued Direct)**

1    **Q**    Sir, are operations, evaluations, and support an

2    important part of the area representative's role from

3    Marco's perspective?

4    **A**    Yes, sir, very important.

12:27:24  5    **Q**    And in your experience, I think you testified 30 or

6    35 years in the restaurant business, and in your tenure at

7    Marco's, is coaching, training, and evaluation of sort of

8    newer franchisees different than it is for more experienced

9    franchisees?

12:27:49  10    **A**    Yes, of course.  Somebody that may be new to the

11    industry may not understand the importance, as an example,

12    of time and temperatures to product, may not understand how

13    the systems integrate in order to be efficient and provide

14    the correct experience to the consumer.  So they require

12:28:06  15    more of what we call shoulder-to-shoulder training where

16    it's the tell-show-do model, right.  Let me show you -- let

17    me tell you what it's supposed to look like, let me show you

18    what it looks like, and now you demonstrate that you got it.

19    And that takes more time than somebody that may be

12:28:23  20    multi-unit, has been in the business a long time, and they

21    understand all those intricacies, and they can do the job

22    themselves in those cases.

23    **Q**    And is that something that is sort of a judgment call,

24    either for the Marco's employee in the market or for an area

12:28:48  25    representative, as to how much coaching one franchisee needs

1    versus another?

2    **A**    I mean, it is a judgment call, but it's more of an

3    interpretation of the circumstances really, right, and

4    you've got to have the sophistication to know what you're

12:29:05  5    looking at and what's required to fix it or amend it in some

6    way.

7    **Q**    Okay.  Sir, could you very briefly explain what an

8    area representative is required to do in conducting OSE

9    visits, which are Operations Systems Evaluations visits?

12:29:28 10    **A**    Yes.  They are to conduct the physical evaluation,

11    which is a digital program that allows them to answer

12    roughly 500 yes/no questions that really are touch points to

13    each of the operating systems that verifies for the system

14    that the operation -- operational system that's being

12:29:53 15    evaluated is being executed correctly.

16        As an example, the cleaning system.  I highlighted

17    this last time, the cleaning system, which has many tools

18    and chemicals and those kinds of things that need to be

19    executed correctly in order to provide a clean

12:30:13 20    establishment.  What the OSE does is, as the evaluator, is

21    going through and clicking yes or no.  Is this clean?  Yes

22    or no.  Is this clean?  Yes or no.

23        The system is sophisticated enough to know.  As it

24    connects the dots to the number of nos to a particular tool

12:30:33 25    within the platform, it highlights that tool or that

**Libardi (Continued Direct)**

1    operating system as being deficient or underutilized or not,

2    not executed at all. And it produces an action plan.

3         And it's at that time that the consulting, influencing

4    and coaching really is applied by the evaluator where you

12:30:48  5    really want to, you know, in the case of a newer franchisee,

6    you may want to do the visit with them so they're

7    understanding what you're looking at and how you're

8    evaluating it. But when it's complete, sitting down with

9    the franchisee and going through it in more detail and

12:31:04  10   gaining agreement on what the priorities are to work on over

11   the next 60 days until the next evaluation is done; creating

12   a smart action plan with alignment of that franchisee or

13   operator of that store; and commitment that it will be done.

14        And, again, if there is something more significant, as

12:31:23  15   if the franchisee isn't aware of how a system may operate,

16   the franchisee may schedule time with the area rep or one of

17   their employees to do some specialized training on a

18   particular system, procedure, or tool. So it's a lot of

19   consulting, coaching, and influencing beyond just the

12:31:42  20   physical inspection.

21   **Q**    And in an AR territory, all of that teaching,

22   coaching, and evaluation, it's all done by the AR as opposed

23   to Marco's at that point, correct?

24   **A**    Correct.

12:31:56  25   **Q**    All right. And, now, if there is an OSE conducted by

**Libardi  (Continued Direct)**

1    an area representative that raises concerns or issues about

2    a franchisee's performance, who notifies the franchisee of

3    the deficiency or default under the franchise agreement?

4    **A**    Marco's Franchising does.

12:32:26  5    **Q**    How is it that Marco's Franchising, LLC learns of the

6    deficiency or the default or the failure to follow up on an

7    action plan or whatever it might be?

8    **A**    It is the area rep's obligation, as identified any the

9    Area Rep Manual, to notify the franchisor of the deficiency.

12:32:49  10   **Q**    Okay.  And you are familiar with the deficiency notice

11   process and the default notice process at Marco's?

12   **A**    Yes, sir.

13   **Q**    And I think -- I'm not sure we went over this on

14   Friday.  But in an AR market where the AR actually operates

12:33:07  15   stores through affiliated and these -- which I think the

16   Hunters have approximately nine or ten -- who is it that

17   does the evaluations, the OSEs for the AR's affiliated

18   locations?

19   **A**    The area rep conducts it on their own stores.

12:33:29  20   **Q**    Okay.  So then they have -- they essentially evaluate

21   themselves; correct?

22   **A**    Yes, sir.

23   **Q**    And when you talk about an action plan, can you very

24   briefly just explain what the action plan requires and what

12:33:46  25   obligation it creates among the franchisee or the AR or

**Libardi  (Continued Direct)**

1   Marco's?

2   **A**     Sure.  It's not complicated.  It identifies a

3   deficiency in the operating system process or tool.  It then

4   calls for an action to improve, and what is that action and

12:34:02  5   is it smart; and then who is it assigned to and what's the

6   deadline for it to be completed.  And when it's completed,

7   there's an area for the person that completed it to go in

8   and check it as complete for a follow-up mechanism to the

9   area rep.

12:34:16 10   **Q**     Okay.  And then if there is something on -- an example

11   might be a certain part of the store is not clean.  It might

12   be on the action plan, "clean it," and the night restaurant

13   manager might have the responsibility.  They mark it "done."

14   So how is it that it's checked to see if, in fact, the

12:34:40 15   person that was responsible for doing that, in fact, did it?

16   **A**     So let me correct a bit of your statement or your

17   question.

18        It's not a question of whether there is a part of the

19   restaurant that's dirty.  If there is sufficient symptoms of

12:34:54 20   a dirty restaurant, it will flag the system that generates a

21   clean restaurant.  And it's that system, when executed

22   correctly, that will cure the default or cure the

23   deficiencies in the cleanliness.  And so the action plan

24   would identify, as an example for cleanliness, that perhaps

12:35:12 25   the opening manager and the team members or the closing

**Libardi  (Continued Direct)**

1  manager and the team members need to be trained on the

2  opening checklist or the cleaning checklist or the

3  temperature logs or how to execute on the chemicals in the

4  stores and what tools to use when cleaning and how to

12:35:31  5  schedule it correctly.

6      So it really is focused on the behaviors that drive a

7  clean restaurant.  It's not intended to say, "Your proofer

8  is dirty, therefore, clean your proofer."  In that case, the

9  evaluator becomes the system; right?  I have to come in

12:35:46  10  every day and give you a list of things to clean in the

11  absence of not executing the system that would tell them

12  that.

13  **Q**    All right.

14  **A**    And it is the AR's responsibility to know when those

12:35:59  15  deadlines are and whether or not they've been completed, and

16  that's why digital automated platform that the ARs have

17  access -- ready access to of all of their stores, an

18  enterprise-level reporting platform.

19  **Q**    All right, sir.  And so the last, maybe, on this

12:36:21  20  question is:  So if there is sort of a deficiency that is

21  recurring, is not being addressed at the store level, does

22  Marco's depend on the area representatives to push that up

23  to Marco's to perhaps enforce the franchise agreement more

24  directly?

12:36:49  25  **A**    If the area rep is unable to correct it, meaning

**Libardi (Continued Direct)**

1   through coaching or influencing or training, and it's a

2   recurring issue, they are obligated to escalate it to the

3   franchisor, Marco's Franchising.

4   **Q**     Including at their own affiliated stores; correct?

12:37:07  5   **A**     Including their own affiliated stores.

6   **Q**     All right, sir.  Mr. Libardi, you are familiar with

7   the issues regarding the July 24 Notices of Default that

8   went out to KAM for operations issues at their affiliated

9   restaurants; correct?

12:38:03  10            MR. DAVIS:  Objection, mischaracterizes the

11   document.  The July 24th communication was a Notice of

12   Deficiency; it is not a Notice of Default.

13            THE COURT:  Mr. Blum.

14            MR. BLUM:  Actually, it's labeled Notice of

12:38:15  15   Deficiency, but it declares them in default, Your Honor.  So

16   I will say the July 24 letter to KAM.

17            THE COURT:  All right.  As corrected, it is

18   certainly permissible.  You can proceed.

19   **A**     I am familiar with it, yes, sir.

12:38:29  20   **Q**     Okay, sir.  And are you also familiar with the

21   follow-up August 31 Notices of Deficiencies that were sent

22   to the franchise locations at issue with those notices;

23   correct?

24   **A**     They were the second notice for those locations, yes,

12:38:56  25   sir, on August 31st, or August 30th.

424

**Libardi (Continued Direct)**

1    **Q**    And in your view -- well, let me pull it up.

2        In your view, sir, is it important for an area

3    representative doing a follow-up OSE -- to ensure a

4    franchisee's compliance -- to do that OSE truthfully so

12:39:29  5    Marco's has a true picture of what's going on in the

6    location?

7    **A**    Critically important.

8    **Q**    Okay.  Sir, in the instances of at least four of

9    KAM-affiliated franchises, is it your understanding that the

12:39:49 10    follow-up OSE visits after July 4th, during the month of

11    August, were done appropriately, and truthful information

12    was provided to Marco's?

13    **A**    I do not believe that.

14    **Q**    And why is that, sir?

12:40:03 15    **A**    Well, the data tells us that there's inconsistencies

16    in what was evaluated or what the determining evaluation was

17    versus what the statistics tell us it is.  And, again, it is

18    very rare in the case of one store to see a 3,400 basis

19    point improvement in a systems evaluation through one OSE

12:40:30 20    cycle.

21    **Q**    You're talking about the one store that went from,

22    like, a 59 to 93 in the follow-up?

23    **A**    94.3, yes, sir.

24    **Q**    Okay, whatever it was.  I'm sorry.

12:40:44 25        All right, sir.  And in your view, is it incumbent

**Libardi (Continued Direct)**

1    upon Marco's in such a situation, when it is concerned about

2    the follow-up, to verify the veracity of the OSE that was

3    done by the AR of its own facility?

4    **A**    Very common practice, yes, sir.

12:41:09  5    **Q**    All right.  And why is it that Marco's needs to do

6    that, sir?

7    **A**    We want to verify that the store is operating

8    correctly and safely.

9    **Q**    Okay.  Were you aware of the fact that a Marco's

12:41:29  10    representative was going to visit the KAM-affiliated

11    franchises on September 30 and October 1 I believe the day

12    is to follow up on the operational issues at those stores?

13    **A**    Yes, sir, I was aware.

14    **Q**    All right.  And do you believe that was something that

12:41:56  15    Marco's was obligated to do?

16    **A**    I do.

17    **Q**    Okay.  And were you made aware of the results of those

18    visits by the Marco's representative who visited the stores

19    on September 30 and October 1?

12:42:18  20    MR. DAVIS:  Objection, Your Honor.  I don't

21    know if I need to go through all the grounds.  This is the

22    objection that began on hearing day number one, that any

23    evidence regarding these inspections are irrelevant because

24    they weren't -- they are not related to the three Notices of

12:42:46  25    Default that were issued in each of the Columbia and

**Libardi  (Continued Direct)**

1    Charlotte NODs.  And we would further add the objection they

2    are irrelevant because these stores have all been

3    reopened -- I'm sorry -- the store that was shut down was

4    reopened within a few days at most of when Marco's could get

12:43:08  5    another representative out there to do the follow-up

6    inspection.

7        And, third, these are, again, franchisee-level

8    deficiencies.  And if Marco's is taking the position that

9    the KAM-related franchisees are related to this matter, then

12:43:31 10   we would probably more forcefully think that the

11   interference would be a violation of the TRO.

12            THE COURT:  Mr. Blum, anything by way of

13   response?

14            MR. BLUM:  Yes, Your Honor.  I think maybe

12:43:49 15   we're missing -- Mr. Davis is not addressing the big picture

16   here.  The condition of the KAM-affiliated restaurants is

17   essential to whether KAM has made false representations or

18   statements in their follow-up OSEs; in other words, they

19   went from -- up to 94.  That is the essence of the AR

12:44:22 20   relationship.  And it goes to the fact that Marco's --

21   there's no relationship or trust or loyalty left.  It goes

22   to the fact that they did not follow up on their own

23   location as they represented they did.

24        And, in fact, they are the ones seeking injunctive

12:44:46 25   relief, Your Honor, and not damages.  And in order to --

**Libardi  (Continued Direct)**

1    they are asking you to enter an injunction, forcing us to

2    maintain them, which, you know, our position is it's a

3    personal services contract, and to live with these people

4    who Mr. Libardi may, based on the circumstances, believe has

12:45:07  5    directly falsified an OSE, and the follow-up to this is the

6    only way to do it.  This goes to the loss, the breach of the

7    trust and the loyalty and the rupture of the relationship of

8    a personal services contract that is irreparable.

9                THE COURT:  Mr. Davis.

12:45:25  10                MR. DAVIS:  Well, I can address the personal

11    services contract argument very quickly.  Mr. Libardi just

12    testified a few moments ago that Marco's AR has, and I,

13    quote, "limited discretion.  And since the discretion to

14    carry out the obligations under the agreement is the essence

12:45:43  15    of a personal services contract, Mr. Libardi just very

16    succinctly testified that the Columbia and the Charlotte

17    Agreement are definitely not personal services contract, so

18    that's that.

19        Second of all, again, the notices of default were for

12:46:04  20    three bases:  They are the Bullfrog Development, LLC

21    Agreement with Jeremiah's; the development schedule; and

22    much like a candidate in a primary debate, I'm having

23    trouble remembering number three off the top of my head

24    right now.  Justin, can you --

12:46:26  25                MR. KLEIN:  The communications issue.

**Libardi (Continued Direct)**

1               MR. DAVIS:  The communications issue, that's

2  right.  I had forgotten it because it hadn't been briefed,

3  or Mr. Libardi communicated to the Hunters that it was not

4  an issue.

12:46:38 5      So, again, these OSE issues are irrelevant to the

6  motion in front of the Court.  They were not the basis for

7  the refusal to tender a renewal, or the threatened

8  termination of the Charlotte Agreement.

9               THE COURT:  So --

12:46:58 10            MR. BLUM:  Your Honor, if I might, two things.

11              THE COURT:  Mr. Blum, right, but we've

12  previously discussed this issue at the outset --

13              MR. BLUM:  Right.

14              THE COURT:  -- at the hearings last Friday.

12:47:07 15     So I think what I said was that I would give you an

16  opportunity to present that evidence or proffer that

17  evidence for determination by a Court.  And so I'm going to

18  allow it, although granting plaintiff a continuing objection

19  to this line of inquiry, but I do want us all to be mindful

12:47:29 20  of timing as we move forward.

21      So to the extent you are going to delve further into

22  this in terms of specifics, I would like it to be done as

23  expeditiously as possible.

24              MR. BLUM:  Okay.

12:47:41 25            THE COURT:  That means a collection or

**Libardi  (Continued Direct)**

1    grouping of exhibits for identification.  I expect this to

2    move quickly because I would like Mr. Libardi available

3    sooner than later to Mr. Klein for any cross-examination

4    moving forward.  Okay?

12:47:55  5          MR. BLUM:  Yes.  Thank you, Your Honor.  Just

6    for the record, one more point.  The important issue here is

7    that the Columbia Agreement, right -- which is a renewal,

8    not a termination -- specifically provides that it is not --

9    KAM is not entitled to a renewal if it is in default of any

12:48:14 10   other Area Representative Agreement.  So if they were in

11   default of either Columbia or Charlotte for failure to

12   correct these problems, whether they were in material

13   default, whether it had been declared or not, it bears upon

14   the Columbia Area Representative Agreement.

12:48:34 15       However, Your Honor, I think I understand.  I'm just

16   going to try to go forward to talk about the process more

17   than all of the pictures, however.  So I'll do it this way:

18   **BY MR. BLUM:**

19   **Q**    So, Mr. Libardi, based on the information that you

12:48:48 20  received in the visits on October 1 and September 30, do you

21   believe that KAM had fulfilled its obligation to correct the

22   deficiencies that existed or get the franchisees to do so

23   and to report that accurately to Marco's?

24   **A**    I don't believe they fulfilled their obligation, and I

12:49:21 25  don't believe that they notified Marco's of the problems in

**Libardi  (Continued Direct)**

1    their stores.

2    **Q**     Okay.  With respect to the notification, can you just

3    tell the Court quickly some examples of why you do not

4    believe that the notification through the August OSEs

12:49:41  5    accurately conveyed to Marco's the situation at the stores?

6    **A**     Prior to the first Notice of Default going out, it was

7    a Marco's employee, Milton Molina.  He's, by title, a

8    regional operations manager.  And as a role, he has the

9    responsibility of oversight of our area reps and their

12:50:04  10    compliance to their obligations.

11    It was through a review of the KAM portfolio, which is

12    one that happens regularly.  But keep in mind that an ROM

13    could have as many as 10 area reps and up to 2- or 300

14    stores to evaluate, so it takes some time to get through

12:50:22  15    them all.

16    In this particular review, Mr. Molina discovered the

17    deficiencies in the OSEs as he was reviewing the portfolio.

18    He then made contact to KAM and notified them of the

19    deficiencies and asked why they weren't notifying Marco's

12:50:40  20    Franchising of the store-level deficiencies.

21    They apologized and said they would correct that.

22    We then sent notice on July, I believe it was, 24th,

23    putting them on notice that they are in default and that

24    they were deficient in their duties.  But at the bottom of

12:51:03  25    that a notice, it does tell them on July 24th, "These

**Libardi  (Continued Direct)**

1    defaults now disqualify you for your renewal in Columbia."

2    It was not, as opposing counsel has said, in August the only

3    time they were notified.  They were notified of the default

4    and that they were not eligible for renewal in July.

12:51:25  5    And then they went about the business of curing those.

6    And, again, it was the August 30th follow-up memo that,

7    again, we struck concerns over the follow-up visits by

8    looking at the data, looking at inconsistencies in the data

9    versus the scores, and, again, as I said, a 3,400 basis

12:51:48  10    point improvement.  Doesn't happen.  In my history, you

11    don't see those types of significant improvements in such a

12    short period of time.  It requires a tremendous amount of

13    training of the store at that level of execution.  And, for

14    the record, in three month's period of time, the store in

12:52:04  15    question only had 11 hours of training in three months --

16    that was identified in our training platform -- to which

17    three were dedicated to their general manager.

18    And so, again, it's not possible to have that type of

19    improvement in such a short period of time with no

12:52:21  20    identifiable training.

21    **Q**    Sir, just a couple of more questions in this area.

22    Were there instances you saw that the historical action

23    plans had the same item over, like, repeating that was not

24    being addressed that created any of the concern for Marco's?

12:52:43  25    **A**    Yes, sir.  Again, take, for example, a torn gasket on

**Libardi (Continued Direct)**

1    a make line.  A torn gasket on a make line takes years to

2    get.  They are not impossible to do it over again, but when

3    we saw the photos in the earlier OSEs and we saw the photo

4    of the torn gasket, we knew that was years of wear and tear

12:53:12   5    and it broke apart, and it happens.  But it was noted on

6    three OSEs, and it was noted on the 94 percent, but it

7    wasn't evaluated correctly in the form, but was typed in the

8    notations as still being a problem.

9    **Q**    Okay.  And what was the effect of it not being

12:53:46  10   evaluated in the form but just typed in?  Did that --

11   **A**    Again, it artificially inflated the performance of the

12   store.

13   **Q**    Okay, sir.  All right, sir.  And so you did see the

14   photographs that -- I'm sorry.

12:54:12  15        Who was the Marco's person who visited the stores on

16   September 30 and October 1?

17   **A**    Angelica Wasser.

18   **Q**    And is she an experienced operations person?

19   **A**    She is our director of franchise operations.  She

12:54:30  20   supervises seven franchise business leaders that are

21   responsible -- the franchise business leaders are the ones

22   responsible to perform the area rep role and

23   responsibilities in non-area rep territories.  And so she

24   supervises those employees of Marco's and was one herself at

12:54:49  25   one point in time; so she is very familiar with operations

**Libardi (Continued Direct)**

1    and very familiar with Marco's operations.

2    **Q**    And does she have any familiarity with the Hunters'

3    territories?

4    **A**    She does.  In fact, she -- when she first was employed

12:55:06  5    by Marco's Franchising in an operations manager role, which

6    provides oversight to the AR community, one of her

7    territories were, in fact, the Hunters' KAM territories.

8    **Q**    Okay.  And I believe her email actually maybe has the

9    last name Lara, L-a-r-a.  Do you know why that is?

12:55:44  10    **A**    She was married through her cycle here at Marco's.

11    Well, her maiden name is Lara.  It's never been changed.

12    **Q**    That's still her email at Marco's?

13    **A**    That's correct, yes, sir.

14    **Q**    Okay, sir.  And, again, in her three visits, did Ms.

12:56:03  15    Lara or Mrs. Wasser, did she send pictures to Marco's in the

16    ordinary course?

17    **A**    Marco's requires pictures to be uploaded in the

18    evaluation form itself.  And, yes, there are pictures

19    uploaded in the evaluation.

12:56:19  20    **Q**    Were there pictures attached to the August 2020 OSEs

21    that KAM performed at their own restaurants with the high

22    score of the 94s, are there pictures attached to those?

23    **A**    No pictures.

24    **Q**    All right, sir.

12:56:43  25                    MR. BLUM:  Your Honor, I don't want to kind of

434

**Libardi (Continued Direct)**

1    go through this too -- just so you understand, I want to

2    show -- I will share a screen.  It shows some of the

3    pictures that are part of our exhibits, if everyone can see

4    this, and I've scrolled down to the bottom.  This is store

12:57:00  5    number 8196, and there are many, many pictures, and we could

6    be here all day with Mr. Libardi.

7    **BY MR. BLUM:**

8    **Q**    But I'm down at the bottom, and if you can see these

9    last pictures, 2875, is that -- can you identify what that

12:57:15 10    picture represents as you understand it, sir?

11    **A**    Are you able to click it and enlarge it?

12    **Q**    Oh.  I'm sorry.  Okay, sir.

13    **A**    Thank you.  Yes.  That is a gasket on the make line.

14    **Q**    Okay.

12:57:31 15    **A**    The make line is where --

16    **Q**    The make line is --

17    **A**    Sorry.  Go ahead.

18    **Q**    What is the make line?

19    **A**    Yes.  The make line is where we prepare pizzas.  It is

12:57:41 20    where the raw ingredients are, and it is assembled on the

21    make line and then placed into the oven.

22    **Q**    Okay.  And is this a torn gasket you were referring to

23    that appeared to be in several previous OSEs?

24    **A**    Yes, sir.

12:57:56 25    **Q**    Okay.  But it did not appear in the August 1 that KAM

**Libardi  (Continued Direct)**

1    did?

2    **A**    That's correct.

3            MR. DAVIS:  Your Honor, I have a new

4    objection, that Mr. Libardi didn't take these pictures.  Ms.

12:58:11  5    Lara -- and, I'm sorry, I didn't catch her new married

6    name -- did.

7        And so besides an authentication issue, if, you know,

8    they are going to discuss these pictures, it should be with

9    the person that took those so KAM has the opportunity to

12:58:25  10    cross-examine about how the pictures were taken, what Ms.

11    Lara did to take that picture, you know.  For example, was

12    that gasket -- when she first got there, was that gasket

13    somehow still connected?  Did she pull it out a little more?

14    If this is going to be a line of questioning, then KAM

12:58:46  15    should be able to cross-examine on it.  And Mr. Libardi is

16    not the witness that should be testifying to what's in these

17    pictures that he didn't take.

18            THE COURT:  Mr. Blum, who took these pictures?

19    Do you know?

12:58:58  20            MR. BLUM:  Ms. Lara did, and she did, as part

21    of Marco's process, upload them.  And, you know, as part of

22    an OSE process, they were uploaded to Marco's as part of the

23    official report that Mr. Libardi reviewed.

24            THE COURT:  Well, I think there is some

12:59:15  25    foundational concern that's been expressed by plaintiffs in

**Libardi  (Continued Direct)**

1    the case about the photographs, and to the extent that there

2    is testimony elicited about what's depicted, there's also

3    some concern there.

4        You had mentioned a second shorter witness in

12:59:30    5    presentation of your case.  Is that Ms. Wasser by any

6    chance?

7                    MR. BLUM:  It actually wasn't; it was Ms.

8    Weis.  But we had -- Ms. Wasser was available in earlier

9    things, Your Honor.  But I believe this is a business record

12:59:42    10    of Marco's.  And in an injunction hearing, the rules are a

11    little relaxed, Your Honor, because of the timing.

12                    THE COURT:  Well, I understand.  But I think

13    the concern that's being expressed is that there is

14    description and opinion evidence that's being given by Mr.

12:59:59    15    Libardi who was not physically present at the restaurant for

16    any inspection, at least there's been no foundation laid

17    that he was, and that these pictures were taken by someone

18    else.

19        So, for example, Mr. Davis' -- one of his descriptions

13:00:15    20    with regard or in support of his objection was:  "Was this

21    gasket, was this seal, was this in that position found?  Or

22    was it removed for purposes of taking the photograph?"  I

23    mean, he's asking those kind of -- or challenging those kind

24    of specific opinions relating to photographs that, as near

13:00:38    25    as I can tell, Mr. Libardi didn't take and wasn't present

**Libardi (Continued Direct)**

1    when they were taken.  So what is -- at least that's how I

2    understand part of Mr. Davis' objection.

3              MR. BLUM:  I appreciate that, Your Honor, but

4    clearly someone is holding it.  I'm assuming it's Ms. Lara's

13:01:00  5    hand.  And I guess they're saying that maybe Ms. Lara broke

6    this and it was a brand new break, you know.  It seems like

7    they -- I mean, are they seriously challenging the

8    authenticity of these pictures?  I don't --

9              THE COURT:  I guess there's a couple of things

13:01:15  10   going on here.  I'm not sure that there is an objection from

11   the plaintiffs, although I will ask Mr. Davis now with

12   regard to the authenticity of these photos.  That is, is the

13   plaintiff objecting to these photos as photos that were

14   purportedly taken by Ms. Wasser or another employee of

13:01:34  15   Marco's at this store location on a date that either has

16   been established or that will be established, Mr. Davis?

17             MR. DAVIS:  No.  That's not our objection at

18   all, Your Honor.  As a matter of fact, we're not even

19   objecting to the admissibility on the grounds of they're a

13:01:52  20   business record.

21             THE COURT:  Subject to your general --

22             MR. DAVIS:  Subject to my general objection.

23   No, we're not objecting to the admission based on, you

24   know -- yes, technically they should probably authenticate

13:02:03  25   from who took the picture, but we're not objecting on those

438

**Libardi (Continued Direct)**

1    grounds.  They are business records.  That would get over

2    the hearsay hump.

3          But what we're objecting to is that Mr. Libardi cannot

4    give testimony as to what's being depicted in the picture

13:02:16  5    because he wasn't there.  That simple.

6                THE COURT:  And I guess as a general matter, I

7    will sustain the objection.  I mean, to the extent that he

8    can describe the equipment, I guess, generally that's

9    depicted in the photo to the extent he recognizes it, that's

13:02:32  10    fine.  But I think when we start getting into so granular

11    detail, that's where Mr. Davis' objections come in and have

12    some validity, which is I don't -- I'm not suggesting that

13    she broke it for purposes of the photograph.  I don't know

14    whether that was pulled back, if that was immediately

13:02:49  15    apparent.  I just don't know.  And I think that's part of

16    the plaintiff's objection with regard to questions that

17    you're asking and opinions that are being given by Mr.

18    Libardi, who I don't doubt knows the business and the

19    equipment generally, but now we're talking about specifics

13:03:09  20    during an inspection on a particular day.

21          So I'm going to sustain it with regard to those

22    questions that concern some detail being involved.  But I'm

23    not hearing a general objection from the plaintiffs, subject

24    to their relevance-related objections before, about

13:03:29  25    admissibility of these photos, if you're moving for their

**Libardi (Continued Direct)**

1    admission, again, subject to their other objections.

2                MR. BLUM:  All right.  I understand, I think,

3    Your Honor's ruling.  I just want to say, Mr. Libardi not

4    being there, which Mr. Davis said is actually cured by the

13:03:45  5    hearsay because -- it's not hearsay because they are a

6    business record.  But I understand on this particular

7    picture.  Fair enough.

8                THE COURT:  Well, you're going a little

9    astray, and you're asking for some opinion testimony from

13:03:55 10    someone who didn't take the photos or wasn't present.  So to

11    me, the objection goes beyond the rules.  And whether or not

12    there is a business record exception under the hearsay

13    rules, that goes to the admissibility of the photos as

14    exhibits.  This, as I understand the plaintiff's objection,

13:04:14 15    goes beyond by way of asking for characterization of what's

16    depicted in those photos.  Am I right, Mr. Davis?

17                MR. DAVIS:  That's correct, Your Honor.

18                THE COURT:  And to that objection, I will

19    sustain it.

13:04:24 20    **BY MR. BLUM:**

21    **Q**    Okay.  Mr. Libardi, we'll do it another way then.

22          Mr. Libardi, I will show you what is included in this

23    picture which is 2564.  Do you see that picture, sir?

24    **A**    I do.

13:04:39 25    **Q**    Do you recognize what that container is as it's used

**Libardi (Continued Direct)**

|  |  |
|---|---|
| 1 | in a Marco's Pizza location? |
| 2 | MR. DAVIS:  Objection, Your Honor.  If he's |
| 3 | going to ask anything about what's in the pictures, the |
| 4 | pictures speak for themselves. |
| 13:04:55  5 | THE COURT:  Well, I'm not sure that I'm going |
| 6 | to prohibit some description generally about what might |
| 7 | appear in a Marco's Franchising restaurant. |
| 8 | But is there sufficient foundation here, Mr. Blum?  On |
| 9 | what date or dates were these photos taken?  There was some |
| 13:05:14  10 | talk about -- there's been various discussions about when |
| 11 | there were visits taken or photographs taken.  There was |
| 12 | some testimony about September 30th, October 1st.  Can you |
| 13 | help me out here a little bit? |
| 14 | MR. BLUM:  Yes.  Yes, Your Honor.  This visit |
| 13:05:31  15 | was on October 1st, second day, I believe. |
| 16 | THE COURT:  All right.  So if you would for me |
| 17 | ask your question again, please. |
| 18 | **BY MR. BLUM:** |
| 19 | **Q**    Okay.  Does the photo here that you are -- that's |
| 13:05:44  20 | pulled up, which is photo 2564, do you recognize that |
| 21 | container and how this fits into the context of a Marco's |
| 22 | Pizza location? |
| 23 | **A**    Yes, sir.  That is a 1/6, 6-inch deep pan, and it has |
| 24 | our ham product quartered and stored in it.  And the orange |
| 13:06:09  25 | sticker is a required date stamp of the product.  It has a |

**Libardi (Continued Direct)**

1    shelf life in that state of two days.

2    **Q**    Okay.  And, sir, is this pan and this product

3    generally used in a Marco's Pizza restaurant?

4    **A**    It is standard.

13:06:31 5    **Q**    And now the red label that you referred to as a "date

6    stamp," what's that called in the Marco's terminology?

7    **A**    It is a food health safety requirement that all

8    consumable foods have shelf life dates attached to them.

9    That would be an expiration date, which means it should not

13:06:55 10    be in production past 9/19.

11                MR. DAVIS:  All right.  I'm going to object

12    again, Your Honor.  This illustrates what the issue is.  Mr.

13    Libardi can't tell us where this pan was originally located,

14    whether or not it was found on this table, or if it was

13:07:11 15    found in a refrigeration unit, if it was being used in

16    production, if it was not being used in production.

17                THE COURT:  Well --

18                MR. BLUM:  Can I --

19                THE COURT:  Go ahead, Mr. Blum.

13:07:20 20    **BY MR. BLUM:**

21    **Q**    Does that matter whether it is being used in

22    production or not, Mr. Libardi?

23    **A**    It does not.  It would 45 five days old.  It should

24    have been thrown away 45 -- 43 days ago.

13:07:35 25                MR. DAVIS:  43 days ago?

**Libardi (Continued Direct)**

1   **Q**     What's this date?  Nine --

2   **A**     I'm sorry.  Yeah, I was referring to a different

3   picture.  Yes.  I'm sorry, 10 days ago -- 12 days -- 10 days

4   ago.  Two days of active use, and then 10 days of discard

13:07:50  5   time.  It should have been thrown away at the end of day

6   two.

7              MR. BLUM:  Your Honor, again, here's the

8   issue:  Mr. Davis has graciously said, "Well, we're not

9   going to object to the business records."  So Mr. Libardi

13:08:02 10  has testified these all came in from Ms. Lara on her visit,

11  and now they're trying to say they weren't there when Ms.

12  Lara visited, so those two things are inconsistent.

13             THE COURT:  Well, I disagree.  I don't think

14  that's the case at all.  It's one thing to establish a

13:08:20 15  foundation for a business record exception, or even perhaps

16  skirt a little bit authenticity with regard to the exhibits

17  moving forward, and there doesn't seem to be any direct

18  challenge mounted by plaintiffs in that regard.

19             But the question is:  "What do the pictures mean?  Or

13:08:38 20  how do you interpret them?  What's in there?  Where was it?

21  What does the sticker mean?"  That's an objection that goes

22  beyond the foundational matters of getting those photographs

23  in as not hearsay or an exception to the hearsay rule, as

24  well as authenticating them.

13:09:00 25             But now you're asking for interpretation by someone

443

**Libardi  (Continued Direct)**

1    who wasn't present at the restaurant to inspect where these

2    were or when these photographs were taken.

3         Mr. Davis, do you wish to be heard further on that?

4              MR. DAVIS:  That summarizes our objection very

13:09:15  5    well, Your Honor.  Thank you.

6              THE COURT:  So, Mr. Blum, my concern is as

7    exactly how much Mr. Libardi -- who I don't doubt knows this

8    business backward and forward -- how much he can say based

9    on photographs at a location on a date certain that were

13:09:32 10    taken, when he wasn't there, to know exactly how those got

11    where they are now depicted in this photo on October 1st.

12    That seems to be the objection, and I share that concern.

13              MR. BLUM:  Your Honor, I guess I'm confused

14    because you just said that there is still a question of when

13:09:52 15    these photos were taken.  I thought that was stipulated and

16    resolved.

17              THE COURT:  No.  I don't think I said that.

18    And if I said that, I didn't mean to.

19              MR. BLUM:  Okay.

13:10:00 20              THE COURT:  In fact, I thought I just said

21    October 1st was the date that they were taken.  The

22    objection, as I understand it, is where did this exhibit

23    come from that's depicted in this photo exactly.  And Mr.

24    Libardi, he has opined about what the container is and

13:10:20 25    what's in there, and the date that's stamped on there.

444

**Libardi (Continued Direct)**

1          Now, you cleaned that up a bit by him saying that it

2     doesn't really matter, and it should be discarded after the

3     end of a couple of days from the date affixed, which appears

4     to be September 19th.  So I guess to that extent, it's fine.

13:10:38  5          But I take the plaintiff's objections to being there's

6     only so much someone can extrapolate upon with regard to

7     photos taken on a date certain at a location in which he

8     didn't participate in any inspection or picture taking.

9               MR. DAVIS:  Your Honor, could I suggest,

13:10:57 10     perhaps, a stipulation that may not only resolve all this,

11     but speed the testimony along?

12               THE COURT:  Please, Mr. Davis.

13               MR. DAVIS:  KAM would be willing to stipulate

14     that Marco's conducted inspections on three stores on

13:11:18 15     September 30th and September 1st, which were --

16               THE COURT:  You mean October 1st?

17               MR. DAVIS:  I'm sorry.  September 30th and

18     October 1st; that Marco's deemed the inspection to

19     necessitate that one store be shut down; and that the store

13:11:40 20     was reopened three days later upon reinspection from

21     Marco's; and that KAM disputes many of the alleged

22     deficiencies.

23               THE COURT:  Mr. Blum.

24               MR. BLUM:  May I just -- I guess we could take

13:12:04 25     the stipulation, and I would just ask Mr. Libardi one or two

**Libardi (Continued Direct)**

1    more questions and then we can move on.

2              THE COURT:  Okay.  Subject to seeing what

3    those questions are, we can try that.

4    **BY MR. BLUM:**

13:12:23  5    **Q**    Have all of the -- you've reviewed the photos that

6    were submitted by Ms. Wasser on September 30th or October 1

7    related to the business that she says she attended; correct?

8    **A**    I have reviewed the entire document, yes, sir.

9    **Q**    Okay.  And they were broken up by different stores;

13:12:49 10   correct?

11   **A**    Correct.  This is store 8425, correct.

12   **Q**    And the kinds of pictures you see here of the store,

13   the kinds of pictures that Ms. Lara sent, are they the

14   typical kind of pictures that are used in evaluations and

13:13:07 15   perhaps attached to OSEs that are done according to

16   standards?

17   **A**    Yes.

18   **Q**    Okay.  And you reviewed all of those pictures?

19   **A**    I have.

13:13:17 20   **Q**    Okay.  And in reviewing them, do you recognize that

21   the pictures were taken in a Marco's Pizza location?

22   **A**    Yes.

23   **Q**    Okay.  All right, sir.  And based on those pictures,

24   sir, did that influence your opinion as to whether the OSEs

13:13:40 25   that were done in August of 2020 by KAM were done accurately

446

**Libardi  (Continued Direct)**

1  or that they correctly assess the condition of these three

2  stores?

3  **A**    My evaluation went far past the pictures and looked at

4  the entire evaluation, as well as supporting documents of

13:14:05  5  operational tools that also have data attached to them.

6  And, yes, it is my determination that this store is in

7  critical shape.

8  **Q**    Okay, sir.  I might be done.  I'm just trying to find

9  the. . .

13:14:39  10      All right, sir.

11          MR. DAVIS:  Your Honor, I'm not clear.  Has

12  defendant then agreed to that stipulation and we're going to

13  move on?

14          THE COURT:  It would appear so; is that right,

13:14:57  15  Mr. Blum.

16          MR. BLUM:  Yes, Your Honor.

17          MR. DAVIS:  Then if we're moving onto a new

18  topic, Your Honor, I know we're pressed for time, but could

19  we take a short recess?

13:15:04  20          THE COURT:  Sure.  Let me ask, because as I

21  indicated before, I want to keep us on track, including Mr.

22  Klein with regard to any cross-examination of this witness.

23  So, Mr. Blum, how much do you have left moving forward?

24          MR. BLUM:  I do not have much left with Mr.

13:15:20  25  Libardi.

**Libardi (Continued Direct)**

```
 1                THE COURT:  All right.  Safe for me to

 2     conclude that you could finish in 30 minutes or so after the

 3     break?

 4                MR. BLUM:  At most.

 5                THE COURT:  Mr. Klein, will that leave you

 6     sufficient time for your cross today?

 7                MR. KLEIN:  Yeah.  Your Honor, I think Mr.

 8     Davis might be handling Mr. Libardi's cross just as a result

 9     of some technical glitches we're having, so I think he may

10     be handling that.

11                THE COURT:  All right.  Very well.  Again, I

12     want to keep us on track for concluding the hearing though

13     this afternoon.  If I wasn't clear about that before, I will

14     be clear about that now.

15                MR. KLEIN:  And just to answer your question,

16     Your Honor, I don't think we are going to be significantly

17     long with Mr. Libardi at all.

18                THE COURT:  Very well.  Then it's 1:15 p.m. at

19     this point Eastern Time.  Let's break for 15 minutes till

20     1:30.  Okay.  We'll be off the record.

21                MR. BLUM:  Your Honor.

22                THE COURT:  Yes.  Mr. Blum, go ahead before we

23     go off the record.  Go ahead.

24                MR. BLUM:  If necessary, Ms. Wasser would be

25     available to testify, so we'll make that determination at
```

**Libardi (Continued Direct)**

1    that point.  We can track her down somewhere.  Everybody is

2    available now.

3                MR. KLEIN:  We've already stipulated.

4                MR. BLUM:  She's on our witness list.

13:16:42  5                THE COURT:  Right.  Mr. Blum, I wouldn't want

6    to make your legal decisions for you, but based upon the

7    testimony of Mr. Libardi and the admission and the

8    stipulation, it seems to me you've accomplished

9    substantially what you need to accomplish here.  But I can

13:16:56  10   make that determination if you try and call her later, I

11   suppose.

12                MR. BLUM:  Just for the record.  Okay.

13                THE COURT:  All right.  Very well.  We'll

14   stand adjourned at this time and off the record.  Thank you.

13:17:02  15                      -  -  -

16                (Recess taken at 1:17 p.m.)

17                      -  -  -

18                (Court reconvened at 1:33 p.m.)

19                      -  -  -

13:33:28  20                HE COURT:  All right.  I think most of the

21   principals here are back at this point, so let's go back on

22   the record.

23         Mr. Libardi, I will simply remind you after the break,

24   as I, again, I do with every witness, that you are still

13:33:41  25   under oath.  And with that, let's resume direct examination

**Libardi (Continued Direct)**

1    by Mr. Blum, please.

2    **BY MR. BLUM:**

3    **Q**    Okay.  Mr. Libardi, you were here -- you've sat

4    through the entire hearing; correct?  Oh.  You are on mute.

13:34:04 5    **A**    Yes, sir.

6    **Q**    And you heard a discussion on Monday about the

7    Charlotte development schedule that runs through the third

8    quarter and whether it goes through the third quarter or

9    fourth quarter of 2020?  Do you recall that?

13:34:25 10   **A**    Yes, sir.

11   **Q**    Have you at any time ever had a discussion with either

12   Mike Hunter or Andy Hunter about that topic, about the

13   schedule ends on the third, quarter but does it end in the

14   third quarter and go to the fourth quarter?  Have you ever

13:34:43 15   had that discussion?

16   **A**    I've had several discussions about development with

17   the Hunters.  I can't recall if there was ever any

18   discussions specifically about quarters.

19   **Q**    Okay.  Do you have any recollection of having a

13:35:02 20   discussion with either of the Hunters about the fact that --

21   strike that.

22        Has Marco's Franchising entered into any transactions

23   in the last two years in which it has acquired area

24   representative territories and, you know, a purchase and

13:35:33 25   sale agreement?

**Libardi  (Continued Direct)**

1    **A**    Yes.

2                          MR. DAVIS:  Objection; relevance.

3                          THE COURT:  It may be a fair question, Mr.

4    Blum.  Do you want to offer some explanation or attempt to

5    lay foundation?  I'm not sure where this is going.

6                          MR. BLUM:  Well, Your Honor, it goes to the

7    fact that area representative territories are easily valued

8    in the marketplace and readily valued, a couple questions on

9    it to establish that there's a market value for these

10   territories.

11                         THE COURT:  Mr. Davis.

12                         MR. DAVIS:  If it's truly a couple questions

13   and it would speed things along, I will just put an

14   objection as to relevance and let it continue.

15                         THE COURT:  I will permit it, but let's move

16   quickly, Mr. Blum.

17   **BY MR. BLUM:**

18   **Q**    And, sir, when was the -- tell the parties when was

19   the last transaction that you recall was completed.

20   **A**    Within the last 45 days.

21   **Q**    Okay.  And, again, without talking about any of the

22   specifics, how did that transaction come to be?

23   **A**    The area rep in question approached us about selling

24   his territory.  We then made an offer to purchase it.  We

25   had some negotiations on the selling price, we agreed, and

**Libardi  (Continued Direct)**

1    we acquired the territory.

2    **Q**    And in your understanding, is there a recognized

3    method of valuing an area representative territory based on

4    the income and the expenses, et cetera?

13:37:09  5    **A**    Well, it's like any other business, yes.  It's a

6    multiple of EBITDA, sure.

7    **Q**    Okay.  And, again, EBITDA is E-B-I-T-D-A?

8    **A**    Yes, earnings, before -- yes.

9    **Q**    What does EBITDA mean?

13:37:25  10    **A**    Earnings before interest, taxes, depreciation, and

11    amortization.

12    **Q**    And amortization?

13    **A**    That's correct.

14    **Q**    So Stacey can hear it.

13:37:37  15        Okay, sir.  And over the past two years, approximately

16    how many transactions do you know have occurred in which an

17    AR territory has been -- has changed hands based on a

18    purchase and sale agreement?

19    **A**    You say the last two years?

13:37:55  20    **Q**    Yes, approximately.

21    **A**    15 times.

22    **Q**    Okay.  All right.  Great.  Over the last couple days,

23    you've heard, at least, argument -- I don't know that there

24    was testimony -- but argument that the KAM or the Hunters

13:38:24  25    have goodwill with the franchisees in their territories.  Do

1   you recall that?

2   **A**    I do recall.

3   **Q**    Is it your view, as the president of Marco's, that the

4   Hunters have any actual goodwill with the franchisees of

13:38:43  5   Marco's Franchising?

6                MR. DAVIS:  Objection; calls for a legal

7   conclusion.

8                THE COURT:  You know what?  I'm not quite so

9   sure about that.  I will overrule the objection.  Go ahead.

13:38:54  10   **A**    I do not believe they have goodwill with their

11   franchisees -- with our franchisees.

12   **Q**    And why is that, sir?

13   **A**    Well, we have the agreements with our franchisees to

14   begin with.  The Hunters do not have agreements with their

13:39:06  15   franchisees.  They have an agreement with Marco's

16   Franchising.  And just purely on the relationship side, the

17   Hunters have been mired in conflict for years with their

18   franchisees.  And so, again, I don't know that they would

19   have a whole lot of support from their franchise community.

13:39:25  20   **Q**    Okay.  Are you aware of any franchisees that -- or

21   specific franchisees that have had issues with or a

22   contentious relationship with the Hunters?

23                MR. DAVIS:  Objection; calls for hearsay.

24                THE COURT:  Yeah.  Mr. Blum.

13:39:49  25   **BY MR. BLUM:**

**Libardi (Continued Direct)**

1    **Q**    Well, Mr. Libardi, in your role as president of

2    Marco's with a franchise relationship with franchisees, are

3    you made aware occasionally of problems between franchisees

4    and their area representative who is your liaison in the

13:40:09  5    territory?

6    **A**    Yes.

7    **Q**    Okay.  And are you made aware of the relationship only

8    with the Hunters?  Or does that happen in other territories

9    as well?

13:40:21  10    **A**    It has happened in other territories.

11    **Q**    Are you aware of any specific issues that have arisen

12    with respect to KAM --

13    **A**    Yes.

14    **Q**    -- in relationships with franchisees?

13:40:32  15    **A**    Yes.

16    **Q**    Okay.  And can you just very briefly explain one or

17    two examples that you have?

18            MR. DAVIS:  Objection.  Objection, Your Honor.

19    He hasn't established how he has this knowledge.  If he just

13:40:45  20    has heard it from that third party, then it's hearsay.  If

21    they have a document that could overcome a hearsay

22    objection, and I'm not suggesting they do, but that might be

23    a different case.  But without, you know, knowing any more

24    foundation, it's calling for hearsay.

13:41:03  25            THE COURT:  I agree.  Sustained.

**Libardi (Continued Direct)**

1          MR. BLUM:  Your Honor, it's not an

2     out-of-court statement.  It's his information that he

3     knows and he's --

4          THE COURT:  Mr. Blum, it's a backdoor way to

13:41:13  5     try and get hearsay in is what it is, because I don't know

6     what else the genesis could be of the information without

7     further foundation.  So the objection is sustained.

8     **BY MR. BLUM:**

9     **Q**     Mr. Libardi, are you aware of a franchisee named Joe

13:41:30  10     Walker?

11     **A**     Yes, sir.

12     **Q**     And I believe maybe his entity is JHD or something in

13     the Columbia territory, I believe?

14     **A**     Yes, sir.

13:41:40  15     **Q**     Okay.  Do you recall on Friday, last Friday, Mr.

16     Hunter testified about JHD, it was a developer, and it was

17     behind on its development schedule, et cetera?  Do you

18     recall that testimony?

19     **A**     I do.

13:41:55  20     **Q**     Okay, sir.  How many stores does Mr. Walker or his

21     entities have in the Columbia territory?

22     **A**     I believe there are 12 in the Columbia territory.

23     There were as many as 14.

24     **Q**     How many?  14 total?

13:42:18  25     **A**     There were as many as 14, but I believe there is 12

455

**Libardi  (Continued Direct)**

1    today.

2    **Q**    Okay.  All right, sir.  And as you understand it, in

3    the time that the Hunters or KAM has been the area

4    developer, was Mr. Walker's group the largest developer of

13:42:35 5    any individual franchisee?

6    **A**    At the time, yes.  Not today, but yes.

7    **Q**    Okay.  Have you had any discussions with Mr. Walker in

8    your role as president regarding his group's relationship

9    with the Hunters?

13:42:52 10   **A**    Yes, sir.

11   **Q**    Okay.  And in those conversations, was there a

12   discussion of the relationship between the franchisee and

13   your area representative, the Hunters?

14   **A**    Yes, sir.

13:43:05 15   **Q**    And what was your -- what is your understanding of the

16   relationship that exists between your area representative

17   and your franchisee?

18                    MR. DAVIS:  Objection; calls for hearsay.

19                    THE COURT:  Sustained.

13:43:22 20                    MR. BLUM:  Your Honor, just for the record, I

21   want to say that the Hunters in that role are acting as Mr.

22   Libardi's agent.  So it's a discussion between the entities,

23   but. . .

24                    THE COURT:  Is that your basis for arguing

13:43:41 25   that it is what, that it is not hearsay?

|    |    |
|----|----|
| 1 | MR. BLUM:  That it's not hearsay.  I'm asking |
| 2 | him to say what his understanding of the relationship is. |
| 3 | I'm not asking him for the truth of what Mr. Walker is |
| 4 | saying.  I'm asking him what he in his role is assuming. |
| 13:44:02  5 | The statement of Mr. Walker just creates the impression of |
| 6 | Mr. Libardi.  I mean, how else -- I mean, the other thing |
| 7 | is:  The only way that Mr. Libardi could know anything is to |
| 8 | go out and have conversations with each individual person. |
| 9 | I mean, he works for an entity.  But I'll move on, Your |
| 13:44:21  10 | Honor.  But it's just that I believe that the testimony is |
| 11 | appropriate on the issue of goodwill, despite that none |
| 12 | was -- that testimony wasn't given by the plaintiff. |
| 13 | **BY MR. BLUM:** |
| 14 | **Q**     Okay.  Sir, you also heard testimony from Mr. Hunter |
| 13:44:39  15 | about a franchisee who opened a store and closed a store; |
| 16 | correct? |
| 17 | **A**     Mr. Tankoos, yes, sir. |
| 18 | **Q**     Mr. Tankoos.  All right, sir.  And Marco's had a |
| 19 | franchise agreement with the Tankoos entity; correct? |
| 13:44:57  20 | **A**     That is correct. |
| 21 | **Q**     Did that franchise agreement require the franchisee to |
| 22 | operate for the entire term of that franchise? |
| 23 | **A**     It did not operate for its entire term.  It operated |
| 24 | for -- |
| 13:45:13  25 | **Q**     Did the franchise agreement require it to operate for |

**Libardi (Continued Direct)**

1    the full term?

2    **A**    It did.

3    **Q**    So when it closed, when the Tankoos store closed, did

4    Marco's have under its contract a right to seek maybe lost

13:45:34  5    royalties for the rest of the term in your understanding?

6    **A**    It's entitled to an early termination fee.

7    **Q**    Okay.

8    **A**    But it's limited, yes.

9                MR. DAVIS:  Objection; relevance.

13:45:44 10    **Q**    Did in fact --

11                THE COURT:  There's an objection pending, Mr.

12    Blum, with regard to relevance.  What is the relevance?

13                MR. BLUM:  To what?  There was a question he

14    already answered.  Which one, the Tankoos?

13:45:57 15                THE COURT:  Well, he has.  Mr. Davis.

16                MR. DAVIS:  The entire line of questioning.  I

17    don't understand what this franchise agreement between

18    Marco's and whether or not Marco's pursued anything it was

19    due under the franchise agreement has anything to do why

13:46:11 20    we're here for the last three days.

21                MR. BLUM:  Well, Your Honor, I'm going to

22    show -- the plaintiff has the burden of showing there's

23    goodwill.  They put on zero evidence, but Mr. Davis has used

24    the term a lot.  It's in the transcripts.  And I'm going to

13:46:30 25    show that the franchisee that closed, it suggests that there

**Libardi (Continued Direct)**

1    is no goodwill and that there is negative goodwill, and I'm

2    laying the foundation for that as to why Mr. Libardi has

3    specific knowledge of this information.

4               MR. DAVIS:  Okay.  Then I would add to the

13:46:42 5    objection that the ultimate question that this line of

6    questioning is going to is going to call for hearsay.

7               THE COURT:  Mr. Blum.

8               MR. BLUM:  I don't understand.  The question

9    I'm going to ask is going to be hearsay?  Your Honor, I

13:46:58 10    don't -- I think we have to wait to hear the question.  I'm

11    going to ask him why -- I don't think it is hearsay -- why

12    did Marco's decide not to pursue the claim it had against

13    the Tankooses, and he will give his explanation.

14               MR. DAVIS:  It just seems like it's another

13:47:16 15    backdoor attempt to get in hearsay.

16               THE COURT:  Mr. Blum, ask your question.

17               MR. BLUM:  Okay.

18    **BY MR. BLUM:**

19    **Q**    Did, in fact, Marco's bring any legal action against

13:47:25 20    the franchisee that shut down -- that closed the restaurant

21    early?

22    **A**    No, sir.

23    **Q**    Okay.  And why is that?  Why did Marco's not do that,

24    sir?

13:47:35 25    **A**    I had to mediate conflict between -- me personally --

**Libardi (Continued Direct)**

1    had to mediate a conflict between the Hunters and Mr.

2    Tankoos.  It was an ongoing feud, and it ultimately landed

3    in a place where Mr. Tankoos walked away from the business

4    and allowed it to close.

13:47:56   5              MR. DAVIS:  Objection.  I'd like the last

6    portion of that answer stricken because, again, he's

7    testifying to what this franchisee said.

8              THE COURT:  Well, I think I disagree, and I

9    will overrule.  What he said was he attempted to mediate,

13:48:15  10   and that mediation failed when one of the parties walked

11   away from that relationship.  I'm not sure that -- I'm not

12   sure that conveys a statement, per se --

13             MR. DAVIS:  Okay.

14             THE COURT:  -- with that foundation.

13:48:27  15             MR. DAVIS:  Then I withdraw that objection.

16   Thank you.

17             THE COURT:  All right.

18             MR. BLUM:  Your Honor, Mr. Blynn just reminded

19   me, and we'll gladly send the cite.  In an injunction

13:48:40  20   hearing, the rules of evidence are relaxed.  And actually

21   there's specific case law that says hearsay generally is

22   admissible, just like people can put in declarations which

23   clearly are hearsay, but in any event. . .

24   **BY MR. BLUM:**

13:48:53  25   **Q**    In any event, Mr. Libardi, the conflict that you

**Libardi (Continued Direct)**

1    personally had to mediate was between whom?

2    **A**    Was between Mike and Andy Hunter and Mr. Tankoos.

3    **Q**    Okay.  And Mr. Tankoos was the franchisee?

4    **A**    He was the franchisee, yes.

13:49:10  5    **Q**    Okay.  All right.  And what was the basis of that

6    conflict as you understood it in your role as mediator?

7    **A**    Mr. Tankoos complained about the support he received

8    from the Hunters, and was really upset about some marketing

9    materials that were purchased at a substantial cost that Mr.

13:49:36 10   Tankoos was now obligated to pay and felt that the Hunters

11   should pay it, not him.  He didn't order it.

12                    THE COURT:  Mr. Davis.

13                    MR. DAVIS:  Yeah.  Objection.  Move to have

14   the last answer stricken as it's hearsay.

13:49:48 15                   THE COURT:  Sustained.  Because we

16   have crossed from his description of his efforts to mediate

17   and a party walking away into direct paraphrasing or

18   quotations from one of the parties.

19        And with regard to injunctions generally, this isn't a

13:50:08 20   TRO hearing or an ex parte proceeding.  We're past that.

21   This is day three that we've convened on a TRO that has been

22   extended by me once, I believe, for good cause and then

23   again by agreement of the parties to conclude this hearing.

24        So the idea that hearsay should just be permitted or

13:50:27 25   roll in in light of witness disclosures and preparations for

**Libardi  (Continued Direct)**

1   this hearing is improper in my view at this point with

2   regard to a request and a pending motion for preliminary

3   injunction.

4        So I'm going to sustain the objection and strike the

13:50:43  5   last answer of the witness.  Mr. Blum, that's exactly what I

6   was trying to avoid, but -- so please move on.

7              MR. BLUM:  Fair enough.  Okay.

8   **BY MR. BLUM:**

9   **Q**     Sir, without, I guess, giving any statements of any of

13:50:58  10   the other parties, was the information that you received in

11   your role as mediator from both parties, was it the

12   reason -- was it considered in Marco's determination not to

13   pursue, to go after the Tankoos group for terminating the

14   agreement early?

13:51:19  15   **A**     Right.

16   **Q**     It was?

17   **A**     It was.

18   **Q**     Okay, sir.  Based on the events of the last several

19   months that you testified to, which is the Hunters'

13:52:03  20   affiliate agreement with the Jeremiah's Ice System, the

21   operational issues from the July 24th letter, and the

22   follow-ups that led to the September and October visits, and

23   your subsequent review of their OSEs and that whole

24   situation, sir, do you, today, as the president of Marco's,

13:52:33  25   have any confidence at all in KAM and its principals to

**Libardi  (Continued Direct)**

1    serve as your company's area representative and liaison in

2    the Columbia and Charlotte markets?

3    **A**    I have no confidence in their ability to serve as a

4    liaison as an area representative for Marco's Franchising.

13:52:55  5    **Q**    Okay.  Do you today, as president of Marco's, have the

6    same confidence and the same confidential and trusting

7    relationship with the Hunters to perform the seven AR stands

8    that you might have had a year ago before these situations

9    arose?

13:53:18 10                   MR. DAVIS:  Can I just ask if --

11                   MR. BLUM:  I'll withdraw the question.

12                   MR. DAVIS:  -- (indiscernible) that because I

13    just didn't quite hear all of it.  I'm sorry.

14                   MR. BLUM:  Okay.

13:53:25 15                   THE COURT:  Mr. Blum, do you want to take

16    another pass there?

17                   MR. BLUM:  Actually, I don't know that I. . .

18                   MR. DAVIS:  Just to be clear, Mr. Blum, I

19    wasn't objecting to the question.  I just didn't hear all of

13:53:43 20    it.

21                   MR. BLUM:  Thank you.  I appreciate that.

22    **BY MR. BLUM:**

23    **Q**    Okay.  I guess the question is:  Based on these same

24    events that you just talked about, sir, do you have the

13:53:53 25    confidence, as the president of Marco's, that the Hunters

463

**Libardi  (Continued Direct)**

1       will perform to your satisfaction in a manner that meets the

2       seven AR standards that are set out in the AR Manual that we

3       reviewed earlier today?

4                   MR. DAVIS:  Objection; calls for speculation.

13:54:13  5     He's asking what is going to happen in the future.

6                   MR. BLUM:  That's --

7                   THE COURT:  I'm not sure that I agree.  I'm

8       not sure I agree, Counsel, the way it was worded.  Objection

9       is overruled.  You can answer, Mr. Libardi.

13:54:24 10     **A**     I have no confidence in the Hunters' ability to

11      execute the seven areas of responsibility.

12                  MR. BLUM:  All right.  Nothing further,

13      Your Honor.

14                  THE COURT:  Very well.  As I understand it,

13:54:36 15     Mr. Davis, you will be conducting cross-examination in this

16      case?

17                  MR. DAVIS:  That is correct, Your Honor.

18                  THE COURT:  All right.  Very well.  Mr. Klein,

19      is there something you wanted to say?

13:54:47 20                 MR. KLEIN:  No.  I was just going to confirm

21      that Mr. Davis was doing the cross.

22                  THE COURT:  All right.  I've gleaned as much

23      from earlier when he was doing the objections, Mr. Klein,

24      but I didn't want to step on your toes in that regard.

13:54:58 25                 MR. KLEIN:  Thank you, Your Honor.

Libardi (Cross)

1          THE COURT:  Mr. Davis, are you ready to

2     proceed.

3          MR. DAVIS:  Can I just have 30 seconds?  We

4     don't need to have a break.  I'm just going to step off

13:55:04  5     camera for a second.

6          THE COURT:  Sure.

7          MR. DAVIS:  Thank you, Your Honor.

8          THE COURT:  This is Judge Helmick.  I'm going

9     to step away for just a moment.  We may get started just a

13:55:42  10     moment later than I hoped.

11          MR. KLEIN:  Thank you, Your Honor.

12               (Pause in the proceedings)

13          MR. DAVIS:  Thank you for that indulgence,

14     Your Honor.  Just got to give Mr. Klein a second to get

13:57:12  15     back.

16          MR. KLEIN:  Giles, do you want to take one

17     more minute to finish what we're talking about?  Or are you

18     good?

19          MR. DAVIS:  I think I'm good, if I can just

13:57:28  20     find out where I put my -- there it is.

21          **CROSS-EXAMINATION OF ANTHONY MICHAEL LIBARDI**

22     **BY MR. DAVIS:**

23     **Q**     Good afternoon, Mr. Libardi.

24     **A**     Good afternoon, sir.

13:57:41  25     **Q**     I'm sure you know by now I'm Giles Davis.  I'm counsel

**Libardi  (Cross)**

1    for KAM, along with Mr. Klein and Mr. Huckaby.  I only have

2    a little bit for you, sir.

3         So earlier you testified that one of the roles of the

4    AR is to sell franchises; correct?

13:58:13  5    **A**    Correct.

6    **Q**    And those franchise agreements, though, emanate from

7    Marco's; correct?

8    **A**    That's correct.

9    **Q**    Can you tell me specifically what training Marco's

13:58:31 10   requires for ARs on the side of selling franchises?

11   **A**    There is a training module hung on our training

12   platform that they are required to finish.  And throughout

13   the life cycle of the area reps, we have multiple

14   conventions that area reps are required to attend, to which

13:58:56 15   we apply training in those conventions three times a year.

16   **Q**    And what does the training module contain?

17   **A**    It is related to franchise sales.

18   **Q**    Well, what I'm asking, sir, is there a -- is it one

19   one-on-one training?

13:59:15 20   **A**    Well, the module is an e-learning module.

21   **Q**    Okay.  And what does the e-learning module consist of?

22   Meaning, is it a -- are there videos, are there audio

23   recordings?  What does the module consist of?

24   **A**    It's a video, yes.  It's a video platform.

13:59:35 25   **Q**    And how many videos are there in that module?

**Libardi  (Cross)**

1    **A**      There is one.

2    **Q**      And how long is that video?

3    **A**      I don't know.

4    **Q**      Do you remember hearing Mr. Hunter, Andy Hunter,

13:59:52  5    testify that the video was approximately 10 minutes in

6    length?

7    **A**      I do not recall.

8    **Q**      Do you have any reason -- well, I will make the

9    representation that that was the testimony from Mr. Hunter.

14:00:04  10    Do you have any reason sitting here to state that that isn't

11    true?

12    **A**      No.

13                    MR. DAVIS:  I'm going to be asking some

14    questions about the AR Manual, so we're going to have to

14:00:27  15    mark this section as confidential.

16                    THE COURT:  Very well.  Stacey, if you would

17    make that notation, please.

18

19

20

21

22

23

24

25

Libardi (Cross)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Libardi  (Cross)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Libardi  (Cross)**

1

2      **BY MR. DAVIS:**

3      **Q**     Mr. Libardi, you testified earlier to all the concerns

4      that Marco's has over the idea of a Marco's AR rep also

14:05:30  5  acting as a Jeremiah's AR rep.  Do you remember that

6      testimony?

7      **A**     I do.

8      **Q**     Do you have any evidence that the Hunters or KAM have

9      done any of the things that you claim you're concerned

14:05:41 10  about?

11     **A**     No, I don't.

12     **Q**     And is it Marco's position that the Hunters are

13     required to only invest in Marco's-related activities?

14     **A**     It is not.

14:06:11 15  **Q**     Well, then I'm confused that why -- how your

16     testimony -- maybe you can explain, then, how your testimony

17     that an entity, in which the Hunters have an ownership

18     interest in, opening a Jeremiah's franchise is somehow a

19     breach of the agreement.

14:06:37 20  **A**     I happen --

21                    MR. BLUM:  I would object.  That definitely

22     mischaracterizes his testimony.

23                    THE COURT:  Mr. Davis, perhaps you should

24     rephrase.

14:06:50 25                    MR. DAVIS:  Okay.

470

**Libardi  (Cross)**

1    **BY MR. DAVIS:**

2    **Q**     You testified that you had concerns because the entity

3    that's partially owned by the Hunters is going to be opening

4    a Jeremiah's franchise within one year of the signing of the

14:07:08  5    agreement.  Did you testify to that?

6                    MR. BLUM:  No.  Again --

7    **A**     No.

8                    MR. BLUM:  -- that misstates his testimony.

9                    THE COURT:  Well, he just asked him an

14:07:19 10   open-ended question about whether or not that was testimony.

11   It wasn't leading.  Let's see what Mr. Libardi says.

12   **A**     No.  You are conflating a franchise business with an

13   area representative business.  I contest their ability to

14   operate an area representative business, not a franchise

14:07:39 15  business.  They are different.

16   **Q**     Okay.  But I didn't ask you -- my question didn't

17   contain any kind of interpretation, sir.  I just asked you:

18   Did you testify regarding an entity partially owned by the

19   Hunters having to open a Jeremiah's franchise within a year

14:08:03 20   of the date of the agreement?

21                   MR. BLUM:  Again -- go ahead.

22                   MR. DAVIS:  Is there an objection?  Because I

23   would like to hear the grounds.

24                   MR. BLUM:  Again, it mischaracterizes his

14:08:17 25  testimony because it conflates -- the Hunters -- and I don't

**Libardi  (Cross)**

1    want to give a speaking objection, but if you want to hear

2    me, it's not about the Hunters.  It's the Hunters opening a

3    restaurant as required as an area representative.  That's in

4    the Area Representative Agreement.

14:08:36  5         MR. DAVIS:  All I asked, Your Honor, was did

6    he testify to that.

7         MR. BLUM:  Okay.  Can you --

8    **A**    I did testify that the Area Representative Agreement

9    does stipulate a franchise unit to be opened within

14:08:48  10    12 months.

11   **Q**    Okay.  And did you then have any further discussion on

12   the impact that would have on, I believe, if I'm not

13   incorrect, that it would have on the franchisees within that

14   same territory?

14:09:12  15   **A**    I'm not sure what you're asking.  Can you restate the

16   question?

17   **Q**    Did you give testimony on what the impact of that

18   would be on the Marco's franchisees within the territory?

19   **A**    I believe you objected to it, Counsel.  So, no, I

14:09:28  20   don't believe I did.

21        MR. DAVIS:  I'm certainly not going to ask the

22   court reporter to go searching through the records, so I

23   will just move on.

24   **BY MR. DAVIS:**

14:09:51  25   **Q**    So do you remember giving testimony that the Hunters

472

**Libardi  (Cross)**

1    investing money in something other than promoting the

2    goodwill and the Marco's system would be a violation of the

3    AR Agreements?

4    **A**    I do not.

14:10:09 5    **Q**    Okay.  So Marco's is not taking the position that the

6    simple act of the Hunters investing money outside of Marco's

7    is somehow a default under the Charlotte or Columbia

8    agreements?

9    **A**    Correct.

14:10:25 10    **Q**    Mr. Libardi, and I'm going to apologize in advance

11    because, as everyone is aware, there are several of similar

12    cases floating around right now.

13        But in the briefing, and I believe it is in the

14    briefing for this case, Marco's took the position that the

14:11:01 15    relationship between KAM and Marco's has broken down and has

16    become untenable?

17    **A**    I would agree with that characterization.

18    **Q**    Okay.  When did that happen?

19    **A**    Over the course of time.  I would say over the last

14:11:19 20    couple of years.

21    **Q**    Over the last couple of years?

22    **A**    Yes, sir.

23    **Q**    So over the last couple of years -- okay.  Let me take

24    a step back so I lay the foundation properly.

14:11:38 25        What are the reasons over the last couple years --

**Libardi (Cross)**

1    well, let's talk -- are we talking two years?  Three years?

2    Four years?  Can you give us a little bit more of an

3    exact -- not an exact time, but what do you mean by "a few

4    years"?

14:11:55   5    **A**    Without checking my notes on when we started to

6    correspond on defaults and deficiencies and those types of

7    things, generally I would say since 2018, early 2018, as I

8    can recall.  I would say around May was the first that I can

9    recall off the top of my head a deficiency note sent to KAM

14:12:20  10    for performance.

11    **Q**    Do you remember Mr. Hunter's testimony that KAM and

12    Ron Stilwell were having discussions about the renewal of

13    the Columbia Agreement and the development schedule that

14    would be part of the renewed agreement?

14:12:42  15    **A**    Standard operating procedure, yes.

16    **Q**    Okay.  And do you have any reason to dispute that

17    those conversations were happening in the spring through

18    July of 2020?

19    **A**    I don't have any reason to dispute it.  That sounds

14:13:06  20    about the right timeline, yes.

21    **Q**    Okay.  So if Marco's had an issue and started to

22    believe that the relationship between KAM and Marco's was so

23    severely broken it couldn't continue, why did Mr. Stilwell

24    engage in those conversations with KAM?

14:13:27  25    **A**    KAM had a right to cure the many deficiencies they

474

**Libardi  (Cross)**

1    were operating under before we unilaterally made the

2    decision not to renew, and so we had to work in parallel

3    lanes.

4    **Q**    But no one from Marco's ever identified to the

14:13:46  5    Hunters, prior to Ashley Weis' comment in August, that the

6    renewal was ever a question?

7    **A**    That's incorrect.

8            MR. BLUM:  Okay.  Your Honor, I don't know

9    that -- I think we're outside the scope of direct here about

14:14:03  10    all this "renewals."  I don't think we talked about that,

11    but I'm not sure Your Honor --

12            MR. DAVIS:  Your Honor, he gave lengthy

13    testimony on Marco's opinion of the Hunters.  Certainly this

14    is related and is well within the bounds of

14:14:21  15    ross-examination.

16            THE COURT:  I will permit it.  Objection

17    overruled.

18            MR. DAVIS:  I'm sorry.  Stacey, can you read

19    back the last question and answer please?

14:14:27  20            (Record was read)

21    **BY MR. DAVIS:**

22    **Q**    Okay.  How is that incorrect?

23    **A**    As I testified earlier, on the July 24th Notice of

24    Deficiency and defaults, at the bottom paragraph in bold, it

14:15:05  25    stated "You are in default and do not qualify for renewal."

1    That was in July.

2    **Q**    Did KAM undertake action to cure those deficiencies?

3    **A**    They did not.

4    **Q**    They did not?

14:15:26 5    **A**    Correct.

6    **Q**    I'm going to direct your attention to Plaintiff's

7    Exhibit 8.  This is the July 24th, 2020, Notice of

8    Deficiency that you were just addressing.

9    **A**    Yes, sir.

14:16:56 10    **Q**    Okay.  The first alleged default or deficiency was

11    "Recommendation of unapproved technology vendors"?

12    **A**    That's correct.

13    **Q**    Is it your testimony as we sit here right now that

14    Andy Hunter had a conversation with Rick Stanbridge

14:17:28 15    regarding this issue?

16    **A**    That is not my testimony, no.

17    **Q**    So you're saying that this is not true?

18    **A**    A conversation with Rick does not cure the deficiency.

19    **Q**    That's not what I asked you, sir.  I asked you:  Are

14:17:42 20    you disputing that Andy Hunter had a conversation with your

21    Chief Information Officer, Rick Stanbridge, regarding this

22    deficiency?

23    **A**    I am not disputing that.  I did not testify to that.

24    **Q**    Okay.  And are you disputing that Mr. Stanbridge

14:18:05 25    advised Mr. Hunter that, to cure the deficiency, KAM was

**Libardi  (Cross)**

1    supposed to provide a PowerPoint presentation regarding

2    technology to the franchisee of store 8550?

3    **A**    I have no proof that that was ever (inaudible).

4                    (Court Reporter clarification)

14:18:30  5    **A**    I said there is no proof that I am aware of that

6    substantiates that claim.

7    **Q**    Well, were you part of the conversation?

8    **A**    I was not.

9    **Q**    Did you have a conversation with Rick Stanbridge

14:18:43 10    specifically about KAM's curing of this alleged deficiency

11    and what would be required?

12    **A**    There would have been a letter sent by me, if it had

13    been.

14    **Q**    That's not what I asked you, sir.  I asked you:  Did

14:19:01 15    you have a conversation with Mr. Stanbridge regarding what

16    would be required for KAM to cure this alleged deficiency?

17    **A**    I did, yes.

18    **Q**    Okay.  And what was the content of that conversation?

19    **A**    The --

14:19:15 20                    MR. BLUM:  Your Honor, I guess I'm concerned.

21    Is this hearsay or not?  I will let him answer.

22                    MR. DAVIS:  Well, first of all, it would be a

23    party admission, so that would be the hearsay.  But, you

24    know, I'm not asking for -- I'm asking for the contents of

14:19:39 25    the conversation that Mr. Libardi himself was a part of.

477

**Libardi  (Cross)**

1          THE COURT:  Proceed as it is.  Go ahead, Mr.

2     Libardi.

3     **A**     The conversation I had with Mr. Stanbridge was:  The

4     way to cure the deficiency was to require the restaurant to

14:19:59 5     abide by the infrastructure standards and replace the

6     unapproved system that Andy Hunter allowed to be put in that

7     store.

8     **Q**     Okay.  So do you know if Mr. Stanbridge communicated

9     that cure to KAM?

14:20:27 10    **A**     I believe it was stipulated in the letter sent to them

11    on July 24th what the cure was.

12    **Q**     Can you see Exhibit 8 on the screen?

13    **A**     No.  It hasn't changed, so I'm not sure.

14          MR. BLUM:  I believe you had Mr. Klein's

14:20:50 15    letter up.

16    **BY MR. DAVIS:**

17    **Q**     Now can you see Exhibit 8?

18    **A**     I do.

19    **Q**     Let's move to the --

14:21:02 20    **A**     I think you went by it.

21    **Q**     I did because I'm moving on, sir.

22    **A**     Oh, okay.

23    **Q**     Well, let me ask you this:  Do you agree that the

24    second deficiency raised in the July 24th deficiency letter

14:21:29 25    was that KAM was not conducting P&L reviews?

478

**Libardi (Cross)**

1    **A**    I agree.

2    **Q**    Are you aware that KAM had a conversation -- multiple

3    conversations with Milton Molina regarding this issue after

4    the issuance of the deficiency notice?

14:21:48 5    **A**    I am not.

6    **Q**    Okay.  Do you have any reason to dispute the fact that

7    KAM had multiple conversations with Milton Molina regarding

8    this issue?

9    **A**    Short of it would have required a note from me, so

14:22:09 10    whatever they discussed, it didn't cure the deficiency.

11                    THE COURT:  Mr. Libardi, I'm having a little

12    trouble hearing you.  Could you answer that question again,

13    please?

14                    THE WITNESS:  I apologize.

14:22:16 15                    THE COURT:  It's not you, sir, it's a clipping

16    or cutting out technologically, so go ahead and try again.

17    **A**    Understood.

18        I am -- as it relates to the conversation between

19    Milton and Andy Hunter, it didn't rise to the level of cure,

14:22:36 20    or it would have received a letter from me.  And so whatever

21    the conversation was, it didn't satisfy the deficiency.

22    **Q**    And the last deficiency claimed in the July 24th was

23    that KAM had OSE visits being conducted by Kevin Legg?

24    **A**    Part of it, yes.

14:23:07 25    **Q**    And that Mr. Legg wasn't authorized to conduct the

**Libardi  (Cross)**

1    training?

2    **A**    Correct.

3    **Q**    Has Mr. Legg undertaken or in the middle of

4    undertaking the remaining required training to become an

14:23:27  5    OFC?

6    **A**    He's currently being trained, yes.

7    **Q**    And once KAM received this deficiency notice, he did

8    not conduct any other OSEs?

9    **A**    I can't say that with certainty.

14:23:52  10   **Q**    Do you have any knowledge of KAM and Milton Molina

11   having conversations regarding the July 24th letter

12   requiring KAM to complete remedial training with the AR-OFC

13   staff on the proper way to commit an OSE visit?

14   **A**    Not specifically.

14:24:18  15   **Q**    Well, what unspecifically do you know?

16   **A**    Well, I know there were communications to assist the

17   Hunters in curing their deficiencies.  And one step

18   require -- again, keep in mind that Mr. Legg was masking the

19   fact that he was doing OSEs under Mr. Weathers' credentials,

14:24:43  20   and so it was, in our opinion, intentionally hidden from us.

21   And so Mr. Weathers, also who was conducting OSEs, was not

22   doing them correctly either.  And so I know that the overall

23   Hunter organization, KAM, needed to be retrained, yes.

24        MR. DAVIS:  It may have been my fault or a

14:25:03  25   connection issue, but can I have the court reporter read my

1    last question again?

2                          (Record was read)

3    **Q**    And perhaps it was my question, so I'm going to ask

4    specifically.  You said that you have no specific knowledge

14:25:35 5    of conversations between KAM and Mr. Molina regarding

6    completing remedial training; is that accurate?

7    **A**    I'm aware of the conversations, but I did not

8    participate in them.

9    **Q**    Okay.  And are you aware that Mr. Molina communicated

14:25:54 10    the requirements for KAM to cure this alleged deficiency?

11    **A**    Other than what was in the letter?

12    **Q**    I'm not talking about what happened before the letter

13    or sending the letter, I'm talking about what happened since

14    the letter.  Are you aware that Mr. Molina gave instructions

14:26:14 15    on what KAM would need to do to complete the alleged default

16    of the training on the proper way to complete an OSE visit?

17    **A**    I've seen no evidence, and I'm not aware of it, no.

18    **Q**    Do you have any reason to dispute that Mr. Molina gave

19    those communications to KAM?

14:26:33 20    **A**    Yeah.  I'm somewhat suspect, if your source is the

21    Hunters, yes.

22    **Q**    That's not what I asked you, sir.  What I asked you

23    is:  Do you have any evidence that those communications did

24    not happen?

14:26:51 25                          MR. BLUM:  Your Honor, object to the form of

**Libardi  (Cross)**

1    that question.  Evidence that something did not happen?

2    I --

3                    THE COURT:  Mr. Davis.

4                    MR. BLUM:  How do you even --

14:27:02  5          MR. DAVIS:  Well, I mean, he can have all the

6    hunches he wants, Your Honor.  I'm asking him what his --

7    **BY MR. DAVIS:**

8    **Q**    Well, then, let me ask can you this:  What is your

9    basis?  Do you have any documents, any conversations with

14:27:12  10   Mr. Molina that would support your hunch that KAM and the

11   Hunters are lying that that happened?

12   **A**    Well, I think we've testified to lots of

13   misrepresentations from the Hunters in terms of

14   documentations, and so I believe there is evidence to

14:27:35  15   support my hunch that I don't have direct evidence of the

16   communications between Andy and Mr. Molina.

17   **Q**    Is Mr. Molina authorized to have these discussions

18   about how to cure these deficiencies with KAM?

19   **A**    He is a coach, yes.  So a coach and an influence --

14:27:55  20   influencer.  Not --

21   **Q**    Let me ask you, sir --

22   **A**    -- a determiner.

23                    (Court Reporter clarification)

24                    MR. BLUM:  "He's not a"?

14:28:02  25   **A**    Not a determiner.

482

**Libardi  (Cross)**

1          MR. BLUM:  Determiner.

2     **BY MR. DAVIS:**

3     **Q**     Can you then describe the proper procedure that an AR

4     is to follow when they receive a deficiency regarding

14:28:23  5     training on properly conducting an OSE visit?

6     **A**     Well, again, the assumption is that the Hunters, as

7     10-year area reps, have already been trained, and they have

8     been, on what a proper OSE is.  That training was done

9     multiple times in those conferences I referenced in terms of

14:28:48  10    training as part of the agenda.  So I am confident to say

11    that the Hunters know what an OSE is and how it's supposed

12    to be performed.

13          As it relates to their employees, I would say that the

14    OFCs would be required to go through the certification

14:29:07  15    process and be certified as AR-OFCs and approved by Marco's

16    to conduct the OSEs.  But as it relates to somebody who that

17    may be certified like Mr. Weathers, then the Hunters would

18    then be required to do the training to get them to a level

19    of sufficient execution.

14:29:29  20    **Q**     That's not what I asked you, sir.  Please listen to my

21    questions and answer what I ask.

22          What is the procedure for an AR, if they receive a

23    deficiency notice regarding required training on conducting

24    an OSE visit, how are they supposed to find out what is

14:29:52  25    required?  What is the procedure?

483

**Libardi  (Cross)**

1     **A**     I just explained it to you.

2     **Q**     No, you didn't, sir.  You explained what the --

3     **A**     I did.

4     **Q**     No.  You explained what you believed the cure would

14:30:02 5     be.

6            My question to you is:  What is the procedure for the

7     AR to find out what the required cure is?

8     **A**     Mr. Davis, that's my answer.

9            THE COURT:  Mr. Libardi, I don't think you

14:30:17 10     addressed the question that was asked.

11            The question that was asked was not to opine about

12     whether or not the Hunters knew.  It was a question

13     generally with regard to ARs and curing that deficiency, how

14     are they supposed find out how to go about that.  Can you

14:30:32 15     answer that question?

16     **A**     Sure.  Absolutely.  They would reach out to Milton

17     Molina, they would reach out to Mr. Singh, they could reach

18     out to Mr. Brown and confer with them what it is that is

19     required for them to cure that deficiency, to interpret

14:30:52 20     and/or coach, if needed to be.

21     **Q**     Okay.  So KAM, having these discussions with Milton

22     Molina, then follows the procedure on how to find out how to

23     cure the deficiencies.  Would you agree?

24     **A**     I would agree.

14:31:13 25     **Q**     And the AR KAM, then, can rely on what they are

**Libardi  (Cross)**

1    informed by Mr. Molina on what needs to be done to cure the

2    deficiency.  Is that fair?

3                MR. BLUM:  Your Honor, I would object to the

4    form of that question because it actually -- he's trying to

14:31:31  5    restate the entire process here.  Remember, this came from

6    the July 24 letter.  It says what you have to do in that

7    letter, and now he's trying to kind of suggest that there's

8    some other cure.  I don't understand where this is going.

9                THE COURT:  It seems to me the question that

14:31:53 10    was asked by Mr. Davis was a general question about how an

11    AR proceeds when they receive a training, coaching-related

12    notice of defect.  It was not -- I mean, what is one to do

13    in that position that's there.

14           So your argument is, what, that we simply have to rely

14:32:15 15    on what's contained in the paragraph and the letter?  I

16    guess I'm not quite sure I understand the objection.

17                MR. BLUM:  He's asking about what does KAM

18    have to do to cure this alleged default.  Now, if he's

19    talking about the mechanics of it, that's one thing.  But it

14:32:29 20    says in that letter, and now he's trying to say, "Well if

21    they just talk to Mr. Molina, that is a cure."  That's what

22    it seems like he's trying to suggest.  Maybe it's in the

23    questions or maybe it's a disconnect, but a default letter

24    says what to do and --

14:32:48 25                MR. DAVIS:  Your Honor, I actually would like

**Libardi  (Cross)**

1     Mr. Blum to stop making a speaking objection and giving his

2     client the answer.

3                 MR. BLUM:  Your Honor, I will withdraw my

4     objection.  I will just address it on redirect.

14:33:01  5                 THE COURT:  Proceed, Mr. Davis.

6                 MR. DAVIS:  Stacey, I'm sorry to keep asking

7     this, but can you read the last question and answer?

8                 (The follow record was read:  "And the AR KAM

9           then can rely on what they are informed by Mr. Molina

14:31:20 10           on what needs to be done to cure the deficiency.  Is

11           that fair?")

12    **BY MR. DAVIS:**

13    **Q**     Then that's the question I give to you, Mr. Libardi.

14    **A**     They can rely on the coaching Mr. Molina gives, yes,

14:34:03 15    to help cure the deficiency.

16    **Q**     And are you disputing, with anything more than a

17    hunch, that in addressing that deficiency in the July 24th

18    letter, that KAM had the conversation with Mr. Molina and

19    enacted what the coaching required?

14:34:27 20                MR. BLUM:  Your Honor, may I just ask for a

21    clarification?  He said does "that deficiency."  Is he

22    referring to a specific deficiency?

23                MR. DAVIS:  Yes.  The one we've been

24    discussing.

14:34:38 25                MR. BLUM:  Which one?

**Libardi  (Cross)**

          1                    MR. DAVIS:  The one we've been discussing for

          2      the last few --

          3                    MR. BLUM:  Which one is that?

          4                    THE COURT:  It's the second one.  Am I right,

14:34:45  5      Mr. Davis?

          6                    MR. DAVIS:  It's the deficiency regarding

          7      training conducting a proper OSE visit.

          8                    MR. BLUM:  That's actually the third one;

          9      right?

14:34:55 10                    MR. DAVIS:  I'm sure the Judge doesn't have

         11      these documents memorized, Counsel.

         12                    MR. BLUM:  Well, you're asking about the

         13      letter and not putting up the exhibit for some reason.  But

         14      is it the complete remedial training?  Your Honor suggest

14:35:06 15      that is the second.  I believe it is the third.

         16                    MR. DAVIS:  Your Honor, I don't know what

         17      further to tell Mr. Blum.  If he can't follow the line of

         18      questioning and explain it, I'm not sure what else he wants.

         19                    MR. BLUM:  Your Honor, I will plead guilty to

14:35:19 20      not being smart, but I just want to know which deficiency

         21      he's talking about, that's all.

         22                    MR. DAVIS:  And I said, "The deficiency

         23      regarding requiring additional training on how to conduct a

         24      proper OSE visit."

14:35:33 25                    THE COURT:  Very good.

**Libardi  (Cross)**

|         |    |                                                             |
|---------|----|-------------------------------------------------------------|
|         | 1  | MR. BLUM:  For the record, I believe it is the              |
|         | 2  | third bullet point to the exhibit, that's all.              |
|         | 3  | THE COURT:  Might have been my mistake.  Go                 |
|         | 4  | ahead.                                                       |
| 14:35:44 | 5  | **BY MR. DAVIS:**                                           |
|         | 6  | **Q**    So do you have any reason to dispute, besides a hunch, |
|         | 7  | that KAM did not follow Mr. Molina's coaching on what was   |
|         | 8  | required to cure that specific default?                      |
|         | 9  | **A**    I have no specific evidence either way.            |
| 14:36:08 | 10 | **Q**    Okay.                                             |
|         | 11 | MR. BLUM:  You froze up at the end.                         |
|         | 12 | **A**    I have no specific evidence either way.           |
|         | 13 | **Q**    And so going back to the issue of the technology  |
|         | 14 | deficiency, would the same protocol be followed; that KAM  |
| 14:36:41 | 15 | should have had a conversation with the CIO regarding that |
|         | 16 | issue and receive coaching on how to handle it?            |
|         | 17 | **A**    Again, the document stipulates how to cure the    |
|         | 18 | deficiency.  So the method in which they go about curing it, |
|         | 19 | meaning if they needed information from the CIO, then they |
| 14:37:02 | 20 | should have reached out to the CIO to gain guidance.  Yes, |
|         | 21 | that would be appropriate for them to do that, yes.        |
|         | 22 | **Q**    Okay.  And it would be appropriate for them to follow |
|         | 23 | the guidance from the CIO --                               |
|         | 24 | **A**    Yes.                                              |
| 14:37:14 | 25 | **Q**    -- of what would be required to complete -- to cure |

**Libardi  (Cross)**

1    the deficiency?

2    **A**    That's correct.

3    **Q**    Okay.  I am going to show you, again, what's been

4    marked -- I'm sorry, I need to hit the share screen first --

14:37:32  5    Exhibit 10.  Is Exhibit 10 up on the screen?

6    **A**    Right.  I see something on the screen.  I'm not sure

7    what it is.

8    **Q**    Do you see "Exhibit 10" in the upper left-hand corner

9    there?

14:37:43  10    **A**    Yes, I do.

11    **Q**    And this is a letter from my firm, specifically from

12    Mr. Klein to you, dated September 2nd, 2020; is that

13    correct?

14    **A**    It is, yes.

14:37:54  15    **Q**    Did you receive this letter?

16    **A**    I did.

17    **Q**    And this letter contains a recitation of what KAM did

18    to complete the curing of the alleged deficiencies in the

19    July 24th letter?

14:38:16  20              MR. BLUM:  Your Honor, I have to object on

21    hearsay because I don't believe Mr. Klein, who wrote this

22    letter, did any of the things that are listed there.

23              THE COURT:  Mr. Davis.

24              MR. DAVIS:  I wasn't asking for Mr. Libardi to

14:38:36  25    opine or testify to the veracity of any statements contained

**Libardi  (Cross)**

1     therein.  I'm asking him if he received it, and did it

2     contain a section that addressed the July 24th, 2020, Notice

3     of Deficiency.

4                     MR. BLUM:  We'll stipulate to that, that he

14:38:54  5     received it and that it has words that address those issues.

6                     MR. DAVIS:  Well, I don't think we require a

7     stipulation.  He can simply say, "Yes."

8                     THE COURT:  Mr. Libardi.

9     **A**     Rephrase the question.  I don't know what the question

14:39:09  10    was.  I'm sorry.

11    **Q**     You testified that you received Exhibit 10, the

12    September 2nd letter from my firm; correct?

13    **A**     I did, yes.

14    **Q**     And I'm asking you, and I'm showing it to you to

14:39:20  15    refresh your memory in case you didn't remember, it contains

16    a section which address the alleged deficiencies contained

17    in the July 24th Notice of Deficiency; is that accurate?

18    **A**     Yes.

19    **Q**     Marco's ever respond to this letter?

14:39:37  20    **A**     No, not that I'm aware of.

21    **Q**     So Marco's made no challenge to the recitations

22    contained about how KAM took steps to cure the alleged

23    deficiencies in the July 24th letter?

24                    MR. BLUM:  Your Honor, there I will object

14:39:56  25    because that question embeds the hearsay.  He's now

**Libardi (Cross)**

1   characterizing this letter as showing that KAM addressed the

2   deficiencies, and Mr. Klein has no firsthand knowledge of

3   that.  I mean, he's trying to elevate this letter to

4   something it isn't.  He can answer if the lawyer says they

14:40:18  5   did.

6           MR. DAVIS:  That's not what the question was.

7           THE COURT:  Right.

8           MR. BLUM:  Did they address it.

9           THE COURT:  No.  Look, I don't consider this

14:40:30 10  to be a concession by Marco's as to the validity of the

11   explanation that's provided in Mr. Klein's letter.  I take

12   the earlier question as:  Was there a portion of the letter

13   which addressed the alleged deficiencies; and then did

14   Marco's ever respond in writing to the allegations contained

14:40:56 15  about efforts to fix the deficiency.

16      That's not an agreement or a concession that they were

17   fixed or valid.  That's what I took the line of questioning

18   to be.  Am I wrong, Mr. Davis?

19           MR. DAVIS:  No.  I was just simply asking did

14:41:14 20  they ever respond in writing challenging the veracity of

21   those statements.

22           MR. BLUM:  Then, Your Honor, I would just

23   object on relevance at that point then, what a lawyer's

24   letter -- and we were in litigation a week later.

14:41:32 25           MR. DAVIS:  That's not entirely true.

**Libardi  (Cross)**

1          MR. BLUM:  I don't understand the relevance of

2    Mr. Klein's allegation to this case.

3          THE COURT:  Okay.  I'll note your objection.

4    I'm going to overrule it.

14:41:46  5          MR. BLUM:  Okay.

6          THE COURT:  Mr. Davis, you can proceed.

7    **Q**    Did Marco's --

8          THE COURT:  Mr. Libardi --

9          MR. DAVIS:  I'm sorry, Your Honor.

14:41:53 10          THE COURT:  -- do you understand the question?

11   The question, as I take it, is:  Did Marco's ever respond in

12   writing to this portion of this letter addressing the

13   efforts, as alleged by KAM, to address the Notice of

14   Deficiency?

14:42:09 15   **A**    Your Honor, Marco's never responded to the letter from

16   the KAM's attorney.

17          MR. DAVIS:  Thank you.  Your Honor, if I may

18   just have a second or two to confer with Mr. Klein.  I may

19   be done.

14:42:36 20          THE COURT:  Stretch your legs if you want for

21   a moment.  Turn off your camera if you want.  We'll give

22   them a couple of moments, nothing by a lengthy break, but a

23   pause here for a moment.  So take a few minutes.  Okay?

24          MR. DAVIS:  Thank you, Your Honor.

14:42:50 25          (Pause in the proceedings)

**Libardi  (Cross)**

1     MR. DAVIS:  I don't know if Your Honor can

2 hear me, but we're ready.

3     THE COURT:  All right, Mr. Davis.  We're back

4 on the record then at this time.  Please proceed.

14:46:57  5     MR. DAVIS:  A handful more, Your Honor.

6 **BY MR. DAVIS:**

7 **Q**  You testified about approximately 15 transactions

8 where AR -- area representative businesses of Marco's were

9 sold; is that accurate?

14:47:13 10 **A**  Yes.  Approximately, yes.

11 **Q**  Right.  Do you know approximately how many of those

12 agreements, those sales, were to third-party entities

13 besides Marco's?

14 **A**  In the last two years, none.

14:47:31 15 **Q**  If the Columbia and Charlotte Agreements were to be

16 terminated --

17 **A**  Yes.

18 **Q**  -- KAM and the Hunters would be prohibited from --

19 there's a non-compete provision in the agreements; correct?

14:47:59 20     MR. BLUM:  Sorry.  I just didn't hear the

21 word.  A what provision?

22     MR. DAVIS:  A non-compete provision that

23 survives the termination of the agreement.

24 **A**  As it relates to pizza, yes.

14:48:13 25 **Q**  Right.

**Libardi  (Cross)**

1    **A**    Pizza category.

2    **Q**    And in the current version of the AR Agreement that

3    ARs are signing right now, is that non-compete language

4    still limited to pizza category restaurants?

14:48:47   5              MR. BLUM:  Your Honor, I'm going to object to

6    relevance on that.

7    **A**    Yeah.  And I'm unclear as to what agreements we're

8    talking about.  Franchise agreements?  Or Area Rep

9    Agreements?

14:48:57  10              MR. DAVIS:  I'm speaking about AR Agreements.

11   And, Your Honor, I'm happy to address the relevancy, if

12   necessary.

13              THE COURT:  Please do so.

14              MR. DAVIS:  The relevancy is I just want to

14:49:06  15   find out what Marco's -- because what Marco's considered

16   competitive in 2010 and 2011 with their agreements may have

17   changed for their agreements in 2020.  And if the Columbia

18   Agreement was tendered -- the renewal agreement was

19   tendered, they would be -- KAM would be required to execute

14:49:31  20   the then-current Area Representative Agreement.

21              THE COURT:  I'll permit it.  Go ahead.

22              MR. BLUM:  Your Honor, on relevance, he's

23   talking about a post-termination covenant not to compete.  I

24   don't --

14:49:46  25              MR. DAVIS:  I can lay that foundation.

**Libardi  (Cross)**

|  |  |
|---|---|
| 1 | MR. BLUM:  That's not anything at issue here, |
| 2 | though, but okay. |
| 3 | THE COURT:  Go ahead, Mr. Davis.  Please lay |
| 4 | some foundation. |
| 14:49:55  5 | **BY MR. DAVIS:** |
| 6 | **Q**   And the Columbia and Charlotte Agreements contain a |
| 7 | provision in turn that KAM or its principals -- or that KAM |
| 8 | and its principals are not allowed to have any ownership |
| 9 | interest in a competing franchise? |
| 14:50:09  10 | **A**   Can -- |
| 11 | **Q**   I will show you. |
| 12 | **A**   Can you pull up the -- |
| 13 | **Q**   Absolutely. |
| 14 | **A**   -- section that you're referencing, please? |
| 14:50:28  15 | **Q**   Sorry.  If you can just give me a second, I'm pulling |
| 16 | it up. |
| 17 | **A**   Sure. |
| 18 | **Q**   I'm going to direct your attention to Plaintiff's |
| 19 | Exhibit 2.  Is that up on the screen for you, Mr. Libardi? |
| 14:50:52  20 | **A**   It is, yes. |
| 21 | **Q**   Okay.  And I'm going to direct your attention to |
| 22 | Section 14.2.3. |
| 23 | **A**   Okay. |
| 24 | **Q**   And I'm going to highlight that section, and I'm going |
| 14:51:05  25 | to ask you to read it. |

**Libardi  (Cross)**

1    **A**    Sure.  "Own, maintain, operate, affiliate with, or

2    have an interest in any franchised or company-owned business

3    that offers or sells pizza products and related food items

4    and services as a primary menu item."

14:51:25  5    **Q**    Okay.  And that's what Marco's considers a competing

6    franchise?

7                    MR. BLUM:  Object to the form.  It calls for a

8    legal conclusion.  It's contrary to the express terms of the

9    agreement.

14:51:41  10                    THE COURT:  I think he can testify about his

11    understanding of the scope of that provision as COO.  I will

12    allow it.

13    **A**    Yes.  It is related to a franchised owned and operated

14    affiliation to the AR Agreement.  So they could not own and

14:52:00  15    operate a Domino's Pizza as an area rep for Marco's

16    Franchising.  That's what it was.

17    **Q**    Okay.  And does the now-current AR Agreement contain a

18    similar provision?

19    **A**    I assume it does.  I don't know.

14:52:23  20    **Q**    Okay.  Do you know if -- well, Your Honor, I can

21    actually just show him an exhibit to refresh his memory.

22    **A**    Perfect.

23                    MR. BLUM:  What exhibit was that that you just

24    showed him?

14:52:39  25                    MR. DAVIS:  That was Exhibit 2.

**Libardi  (Cross)**

1                      MR. BLUM:  Okay.

2                      MR. DAVIS:  I'm sorry.  It's going to take me

3          a second to. . .

4          **BY MR. DAVIS:**

14:53:19  5   **Q**     Sir, I'm just going to show you a document, not to be

6          entered into evidence, just to refresh your memory, perhaps.

7                      Mr. Libardi, can you please take a look at this

8          document?  And I know it's difficult because you can't

9          scroll through it, and I will do whatever you need me to do,

14:53:42  10  but are you familiar with this document?

11         **A**     I am not.

12         **Q**     I'm going to turn your attention to page 9.  Is that

13         your electronic signature?

14         **A**     It is.

14:53:57  15  **Q**     Okay.  So at some point you were familiar with this

16         document?

17         **A**     Sure.  Fair.  Fair assessment.

18         **Q**     And as you can see here, I'm going to scroll through

19         this page slowly:  Marco's Pizza, Marco's Franchising, LLC,

14:54:16  20  Area Representative Agreement for American Eagle

21         Investments, Inc.  Does that refresh your memory of what

22         this document is?

23         **A**     I'm familiar with what it is, yes.

24         **Q**     Okay.  And if you can take a look and read to yourself

14:54:51  25  Section 15.3.3 of this document.

**Libardi  (Redirect)**

1    **A**    Yes.

2    **Q**    Okay.  So does that refresh your recollection this

3    clause of the agreement, while it may have changed numbers,

4    the language remained unchanged?

14:55:10  5    **A**    Correct.

6              MR. DAVIS:  I have nothing further,

7    Your Honor.

8              THE COURT:  All right.  Mr. Blum, any

9    redirect?

14:55:29 10              MR. BLUM:  Yes.  Just a few, Your Honor.

11    **REDIRECT EXAMINATION OF ANTHONY MICHAEL LIBARDI**

12    **BY MR. BLUM:**

13    **Q**    Mr. Libardi.

14    **A**    Yes, sir.

14:55:36 15    **Q**    Do you know -- referring to Mr. Klein's September 2

16    letter that asked if Marco's responded, do you know if

17    Marco's lawyers responded to that letter?

18    **A**    They did.

19    **Q**    What's that?

14:55:48 20    **A**    I believe they did.

21    **Q**    They did?

22    **A**    I believe so.

23    **Q**    Okay, sir.  All right.  And let's go to -- let's see

24    where we are here.  Sir, I'm going to show you Plaintiff's

14:56:23 25    Exhibit 5.  Mr. Davis asked you a question about this, sir.

**Libardi (Redirect)**

 1    I'm trying to find where it is that -- oh, right there.

 2    It's on page 7, but I will share the screen real quick.

 3                  MR. DAVIS:  Again, Your Honor, only because I

 4    don't want KAM to be accused of any wrongdoing here, this

14:56:47   5    exhibit has been identified as confidential.  If Marco's

 6    isn't --

 7                  MR. BLUM:  I've got it, I've got it.  Fine.

 8    We'll mark this question confidential, Stacey.

 9                  THE COURT:  Very good.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    **BY MR. BLUM:**

14:57:56  25    **Q**    Okay.  Sir, I will show you this.  Mr. Davis asked you

**Libardi  (Redirect)**

1    some questions at the end there about Section 14.2.3 here

2    about the restriction in the AR Agreement of owning,

3    maintaining; right?

4    **A**    Yes, sir.

14:58:20  5    **Q**    And it says, "in any business that offers or sells

6    pizza products"; correct?

7    **A**    That's correct.

8    **Q**    Okay.  Now, up in 14.2.1, the area representative, it

9    says, is not permitted to "Divert or attempt to divert any

14:58:40  10   business or customer of any franchised business operated

11   under the Marco's System to any competitor or to do any act

12   injurious."  Do you see that phrase?

13   **A**    I do.

14   **Q**    Okay.  Is the phrase "any business or customer of any

14:58:59  15   franchised to any competitor," is "any competitor" a

16   smaller -- a larger group, rather, than a business that

17   offers or sells pizza products?

18   **A**    It is.

19   **Q**    Okay.  So 14.2.3 is related to the Pizza Huts and the

14:59:15  20   Domino's of the world, and 14.2.1 is they are not allowed to

21   divert any business to any other competitor in the food

22   space; correct?

23   **A**    Correct.

24   **Q**    Okay.  All right, sir.  The July 24 letter.  I can

14:59:42  25   pull that up.  It is, I believe, Plaintiff's Exhibit 8.  I

**Libardi  (Redirect)**

1    will get that up here.  Okay, sir.  Mr. Davis went through a

2    lot of questions about this.  Do you recall that line?

3    **A**    I do.

4    **Q**    Okay.  All right.  Now, we go down the page, and the

15:00:09 5    third default is the "OSE Visits and Unauthorized AR-OFC";

6    correct?

7    **A**    That's correct.

8    **Q**    And that talks about the delay, but then there are

9    other issues there; correct?

15:00:22 10   **A**    Yes.

11   **Q**    It says -- and this says here "Additionally."  Is that

12   separate from Mr. Legg's "Additionally, resent OSE visits"?

13   **A**    It is separate from Mr. Legg's issue.

14   **Q**    On the next page, it says that Section 4.3.4 permits

15:00:39 15   the default for failure to comply.  And then can you read

16   this paragraph that follows that on page 3?

17   **A**    Yes, sir.  "To cure this default, you must complete

18   all of the following by September 1st, 2020."

19   **Q**    Okay.  And this is related to the OSE and Legg

15:00:59 20   default?

21   **A**    That's correct.

22   **Q**    And the second bullet point.  Is it your belief, sir,

23   that KAM corrected all store-level operational deficiencies

24   for stores KAM directly owns, according to its deficiency

15:01:15 25   letter sent out to each store?

Libardi  (Recross)

1     A     It is not my position.  They did not cure them.

2     Q     Okay.  Sir, did KAM represent to you by doing certain

3     OSEs in August that they did cure -- address these problems?

4     A     They did.

15:01:30  5     Q     And in your follow-up in the Marco's further

6     investigation, did it appear that they, in fact, cured those

7     defaults, or not?

8     A     They did not.

9     Q     Okay.  And that's related to the September 30 and

15:01:45 10     October 1 --

11     A     Yes, sir.

12     Q     -- that verified the condition of those stores;

13     correct?

14     A     That is correct.

15:01:52 15     Q     All right, sir.

16               MR. BLUM:  Nothing further, Your Honor.

17               THE COURT:  Any recross, Mr. Davis?

18               MR. DAVIS:  Yes, unfortunately, Your Honor.

19          **RECROSS-EXAMINATION OF ANTHONY MICHAEL LIBARDI**

15:02:20 20  **BY MR. DAVIS:**

21     Q     You just testified that Marco's provided a response to

22     the September 2nd letter from my firm; is that correct?

23               MR. BLUM:  Object to the form.  I believe it

24     misstates his testimony, Your Honor.  It was Marco's counsel

15:02:38 25     sent him.

**Libardi  (Recross)**

1          THE COURT:  That his testimony was Marco's

2    counsel.

3          MR. BLUM:  That Marco's counsel sent him,

4    right.

15:02:44  5          THE COURT:  Right.

6    **BY MR. DAVIS:**

7    **Q**    When did Marco's counsel send that letter, before or

8    after this litigation was initiated?

9    **A**    Well, the day we received the letter, Todd Watson

15:02:56 10   responded to you that we received the letter.  That is a

11   correspondence.

12   **Q**    All right.  Prior to the initiation of this

13   litigation, did Marco's counsel -- well, let me rephrase it.

14          Besides that communication from Mr. Watson verifying

15:03:18 15  receipt, did Marco's, through its counsel or from you, give

16   any substantive response to the September 2nd letter?

17   **A**    Before when?

18   **Q**    Well, I'm not putting a time limit here on Marco's.

19   **A**    I believe there was a response once you filed

15:03:41 20  litigation.

21   **Q**    Okay.  So before this lawsuit was filed, though, there

22   was no response -- a substantive response to this

23   September 2nd letter?

24   **A**    I believe in the six or seven business days between

15:03:54 25  the two, no.  I don't know that there was a direct response

Libardi  (Recross)

1    to what you -- the content of your letter.

2    **Q**    Do you remember your testimony just now regarding

3    14.2.1, prohibiting diverting to other franchises,

4    et cetera, et cetera?  Do you remember that testimony?

15:04:17  5    **A**    I do.

6                    MR. BLUM:  Excuse me.  That was outside the

7    scope of redirect, Your Honor.

8                    MR. DAVIS:  You just asked him questions about

9    that section of the agreement.  How could that be outside

15:04:29  10    the scope?

11                    THE COURT:  I will permit it.  Go ahead, Mr.

12    Davis.

13    **BY MR. DAVIS:**

14    **Q**    So do you remember that testimony?

15:04:34  15    **A**    I do.

16    **Q**    Okay.  Do you have any evidence that the Hunters have

17    violated that provision of the agreement?

18    **A**    I do not.

19                    MR. DAVIS:  Okay.  Nothing further,

15:04:50  20    Your Honor.

21                    MR. BLUM:  Okay.  Your Honor, I have one

22    thing, and I'm going to show an exhibit that I won't move

23    into evidence.

24        **FURTHER REDIRECT EXAMINATION OF ANTHONY MICHAEL LIBARDI**

15:05:03  25    **BY MR. BLUM:**

**Libardi (Further Redirect)**

1    **Q**    But, Mr. Libardi, have you ever seen -- Genovese

2    Joblove & Battista, that's my law firm, and we represent

3    you; correct?

4    **A**    That's correct.

15:05:10  5    **Q**    And you know my partner, Michael Joblove; correct?

6    **A**    I sure do.

7    **Q**    And, I don't know, maybe you hadn't seen this, but on

8    September 8th, 2020, Mr. Joblove wrote to Mr. Klein and

9    said, "In general response to your letter and KAM

15:05:26 10    Development," and it's specifically responding to the

11    September 2 letter, is it not?

12    **A**    It is, yes.

13                MR. BLUM:  Okay.  Nothing further.

14                MR. DAVIS:  Whoa, whoa, whoa, whoa.  Well,

15:05:42 15    that wasn't provided beforehand.  We may have received it,

16    but we had no idea they were going to intend to use it, and

17    I think I have the right to cross-examine on it now.

18                MR. BLUM:  Your Honor, I didn't put it into

19    evidence.  He said there was no response.  It was a

15:05:59 20    rebuttal.  It went to his law firm.

21                MR. DAVIS:  Lots of things come to our firm,

22    Your Honor.  We didn't prepare for every communication we've

23    ever received.  There have been lots of emails about

24    scheduling.  I didn't know they were going to be part and so

15:06:17 25    we didn't -- I should be able to ask questions about that

1    letter since he brought it up.

2                    THE COURT:  Let me ask first:  So you do not

3    have that letter, Mr. Davis?

4                    MR. DAVIS:  I'm not, no.  We received that

15:06:25  5    letter, Your Honor.  What I'm saying is that if he wants to

6    make the representation that there was a substantive

7    response, we should be able to at least question about what

8    the response was.

9          And can you also let us know what date was the --

15:06:43 10                    MR. BLUM:  September 8.

11                    MR. DAVIS:  Oh.  So this was the same day we

12    filed.  You know what?  I have no questions.

13                    MR. BLUM:  I don't know when you filed.

14                    MR. DAVIS:  Oh.  Then, Nick, do you know what

15:06:55 15    date we filed the complaint?

16                    MR. HUCKABY:  Not off the top of my head, but

17    I can review it.

18                    MR. DAVIS:  Take a look, please.

19                    MR. HUCKABY:  But I believe the Court can take

15:07:07 20    judicial notice of their docket as well.

21                    MR. BLUM:  Again, Your Honor, I don't know

22    where we are.  I'm not offering it into evidence.  I'm

23    just --

24                    THE COURT:  Well, I guess my --

15:07:28 25                    MR. KLEIN:  I think it's being offered for the

1    purpose of -- I don't know -- I guess, you know, either --

2    not impeaching, but rehabilitating the witness.  And I'm

3    trying to pull it up, but I just want to look to see what

4    the letter says.

15:07:52 5               THE COURT:  It appears the complaint was filed

6    on September 9th.

7               MR. KLEIN:  Yeah.  Because I just saw my email

8    to Michael Joblove responding to that -- the letter that he

9    sent.

15:08:05 10              MR. BLUM:  Your Honor, I don't know if Mr.

11   Davis or Mr. Klein, you know, I'm getting a little double

12   teamed here.

13        But the issue is -- the question was, "Did Marco's

14   ever respond?"

15:08:17 15        And Mr. Libardi, said -- maybe he wasn't aware of that

16   letter, but he said, "I don't believe we did."

17        And then I asked him, "Did Marco's counsel ever

18   respond?"  And I showed him that letter.

19        So it's not to rehabilitate -- he didn't need

15:08:31 20   rehabilitation because the question had an embedded

21   suggestion that wasn't completely accurate.

22        I'm not putting it into evidence.  I mean, come on.

23   Mr. Davis' question suggested -- I don't know what the

24   significance is, whether we responded or not in five or six

15:08:50 25   days, but I would like to prove matters, I guess.

1            THE COURT:  Well, hold on.  So, Mr. Davis, in

2    light of the disclosure of those dates, what is your

3    position moving forward here?

4            MR. DAVIS:  It's fine, Your Honor.  There's no

15:09:05  5    sense to beat a dead horse.

6            THE COURT:  I mean, the letter is not in, but

7    there appears to be a letter of response from the 8th that

8    was sent generally, but Mr. Libardi appears to have had no

9    knowledge of that.

15:09:22 10            MR. DAVIS:  We're fine, Your Honor.

11            THE COURT:  All right.

12            MR. DAVIS:  I was just -- our reaction may

13    have been, at least mine was, I was in the middle of reading

14    this letter when it was taken off the screen.

15:09:31 15            THE COURT:  Fair enough.

16            MR. DAVIS:  And I hadn't had a chance to

17    review it again before the hearing.  That's all.

18            THE COURT:  Fair enough.  So I'm assuming at

19    this point, for the sake and mental health of Mr. Libardi,

15:09:44 20    there are no further questions from him for either side?

21            MR. DAVIS:  No further questions.

22            THE COURT:  So, Mr. Libardi, you are now

23    finished as a witness in the case.

24        Are there any additional witnesses or evidence on

15:09:56 25    behalf of the defense at this point?

```
 1                    MR. BLUM:  Yes, Your Honor.  We would like to

 2      call Ashley Weis for -- and I don't know if we can --

 3                    MR. WATSON:  I will reach her to let her know

 4      to log in.

 5                    MR. BLUM:  Okay.  But I don't know if we

 6      could -- there were some documents that we had that we had

 7      talked about before with Mr. Hunter.  It was the BDM

 8      development agreement, the Denver franchise agreement, the

 9      Candler, North Carolina, franchise agreement that we went

10      through with Mr. Hunter.  And he suggested that he did not

11      necessarily have full -- those in his possession.

12          Ms. Weis will be the person who handles those and

13      monitors and can substantiate those.  There are some other

14      areas, but we might be able to shorten her up.  If they

15      would just agree that those come into evidence, we won't

16      have to lay that foundation.

17                    MR. KLEIN:  Is it just for authentication?

18                    MR. BLUM:  There is Ms. Weis there.

19                    MR. DAVIS:  I would ask Ms. Weis to sign off

20      while we're discussing her testimony.

21                    MR. BLUM:  Right, right.  Ashley, if you would

22      just sign off for a little bit before, that would be fine.

23                    THE COURT:  Ms. Weis, you just signed on, now

24      we're having you sign off, but we'll let you know when to

25      sign in again.  Okay?  We appreciate it.
```

```
              1              THE WITNESS:  No worries.

              2              THE COURT:  All right.  So let's start

              3     foundationally here.  What exhibits are we talking about?  I

              4     mean, if the suggestion is there might be a stipulation as

   15:11:27   5     to those exhibits, then let's see what they are and get a

              6     response from plaintiffs.

              7              MR. BLUM:  Right, right.  Your Honor, it will

              8     not be -- it won't be all of Ms. Weis' testimony, but it

              9     will shorten it up.

   15:11:43  10          Let's see where we are here.  They are exhibit --

             11     okay.  I believe it is Exhibit 26 I believe it is.

             12              MR. DAVIS:  Okay.  Wait, wait.  Go slowly

             13     because, again, you have --

             14              MR. BLUM:  Exhibit 26.

   15:12:13  15              MR. DAVIS:  I'm sorry?

             16              MR. BLUM:  Exhibit 26.

             17              THE COURT:  Exhibit 26.

             18              MR. DAVIS:  I heard that, but the problem is

             19     that you gave us a PDF with three exhibits in it that's

   15:12:24  20     131 pages long.  What page does Exhibit 26 start at?

             21              MR. BLUM:  It starts on page 4.  The cover

             22     sheet is actually page 3.

             23              THE COURT:  Can you share that with us, Mr.

             24     Blum?

   15:12:36  25              MR. DAVIS:  I'm looking at it, Your Honor.
```

1    It's fine.

2                    THE COURT:  All right.

3                    MR. BLUM:  And then Exhibit 27 starts on

4    page -- the cover sheet is on page 67.  The document starts

15:12:48  5    on 68.  That is a franchise agreement for store 8574.

6                    MR. DAVIS:  Okay.  Any others?  Because I can

7    put my objections down to these first two.

8                    MR. BLUM:  Exhibit 28, which is the BDM

9    development agreement, which we talked about extensively

15:13:19 10    with Mr. Hunter; and Exhibit 30, which is the list of the 20

11    stores in the Charlotte territory.

12                    MR. DAVIS:  All right.  Well, let's leave off

13    that last one for a minute.  The first three, Your Honor, I

14    would object to them on relevance.  They are agreements that

15:13:58 15    don't involve KAM.  Andy Hunter has testified that he

16    doesn't have any knowledge of the contents of those

17    agreements.

18         And I guess the proffer I would ask for is what is Ms.

19    Weis going to testify to regarding those documents and how

15:14:15 20    that's relevant.

21                    THE COURT:  Let's take them one at a time, Mr.

22    Blum.  Defendant's Exhibit 26 is what, in your description

23    as counsel for defendant?

24                    MR. BLUM:  Okay.  26 is a development

15:14:35 25    agreement -- or rather I believe 26 is the franchise

1    agreement for store 8525, which is the Denver store.

2              MR. DAVIS:  Which is not owned or operated by

3    KAM or any of its affiliates.

4              MR. BLUM:  Exhibit 27 is the franchise

15:15:09 5    agreement for store 8574, dated July 2nd, 2020, for the

6    Candler, North Carolina, area that Mr. Hunter testified

7    about.  He also testified extensively about Denver in that

8    agreement.

9              MR. DAVIS:  And again --

15:15:28 10             MR. BLUM:  And 28 is the BDM development

11   agreement that Mr. Hunter testified about extensively and

12   relies upon in explaining how they are not in default under

13   the Charlotte -- or that they are in compliance with their

14   development obligations in Charlotte.

15:15:48 15             MR. DAVIS:  Well, that mischaracterizes Mr.

16   Hunter's testimony.  He testified that the stores being

17   built under that development agreement has an impact, not

18   the agreement itself.  And, again, with the other two

19   franchise agreements, as I said, KAM and the Hunters aren't

15:16:11 20   a party to.  How they are relevant to this proceeding, I --

21             MR. BLUM:  Marco's is.  Your Honor, if I

22   might, under the development agreement, a key issue is

23   whether it was complied with in 2019 by the opening of a

24   store, and that document will show that if it's not, it goes

15:16:31 25   away, and that makes Charlotte a completely different story.

1          And the Denver agreement, Mr. Hunter specifically

2     testified that that agreement was opened under the BDM

3     development agreement and, in fact, our position is it was

4     not.  It's shown from the agreement itself, and Ms. Weis

15:16:52 5     will explain how, explain what the records show.  I mean,

6     you know, I think I can put her in and have her go through

7     all these things, but then she can explain the theory.

8          I mean, they cannot put up a theory that "We're in

9     compliance with Charlotte" -- even though you know that they

15:17:09 10     never get there even using the development agreement --

11     "because we have five provisional credits from the Davis

12     development agreement," and then say, "The Davis development

13     agreement is irrelevant."  If it is, those five credits have

14     to go away.  How can it be irrelevant?  It's essential to

15:17:23 15     their case.

16               THE COURT:  Mr. Davis.

17               MR. DAVIS:  Again, Your Honor, it's

18     simply -- look, Mr. Hunter's testimony was that these stores

19     were developed under this agreement.  The existence of the

15:17:38 20     stores is what he testified to.  He didn't say that "We're

21     relying on Section 4.7 of the BDM development agreement to

22     satisfy the development agreement."  It's "These stores were

23     built and under our Area Representative Agreement."  It has

24     nothing to do with the underlying agreement.

15:18:02 25          And I'm not sure -- you know, look, we're willing to

1    stipulate that those things exist and they want to come in.

2    I still don't know what the relevance of Ms. Weis'

3    testimony -- and I'm not saying we're doing that until I'm

4    fully satisfied.  But what is Ms. Weis going to testify to

15:18:22  5    that's relevant to these proceedings?

6                    THE COURT:  Mr. Blum.

7                    MR. BLUM:  Okay.  Let's get the first part out

8    there, Your Honor.  The Davis development agreement is

9    essential to them having any chance of proving anything.

15:18:36  10    Mr. Hunter agreed that the Charlotte development agreement

11    requires 29 stores, and we have an argument about the third

12    quarter and the fourth quarter.  He has 20 open.  He has one

13    that was closed.  He has one that he signed a franchise

14    agreement with.  That's 22.  He's also claiming five credits

15:18:57  15    under the Davis development agreement.

16         So I don't see how they can say that the Davis

17    development agreement is irrelevant.  They are taking five

18    credits under their AR Agreement for Charlotte based on the

19    existence of that agreement.

15:19:15  20         Now, their AR Agreement specifically says if Davis

21    doesn't comply with that development agreement by opening a

22    store in 2019 and then opening two stores in 2020, he loses

23    all his development credits, his provisional credits.

24         When you put these documents in evidence, you will see

15:19:43  25    that those requirements exist, and Ms. Weis will explain why

1      it is that these documents, in our view, show that the

2      Denver store was not opened under that development agreement

3      as Mr. Hunter said it was, and as he -- and would be

4      essential to them to get any development credit.

15:20:07  5          So without the Davis development there, if they want

6      to keep it out, then you have to take out any arguable

7      development credit.  I mean, I don't understand.

8                  MR. DAVIS:  Then I'm going to have to add a

9      new objection, Your Honor.  It is just surprise.  Where was

15:20:23 10      this argument in any of the briefing?  They never submitted

11      any declarations.  And, once again, we're being faced with

12      we're about to hear a witness that we have no idea what

13      she's about to say, and they are advancing a new argument

14      that hasn't been briefed.

15:20:37 15                  MR. BLUM:  She was on our witness list,

16      Your Honor.

17                  THE COURT:  Regardless of the issue of

18      briefing, I think at this point Mr. Blum has the better

19      argument, and I will permit him to pursue it.  You don't

15:20:52 20      have to stipulate to these or stipulate to their

21      admissibility here.  But I am going to give him an

22      opportunity to develop with Ms. Weis whatever foundation he

23      can for admission of these exhibits.

24                  MR. DAVIS:  Okay, Your Honor.  Thank you.

15:21:09 25                  THE COURT:  All right.  Note your objection.

1          MR. WATSON:  Are we ready to call her back?

2          THE COURT:  Yes, Mr. Watson.  Why don't we

3   call her back.

4          MR. DAVIS:  Wait.  Before we do that.

5          THE COURT:  Okay.

6          MR. DAVIS:  I also heard there is going to be

7   additional testimony.  And, again, since we have no idea

8   what that is, if we could at least get a proffer to see

9   whether or not we have any objections to that proceeding.

10         THE COURT:  Mr. Blum, can you help us out

11  here?

12         MR. BLUM:  As a proffer in advance, this

13  person was on my witness list.  But, okay, she's also going

14  to discuss something that came up late, late Monday

15  regarding Mr. Hunter's testimony about the Charlotte

16  development schedule.  For the first time ever, we heard

17  that there is no such thing as a Charlotte development

18  schedule attached to the Charlotte development agreement.

19  That is actually inconsistent from Mr. Hunter's testimony on

20  Friday, then he went to Monday.  So it's a completely new

21  position.  So Ms. Weis can, as the person who takes care

22  of -- who's in charge of documents, there's that little

23  additional bit.

24         MR. DAVIS:  Well, with the exception of I

25  completely disagree with the characterization that Mr.

1    Hunter has changed any testimony.  Let's just get it over

2    with, Your Honor.

3              THE COURT:  I agree that I think Mr. Blum

4    ought to be able to proceed in this area.  Let's bring her

15:22:32  5    in now, if we can, as a witness.

6              MR. WATSON:  I will call her now.

7              THE COURT:  Thank you.

8              MR. WATSON:  She'll be here momentarily.

9              MR. DAVIS:  And, Your Honor, in trying to move

15:23:08  10    time along, we'll stipulate to the, you know, admissibility

11    of the documents pending our objection on grounds.

12              THE COURT:  Very good.  Thank you.

13              MR. BLUM:  And for the record, it's 26 to 28

14    and 30.

15:23:32  15              THE COURT:  Correct.  I'm not sure there ever

16    was an objection to 30.  Was there, Mr. Davis?

17              MR. BLUM:  Right, right.

18              MR. DAVIS:  Again, I vaguely remember 30.  My

19    objection previous was I didn't know where this document

15:23:43  20    came from or what it was, and that was --

21              THE COURT:  I think my recollection is Mr.

22    Hunter took a look at it and --

23              MR. DAVIS:  Said it was --

24              THE COURT:  -- said it looked correct.

15:23:54  25              MR. DAVIS:  Yes.

1          THE COURT:  That he believed it to be correct.

2          MR. DAVIS:  Yes.  Your Honor is correct.

3          THE COURT:  All right.  Very good.

4      So, Ms. Weis, I understand that you are being called

15:24:03  5  now on behalf of the defendant in this particular case.  Are

6  you prepared to take the oath at this time?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Would you raise your right hand

9  for me, please?

15:24:15 10              -  -  -

11              (Witness was sworn)

12              -  -  -

13          THE COURT:  You may lower your hand.  Thank

14  you.

15:24:23 15      Would you state your full name for us for the record.

16          THE WITNESS:  Ashley Weis.

17          THE COURT:  And I just want to make sure.  How

18  do you spell Ashley?

19          THE WITNESS:  A-s-h-l-e-y.

15:24:33 20          THE COURT:  And your last name, Weis, as well,

21  please.

22          THE WITNESS:  W-e-i-s.

23          THE COURT:  Thank you.  And with that, Mr.

24  Blum, please proceed with your direct examination.

15:24:42 25          MR. BLUM:  Okay.

Weis (Direct)

1          **DIRECT EXAMINATION OF ASHLEY WEIS**

2      **BY MR. BLUM:**

3      **Q**     Good afternoon, Ashley.  Where are you employed?

4      **A**     Marco's Franchising.

15:24:50  5   **Q**     And what's your role there?

6      **A**     Currently I'm corporate counsel.

7      **Q**     Okay.  And how long have you been in that role of

8      corporate counsel?

9      **A**     Since May of this year.

15:25:02  10  **Q**     In May of 2020.

11          How long have you been an employee at Marco's

12     Franchising?

13     **A**     Since December of 2013.

14     **Q**     And what roles did you hold between December of 2013

15:25:16  15  and May of 2020?

16     **A**     I was a paralegal.

17     **Q**     What's that?  A paralegal?

18     **A**     Yes.

19     **Q**     Okay.  And who is your supervisor?

15:25:25  20  **A**     Todd Watson.

21     **Q**     And Mr. Watson is general counsel?

22     **A**     Yes, that's correct.

23     **Q**     How many lawyers are there in the legal department

24     now?

15:25:33  25  **A**     Currently two.  Todd and myself.

**Weis (Direct)**

1    **Q**    Okay.  And how many people total in the department?

2    **A**    Five.

3    **Q**    Five?

4    **A**    Yes.

15:25:42  5    **Q**    Okay.  All right.  And in your career at Marco's

6    beginning in December of 2013, did you have responsibility

7    with respect to the preparation, you know, execution process

8    for franchise agreements and development agreements?

9    **A**    Yes.

15:26:04 10    **Q**    Okay.  And, very briefly, can you tell the Court what

11    that entailed in that role?

12    **A**    That entailed getting information from the development

13    team about the parties and the terms of the agreements that

14    we were signing, preparing them, sending them out for

15:26:18 15    signature, receiving them back in, making sure they were

16    correct; and then putting the information into our database,

17    and notifying the other departments that that has been

18    signed and a new franchisee or developer has entered the

19    system.

15:26:32 20    **Q**    Okay.  All right.  Let me go here.  Ms. Weis, I will

21    show you what's in evidence as Defendant's Exhibit 28.  I'm

22    just putting a couple pages up until we get through.  That's

23    shown up there, a Marco's Franchising, LLC development

24    agreement summary, effective date 12-27, with BDM, LLC.  Do

15:27:05 25    you see that, ma'am?

**Weis (Direct)**

1    **A**    Yes.

2    **Q**    Okay.  And then there's attached to that is a

3    development schedule and we've added the yellow to it.  Are

4    you familiar with this kind of document and development

15:27:20  5    agreements in general?

6    **A**    Yes.

7    **Q**    Okay.  What is the purpose of the summary sheet that

8    goes on the -- this summary sheet?

9    **A**    It lays out in a concise format all of the essential

15:27:40 10    terms of the agreement, just from our perspective, of the

11    people, the parties, the, you know, number of stores, the

12    fee that's to be paid.  It is really a summary of the terms

13    that may change from agreement to agreement, you know.  Each

14    party's may be different, each state is going to be

15:28:01 15    different, those kinds of things.

16    **Q**    Okay.  And we can share this.  This summary talks

17    about what we've been referring to, the BDM or the Davis

18    Development previously.  You're familiar with BDM and its

19    principals?

15:28:17 20    **A**    Yes.

21    **Q**    Okay.  And were you involved in the preparation and

22    the administration and the signing of this development

23    agreement in 2018 and early 2019?

24    **A**    I did not directly prepare the agreement, but I was

15:28:34 25    involved in the process.

**Weis (Direct)**

1    **Q**    Okay.  And were you the person who was charged with

2    getting it signed and documenting that the fees were paid

3    and that type of -- from the legal perspective?

4    **A**    Yes.  I oversaw the junior paralegal that did the

15:28:51 5    actual activities, but I was involved in that, yes.

6    **Q**    Okay.  All right, ma'am.  And down at the bottom it

7    says, "Number of stores for development, 8."  Is that a

8    common part of the summary sheet page?

9    **A**    Yes.

15:29:05 10   **Q**    Okay.  So that means it says eight store -- is the

11   development agreement for eight stores?

12   **A**    Uh-huh, yes.

13   **Q**    And the next page is a development schedule.  Do you

14   see that?

15:29:15 15   **A**    Yes.

16   **Q**    And is that something that's commonly put onto a

17   multi-unit development agreement?

18   **A**    Yes.

19   **Q**    All right.  And then down below, it's highlighted.  I

15:29:25 20   don't think it was highlighted on the original.  But there

21   is a development fee and that's listed at $40,000; correct?

22   **A**    Yes.

23   **Q**    Okay.  In 2018, what was the required development fee

24   for a development agreement?

15:29:41 25   **A**    It's $5,000 per site.  So eight sites here times

**Weis (Direct)**

1  $5,000 equals a $40,000 fee.

2  **Q**    Okay.  So the $40,000 is consistent with the

3  eight-store development that we saw on the prior page;

4  correct?

15:29:58 5  **A**    Yes.

6  **Q**    Is that fee a refundable fee or nonrefundable?

7  **A**    Nonrefundable.

8  **Q**    Okay.  Are those funds used in any manner if stores

9  are eventually developed under a development agreement?

15:30:13 10  **A**    Yes.  The $5,000 per site is applied towards the

11  initial franchise fee for each of those locations as they

12  sign franchise agreements for them.

13  **Q**    Okay.  And in 2018 and through today, what is the

14  standard franchise fee for a Marco's store franchise?

15:30:34 15  **A**    $25,000.

16  **Q**    Okay.  So am I right that if a new franchisee came in

17  just by himself or herself and say, "I want to sign a new

18  franchise," they would pay a $25,000 fee; correct?

19  **A**    Correct.

15:30:52 20  **Q**    In a development agreement such as this, if BDM opens

21  a store under this development agreement, how much do they

22  pay as a fee?

23  **A**    They pay $20,000 of fees for the franchise agreement,

24  and then $5,000 for the development fee is applied for the

15:31:11 25  remainder.

**Weis (Direct)**

1    **Q**    So they get a $5,000 credit because they've already

2    paid this $5,000 per store?

3    **A**    Yes.

4    **Q**    All right.  Now, do you recall there were some -- let

15:31:27  5    me ask you this:  Do you have any knowledge, ma'am, of

6    whether before December 27th, 2018, you communicated with

7    anyone at KAM Development about this development agreement?

8    **A**    I do recall an email exchange.

9    **Q**    Who was that with?

15:31:53  10    **A**    With Mike Hunter.

11    **Q**    Okay.  And what was that about?

12    **A**    It was discussing some of the revisions that they were

13    asking to be made to the original terms of the deal.  I

14    wasn't involved in the direct conversations.  But from what

15:32:08  15    I understood, they were going back and forth with the

16    development team about the number of sites and some of

17    geographical areas.  And so then I received that information

18    from Mike, and we kind of discussed how the agreement was

19    going to be laid out based on that information.

15:32:22  20    **Q**    And when you say "Mike," it's Mike Hunter?

21    **A**    Yes.

22    **Q**    So was Mike Hunter involved in sort of the pre-signing

23    details of this development agreement?

24    **A**    Yes.

15:32:35  25    **Q**    Okay.  All right, ma'am.  Let me show you what is in

**Weis (Direct)**

1    evidence now as Defendant's Exhibit 27.  It's a cover sheet

2    that says, "Marco's Franchising, LLC franchise agreement

3    for Store Number 8574."  And on the first page typed in on

4    blank it says, "BDM, LLC."  What does that mean?

15:33:13  5    **A**    That references the franchisee entity.

6    **Q**    So for this 8574, BDM, LLC is the franchisee.  That's

7    the same company that was the developer under the

8    development agreement?

9    **A**    Correct.

15:33:29  10   **Q**    Okay.  All right.  And there's a summary here.  Is

11   this in connection with all summary franchise agreements?

12   **A**    Yes.

13   **Q**    Okay.  And effective date of this is 7-1-2020.  What

14   does that mean?

15:33:42  15   **A**    That's the date that the franchise agreement was fully

16   executed.

17   **Q**    Okay.  All right.  If I go down here, if we go to the

18   second page, this is the 2020 agreement.  I think there's

19   been testimony by Mr. Hunter that this relates to the

15:34:02  20   Candler, North Carolina, location.  Does that comport with

21   your understanding?

22   **A**    Yes, that's my understanding.

23   **Q**    Okay.  So if we go to the second page, there's a --

24   can you tell us what it means up in that first box about

15:34:19  25   "initial franchise fee" and what the significance of that

**Weis (Direct)**

1    is?

2    **A**    Yeah.  So this section here is noting that the initial

3    franchise fee that's due at the time that they executed this

4    agreement is $20,000.  And then on where it says "other" and

15:34:38  5    it's marked, we would note "$5,000 ADA credit" to note that

6    we are taking $5,000 out of that $40,000 ADA fee, and

7    applying it towards what's owed on the initial franchise

8    fee.  So if you add $20,000 and the $5,000 credit, you get

9    to the full $25,000 franchise fee that we would otherwise

15:34:58 10    charge.

11    **Q**    Okay.  And ADA stands for what?

12    **A**    Area Development Agreement.

13    **Q**    Okay.  And I think you said before that the $40,000

14    that BDM paid was nonrefundable.  And by that you mean if

15:35:11 15    they only develop four locations, they don't get their --

16    they get $20,000 in credit, but they don't get the other

17    $20,000 back; right?

18    **A**    Correct.

19    **Q**    All right, ma'am.  Are you familiar with the location

15:35:35 20    in Denver, North Carolina, that was opened sometime in 2019?

21    **A**    Yes.

22    **Q**    Okay.  I'm going to show you what's in evidence as

23    Defendant's Exhibit 26, which is the store number 8525

24    franchise agreement, also by BDM, LLC.  Do you know where

15:36:00 25    store 8525 is?

**Weis (Direct)**

1       **A**      I believe it's located in Denver, North Carolina.

2       **Q**      Okay.  All right.  The if we go to the summary sheet

3       here, the effective date of this is 1-7-2019.  Do you see

4       that?

15:36:21  5    **A**      Yes.

6       **Q**      That's, like, within 10 days or so of the development

7       agreement; is it not?

8       **A**      Yes, that's correct.

9       **Q**      Okay, ma'am.  Is it your understanding, Ms. Weis, as

15:36:36 10   to whether -- was the Denver territory -- in other words,

11      was the Denver franchise agreement signed under the

12      eight-store development agreement that BDM had signed

13      effective December 28, 2018?

14      **A**      No.  It was always the nine store total deal.  And we

15:37:04 15   always set that up with -- or I should say almost all of the

16      time we set that up when they sign the franchise agreement

17      for the first location; and then they sign an Area

18      Development Agreement for the remaining locations.  And we

19      explain that to them at the time, that they would be signing

15:37:20 20   a franchise agreement for one store then; and then the

21      development agreement covered their eight remaining

22      locations that were not fulfilled by that original

23      development -- I'm sorry -- franchise agreement.

24      **Q**      Okay.  So if we go to the next summary pages, this was

15:37:37 25   for the Denver agreement that was signed in earlier 2019.

**Weis (Direct)**

1    The top left box, what does that show was the initial

2    franchise fee?

3    **A**    It shows a $25,000 franchise fee.

4    **Q**    And does it show any credit for the $5,000 for the

15:37:54 5    development agreement?

6    **A**    No, it does not.

7    **Q**    And what does this suggest to you as to whether this

8    agreement was signed as part of the BDM development

9    agreement?

15:38:06 10    **A**    This agreement, it does not satisfy any of the

11    obligations under the development agreement.

12    **Q**    Okay.  And if, in fact, it was part of -- opened under

13    the -- or signed as part of the BDM development agreement,

14    up here at the top where it says "Initial franchise fee," it

15:38:22 15    would be like we just saw on 27?  That would say, "$20,000

16    with a $5,000 credit on other"; correct?

17    **A**    That's correct.

18    **Q**    In your job, were you familiar with any correspondence

19    in 2019 between Marco's and KAM that specifically addressed

15:38:48 20    whether the Denver agreement was being opened under the

21    development agreement?

22    **A**    Yes.  I believe there was a letter that was exchanged

23    with them regarding their area rep development schedule, and

24    we specifically noted that Denver did not count towards that

15:39:07 25    development schedule obligation.

**Weis (Direct)**

1    **Q**    All right.  And are you aware -- at any time did

2    anyone ever communicate with you, Ms. Weis, from BDM to

3    suggest, "Hey, this is wrong.  We should get a $5,000

4    credit"?  Or, you know, "This is one of our eight stores

15:39:35  5    under our development agreement"?

6    **A**    No, not to my knowledge.

7    **Q**    Okay.  Ma'am, there was something that came up that

8    the development agreement was signed in -- or it's dated

9    effective 12-28-2018.  To be an effective development

15:39:57  10    agreement, does the $40,000 fee, is it technically required

11    to be paid to make that agreement effective?

12    **A**    Yes.

13    **Q**    Was the BDM, LLC development agreement of $40,000, was

14    that paid by December 28th, 2018?

15:40:14  15    **A**    No.  In fact, when they signed the Area Development

16    Agreement, they did not submit any bank information, which

17    is part of the requirement, so we could not electronically

18    take any of the fees.  We contacted Brad Davis, one of the

19    principals of BDM at the time, and Mike Hunter, and let them

15:40:35  20    know that that was the case and that we would need that bank

21    information and those fees paid before the agreement would

22    be effective.

23        We didn't receive that information for a couple of

24    weeks after that, and then we attempted to ACH the funds

15:40:49  25    using the information that Brad Davis had provided, and

**Weis (Direct)**

1    those payments bounced back, non-sufficient funds.  So we

2    had to request them a second time, and they were finally

3    actually paid, I believe, on January 22nd or thereabouts.

4    **Q**    Okay.  And on January 22nd, what funds did Marco's

15:41:16  5    Franchising draft or did by ACH from BDM?

6    **A**    $40,000 for the area development fee and $25,000 for

7    the initial franchise fee.

8    **Q**    So they were both drafted, essentially paid by BDM on

9    the same day; correct?

15:41:33  10    **A**    Yes.

11    **Q**    Were there any other charges received that day or

12    payments received that day?

13    **A**    We did ACH another $5,000, which is our standard

14    deposit for the grand opening and brand launch marketing

15:41:50  15    fund program.

16    **Q**    All right, ma'am.  Ms. Weis, let me just say that on

17    Monday of this week, there was some testimony by Mr. Hunter

18    that there was no actual development schedule attached to

19    the Columbia development agreement that the parties ever

15:42:38  20    specifically agreed to.

21        Is that consistent with your understanding of the

22    relationship since 2013 when you got involved until today?

23    **A**    No.

24             MR. DAVIS:  Objection to the extent it

15:42:54  25    mischaracterizes his testimony.  She can answer the question

**Weis (Direct)**

1    itself.

2                    THE COURT:  Noted.  Go ahead.  You can answer,

3    Ms. Weis.

4    **A**    No.  That's not consistent with my understanding.

15:43:05  5    **Q**    Okay.  Well, up until, you know -- up through last

6    week, at least, was Marco's proceeding on the assumption

7    that there was a 35-store development schedule that existed

8    under the Columbia development -- or the Columbia AR

9    Agreement?

15:43:25  10   **A**    Yes.

11   **Q**    Okay.  And you're also familiar with the Charlotte

12   development agreement?

13   **A**    The Charlotte Area --

14   **Q**    I'm sorry.  The Charlotte Area Representative

15:43:58  15   Agreement.

16   **A**    Yes, I am.

17   **Q**    And the development schedule that's attached to that?

18   **A**    Yes.

19   **Q**    Okay.  All right.  Very quickly, I just want to show

15:44:12  20   you -- it's just one page pulled out -- the development

21   schedule attached to the Charlotte Agreement.  Can you

22   explain what the various numbers mean on this, and the

23   headings and the columns, and how -- the significance of all

24   of these words and numbers on the development schedule

15:44:53  25   that's attached to the Charlotte Area Representative

**Weis (Direct)**

1    Agreement?

2    **A**    Yes.  So in the top left corner, you see "QTR."  That

3    stands for quarter.  We measure the development on a

4    quarterly basis according to this schedule.

15:45:09  5        Underneath that shows each fiscal year, and then the

6    "1, 2, 3, 4" indicates quarter one, quarter two, quarter

7    three, and so on.

8        To the right of that, there is a column for "Sold."

9    That was to indicate the number of franchise agreements that

15:45:25  10   were to be sold in each of those particular quarters.

11       Next one is "Open."  That means the store is open and

12   operating.

13       And then the "Accumulative Total" adds up all of the

14   different obligations for each quarter.  And then at the end

15:45:40  15   of the year, that's how many accumulative total restaurants

16   should have been open and operating in the territory.

17       And then it goes through each year, "Year 1" is 2012,

18   "Year 2" is 2013, and so on.

19   **Q**    Okay.  And then the last requirement for the Hunters

15:45:58  20   here to sell a franchise is what?

21   **A**    Quarter two of 2020.

22   **Q**    And the last date there is an obligation to open a

23   store is what?

24   **A**    Q3 of 2020.

15:46:16  25   **Q**    Third quarter?

**Weis (Direct)**

1    **A**    Yes.

2    **Q**    Okay.  Am I reading this right, ma'am, that beginning

3    in the second quarter of 2014 here, right, I believe, up

4    here, every quarter for the next -- it's 26 quarters.  The

15:46:40  5    obligation of KAM increases to have one store open,

6    additional, each quarter for 26 quarters in a row; is that

7    correct?  Is that what that shows?

8    **A**    Yes.

9    **Q**    All right.  And, ma'am, you are familiar with the

15:47:01  10   concept of provisional credits that an area representative

11   may take in determining whether it's in compliance with its

12   development schedule?

13   **A**    Yes.

14   **Q**    Okay.  And very quickly, could you explain how that

15:47:21  15   works?

16             MR. DAVIS:  Objection.  It's asking her to

17   interpret the contract.

18             THE COURT:  Mr. Blum.

19             MR. BLUM:  She's a lawyer in the legal

15:47:28  20   department to explain what Marco's understanding of the AR

21   Agreement is.  Mr. Hunter explained it.

22             THE COURT:  I will permit it.

23   **A**    So, briefly, there are some credits that are available

24   for an area representative to apply towards one of the

15:47:48  25   targets listed on their development schedule.  And there

**Weis (Direct)**

1    were a couple of different ones that were available to them:

2    One was that they could apply credit for a franchise

3    agreement that was signed and paid for, but for which the

4    store was not opened yet, that they were permitted to only

15:48:08 5    use that once during the term of the agreement.

6         And then they were able to take credit for a

7    development agreement that had been signed and paid for

8    during the term, but provided that that development

9    agreement met each and every one of its own development

15:48:29 10   obligations under the development schedule for that

11   agreement as well.

12   **Q**    Okay.  All right, ma'am.  Okay.  Not much more.  Let

13   me just look at one more thing.

14        All right.  Ms. Weis, in the Columbia Area

15:49:20 15   Representative Agreement, are you aware that there was

16   originally a development schedule that provided for 40

17   stores, and then there was some change made?

18   **A**    Yes.

19   **Q**    What is your understanding of that, ma'am?

15:49:35 20   **A**    My understanding is that the parties originally had an

21   agreement for 40 stores, requested the agreements, and those

22   were prepared by whoever was responsible for those as the

23   time.  As I said, I was not with the company then.  Then

24   after it was sent --

15:49:51 25              MR. DAVIS:  Objection.  She just testified she

**Weis (Direct)**

1    has no personal knowledge.

2                    THE COURT:  Sustained.  Go ahead.

3    **BY MR. BLUM:**

4    **Q**    Have you gone back and reviewed the records of the

15:50:08  5    Columbia transaction and the original signing as part of

6    your role as a lawyer now and previously as a paralegal?

7    **A**    Yes.

8    **Q**    And what you saw and what you relied on, were they all

9    business records of Marco's, emails, correspondence,

15:50:26  10    documents, et cetera?

11    **A**    Yes.

12    **Q**    Okay.  And that was part of your job as a paralegal

13    and continues to be now in a supervisory role as the

14    corporate counsel?

15:50:35  15    **A**    Yes.

16    **Q**    Okay.  And were you the person at Marco's who was, for

17    many years, charged with at least the administration of any

18    development agreements that might have existed in Columbia

19    or not?

15:50:49  20    **A**    Yes.

21    **Q**    Okay.  So what was your understanding of whether or

22    not there existed a development schedule that applied or

23    attached to the Columbia AR Agreement as opposed to

24    Charlotte?

15:51:13  25                    MR. DAVIS:  Objection.  She already testified

**Weis (Direct)**

1    she has no personal knowledge.

2            MR. BLUM:  No.  She actually said she was the

3    person that administered that development schedule for

4    years.

15:51:24  5            THE COURT:  Mr. Davis.

6            MR. DAVIS:  Your Honor, she testified that she

7    wasn't involved in the creation of that agreement.  So for

8    her to testify what was anybody's mindset as of that date,

9    she doesn't have the knowledge required to make that

15:51:42 10    testimony.

11            THE COURT:  I tend to agree, Mr. Blum.

12        Is that what you're seeking in terms of timing or. . .

13            MR. BLUM:  Well, first of all, I find this is

14    interesting, because they had Mr. Hunter testify about that

15:51:59 15    there was no development schedule because that's what Kerry

16    Nohle told him.

17        But that all being said, what I'm asking her is she

18    said over the years she has always and Marco's have always

19    acted on the assumption that there was a 35-store

15:52:19 20    development agreement, and they communicated -- and sounds

21    like they communicated with the Hunters about that.  And, in

22    fact, Your Honor, I will tell you on Friday -- I mean, it's

23    as if (inaudible).

24            (Court reporter clarification)

15:52:36 25            MR. BLUM:  "Were you in compliance with your

**Weis (Direct)**

1    development schedule?"  And Mr. Davis asked specific

2    question to Mr. Hunter, "Were you in compliance with your

3    development schedule in 2018?"

4                    (Court Reporter clarification)

15:52:42  5              MR. BLUM:  Something about my equipment maybe.

6    Hold on.  Is it my microphone?  Or --

7                    THE COURT:  Stacey, is his speaking, is it

8    breaking up?  I can hear him fine.

9                    (Discussion held off the record)

15:53:03 10              THE COURT:  Why don't we try again, Mr. Blum.

11   I can hear you fine, Barry.

12                   MR. BLUM:  My computer says I'm unstable.

13   Okay.  All right, Stacey.  So the question was -- what was

14   it?  I said on -- and I don't know what you heard.

15:53:24 15         On Friday, Mr. Davis asked Mr. Hunter the question,

16   "Were you in compliance with your development schedule as of

17   the end of 2018 in Columbia?"  On Monday, Mr. Hunter said

18   that actually there was no development schedule in Columbia.

19   And I'm trying to get the person who has been the most

15:53:51 20   active with the development schedule in maintaining it and

21   administering it at Marco's to explain how we address Mr.

22   Hunter's newest position.  That's all.

23                   THE COURT:  Mr. Davis.

24                   MR. DAVIS:  Your Honor, first of all, it

15:54:10 25   misrepresents Mr. Hunter's testimony.

**Weis (Direct)**

1        With that being said, the question presented to

2   Ms. Weis was what was the understanding at the time of the

3   signing of the agreement.  And since she has no personal

4   knowledge, then that's -- she doesn't have the requisite

15:54:28   5   knowledge to testify.

6              THE COURT:  Mr. Blum, is that what you

7   intended to ask?

8              MR. BLUM:  No.  That wasn't my question.  That

9   wasn't my question.

15:54:35  10              THE COURT:  Right.  Does your question turn on

11   her review of the document and role at the company later,

12   and what her understanding is in terms of whether or not

13   there is a schedule that's associated with that document?

14              MR. BLUM:  Well, yes.  As for beginning in

15:54:52  15   2013, she was the person charged in administering it.  She

16   did administer it.  She communicated with the parties about

17   it.  You heard Mr. Hunter talk about that --

18              THE COURT:  Mr. Blum.  Mr. Blum, I'm fine with

19   her answering that question.

15:55:06  20              MR. BLUM:  Okay.

21              THE COURT:  I think Mr. Davis' concern was:

22   Was that an opinion as to the intent of the parties at the

23   time of execution of a contract with regard to the schedule.

24   That doesn't seem to be what you're asking her though.

15:55:19  25   Okay.  Go ahead.

**Weis (Direct)**

|     |                                                                              |
|-----|------------------------------------------------------------------------------|
| 1   | **BY MR. BLUM:**                                                             |
| 2   | **Q**   Okay.  Ms. Weis, you did say, I believe, that over the              |
| 3   | years, you, Marco's, has operated under the impression that                 |
| 4   | there was a 35-store Columbia development schedule that                      |
| 5   | applied under the Columbia AR Agreement; correct?                           |
| 6   | **A**   Yes.                                                                 |
| 7   | **Q**   And to your knowledge, what was the end period of that              |
| 8   | 35-store development agreement?                                              |
| 9   | **A**   The end date on the --                                              |
| 10  | **Q**   Right.  The last time KAM was supposed to have done                 |
| 11  | something in the development schedule.                                      |
| 12  | **A**   I believe it was the end of the first quarter of 2019.              |
| 13  | **Q**   Okay.  Fine.  Now, in your understanding of what the                |
| 14  | business records and the agreements of Marco's show, did the                |
| 15  | Hunters also understand that there was a development                        |
| 16  | schedule in place that was a 35-store development schedule                  |
| 17  | that ran through this first quarter of 2019?                                |
| 18  | **A**   That's my understanding, yes.                                       |
| 19  | **Q**   Okay.  And what is that based on?                                   |
| 20  | **A**   Based on emails exchanged between other members of the              |
| 21  | company and the Hunters.                                                    |
| 22  | **Q**   Okay.  And --                                                       |
| 23  | **A**   That was the contract itself.                                       |
| 24  | **Q**   And what emails are you referring to, ma'am?                        |
| 25  | **A**   There is an email exchanged between Mike Hunter and                 |

Timestamps in left margin: 15:55:38 (line 5), 15:55:52 (line 10), 15:56:24 (line 15), 15:56:42 (line 20), 15:56:57 (line 25)

**Weis (Direct)**

1    Cameron Cummins, the former vice president of development;

2    and Debbie Allen, who was a former legal compliance manager

3    at the time.  They were discussing the 40-store schedule and

4    that it was mistakenly included in the agreement, and

15:57:25  5    discussed the 35-store schedule that Mike Hunter had agreed

6    to with Cameron.

7    **Q**    Okay.  And do Marco's Franchising's records show that

8    Marco's sent KAM, at or around the time of the signing of

9    the AR Agreement, a development schedule for 35 stores?

15:57:51 10    **A**    Yes.

11    **Q**    And is that the development schedule that Marco's has

12    been sort of operating under the assumption that it was

13    applicable since then, or at least since 2013 when you've

14    been with the company?

15:58:03 15    **A**    Yes.  As long as I've been with the company, that's

16    the understanding.

17    **Q**    Okay. All right.  And I want to show you quickly

18    here.  Let me get out of this.  Oh, there it is.  How many

19    today -- your amazingly (indiscernible).  How many stores

15:58:50 20    are actually open and operating in the Charlotte territory

21    today, October 8th?

22    **A**    I believe 20 stores.

23    **Q**    Okay.  And how many are actually open and operating in

24    the Columbia territory?

15:59:05 25                   MR. DAVIS:  Objection, Your Honor, only in the

**Weis (Direct)**

1    sense of time.  This is cumulative at this point.  We've

2    heard a lot of testimony about the number of stores open.

3                    MR. BLUM:  If it would have been answered

4    without the objection, we would have been done.

15:59:17  5                    THE COURT:  I will permit it.  Go ahead, Mr.

6    Blum.

7    **BY MR. BLUM:**

8    **Q**    How many in Columbia are open and operating today?

9    **A**    30.

15:59:35  10                    MR. BLUM:  Okay.  Nothing further, Your Honor.

11                    THE COURT:  Any cross-examination from

12   plaintiffs?  Mr. Klein, do you need to leave us soon?

13                    MR. KLEIN:  Yeah, Your Honor, I do.  And I

14   apologize for stepping away before, but I stepped away to

15:59:53  15   make a phone call to let my commitment know that I was going

16   to be about 30 to 45 minutes late.  So I'm at the Court's

17   disposal now and I will make myself, you know, available.

18                    THE COURT:  All right.  So, folks, before we

19   proceed, just to be clear, I still have an expectation we'll

16:00:08  20   conclude here this afternoon.  I have a 4:30 Title III

21   wiretap application scheduled today with the Government.  So

22   it's currently about 4:00 o'clock.

23       Mr. Davis, you are going to undertake

24   cross-examination at this point?

16:00:25  25                    MR. DAVIS:  That's correct, Your Honor.  I

**Weis (Direct)**

1    only foresee it taking a few minutes.

2                    THE COURT:  All right.  Proceed.

3                    MR. BLUM:  Your Honor.

4                    THE COURT:  Yeah, Mr. Blum.

16:00:32  5          MR. BLUM:  There is one question I neglected

6    to ask her.  And I'd reopen with -- it's just I was trying

7    to rush this.  I threw out a couple pages and there was one.

8                    THE COURT:  Mr. Davis.

9                    MR. DAVIS:  If it can be done quickly,

16:00:45 10   Your Honor.

11                   THE COURT:  Go ahead, Mr. Blum.

12   **BY MR. BLUM:**

13   **Q**    All right.  Ms. Weis, in preparation for your

14   testimony, were you asked to determine the amount of

16:00:53 15   royalties -- or not royalties, but the amount of commissions

16   that have been paid by Marco's to KAM over the last two

17   years?

18   **A**    Yes.  I was asked to obtain that information from our

19   finance department.

16:01:07 20   **Q**    And did you do that, ma'am?

21   **A**    Yes, I did.

22   **Q**    Okay.  And let me, just so I can -- and I will show

23   you what we have marked as -- I'm going to pull up a

24   document that we have, and you got it from your finance

16:01:44 25   department.

**Weis (Direct)**

1          What was the approximate amount of the royalties -- or

2     the commissions -- I'm sorry -- the commissions paid to KAM

3     in the two territories over the last two years?

4     **A**     I do not recall the exact amount.  I believe it was

16:01:59  5     around a million.

6     **Q**     Okay.

7     **A**     I don't recall the exact number.

8     **Q**     I'm missing an exhibit that I think I may have sent

9     before.  Your Honor, I apologize I may be rushing through.

16:02:12  10                     THE COURT:  Okay.  Aaron, can you help us?

11                     MR. BLUM:  Don't be in a hurry to mess up.

12                     MR. BLYNN:  It's Exhibit 30.

13                     MR. BLUM:  Oh.  Is it 30?  Or is that --

14                     MR. BLYNN:  I'm sorry.  Not 30.  It's

16:02:30  15     exhibit -- give me one second --

16                     MR. BLUM:  I thought it was in our original

17     exhibits.

18                     MR. BLYNN:  Right.  One second.

19                     MR. BLUM:  But I can't find it.

16:03:00  20                     MR. BLYNN:  It's Exhibit 10, Barry.

21     **BY MR. BLUM:**

22     **Q**     Exhibit 10.  There we go.  Okay.  Ma'am, I'm going to

23     show you -- this is in our Exhibit 10.  Okay.  All right.

24     Sorry for trying to rush through.  And you received

16:03:45  25     information from -- I'm showing you what's Exhibit 10.  Who

**Weis (Cross)**

1    was it in finance that you got this from?

2    **A**    Bonnie Huff.

3    **Q**    Okay.  And what does this show for the commissions

4    that have been paid to KAM Development for the last two

16:03:59 5   years?

6    **A**    Shows from period 9 of 2018 through a period of 8 of

7    2020, in the Charlotte territory we paid a total of $568,884

8    comprised of royalties, franchise fees and area development

9    fees; and Columbia, same makeup, for a total of $941,754.

16:04:25 10  **Q**    Okay.  And so the total for the two is the 1.5 million

11   at the bottom?

12   **A**    Correct.

13                MR. BLUM:  All right.  Your Honor, we would

14   just move Exhibit 10 into evidence or -- that's what it is,

16:04:40 15  Exhibit 10.

16                THE COURT:  Mr. Davis.

17                MR. DAVIS:  No objection, Your Honor.

18                THE COURT:  Admitted without objection.

19                MR. BLUM:  Thank you.  Now no further

16:04:51 20  questions.

21                THE COURT:  Mr. Davis.

22                **CROSS-EXAMINATION OF ASHLEY WEIS**

23   **BY MR. DAVIS:**

24   **Q**    Good afternoon, Ms. Weis.  My name is Brent Giles

16:05:01 25  Davis.  Mr. Klein and I are the attorneys, along with Mr.

**Weis (Cross)**

1    Huckaby, for KAM Development, LLC.  I only have a couple

2    questions for you.

3            There was a lot of talk about the Denver, North

4    Carolina, store.  Is that store located within the

16:05:16  5    geographic territory covered under KAM's Charlotte

6    Agreement?

7    **A**    I believe so, yes.

8    **Q**    Is it open?

9    **A**    Yes.

16:05:28 10    **Q**    So why shouldn't it count toward their development

11    agreement?

12    **A**    Because it's not part of the eight stores that the

13    development agreement covers.

14    **Q**    But it's open in their territory, so it should count

16:05:38 15    as an open store in their territory; correct?

16    **A**    No.  Because the franchise agreement for which the

17    Denver location is covered does not apply any of the area

18    development fees toward it, and it was not part of the

19    eight.

16:05:52 20    **Q**    I'm not asking if it is included as part of the eight

21    of the development deal.

22            If it's a store that's been opened within the

23    territory, shouldn't it count simply as an open store within

24    the territory?

16:06:05 25    **A**    Yes, it should.

**Weis (Cross)**

1    **Q**    Thank you.  I'm going to show you -- sorry.  Sometimes

2    it recognizes what's open, sometimes it doesn't.  I'm going

3    to show you what's been entered into evidence as -- sorry.

4    Not Exhibit 8.  Let me start with -- I'm sorry.

16:07:11  5                MR. DAVIS:  Is the December 20, 2019, letter

6    up on everyone's screen?  I can see Your Honor shaking your

7    head.  Thank you.

8                MR. BLUM:  Is that for Columbia?  Or do you

9    want it for Columbia?  Or Charlotte?

16:07:23  10               MR. DAVIS:  No.  I'm starting with Columbia.

11   This is Exhibit 6.

12               MR. BLUM:  Okay.

13   **BY MR. DAVIS:**

14   **Q**    You can see Exhibit 6?  Okay.  I'm going to show you

16:07:29  15  what's been entered into evidence as Plaintiff's Exhibit 6.

16        Did I understand your testimony just now that it's

17   your understanding that under the Columbia Agreement the

18   last store was to be opened by first quarter of 2019?

19   **A**    Correct.

16:07:52  20  **Q**    Okay.  Have you seen this letter before?

21   **A**    Yes.

22   **Q**    Can you please read the first paragraph that I'm

23   highlighting now, if that little thing will go out of the

24   way?

16:08:10  25  **A**    It says, "Congratulations on the development results

**Weis (Cross)**

1    in this market for 2019!  We recognize your team's efforts

2    in opening 2 new stores this year, exceeding your

3    development commitment of 1 store."

4    **Q**    So is it your understanding that as of December 20th,

16:08:28  5    2019, Marco's was not taking the position that KAM had not

6    met its development schedule as of quarter one of 2019?

7                    MR. BLUM:  Object to the form of the question,

8    assumes facts not in evidence.

9                    THE COURT:  I will permit it.  Overruled.

16:08:47 10   **A**    That's not correct.  That paragraph references their

11   actual development against their development commitment for

12   just 2019.  It does not try to summarize the overall status

13   of the development schedule at that time.

14   **Q**    Okay.  I'm going to have you read the next paragraph.

16:09:11 15   **A**    It says, "As we enter the new year, we need to

16   establish a development plan with you to ensure your

17   remaining obligation of 6 stores will be satisfied prior to

18   the expiration/renewal date of your AR Agreement, which is

19   September 10th, 2020.  To that end, please provide a plan

16:09:29 20   for your 2020 development by January 15th, 2020, including

21   detailed actions you will take to achieve the 6 store

22   requirement."

23   **Q**    And is it your position then that Marco's wasn't

24   saying that they needed to develop six stores by

16:09:51 25   September 10th, 2020, to satisfy their development

**Weis (Cross)**

1    requirement?

2    **A**    I'm not sure I understand the question.

3    **Q**    Do you disagree that that paragraph states that KAM

4    has to develop six stores between December 20th, 2019, and

16:10:06  5    September 10th, 2020, in the Columbia territory to satisfy

6    their development?

7                    MR. BLUM:  Your Honor, I just object.  I don't

8    think this was brought up on direct, and it's not Ms. Weis'

9    letter.  So I'm curious as to why -- how this is appropriate

16:10:23 10    cross.

11                    MR. DAVIS:  She was table to testify to other

12    understandings of Marco's as her position.  She's testified

13    she's familiar with this document, and she was giving

14    testimony regarding the KAM's development commitments in the

16:10:39 15    Columbia territory.

16                    THE COURT:  She was pretty much given carte

17    blanche on her direct.  I will permit it.  Overruled.

18    **A**    So this paragraph is a request for a plan, for them to

19    cure the shortfall of, at that time, six stores before the

16:10:58 20    expiration date of the AR Agreement.

21    **Q**    Can you show me exactly where in that paragraph it

22    says the word "shortfall"?

23    **A**    That exact word is not used.

24    **Q**    Can you show me anywhere in this letter where it says

16:11:17 25    "shortfall"?

**Weis (Cross)**

1  **A**     I can't see the entire letter.  But from what I can

2  see, there is no such word.

3  **Q**     Now you can see the entire letter.

4  **A**     The word shortfall is not in the letter.

16:11:33  5  **Q**     Okay.  Does this letter say anywhere that they are not

6  current on their commitment under the development schedule?

7                  MR. BLUM:  I will object.  Can you -- I will

8  object to the form of the question, Your Honor.  Now he's

9  just taken development -- "commitment to development

16:11:49 10  schedule," and "shortfall" is not in there, but nor is

11  "development schedule."

12                  MR. DAVIS:  Okay.  I will rephrase and use a

13  different word, Your Honor.

14                  THE COURT:  Very good.

16:12:00 15  **BY MR. DAVIS:**

16  **Q**     Can you point to me anywhere in this letter, Ms. Weis,

17  that Marco's is stating that KAM is not meeting its

18  development obligations?

19  **A**     In the second paragraph, it references "we need to

16:12:15 20  ensure the remaining obligation of 6 stores will be

21  satisfied."  And according to the development schedule of

22  that agreement, they were supposed to already have had those

23  six stores development or in process.  I can't see the date

24  on this letter, but they were six stores behind at that

16:12:33 25  time.

**Weis (Cross)**

1    **Q**    So -- never mind.  That -- we can move on.

2          I just need one second, Your Honor.  I need to find

3    the proper exhibit.

4                    THE COURT:  Sure.

16:13:46  5    **Q**    Ms. Weis, I'm going to direct your attention to what's

6    been entered into evidence as Plaintiff's Exhibit 11.  This

7    has been referred to in the briefing and so far in the

8    hearing as the Charlotte NOD.  Are you familiar with this

9    document?

16:13:58  10   **A**    Yes.

11                   MR. BLUM:  Charlotte.

12                   MR. DAVIS:  Okay.  Sorry.  I heard someone

13   speak.  Is there an objection?

14                   MR. BLUM:  Yes, Your Honor.  This is

16:14:10  15   definitely outside the scope of direct.

16                   THE COURT:  Mr. Davis.

17                   MR. DAVIS:  Your Honor, I'm about to ask her

18   about the date she claimed that KAM needed to be -- have the

19   remaining stores opened under the Charlotte Agreement, and I

16:14:29  20   just want to point to what Marco's itself has said.

21                   THE COURT:  Overruled.  I will permit it.

22   **BY MR. DAVIS:**

23   **Q**    I'm go to ask you to read the highlighted portion on

24   page 2 of Plaintiff's Exhibit 11.

16:14:49  25   **A**    "KAM will only have opened only two of the three

**Weis (Redirect)**

1    stores required to be opened by December 31st, 2020."

2    **Q**    So that deadline -- Marco's, in their Charlotte NOD,

3    is saying that three stores are required to be opened by

4    December 31st, 2020; is that what the letter says?

5    **A**    I believe the letter is saying that they will have

6    only opened two of those three stores by that date.

7    **Q**    But the date is December 31st, 2020?

8    **A**    Yes.

9             MR. DAVIS:  Okay.  Your Honor, may I have a

10   brief second to confer with Mr. Klein?  And then I will

11   either be done or very shortly.

12            THE COURT:  Certainly.

13            (Discussion held off the record)

14            MR. DAVIS:  Thank you, Your Honor.  It is a

15   lot easier when you can lean over and whisper in each

16   other's ears.  No further questions, Your Honor.

17            THE COURT:  Okay.  Mr. Blum.

18            MR. BLUM:  I just have one or two.  Mr. Davis,

19   instead of me fumbling around, can you put up that last

20   Notice of Default that you had, whatever it was, Plaintiff's

21   Exhibit 6?  Can you share that?

22            MR. DAVIS:  It was Plaintiff's Exhibit 11.

23         <u>**REDIRECT EXAMINATION OF ASHLEY WEIS**</u>

24   **BY MR. BLUM:**

25   **Q**    All right.  Ms. Weis, you were just asked a question

**Weis (Redirect)**

1    here about this Notice of Default.  You didn't sign this

2    letter, did you?

3    **A**    No, I did not.

4    **Q**    Okay.  But it refers to "KAM will have only opened two

16:17:15  5    of three stores required to be opened by December 31, 2020";

6    correct?

7    **A**    Yes.

8    **Q**    Okay.  All right.  You can take that down.

9          All right.  I'm going to share a screen with you.  I'm

16:17:38  10    going to share a letter.  It is a letter that's --

11    February 26th, 2019, letter regarding Charlotte from Mr.

12    Libardi to Mr. Hunter.

13                MR. DAVIS:  Objection.  Beyond the scope of

14    cross.

16:18:02  15                MR. BLUM:  Your Honor, this is --

16                THE COURT:  Mr. Blum.

17                MR. BLUM:  This was never the case.  The

18    December 31 deadline comes from this -- I don't want to

19    testify -- but which Mr. Hunter testified is meaningless.

16:18:20  20    So Marco's was -- it was true, Marco's was operating under

21    Mr. Libardi's February 26th letter which gave them till the

22    end of the year, but Mr. Hunter said, "No.  I'm not doing

23    that," and he expressly rejected this letter.  So I need her

24    to be able to explain.  You can't just put in that statement

16:18:41  25    of December 31, 2020, and then graph it onto the development

**Weis (Redirect)**

1    schedule.

2         They are trying to take a deadline in a letter that

3    they say has no meaning and attach it to -- and use it to

4    amend an unambiguous document.  It's kind of sophistry, and

16:19:04  5    I have to be able to explain that.  I will do it this way

6    Your Honor:

7    **BY MR. BLUM:**

8    **Q**    Ms. Weis, you are familiar with the Charlotte

9    development schedule; right?

16:19:15 10   **A**    Yes.

11   **Q**    And remember the December 20 letter that Mr. Davis

12   showed you when he said, "Oh, there is no use of the word

13   shortfall in there"?  Do you recall that?

14   **A**    Yes, for the Columbia territory.

16:19:33 15   **Q**    Okay.  Was there any reference in there to the

16   development schedule in that Columbia letter?

17   **A**    No.

18   **Q**    Okay.  In the letter he just showed you, Exhibit 6, it

19   talked about six stores.  Did it refer to a development

16:19:49 20   schedule?  Or did it just say "development plan"?

21   **A**    I believe it refers to development plan.

22   **Q**    And, ma'am, you're familiar with the Charlotte

23   development schedule that's attached to the Charlotte

24   Agreement; correct?

16:20:02 25   **A**    Yes.

**Weis (Redirect)**

1    **Q**    Okay.  And we talked about that earlier.  And isn't it

2    a fact that that development schedule ends in the third

3    quarter of 2020; correct?

4    **A**    Correct.

16:20:19  5    **Q**    Okay.  The obligation in that letter -- and, again,

6    you didn't write it.  But to go to the year end of 2020 to

7    open stores, where does that date come from?

8    **A**    It comes from the February letter with the action

9    plan.

16:20:39  10    **Q**    Okay, ma'am.  Hold on one second.  Let me get out of

11    here.

12        Okay.  So are you talking about this February 26th,

13    2019, letter from Mr. Libardi that talks about the Charlotte

14    DMA; correct?

16:21:03  15    **A**    Yes.

16    **Q**    Okay.  And in that, Mr. Libardi said the obligation

17    was to open four units in December 2019, and three more by

18    December '20.  That was the action plan that Mr. Libardi

19    indicated he was approving; correct?

16:21:20  20    **A**    Yes.

21    **Q**    Okay.  Now, if KAM's position were to be that this

22    letter did not change anything and is not binding on them,

23    was the time to open restaurants the third quarter of 2020,

24    or was it December 31?  If this letter --

16:21:42  25                MR. DAVIS:  Objection; calls for speculation.

**Weis (Redirect)**

1        "Were KAM to."

2                    THE COURT:  Sustained.

3        **BY MR. BLUM:**

4        **Q**     Assume KAM has -- Mr. Hunter has testified that the

16:21:54  5     February 26th, 2019, letter is not a binding agreement on

6        either side.

7                    MR. DAVIS:  Objection.  That mischaracterizes

8        his testimony.  He's trying to -- he's just getting a second

9        bite at the apple.

16:22:07  10                    MR. BLUM:  Your Honor, it is exactly Mr.

11       Hunter's testimony.

12                    THE COURT:  Proceed, Mr. Blum.

13       **Q**     So if the testimony, you know -- if there is

14       testimony, or if the Court were to find that this

16:22:18  15     February 26th, 2019, letter did not bind either side, what

16       was the deadline for KAM to comply with its development

17       commitment under the development schedule in Charlotte?

18       **A**     The third quarter of 2020.

19       **Q**     Right.  So it's only if this letter that Mr.

16:22:49  20     Libardi -- and, again -- I will strike that.

21                    MR. BLUM:  I don't think I have anything else,

22       Your Honor.  Maybe one more.  Nothing further, Your Honor.

23                    THE COURT:  Mr. Davis.

24                    MR. DAVIS:  Nothing further, Your Honor.

16:23:16  25                    THE COURT:  All right.  So the matter is now

1    presented and decisional with the Court moving forward.

2         And need we talk at this point, before we adjourn,

3    about the Tenn Slices case, Counsel?  Mr. Davis.

4              MR. DAVIS:  Yes.  We're not quite prepared to

16:23:31  5    withdraw our motion at the point, Your Honor.  Tenn Slices

6    received a letter from Marco's yesterday or the day before

7    stating that they've accepted the cure and that he's been --

8    that they've ended their step in.  But as of a few hours

9    ago, right before this hearing started, Tenn Slices' access

16:23:58 10    to the system to complete their duties as an AR had not been

11    restored.  So as soon as that happens, then we can withdraw

12    the motion.

13              THE COURT:  Mr. Blum, do you want to add

14    anything?  I mean, I think your position for a while has

16:24:14 15    been there is really no Court action required at this stage

16    or at this point.

17              MR. BLUM:  Yeah, Your Honor.  I can't speak to

18    how long the processes take.  I know that the letter was

19    sent.  But I did have a question about this matter when --

16:24:26 20    but that's it on Tenn Slices.

21              THE COURT:  All right.  I think for the

22    moment, then, we can conclude our discussion about Tenn

23    Slices, unless something comes to the attention of the Court

24    further.  Mr. Davis.

16:24:38 25              MR. DAVIS:  Right.  The only thing I would add

1   is that we have not had a chance to further meet and confer

2   with counsel regarding the jurisdictional discovery.  So at

3   some point, we'll probably have to reconvene with the Court,

4   but I don't think it makes any sense to do it now.

16:24:58  5              THE COURT:  Very well.  Mr. Blum.

6              MR. BLUM:  For the record on that, we have

7   actually -- Ms. Weis has reached out to Dr. Firestone, who

8   is a Ph.D., and spoke to her.  Our plan was to file and also

9   send to them a declaration from her, and they also show the

16:25:23 10   membership list and some recent correspondence that shows

11   that she, you know, still lives there and is still the

12   trustee.  And I guess if they wanted to go further, I don't

13   know if we would address that.  But I think by that time

14   that case should be mooted.

16:25:42 15              MR. DAVIS:  Well, I disagree with the mooted

16   point, Your Honor.  Tenn Slices has a claim for a tortious

17   interference of a contract, and they also have a claim for

18   damages in this time that -- well, they still want a

19   declaratory judgement that weren't in breach of the

16:25:56 20   agreement by entering into the Jeremiah's Agreement, and

21   that a declaratory judgment of that would allow them to have

22   damages for the -- if Marco's refuses to pay them their

23   commissions for the time they were improperly --

24              THE COURT:  All right.  So is it safe for me

16:26:18 25   to conclude that at this point the issue with regard to

1    injunctive relief or equitable relief by the Court is tabled

2    for the moment?

3              MR. DAVIS:  For the moment.

4              THE COURT:  All right.  And that there may be,

16:26:31  5    from plaintiff's perspective, additional causes of action

6    that survive for money damages down the road, perhaps,

7    depending on what path the litigation takes, and that,

8    therefore, the issue of jurisdiction is still alive, unless

9    and until all those issues are resolved in the short run.

16:26:48  10    So I guess the interim action by the parties will be

11    what is satisfactory to plaintiff moving forward, and Mr.

12    Blum has suggested next steps with regard to discovery on

13    the issue of jurisdiction and diversity moving forward.

14    So I guess I would ask Mr. Davis, Mr. Klein, that you

16:27:10  15    wait for the next salvo by the defense in this case from

16    Marco's to see and whether or not that satisfies you.  And

17    if it does not, coming forward, then I would, again, ask

18    that -- and I know you've all been preparing and

19    participating in these hearings -- but that you would then

16:27:26  20    turn attention to Tenn Slices with regard to what might be

21    an acceptable accommodation to satisfy the parties about the

22    citizenship issue at stake here with regard to diversity

23    jurisdiction.  And I had made the suggestion before about a

24    possible video deposition or remote deposition as a

16:27:47  25    possibility moving forward.  Let's see where those next

1    steps take us moving forward.

2          Mr. Blum, you wanted to talk a little bit more I think

3    about the KAM matter; is that right?

4                MR. BLUM:  Yes, a housekeeping.

16:28:01  5          But back to the Tenn Slices, also there is another

6    issue that the Tenn Slices, to the extent it is only a

7    damages claim, has a pre-suit mediation requirement, and

8    neither of us have spent a lot of time on in the last week

9    so.  So I think that that might have an effect on things as

16:28:18 10   well.

11                THE COURT:  Sounds like it could, Mr. Blum.

12   But let's see where you end up on next steps moving forward.

13   And if injunctive relief is put to bed, then we can have a

14   conversation about that.

16:28:28 15                MR. BLUM:  All right.  Yes, Your Honor.  And I

16   guess the issue is, and I don't know what your procedure or

17   preference is.  I know we're on a short time frame.  But is

18   there going to be an opportunity for closing here?  Because

19   there are very, very significant, you know, factual issues,

16:28:45 20   and we have the transcripts, and I think we have to point

21   that out.  I don't know if you want us to do that orally, or

22   you want us to do it in writing or what, Your Honor.  But it

23   is important, Your Honor, because the facts are very, very,

24   very, very significant here and compounded.

16:29:04 25                THE COURT:  All right.  There's been

1    significant briefing already in the case, but I recognize

2    that there has been testimony taken, therefore some facts

3    adduced, presumably, moving forward as a result of these

4    hearings.

16:29:15 5        Mr. Davis, Mr. Klein, what are your thoughts with

6    regard to the appropriateness of any additional argument

7    that might be needed?  I can't do it right now.  I just

8    can't.  And at this point, the TRO has been extended through

9    next Tuesday in terms of effectiveness or an effective date.

16:29:35 10        What is it that plaintiffs would propose?

11            MR. KLEIN:  Your Honor, I think we said at the

12    outset, you know, we don't need additional argument.  You

13    know, we've put our case on before Your Honor.  Your Honor

14    has sat through three days of hearing on all of these facts.

16:29:48 15    I don't know that we need to boil down and distill all of

16    the facts for Your Honor.  You've heard them directly from

17    the parties now.  You certainly don't need, you know, the

18    lawyers' characterizations of what those facts, you know,

19    are.

16:30:03 20        If Your Honor is inclined to want more, to see us

21    again and have more papers, you know, we will certainly, you

22    know, avail ourselves to the Court.  I just don't know that

23    there is a necessity for it.

24            THE COURT:  All right.  So, Mr. Blum, what is

16:30:22 25    it that you would propose?

1          MR. BLUM:  Well, I didn't know, you know, what

2     we would have.  I understand we don't have any time today

3     for oral.  We could have done it that way.  I would propose

4     maybe a closing argument -- written closing argument on

16:30:38  5     short notice.  We could do it by tomorrow at some point

6     Your Honor would have it.

7          Like I said, it is very important.  Mr. Klein is

8     right, you know, you don't want to go on mischaracterization

9     of the evidence.  But we have actually transcript cites that

16:30:54 10     we would like to show you, Your Honor.  Mr. Klein today --

11     Mr. Davis today accused me three times of mischaracterizing

12     Mr. Hunter's testimony.  And Mr. Hunter said one thing on

13     Friday and another thing on Monday, and I need to point that

14     out to Your Honor because that's why our position has

16:31:10 15     changed.

16          THE COURT:  But, Mr. Blum, again, as you

17     fairly acknowledged, we are up against the deadline --

18          MR. BLUM:  I understand.

19          THE COURT:  -- moving forward.  And so I don't

16:31:20 20     know exactly what would work, given how tight time is.

21     We're close to the end of the day on Thursday, and the TRO

22     only extends through Thursday -- through Tuesday of next

23     week.

24          Are you proposing that something be submitted in

16:31:38 25     writing by the end of the day tomorrow?  Or what is it --

1   Mr. Davis.

2              MR. DAVIS:  Well, Your Honor.  I mean, first

3   of all, that there's a hearing -- a preliminary injunction

4   hearing in state court involving Marco's and another area

16:31:59   5   representative that all the same lawyers are involved in

6   which we need to prepare for and participate in.

7              THE COURT:  Let me just ask because I don't

8   like short suiting lawyers when they say, "Well, Judge

9   you've taken a lot of evidence, and now we ought to be able

16:32:17  10   to synthesize that in some way in telling you what it means

11   in support of our arguments."

12         But my problem -- and let me just be direct:  What is

13   Marco's position with regard to further extension of the

14   TRO?

16:32:29  15              MR. BLUM:  Your Honor, I don't think we need

16   it, Your Honor.  We will submit our closing by 5:00 o'clock

17   tomorrow.

18              THE COURT:  Well, I think what I'm hearing

19   from the plaintiffs is that that might not be workable or

16:32:44  20   possible for them.  Mr. Davis or Mr. Klein.

21              MR. BLUM:  They can have another day if they

22   want, Your Honor.

23              MR. DAVIS:  Your Honor, just to be extremely

24   candid with the Court:  We've had a lot of hearings, a lot

16:32:55  25   of briefing in both these cases and the third one.  I'm not

```
       1    in a position to be able to turn around a response to a

       2    brief in a day.

       3                THE COURT:  How quickly could you, Mr. Davis?

       4                MR. DAVIS:  It depends.  I mean, is there

16:33:11  5    going to be a page limit?  Is there going to be a -- you

       6    know, until I know what I'm seeing.  I mean, basically, if

       7    they're going to write a brand new brief --

       8                MR. KLEIN:  And we need to get the

       9    transcripts.

16:33:22 10                MR. BLUM:  Not a brief, Your Honor.  It's a

      11    closing argument.  It's a written closing argument.

      12                THE COURT:  Right.  But presumably premised on

      13    facts, which it would be useful for the Court to know in

      14    terms of indication of where it might be in the transcript.

16:33:33 15                MR. BLUM:  Right.

      16                THE COURT:  Also, plaintiff is indicating that

      17    they don't have the transcripts currently, so that they

      18    would have to obtain those as well.  It's my understanding

      19    so the defense does?  Do I understand that correctly?

16:33:50 20                MR. BLUM:  Yes, Your Honor.  They can order

      21    them.  Stacey can turn that around very quickly.

      22                MR. DAVIS:  Certainly, if they are going to be

      23    submitting even portions of them as exhibits, you know,

      24    maybe they can provide the transcripts to us now and that

16:34:06 25    way maybe we would have a little bit better of a jump on
```

1    being able to get something --

2                    MR. BLUM:  You pay half of the cost, you got

3    it.  I'm not going to --

4                    THE COURT:  Hold on.

16:34:16  5                    MR. BLUM:  Order them from Stacey.

6                    THE COURT:  Right.  Thank you, Mr. Blum.

7    Right, Stacey has something to say about this in terms of

8    how this works in terms of orders and copies and so forth

9    moving forward.

16:34:27 10                    MR. BLUM:  Yes, and that's not fair to her.

11                    THE COURT:  Look, I'm not sure how this can be

12    done, given the current expiration of the TRO.

13        So I guess, Mr. Blum, I'm going to bounce it back to

14    you and say:  If you want to make argument with citation to

16:34:43 15    the record as a result of the hearing, I think that the

16    defense is entitled to a reasonable period of time to

17    acquire the transcripts and either respond to that argument

18    or submit their own argument in support of the request for

19    preliminary injunction.  But what they're telling me is

16:34:58 20    that's not practicable for them moving forward on this

21    timeline.

22        So I guess I would put it this way:  Either stand upon

23    what you've submitted so far, or agree to an extension of

24    the TRO so that we can set a schedule over the next week or

16:35:14 25    so for that additional briefing.

1          MR. BLUM:  Your Honor, respectfully, okay, to

2     me, it sounds like we've got somebody who wants a delay

3     here.  Stacey -- I called her on Saturday afternoon and

4     she --

16:35:29  5          THE COURT:  Mr. Blum, let me interrupt.

6     Transcript availability isn't the only objection I'm hearing

7     from plaintiff's counsel.

8          MR. BLUM:  Well, it kind of was.  "We can't

9     get the transcripts."  They could have the transcripts this

16:35:39 10    afternoon, I'm sure.

11          MR. DAVIS:  Well, that still doesn't give me

12     the opportunity to do whatever -- I'm not even sure exactly

13     what Mr. Blum is proposing.  But it's pretty simple --

14          MR. BLUM:  A written closing argument.

16:35:52 15          THE COURT:  Which I am assuming it's going

16     to -- it sure sounds a lot like briefing to me, if it's

17     making citations to the record in the case.

18          MR. BLUM:  Your Honor, because they are --

19          THE COURT:  Mr. Blum --

16:36:02 20          MR. BLUM:  It's closing --

21          THE COURT:  -- I'm not trying to put you in an

22     untenable situation at all in terms of making choices.  What

23     I'm saying is:  I've devoted the better part of three

24     business days to hearings on this matter:  Six hours, five

16:36:21 25     hours, the better half of a day or a half-day, or really

1    more than half a day on three days in terms of taking

2    evidence on this case.  We all knew that the deadline was

3    coming up next Tuesday after I extended it by agreement to

4    put on the evidence.  Now we're on a restricted timeline in

16:36:39 5    terms of further argument for me to get out a decision by

6    Tuesday.

7         So the timing matters, Mr. Blum, it does for me, and

8    it does for opposing counsel.

9              MR. BLUM:  Well, I understand that,

16:36:51 10   Your Honor.  How about this:  We file -- both sides file

11   their closing argument arguments by the end of day Sunday,

12   and Your Honor has -- we'll give you -- extend it for two

13   more days till Thursday.  Then you have three business days,

14   more than you actually had.  I know, not counting Monday as

16:37:09 15   a business day.

16              THE COURT:  Mr. Davis.

17              MR. DAVIS:  Your Honor, again, I will be

18   candid with the Court.  I get alternate weekends with my

19   daughter.  I haven't been able to spend a whole lot of time

16:37:23 20   with her the last time she was here, and it would just be

21   personally kind of sad if I had to spend another weekend I

22   had with her working on these briefs when a simple extension

23   of time would allow us another couple days to do the

24   briefing.

16:37:37 25              THE COURT:  Mr. Blum, what say you?  I mean,

1    look, in the ordinary course, I would simply say:  You've

2    submitted, the evidence is in, you've made your arguments

3    previously.

4         I understand your frustration, Mr. Blum, because you

16:37:51  5    want to be able to highlight for me what I've heard over

6    these three days' worth of testimony.  But I think we're

7    going to have to be a little more flexible on the scheduling

8    if that's the route you would like to go.

9              MR. BLUM:  You Honor, I just need to state for

16:38:07 10    the record, you have not heard many of my arguments

11    because -- and they can make any objection they want --

12    their case has changed during the course of this hearing.

13    There was never an assertion of the end of the year

14    schedule.  There's never been an assertion of --

16:38:20 15              THE COURT:  Okay.  But Mr. Blum, Mr. Blum --

16              MR. BLUM:  So you haven't heard that.

17              THE COURT:  Again, Mr. Blum, I'm not shorting

18    you on an opportunity to be heard.  What I'm telling you is

19    the timeline is too short in my view.  I don't want to try

16:38:33 20    and extort additional time by agreement out of Marco's on

21    the TRO, but I don't know exactly how to accomplish what you

22    want to accomplish without an extension of that date.  You

23    said that -- you mentioned a couple days through Thursday.

24         And I guess what I propose is, if this is the route

16:38:49 25    you want to go, that we do through a week from Monday

```
 1    instead.  Because I don't -- I'm trying to be fair to all of
 2    you personally and professionally, and I'm trying to give
 3    myself time to do what needs to be done in the case.  And so
 4    I don't know if you need to talk to your clients or not, but
16:39:11  5    I -- Aaron is nodding, by the way.
 6                   MR. BLUM:  Well, Your Honor, Marco's agrees a
 7    week from Monday.  When do you want the briefs?
 8                   THE COURT:  Well, let's talk about this.  Is
 9    the proposal simultaneous briefing, Mr. Blum?
16:39:26 10                   MR. BLUM:  It should be if they are written
11    closing arguments.  Technically, they would go first, but
12    that's fine.
13                   THE COURT:  Mr. Davis.
14                   MR. DAVIS:  Well --
16:39:33 15                   THE COURT:  Rather than submission and
16    response --
17                   MR. BLUM:  Right, right.
18                   THE COURT:  -- on such a short timeline.  I
19    mean, it's not uncommon to set a common briefing deadline
16:39:42 20    for submission of your respective positions based on the
21    record.
22                   MR. BLUM:  Yes.
23                   MR. DAVIS:  The only problem I foresee with
24    that, Your Honor, is Mr. Blum just made a representation
16:39:53 25    that he's going to have new arguments.  And we should at
```

1          least be given the opportunity to see these new arguments

2          and respond to them.

3               KAM has been very forthcoming with its briefing and

4          its declarations and its exhibits ahead of time.  We've been

16:40:13  5     kind of been, you know --

6                    MR. BLUM:  Don't say it.

7                    MR. DAVIS:  -- having to play catch-up in a

8          lot of ways so far.  And, again, you know, if there is going

9          to be new argument, then I think KAM should have the

16:40:27 10     opportunity to respond.

11               That being said, if the argument is that a single

12          answer to a question somehow changes KAM's argument, it

13          doesn't.

14                    THE COURT:  Okay.  But I can't hear argument

16:40:42 15     about that now --

16                    MR. DAVIS:  Right.  I understand.

17                    THE COURT:  -- about that determination now.

18               So what is it that you are proposing, Mr. Davis?

19                    MR. DAVIS:  That, you know, either

16:40:53 20     simultaneous, then with the opportunity for a short reply.

21          But I don't -- again, we were prepared, if the Court wanted

22          to hear argument, to rest on the briefs, the evidence and

23          the testimony.  So basically we could just have a response

24          to whatever Marco's wants to submit.  That's fine with us.

16:41:16 25                    THE COURT:  Well, I guess what I would say is,

1    I mean, clearly it's not Marco's burden in terms of the

2    relief that's requested moving forward.  And so if we're

3    going to do this, I only see a couple of ways to do it:

4    Either simultaneous briefing that's submitted on a date

16:41:35   5    certain, or I give Marco's an opportunity to educate me

6    going forward; you have a brief opportunity to respond; and

7    Marco's then would get the last word by way of a reply so

8    that they can see your response before they move forward.

9        And I know the briefing is backward that way, I

16:41:53  10    completely understand that in terms of burden.  But maybe

11    Mr. Blum and Mr. Blynn, maybe they are okay with that, I

12    don't know, the way it's proposed.

13                MR. DAVIS:  That would be -- we would have no

14    objection to that.

16:42:04  15                THE COURT:  I mean, that way they get the last

16    word, which most lawyers wouldn't want to pass up anyway.

17    In which case I guess I would ask Mr. Blum:  How quickly can

18    you get your submission in for review by the plaintiffs?

19    And it doesn't have to be tomorrow, Mr. Blum.  I'm

16:42:21  20    anticipating that we move out through the following Monday

21    the TRO that's in effect.  So think about your schedule.

22                MR. BLUM:  Okay, Your Honor.  At the risk

23    of -- Your Honor doesn't do divorces, but I might be in

24    divorce court here.  I was going to say Monday is a holiday.

16:42:42  25    I don't know if the Court --

```
          1              THE COURT:  I mean, look, don't worry about

          2     holidays.  I'm kind of on the clock all the time, and you

          3     can file them CM/ECF 24/7.

          4              MR. BLUM:  Sure.  Your Honor, I could have it

16:42:57  5     in by Monday at noon.  How is that?

          6              THE COURT:  Okay.  I'm not sure what that does

          7     for Aaron's personal life either, by the way, but that's

          8     fine.  I mean, if you think you can hit noon Eastern on

          9     Monday, then I think that would be good.  Then, Mr. Davis,

16:43:16 10     frankly, it gives you the weekend with your daughter, I

         11     mean, moving forward.  I don't know what Mr. Klein's

         12     commitments are.  But how quickly -- could you get a

         13     response in then by Thursday?

         14              MR. DAVIS:  Oh, absolutely, Your Honor.  I was

16:43:30 15     about to suggest that, you know, we would give them until

         16     the close of Monday.  We won't hold them until noon.

         17              THE COURT:  How quickly could you get your

         18     document filed next week?

         19              MR. DAVIS:  I would hope that, depending on,

16:43:43 20     again, depending on -- I could definitely have it done by

         21     Thursday.  If push comes to shove, if the Court really

         22     insisted on Wednesday, I would make sure it got done.

         23              THE COURT:  Why don't we do noon on Monday, as

         24     Mr. Blum proposed.  And can you then do noon on Thursday?

16:44:02 25              MR. DAVIS:  Absolutely.
```

1          THE COURT:  Mr. Blum, can you get a reply in

2     by Friday?

3          MR. BLUM:  I have to get a reply in.  I don't

4     want to ruin Your Honor's weekend.

16:44:11  5          THE COURT:  Can you get a reply in by the end

6     of the day on Friday?

7          MR. BLUM:  Yes.  If this would work, I will do

8     Sunday, Wednesday -- or then -- no, I don't want to jam

9     Your Honor up either because it's a lot of paper coming in

16:44:31  10     on Friday.

11          THE COURT:  It's fine.  It is what it is,

12     gentlemen and ladies, at this point.  So I -- Mr. Davis.

13          MR. DAVIS:  Well, then I would -- again, it

14     kind of defeats the purpose of saying if we push it out a

16:44:44  15     little bit, because if I have to spend half of my day on

16     Sunday reviewing, it's kind of the same personal time.

17          MR. BLUM:  No.  I'm not saying I'll file it --

18     I will file it late Sunday.  If I file it, it will be

19     midnight, you know, 11:50.

16:44:56  20          THE COURT:  Can you get something in by

21     Wednesday night, Mr. Davis, or no?

22          MR. DAVIS:  If it is filed -- if I have it

23     first thing Monday morning, yes.

24          THE COURT:  That's what I'm getting at I

16:45:05  25     guess, yes.

1           MR. DAVIS:  Absolutely.

2           THE COURT:  Before the sun rises on Monday, it

3  is filed.  You will have it, all right.  And then by the

4  time the sun is up on Thursday, Mr. Blum, you should have

16:45:18  5  access to that document, and if you could get me something

6  by the end of the day on Friday, I will appreciate it.

7           MR. BLUM:  It will be there before that.

8           THE COURT:  All right.  Thank you, all, very

9  much.

16:45:32  10      Yes, Aaron.

11           MR. BLYNN:  One question, Your Honor.

12           THE COURT:  Yes, sir.

13           MR. BLYNN:  Will there be a page limit imposed

14  on these briefings?

16:45:38  15           THE COURT:  There probably ought to be.  Do

16  you want to make a suggestion, Aaron?

17           MR. BLYNN:  I will leave that up to Barry.

18           THE COURT:  25 pages, Mr. Blum?

19           MR. BLUM:  That's fine.

16:45:50  20           THE COURT:  Brevity being the soul of whit.

21  Is that acceptable to the plaintiffs?

22           MR. DAVIS:  Absolutely.  I don't think any

23  briefing has exceeded that already.

24           MR. BLUM:  Your Honor, when you cite

16:46:05  25  transcripts, they take up a lot of pages, right, because of

1    just the way that they are done.

2              THE COURT:  Well, I just assume you will

3    attach -- I just assume those will be filed.  All you have

4    to do is make a page reference and then quote selectively as

16:46:17  5    you choose.

6              MR. BLUM:  And tell me the procedure,

7    Your Honor.  Stacey -- I have sort of rough drafts from her

8    that she turned over, and it appears there's some that she

9    hasn't cleaned up.  Do we file those or try to --

16:46:29  10              THE COURT:  Stacey has been under the gun a

11    lot lately, by the way, with various transcripts.

12              MR. BLUM:  I understand that.

13              THE COURT:  Let me ask.  Stacey, in terms of

14    where you are with these proceedings, what's it look like

16:46:38  15    for you?

16              (Discussion held off the record)

17              THE COURT:  All right.  Mr. Blum, thank you.

18    Everyone, enjoy your evening.  With that we'll stand

19    adjourned at this time.  Thank you, everyone.

20              (Proceedings concluded at 4:47 p.m.)

21                        -  -  -

22              **C E R T I F I C A T E**

23         I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
24    prepared from my stenotype notes.

25              */s/ Stacey L. Kiprotich*          *07/05/2021*
              STACEY L. KIPROTICH, RMR, CRR          DATE

## $

**$20,000** [6] - 522:23, 525:4, 525:8, 525:16, 525:17, 527:15
**$25,000** [5] - 522:15, 522:18, 525:9, 527:3, 529:6
**$40,000** [8] - 521:21, 522:1, 522:2, 525:6, 525:13, 528:10, 528:13, 529:6
**$5,000** [13] - 521:25, 522:1, 522:10, 522:24, 523:1, 523:2, 525:5, 525:6, 525:8, 527:4, 527:16, 528:3, 529:13
**$568,884** [1] - 543:7
**$941,754** [1] - 543:9

## '

**'20** [1] - 553:18

## /

**/s** [1] - 573:25

## 0

**07/05/2021** [1] - 573:25
**07701** [1] - 390:5

## 1

**1** [12] - 391:7, 391:16, 425:11, 425:19, 429:20, 432:16, 434:25, 445:6, 501:10, 531:6, 531:17, 546:3
**1-7-2019** [1] - 526:3
**1.5** [1] - 543:10
**1/6** [1] - 440:23
**10** [17] - 391:17, 430:13, 442:3, 442:4, 466:5, 488:5, 488:8, 489:11, 526:6, 542:20, 542:22, 542:23, 542:25, 543:14, 543:15
**10-year** [2] - 404:3, 482:7
**100** [1] - 390:15
**1000** [1] - 390:8
**10th** [3] - 546:19,

546:25, 547:5
**11** [4] - 431:15, 549:6, 549:24, 550:22
**11:46** [1] - 392:3
**11:50** [1] - 571:19
**12** [4] - 442:3, 454:22, 454:25, 471:10
**12-27** [1] - 519:24
**12-28-2018** [1] - 528:9
**120** [1] - 389:16
**13** [1] - 391:15
**131** [1] - 509:20
**14** [3] - 454:23, 454:24, 454:25
**14.2.1** [3] - 499:8, 499:20, 503:3
**14.2.3** [3] - 494:22, 499:1, 499:19
**140** [1] - 393:17
**15** [3] - 447:19, 451:21, 492:7
**15.3.3** [1] - 496:25
**15th** [1] - 546:20
**1716** [1] - 389:16
**175** [1] - 390:18
**18** [2] - 391:16, 391:16
**19th** [1] - 444:4
**1:15** [1] - 447:18
**1:17** [1] - 448:16
**1:30** [1] - 447:20
**1:33** [1] - 448:18
**1st** [8] - 440:12, 440:15, 443:11, 443:21, 444:15, 444:16, 444:18, 500:18

## 2

**2** [10] - 391:11, 430:13, 494:19, 495:25, 497:15, 504:11, 531:6, 531:18, 546:2, 549:24
**20** [5] - 510:10, 513:12, 539:22, 545:5, 552:11
**2010** [1] - 493:16
**2011** [1] - 493:16
**2012** [1] - 531:17
**2013** [7] - 518:13, 518:14, 519:6, 529:22, 531:18, 537:15, 539:13
**2014** [1] - 532:3
**2018** [11] - 473:7, 520:23, 521:23, 522:13, 523:6, 526:13, 528:14, 536:3, 536:17, 543:6

**2019** [20] - 511:23, 513:22, 520:23, 525:20, 526:25, 527:19, 538:12, 538:17, 545:5, 545:18, 546:1, 546:5, 546:6, 546:12, 547:4, 551:11, 553:13, 553:17, 554:5, 554:15
**2020** [34] - 389:6, 392:1, 433:20, 445:25, 449:9, 473:18, 475:7, 488:12, 489:2, 493:17, 500:18, 504:8, 511:5, 513:22, 518:10, 518:15, 524:18, 531:21, 531:24, 543:7, 546:19, 546:20, 546:25, 547:5, 550:1, 550:4, 550:7, 551:5, 551:25, 553:3, 553:6, 553:23, 554:18
**20th** [2] - 546:4, 547:4
**213-5520** [1] - 389:17
**22** [1] - 513:14
**22nd** [2] - 529:3, 529:4
**23** [1] - 391:17
**24** [5] - 391:16, 423:7, 423:16, 484:6, 499:24
**24/7** [1] - 570:3
**24th** [15] - 423:11, 430:22, 430:25, 461:21, 474:23, 475:7, 477:11, 477:24, 478:22, 479:11, 485:17, 488:19, 489:2, 489:17, 489:23
**25** [1] - 572:18
**2564** [2] - 439:23, 440:20
**26** [12] - 509:11, 509:14, 509:16, 509:17, 509:20, 510:22, 510:24, 510:25, 516:13, 525:23, 532:4, 532:6
**26th** [5] - 551:11, 551:21, 553:12, 554:5, 554:15
**27** [4] - 510:3, 511:4, 524:1, 527:15
**27th** [1] - 523:6

**28** [5] - 510:8, 511:10, 516:13, 519:21, 526:13
**2875** [1] - 434:9
**28th** [1] - 528:14
**29** [1] - 513:11
**2nd** [6] - 488:12, 489:12, 501:22, 502:16, 502:23, 511:5

## 3

**3** [3] - 500:16, 509:22, 531:6
**3,400** [2] - 424:18, 431:9
**30** [17] - 417:5, 425:11, 425:19, 429:20, 432:16, 447:2, 464:3, 501:9, 510:10, 516:14, 516:16, 516:18, 540:9, 540:16, 542:12, 542:13, 542:14
**300** [1] - 430:13
**305-349-2300** [1] - 390:16
**30th** [6] - 423:25, 431:6, 440:12, 444:15, 444:17, 445:6
**31** [5] - 423:21, 551:5, 551:18, 551:25, 553:24
**31st** [4] - 423:25, 550:1, 550:4, 550:7
**33131** [1] - 390:15
**35** [2] - 417:6, 539:9
**35-store** [6] - 530:7, 535:19, 538:4, 538:8, 538:16, 539:5
**389-573** [1] - 389:8
**392** [1] - 391:7
**394** [1] - 391:15
**3:20-CV-02024-JJH** [1] - 389:4

## 4

**4** [4] - 389:7, 509:21, 531:6
**4.3.4** [1] - 500:14
**4.7** [1] - 512:21
**40** [2] - 533:16, 533:21
**40-store** [1] - 539:3
**401** [1] - 391:15
**412** [1] - 391:16
**416** [1] - 391:16

**419** [1] - 389:17
**419-321-1307** [1] - 390:9
**43** [2] - 441:24, 441:25
**43215** [1] - 390:19
**43604** [2] - 389:17, 390:8
**44th** [1] - 390:15
**45** [4] - 441:23, 441:24, 450:20, 540:16
**464** [1] - 391:8
**466** [1] - 391:16
**469** [1] - 391:16
**497** [1] - 391:8
**498** [2] - 391:17
**4:00** [1] - 540:22
**4:30** [1] - 540:20
**4:47** [1] - 573:20
**4th** [1] - 424:10

## 5

**5** [2] - 393:17, 497:25
**500** [1] - 418:12
**501** [1] - 391:9
**504** [1] - 391:9
**518** [1] - 391:11
**520** [1] - 390:18
**543** [1] - 391:12
**550** [1] - 391:12
**59** [1] - 424:22
**5:00** [1] - 561:16

## 6

**6** [9] - 391:15, 545:11, 545:14, 545:15, 546:17, 546:21, 548:20, 550:21, 552:18
**6-inch** [1] - 440:23
**60** [1] - 419:11
**614-358-9717** [1] - 390:19
**63** [1] - 390:4
**67** [1] - 510:4
**68** [1] - 510:5

## 7

**7** [1] - 498:2
**7-1-2020** [1] - 524:13
**732-747-7100** [1] - 390:5

## 8

**8** [10] - 389:6, 392:1, 475:7, 477:12, 477:17, 499:25,

*505*:10, *521*:7,
*543*:6, *545*:4
**8196** [1] - *434*:5
**8425** [1] - *445*:11
**8525** [3] - *511*:1,
*525*:23, *525*:25
**8550** [1] - *476*:2
**8574** [4] - *510*:5,
*511*:5, *524*:3, *524*:6
**8th** [3] - *504*:8, *507*:7,
*539*:21

## 9

**9** [2] - *496*:12, *543*:6
**9/19** [1] - *441*:10
**93** [1] - *424*:22
**94** [2] - *426*:19, *432*:6
**94.3** [1] - *424*:23
**94s** [1] - *433*:22
**9th** [1] - *506*:6

## A

**A-s-h-l-e-y** [1] -
*517*:19
**a.m** [1] - *392*:3
**Aaron** [4] - *542*:10,
*567*:5, *572*:10,
*572*:16
**aaron** [1] - *390*:14
**Aaron's** [1] - *570*:7
**abide** [1] - *477*:5
**ability** [5] - *405*:22,
*406*:12, *462*:3,
*463*:10, *470*:13
**able** [15] - *393*:8,
*434*:11, *435*:15,
*504*:25, *505*:7,
*508*:14, *516*:4,
*533*:6, *551*:24,
*552*:5, *561*:9, *562*:1,
*563*:1, *565*:19, *566*:5
**above-entitled** [1] -
*573*:23
**absence** [1] - *422*:11
**absolutely** [7] -
*402*:11, *483*:16,
*494*:13, *570*:14,
*570*:25, *572*:1,
*572*:22
**acceptable** [3] -
*402*:22, *557*:21,
*572*:21
**accepted** [1] - *555*:7
**access** [9] - *402*:14,
*402*:18, *406*:24,
*406*:25, *407*:2,
*422*:17, *555*:9, *572*:5
**accommodate** [1] -

*403*:5
**accommodation** [1] -
*557*:21
**accomplish** [3] -
*448*:9, *566*:21,
*566*:22
**accomplished** [1] -
*448*:8
**according** [4] -
*445*:15, *500*:24,
*531*:4, *548*:21
**accordingly** [1] -
*394*:10
**Accumulative** [1] -
*531*:13
**accumulative** [1] -
*531*:15
**accurate** [5] - *401*:23,
*480*:6, *489*:17,
*492*:9, *506*:21
**accurately** [3] -
*429*:23, *430*:5,
*445*:25
**accused** [2] - *498*:4,
*560*:11
**ACH** [3] - *528*:24,
*529*:5, *529*:13
**achieve** [1] - *546*:21
**acknowledged** [1] -
*560*:17
**acquire** [1] - *563*:17
**acquired** [2] - *449*:23,
*451*:1
**act** [2] - *472*:6, *499*:11
**acted** [1] - *535*:19
**acting** [2] - *455*:21,
*469*:5
**action** [18] - *404*:11,
*419*:2, *419*:12,
*420*:7, *420*:23,
*420*:24, *421*:4,
*421*:12, *421*:23,
*431*:22, *458*:19,
*475*:2, *553*:8,
*553*:18, *555*:15,
*557*:5, *557*:10
**actions** [1] - *546*:21
**active** [2] - *442*:4,
*536*:20
**activities** [2] - *469*:13,
*521*:5
**actual** [4] - *452*:4,
*521*:5, *529*:18,
*546*:11
**ADA** [3] - *525*:5,
*525*:6, *525*:11
**add** [7] - *410*:10,
*426*:1, *458*:4, *514*:8,
*525*:8, *555*:13,
*555*:25

**added** [1] - *520*:3
**additional** [10] -
*486*:23, *507*:24,
*515*:7, *515*:23,
*532*:6, *557*:5, *559*:6,
*559*:12, *563*:25,
*566*:20
**Additionally** [2] -
*500*:11, *500*:12
**address** [10] - *427*:10,
*485*:4, *489*:5,
*489*:16, *490*:8,
*491*:13, *493*:11,
*501*:3, *536*:21,
*556*:13
**addressed** [7] -
*422*:21, *431*:24,
*483*:10, *489*:2,
*490*:1, *490*:13,
*527*:19
**addressing** [4] -
*426*:15, *475*:8,
*485*:17, *491*:12
**adds** [1] - *531*:13
**adduced** [1] - *559*:3
**adjourn** [1] - *555*:2
**adjourned** [2] -
*448*:14, *573*:19
**administer** [1] -
*537*:16
**administered** [1] -
*535*:3
**administering** [2] -
*536*:21, *537*:15
**administration** [2] -
*520*:22, *534*:17
**admissibility** [5] -
*437*:19, *438*:25,
*439*:13, *514*:21,
*516*:10
**admissible** [1] -
*459*:22
**admission** [5] -
*437*:23, *439*:1,
*448*:7, *476*:23,
*514*:23
**admitted** [1] - *543*:18
**advance** [8] - *408*:16,
*410*:4, *410*:13,
*410*:14, *411*:2,
*411*:15, *472*:10,
*515*:12
**advancing** [1] -
*514*:13
**advised** [1] - *475*:25
**affect** [3] - *404*:4,
*405*:7
**affiliate** [2] - *461*:20,
*495*:1
**affiliated** [8] - *420*:15,

*420*:17, *423*:4,
*423*:5, *423*:8, *424*:9,
*425*:10, *426*:16
**affiliates** [1] - *511*:3
**affiliation** [1] - *495*:14
**affixed** [1] - *444*:3
**afternoon** [8] -
*447*:13, *464*:23,
*464*:24, *518*:3,
*540*:20, *543*:24,
*564*:3, *564*:10
**agenda** [1] - *482*:10
**agent** [1] - *455*:22
**ago** [7] - *427*:12,
*441*:24, *441*:25,
*442*:3, *442*:4, *462*:8,
*555*:9
**agree** [12] - *453*:25,
*463*:7, *463*:8,
*472*:17, *477*:23,
*478*:1, *483*:23,
*483*:24, *508*:15,
*516*:3, *535*:11,
*563*:23
**agreed** [5] - *446*:12,
*450*:25, *513*:10,
*529*:20, *539*:5
**Agreement** [49] -
*392*:18, *392*:19,
*404*:20, *406*:13,
*408*:17, *408*:25,
*409*:15, *411*:9,
*411*:17, *411*:20,
*412*:10, *427*:17,
*427*:21, *428*:8,
*429*:7, *429*:10,
*429*:14, *471*:4,
*471*:8, *473*:13,
*493*:2, *493*:18,
*493*:20, *495*:14,
*495*:17, *496*:20,
*499*:2, *512*:23,
*513*:18, *513*:20,
*525*:12, *526*:18,
*528*:16, *530*:9,
*530*:15, *530*:21,
*531*:1, *532*:21,
*533*:15, *534*:23,
*538*:5, *539*:9, *544*:6,
*545*:17, *546*:18,
*547*:20, *549*:19,
*552*:24, *556*:20,
*565*:3, *566*:20
**agreement** [127] -
*401*:10, *409*:7,
*410*:17, *419*:10,
*420*:3, *422*:23,
*427*:14, *449*:25,
*451*:18, *452*:15,
*456*:19, *456*:21,
*456*:25, *457*:17,

*457*:19, *460*:23,
*461*:14, *461*:20,
*469*:19, *470*:5,
*470*:20, *473*:14,
*490*:16, *492*:23,
*493*:18, *495*:9,
*497*:3, *503*:9,
*503*:17, *508*:8,
*508*:9, *510*:5, *510*:9,
*510*:25, *511*:1,
*511*:5, *511*:8,
*511*:11, *511*:17,
*511*:18, *511*:22,
*512*:1, *512*:2, *512*:3,
*512*:4, *512*:10,
*512*:12, *512*:13,
*512*:19, *512*:21,
*512*:22, *512*:24,
*513*:8, *513*:10,
*513*:14, *513*:15,
*513*:17, *513*:19,
*513*:21, *514*:2,
*515*:18, *519*:24,
*520*:10, *520*:13,
*520*:23, *520*:24,
*521*:11, *521*:17,
*521*:24, *522*:9,
*522*:20, *522*:21,
*522*:23, *523*:7,
*523*:18, *523*:23,
*524*:2, *524*:8,
*524*:15, *524*:18,
*525*:4, *525*:24,
*526*:7, *526*:11,
*526*:12, *526*:16,
*526*:20, *526*:21,
*526*:23, *526*:25,
*527*:5, *527*:8, *527*:9,
*527*:10, *527*:11,
*527*:13, *527*:20,
*527*:21, *528*:5,
*528*:8, *528*:10,
*528*:11, *528*:13,
*528*:21, *529*:19,
*530*:12, *533*:3,
*533*:5, *533*:7, *533*:9,
*533*:11, *533*:21,
*535*:7, *535*:20,
*537*:3, *538*:8, *539*:4,
*544*:11, *544*:13,
*544*:16, *548*:22,
*554*:5, *556*:20,
*565*:3, *566*:20
**Agreements** [5] -
*472*:3, *492*:15,
*493*:9, *493*:10, *494*:6
**agreements** [23] -
*452*:13, *452*:14,
*465*:6, *472*:8,
*492*:12, *492*:19,
*493*:7, *493*:8,

493:16, 493:17,
510:14, 510:17,
511:19, 519:8,
519:13, 520:5,
522:12, 524:11,
531:9, 533:21,
534:18, 538:14
**agrees** [1] - 567:6
**ahead** [20] - 404:7,
404:16, 434:17,
441:19, 447:22,
447:23, 452:9,
470:21, 477:1,
478:16, 487:4,
493:21, 494:3,
503:11, 530:2,
534:2, 537:25,
540:5, 541:11, 568:4
**aided** [1] - 389:23
**alignment** [1] - 419:12
**alive** [1] - 557:8
**allegation** [1] - 491:2
**allegations** [1] -
490:14
**alleged** [12] - 444:21,
475:10, 476:10,
476:16, 480:10,
480:15, 484:18,
488:18, 489:16,
489:22, 490:13,
491:13
**Allen** [1] - 539:2
**allow** [7] - 404:23,
406:17, 408:9,
428:18, 495:12,
556:21, 565:23
**allowed** [4] - 459:4,
477:6, 494:8, 499:20
**allows** [1] - 418:11
**almost** [1] - 526:15
**alternate** [1] - 565:18
**amazingly** [1] - 539:19
**amend** [2] - 418:5,
552:4
**American** [1] - 496:20
**amortization** [2] -
451:11, 451:12
**amount** [5] - 431:12,
541:14, 541:15,
542:1, 542:4
**andrew** [1] - 390:10
**Andy** [13] - 401:9,
402:2, 402:5,
407:21, 449:12,
460:2, 466:4,
475:14, 475:20,
477:6, 478:19,
481:16, 510:15
**Angela** [3] - 392:5,
392:9, 392:11

**Angelica** [1] - 432:17
**answer** [23] - 402:3,
402:5, 402:6,
403:15, 406:17,
418:11, 447:15,
459:6, 460:14,
461:5, 463:9,
474:19, 476:21,
478:12, 482:21,
483:8, 483:15,
485:2, 485:7, 490:4,
529:25, 530:2,
568:12
**answered** [3] -
410:10, 457:14,
540:3
**answering** [1] -
537:19
**ANTHONY** [6] - 391:7,
392:16, 464:21,
497:11, 501:19,
503:24
**anticipated** [1] -
393:23
**anticipating** [1] -
569:20
**anyway** [1] - 569:16
**apart** [1] - 433:2
**apologize** [4] -
472:10, 478:14,
540:14, 542:9
**apologized** [1] -
430:21
**apparent** [1] - 438:15
**appear** [4] - 434:25,
440:7, 446:14, 501:6
**APPEARANCES** [1] -
390:1
**appeared** [1] - 434:23
**apple** [1] - 554:9
**applicable** [1] -
539:13
**application** [1] -
540:21
**applied** [5] - 419:4,
522:10, 522:24,
534:22, 538:5
**apply** [5] - 405:2,
465:15, 532:24,
533:2, 544:17
**applying** [1] - 525:7
**appreciate** [4] - 437:3,
462:21, 508:25,
572:6
**approach** [3] - 410:21,
410:24, 411:4
**approached** [3] -
403:3, 403:10,
450:23
**appropriate** [4] -

456:11, 487:21,
487:22, 547:9
**appropriately** [1] -
424:11
**appropriateness** [1] -
559:6
**approved** [2] - 411:8,
482:15
**approving** [1] - 553:19
**approximate** [1] -
542:1
**AR** [50] - 392:18,
404:4, 404:9,
404:19, 411:9,
411:20, 412:4,
419:21, 419:22,
420:14, 420:25,
425:3, 426:19,
427:12, 433:6,
451:17, 462:7,
463:2, 465:4,
466:14, 469:4,
469:5, 472:3,
479:12, 482:3,
482:15, 482:22,
483:7, 483:25,
484:11, 485:8,
492:8, 493:2,
493:10, 495:14,
495:17, 499:2,
500:5, 513:18,
513:20, 530:8,
532:20, 534:23,
538:5, 539:9,
546:18, 547:20,
555:10
**AR's** [2] - 420:17,
422:14
**AR-OFC** [2] - 479:12,
500:5
**AR-OFCs** [1] - 482:15
**area** [72] - 401:17,
402:4, 402:9,
402:14, 402:20,
403:2, 403:11,
403:22, 403:23,
405:13, 405:21,
406:10, 407:7,
407:19, 407:23,
407:24, 408:2,
408:11, 408:13,
408:15, 408:25,
409:3, 409:5, 409:8,
410:14, 412:4,
417:2, 417:24,
418:8, 419:16,
420:1, 420:8,
420:19, 421:7,
421:9, 422:22,
422:25, 424:2,

430:9, 430:13,
431:21, 432:22,
432:23, 449:23,
450:7, 450:23,
451:3, 453:4, 455:3,
455:13, 455:16,
462:1, 462:4,
465:13, 465:14,
470:13, 470:14,
471:3, 482:7, 492:8,
495:15, 499:8,
511:6, 516:4,
525:12, 527:23,
529:6, 532:10,
532:24, 543:8,
544:17, 561:4
**Area** [26] - 392:19,
393:15, 393:19,
393:23, 405:23,
406:13, 408:17,
408:25, 409:14,
411:17, 420:9,
429:10, 429:14,
471:4, 471:8, 493:8,
493:20, 496:20,
512:23, 526:17,
528:15, 530:13,
530:14, 530:25,
533:14
**areas** [3] - 463:11,
508:14, 523:17
**arguable** [1] - 514:6
**argue** [1] - 412:1
**arguing** [1] - 455:24
**argument** [25] -
427:11, 451:23,
451:24, 484:14,
513:11, 514:10,
514:13, 514:19,
559:6, 559:12,
560:4, 562:11,
563:14, 563:17,
563:18, 564:14,
565:5, 565:11,
568:9, 568:11,
568:12, 568:14,
568:22
**arguments** [8] -
409:14, 561:11,
565:11, 566:2,
566:10, 567:11,
567:25, 568:1
**arisen** [1] - 453:11
**arose** [1] - 462:9
**ARs** [4] - 422:16,
465:10, 483:13,
493:3
**artificially** [1] - 432:11
**Ashley** [6] - 474:5,
508:2, 508:21,

517:16, 517:18,
518:3
**ASHLEY** [4] - 391:11,
518:1, 543:22,
550:23
**assembled** [1] -
434:20
**assertion** [2] - 566:13,
566:14
**assess** [1] - 446:1
**assessment** [1] -
496:17
**assets** [1] - 402:17
**assigned** [1] - 421:5
**assist** [1] - 479:16
**associated** [2] -
402:20, 537:13
**assume** [5] - 404:16,
495:19, 554:4,
573:2, 573:3
**assumes** [1] - 546:8
**assuming** [4] - 437:4,
456:4, 507:18,
564:15
**assumption** [4] -
482:6, 530:6,
535:19, 539:12
**astray** [1] - 439:9
**attach** [2] - 552:3,
573:3
**attached** [13] - 433:20,
433:22, 441:8,
445:15, 446:5,
515:18, 520:2,
529:18, 530:17,
530:21, 530:25,
534:23, 552:23
**attempt** [3] - 450:4,
458:15, 499:9
**attempted** [2] - 459:9,
528:24
**attend** [1] - 465:14
**attended** [1] - 445:7
**attention** [7] - 475:6,
494:18, 494:21,
496:12, 549:5,
555:23, 557:20
**attorney** [1] - 491:16
**attorneys** [1] - 543:25
**audio** [1] - 465:22
**August** [13] - 401:13,
423:21, 423:25,
424:11, 430:4,
431:2, 431:6,
433:20, 434:25,
445:25, 474:5, 501:3
**authenticate** [1] -
437:24
**authenticating** [1] -
442:24

*authentication* [2] - 435:7, 508:17
*authenticity* [3] - 437:8, 437:12, 442:16
*authorized* [2] - 478:25, 481:17
*automated* [1] - 422:16
*avail* [1] - 559:22
*availability* [1] - 564:6
*available* [10] - 406:20, 406:22, 407:3, 429:2, 436:8, 447:25, 448:2, 532:23, 533:1, 540:17
*Avenue* [2] - 389:16, 390:4
*avoid* [1] - 461:6
*aware* [22] - 405:20, 412:8, 419:15, 425:9, 425:13, 425:17, 452:20, 453:3, 453:7, 453:11, 454:9, 472:11, 476:5, 478:2, 480:7, 480:9, 480:14, 480:17, 489:20, 506:15, 528:1, 533:15

## B

*backdoor* [2] - 454:4, 458:15
*backward* [2] - 443:8, 569:9
*balance* [2] - 402:16, 407:2
*Bank* [1] - 390:5
*bank* [2] - 528:16, 528:20
*Barry* [5] - 390:13, 411:14, 536:11, 542:20, 572:17
*based* [15] - 427:4, 429:19, 437:23, 443:8, 445:23, 448:6, 451:3, 451:17, 461:18, 462:23, 513:18, 523:19, 538:19, 538:20, 567:20
*bases* [1] - 427:20
*basis* [8] - 409:17, 424:18, 428:6, 431:9, 455:24, 460:5, 481:9, 531:4
*Battista* [2] - 390:14,

504:2
*BDM* [21] - 508:7, 510:8, 511:10, 512:2, 512:21, 519:24, 520:17, 520:18, 522:20, 524:4, 524:6, 525:14, 525:24, 526:12, 527:8, 527:13, 528:2, 528:13, 528:19, 529:5, 529:8
*bears* [1] - 429:13
*beat* [1] - 507:5
*became* [1] - 401:17
*become* [2] - 472:16, 479:4
*becomes* [1] - 422:9
*becoming* [1] - 403:12
*bed* [1] - 558:13
*BEFORE* [1] - 389:11
*beforehand* [1] - 504:15
*began* [2] - 409:20, 425:22
*begin* [1] - 452:14
*beginning* [3] - 519:6, 532:2, 537:14
*behalf* [3] - 404:25, 507:25, 517:5
*behaviors* [1] - 422:6
*behind* [2] - 454:17, 548:24
*belief* [2] - 406:18, 500:22
*below* [1] - 521:19
*best* [5] - 403:25, 409:18, 409:23, 409:24, 412:3
*better* [4] - 514:18, 562:25, 564:23, 564:25
*between* [20] - 453:3, 455:12, 455:16, 455:22, 457:17, 458:25, 459:1, 460:1, 460:2, 472:15, 473:22, 478:18, 480:5, 481:16, 502:24, 518:14, 527:19, 538:20, 538:25, 547:4
*beyond* [5] - 419:19, 439:11, 439:15, 442:22, 551:13
*big* [2] - 392:21, 426:15
*bind* [1] - 554:15
*binding* [2] - 553:22,

554:5
*bit* [11] - 421:16, 440:13, 442:16, 444:1, 465:2, 473:2, 508:22, 515:23, 558:2, 562:25, 571:15
*bite* [1] - 554:9
*blanche* [1] - 547:17
*blank* [1] - 524:4
*Blum* [81] - 390:13, 392:15, 394:3, 394:12, 403:19, 404:8, 404:22, 408:23, 423:13, 426:12, 428:11, 435:18, 440:8, 441:19, 443:6, 444:23, 446:15, 446:23, 447:22, 448:5, 449:1, 450:4, 450:16, 452:24, 454:4, 457:12, 458:7, 458:16, 461:5, 462:15, 462:18, 485:1, 486:17, 497:8, 509:24, 510:22, 513:6, 514:18, 515:10, 516:3, 517:24, 532:18, 535:11, 536:10, 537:6, 537:18, 540:6, 541:4, 541:11, 550:17, 551:16, 554:12, 555:13, 556:5, 557:12, 558:2, 558:11, 559:24, 560:16, 563:6, 563:13, 564:5, 564:13, 564:19, 565:7, 565:25, 566:4, 566:15, 566:17, 567:9, 567:24, 569:11, 569:17, 569:19, 570:24, 571:1, 572:4, 572:18, 573:17
*BLUM* [234] - 391:7, 391:8, 391:9, 391:11, 391:12, 392:17, 393:6, 393:11, 393:13, 394:4, 401:7, 403:20, 404:14, 404:17, 405:4, 405:10, 405:11, 406:6, 408:24, 409:11, 409:13,

410:12, 411:1, 411:3, 411:11, 412:9, 412:17, 416:25, 423:14, 426:14, 428:10, 428:13, 428:24, 429:5, 429:18, 433:25, 434:7, 435:20, 436:7, 437:3, 439:2, 439:20, 440:14, 440:18, 441:18, 441:20, 442:7, 443:13, 443:19, 444:24, 445:4, 446:16, 446:24, 447:4, 447:21, 447:24, 448:4, 448:12, 449:2, 450:6, 450:17, 452:25, 454:1, 454:8, 455:20, 456:1, 456:13, 457:13, 457:21, 458:8, 458:17, 458:18, 459:18, 459:24, 461:7, 461:8, 462:11, 462:14, 462:17, 462:21, 462:22, 463:6, 463:12, 469:21, 470:6, 470:8, 470:21, 470:24, 471:7, 474:8, 476:20, 477:14, 480:25, 481:4, 481:24, 482:1, 484:3, 484:17, 485:3, 485:20, 485:25, 486:3, 486:8, 486:12, 486:19, 487:1, 487:11, 488:20, 489:4, 489:24, 490:8, 490:22, 491:1, 491:5, 492:20, 493:5, 493:22, 494:1, 495:7, 495:23, 496:1, 497:10, 497:12, 498:7, 498:24, 501:16, 501:23, 502:3, 503:6, 503:21, 503:25, 504:13, 504:18, 505:10, 505:13, 505:21, 506:10, 508:1, 508:5, 508:18, 508:21, 509:7, 509:14,

509:16, 509:21, 510:3, 510:8, 510:24, 511:4, 511:10, 511:21, 513:7, 514:15, 515:12, 516:13, 516:17, 517:25, 518:2, 532:19, 534:3, 535:2, 535:13, 535:25, 536:5, 536:12, 537:8, 537:14, 537:20, 538:1, 540:3, 540:7, 540:10, 541:3, 541:5, 541:12, 542:11, 542:13, 542:16, 542:19, 542:21, 543:13, 543:19, 545:8, 545:12, 546:7, 547:7, 548:7, 549:11, 549:14, 550:18, 550:24, 551:15, 551:17, 552:7, 554:3, 554:10, 554:21, 555:17, 556:6, 558:4, 558:15, 560:1, 560:18, 561:15, 561:21, 562:10, 562:15, 562:20, 563:2, 563:5, 563:10, 564:1, 564:8, 564:14, 564:18, 564:20, 565:9, 566:9, 566:16, 567:6, 567:10, 567:17, 567:22, 568:6, 569:22, 570:4, 571:3, 571:7, 571:17, 572:7, 572:19, 572:24, 573:6, 573:12
*Blum's* [1] - 392:13
*BLYNN* [7] - 542:12, 542:14, 542:18, 542:20, 572:11, 572:13, 572:17
*Blynn* [5] - 390:14, 393:7, 393:12, 459:18, 569:11
*boil* [1] - 559:15
*bold* [1] - 474:24
*Bonnie* [1] - 543:2
*bottom* [6] - 430:24, 434:4, 434:8, 474:24, 521:6, 543:11
*bounce* [1] - 563:13

**bounced** [1] - 529:1
**bounds** [1] - 474:14
**box** [2] - 524:24, 527:1
**Brad** [3] - 403:2, 528:18, 528:25
**brand** [6] - 409:19, 409:25, 412:5, 437:6, 529:14, 562:7
**brands** [1] - 411:25
**breach** [4] - 404:19, 427:6, 469:19, 556:19
**breached** [1] - 409:4
**break** [6] - 437:6, 447:3, 447:19, 448:23, 464:4, 491:22
**breaking** [1] - 536:8
**Brent** [1] - 543:24
**brent** [1] - 390:3
**brevity** [1] - 572:20
**brief** [5] - 550:10, 562:2, 562:7, 562:10, 569:6
**briefed** [2] - 428:2, 514:14
**briefing** [16] - 472:13, 472:14, 514:10, 514:18, 549:7, 559:1, 561:25, 563:25, 564:16, 565:24, 567:9, 567:19, 568:3, 569:4, 569:9, 572:23
**briefings** [1] - 572:14
**briefly** [5] - 418:7, 420:24, 453:16, 519:10, 532:23
**briefs** [3] - 565:22, 567:7, 568:22
**bring** [3] - 407:12, 458:19, 516:4
**broke** [3] - 432:5, 437:5, 438:13
**broken** [3] - 445:9, 472:15, 473:23
**brokers** [1] - 393:2
**brought** [2] - 505:1, 547:8
**brown** [1] - 483:18
**build** [2] - 407:9, 407:10
**built** [2] - 511:17, 512:23
**bullet** [2] - 487:2, 500:22
**Bullfrog** [1] - 427:20
**burden** [3] - 457:22, 569:1, 569:10
**business** [38] - 402:7,

402:9, 409:17, 412:4, 417:6, 417:20, 431:5, 432:20, 432:21, 436:9, 437:20, 438:1, 438:18, 439:6, 439:12, 442:9, 442:15, 443:8, 445:7, 451:5, 459:3, 470:12, 470:13, 470:14, 470:15, 495:2, 499:5, 499:10, 499:14, 499:16, 499:21, 502:24, 534:9, 538:14, 564:24, 565:13, 565:15
**businesses** [1] - 492:8
**BY** [62] - 391:7, 391:8, 391:8, 391:9, 391:9, 391:11, 391:12, 391:12, 392:17, 393:13, 401:7, 405:11, 406:6, 411:3, 416:25, 429:18, 434:7, 439:20, 440:18, 441:20, 445:4, 449:2, 450:17, 452:25, 454:8, 456:13, 458:18, 459:24, 461:8, 462:22, 464:22, 469:2, 470:1, 471:24, 474:21, 477:16, 481:7, 482:2, 485:12, 487:5, 492:6, 494:5, 496:4, 497:12, 498:24, 501:20, 502:6, 503:13, 503:25, 518:2, 534:3, 538:1, 540:7, 541:12, 542:21, 543:23, 545:13, 548:15, 549:22, 550:24, 552:7, 554:3

**C**

**camera** [2] - 464:5, 491:21
**Cameron** [2] - 539:1, 539:6
**candid** [2] - 561:24, 565:18
**candidate** [3] - 406:21, 406:22, 427:22

**candidates** [1] - 408:4
**Candler** [3] - 508:9, 511:6, 524:20
**cannot** [2] - 438:3, 512:8
**capital** [2] - 407:3, 408:5
**care** [1] - 515:21
**career** [1] - 519:5
**Carolina** [6] - 508:9, 511:6, 524:20, 525:20, 526:1, 544:4
**Carrie** [1] - 390:17
**carry** [1] - 427:14
**carte** [1] - 547:16
**Case** [1] - 389:4
**case** [29] - 405:2, 405:8, 419:5, 422:8, 424:18, 436:1, 436:5, 442:14, 453:23, 459:21, 463:16, 472:14, 489:15, 491:2, 507:23, 512:15, 517:5, 528:20, 551:17, 555:3, 556:14, 557:15, 559:1, 559:13, 564:17, 565:2, 566:12, 567:3, 569:17
**cases** [3] - 417:22, 472:12, 561:25
**catch** [2] - 435:5, 568:7
**catch-up** [1] - 568:7
**category** [2] - 493:1, 493:4
**causes** [1] - 557:5
**certain** [5] - 421:11, 443:9, 444:7, 501:2, 569:5
**certainly** [7] - 423:18, 471:21, 474:13, 550:12, 559:17, 559:21, 562:22
**certainty** [1] - 479:9
**certification** [1] - 482:14
**certified** [2] - 482:15, 482:17
**certify** [1] - 573:23
**cetera** [6] - 405:24, 451:4, 454:17, 503:4, 534:10
**challenge** [2] - 442:18, 489:21
**challenging** [3] - 436:23, 437:7, 490:20

**chance** [5] - 402:25, 436:6, 507:16, 513:9, 556:1
**change** [3] - 520:13, 533:17, 553:22
**changed** [8] - 433:11, 451:17, 477:13, 493:17, 497:3, 516:1, 560:15, 566:12
**changes** [1] - 568:12
**characterization** [3] - 439:15, 472:17, 515:25
**characterizations** [1] - 559:18
**characterizing** [1] - 490:1
**charge** [2] - 515:22, 525:10
**charged** [3] - 521:1, 534:17, 537:15
**charges** [1] - 529:11
**Charlotte** [40] - 411:18, 426:1, 427:16, 428:8, 429:11, 449:7, 462:2, 472:7, 492:15, 494:6, 510:11, 511:13, 511:14, 511:25, 512:9, 513:10, 513:18, 515:15, 515:17, 515:18, 530:11, 530:13, 530:14, 530:21, 530:25, 534:24, 539:20, 543:7, 544:5, 545:9, 549:8, 549:11, 549:19, 550:2, 551:11, 552:8, 552:22, 552:23, 553:13, 554:17
**check** [1] - 421:8
**checked** [1] - 421:14
**checking** [1] - 473:5
**checklist** [1] - 422:2
**chemicals** [2] - 418:18, 422:3
**Chief** [1] - 475:21
**choices** [1] - 564:22
**choose** [1] - 573:5
**CIO** [4] - 487:15, 487:19, 487:20, 487:23
**circumstances** [2] - 418:3, 427:4
**citation** [1] - 563:14
**citations** [1] - 564:17

**cite** [2] - 459:19, 572:24
**cites** [1] - 560:9
**citizenship** [1] - 557:22
**claim** [6] - 458:12, 469:9, 476:6, 556:16, 556:17, 558:7
**claimed** [2] - 478:22, 549:18
**claiming** [1] - 513:14
**clarification** [7] - 393:22, 404:22, 476:4, 481:23, 485:21, 535:24, 536:4
**clause** [1] - 497:3
**clean** [9] - 418:19, 418:21, 418:22, 421:11, 421:12, 421:21, 422:7, 422:8, 422:10
**cleaned** [2] - 444:1, 573:9
**cleaning** [4] - 418:16, 418:17, 422:2, 422:4
**cleanliness** [2] - 421:23, 421:24
**clear** [5] - 446:11, 447:13, 447:14, 462:18, 540:19
**clearly** [5] - 393:24, 405:1, 437:4, 459:23, 569:1
**click** [1] - 434:11
**clicking** [1] - 418:21
**client** [1] - 485:2
**clients** [1] - 567:4
**clipping** [1] - 478:15
**clock** [1] - 570:2
**close** [3] - 459:4, 560:21, 570:16
**closed** [6] - 456:15, 457:3, 457:25, 458:20, 513:13
**closing** [11] - 421:25, 558:18, 560:4, 561:16, 562:11, 564:14, 564:20, 565:11, 567:11
**clothes** [1] - 392:24
**CM/ECF** [1] - 570:3
**coach** [3] - 481:19, 483:20
**coaching** [11] - 417:7, 417:25, 419:4, 419:19, 419:22, 423:1, 484:11, 485:14, 485:19,

487:7, 487:16
**coaching-related** [1] - 484:11
**collection** [1] - 428:25
**Columbia** [38] - 411:18, 425:25, 427:16, 429:7, 429:11, 429:14, 431:1, 454:13, 454:21, 454:22, 462:2, 472:7, 473:13, 492:15, 493:17, 494:6, 529:19, 530:8, 533:14, 534:5, 534:18, 534:23, 536:17, 536:18, 538:4, 538:5, 539:24, 540:8, 543:9, 545:8, 545:9, 545:10, 545:17, 547:5, 547:15, 552:14, 552:16
**Columbus** [1] - 390:19
**column** [1] - 531:8
**columns** [1] - 530:23
**coming** [3] - 557:17, 565:3, 571:9
**commenced** [1] - 392:3
**comment** [1] - 474:5
**commissions** [5] - 541:15, 542:2, 543:3, 556:23
**commit** [1] - 479:13
**commitment** [7] - 419:13, 540:15, 546:3, 546:11, 548:6, 548:9, 554:17
**commitments** [2] - 547:14, 570:12
**common** [3] - 425:4, 521:8, 567:19
**commonly** [1] - 521:16
**communicate** [2] - 393:3, 528:2
**communicated** [7] - 428:3, 477:8, 480:9, 523:6, 535:20, 535:21, 537:16
**communication** [3] - 423:11, 502:14, 504:22
**communications** [7] - 402:18, 427:25, 428:1, 479:16, 480:19, 480:23, 481:16

**community** [2] - 433:6, 452:19
**company** [8] - 402:21, 495:2, 524:7, 533:23, 537:11, 538:21, 539:14, 539:15
**company's** [1] - 462:1
**company-owned** [1] - 495:2
**compete** [4] - 492:19, 492:22, 493:3, 493:23
**competing** [2] - 494:9, 495:5
**competitive** [1] - 493:16
**competitor** [5] - 407:19, 499:11, 499:15, 499:21
**competitors** [1] - 407:16
**complained** [1] - 460:7
**complaint** [2] - 505:15, 506:5
**complete** [10] - 419:8, 421:8, 479:12, 480:15, 480:16, 486:14, 487:25, 488:18, 500:17, 555:10
**completed** [5] - 421:6, 421:7, 422:15, 450:19
**completely** [6] - 410:19, 506:21, 511:25, 515:20, 515:25, 569:10
**completing** [1] - 480:6
**compliance** [9] - 424:4, 430:10, 511:13, 512:9, 532:11, 535:25, 536:2, 536:16, 539:2
**complicated** [1] - 421:2
**complied** [1] - 511:23
**comply** [4] - 405:22, 500:15, 513:21, 554:16
**comport** [1] - 524:20
**compounded** [1] - 558:24
**comprised** [1] - 543:8
**computer** [2] - 389:23, 536:12
**computer-aided** [1] - 389:23
**concept** [2] - 402:10,

532:10
**concern** [10] - 403:22, 404:25, 431:24, 435:25, 436:3, 436:13, 438:22, 443:6, 443:12, 537:21
**concerned** [3] - 425:1, 469:9, 476:20
**concerns** [7] - 402:23, 405:21, 406:11, 420:1, 431:7, 469:3, 470:2
**concession** [2] - 490:10, 490:16
**concise** [1] - 520:9
**conclude** [5] - 447:2, 460:23, 540:20, 555:22, 556:25
**concluded** [1] - 573:20
**concluding** [1] - 447:12
**conclusion** [2] - 452:7, 495:8
**condition** [3] - 426:16, 446:1, 501:12
**conduct** [5] - 418:10, 478:25, 479:8, 482:16, 486:23
**conducted** [3] - 419:25, 444:14, 478:23
**conducting** [7] - 418:8, 463:15, 477:25, 479:21, 482:5, 482:23, 486:7
**conducts** [1] - 420:19
**confer** [4] - 483:18, 491:18, 550:10, 556:1
**conferences** [1] - 482:9
**confidence** [5] - 461:25, 462:3, 462:6, 462:25, 463:10
**confident** [1] - 482:10
**confidential** [10] - 393:25, 394:2, 394:5, 412:11, 412:13, 412:14, 462:6, 466:15, 498:5, 498:8
**confidentiality** [1] - 402:24
**confirm** [1] - 463:20
**conflates** [1] - 470:25
**conflating** [1] - 470:12
**conflict** [10] - 403:13,

407:11, 407:24, 407:25, 408:1, 452:17, 458:25, 459:1, 459:25, 460:6
**confused** [2] - 443:13, 469:15
**Congratulations** [1] - 545:25
**connected** [1] - 435:13
**connection** [2] - 479:25, 524:11
**connects** [1] - 418:24
**consider** [2] - 407:18, 490:9
**considered** [2] - 461:12, 493:15
**considers** [1] - 495:5
**consist** [2] - 465:21, 465:23
**consistent** [8] - 394:6, 410:16, 410:17, 411:9, 411:19, 522:2, 529:21, 530:4
**consulting** [2] - 419:3, 419:19
**consumable** [1] - 441:8
**consumer** [1] - 417:14
**contact** [2] - 408:16, 430:18
**contacted** [1] - 528:18
**contain** [5] - 465:16, 470:17, 489:2, 494:6, 495:17
**contained** [5] - 484:15, 488:25, 489:16, 489:22, 490:14
**container** [3] - 439:25, 440:21, 443:24
**contains** [2] - 488:17, 489:15
**content** [2] - 476:18, 503:1
**contentious** [1] - 452:22
**contents** [3] - 393:25, 476:24, 510:16
**contest** [1] - 470:13
**context** [1] - 440:21
**continue** [2] - 450:14, 473:23
**CONTINUED** [2] - 391:7, 392:16
**continues** [1] - 534:13
**continuing** [1] - 428:18
**contract** [12] - 407:10, 412:13, 427:3,

427:8, 427:11, 427:15, 427:17, 457:4, 532:17, 537:23, 538:23, 556:17
**contrary** [1] - 495:8
**convened** [1] - 460:21
**convenience** [1] - 403:9
**conventions** [2] - 465:14, 465:15
**conversation** [15] - 475:14, 475:18, 475:20, 476:7, 476:9, 476:15, 476:18, 476:25, 477:3, 478:2, 478:18, 478:21, 485:18, 487:15, 558:14
**conversations** [12] - 402:2, 455:11, 456:8, 473:17, 473:24, 478:3, 478:7, 479:11, 480:5, 480:7, 481:9, 523:14
**conveyed** [1] - 430:5
**conveys** [1] - 459:12
**COO** [2] - 390:20, 495:11
**copies** [1] - 563:8
**corner** [2] - 488:8, 531:2
**corporate** [3] - 518:6, 518:8, 534:14
**correct** [87] - 405:14, 405:15, 407:16, 407:17, 408:14, 412:6, 417:14, 419:23, 419:24, 420:21, 421:16, 422:25, 423:4, 423:9, 423:23, 429:12, 429:21, 430:21, 433:13, 435:2, 439:17, 445:7, 445:10, 445:11, 449:4, 451:13, 456:16, 456:19, 456:20, 463:17, 465:4, 465:5, 465:7, 465:8, 472:9, 475:5, 475:12, 479:2, 488:2, 488:13, 489:12, 492:19, 497:5, 499:6, 499:7, 499:22, 499:23, 500:6, 500:7, 500:9,

*500:21, 501:13,*
*501:14, 501:22,*
*504:3, 504:4, 504:5,*
*516:24, 517:1,*
*517:2, 518:22,*
*519:16, 521:21,*
*522:4, 522:18,*
*522:19, 524:9,*
*525:18, 526:8,*
*527:16, 527:17,*
*529:9, 532:7, 538:5,*
*540:25, 543:12,*
*544:15, 545:19,*
*546:10, 551:6,*
*552:24, 553:3,*
*553:4, 553:14,*
*553:19, 573:23*
**Correct** *[1] - 516:15*
**corrected** *[2] - 423:17,*
*500:23*
**correctly** *[10] -*
*403:17, 418:15,*
*418:19, 421:22,*
*422:5, 425:8, 432:7,*
*446:1, 479:22,*
*562:19*
**correspond** *[1] -*
*473:6*
**correspondence** *[4] -*
*502:11, 527:18,*
*534:9, 556:10*
**cost** *[2] - 460:9, 563:2*
**counsel** *[17] - 431:2,*
*464:25, 501:24,*
*502:2, 502:3, 502:7,*
*502:13, 502:15,*
*506:17, 510:23,*
*518:6, 518:8,*
*518:21, 534:14,*
*556:2, 564:7, 565:8*
**Counsel** *[5] - 390:21,*
*463:8, 471:19,*
*486:11, 555:3*
**count** *[4] - 527:24,*
*544:10, 544:14,*
*544:23*
**counting** *[1] - 565:14*
**couple** *[19] - 431:21,*
*437:9, 444:3, 450:8,*
*450:12, 451:22,*
*472:20, 472:21,*
*472:23, 472:25,*
*491:22, 519:22,*
*528:23, 533:1,*
*541:7, 544:1,*
*565:23, 566:23,*
*569:3*
**course** *[5] - 417:10,*
*433:16, 472:19,*
*566:1, 566:12*

**COURT** *[244] - 389:1,*
*392:5, 392:9,*
*392:11, 393:9,*
*394:3, 394:8,*
*403:19, 404:7,*
*404:22, 405:5,*
*406:4, 406:16,*
*408:8, 408:23,*
*409:6, 409:12,*
*410:6, 410:22,*
*411:12, 412:15,*
*423:13, 423:17,*
*426:12, 427:9,*
*428:9, 428:11,*
*428:14, 428:25,*
*435:18, 435:24,*
*436:12, 437:9,*
*437:21, 438:6,*
*439:8, 439:18,*
*440:5, 440:16,*
*441:17, 441:19,*
*442:13, 443:6,*
*443:17, 443:20,*
*444:12, 444:16,*
*444:23, 445:2,*
*446:14, 446:20,*
*447:1, 447:5,*
*447:11, 447:18,*
*447:22, 448:5,*
*448:13, 448:20,*
*450:3, 450:11,*
*450:15, 452:8,*
*452:24, 453:25,*
*454:4, 455:19,*
*455:24, 457:11,*
*457:15, 458:7,*
*458:16, 459:8,*
*459:14, 459:17,*
*460:12, 460:15,*
*462:15, 463:7,*
*463:14, 463:18,*
*463:22, 464:1,*
*464:6, 464:8,*
*466:16, 469:23,*
*470:9, 474:16,*
*477:1, 478:11,*
*478:15, 481:3,*
*483:9, 484:9, 485:5,*
*486:4, 486:25,*
*487:3, 488:23,*
*489:8, 490:7, 490:9,*
*491:3, 491:6, 491:8,*
*491:10, 491:20,*
*492:3, 493:13,*
*493:21, 494:3,*
*495:10, 497:8,*
*498:9, 501:17,*
*502:1, 502:5,*
*503:11, 505:2,*
*505:24, 506:5,*
*507:1, 507:6,*

*507:11, 507:15,*
*507:18, 507:22,*
*508:23, 509:2,*
*509:17, 509:23,*
*510:2, 510:21,*
*512:16, 513:6,*
*514:17, 514:25,*
*515:2, 515:5,*
*515:10, 516:3,*
*516:7, 516:12,*
*516:15, 516:21,*
*516:24, 517:1,*
*517:3, 517:8,*
*517:13, 517:17,*
*517:20, 517:23,*
*530:2, 532:18,*
*532:22, 534:2,*
*535:5, 535:11,*
*536:7, 536:10,*
*536:23, 537:6,*
*537:10, 537:18,*
*537:21, 540:5,*
*540:11, 540:18,*
*541:2, 541:4, 541:8,*
*541:11, 542:10,*
*543:16, 543:18,*
*543:21, 546:9,*
*547:16, 548:14,*
*549:4, 549:16,*
*549:21, 550:12,*
*550:17, 551:16,*
*554:2, 554:12,*
*554:23, 554:25,*
*555:13, 555:21,*
*556:5, 556:24,*
*557:4, 558:11,*
*558:25, 559:24,*
*560:16, 560:19,*
*561:7, 561:18,*
*562:3, 562:12,*
*562:16, 563:4,*
*563:6, 563:11,*
*564:5, 564:15,*
*564:19, 564:21,*
*565:16, 565:25,*
*566:15, 566:17,*
*567:8, 567:13,*
*567:15, 567:18,*
*568:14, 568:17,*
*568:25, 569:15,*
*570:1, 570:6,*
*570:17, 570:23,*
*571:1, 571:5,*
*571:11, 571:20,*
*571:24, 572:2,*
*572:8, 572:12,*
*572:15, 572:18,*
*572:20, 573:2,*
*573:10, 573:13,*
*573:17*
**court** *[6] - 454:2,*

*471:22, 479:25,*
*536:4, 561:4, 569:24*
**Court** *[24] - 389:15,*
*389:16, 428:6,*
*428:17, 430:3,*
*448:18, 476:4,*
*481:23, 505:19,*
*519:10, 535:24,*
*554:14, 555:1,*
*555:15, 555:23,*
*556:3, 557:1,*
*559:22, 561:24,*
*562:13, 565:18,*
*568:21, 569:25,*
*570:21*
**Court's** *[1] - 540:16*
**covenant** *[1] - 493:23*
**cover** *[3] - 509:21,*
*510:4, 524:1*
**covered** *[4] - 410:10,*
*526:21, 544:5,*
*544:17*
**covers** *[1] - 544:13*
**create** *[2] - 405:21,*
*406:11*
**created** *[1] - 431:24*
**creates** *[2] - 420:25,*
*456:5*
**creating** *[1] - 419:11*
**creation** *[1] - 535:7*
**credentials** *[1] -*
*479:19*
**credit** *[11] - 514:4,*
*514:7, 523:1, 525:5,*
*525:8, 525:16,*
*527:4, 527:16,*
*528:4, 533:2, 533:6*
**credits** *[8] - 512:11,*
*512:13, 513:14,*
*513:18, 513:23,*
*532:10, 532:23*
**critical** *[2] - 404:3,*
*446:7*
**critically** *[1] - 424:7*
**cross** *[13] - 429:3,*
*435:10, 435:15,*
*446:22, 447:6,*
*447:8, 463:15,*
*463:21, 504:17,*
*540:11, 540:24,*
*547:10, 551:14*
**CROSS** *[4] - 391:8,*
*391:12, 464:21,*
*543:22*
**cross-examination** *[5]*
*- 429:3, 446:22,*
*463:15, 540:11,*
*540:24*
**CROSS-**
**EXAMINATION** *[4] -*

*391:8, 391:12,*
*464:21, 543:22*
**cross-examine** *[3] -*
*435:10, 435:15,*
*504:17*
**crossed** *[1] - 460:16*
**CRR** *[2] - 389:15,*
*573:25*
**culture** *[1] - 405:24*
**Cummins** *[1] - 539:1*
**cumulative** *[1] - 540:1*
**cure** *[33] - 421:22,*
*473:25, 475:2,*
*475:18, 475:25,*
*476:16, 477:4,*
*477:9, 477:11,*
*478:10, 478:19,*
*480:10, 481:18,*
*483:4, 483:7,*
*483:19, 483:23,*
*484:1, 484:8,*
*484:18, 484:21,*
*485:10, 485:15,*
*487:8, 487:17,*
*487:25, 489:22,*
*500:17, 501:1,*
*501:3, 547:19, 555:7*
**cured** *[2] - 439:4,*
*501:6*
**curing** *[6] - 431:5,*
*476:10, 479:17,*
*483:13, 487:18,*
*488:18*
**curious** *[1] - 547:9*
**current** *[7] - 393:19,*
*403:5, 493:2,*
*493:20, 495:17,*
*548:6, 563:12*
**customer** *[2] - 499:10,*
*499:14*
**cutting** *[1] - 478:16*
**cycle** *[3] - 424:20,*
*433:10, 465:13*

**D**

**damages** *[4] - 426:25,*
*556:18, 556:22,*
*557:6, 558:7*
**data** *[4] - 424:15,*
*431:8, 446:5*
**database** *[1] - 519:16*
**date** *[32] - 401:12,*
*437:15, 440:9,*
*440:25, 441:5,*
*441:9, 442:1, 443:9,*
*443:21, 443:25,*
*444:3, 444:7,*
*470:20, 505:9,*
*505:15, 519:24,*

524:13, 524:15,
526:3, 531:22,
535:8, 538:9,
546:18, 547:20,
548:23, 549:18,
550:6, 550:7, 553:7,
559:9, 566:22, 569:4
*DATE* [1] - 573:25
*dated* [3] - 488:12,
511:5, 528:8
*dates* [3] - 440:9,
441:8, 507:2
*daughter* [2] - 565:19,
570:10
*Davis* [80] - 390:3,
403:3, 404:15,
410:6, 426:15,
427:9, 437:11,
437:16, 439:4,
439:16, 442:8,
443:3, 444:12,
447:8, 450:11,
457:15, 457:23,
460:12, 463:15,
463:21, 464:1,
464:25, 469:23,
481:3, 483:8,
484:10, 485:5,
486:5, 488:23,
490:18, 491:6,
492:3, 494:3,
497:25, 498:25,
500:1, 501:17,
503:12, 505:3,
506:11, 507:1,
512:11, 512:12,
512:16, 513:8,
513:15, 513:16,
513:20, 514:5,
516:16, 520:17,
528:18, 528:25,
535:5, 536:1,
536:15, 536:23,
540:23, 541:8,
543:16, 543:21,
543:25, 549:16,
550:18, 552:11,
554:23, 555:3,
555:24, 557:14,
559:5, 560:11,
561:1, 561:20,
562:3, 565:16,
567:13, 568:18,
570:9, 571:12,
571:21
*DAVIS* [193] - 391:8,
391:9, 391:12,
393:21, 403:14,
404:6, 404:8,
404:16, 405:25,
406:14, 408:6,

408:20, 410:7,
410:19, 411:10,
412:12, 423:10,
425:20, 427:10,
428:1, 435:3,
437:17, 437:22,
439:17, 440:2,
441:11, 441:25,
443:4, 444:9,
444:13, 444:17,
446:11, 446:17,
450:2, 450:12,
452:6, 452:23,
453:18, 455:18,
457:9, 457:16,
458:4, 458:14,
459:5, 459:13,
459:15, 460:13,
462:10, 462:12,
462:18, 463:4,
463:17, 464:3,
464:7, 464:13,
464:19, 464:22,
466:13, 469:2,
469:25, 470:1,
470:22, 471:5,
471:21, 471:24,
474:12, 474:18,
474:21, 476:22,
477:16, 479:24,
481:5, 481:7, 482:2,
484:25, 485:6,
485:12, 485:23,
486:1, 486:6,
486:10, 486:16,
486:22, 487:5,
488:24, 489:6,
490:6, 490:19,
490:25, 491:9,
491:17, 491:24,
492:1, 492:5, 492:6,
492:22, 493:10,
493:14, 493:25,
494:5, 495:25,
496:2, 496:4, 497:6,
498:3, 501:18,
501:20, 502:6,
503:8, 503:13,
503:19, 504:14,
504:21, 505:4,
505:11, 505:14,
505:18, 507:4,
507:10, 507:12,
507:16, 507:21,
509:9, 509:12,
509:15, 509:18,
509:25, 510:6,
510:12, 511:2,
511:9, 511:15,
512:17, 514:8,
514:24, 515:4,

515:6, 515:24,
516:9, 516:18,
516:23, 516:25,
517:2, 529:24,
532:16, 533:25,
534:25, 535:6,
536:24, 539:25,
540:25, 541:9,
543:17, 543:23,
545:5, 545:10,
545:13, 547:11,
548:12, 548:15,
549:12, 549:17,
549:22, 550:9,
550:14, 550:22,
551:13, 553:25,
554:7, 554:24,
555:4, 555:25,
556:15, 557:3,
561:2, 561:23,
562:4, 562:22,
564:11, 565:17,
567:14, 567:23,
568:7, 568:16,
568:19, 569:13,
570:14, 570:19,
570:25, 571:13,
571:22, 572:1,
572:22
*Davis'* [5] - 436:19,
437:2, 438:11,
506:23, 537:21
*days* [26] - 419:11,
426:4, 441:1,
441:23, 441:24,
441:25, 442:3,
442:4, 444:3,
444:20, 450:20,
451:22, 457:20,
502:24, 506:25,
526:6, 559:14,
564:24, 565:1,
565:13, 565:23,
566:23
*days'* [1] - 566:6
*dead* [1] - 507:5
*deadline* [8] - 421:6,
550:2, 551:18,
552:2, 554:16,
560:17, 565:2,
567:19
*deadlines* [1] - 422:15
*deal* [4] - 393:4,
523:13, 526:14,
544:21
*debate* [1] - 427:22
*Debbie* [1] - 539:2
*December* [19] -
518:13, 518:14,
519:6, 523:6,

526:13, 528:14,
545:5, 546:4, 547:4,
550:1, 550:4, 550:7,
551:5, 551:18,
551:25, 552:11,
553:17, 553:18,
553:24
*decide* [1] - 458:12
*decision* [2] - 474:2,
565:5
*decisional* [1] - 555:1
*decisions* [1] - 448:6
*declaration* [1] - 556:9
*declarations* [3] -
459:22, 514:11,
568:4
*declaratory* [2] -
556:19, 556:21
*declared* [1] - 429:13
*declares* [1] - 423:15
*dedicated* [1] - 431:17
*deemed* [1] - 444:18
*deep* [1] - 457:23
*default* [23] - 420:3,
420:6, 420:11,
421:22, 423:15,
427:19, 429:9,
429:11, 429:13,
430:23, 431:3,
472:7, 474:25,
475:10, 480:15,
484:18, 484:23,
487:8, 500:5,
500:15, 500:17,
500:20, 511:12
*Default* [6] - 423:7,
423:12, 425:25,
430:6, 550:20, 551:1
*defaults* [4] - 431:1,
473:6, 474:24, 501:7
*defeats* [1] - 571:14
*defect* [1] - 484:12
*Defendant* [2] - 389:8,
390:13
*defendant* [3] -
446:12, 510:23,
517:5
*Defendant's* [4] -
510:22, 519:21,
524:1, 525:23
*DEFENDANT'S* [1] -
391:6
*defense* [4] - 507:25,
557:15, 562:19,
563:16
*deficiencies* [19] -
421:23, 426:8,
429:22, 430:17,
430:19, 430:20,
444:22, 473:6,

473:25, 475:2,
479:17, 481:18,
483:23, 488:18,
489:16, 489:23,
490:2, 490:13,
500:23
*Deficiencies* [1] -
423:21
*deficiency* [40] -
420:3, 420:6, 420:9,
420:10, 421:3,
422:20, 473:9,
475:10, 475:18,
475:22, 475:25,
476:10, 476:16,
477:4, 477:24,
478:4, 478:10,
478:21, 478:22,
479:7, 480:10,
482:4, 482:23,
483:13, 483:19,
484:2, 485:10,
485:15, 485:17,
485:21, 485:22,
486:6, 486:20,
486:22, 487:14,
487:18, 488:1,
490:15, 500:24
*Deficiency* [7] -
423:12, 423:15,
474:24, 475:8,
489:3, 489:17,
491:14
*deficient* [2] - 419:1,
430:24
*definitely* [4] - 427:17,
469:21, 549:15,
570:20
*delay* [2] - 500:8,
564:2
*delve* [1] - 428:21
*demising* [1] - 403:4
*demonstrate* [1] -
417:18
*Denver* [14] - 508:8,
511:1, 511:7, 512:1,
514:2, 525:20,
526:1, 526:10,
526:11, 526:25,
527:20, 527:24,
544:3, 544:17
*department* [5] -
518:23, 519:1,
532:20, 541:19,
541:25
*departments* [1] -
519:17
*depicted* [6] - 436:2,
438:4, 438:9,
439:16, 443:11,

*443:23*
**deposit** *[1] - 529:14*
**deposition** *[2] - 557:24*
**depreciation** *[1] - 451:10*
**describe** *[2] - 438:8, 482:3*
**description** *[4] - 436:14, 440:6, 460:16, 510:22*
**descriptions** *[1] - 436:19*
**designated** *[1] - 412:12*
**despite** *[1] - 456:11*
**detail** *[3] - 419:9, 438:11, 438:22*
**detailed** *[1] - 546:21*
**details** *[1] - 523:23*
**determination** *[6] - 428:17, 446:6, 447:25, 448:10, 461:12, 568:17*
**determine** *[1] - 541:14*
**determiner** *[2] - 481:22, 481:25*
**Determiner** *[1] - 482:1*
**determining** *[2] - 424:16, 532:11*
**develop** *[4] - 514:22, 525:15, 546:24, 547:4*
**developed** *[4] - 403:1, 405:3, 512:19, 522:9*
**developer** *[5] - 454:16, 455:4, 519:18, 524:7*
**developers** *[2] - 393:2, 409:9*
**development** *[139] - 405:24, 407:20, 408:4, 427:21, 449:7, 449:16, 454:17, 473:13, 508:8, 510:9, 510:24, 511:10, 511:14, 511:17, 511:22, 512:3, 512:10, 512:12, 512:21, 512:22, 513:8, 513:10, 513:15, 513:17, 513:21, 513:23, 514:2, 514:4, 514:5, 514:7, 515:16, 515:17, 515:18, 519:8, 519:12, 519:23, 520:3, 520:4, 520:22,*
**Development** *[9] - 427:20, 504:10, 520:18, 523:7, 525:12, 526:18, 528:15, 543:4, 544:1*
**DEVELOPMENT** *[1] - 389:4*
**devote** *[4] - 409:18, 409:22, 409:24, 412:2*
**devoted** *[1] - 564:23*
**devoting** *[1] - 403:25*

*521:7, 521:11, 521:13, 521:17, 521:21, 521:23, 521:24, 522:3, 522:9, 522:20, 522:21, 522:24, 523:7, 523:16, 523:23, 524:8, 526:6, 526:12, 526:21, 526:23, 527:5, 527:8, 527:11, 527:13, 527:21, 527:23, 527:25, 528:5, 528:8, 528:9, 528:13, 529:6, 529:18, 529:19, 530:7, 530:8, 530:12, 530:17, 530:20, 530:24, 531:3, 532:12, 532:25, 533:7, 533:8, 533:9, 533:10, 533:16, 534:18, 534:22, 535:3, 535:15, 535:20, 536:1, 536:3, 536:16, 536:18, 536:20, 538:4, 538:8, 538:11, 538:15, 538:16, 539:1, 539:9, 539:11, 543:8, 544:10, 544:13, 544:18, 544:21, 545:25, 546:3, 546:6, 546:11, 546:13, 546:16, 546:20, 546:25, 547:6, 547:14, 548:6, 548:9, 548:11, 548:18, 548:21, 548:23, 551:25, 552:9, 552:16, 552:19, 552:20, 552:21, 552:23, 553:2, 554:16, 554:17*

*dictate* *[4] - 392:20, 392:24, 393:2, 393:4*
**different** *[15] - 402:10, 410:19, 411:25, 412:5, 417:8, 442:2, 445:9, 453:23, 470:15, 511:25, 520:14, 520:15, 531:14, 533:1, 548:13*
**difficult** *[1] - 496:8*
**digital** *[2] - 418:11, 422:16*
**DIRECT** *[4] - 391:7, 391:11, 392:16, 518:1*
**direct** *[20] - 403:12, 407:11, 407:16, 407:18, 442:17, 448:25, 460:17, 474:9, 475:6, 481:15, 494:18, 494:21, 502:25, 517:24, 523:14, 547:8, 547:17, 549:5, 549:15, 561:12*
**directly** *[5] - 422:24, 427:5, 500:24, 520:24, 559:16*
**director** *[1] - 432:19*
**dirty** *[3] - 421:19, 421:20, 422:8*
**disagree** *[6] - 408:8, 442:13, 459:8, 515:25, 547:3, 556:15*
**discard** *[1] - 442:4*
**discarded** *[1] - 444:2*
**disclosure** *[1] - 507:2*
**disclosures** *[1] - 460:25*
**disconnect** *[1] - 484:23*
**discovered** *[1] - 430:16*
**discovery** *[2] - 556:2, 557:12*
**discretion** *[2] - 427:13*
**discuss** *[2] - 435:8, 515:14*
**discussed** *[4] - 428:12, 478:10, 523:18, 539:5*
**discussing** *[5] - 485:24, 486:1, 508:20, 523:12, 539:3*
**Discussion** *[3] - 536:9, 550:13,*

*573:16*
**discussion** *[8] - 449:6, 449:11, 449:15, 449:20, 455:12, 455:22, 471:11, 555:22*
**discussions** *[7] - 440:10, 449:16, 449:18, 455:7, 473:12, 481:17, 483:21*
**disposal** *[1] - 540:17*
**dispute** *[5] - 473:16, 473:19, 478:6, 480:18, 487:6*
**disputes** *[1] - 444:21*
**disputing** *[4] - 475:20, 475:23, 475:24, 485:16*
**disqualify** *[1] - 431:1*
**distill** *[1] - 559:15*
**DISTRICT** *[3] - 389:1, 389:1, 389:11*
**District** *[1] - 389:16*
**diversity** *[2] - 557:13, 557:22*
**Divert** *[1] - 499:9*
**divert** *[2] - 499:9, 499:21*
**diverting** *[1] - 503:3*
**DIVISION** *[1] - 389:2*
**divorce** *[1] - 569:24*
**divorces** *[1] - 569:23*
**DMA** *[1] - 553:14*
**docket** *[1] - 505:20*
**document** *[24] - 393:17, 393:22, 423:11, 445:8, 453:21, 487:17, 496:5, 496:8, 496:10, 496:16, 496:22, 496:25, 510:4, 511:24, 516:19, 520:4, 537:11, 537:13, 541:24, 547:13, 549:9, 552:4, 570:18, 572:5*
**documentations** *[1] - 481:14*
**documenting** *[1] - 521:2*
**documents** *[10] - 446:4, 481:9, 486:11, 508:6, 510:19, 513:24, 514:1, 515:22, 516:11, 534:10*
**Domino's** *[4] - 407:14, 407:15, 495:15,*

*499:20*
**done** *[33] - 403:17, 403:21, 404:2, 404:18, 404:19, 406:2, 411:7, 419:11, 419:13, 419:22, 421:13, 424:11, 425:3, 428:22, 445:15, 445:25, 446:8, 469:9, 482:8, 484:1, 485:10, 491:19, 538:10, 540:4, 541:9, 550:11, 560:3, 563:12, 567:3, 570:20, 570:22, 573:1*
**door** *[1] - 403:8*
**dots** *[1] - 418:24*
**double** *[1] - 506:11*
**doubt** *[2] - 438:18, 443:7*
**down** *[17] - 407:12, 419:8, 426:3, 434:4, 434:8, 444:19, 448:1, 458:20, 472:15, 500:4, 510:7, 521:6, 521:19, 524:17, 551:8, 557:6, 559:15*
**Dr** *[1] - 556:7*
**draft** *[1] - 529:5*
**drafted** *[1] - 529:8*
**drafts** *[1] - 573:7*
**drive** *[1] - 422:6*
**due** *[2] - 457:19, 525:3*
**dumb** *[1] - 402:25*
**during** *[5] - 424:10, 438:20, 533:5, 533:8, 566:12*
**duties** *[2] - 430:24, 555:10*

## E

**e-learning** *[2] - 465:20, 465:21*
**Eagle** *[1] - 496:20*
**early** *[6] - 401:13, 457:6, 458:21, 461:14, 473:7, 520:23*
**earnings** *[2] - 451:8, 451:10*
**ears** *[1] - 550:16*
**easier** *[1] - 550:15*
**easily** *[1] - 450:7*
**Eastern** *[2] - 447:19, 570:8*
**EBITDA** *[4] - 451:6,*

451:7, 451:9
**educate** [1] - 569:5
**effect** [4] - 392:22,
432:9, 558:9, 569:21
**effective** [9] - 519:24,
524:13, 526:3,
526:13, 528:9,
528:11, 528:22,
559:9
**effectiveness** [1] -
559:9
**efficient** [1] - 417:13
**efforts** [9] - 403:25,
409:18, 409:23,
409:24, 412:3,
460:16, 490:15,
491:13, 546:1
**eight** [10] - 521:10,
521:11, 521:25,
522:3, 526:12,
526:21, 528:4,
544:12, 544:19,
544:20
**eight-store** [2] -
522:3, 526:12
**either** [19] - 417:24,
429:11, 437:15,
449:11, 449:20,
479:22, 487:9,
487:12, 506:1,
507:20, 550:11,
554:6, 554:15,
563:17, 563:22,
568:19, 569:4,
570:7, 571:9
**electronic** [1] - 496:13
**electronically** [1] -
528:17
**elevate** [1] - 490:3
**elicited** [1] - 436:2
**eligible** [1] - 431:4
**Ellis** [1] - 390:18
**email** [5] - 433:8,
433:12, 506:7,
523:8, 538:25
**emails** [4] - 504:23,
534:9, 538:20,
538:24
**emanate** [1] - 465:6
**embedded** [1] -
506:20
**embeds** [1] - 489:25
**employed** [2] - 433:4,
518:3
**employee** [4] -
417:24, 430:7,
437:14, 518:11
**employees** [4] -
409:16, 419:17,
432:24, 482:13

**enacted** [1] - 485:19
**end** [20] - 442:5,
444:3, 449:13,
487:11, 499:1,
531:14, 536:17,
538:7, 538:9,
538:12, 546:19,
551:22, 553:6,
558:12, 560:21,
560:25, 565:11,
566:13, 571:5, 572:6
**ended** [2] - 470:10,
555:8
**ends** [2] - 449:13,
553:2
**energy** [3] - 409:18,
409:22, 412:3
**enforce** [1] - 422:23
**engage** [1] - 473:24
**engaging** [1] - 409:8
**enjoy** [1] - 573:18
**enlarge** [1] - 434:11
**ensure** [3] - 424:3,
546:16, 548:20
**entailed** [2] - 519:11,
519:12
**enter** [2] - 427:1,
546:15
**entered** [7] - 394:7,
449:22, 496:6,
519:18, 545:3,
545:15, 549:6
**entering** [1] - 556:20
**enterprise** [1] - 422:18
**enterprise-level** [1] -
422:18
**entire** [11] - 402:16,
403:15, 445:8,
446:4, 449:4,
456:22, 456:23,
457:16, 484:5,
548:1, 548:3
**entirely** [1] - 490:25
**entities** [3] - 454:21,
455:22, 492:12
**entitled** [4] - 429:9,
457:6, 563:16,
573:23
**entity** [7] - 454:12,
456:9, 456:19,
469:17, 470:2,
470:18, 524:5
**equals** [1] - 522:1
**equipment** [3] - 438:8,
438:19, 536:5
**equitable** [1] - 557:1
**escalate** [1] - 423:2
**Esquire** [6] - 390:3,
390:3, 390:7,
390:13, 390:14,

390:17
**essence** [2] - 426:19,
427:14
**essential** [5] - 426:17,
512:14, 513:9,
514:4, 520:9
**essentially** [2] -
420:20, 529:8
**establish** [4] - 409:20,
442:14, 450:9,
546:16
**established** [3] -
437:16, 453:19
**establishment** [1] -
418:20
**et** [6] - 405:24, 451:4,
454:17, 503:4,
534:10
**evaluate** [1] - 420:20,
430:14
**evaluated** [4] -
418:15, 424:16,
432:7, 432:10
**evaluating** [1] - 419:8
**evaluation** [10] -
417:7, 418:10,
419:11, 419:22,
424:16, 424:19,
433:18, 433:19,
446:3, 446:4
**Evaluations** [1] -
418:9
**evaluations** [3] -
417:1, 420:17,
445:14
**evaluator** [3] - 418:20,
419:4, 422:9
**evening** [1] - 573:18
**event** [2] - 459:23,
459:25
**events** [2] - 461:18,
462:24
**eventually** [1] - 522:9
**evidence** [37] -
425:23, 428:16,
428:17, 436:14,
457:23, 459:20,
469:8, 480:17,
480:23, 481:1,
481:14, 481:15,
487:9, 487:12,
496:6, 503:16,
503:23, 504:19,
505:22, 506:22,
507:24, 508:15,
513:24, 519:21,
524:1, 525:22,
543:14, 545:3,
545:15, 546:8,
549:6, 560:9, 561:9,

565:2, 565:4, 566:2,
568:22
**EVIDENTIARY** [1] -
389:10
**ex** [1] - 460:20
**exact** [6] - 401:12,
473:3, 542:4, 542:7,
547:23
**exactly** [9] - 443:7,
443:10, 443:23,
461:5, 547:21,
554:10, 560:20,
564:12, 566:21
**examination** [8] -
429:3, 446:22,
448:25, 463:15,
474:15, 517:24,
540:11, 540:24
**EXAMINATION** [16] -
391:7, 391:8, 391:8,
391:9, 391:9,
391:11, 391:12,
391:12, 392:16,
464:21, 497:11,
501:19, 503:24,
518:1, 543:22,
550:23
**examine** [3] - 435:10,
435:15, 504:17
**example** [10] - 406:19,
407:14, 407:21,
417:11, 418:16,
421:10, 421:24,
431:25, 435:11,
436:19
**examples** [3] - 404:20,
430:3, 453:17
**exceeded** [1] - 572:23
**exceeding** [1] - 546:2
**exception** [4] -
439:12, 442:15,
442:23, 515:24
**exchange** [1] - 523:8
**exchanged** [3] -
527:22, 538:20,
538:25
**exclusivity** [1] - 409:7
**excuse** [2] - 393:6,
503:6
**execute** [3] - 422:3,
463:11, 493:19
**executed** [6] - 418:15,
418:19, 419:2,
421:21, 524:16,
525:3
**executing** [1] - 422:11
**execution** [4] -
431:13, 482:19,
519:7, 537:23
**executive** [1] - 402:3

**exhibit** [12] - 443:22,
486:13, 487:2,
495:21, 495:23,
498:5, 503:22,
509:10, 511:4,
542:8, 542:15, 549:3
**Exhibit** [40] - 393:17,
475:7, 477:12,
477:17, 488:5,
488:8, 489:11,
494:19, 495:25,
497:25, 499:25,
509:11, 509:14,
509:16, 509:17,
509:20, 510:3,
510:8, 510:10,
510:22, 519:21,
524:1, 525:23,
542:12, 542:20,
542:22, 542:23,
542:25, 543:14,
543:15, 545:4,
545:11, 545:14,
545:15, 549:6,
549:24, 550:21,
550:22, 552:18
**exhibits** [11] - 429:1,
434:3, 439:14,
442:16, 509:3,
509:5, 509:19,
514:23, 542:17,
562:23, 568:4
**exist** [2] - 513:1,
513:25
**existed** [4] - 429:22,
530:7, 534:18,
534:22
**existence** [2] - 512:19,
513:19
**exists** [1] - 455:16
**expect** [1] - 429:1
**expectation** [1] -
540:19
**expectations** [1] -
410:16
**expected** [1] - 393:12
**expeditiously** [1] -
428:23
**expenses** [1] - 451:4
**experience** [3] -
402:1, 417:5, 417:14
**experienced** [2] -
417:8, 432:18
**expiration** [3] - 441:9,
547:20, 563:12
**expiration/renewal** [1]
- 546:18
**explain** [18] - 401:25,
404:20, 418:7,
420:24, 453:16,

469:16, 486:18,
512:5, 512:7,
513:25, 526:19,
530:22, 532:14,
532:20, 536:21,
551:24, 552:5
**explained** [6] -
411:19, 411:22,
483:1, 483:2, 483:4,
532:21
**explaining** [2] -
404:24, 511:12
**explanation** [3] -
450:4, 458:13,
490:11
**explore** [1] - 410:17
**express** [1] - 495:8
**expressed** [2] -
435:25, 436:13
**expressly** [1] - 551:23
**extend** [1] - 565:12
**extended** [3] - 460:22,
559:8, 565:3
**extends** [1] - 560:22
**extension** [4] -
561:13, 563:23,
565:22, 566:22
**extensively** [3] -
510:9, 511:7, 511:11
**extent** [7] - 428:21,
436:1, 438:7, 438:9,
444:4, 529:24, 558:6
**extort** [1] - 566:20
**extrapolate** [1] - 444:6
**extremely** [1] - 561:23

### F

**faced** [1] - 514:11
**facility** [1] - 425:3
**fact** [25] - 405:19,
406:7, 406:10,
421:14, 421:15,
425:9, 426:20,
426:22, 426:24,
433:4, 433:7,
437:18, 443:20,
449:20, 450:7,
457:10, 458:19,
478:6, 479:19,
501:6, 512:3,
527:12, 528:15,
535:22, 553:2
**facts** [7] - 546:8,
558:23, 559:2,
559:14, 559:16,
559:18, 562:13
**factual** [1] - 558:19
**failed** [1] - 459:10
**failure** [3] - 420:6,

429:11, 500:15
**fair** [13] - 394:5,
405:10, 439:7,
450:3, 461:7, 484:2,
485:11, 496:17,
507:15, 507:18,
563:10, 567:1
**fairly** [1] - 560:17
**false** [1] - 426:17
**falsified** [1] - 427:5
**familiar** [19] - 420:10,
423:6, 423:19,
423:20, 432:25,
433:1, 496:10,
496:15, 496:23,
520:4, 520:18,
525:19, 527:18,
530:11, 532:9,
547:13, 549:8,
552:8, 552:22
**familiarity** [1] - 433:2
**far** [4] - 446:3, 549:7,
563:23, 568:8
**father** [1] - 407:22
**fault** [1] - 479:24
**February** [6] - 551:11,
551:21, 553:8,
553:12, 554:5,
554:15
**fee** [23] - 457:6,
520:12, 521:21,
521:23, 522:1,
522:6, 522:11,
522:14, 522:18,
522:22, 522:24,
524:25, 525:3,
525:6, 525:8, 525:9,
527:2, 527:3,
527:14, 528:10,
529:6, 529:7
**fees** [7] - 521:2,
522:23, 528:18,
528:21, 543:8,
543:9, 544:18
**felt** [1] - 460:10
**feud** [1] - 459:2
**few** [8] - 426:4,
427:12, 473:3,
486:2, 491:23,
497:10, 541:1, 555:8
**file** [8] - 556:8, 565:10,
570:3, 571:17,
571:18, 573:9
**FILED** [1] - 391:14
**filed** [10] - 502:19,
502:21, 505:12,
505:13, 505:15,
506:5, 570:18,
571:22, 572:3, 573:3
**finally** [1] - 529:2

**finance** [3] - 541:19,
541:24, 543:1
**fine** [16] - 438:10,
444:4, 498:7, 507:4,
507:10, 508:22,
510:1, 536:8,
536:11, 537:18,
538:13, 567:12,
568:24, 570:8,
571:11, 572:19
**finish** [3] - 447:2,
464:17, 465:12
**finished** [2] - 404:15,
507:23
**firestone** [1] - 556:7
**firm** [6] - 488:11,
489:12, 501:22,
504:2, 504:20,
504:21
**first** [25] - 401:8,
430:6, 433:4,
435:12, 473:8,
475:10, 476:22,
488:4, 505:2, 510:7,
510:13, 513:7,
515:16, 524:3,
524:24, 526:17,
535:13, 536:24,
538:12, 538:17,
545:18, 545:22,
561:2, 567:11,
571:23
**firsthand** [1] - 490:2
**fiscal** [1] - 531:5
**fits** [1] - 440:21
**five** [9] - 441:23,
506:24, 512:11,
512:13, 513:14,
513:17, 519:2,
519:3, 564:24
**fix** [2] - 418:5, 490:15
**fixed** [1] - 490:17
**flag** [1] - 421:20
**flexible** [1] - 566:7
**floating** [1] - 472:12
**Floor** [1] - 390:15
**Florida** [1] - 390:15
**focused** [1] - 422:6
**folks** [2] - 404:20,
540:18
**follow** [21] - 420:6,
421:8, 423:21,
424:3, 424:10,
424:22, 425:2,
425:12, 426:5,
426:18, 426:22,
427:5, 431:6, 431:7,
461:22, 482:4,
485:8, 486:17,
487:7, 487:22, 501:5

**follow-up** [12] - 421:8,
423:21, 424:3,
424:10, 424:22,
425:2, 426:5,
426:18, 427:5,
431:6, 431:7, 501:5
**follow-ups** [1] -
461:22
**followed** [1] - 487:14
**following** [2] - 500:18,
569:20
**follows** [2] - 483:22,
500:16
**food** [3] - 441:7,
495:3, 499:21
**foods** [1] - 441:8
**footprint** [2] - 403:5,
407:4
**forcefully** [1] - 426:10
**forcing** [1] - 427:1
**foregoing** [1] - 573:23
**foresee** [1] - 541:1,
567:23
**forgotten** [1] - 428:2
**form** [11] - 394:5,
409:7, 432:7,
432:10, 433:18,
480:25, 484:4,
495:7, 501:23,
546:7, 548:8
**format** [1] - 520:9
**former** [2] - 539:1,
539:2
**forth** [2] - 523:15,
563:8
**forthcoming** [1] -
568:3
**forward** [25] - 392:13,
410:25, 412:16,
428:20, 429:4,
429:16, 442:17,
443:8, 446:23,
507:3, 555:1,
557:11, 557:13,
557:17, 557:25,
558:1, 558:12,
559:3, 560:19,
563:9, 563:20,
569:2, 569:6, 569:8,
570:11
**foundation** [13] -
436:16, 440:8,
442:15, 450:5,
453:24, 454:7,
458:2, 459:14,
472:24, 493:25,
494:4, 508:16,
514:22
**foundational** [2] -
435:25, 442:22

**foundationally** [1] -
509:3
**four** [6] - 403:11,
408:11, 424:8,
473:2, 525:15,
553:17
**fourth** [3] - 449:9,
449:14, 513:12
**frame** [1] - 558:17
**franchise** [62] -
407:20, 409:9,
420:3, 422:23,
423:22, 432:19,
432:20, 432:21,
452:19, 453:2,
456:19, 456:21,
456:22, 456:25,
457:17, 457:19,
465:6, 465:17,
469:18, 470:4,
470:12, 470:14,
470:19, 471:9,
493:8, 494:9, 495:6,
508:8, 508:9, 510:5,
510:25, 511:4,
511:19, 513:13,
519:8, 522:11,
522:12, 522:14,
522:18, 522:23,
524:2, 524:11,
524:15, 524:25,
525:3, 525:7, 525:9,
525:24, 526:11,
526:16, 526:20,
526:23, 527:2,
527:3, 527:14,
529:7, 531:9,
531:20, 533:2,
543:8, 544:16
**franchised** [4] - 495:2,
495:13, 499:10,
499:15
**franchisee** [37] -
401:16, 403:4,
405:14, 405:16,
405:20, 406:8,
407:3, 407:13,
407:20, 407:22,
407:23, 407:24,
417:25, 419:5,
419:9, 419:12,
419:15, 419:16,
420:2, 420:25,
426:7, 454:9, 455:5,
455:12, 455:17,
456:15, 456:21,
457:25, 458:20,
459:7, 460:3, 460:4,
476:2, 519:18,
522:16, 524:5, 524:6
**franchisee's** [2] -

420:2, 424:4
*franchisee-level* [1] -
426:7
*franchisees* [27] -
402:15, 403:3,
403:10, 403:12,
407:1, 407:2, 407:5,
407:9, 409:9, 417:8,
417:9, 426:9,
429:22, 451:25,
452:4, 452:11,
452:13, 452:15,
452:18, 452:20,
452:21, 453:2,
453:3, 453:14,
471:13, 471:18
*franchises* [6] - 408:2,
424:9, 425:11,
465:4, 465:10, 503:3
*FRANCHISING* [1] -
389:7
*Franchising* [18] -
403:8, 420:4, 420:5,
423:3, 430:20,
433:5, 440:7,
449:22, 452:5,
452:16, 462:4,
495:16, 496:19,
518:4, 518:12,
519:23, 524:2, 529:5
*Franchising's* [1] -
539:7
*franchisor* [2] - 420:9,
423:3
*frankly* [1] - 570:10
*Friday* [12] - 420:14,
428:14, 454:15,
515:20, 535:22,
536:15, 560:13,
571:2, 571:6,
571:10, 572:6
*front* [1] - 428:6
*froze* [1] - 487:11
*frustration* [1] - 566:4
*fulfilled* [3] - 429:21,
429:24, 526:22
*full* [11] - 403:25,
409:17, 409:18,
409:21, 409:22,
412:2, 412:3, 457:1,
508:11, 517:15,
525:9
*full-time* [2] - 409:17,
412:3
*fully* [2] - 513:4,
524:15
*fumbling* [1] - 550:19
*fund* [1] - 529:15
*funds* [4] - 522:8,
528:24, 529:1, 529:4

*FURTHER* [2] - 391:9,
503:24
*future* [1] - 463:5

## G

*gain* [1] - 487:20
*gaining* [1] - 419:10
*gasket* [8] - 431:25,
432:1, 432:4,
434:13, 434:22,
435:12, 436:21
*general* [1] - 431:17,
437:21, 437:22,
438:6, 438:23,
484:10, 504:9,
518:21, 520:5
*General* [1] - 390:21
*generally* [10] -
404:25, 438:8,
438:19, 440:6,
441:3, 459:21,
460:19, 473:7,
483:13, 507:8
*generates* [1] - 421:20
*genesis* [1] - 454:6
*Genovese* [2] -
390:14, 504:1
*gentlemen* [1] -
571:12
*geographic* [1] - 544:5
*geographical* [1] -
523:17
*Giles* [3] - 464:16,
464:25, 543:24
*given* [7] - 436:14,
438:17, 456:12,
547:16, 560:20,
563:12, 568:1
*glad* [1] - 392:7
*gladly* [1] - 459:19
*gleaned* [1] - 463:22
*glitches* [1] - 447:9
*goodwill* [9] - 402:17,
451:25, 452:4,
452:10, 456:11,
457:23, 458:1, 472:2
*Government* [1] -
540:21
*graciously* [1] - 442:8
*grand* [1] - 529:14
*granting* [1] - 428:18
*granular* [1] - 438:10
*graph* [1] - 551:25
*great* [3] - 406:19,
406:21, 451:22
*ground* [1] - 404:2
*grounds* [5] - 425:21,
437:19, 438:1,
470:23, 516:11

*group* [3] - 455:4,
461:13, 499:16
*group's* [1] - 455:8
*grouping* [1] - 429:1
*growing* [1] - 409:24
*growth* [1] - 407:11
*guess* [26] - 394:6,
437:5, 437:9, 438:6,
438:8, 443:13,
444:4, 444:24,
461:9, 462:23,
476:20, 484:16,
505:24, 506:1,
506:25, 510:18,
556:12, 557:10,
557:14, 558:16,
563:13, 563:22,
566:24, 568:25,
569:17, 571:25
*guidance* [2] - 487:20,
487:23
*guilty* [1] - 486:19
*gun* [1] - 573:10

## H

*half* [5] - 563:2,
564:25, 565:1,
571:15
*half-day* [1] - 564:25
*ham* [1] - 440:24
*hand* [4] - 437:5,
488:8, 517:8, 517:13
*handful* [1] - 492:5
*handle* [1] - 487:16
*handles* [1] - 508:12
*handling* [2] - 447:8,
447:10
*hands* [1] - 451:17
*happy* [1] - 493:11
*HE* [1] - 448:20
*head* [4] - 427:23,
473:9, 505:16, 545:7
*headings* [1] - 530:23
*health* [2] - 441:7,
507:19
*hear* [13] - 451:14,
458:10, 462:13,
462:19, 470:23,
471:1, 492:2,
492:20, 514:12,
536:8, 536:11,
568:14, 568:22
*heard* [17] - 443:3,
449:6, 451:23,
453:20, 456:14,
509:18, 515:6,
515:16, 536:14,
537:17, 540:2,
549:12, 559:16,

566:5, 566:10,
566:16, 566:18
*hearing* [22] - 404:11,
425:22, 436:10,
438:23, 447:12,
449:4, 459:20,
460:20, 460:23,
461:1, 466:4,
478:12, 507:17,
549:8, 555:9,
559:14, 561:3,
561:4, 561:18,
563:15, 564:6,
566:12
*HEARING* [1] - 389:10
*hearings* [5] - 428:14,
557:19, 559:4,
561:24, 564:24
*hearsay* [26] - 438:2,
439:5, 439:12,
442:23, 452:23,
453:20, 453:21,
453:24, 454:5,
455:18, 455:25,
456:1, 458:6, 458:9,
458:11, 458:15,
459:21, 459:23,
460:14, 460:24,
476:21, 476:23,
488:21, 489:25
*held* [3] - 536:9,
550:13, 573:16
*Helmick* [1] - 464:8
*HELMICK* [1] - 389:11
*help* [5] - 393:8,
440:13, 485:15,
515:10, 542:10
*helped* [1] - 393:12
*herself* [2] - 432:24,
522:17
*hidden* [1] - 479:20
*high* [2] - 402:19,
433:21
*highlight* [2] - 494:24,
566:5
*highlighted* [4] -
418:16, 521:19,
521:20, 549:23
*highlighting* [1] -
545:23
*highlights* [1] - 418:25
*himself* [2] - 476:25,
522:17
*historical* [1] - 431:22
*history* [1] - 431:10
*hit* [2] - 488:4, 570:8
*hold* [6] - 507:1,
518:14, 536:6,
553:10, 563:4,
570:16

*holding* [1] - 437:4
*holiday* [1] - 569:24
*holidays* [1] - 570:2
*Honor* [179] - 393:7,
393:11, 393:21,
394:4, 403:14,
404:6, 404:14,
404:17, 406:14,
408:7, 408:20,
408:24, 409:11,
410:2, 410:20,
412:10, 412:12,
423:15, 425:20,
426:14, 426:25,
428:10, 429:5,
429:15, 433:25,
435:3, 436:9,
436:11, 437:3,
437:18, 439:17,
440:2, 440:14,
441:12, 442:7,
443:5, 443:13,
444:9, 446:11,
446:16, 446:18,
447:7, 447:16,
447:21, 450:6,
453:18, 454:1,
455:20, 456:10,
457:21, 458:9,
459:18, 463:13,
463:17, 463:25,
464:7, 464:11,
464:14, 471:5,
474:8, 474:11,
474:12, 476:20,
480:25, 481:6,
484:3, 484:25,
485:3, 485:20,
486:14, 486:16,
486:19, 488:20,
489:24, 490:22,
491:9, 491:15,
491:17, 491:24,
492:1, 492:5, 493:5,
493:11, 493:22,
495:20, 497:7,
497:10, 498:3,
501:16, 501:18,
501:24, 503:7,
503:20, 503:21,
504:18, 504:22,
505:5, 505:21,
506:10, 507:4,
507:10, 508:1,
509:7, 509:25,
510:13, 511:21,
512:17, 513:8,
514:9, 514:16,
514:24, 516:2,
516:9, 517:2, 535:6,
535:22, 536:24,

539:25, 540:10,
540:13, 540:25,
541:3, 541:10,
542:9, 543:13,
543:17, 545:6,
547:7, 548:8,
548:13, 549:2,
549:14, 549:17,
550:9, 550:14,
550:16, 551:15,
552:6, 554:10,
554:22, 554:24,
555:5, 555:17,
556:16, 558:15,
558:22, 558:23,
559:11, 559:13,
559:16, 559:20,
560:6, 560:10,
560:14, 561:2,
561:15, 561:16,
561:22, 561:23,
562:10, 562:20,
564:1, 564:18,
565:10, 565:12,
565:17, 566:9,
567:6, 567:24,
569:22, 569:23,
570:4, 570:14,
571:9, 572:11,
572:24, 573:7

**Honor's** [2] - 439:3,
571:4

**HONORABLE** [1] -
389:11

**hope** [1] - 570:19

**hoped** [1] - 464:10

**horse** [1] - 507:5

**hours** [6] - 392:20,
409:22, 431:15,
555:8, 564:24,
564:25

**housekeeping** [1] -
558:4

**Huckaby** [3] - 390:7,
465:1, 544:1

**HUCKABY** [2] -
505:16, 505:19

**Huff** [1] - 543:2

**hump** [1] - 438:2

**hunch** [1] - 481:10,
481:15, 485:17,
487:6

**hunches** [1] - 481:6

**hung** [1] - 465:11

**Hunter** [50] - 390:10,
390:10, 401:9,
402:2, 407:21,
449:12, 454:16,
456:14, 460:2,
466:4, 466:9,

475:14, 475:20,
475:25, 477:6,
478:19, 479:23,
508:7, 508:10,
510:10, 510:15,
511:6, 511:11,
512:1, 513:10,
514:3, 516:1,
516:22, 523:10,
523:20, 523:22,
524:19, 528:19,
529:17, 532:21,
535:14, 536:2,
536:15, 536:17,
537:17, 538:25,
539:5, 551:12,
551:19, 551:22,
554:4, 560:12

**Hunter's** [10] - 404:1,
473:11, 511:16,
512:18, 515:15,
515:19, 536:22,
536:25, 554:11,
560:12

**Hunters** [76] - 401:9,
401:17, 401:22,
402:9, 403:11,
403:18, 403:21,
404:9, 404:11,
404:12, 404:13,
404:18, 405:2,
405:7, 405:13,
405:20, 406:1,
406:10, 406:11,
407:6, 408:22,
409:8, 409:16,
410:2, 410:3, 410:8,
410:13, 411:4,
411:15, 420:16,
428:3, 449:17,
449:20, 451:24,
452:4, 452:14,
452:17, 452:22,
453:8, 455:3, 455:9,
455:13, 455:21,
459:1, 460:8,
460:10, 462:7,
462:25, 469:8,
469:12, 469:17,
470:3, 470:19,
470:25, 471:2,
471:25, 472:6,
474:5, 474:13,
479:17, 480:21,
481:11, 481:13,
482:6, 482:11,
482:17, 483:12,
492:18, 503:16,
511:19, 531:19,
535:21, 538:15,
538:21

**Hunters'** [9] - 401:16,
405:16, 405:22,
406:8, 406:12,
433:2, 433:7,
461:19, 463:10

**hurry** [1] - 542:11

**Huts** [1] - 499:19

**hypothetical** [1] -
410:23

## I

**Ice** [12] - 401:11,
401:18, 403:1,
403:4, 403:6,
403:12, 406:21,
406:23, 407:9,
407:19, 411:18,
461:20

**idea** [5] - 460:24,
469:4, 504:16,
514:12, 515:7

**identifiable** [1] -
431:20

**identification** [1] -
429:1

**identified** [4] - 420:8,
431:16, 474:4, 498:5

**identifies** [1] - 421:2

**identify** [2] - 421:24,
434:9

**Ill** [1] - 540:20

**illustrates** [1] - 441:12

**immediately** [1] -
438:14

**impact** [4] - 404:5,
471:12, 471:17,
511:17

**impeaching** [1] -
506:2

**importance** [1] -
417:11

**important** [7] - 417:2,
417:4, 424:2, 424:7,
429:6, 558:23, 560:7

**imposed** [1] - 572:13

**impossible** [1] - 432:2

**impression** [2] -
456:5, 538:3

**improper** [1] - 461:1

**improperly** [1] -
556:23

**improve** [1] - 421:4

**improvement** [3] -
424:19, 431:10,
431:19

**improvements** [1] -
431:11

**inaudible)** [2] - 476:3,
535:23

**Inc** [1] - 496:21

**inclined** [1] - 559:20

**include** [1] - 403:11

**included** [3] - 439:22,
539:4, 544:20

**including** [5] - 410:3,
423:4, 423:5,
446:21, 546:20

**income** [1] - 451:4

**inconsistencies** [2] -
424:15, 431:8

**inconsistency** [1] -
411:24

**inconsistent** [5] -
403:24, 404:21,
409:25, 442:12,
515:19

**incorrect** [3] - 471:13,
474:7, 474:22

**increases** [1] - 532:5

**incumbent** [1] -
424:25

**indicate** [2] - 394:9,
531:9

**indicated** [2] - 446:21,
553:19

**indicates** [1] - 531:6

**indicating** [1] - 562:16

**indication** [1] - 562:14

**indiscernible** [1] -
462:12

**indiscernible)** [1] -
539:19

**individual** [2] - 455:5,
456:8

**indulgence** [1] -
464:13

**industry** [1] - 417:11

**inevitably** [1] - 406:18

**inflated** [1] - 432:11

**influence** [2] - 445:24,
481:19

**influencer** [1] - 481:20

**influencing** [3] -
419:3, 419:19, 423:1

**information** [21] -
401:15, 401:22,
402:14, 402:24,
424:11, 429:19,
454:2, 454:6, 458:3,
461:10, 487:19,
519:12, 519:16,
523:17, 523:19,
528:16, 528:21,
528:23, 528:25,
541:18, 542:25

**Information** [1] -
475:21

**informed** [2] - 484:1,
485:9

**infrastructure** [1] -
477:5

**ingredients** [1] -
434:20

**initial** [6] - 522:11,
524:25, 525:2,
525:7, 527:1, 529:7

**Initial** [1] - 527:14

**initiated** [1] - 502:8

**initiation** [1] - 502:12

**injunction** [6] - 427:1,
436:10, 459:19,
461:3, 561:3, 563:19

**injunctions** [1] -
460:19

**injunctive** [3] -
426:24, 557:1,
558:13

**injurious** [1] - 499:12

**inquire** [1] - 401:22

**inquiry** [1] - 428:19

**inside** [1] - 403:2

**insisted** [1] - 570:22

**inspect** [1] - 443:1

**inspection** [6] -
419:20, 426:6,
436:16, 438:20,
444:8, 444:18

**inspections** [2] -
425:23, 444:14

**instances** [2] - 424:8,
431:22

**instead** [2] - 550:19,
567:1

**instructions** [1] -
480:14

**integrate** [1] - 417:13

**intend** [1] - 504:16

**intended** [2] - 422:7,
537:7

**intent** [1] - 537:22

**intentionally** [1] -
479:20

**interest** [4] - 451:10,
469:18, 494:9, 495:2

**interesting** [1] -
535:14

**interference** [2] -
426:11, 556:17

**interim** [1] - 557:10

**interpret** [3] - 442:20,
483:19, 532:17

**interpretation** [3] -
418:3, 442:25,
470:17

**interrupt** [1] - 564:5

**interruption** [1] -
392:15

**intricacies** [1] -
417:21

invest [1] - 469:13
investigation [1] - 501:6
investing [2] - 472:1, 472:6
Investments [1] - 496:21
involve [1] - 510:15
involved [13] - 401:10, 402:9, 404:10, 405:20, 438:22, 520:21, 520:25, 521:5, 523:14, 523:22, 529:22, 535:7, 561:5
involving [1] - 561:4
irrelevant [6] - 425:23, 426:2, 428:5, 512:13, 512:14, 513:17
irreparable [1] - 427:8
issuance [1] - 478:4
issue [31] - 403:20, 403:21, 423:2, 423:22, 427:25, 428:1, 428:4, 428:12, 429:6, 435:7, 441:12, 442:8, 456:11, 473:21, 475:15, 478:3, 478:8, 479:25, 487:13, 487:16, 494:1, 500:13, 506:13, 511:22, 514:17, 556:25, 557:8, 557:13, 557:22, 558:6, 558:16
issued [1] - 425:25
issues [12] - 420:1, 423:7, 423:8, 425:12, 428:5, 452:21, 453:11, 461:21, 489:5, 500:9, 557:9, 558:19
Italian [2] - 401:10, 411:18
item [2] - 431:23, 495:4
items [1] - 495:3
itself [6] - 433:18, 511:18, 512:4, 530:1, 538:23, 549:20

## J

Jackson [1] - 390:8
jam [1] - 571:8
January [3] - 529:3, 529:4, 546:20
JEFFREY [1] - 389:11
Jeremiah's [34] - 401:10, 401:17, 402:4, 403:1, 403:4, 403:6, 403:12, 404:10, 405:13, 405:21, 406:11, 406:21, 406:23, 407:8, 407:9, 407:19, 408:4, 408:13, 408:17, 409:25, 410:15, 411:5, 411:16, 411:18, 412:8, 412:10, 412:13, 427:21, 461:20, 469:5, 469:18, 470:4, 470:19, 556:20
Jersey [1] - 390:5
JHD [2] - 454:12, 454:16
job [3] - 417:21, 527:18, 534:12
Joblove [5] - 390:14, 504:2, 504:5, 504:8, 506:8
Joe [1] - 454:9
Joseph [1] - 390:10
Judge [3] - 464:8, 486:10, 561:8
JUDGE [1] - 389:11
judgement [1] - 556:19
judgment [3] - 417:23, 418:2, 556:21
judicial [1] - 505:20
July [25] - 401:13, 423:7, 423:11, 423:16, 424:10, 430:22, 430:25, 431:4, 461:21, 473:18, 474:23, 475:1, 475:7, 477:11, 477:24, 478:22, 479:11, 484:6, 485:17, 488:19, 489:2, 489:17, 489:23, 499:24, 511:5
jump [1] - 562:25
junior [1] - 521:4
jurisdiction [3] - 557:8, 557:13, 557:23
jurisdictional [1] - 556:2
justin [1] - 390:3
Justin [1] - 427:24

## K

KAM [98] - 389:4, 393:25, 405:8, 406:1, 408:22, 423:8, 423:16, 424:9, 425:10, 426:9, 426:16, 426:17, 429:9, 429:21, 430:11, 430:18, 433:7, 433:21, 434:25, 435:9, 435:14, 444:13, 444:21, 445:25, 451:24, 453:12, 455:3, 461:25, 465:1, 469:8, 472:15, 473:9, 473:11, 473:22, 473:24, 473:25, 475:2, 475:25, 476:16, 477:9, 477:25, 478:2, 478:7, 478:23, 479:7, 479:10, 479:12, 479:23, 480:5, 480:10, 480:15, 480:19, 481:10, 481:18, 483:21, 483:25, 484:17, 485:8, 485:18, 487:7, 487:14, 488:17, 489:22, 490:1, 491:13, 492:18, 493:19, 494:7, 498:4, 500:23, 500:24, 501:2, 504:9, 510:15, 511:3, 511:19, 523:7, 527:19, 532:5, 538:10, 539:8, 541:16, 542:2, 543:4, 544:1, 546:5, 547:3, 548:17, 549:18, 549:25, 551:4, 554:1, 554:4, 554:16, 558:3, 568:3, 568:9
KAM's [6] - 476:10, 491:16, 544:5, 547:14, 553:21, 568:12
KAM-affiliated [3] - 424:9, 425:10, 426:16
KAM-related [1] - 426:9
keep [9] - 393:25, 394:5, 408:21, 430:12, 446:21, 447:12, 479:18, 485:6, 514:6
Kendrick [1] - 390:7
Kerry [1] - 535:15
Kevin [1] - 478:23
key [1] - 511:22
kind [16] - 392:24, 433:25, 436:23, 445:14, 470:17, 484:7, 520:4, 523:18, 552:4, 564:8, 565:21, 568:5, 570:2, 571:14, 571:16
kinds [4] - 418:18, 445:12, 445:13, 520:15
KIPROTICH [1] - 573:25
Kiprotich [2] - 389:15, 573:25
KLEIN [14] - 427:25, 447:7, 447:15, 448:3, 463:20, 463:25, 464:11, 464:16, 505:25, 506:7, 508:17, 540:13, 559:11, 562:8
Klein [23] - 390:3, 390:4, 429:3, 446:22, 447:5, 463:18, 463:23, 464:14, 465:1, 488:12, 488:21, 490:2, 491:18, 504:8, 506:11, 540:12, 543:25, 550:10, 557:14, 559:5, 560:7, 560:10, 561:20
Klein's [5] - 477:14, 490:11, 491:2, 497:15, 570:11
knowing [1] - 453:23
knowledge [15] - 453:19, 458:3, 479:10, 480:4, 490:2, 507:9, 510:16, 523:5, 528:6, 534:1, 535:1, 535:9, 537:4, 537:5, 538:7
known [1] - 403:11
knows [4] - 406:11, 438:18, 443:7, 454:3

## L

L-a-r-a [1] - 433:9
label [1] - 441:5
labeled [1] - 423:14
ladies [1] - 571:12
laid [2] - 436:16, 523:19
landed [1] - 459:2
lanes [1] - 474:3
language [2] - 493:3, 497:4
Lara [10] - 433:9, 433:11, 433:15, 435:5, 435:11, 435:20, 437:5, 442:10, 442:12, 445:13
Lara's [1] - 437:4
larger [1] - 499:16
largest [1] - 455:4
last [41] - 418:17, 422:19, 428:14, 433:9, 434:9, 449:23, 450:19, 450:20, 451:19, 451:22, 454:15, 457:20, 459:5, 460:14, 461:5, 461:18, 472:19, 472:21, 472:23, 472:25, 474:19, 478:22, 480:1, 485:7, 486:2, 492:14, 510:13, 517:20, 530:5, 531:19, 531:22, 538:10, 541:16, 542:3, 543:4, 545:18, 550:19, 558:8, 565:20, 569:7, 569:15
late [5] - 401:12, 515:14, 540:16, 571:18
lately [1] - 573:11
launch [1] - 529:14
law [3] - 459:21, 504:2, 504:20
lawsuit [1] - 502:21
lawyer [3] - 490:4, 532:19, 534:6
lawyer's [1] - 490:23
lawyers [5] - 497:17, 518:23, 561:5, 561:8, 569:16
lawyers' [1] - 559:18
lay [5] - 450:5, 472:24, 493:25, 494:3, 508:16

**laying** *[1]* - 458:2
**lays** *[1]* - 520:9
**leaders** *[2]* - 432:20, 432:21
**leadership** *[1]* - 405:24
**leading** *[1]* - 470:11
**lean** *[1]* - 550:15
**learned** *[3]* - 401:9, 405:12, 408:11
**learning** *[2]* - 465:20, 465:21
**learns** *[1]* - 420:5
**least** *[12]* - 408:12, 424:8, 436:16, 437:1, 451:23, 505:7, 507:13, 515:8, 530:6, 534:17, 539:13, 568:1
**leave** *[4]* - 447:5, 510:12, 540:12, 572:17
**led** *[1]* - 461:22
**left** *[6]* - 426:21, 446:23, 446:24, 488:8, 527:1, 531:2
**left-hand** *[1]* - 488:8
**legal** *[8]* - 448:6, 452:6, 458:19, 495:8, 518:23, 521:3, 532:19, 539:2
**Legg** *[5]* - 478:23, 478:25, 479:3, 479:18, 500:19
**Legg's** *[2]* - 500:12, 500:13
**legs** *[1]* - 491:20
**length** *[1]* - 466:6
**lengthy** *[2]* - 474:12, 491:22
**letter** *[90]* - 423:16, 461:21, 476:12, 477:10, 477:15, 477:24, 478:20, 479:11, 480:11, 480:12, 480:13, 480:14, 484:6, 484:7, 484:15, 484:20, 484:23, 485:18, 486:13, 488:11, 488:15, 488:17, 488:19, 488:22, 489:12, 489:19, 489:23, 490:1, 490:3, 490:11, 490:12, 490:24, 491:12, 491:15, 497:16, 497:17, 499:24,

500:25, 501:22, 502:7, 502:9, 502:10, 502:16, 502:23, 503:1, 504:9, 504:11, 505:1, 505:3, 505:5, 506:4, 506:8, 506:16, 506:18, 507:6, 507:7, 507:14, 527:22, 545:5, 545:20, 547:9, 547:24, 548:1, 548:3, 548:4, 548:5, 548:16, 548:24, 550:4, 550:5, 551:2, 551:10, 551:11, 551:21, 551:23, 552:2, 552:11, 552:16, 552:18, 553:5, 553:8, 553:13, 553:22, 553:24, 554:5, 554:15, 554:19, 555:6, 555:18
**level** *[14]* - 402:19, 407:13, 407:15, 407:20, 407:24, 411:25, 422:18, 422:21, 426:7, 430:20, 431:13, 478:19, 482:18, 500:23
**levels** *[2]* - 406:25
**liaison** *[3]* - 453:4, 462:1, 462:4
**Libardi** *[71]* - 390:20, 392:18, 401:8, 403:16, 404:24, 405:12, 410:3, 410:8, 410:18, 411:16, 423:6, 427:4, 427:11, 427:15, 428:3, 429:2, 429:19, 434:6, 435:4, 435:15, 435:23, 436:15, 436:25, 438:3, 438:18, 439:3, 439:21, 439:22, 441:13, 441:22, 442:9, 443:7, 443:24, 444:25, 446:25, 447:17, 448:7, 448:23, 449:3, 453:1, 454:9, 456:6, 456:7, 458:2, 459:25, 463:9, 464:23, 469:3, 470:11, 472:10,

476:25, 477:2, 478:11, 483:9, 485:13, 488:24, 489:8, 491:8, 494:19, 496:7, 497:13, 504:1, 506:15, 507:8, 507:19, 507:22, 551:12, 553:13, 553:16, 553:18, 554:20
**LIBARDI** *[6]* - 391:7, 392:16, 464:21, 497:11, 501:19, 503:24
**Libardi's** *[4]* - 409:20, 447:8, 455:22, 551:21
**life** *[4]* - 441:1, 441:8, 465:13, 570:7
**light** *[2]* - 460:25, 507:2
**limit** *[4]* - 410:1, 502:18, 562:5, 572:13
**limited** *[7]* - 404:12, 404:24, 405:6, 410:7, 427:13, 457:8, 493:4
**LINE** *[8]* - 391:15, 391:16, 391:16, 391:17
**line** *[15]* - 428:19, 432:1, 434:13, 434:15, 434:16, 434:18, 434:19, 434:21, 435:14, 457:16, 458:5, 486:17, 490:17, 500:2
**list** *[6]* - 422:10, 448:4, 510:10, 514:15, 515:13, 556:10
**listed** *[3]* - 488:22, 521:21, 532:25
**listen** *[1]* - 482:20
**litigation** *[5]* - 490:24, 502:8, 502:13, 502:20, 557:7
**live** *[1]* - 427:3
**lives** *[1]* - 556:11
**LLC** *[13]* - 389:4, 389:7, 420:5, 427:20, 496:19, 519:23, 519:24, 524:2, 524:4, 524:6, 525:24, 528:13, 544:1
**local** *[1]* - 393:2
**located** *[3]* - 441:13,

526:1, 544:4
**location** *[13]* - 403:7, 424:6, 426:23, 437:15, 440:1, 440:22, 443:9, 444:7, 445:21, 524:20, 525:19, 526:17, 544:17
**locations** *[8]* - 402:15, 420:18, 423:22, 423:24, 522:11, 525:15, 526:18, 526:22
**log** *[1]* - 508:4
**logs** *[1]* - 422:3
**look** *[14]* - 417:17, 490:9, 496:7, 496:24, 505:18, 506:3, 512:18, 512:25, 516:22, 533:13, 563:11, 566:1, 570:1, 573:14
**looked** *[2]* - 446:3, 516:24
**looking** *[5]* - 418:5, 419:7, 431:8, 509:25
**looks** *[1]* - 417:18
**Loop** *[1]* - 390:7
**losers** *[1]* - 406:19
**loses** *[1]* - 513:22
**loss** *[2]* - 407:1, 427:6
**lost** *[1]* - 457:4
**lower** *[1]* - 517:13
**loyalty** *[4]* - 402:13, 402:19, 426:21, 427:7
**luck** *[1]* - 402:25
**lying** *[1]* - 481:11

---

## M

**ma'am** *[17]* - 519:25, 521:6, 523:5, 523:25, 525:19, 526:9, 528:7, 529:16, 532:2, 532:9, 533:12, 533:19, 538:24, 541:20, 542:22, 552:22, 553:10
**maiden** *[1]* - 433:11
**maintain** *[2]* - 427:2, 495:1
**maintaining** *[2]* - 499:3, 536:20
**makeup** *[1]* - 543:9
**manage** *[1]* - 409:16
**managed** *[1]* - 406:9
**management** *[1]* - 412:3

**manager** *[7]* - 421:13, 421:25, 422:1, 430:8, 431:17, 433:5, 539:2
**manner** *[2]* - 463:1, 522:8
**Manual** *[8]* - 392:20, 393:16, 393:19, 393:24, 405:23, 420:9, 463:2, 466:14
**manuals** *[1]* - 402:17
**MARCO'S** *[1]* - 389:7
**Marco's** *[186]* - 392:20, 393:19, 394:1, 401:21, 402:23, 403:2, 403:5, 403:8, 403:13, 403:22, 404:1, 404:4, 404:25, 405:22, 406:7, 406:20, 406:22, 407:8, 407:10, 407:11, 407:16, 407:18, 407:23, 408:11, 408:16, 409:2, 409:6, 409:19, 410:5, 410:15, 411:11, 411:20, 412:4, 417:3, 417:7, 417:24, 419:23, 420:4, 420:5, 420:11, 421:1, 422:22, 422:23, 423:3, 424:5, 424:12, 425:1, 425:5, 425:9, 425:15, 425:18, 426:4, 426:8, 426:20, 427:12, 429:23, 429:25, 430:5, 430:7, 430:19, 431:24, 432:15, 432:24, 433:1, 433:5, 433:10, 433:12, 433:15, 433:17, 435:21, 435:22, 436:10, 437:15, 440:1, 440:7, 440:21, 441:3, 441:6, 444:14, 444:18, 444:21, 445:21, 449:22, 452:3, 452:5, 452:15, 453:2, 456:18, 457:4, 457:18, 458:12, 458:19, 458:23, 461:12, 461:24, 462:4, 462:5, 462:25, 465:7,

465:9, 469:4,
469:12, 469:13,
471:18, 472:2,
472:5, 472:6,
472:14, 472:15,
473:21, 473:22,
474:4, 474:13,
482:15, 489:19,
489:21, 490:10,
490:14, 491:7,
491:11, 491:15,
492:8, 492:13,
493:15, 495:5,
495:15, 496:19,
497:16, 497:17,
498:5, 499:11,
501:5, 501:21,
501:24, 502:1,
502:3, 502:7,
502:13, 502:15,
502:18, 506:13,
506:17, 511:21,
518:4, 518:11,
519:5, 519:23,
522:14, 524:2,
527:19, 529:4,
530:6, 532:20,
534:9, 534:16,
535:18, 536:21,
538:3, 538:14,
539:7, 539:8,
539:11, 541:16,
546:5, 546:23,
547:12, 548:17,
549:20, 550:2,
551:20, 555:6,
556:22, 557:16,
561:4, 561:13,
566:20, 567:6,
568:24, 569:1,
569:5, 569:7
**Marco's-related** [1] -
469:13
**mark** [4] - 394:9,
421:13, 466:15,
498:8
**marked** [6] - 412:11,
412:14, 412:15,
488:4, 525:5, 541:23
**market** [5] - 412:5,
417:24, 420:14,
450:9, 546:1
**marketing** [2] - 460:8,
529:14
**marketplace** [1] -
450:8
**markets** [1] - 462:2
**marks** [1] - 390:4
**married** [2] - 433:10,
435:5

**masking** [1] - 479:18
**material** [1] - 429:12
**materials** [1] - 460:9
**matter** [10] - 426:9,
437:18, 438:6,
441:21, 444:2,
554:25, 555:19,
558:3, 564:24,
573:23
**matters** [4] - 394:11,
442:22, 506:25,
565:7
**mean** [39] - 410:22,
418:2, 436:23,
437:7, 438:7,
442:19, 442:21,
443:18, 444:16,
451:9, 456:6, 456:9,
473:3, 481:5,
484:12, 490:3,
506:22, 507:6,
509:4, 512:5, 512:8,
514:7, 524:4,
524:14, 525:14,
530:22, 535:22,
555:14, 561:2,
562:4, 562:6,
565:25, 567:19,
569:1, 569:15,
570:1, 570:8, 570:11
**meaning** [4] - 422:25,
465:22, 487:19,
552:3
**meaningless** [1] -
551:19
**means** [7] - 409:4,
428:25, 441:9,
521:10, 524:24,
531:11, 561:10
**measure** [1] - 531:3
**mechanical** [1] -
389:22
**mechanics** [1] -
484:19
**mechanism** [1] -
421:8
**mediate** [3] - 458:25,
459:1, 459:9, 460:1,
460:16
**mediation** [2] -
459:10, 558:7
**mediator** [2] - 460:6,
461:11
**meet** [1] - 556:1
**meeting** [1] - 548:17
**meets** [1] - 463:1
**members** [4] - 421:25,
422:1, 538:20
**membership** [1] -
556:10

**memo** [1] - 431:6
**memorized** [1] -
486:11
**memory** [4] - 489:15,
495:21, 496:6,
496:21
**mental** [1] - 507:19
**mentioned** [2] - 436:4,
566:23
**menu** [1] - 495:4
**mess** [1] - 542:11
**met** [2] - 533:9, 546:6
**method** [2] - 451:3,
487:18
**Miami** [1] - 390:15
**Michael** [2] - 504:5,
506:8
**MICHAEL** [6] - 391:7,
392:16, 464:21,
497:11, 501:19,
503:24
**microphone** [1] -
536:6
**middle** [2] - 479:3,
507:13
**midnight** [1] - 571:19
**might** [24] - 404:25,
405:7, 406:2, 420:7,
421:11, 421:13,
428:10, 440:6,
446:8, 447:8,
453:22, 462:8,
487:3, 508:14,
509:4, 511:22,
534:18, 557:20,
558:9, 559:7,
561:19, 562:14,
569:23
**Mike** [12] - 390:10,
401:9, 449:12,
460:2, 523:10,
523:18, 523:20,
523:22, 528:19,
538:25, 539:5
**million** [2] - 542:5,
543:10
**Milton** [7] - 430:7,
478:3, 478:7,
478:19, 479:10,
483:16, 483:21
**mind** [3] - 430:12,
479:18, 549:1
**mindful** [1] - 428:19
**mindset** [1] - 535:8
**mine** [1] - 507:13
**minute** [2] - 464:17,
510:13
**minutes** [6] - 447:2,
447:19, 466:5,
491:23, 540:16,

541:1
**mired** [1] - 452:17
**mischaracterization**
[1] - 560:8
**mischaracterizes** [6] -
423:10, 469:22,
470:24, 511:15,
529:25, 554:7
**mischaracterizing** [1]
- 560:11
**misrepresentations**
[1] - 481:13
**misrepresents** [1] -
536:25
**missing** [2] - 426:15,
542:8
**misstates** [2] - 470:8,
501:24
**mistake** [1] - 487:3
**mistakenly** [1] - 539:4
**model** [1] - 417:16
**module** [7] - 465:11,
465:16, 465:20,
465:21, 465:23,
465:25
**Molina** [19] - 430:7,
430:16, 478:3,
478:7, 479:10,
480:5, 480:9,
480:14, 480:18,
481:10, 481:16,
481:17, 483:17,
483:22, 484:1,
484:21, 485:9,
485:14, 485:18
**Molina's** [1] - 487:7
**moment** [7] - 464:9,
464:10, 491:21,
491:23, 555:22,
557:2, 557:3
**momentarily** [1] -
516:8
**moments** [2] - 427:12,
491:22
**Monday** [17] - 449:6,
515:14, 515:20,
529:17, 536:17,
560:13, 565:14,
566:25, 567:7,
569:20, 569:24,
570:5, 570:9,
570:16, 570:23,
571:23, 572:2
**money** [3] - 472:1,
472:6, 557:6
**monitors** [1] - 508:13
**month** [1] - 424:10
**month's** [1] - 431:14
**months** [3] - 431:15,
461:19, 471:10

**mooted** [2] - 556:14,
556:15
**morning** [1] - 571:23
**most** [5] - 426:4,
447:4, 448:20,
536:19, 569:16
**motion** [4] - 428:6,
461:2, 555:5, 555:12
**mounted** [1] - 442:18
**mouth** [1] - 411:24
**move** [7] - 392:13,
428:20, 429:2,
445:1, 446:13,
450:15, 456:9,
460:13, 461:6,
471:23, 477:19,
503:22, 516:9,
543:14, 549:1,
569:8, 569:20
**moving** [21] - 410:25,
412:15, 429:4,
438:25, 442:17,
446:17, 446:23,
477:21, 507:3,
555:1, 557:11,
557:13, 557:25,
558:1, 558:12,
559:3, 560:19,
563:9, 563:20,
569:2, 570:11
**MR** [454] - 391:7,
391:8, 391:8, 391:9,
391:9, 391:11,
391:12, 391:12,
392:17, 393:6,
393:11, 393:13,
393:21, 394:4,
401:7, 403:14,
403:20, 404:6,
404:8, 404:14,
404:16, 404:17,
405:4, 405:10,
405:11, 405:25,
406:6, 406:14,
406:6, 408:20,
408:24, 409:11,
409:13, 410:7,
410:12, 410:19,
411:1, 411:3,
411:10, 411:11,
412:9, 412:12,
412:17, 416:25,
423:10, 423:14,
425:20, 426:14,
427:10, 427:25,
428:1, 428:10,
428:13, 428:24,
429:5, 429:18,
433:25, 434:7,
435:3, 435:20,
436:7, 437:3,

437:17, 437:22,
439:2, 439:17,
439:20, 440:2,
440:14, 440:18,
441:11, 441:18,
441:20, 441:25,
442:7, 443:4,
443:13, 443:19,
444:9, 444:13,
444:17, 444:24,
445:4, 446:11,
446:16, 446:17,
446:24, 447:4,
447:7, 447:15,
447:21, 447:24,
448:3, 448:4,
448:12, 449:2,
450:2, 450:6,
450:12, 450:17,
452:6, 452:23,
452:25, 453:18,
454:1, 454:8,
455:18, 455:20,
456:1, 456:13,
457:9, 457:13,
457:16, 457:21,
458:4, 458:8,
458:14, 458:17,
458:18, 459:5,
459:13, 459:15,
459:18, 459:24,
460:13, 461:7,
461:8, 462:10,
462:11, 462:12,
462:14, 462:17,
462:18, 462:21,
462:22, 463:4,
463:6, 463:12,
463:17, 463:20,
463:25, 464:3,
464:7, 464:11,
464:13, 464:16,
464:19, 464:22,
466:13, 469:2,
469:21, 469:25,
470:1, 470:6, 470:8,
470:21, 470:22,
470:24, 471:5,
471:7, 471:21,
471:24, 474:8,
474:12, 474:18,
474:21, 476:20,
476:22, 477:14,
477:16, 479:24,
480:25, 481:4,
481:5, 481:7,
481:24, 482:1,
482:2, 484:3,
484:17, 484:25,
485:3, 485:6,
485:12, 485:20,

485:23, 485:25,
486:1, 486:3, 486:6,
486:8, 486:10,
486:12, 486:16,
486:19, 486:22,
487:1, 487:5,
487:11, 488:20,
488:24, 489:4,
489:6, 489:24,
490:6, 490:8,
490:19, 490:22,
490:25, 491:1,
491:5, 491:9,
491:17, 491:24,
492:1, 492:5, 492:6,
492:20, 492:22,
493:5, 493:10,
493:14, 493:22,
493:25, 494:1,
494:5, 495:7,
495:23, 495:25,
496:1, 496:2, 496:4,
497:6, 497:10,
497:12, 498:3,
498:7, 498:24,
501:16, 501:18,
501:20, 501:23,
502:3, 502:6, 503:6,
503:8, 503:13,
503:19, 503:21,
503:25, 504:13,
504:14, 504:18,
504:21, 505:4,
505:10, 505:11,
505:13, 505:14,
505:16, 505:18,
505:19, 505:21,
505:25, 506:7,
506:10, 507:4,
507:10, 507:12,
507:16, 507:21,
508:1, 508:3, 508:5,
508:17, 508:18,
508:19, 508:21,
509:7, 509:12,
509:14, 509:15,
509:16, 509:18,
509:21, 509:25,
510:3, 510:6, 510:8,
510:12, 510:24,
511:2, 511:4, 511:9,
511:10, 511:15,
511:21, 512:17,
513:7, 514:8,
514:15, 514:24,
515:1, 515:4, 515:6,
515:12, 515:24,
516:6, 516:8, 516:9,
516:13, 516:17,
516:18, 516:23,
516:25, 517:2,

517:25, 518:2,
529:24, 532:16,
532:19, 533:25,
534:3, 534:25,
535:2, 535:6,
535:13, 535:25,
536:5, 536:12,
536:24, 537:8,
537:14, 537:20,
538:1, 539:25,
540:3, 540:7,
540:10, 540:13,
540:25, 541:3,
541:5, 541:9,
541:12, 542:11,
542:12, 542:13,
542:14, 542:16,
542:18, 542:19,
542:20, 542:21,
543:13, 543:17,
543:19, 543:23,
545:5, 545:8,
545:10, 545:12,
545:13, 546:7,
547:7, 547:11,
548:7, 548:12,
548:15, 549:11,
549:12, 549:14,
549:17, 549:22,
550:9, 550:14,
550:18, 550:22,
550:24, 551:13,
551:15, 551:17,
552:7, 553:25,
554:3, 554:7,
554:10, 554:21,
554:24, 555:4,
555:17, 555:25,
556:6, 556:15,
557:3, 558:4,
558:15, 559:11,
560:1, 560:18,
561:2, 561:15,
561:21, 561:23,
562:4, 562:8,
562:10, 562:15,
562:20, 562:22,
563:2, 563:5,
563:10, 564:1,
564:8, 564:11,
564:14, 564:18,
564:20, 565:9,
565:17, 566:9,
566:16, 567:6,
567:10, 567:14,
567:17, 567:22,
567:23, 568:6,
568:7, 568:16,
568:19, 569:13,
569:22, 570:4,
570:14, 570:19,

570:25, 571:3,
571:7, 571:13,
571:17, 571:22,
572:1, 572:7,
572:11, 572:13,
572:17, 572:19,
572:22, 572:24,
573:6, 573:12
**MS** [2] - 392:7, 392:10
**multi** [2] - 417:20,
521:17
**multi-unit** [2] - 417:20,
521:17
**multiple** [6] - 401:24,
451:6, 465:13,
478:2, 478:7, 482:9
**must** [1] - 500:17
**mute** [1] - 449:4

---

## N

**name** [6] - 433:9,
433:11, 435:6,
517:15, 517:20,
543:24
**named** [1] - 454:9
**near** [1] - 436:24
**necessarily** [1] -
508:11
**necessary** [2] -
447:24, 493:12
**necessitate** [1] -
444:19
**necessity** [1] - 559:23
**need** [26] - 418:18,
422:1, 425:21,
448:9, 464:4,
480:15, 488:4,
496:9, 506:19,
528:20, 540:12,
546:15, 548:19,
549:2, 551:23,
555:2, 559:12,
559:15, 559:17,
560:13, 561:6,
561:15, 562:8,
566:9, 567:4
**needed** [6] - 479:23,
483:20, 487:19,
546:24, 549:18,
559:7
**needs** [6] - 412:11,
417:25, 425:5,
484:1, 485:10, 567:3
**negative** [1] - 458:1
**neglected** [1] - 541:5
**negotiations** [1] -
450:25
**never** [8] - 433:11,
491:15, 512:10,

514:10, 549:1,
551:17, 566:13,
566:14
**new** [17] - 417:10,
435:3, 435:5, 437:6,
446:17, 514:9,
514:13, 515:20,
519:18, 522:16,
522:17, 546:2,
546:15, 562:7,
567:25, 568:1, 568:9
**New** [1] - 390:5
**newer** [2] - 417:8,
419:5
**newest** [1] - 536:22
**next** [18] - 403:8,
419:11, 500:14,
521:13, 526:24,
531:11, 532:4,
546:14, 557:12,
557:15, 557:25,
558:12, 559:9,
560:22, 563:24,
565:3, 570:18
**Nicholas** [1] - 390:7
**Nick** [1] - 505:14
**night** [2] - 421:12,
571:21
**nine** [3] - 420:16,
442:1, 526:14
**NIXON** [2] - 392:7,
392:10
**NOD** [2] - 549:8, 550:2
**Nohle** [1] - 535:16
**non** [5] - 432:23,
492:19, 492:22,
493:3, 529:1
**non-area** [1] - 432:23
**non-compete** [3] -
492:19, 492:22,
493:3
**non-sufficient** [1] -
529:1
**NONE** [1] - 391:3
**none** [5] - 402:7,
403:17, 404:10,
456:11, 492:14
**nonrefundable** [3] -
522:6, 522:7, 525:14
**noon** [5] - 570:5,
570:8, 570:16,
570:23, 570:24
**North** [6] - 508:9,
511:6, 524:20,
525:20, 526:1, 544:3
**NORTHERN** [1] -
389:1
**nos** [1] - 418:24
**notation** [1] - 466:17
**notations** [1] - 432:8

*note* [6] - 473:9, 478:9, 491:3, 514:25, 525:5
*noted* [4] - 432:5, 432:6, 527:24, 530:2
*notes* [2] - 473:5, 573:24
*nothing* [10] - 463:12, 491:22, 497:6, 501:16, 503:19, 504:13, 512:24, 540:10, 554:22, 554:24
*Notice* [11] - 423:11, 423:12, 423:14, 430:6, 474:23, 475:7, 489:2, 489:17, 491:13, 550:20, 551:1
*notice* [12] - 420:10, 420:11, 423:24, 430:22, 430:23, 430:25, 478:4, 479:7, 482:23, 484:12, 505:20, 560:5
*Notices* [3] - 423:7, 423:21, 425:24
*notices* [2] - 423:22, 427:19
*notification* [2] - 430:2, 430:4
*notified* [4] - 429:25, 430:18, 431:3
*notifies* [1] - 420:2
*notify* [1] - 420:9
*notifying* [2] - 430:19, 519:17
*noting* [1] - 405:1, 525:2
*now-current* [1] - 495:17
*number* [10] - 418:24, 425:22, 427:23, 434:5, 520:11, 523:16, 525:23, 531:9, 540:2, 542:7
*Number* [2] - 521:7, 524:3
*numbers* [3] - 497:3, 530:22, 530:24

## O

*o'clock* [2] - 540:22, 561:16
*oath* [2] - 448:25, 517:6
*object* [17] - 408:21, 441:11, 442:9,

469:21, 480:25, 484:3, 488:20, 489:24, 490:23, 493:5, 495:7, 501:23, 510:14, 546:7, 547:7, 548:7, 548:8
*objected* [2] - 410:20, 471:19
*objecting* [6] - 437:13, 437:19, 437:23, 437:25, 438:3, 462:19
*objection* [76] - 403:14, 404:23, 405:25, 406:5, 406:14, 408:6, 408:20, 411:10, 423:10, 425:20, 425:22, 426:1, 428:18, 435:4, 436:20, 437:2, 437:10, 437:17, 437:22, 438:7, 438:16, 438:23, 439:11, 439:14, 439:18, 440:2, 442:21, 443:4, 443:12, 443:22, 450:2, 450:14, 452:6, 452:9, 452:23, 453:18, 453:22, 454:7, 455:18, 457:9, 457:11, 458:5, 459:5, 459:15, 460:13, 461:4, 463:4, 463:8, 470:22, 471:1, 474:16, 484:16, 485:1, 485:4, 491:3, 514:9, 514:25, 516:11, 516:16, 516:19, 529:24, 532:16, 533:25, 534:25, 539:25, 540:4, 543:17, 543:18, 549:13, 551:13, 553:25, 554:7, 564:6, 566:11, 569:14
*objections* [8] - 411:21, 438:11, 438:24, 439:1, 444:5, 463:23, 510:7, 515:9
*obligated* [3] - 423:2, 425:15, 460:10
*obligation* [14] - 403:13, 407:10, 409:24, 420:8,

420:25, 429:21, 429:24, 527:25, 531:22, 532:5, 546:17, 548:20, 553:5, 553:16
*obligations* [8] - 411:9, 427:14, 430:10, 511:14, 527:11, 531:14, 533:10, 548:18
*obtain* [2] - 541:18, 562:18
*occasionally* [1] - 453:3
*occurred* [1] - 451:16
*October* [15] - 392:1, 425:11, 425:19, 429:20, 432:16, 440:12, 440:15, 443:11, 443:21, 444:16, 444:18, 445:6, 461:22, 501:10, 539:21
*OCTOBER* [1] - 389:6
*OF* [11] - 389:1, 389:7, 389:10, 392:16, 464:21, 497:11, 501:19, 503:24, 518:1, 543:22, 550:23
*OFC* [3] - 479:5, 479:12, 500:5
*OFCs* [2] - 482:14, 482:15
*offer* [2] - 450:4, 450:24
*offered* [2] - 405:6, 505:25
*offering* [1] - 505:22
*offers* [3] - 495:3, 499:5, 499:17
*office* [4] - 392:20, 392:21, 392:25
*Officer* [1] - 475:21
*official* [1] - 435:23
*Official* [1] - 389:15
*OHIO* [1] - 389:1
*Ohio* [4] - 389:4, 389:17, 390:8, 390:19
*old* [1] - 441:23
*once* [5] - 460:22, 479:7, 502:19, 514:11, 533:5
*one* [74] - 392:12, 393:6, 393:8, 403:2, 403:3, 405:16, 406:2, 408:12, 410:22, 410:24, 417:25, 419:16,

424:18, 424:19, 424:21, 425:22, 429:6, 430:12, 432:24, 432:25, 433:6, 436:19, 442:14, 444:19, 444:25, 453:16, 457:14, 459:10, 460:18, 464:16, 465:3, 465:18, 465:19, 466:1, 470:4, 474:4, 479:17, 484:12, 484:19, 485:23, 485:25, 486:1, 486:3, 486:4, 486:8, 503:21, 510:13, 510:21, 513:12, 513:13, 526:20, 528:4, 528:18, 530:20, 531:6, 531:11, 532:5, 532:24, 533:2, 533:9, 533:13, 541:5, 541:7, 542:15, 542:18, 546:6, 549:2, 550:18, 553:10, 554:22, 560:12, 561:25, 572:11
*one-on-one* [1] - 465:19
*ones* [3] - 426:24, 432:21, 533:1
*ongoing* [1] - 459:2
*Open* [1] - 531:11
*open* [20] - 392:21, 470:10, 470:19, 513:12, 531:11, 531:16, 531:22, 532:5, 539:20, 539:23, 540:2, 540:8, 544:8, 544:14, 544:15, 544:23, 545:2, 553:7, 553:17, 553:23
*open-ended* [1] - 470:10
*opened* [17] - 456:15, 471:9, 512:2, 514:2, 525:20, 527:12, 527:20, 533:4, 544:22, 545:18, 549:19, 549:25, 550:1, 550:3, 550:6, 551:4, 551:5
*opening* [10] - 421:25, 422:2, 469:18, 470:3, 471:2, 511:23, 513:21,

513:22, 529:14, 546:2
*opens* [1] - 522:20
*operate* [8] - 407:13, 419:15, 456:22, 456:23, 456:25, 470:14, 495:1, 495:15
*operated* [6] - 407:4, 456:23, 495:13, 499:10, 511:2, 538:3
*operates* [1] - 420:14
*operating* [15] - 403:23, 409:15, 418:13, 419:1, 421:3, 425:7, 473:15, 474:1, 531:12, 531:16, 539:12, 539:20, 539:23, 540:8, 551:20
*operation* [1] - 418:14
*operational* [5] - 418:14, 425:12, 446:5, 461:21, 500:23
*operations* [8] - 417:1, 423:8, 430:8, 432:18, 432:19, 432:25, 433:1, 433:5
*Operations* [1] - 418:9
*operator* [1] - 419:13
*opine* [2] - 483:11, 488:25
*opined* [1] - 443:24
*opinion* [7] - 408:7, 436:14, 439:9, 445:24, 474:13, 479:20, 537:22
*opinions* [2] - 436:24, 438:17
*opportunity* [11] - 428:16, 435:9, 514:22, 558:18, 564:12, 566:18, 568:1, 568:10, 568:20, 569:5, 569:6
*opposed* [2] - 419:22, 534:23
*opposing* [2] - 431:2, 565:8
*oral* [1] - 560:3
*orally* [1] - 558:21
*orange* [1] - 440:24
*order* [9] - 393:23, 394:6, 394:9, 417:13, 418:19, 426:25, 460:11, 562:20, 563:5
*orders* [1] - 563:8

**ordinary** [2] - 433:16, 566:1
**organization** [2] - 409:12, 479:23
**original** [5] - 521:20, 523:13, 526:22, 534:5, 542:16
**originally** [3] - 441:13, 533:16, 533:20
**OSE** [23] - 418:8, 418:20, 419:25, 424:3, 424:4, 424:10, 424:19, 425:2, 427:5, 428:5, 435:22, 478:23, 479:13, 480:16, 482:5, 482:8, 482:11, 482:24, 486:7, 486:24, 500:5, 500:12, 500:19
**OSEs** [16] - 420:17, 426:18, 430:4, 430:17, 432:3, 432:6, 433:20, 434:23, 445:15, 445:24, 461:23, 479:8, 479:19, 479:21, 482:16, 501:3
**otherwise** [1] - 525:9
**ought** [3] - 516:4, 561:9, 572:15
**ourselves** [1] - 559:22
**out-of-court** [1] - 454:2
**outset** [2] - 428:12, 559:12
**outside** [5] - 472:6, 474:9, 503:6, 503:9, 549:15
**oven** [1] - 434:21
**overall** [2] - 479:22, 546:12
**overcome** [1] - 453:21
**overrule** [5] - 404:23, 406:16, 452:9, 459:9, 491:4
**overruled** [7] - 408:8, 411:13, 463:9, 474:17, 546:9, 547:17, 549:21
**oversaw** [1] - 521:4
**oversight** [2] - 430:9, 433:6
**owe** [1] - 392:11
**owed** [1] - 525:7
**own** [11] - 407:13, 420:19, 423:4, 423:5, 425:3,

426:22, 433:21, 495:1, 495:14, 533:9, 563:18
**owned** [5] - 470:3, 470:18, 495:2, 495:13, 511:2
**ownership** [2] - 469:17, 494:8
**owning** [1] - 499:2
**owns** [1] - 500:24

## P

**P&L** [1] - 477:25
**p.m** [4] - 447:18, 448:16, 448:18, 573:20
**page** [23] - 393:24, 496:12, 496:19, 498:2, 500:4, 500:14, 500:16, 509:20, 509:21, 509:22, 510:4, 521:8, 521:13, 522:3, 524:3, 524:18, 524:23, 530:20, 549:24, 562:5, 572:13, 573:4
**PAGE** [10] - 391:2, 391:6, 391:15, 391:16, 391:16, 391:17
**Pages** [1] - 389:8
**PAGES** [1] - 391:14
**pages** [7] - 393:17, 509:20, 519:22, 526:24, 541:7, 572:18, 572:25
**paid** [15] - 520:12, 521:2, 523:2, 525:14, 528:11, 528:14, 528:21, 529:3, 529:8, 533:3, 533:7, 541:16, 542:2, 543:4, 543:7
**pan** [3] - 440:23, 441:2, 441:13
**paper** [1] - 571:9
**papers** [1] - 559:21
**paragraph** [10] - 474:24, 484:15, 500:16, 545:22, 546:10, 546:14, 547:3, 547:18, 547:21, 548:19
**paralegal** [5] - 518:16, 518:17, 521:4, 534:6, 534:12
**parallel** [1] - 474:2
**paraphrasing** [1] -

460:17
**part** [31] - 402:2, 406:25, 408:3, 410:10, 417:2, 421:11, 421:18, 434:3, 435:20, 435:21, 435:22, 437:2, 438:15, 473:14, 476:7, 476:25, 478:24, 482:10, 504:24, 513:7, 521:8, 527:8, 527:12, 527:13, 528:17, 534:5, 534:12, 544:12, 544:18, 544:20, 564:23
**parte** [1] - 460:20
**partially** [2] - 470:3, 470:18
**participate** [3] - 444:8, 480:8, 561:6
**participating** [1] - 557:19
**particular** [7] - 418:24, 419:18, 430:16, 438:20, 439:6, 517:5, 531:10
**parties** [15] - 450:18, 459:10, 460:18, 460:23, 461:10, 461:11, 519:13, 520:11, 519:9, 533:20, 537:16, 537:22, 557:10, 557:21, 559:17
**partner** [1] - 504:5
**partners** [2] - 403:23, 409:15
**party** [5] - 453:20, 460:17, 476:23, 492:12, 511:20
**party's** [1] - 520:14
**pass** [2] - 462:16, 569:16
**past** [5] - 394:10, 441:10, 446:3, 451:15, 460:20
**path** [1] - 557:7
**pause** [4] - 393:10, 464:12, 491:23, 491:25
**pay** [7] - 460:10, 460:11, 522:18, 522:22, 522:23, 556:22, 563:2
**payments** [2] - 529:1, 529:12
**PDF** [1] - 509:19
**pending** [3] - 457:11,

461:2, 516:11
**people** [7] - 404:19, 409:17, 410:3, 427:3, 459:22, 519:1, 520:11
**per** [4] - 459:12, 521:25, 522:10, 523:2
**percent** [1] - 432:6
**perfect** [1] - 495:22
**perform** [4] - 406:12, 432:22, 462:7, 463:1
**performance** [3] - 420:2, 432:11, 473:10
**performed** [2] - 433:21, 482:12
**performing** [1] - 402:21
**perhaps** [10] - 408:11, 421:24, 422:23, 442:15, 444:10, 445:15, 469:23, 480:3, 496:6, 557:6
**period** [7] - 431:12, 431:14, 431:19, 538:7, 543:6, 563:16
**permissible** [1] - 423:18
**permit** [12] - 411:12, 450:15, 474:16, 493:21, 503:11, 514:19, 532:22, 540:5, 546:9, 547:17, 549:21
**permits** [1] - 500:14
**permitted** [3] - 460:24, 499:9, 533:4
**person** [15] - 406:11, 421:7, 421:15, 432:15, 432:18, 435:9, 456:8, 508:12, 515:13, 515:21, 521:1, 534:16, 535:3, 536:19, 537:15
**personal** [10] - 427:3, 427:8, 427:10, 427:15, 427:17, 534:1, 535:1, 537:3, 570:7, 571:16
**personally** [4] - 458:25, 460:1, 565:21, 567:2
**perspective** [4] - 417:3, 520:10, 521:3, 557:5
**Ph.D** [1] - 556:8
**phone** [1] - 540:15
**photo** [6] - 432:3,

438:9, 440:19, 440:20, 443:11, 443:23
**photograph** [2] - 436:22, 438:13
**photographs** [7] - 432:14, 436:1, 436:24, 440:11, 442:22, 443:2, 443:9
**photos** [12] - 432:3, 437:12, 437:13, 438:25, 439:10, 439:13, 439:16, 440:9, 443:15, 444:7, 445:5
**phrase** [2] - 499:12, 499:14
**physical** [2] - 418:10, 419:20
**physically** [1] - 436:15
**picture** [11] - 424:5, 426:15, 434:10, 435:11, 437:25, 438:4, 439:7, 439:23, 442:3, 444:8
**pictures** [27] - 429:17, 433:15, 433:17, 433:18, 433:20, 433:22, 433:23, 434:3, 434:5, 434:9, 435:4, 435:8, 435:10, 435:17, 435:18, 436:17, 437:8, 440:3, 440:4, 442:19, 445:12, 445:13, 445:14, 445:18, 445:21, 445:23, 446:3
**Pizza** [8] - 407:16, 440:1, 440:22, 441:3, 445:21, 495:15, 496:19, 499:19
**pizza** [6] - 492:24, 493:1, 493:4, 495:3, 499:6, 499:17
**pizzas** [1] - 434:19
**place** [3] - 402:13, 459:3, 538:16
**placed** [2] - 404:10, 434:21
**plaintiff** [7] - 393:22, 428:18, 437:13, 456:12, 457:22, 557:11, 562:16
**Plaintiff** [2] - 389:5, 390:3
**Plaintiff's** [10] - 393:16, 475:6, 494:18, 497:24,

*499:25, 545:15, 549:6, 549:24, 550:20, 550:22*
**plaintiff's** *[5] - 438:16, 439:14, 444:5, 557:5, 564:7*
**PLAINTIFF'S** *[1] - 391:2*
**plaintiffs** *[10] - 435:25, 437:11, 438:23, 442:18, 509:6, 540:12, 559:10, 561:19, 569:18, 572:21*
**plan** *[15] - 419:2, 419:12, 420:7, 420:23, 420:24, 421:12, 421:23, 546:16, 546:19, 547:18, 552:20, 552:21, 553:9, 553:18, 556:8*
**plans** *[1] - 431:23*
**platform** *[6] - 418:25, 422:16, 422:18, 431:16, 465:12, 465:24*
**platforms** *[1] - 402:18*
**play** *[1] - 568:7*
**plaza** *[1] - 403:8*
**plead** *[1] - 486:19*
**point** *[36] - 392:6, 407:7, 408:12, 409:23, 411:11, 419:23, 424:19, 429:6, 431:10, 432:25, 447:19, 448:1, 448:21, 461:1, 487:2, 490:23, 496:15, 500:22, 507:19, 507:25, 514:18, 540:1, 540:24, 548:16, 549:20, 555:2, 555:5, 555:16, 556:3, 556:16, 556:25, 558:20, 559:8, 560:5, 560:13, 571:12*
**points** *[1] - 418:12*
**portfolio** *[2] - 430:11, 430:17*
**portion** *[6] - 394:2, 394:10, 459:6, 490:12, 491:12, 549:23*
**portions** *[1] - 562:23*
**position** *[22] - 404:21, 409:6, 426:8, 427:2,*

*436:21, 469:12, 472:5, 472:14, 484:13, 501:1, 507:3, 512:3, 515:21, 536:22, 546:5, 546:23, 547:12, 553:21, 555:14, 560:14, 561:13, 562:1*
**positions** *[1] - 567:20*
**possession** *[1] - 508:11*
**possibility** *[1] - 557:25*
**possible** *[7] - 409:21, 412:1, 412:2, 428:23, 431:18, 557:24, 561:20*
**possibly** *[1] - 409:8*
**post** *[1] - 493:23*
**post-termination** *[1] - 493:23*
**potentially** *[1] - 407:5*
**PowerPoint** *[1] - 476:1*
**practicable** *[1] - 563:20*
**practice** *[2] - 394:11, 425:4*
**pre** *[2] - 523:22, 558:7*
**pre-signing** *[1] - 523:22*
**pre-suit** *[1] - 558:7*
**preference** *[1] - 558:17*
**preliminary** *[3] - 461:2, 561:3, 563:19*
**premised** *[1] - 562:12*
**preparation** *[3] - 519:7, 520:21, 541:13*
**preparations** *[1] - 460:25*
**prepare** *[4] - 434:19, 504:22, 520:24, 561:6*
**prepared** *[5] - 517:6, 533:22, 555:4, 568:21, 573:24*
**preparing** *[2] - 519:14, 557:18*
**present** *[5] - 428:16, 436:15, 436:25, 439:10, 443:1*
**Present** *[2] - 390:10, 390:20*
**presentation** *[2] - 436:5, 476:1*
**presented** *[2] - 537:1, 555:1*

**president** *[7] - 452:3, 453:1, 455:8, 461:24, 462:5, 462:25, 539:1*
**President** *[1] - 390:20*
**pressed** *[1] - 446:18*
**presumably** *[2] - 559:3, 562:12*
**pretty** *[2] - 547:16, 564:13*
**previous** *[3] - 402:2, 434:23, 516:19*
**previously** *[4] - 428:12, 520:18, 534:6, 566:3*
**price** *[1] - 450:25*
**primary** *[2] - 427:22, 495:4*
**principals** *[6] - 448:21, 461:25, 494:7, 494:8, 520:19, 528:19*
**priorities** *[1] - 419:10*
**problem** *[6] - 392:10, 393:7, 432:8, 509:18, 561:12, 567:23*
**problems** *[4] - 429:12, 429:25, 453:3, 501:3*
**procedure** *[9] - 419:18, 473:15, 482:3, 482:22, 482:25, 483:6, 483:22, 558:16, 573:6*
**proceed** *[12] - 405:9, 423:18, 464:2, 477:1, 485:5, 491:6, 492:4, 516:4, 517:24, 540:19, 541:2, 554:12*
**proceeding** *[4] - 460:20, 511:20, 515:9, 530:6*
**proceedings** *[6] - 393:10, 464:12, 491:25, 513:5, 573:14, 573:23*
**PROCEEDINGS** *[1] - 389:10*
**Proceedings** *[3] - 389:22, 392:3, 573:20*
**proceeds** *[1] - 484:11*
**process** *[12] - 420:11, 421:3, 429:16, 435:21, 435:22, 482:15, 484:5, 519:7, 520:25, 548:23*

**processes** *[1] - 555:18*
**produced** *[1] - 389:23*
**produces** *[1] - 419:2*
**product** *[4] - 417:12, 440:24, 440:25, 441:2*
**production** *[4] - 441:10, 441:16, 441:22*
**products** *[3] - 495:3, 499:6, 499:17*
**professionally** *[1] - 567:2*
**proffer** *[4] - 428:16, 510:18, 515:8, 515:12*
**profit** *[1] - 406:25*
**profitability** *[1] - 402:16*
**program** *[2] - 418:11, 529:15*
**prohibit** *[2] - 409:8, 440:6*
**prohibited** *[1] - 492:18*
**prohibiting** *[1] - 503:3*
**promoting** *[2] - 409:18, 472:1*
**proof** *[2] - 476:3, 476:5*
**proofer** *[2] - 422:7, 422:8*
**proper** *[8] - 406:3, 479:13, 480:16, 482:3, 482:8, 486:7, 486:24, 549:3*
**properly** *[2] - 472:24, 482:5*
**proposal** *[1] - 567:9*
**propose** *[4] - 559:10, 559:25, 560:3, 566:24*
**proposed** *[2] - 569:12, 570:24*
**proposing** *[3] - 560:24, 564:13, 568:18*
**protective** *[1] - 393:23*
**protocol** *[1] - 487:14*
**prove** *[1] - 506:25*
**provide** *[5] - 417:13, 418:19, 476:1, 546:19, 562:24*
**provided** *[7] - 424:12, 490:11, 501:21, 504:15, 528:25, 533:8, 533:16*
**provides** *[3] - 409:7, 429:8, 433:6*

**proving** *[1] - 513:9*
**provision** *[7] - 492:19, 492:21, 492:22, 494:7, 495:11, 495:18, 503:17*
**provisional** *[3] - 512:11, 513:23, 532:10*
**provisions** *[1] - 412:10*
**pull** *[6] - 424:1, 435:13, 494:12, 499:25, 506:3, 541:23*
**pulled** *[3] - 438:14, 440:20, 530:20*
**pulling** *[1] - 494:15*
**purchase** *[3] - 449:24, 450:24, 451:18*
**purchased** *[1] - 460:9*
**purely** *[1] - 452:16*
**purportedly** *[1] - 437:14*
**purpose** *[7] - 404:24, 405:5, 410:7, 410:9, 506:1, 520:7, 571:14*
**purposes** *[2] - 436:22, 438:13*
**pursuant** *[1] - 394:10*
**pursue** *[3] - 458:12, 461:13, 514:19*
**pursued** *[1] - 457:18*
**push** *[3] - 422:22, 570:21, 571:14*
**put** *[20] - 411:23, 412:7, 450:13, 457:23, 459:22, 464:20, 477:6, 504:18, 510:7, 512:6, 512:8, 513:24, 521:16, 550:19, 551:24, 558:13, 559:13, 563:22, 564:21, 565:4*
**putting** *[6] - 430:23, 486:13, 502:18, 506:22, 519:16, 519:22*

## Q

**Q3** *[1] - 531:24*
**QTR** *[1] - 531:2*
**qualify** *[1] - 474:25*
**quarter** *[25] - 449:8, 449:9, 449:13, 449:14, 513:12, 531:3, 531:6, 531:14, 531:21,*

*531:25, 532:3, 532:4, 532:6, 538:12, 538:17, 545:18, 546:6, 553:3, 553:23, 554:18*
**quartered**[1] - 440:24
**quarterly**[1] - 531:4
**quarters**[4] - 449:18, 531:10, 532:4, 532:6
**questioning**[6] - 392:14, 435:14, 457:16, 458:6, 486:18, 490:17
**questions**[21] - 418:12, 431:21, 438:16, 438:22, 445:1, 445:3, 450:8, 450:12, 466:14, 482:21, 484:23, 499:1, 500:2, 503:8, 504:25, 505:12, 507:20, 507:21, 543:20, 544:2, 550:16
**quick**[1] - 498:2
**quickly**[13] - 427:11, 429:2, 430:3, 450:16, 530:19, 532:14, 539:17, 541:9, 562:3, 562:21, 569:17, 570:12, 570:17
**quite**[4] - 452:8, 462:13, 484:16, 555:4
**quotations**[1] - 460:18
**quote**[3] - 402:8, 427:13, 573:4

## R

**raise**[1] - 517:8
**raised**[2] - 411:21, 477:24
**raises**[1] - 420:1
**ran**[1] - 538:17
**rare**[1] - 424:18
**rather**[4] - 407:9, 499:16, 510:25, 567:15
**raw**[1] - 434:20
**reach**[4] - 483:16, 483:17, 508:3
**reached**[2] - 487:20, 556:7
**reaction**[1] - 507:12
**read**[12] - 474:18, 474:20, 479:25,

*480:2, 485:7, 485:8, 494:25, 496:24, 500:15, 545:22, 546:14, 549:23*
**readily**[1] - 450:8
**reading**[2] - 507:13, 532:2
**ready**[6] - 392:14, 394:12, 422:17, 464:1, 492:2, 515:1
**real**[1] - 498:2
**really**[12] - 404:3, 418:3, 418:12, 419:4, 419:5, 422:6, 444:2, 460:8, 520:12, 555:15, 564:25, 570:21
**reason**[9] - 461:12, 466:8, 466:10, 473:16, 473:19, 478:6, 480:18, 486:13, 487:6
**reasonable**[1] - 563:16
**reasons**[3] - 407:14, 411:22, 472:25
**rebuttal**[1] - 504:20
**receipt**[1] - 502:15
**receive**[6] - 482:4, 482:22, 484:11, 487:16, 488:15, 528:23
**received**[18] - 429:20, 460:7, 461:10, 478:20, 479:7, 489:1, 489:5, 489:11, 502:9, 502:10, 504:15, 504:23, 505:4, 523:17, 529:11, 529:12, 542:24, 555:6
**receiving**[1] - 519:15
**recent**[1] - 556:10
**recess**[2] - 446:19, 448:16
**recitation**[1] - 488:17
**recitations**[1] - 489:21
**recognize**[7] - 393:17, 393:18, 439:25, 440:20, 445:20, 546:1, 559:1
**recognized**[1] - 451:2
**recognizes**[2] - 438:9, 545:2
**recollection**[3] - 449:19, 497:2, 516:21
**Recommendation**[1]

*- 475:11*
**reconvene**[1] - 556:3
**reconvened**[1] - 448:18
**Record**[1] - 480:2
**record**[29] - 394:2, 429:6, 431:14, 436:9, 437:20, 439:6, 439:12, 442:15, 447:20, 447:23, 448:12, 448:14, 448:22, 455:20, 474:20, 485:8, 487:1, 492:4, 516:13, 517:15, 536:9, 550:13, 556:6, 563:15, 564:17, 566:10, 567:21, 573:16, 573:23
**recorded**[1] - 389:22
**recordings**[1] - 465:23
**records**[8] - 438:1, 442:9, 471:22, 512:5, 534:4, 534:9, 538:14, 539:7
**RECR0SS**[1] - 391:9
**RECR0SS-EXAMINATION**[1] - 391:9
**recross**[1] - 501:17
**RECROSS**[1] - 501:19
**RECROSS-EXAMINATION**[1] - 501:19
**recruited**[1] - 407:22
**recurring**[2] - 422:21, 423:2
**red**[1] - 441:5
**Red**[1] - 390:5
**REDACTED**[2] - 389:10, 391:14
**redirect**[3] - 485:4, 497:9, 503:7
**REDIRECT**[6] - 391:8, 391:9, 391:12, 497:11, 503:24, 550:23
**refer**[1] - 552:19
**reference**[2] - 552:15, 573:4
**referenced**[1] - 482:9
**references**[3] - 524:5, 546:10, 548:19
**referencing**[1] - 494:14
**referred**[2] - 441:5, 549:7

**referring**[6] - 434:22, 442:2, 485:22, 497:15, 520:17, 538:24
**refers**[2] - 551:4, 552:21
**refresh**[5] - 489:15, 495:21, 496:6, 496:21, 497:2
**refrigeration**[1] - 441:15
**refundable**[1] - 522:6
**refusal**[1] - 428:7
**refuse**[1] - 402:5
**refused**[1] - 402:3
**refuses**[1] - 556:22
**regard**[22] - 394:11, 405:1, 436:20, 437:12, 438:16, 438:21, 442:16, 442:18, 444:6, 446:22, 457:12, 460:19, 461:2, 463:24, 483:13, 537:23, 556:25, 557:12, 557:20, 557:22, 559:6, 561:13
**regarding**[25] - 405:23, 423:7, 425:23, 455:8, 470:18, 475:15, 475:21, 476:1, 476:15, 478:3, 478:7, 479:11, 480:5, 482:4, 482:23, 486:6, 486:23, 487:15, 503:2, 510:19, 515:15, 527:23, 547:14, 551:11, 556:2
**regardless**[1] - 514:17
**regional**[1] - 430:8
**regularly**[1] - 430:12
**rehabilitate**[1] - 506:19
**rehabilitating**[1] - 506:2
**rehabilitation**[1] - 506:20
**reinspection**[1] - 444:20
**rejected**[1] - 551:23
**related**[14] - 425:24, 426:9, 438:24, 445:7, 465:17, 469:13, 474:14, 484:11, 495:3,

*495:13, 499:19, 500:19, 501:9*
**relates**[5] - 478:18, 482:13, 482:16, 492:24, 524:19
**relating**[1] - 436:24
**relationship**[19] - 404:5, 409:1, 409:3, 426:20, 426:21, 427:7, 452:16, 452:22, 453:2, 453:7, 455:8, 455:12, 455:16, 456:2, 459:11, 462:7, 472:15, 473:22, 529:22
**relationships**[2] - 405:1, 453:14
**relaxed**[2] - 436:11, 459:20
**relevance**[13] - 403:18, 438:24, 450:2, 450:14, 457:9, 457:12, 490:23, 491:1, 493:6, 493:22, 510:14, 513:2
**relevance-related**[1] - 438:24
**relevancy**[2] - 493:11, 493:14
**relevant**[3] - 510:20, 511:20, 513:5
**relied**[1] - 534:8
**relief**[5] - 426:25, 557:1, 558:13, 569:2
**relies**[1] - 511:12
**rely**[4] - 483:25, 484:14, 485:9, 485:14
**relying**[1] - 512:21
**remainder**[1] - 522:25
**remained**[1] - 497:4
**remaining**[6] - 479:4, 526:18, 526:21, 546:17, 548:20, 549:19
**remedial**[3] - 479:12, 480:6, 486:14
**remember**[11] - 466:4, 469:5, 471:25, 473:11, 484:5, 489:15, 503:2, 503:4, 503:14, 516:18, 552:11
**remembering**[1] - 427:23
**remind**[1] - 448:23
**reminded**[1] - 459:18

**remote** [1] - 557:24
**removed** [1] - 436:22
**renew** [1] - 474:2
**renewal** [9] - 428:7, 429:7, 429:9, 431:1, 431:4, 473:12, 474:6, 474:25, 493:18
**renewals** [1] - 474:10
**renewed** [1] - 473:14
**reopen** [1] - 541:6
**reopened** [3] - 426:3, 426:4, 444:20
**Rep** [2] - 420:9, 493:8
**rep** [12] - 407:23, 419:16, 420:19, 421:9, 422:25, 432:22, 432:23, 450:23, 469:4, 469:5, 495:15, 527:23
**rep's** [1] - 420:8
**repeating** [1] - 431:23
**rephrase** [4] - 469:24, 489:9, 502:13, 548:12
**replace** [1] - 477:5
**reply** [5] - 568:20, 569:7, 571:1, 571:3, 571:5
**report** [2] - 429:23, 435:23
**Reporter** [4] - 389:15, 476:4, 481:23, 536:4
**reporter** [3] - 471:22, 479:25, 535:24
**reporting** [1] - 422:18
**represent** [2] - 501:2, 504:2
**representation** [3] - 466:9, 505:6, 567:24
**representations** [1] - 426:17
**representative** [34] - 403:23, 405:13, 405:21, 406:10, 407:19, 407:25, 409:1, 409:3, 409:5, 410:15, 412:5, 417:25, 418:8, 420:1, 424:3, 425:10, 425:18, 426:5, 449:24, 450:7, 451:3, 453:4, 455:13, 455:16, 462:1, 462:4, 470:13, 470:14, 471:3, 492:8, 499:8, 532:10, 532:24, 561:5

**Representative** [21] - 392:19, 393:16, 393:19, 393:23, 405:23, 406:13, 408:17, 408:25, 409:14, 411:17, 429:10, 429:14, 431:4, 471:8, 493:20, 496:20, 512:23, 530:14, 530:25, 533:15
**representative's** [1] - 417:2
**representatives** [8] - 402:4, 402:10, 403:11, 403:24, 408:12, 408:13, 408:15, 422:22
**represented** [2] - 406:9, 426:23
**representing** [2] - 411:25, 412:4
**represents** [1] - 434:10
**reps** [11] - 401:17, 402:14, 402:20, 407:7, 408:2, 409:8, 430:9, 430:13, 465:13, 465:14, 482:7
**request** [4] - 461:2, 529:2, 547:18, 563:18
**requested** [2] - 533:21, 569:2
**require** [6] - 417:14, 456:21, 456:25, 477:4, 479:18, 489:6
**required** [29] - 393:25, 418:5, 418:8, 440:25, 465:12, 465:14, 469:13, 471:3, 476:11, 476:16, 478:9, 479:4, 482:14, 482:18, 482:23, 482:25, 483:7, 483:19, 485:19, 487:8, 487:25, 493:19, 521:23, 528:10, 535:9, 550:1, 550:3, 551:5, 555:15
**requirement** [6] - 441:7, 528:17, 531:19, 546:22, 547:1, 558:7
**requirements** [3] - 405:23, 480:10, 513:25

**requires** [6] - 409:15, 420:24, 431:12, 433:17, 465:10, 513:11
**requiring** [2] - 479:12, 486:23
**requisite** [1] - 537:4
**resent** [1] - 500:12
**resolve** [1] - 444:10
**resolved** [2] - 443:16, 557:9
**respect** [3] - 430:2, 453:12, 519:7
**respectfully** [1] - 564:1
**respective** [1] - 567:20
**respond** [11] - 404:6, 489:19, 490:14, 490:20, 491:11, 506:14, 506:18, 563:17, 568:2, 568:10, 569:6
**responded** [5] - 491:15, 497:16, 497:17, 502:10, 506:24
**responding** [2] - 504:10, 506:8
**response** [19] - 410:5, 426:13, 501:21, 502:16, 502:19, 502:22, 502:25, 504:9, 504:19, 505:7, 505:8, 507:7, 509:6, 562:1, 567:16, 568:23, 569:8, 570:13
**responsibilities** [2] - 408:3, 432:23
**responsibility** [5] - 421:13, 422:14, 430:9, 463:11, 519:6
**responsible** [4] - 421:15, 432:21, 432:22, 533:22
**rest** [2] - 457:5, 568:22
**restate** [2] - 471:15, 484:5
**restaurant** [13] - 417:6, 421:12, 421:19, 421:20, 421:21, 422:7, 436:15, 440:7, 441:3, 443:1, 458:20, 471:3, 477:4
**restaurants** [6] - 423:9, 426:16, 433:21, 493:4, 531:15, 553:23

**restored** [1] - 555:11
**restricted** [1] - 565:4
**restriction** [1] - 499:2
**result** [3] - 447:8, 559:3, 563:15
**results** [2] - 425:17, 545:25
**resume** [2] - 394:12, 448:25
**retail** [2] - 407:12, 407:15
**retained** [1] - 479:23
**review** [7] - 430:11, 430:16, 461:23, 505:17, 507:17, 537:11, 569:18
**reviewed** [6] - 435:23, 445:5, 445:8, 445:18, 463:3, 534:4
**reviewing** [3] - 430:17, 445:20, 571:16
**reviews** [1] - 477:25
**revisions** [1] - 523:12
**Rick** [4] - 475:14, 475:18, 475:21, 476:9
**rise** [1] - 478:19
**rises** [1] - 572:2
**risk** [1] - 569:22
**Riverside** [1] - 390:4
**RMR** [2] - 389:15, 573:25
**road** [1] - 557:6
**role** [19] - 402:21, 403:25, 408:1, 417:2, 430:8, 432:22, 433:5, 453:1, 455:8, 455:21, 456:4, 460:6, 461:11, 518:5, 518:7, 519:11, 534:6, 534:13, 537:11
**roles** [2] - 465:3, 518:14
**roll** [1] - 460:25
**ROM** [1] - 430:12
**Ron** [1] - 473:12
**ross** [1] - 474:15
**ross-examination** [1] - 474:15
**rough** [1] - 573:7
**roughly** [1] - 418:12
**route** [2] - 566:8, 566:24
**row** [1] - 532:6
**royalties** [5] - 457:5, 541:15, 542:1, 543:8
**ruin** [1] - 571:4

**rule** [1] - 442:23
**rules** [4] - 436:10, 439:11, 439:13, 459:20
**ruling** [1] - 439:3
**run** [1] - 557:9
**runs** [1] - 449:7
**rupture** [1] - 427:7
**rush** [2] - 541:7, 542:24
**rushing** [1] - 542:9

## S

**sad** [1] - 565:21
**safe** [2] - 447:1, 556:24
**safely** [1] - 425:8
**safety** [1] - 441:7
**sake** [1] - 507:19
**sale** [2] - 449:25, 451:18
**sales** [5] - 402:15, 406:24, 406:25, 465:17, 492:12
**salvo** [1] - 557:15
**sat** [2] - 449:3, 559:14
**satisfaction** [1] - 463:1
**satisfactory** [1] - 557:11
**satisfied** [3] - 513:4, 546:17, 548:21
**satisfies** [1] - 557:16
**satisfy** [6] - 478:21, 512:22, 527:10, 546:25, 547:5, 557:21
**Saturday** [1] - 564:3
**saw** [7] - 431:22, 432:3, 506:7, 522:3, 527:15, 534:8
**schedule** [57] - 419:16, 422:5, 427:21, 449:7, 449:13, 454:17, 473:13, 515:16, 515:18, 520:3, 521:13, 527:23, 527:25, 529:18, 530:7, 530:17, 530:21, 530:24, 531:4, 532:12, 532:25, 533:10, 533:16, 534:22, 535:3, 535:15, 536:1, 536:3, 536:16, 536:18, 536:20, 537:13, 537:23, 538:4,

538:11, 538:16, 539:3, 539:5, 539:9, 539:11, 546:6, 546:13, 548:6, 548:10, 548:11, 548:21, 552:1, 552:9, 552:16, 552:20, 552:23, 553:2, 554:17, 563:24, 566:14, 569:21

**scheduled** [1] - 540:21

**scheduling** [2] - 504:24, 566:7

**scope** [6] - 474:9, 495:11, 503:7, 503:10, 549:15, 551:13

**score** [1] - 433:22

**scores** [1] - 431:9

**screen** [10] - 434:2, 477:12, 488:4, 488:5, 488:6, 494:19, 498:2, 507:14, 545:6, 551:9

**scroll** [2] - 496:9, 496:18

**scrolled** [1] - 434:4

**se** [1] - 459:12

**SEAL** [1] - 391:14

**seal** [1] - 436:21

**searching** [1] - 471:22

**second** [28] - 393:6, 393:8, 393:24, 403:7, 423:24, 427:19, 436:4, 440:15, 464:5, 464:14, 477:24, 486:4, 486:15, 491:18, 494:15, 496:3, 500:22, 524:18, 524:23, 529:2, 532:3, 542:15, 542:18, 548:19, 549:2, 550:10, 553:10, 554:8

**Second** [1] - 390:15

**seconds** [1] - 464:3

**section** [7] - 466:15, 489:2, 489:16, 494:14, 494:24, 503:9, 525:2

**Section** [5] - 494:22, 496:25, 499:1, 500:14, 512:21

**see** [40] - 403:18, 421:14, 424:18, 431:11, 432:13,

434:3, 434:8, 439:23, 445:12, 470:11, 477:12, 477:17, 488:6, 488:8, 496:18, 497:23, 499:12, 506:3, 509:5, 509:10, 513:16, 513:24, 515:8, 519:25, 521:14, 526:3, 531:2, 545:6, 545:14, 548:1, 548:2, 548:3, 548:23, 557:16, 557:25, 558:12, 559:20, 568:1, 569:3, 569:8

**seeing** [2] - 445:2, 562:6

**seek** [1] - 457:4

**seeking** [2] - 426:24, 535:12

**seem** [2] - 442:17, 537:24

**selectively** [1] - 573:4

**sell** [3] - 408:2, 465:4, 531:20

**selling** [4] - 408:2, 450:23, 450:25, 465:10

**sells** [3] - 495:3, 499:5, 499:17

**send** [4] - 433:15, 459:19, 502:7, 556:9

**sending** [2] - 480:13, 519:14

**sense** [3] - 507:5, 540:1, 556:4

**sent** [15] - 423:21, 430:22, 445:13, 473:9, 476:12, 477:10, 500:25, 501:25, 502:3, 506:9, 507:8, 533:24, 539:8, 542:8, 555:19

**separate** [2] - 500:12, 500:13

**September** [25] - 425:11, 425:19, 429:20, 432:16, 440:12, 444:4, 444:15, 444:17, 445:6, 461:22, 488:12, 489:12, 497:15, 500:18, 501:9, 501:22, 502:16, 502:23, 504:8, 504:11, 506:6, 546:19,

546:25, 547:5

**september** [1] - 505:10

**seriously** [1] - 437:7

**serve** [2] - 462:1, 462:3

**services** [6] - 427:3, 427:8, 427:11, 427:15, 427:17, 495:4

**set** [5] - 463:2, 526:15, 526:16, 563:24, 567:19

**seven** [5] - 432:20, 462:7, 463:2, 463:11, 502:24

**several** [4] - 434:23, 449:16, 461:18, 472:11

**severely** [1] - 473:23

**shaking** [1] - 545:6

**shape** [1] - 446:7

**share** [11] - 393:14, 402:1, 434:2, 443:12, 488:4, 498:2, 509:23, 520:16, 550:21, 551:9, 551:10

**sheet** [7] - 509:22, 510:4, 520:7, 520:8, 521:8, 524:1, 526:2

**sheets** [2] - 402:16, 407:2

**shelf** [2] - 441:1, 441:8

**short** [11] - 431:12, 431:19, 446:19, 478:9, 557:9, 558:17, 560:5, 561:8, 566:19, 567:18, 568:20

**shorten** [2] - 508:14, 509:9

**shorter** [1] - 436:4

**shortfall** [6] - 547:19, 547:22, 547:25, 548:4, 548:10, 552:13

**shorting** [1] - 566:17

**shortly** [1] - 550:11

**shoulder** [2] - 417:15

**shoulder-to-shoulder** [1] - 417:15

**shove** [1] - 570:21

**show** [36] - 417:16, 417:17, 434:2, 439:22, 457:22, 457:25, 488:3, 494:11, 495:21, 496:5, 497:24, 498:25, 503:22,

511:24, 512:5, 514:1, 519:21, 523:25, 525:22, 527:1, 527:4, 530:19, 538:14, 539:7, 539:17, 541:22, 542:23, 543:3, 545:1, 545:3, 545:14, 547:21, 547:24, 556:9, 560:10

**showed** [4] - 495:24, 506:18, 552:12, 552:18

**showing** [5] - 393:15, 457:22, 489:14, 490:1, 542:25

**shown** [2] - 512:4, 519:23

**shows** [6] - 434:2, 527:3, 531:5, 532:7, 543:6, 556:10

**Shumaker** [1] - 390:7

**shut** [3] - 426:3, 444:19, 458:20

**side** [5] - 452:16, 465:10, 507:20, 554:6, 554:15

**sides** [1] - 565:10

**sign** [11] - 410:14, 411:17, 508:19, 508:22, 508:24, 508:25, 522:12, 522:17, 526:16, 526:17, 551:1

**signature** [2] - 496:13, 519:15

**signed** [15] - 408:12, 411:5, 508:23, 513:13, 519:18, 521:2, 526:11, 526:12, 526:25, 527:8, 527:13, 528:8, 528:15, 533:3, 533:7

**significance** [3] - 506:24, 524:25, 530:23

**significant** [5] - 419:14, 431:11, 558:19, 558:24, 559:1

**significantly** [1] - 447:16

**signing** [13] - 408:16, 409:1, 409:4, 411:16, 470:4, 493:3, 519:14, 520:22, 523:22, 526:19, 534:5,

537:3, 539:8

**similar** [2] - 472:11, 495:18

**simple** [4] - 438:5, 472:6, 564:13, 565:22

**simply** [7] - 448:23, 484:14, 489:7, 490:19, 512:18, 544:23, 566:1

**simultaneous** [3] - 567:9, 568:20, 569:4

**Singh** [1] - 483:17

**single** [1] - 568:11

**sit** [1] - 475:13

**site** [3] - 406:19, 521:25, 522:10

**sites** [2] - 521:25, 523:16

**sitting** [2] - 419:8, 466:10

**situation** [4] - 425:1, 430:5, 461:24, 564:22

**situations** [1] - 462:8

**six** [9] - 502:24, 506:24, 546:24, 547:4, 547:19, 548:23, 548:24, 552:19, 564:24

**skirt** [1] - 442:16

**Slices** [9] - 403:2, 555:3, 555:5, 555:20, 555:23, 556:16, 557:20, 558:5, 558:6

**Slices'** [1] - 555:9

**slowly** [2] - 496:19, 509:12

**smaller** [3] - 393:15, 403:5, 499:16

**smart** [3] - 419:12, 421:5, 486:20

**Sold** [1] - 531:8

**sold** [3] - 403:3, 492:9, 531:10

**solicited** [1] - 407:8

**soliciting** [1] - 407:5

**someone** [7] - 409:5, 436:17, 437:4, 439:10, 442:25, 444:6, 549:12

**sometime** [1] - 525:20

**sometimes** [2] - 545:1, 545:2

**somewhat** [1] - 480:20

**somewhere** [1] - 448:1

**soon** [2] - 540:12,

*555*:11

**sooner** *[1]* - 429:3

**sophisticated** *[1]* - 418:23

**sophistication** *[1]* - 418:4

**sophistry** *[1]* - 552:4

**sorry** *[32]* - 392:14, 404:14, 408:20, 411:14, 424:24, 426:3, 432:14, 434:12, 434:17, 435:5, 442:2, 442:3, 444:17, 462:13, 474:18, 485:6, 488:4, 489:10, 491:9, 492:20, 494:15, 496:2, 509:15, 526:23, 530:14, 542:2, 542:14, 542:24, 545:1, 545:3, 545:4, 549:12

**sort** *[6]* - 417:7, 417:23, 422:20, 523:22, 539:12, 573:7

**soul** *[1]* - 572:20

**sounds** *[5]* - 473:19, 535:20, 558:11, 564:2, 564:16

**source** *[1]* - 480:20

**South** *[1]* - 390:18

**Southeast** *[1]* - 390:15

**space** *[1]* - 499:22

**speaking** *[4]* - 471:1, 485:1, 493:10, 536:7

**specialized** *[1]* - 419:17

**specific** *[11]* - 436:24, 452:21, 453:11, 458:3, 459:21, 480:4, 485:22, 487:8, 487:9, 487:12, 536:1

**specifically** *[17]* - 405:2, 411:4, 411:15, 412:9, 429:8, 449:18, 465:9, 476:10, 479:14, 480:4, 488:11, 504:10, 512:1, 513:20, 527:19, 527:24, 529:20

**specifics** *[3]* - 428:22, 438:19, 450:22

**speculate** *[1]* - 406:2

**speculation** *[5]* - 405:25, 406:15,

*411*:10, 463:4, 553:25

**speculative** *[1]* - 410:23

**speed** *[2]* - 444:11, 450:13

**spell** *[1]* - 517:18

**spend** *[3]* - 565:19, 565:21, 571:15

**spent** *[1]* - 558:8

**Spielbusch** *[1]* - 389:16

**Spring** *[1]* - 403:7

**spring** *[1]* - 473:17

**Stacey** *[19]* - 389:15, 392:8, 392:11, 394:9, 451:14, 466:16, 474:18, 485:6, 498:8, 536:7, 536:13, 562:21, 563:5, 563:7, 564:3, 573:7, 573:10, 573:13, 573:25

**STACEY** *[1]* - 573:25

**staff** *[1]* - 479:13

**stage** *[1]* - 555:15

**stake** *[1]* - 557:22

**stamp** *[2]* - 440:25, 441:6

**stamped** *[1]* - 443:25

**Stanbridge** *[7]* - 475:14, 475:21, 475:24, 476:9, 476:15, 477:3, 477:8

**stand** *[3]* - 448:14, 563:22, 573:18

**standard** *[4]* - 441:4, 473:15, 522:14, 529:13

**standards** *[3]* - 445:16, 463:2, 477:5

**stands** *[3]* - 462:7, 525:11, 531:3

**start** *[4]* - 438:10, 509:2, 509:20, 545:4

**started** *[4]* - 464:9, 473:5, 473:21, 555:9

**starting** *[1]* - 545:10

**starts** *[3]* - 509:21, 510:3, 510:4

**state** *[6]* - 441:1, 466:10, 517:15, 520:14, 561:4, 566:9

**statement** *[5]* - 421:16, 454:2, 456:5, 459:12, 551:24

**statements** *[5]* - 407:1, 426:18, 461:9, 488:25,

*490*:21

**states** *[2]* - 393:24, 547:3

**STATES** *[2]* - 389:1, 389:11

**States** *[1]* - 389:16

**stating** *[2]* - 548:17, 555:7

**statistics** *[1]* - 424:17

**status** *[1]* - 546:12

**stay** *[1]* - 394:6

**stenography** *[1]* - 389:22

**stenotype** *[1]* - 573:24

**step** *[6]* - 463:24, 464:4, 464:9, 472:24, 479:17, 555:8

**stepped** *[1]* - 540:14

**stepping** *[1]* - 540:14

**steps** *[4]* - 489:22, 557:12, 558:1, 558:12

**sticker** *[2]* - 440:25, 442:21

**still** *[14]* - 406:15, 432:8, 433:12, 435:13, 443:14, 448:24, 493:4, 513:2, 540:19, 556:11, 556:18, 557:8, 564:11

**Stilwell** *[2]* - 473:12, 473:23

**stipulate** *[7]* - 444:13, 471:9, 489:4, 513:1, 514:20, 516:10

**stipulated** *[3]* - 443:15, 448:3, 477:10

**stipulates** *[1]* - 487:17

**stipulation** *[6]* - 444:10, 444:25, 446:12, 448:8, 489:7, 509:4

**stop** *[1]* - 485:1

**store** *[54]* - 419:13, 421:11, 422:21, 424:18, 424:21, 425:7, 426:3, 430:20, 431:13, 431:14, 432:12, 434:4, 437:15, 444:19, 445:11, 445:12, 446:6, 456:15, 457:3, 476:2, 477:7, 500:23, 500:25, 510:5, 511:1, 511:5, 511:24, 513:22,

*514*:2, 521:10, 522:3, 522:14, 522:21, 523:2, 525:23, 525:25, 526:12, 526:14, 526:20, 531:11, 531:23, 532:5, 533:4, 544:4, 544:15, 544:22, 544:23, 545:18, 546:3, 546:21

**Store** *[1]* - 524:3

**store's** *[1]* - 406:24

**store-level** *[2]* - 430:20, 500:23

**stored** *[1]* - 440:24

**stores** *[53]* - 420:15, 420:19, 422:4, 422:17, 423:4, 423:5, 425:12, 425:18, 426:2, 430:1, 430:5, 430:14, 432:15, 444:14, 445:9, 446:2, 454:20, 500:24, 501:12, 510:11, 511:16, 512:18, 512:20, 512:22, 513:11, 513:22, 520:11, 521:7, 521:11, 522:8, 528:4, 533:17, 533:21, 539:9, 539:19, 539:22, 540:2, 544:12, 546:2, 546:17, 546:24, 547:4, 547:19, 548:20, 548:23, 548:24, 549:19, 550:1, 550:3, 550:6, 551:5, 552:19, 553:7

**story** *[1]* - 511:25

**Street** *[3]* - 390:8, 390:15, 390:18

**stretch** *[1]* - 491:20

**stricken** *[3]* - 403:15, 459:6, 460:14

**strike** *[3]* - 449:21, 461:4, 554:20

**struck** *[1]* - 431:7

**structure** *[1]* - 408:5

**subject** *[6]* - 394:8, 437:21, 437:22, 438:23, 439:1, 445:2

**submission** *[3]* - 567:15, 567:20, 569:18

**submit** *[4]* - 528:16, 561:16, 563:18,

*568*:24

**submitted** *[7]* - 393:22, 445:6, 514:10, 560:24, 563:23, 566:2, 569:4

**submitting** *[1]* - 562:23

**subsequent** *[1]* - 461:23

**substantial** *[1]* - 460:9

**substantially** *[1]* - 448:9

**substantiate** *[1]* - 508:13

**substantiates** *[1]* - 476:6

**substantive** *[3]* - 502:16, 502:22, 505:6

**Subway** *[2]* - 407:22, 407:25

**succinctly** *[1]* - 427:16

**sufficient** *[5]* - 421:19, 440:8, 447:6, 482:19, 529:1

**suggest** *[7]* - 444:9, 484:7, 484:22, 486:14, 527:7, 528:3, 570:15

**suggested** *[3]* - 506:23, 508:10, 557:12

**suggesting** *[2]* - 438:12, 453:22

**suggestion** *[4]* - 506:21, 509:4, 557:23, 572:16

**suggests** *[1]* - 457:25

**suit** *[1]* - 558:7

**Suite** *[2]* - 389:16, 390:18

**suiting** *[1]* - 561:8

**summarize** *[1]* - 546:12

**summarizes** *[1]* - 443:4

**summary** *[10]* - 519:24, 520:7, 520:8, 520:12, 520:16, 521:8, 524:10, 524:11, 526:2, 526:24

**sun** *[2]* - 572:2, 572:4

**Sunday** *[4]* - 565:11, 571:8, 571:16, 571:18

**supervised** *[1]* - 406:9

**supervises** *[2]* - 432:20, 432:24

**supervisor** [1] - 518:19
**supervisory** [1] - 534:13
**support** [8] - 417:1, 436:20, 452:19, 460:7, 481:10, 481:15, 561:11, 563:18
**supporting** [1] - 446:4
**suppose** [2] - 410:22, 448:11
**supposed** [7] - 417:17, 476:1, 482:11, 482:24, 483:14, 538:10, 548:22
**surprise** [1] - 514:9
**survive** [1] - 557:6
**survives** [1] - 492:23
**suspect** [3] - 401:13, 403:9, 480:20
**sustain** [5] - 406:4, 438:7, 438:21, 439:19, 461:4
**sustained** [6] - 453:25, 454:7, 455:19, 460:15, 534:2, 554:2
**sworn** [1] - 517:11
**symptoms** [1] - 421:19
**synthesize** [1] - 561:10
**System** [3] - 401:11, 461:20, 499:11
**system** [18] - 409:2, 418:13, 418:14, 418:16, 418:17, 418:23, 419:1, 419:15, 419:18, 421:3, 421:20, 421:21, 422:9, 422:11, 472:2, 477:6, 519:19, 555:10
**Systems** [1] - 418:9
**systems** [3] - 417:13, 418:13, 424:19

**T**

**table** [2] - 441:14, 547:11
**tabled** [1] - 557:1
**tagging** [1] - 392:5
**talks** [3] - 500:8, 520:16, 553:13
**Tankoos** [12] - 456:17, 456:18, 456:19,

457:3, 457:14, 459:2, 459:3, 460:2, 460:3, 460:7, 460:10, 461:13
**Tankooses** [1] - 458:13
**targets** [1] - 532:25
**taxes** [1] - 451:10
**teaching** [1] - 419:21
**team** [5] - 402:3, 421:25, 422:1, 519:13, 523:16
**team's** [1] - 546:1
**teamed** [1] - 506:12
**tear** [1] - 432:4
**technical** [1] - 447:9
**technically** [3] - 437:24, 528:10, 567:11
**technologically** [1] - 478:16
**technology** [4] - 393:7, 475:11, 476:2, 487:13
**tell-show-do** [1] - 417:16
**temperature** [1] - 422:3
**temperatures** [1] - 417:12
**ten** [1] - 420:16
**tend** [1] - 535:11
**tender** [1] - 428:7
**tendered** [2] - 493:18, 493:19
**Tenn** [9] - 555:3, 555:5, 555:9, 555:20, 555:22, 556:16, 557:20, 558:5, 558:6
**Tennessee** [1] - 403:2
**tenure** [1] - 417:6
**term** [8] - 404:3, 456:22, 456:23, 457:1, 457:5, 457:24, 533:5, 533:8
**terminated** [1] - 492:16
**terminating** [1] - 461:13
**termination** [5] - 428:8, 429:8, 457:6, 492:23, 493:23
**terminology** [1] - 441:6
**terms** [21] - 405:6, 428:22, 481:13, 482:9, 495:8, 519:13, 520:10, 520:12, 523:13,

535:12, 537:12, 559:9, 562:14, 563:7, 563:8, 564:22, 565:1, 565:5, 569:1, 569:10, 573:13
**territories** [12] - 405:17, 432:23, 433:3, 433:7, 449:24, 450:7, 450:10, 451:25, 453:8, 453:10, 542:3
**territory** [30] - 401:17, 402:17, 402:22, 406:8, 406:20, 419:21, 450:24, 451:1, 451:3, 451:17, 453:5, 454:13, 454:21, 454:22, 471:14, 471:18, 510:11, 526:10, 531:16, 539:20, 539:24, 543:7, 544:5, 544:14, 544:15, 544:23, 544:24, 547:5, 547:15, 552:14
**testified** [30] - 403:16, 407:21, 408:10, 417:5, 427:12, 427:16, 442:10, 454:16, 461:19, 465:3, 469:3, 470:2, 474:23, 481:12, 489:11, 492:7, 501:21, 510:15, 511:6, 511:7, 511:11, 511:16, 512:2, 512:20, 533:25, 534:25, 535:6, 547:12, 551:19, 554:4
**testify** [17] - 406:1, 447:25, 466:5, 470:5, 470:18, 471:6, 471:8, 475:23, 488:25, 495:10, 510:19, 513:4, 535:8, 535:14, 537:5, 547:11, 551:19
**testifying** [2] - 435:16, 459:7
**testimony** [62] - 402:6, 403:17, 408:7, 409:13, 409:20, 412:14, 436:2, 438:4, 439:9, 440:12, 444:11, 448:7, 451:24,

454:18, 456:10, 456:12, 456:14, 466:9, 469:6, 469:16, 469:22, 470:8, 470:10, 470:25, 471:17, 471:25, 473:11, 474:13, 475:13, 475:16, 501:24, 502:1, 503:2, 503:4, 503:14, 508:20, 509:8, 511:16, 512:18, 513:3, 515:7, 515:15, 515:19, 516:1, 524:19, 529:17, 529:25, 535:10, 536:25, 540:2, 541:14, 545:16, 547:14, 554:8, 554:11, 554:13, 554:14, 559:2, 560:12, 566:6, 568:23
**Texas** [1] - 403:7
**THE** [249] - 389:11, 392:5, 392:9, 392:11, 393:9, 394:3, 394:8, 403:19, 404:7, 404:22, 405:5, 406:4, 406:16, 408:8, 408:23, 409:6, 409:12, 410:6, 410:22, 411:12, 412:15, 423:13, 423:17, 426:12, 427:9, 428:9, 428:11, 428:14, 428:25, 435:18, 435:24, 436:12, 437:9, 437:21, 438:6, 439:8, 439:18, 440:5, 440:16, 441:17, 441:19, 442:13, 443:6, 443:17, 443:20, 444:12, 444:16, 444:23, 445:2, 446:14, 446:20, 447:1, 447:5, 447:11, 447:18, 447:22, 448:5, 448:13, 450:3, 450:11, 450:15, 452:8, 452:24, 453:25, 454:4, 455:19, 455:24, 457:11, 457:15, 458:7, 458:16,

459:8, 459:14, 459:17, 460:12, 460:15, 462:15, 463:7, 463:14, 463:18, 463:22, 464:1, 464:6, 464:8, 466:16, 469:23, 470:9, 474:16, 477:1, 478:11, 478:14, 478:15, 481:3, 483:9, 484:9, 485:5, 486:4, 486:25, 487:3, 488:23, 489:8, 490:7, 490:9, 491:3, 491:6, 491:8, 491:10, 491:20, 492:3, 493:13, 493:21, 494:3, 495:10, 497:8, 498:9, 501:17, 502:1, 502:5, 503:11, 505:2, 505:24, 506:5, 507:1, 507:6, 507:11, 507:15, 507:18, 507:22, 508:23, 509:1, 509:2, 509:17, 509:23, 510:2, 510:21, 512:16, 513:6, 514:17, 514:25, 515:2, 515:5, 515:10, 516:3, 516:7, 516:12, 516:15, 516:21, 516:24, 517:1, 517:3, 517:7, 517:8, 517:13, 517:16, 517:17, 517:19, 517:20, 517:22, 517:23, 530:2, 532:18, 532:22, 534:2, 535:5, 535:11, 536:7, 536:10, 536:23, 537:6, 537:10, 537:18, 537:21, 540:5, 540:11, 540:18, 541:2, 541:4, 541:8, 541:11, 542:10, 543:16, 543:18, 543:21, 546:9, 547:16, 548:14, 549:4, 549:16, 549:21, 550:12, 550:17, 551:16, 554:2, 554:12, 554:23, 554:25, 555:13, 555:21,

556:5, 556:24,
557:4, 558:11,
558:25, 559:24,
560:16, 560:19,
561:7, 561:18,
562:3, 562:12,
562:16, 563:4,
563:6, 563:11,
564:5, 564:15,
564:19, 564:21,
565:16, 565:25,
566:15, 566:17,
567:8, 567:13,
567:15, 567:18,
568:14, 568:17,
568:25, 569:15,
570:1, 570:6,
570:17, 570:23,
571:1, 571:5,
571:11, 571:20,
571:24, 572:2,
572:8, 572:12,
572:15, 572:18,
572:20, 573:2,
573:10, 573:13,
573:17
*theirs* [1] - 409:16
*themselves* [3] -
417:22, 420:21,
440:4
*then-current* [1] -
493:20
*theory* [2] - 512:7,
512:8
*thereabouts* [1] -
529:3
*therefore* [3] - 422:8,
557:8, 559:2
*therein* [1] - 489:1
*they've* [5] - 407:8,
422:15, 523:1,
555:7, 555:8
*Thiem* [1] - 390:17
*third* [18] - 393:24,
426:7, 449:7, 449:8,
449:13, 449:14,
453:20, 486:8,
486:15, 487:2,
492:12, 500:5,
513:11, 531:25,
553:2, 553:23,
554:18, 561:25
*Third* [1] - 390:18
*third-party* [1] -
492:12
*thoughts* [1] - 559:5
*threatened* [1] - 428:7
*three* [29] - 425:24,
427:20, 427:23,
431:14, 431:15,

431:17, 432:6,
433:14, 444:14,
444:20, 446:1,
457:20, 460:21,
465:15, 473:1,
509:19, 510:13,
531:7, 549:25,
550:3, 550:6, 551:5,
553:17, 559:14,
560:11, 564:23,
565:1, 565:13, 566:6
*threw* [1] - 541:7
*THROUGH* [4] -
391:15, 391:16,
391:16, 391:17
*throughout* [1] -
465:12
*thrown* [2] - 441:24,
442:5
*THURSDAY* [1] -
389:6
*Thursday* [8] - 560:21,
560:22, 565:13,
566:23, 570:13,
570:21, 570:24,
572:4
*thursday* [1] - 392:1
*tight* [1] - 560:20
*timeline* [3] - 473:20,
563:21, 565:4,
566:19, 567:18
*timing* [4] - 428:20,
436:11, 535:12,
565:7
*title* [1] - 430:7
*Title* [1] - 540:20
*today* [15] - 447:6,
455:1, 455:6,
461:24, 462:5,
463:3, 522:13,
529:22, 539:19,
539:21, 540:8,
540:21, 560:2,
560:10, 560:11
*Todd* [4] - 390:21,
502:9, 518:20,
518:25
*toes* [1] - 463:24
*Toledo* [3] - 389:4,
389:17, 390:8
*tomorrow* [4] - 560:5,
560:25, 561:17,
569:19
*tony* [1] - 390:20
*took* [7] - 435:9,
435:18, 437:25,
472:14, 489:22,
490:17, 516:22
*tool* [4] - 418:24,
418:25, 419:18,

421:3
*tools* [3] - 418:17,
422:4, 446:5
*top* [6] - 427:23,
473:9, 505:16,
527:1, 527:14, 531:2
*topic* [2] - 446:18,
449:12
*torn* [4] - 431:25,
432:1, 432:4, 434:22
*tortious* [1] - 556:16
*Total* [1] - 531:13
*total* [7] - 454:24,
519:1, 526:14,
531:15, 543:7,
543:9, 543:10
*touch* [1] - 418:12
*toward* [2] - 544:10,
544:18
*towards* [4] - 522:10,
525:7, 527:24,
532:24
*track* [3] - 446:21,
447:12, 448:1
*trained* [3] - 422:1,
479:6, 482:7
*training* [29] - 402:18,
417:7, 417:15,
419:17, 423:1,
431:13, 431:15,
431:16, 431:20,
465:9, 465:11,
465:15, 465:16,
465:19, 479:1,
479:4, 479:12,
480:6, 480:16,
482:5, 482:8,
482:10, 482:18,
482:23, 484:11,
486:7, 486:14,
486:23
*transaction* [3] -
450:19, 450:22,
534:5
*transactions* [3] -
449:22, 451:16,
492:7
*TRANSCRIPT* [1] -
389:10
*transcript* [6] - 389:22,
394:10, 560:9,
562:14, 564:6,
573:23
*transcription* [1] -
389:23
*transcripts* [10] -
457:24, 558:20,
562:9, 562:17,
562:24, 563:17,
564:9, 572:25,

573:11
*tremendous* [1] -
431:12
*TRO* [10] - 426:11,
460:20, 460:21,
559:8, 560:21,
561:14, 563:12,
563:24, 566:21,
569:21
*trouble* [2] - 427:23,
478:12
*true* [5] - 424:5,
466:11, 475:17,
490:25, 551:20
*truly* [1] - 450:12
*trust* [4] - 402:13,
402:20, 426:21,
427:7
*trustee* [1] - 556:12
*trusting* [1] - 462:6
*truth* [1] - 456:3
*truthful* [1] - 424:11
*truthfully* [1] - 424:4
*try* [10] - 393:14,
429:16, 445:3,
448:10, 454:5,
478:16, 536:10,
546:12, 566:19,
573:9
*trying* [19] - 442:11,
446:8, 461:6, 484:4,
484:7, 484:20,
484:22, 490:3,
498:1, 506:3, 516:9,
536:19, 541:6,
542:24, 552:2,
554:8, 564:21,
567:1, 567:2
*Tucker* [1] - 390:18
*Tuesday* [4] - 559:9,
560:22, 565:3, 565:6
*turn* [7] - 491:21,
494:7, 496:12,
537:10, 557:20,
562:1, 562:21
*turned* [1] - 573:8
*two* [33] - 403:1,
409:25, 411:25,
428:10, 441:1,
442:4, 442:6,
442:12, 444:25,
449:23, 451:15,
451:19, 453:17,
473:1, 491:18,
492:14, 502:25,
510:7, 511:18,
513:22, 518:25,
531:6, 531:21,
541:16, 542:3,
543:4, 543:10,

549:25, 550:6,
550:18, 551:4,
565:12
*type* [2] - 431:18,
521:3
*typed* [3] - 432:7,
432:10, 524:3
*types* [1] - 431:11,
473:6
*typical* [1] - 445:14

**U**

*ultimate* [1] - 458:5
*ultimately* [1] - 459:2
*unable* [1] - 422:25
*unambiguous* [1] -
552:4
*unapproved* [2] -
475:11, 477:6
*Unauthorized* [1] -
500:5
*unchanged* [1] - 497:4
*unclear* [1] - 493:7
*uncommon* [1] -
567:19
*UNDER* [1] - 391:14
*under* [42] - 393:22,
406:12, 411:9,
420:3, 427:14,
439:12, 448:25,
457:4, 457:19,
472:7, 474:1,
479:19, 499:11,
511:12, 511:17,
511:22, 512:2,
512:19, 512:23,
513:15, 513:18,
514:2, 522:9,
522:21, 524:7,
526:11, 527:11,
527:12, 527:20,
528:5, 530:8,
533:10, 538:3,
538:5, 539:12,
544:5, 545:17,
548:6, 549:19,
551:20, 554:17,
573:10
*underlying* [1] -
512:24
*underneath* [1] -
531:5
*understandings* [1] -
547:12
*understood* [4] -
403:16, 460:6,
478:17, 523:15
*undertake* [2] - 475:2,
540:23

**undertaken** [1] - 479:3
**undertaking** [1] - 479:4
**underutilized** [1] - 419:1
**unfortunately** [1] - 501:18
**unilaterally** [1] - 474:1
**unit** [4] - 417:20, 441:15, 471:9, 521:17
**UNITED** [2] - 389:1, 389:11
**United** [1] - 389:16
**units** [1] - 553:17
**unless** [2] - 555:23, 557:8
**unspecifically** [1] - 479:15
**unstable** [1] - 536:12
**untenable** [2] - 472:16, 564:22
**up** [68] - 408:12, 410:14, 412:7, 420:6, 421:8, 422:22, 423:21, 424:1, 424:3, 424:10, 424:22, 425:2, 425:12, 426:5, 426:18, 426:19, 426:22, 427:5, 430:13, 431:6, 431:7, 440:20, 444:1, 445:9, 477:15, 486:13, 487:11, 488:5, 494:12, 494:16, 494:19, 499:8, 499:25, 500:1, 501:5, 505:1, 506:3, 508:14, 509:9, 512:8, 515:14, 519:22, 519:23, 524:24, 526:15, 526:16, 527:14, 528:7, 530:5, 531:13, 532:3, 536:8, 541:23, 542:11, 545:6, 547:8, 550:19, 558:12, 560:17, 565:3, 568:7, 569:16, 571:9, 572:4, 572:17, 572:25, 573:9
**upload** [1] - 435:21
**uploaded** [3] - 433:17, 433:19, 435:22
**upper** [1] - 488:8

**ups** [1] - 461:22
**upset** [1] - 460:8
**useful** [1] - 562:13

## V

**vaguely** [1] - 516:18
**valid** [1] - 490:17
**validity** [2] - 438:12, 490:10
**value** [1] - 450:9
**valued** [2] - 450:7, 450:8
**valuing** [1] - 451:3
**various** [3] - 440:10, 530:22, 573:11
**vendors** [1] - 475:11
**veracity** [3] - 425:2, 488:25, 490:20
**verified** [1] - 501:12
**verifies** [1] - 418:13
**verify** [2] - 425:2, 425:7
**verifying** [1] - 502:14
**version** [1] - 493:2
**versus** [3] - 418:1, 424:17, 431:9
**vice** [1] - 539:1
**VIDEO** [1] - 389:10
**video** [5] - 465:24, 466:2, 466:5, 557:24
**videos** [2] - 465:22, 465:25
**view** [9] - 402:8, 411:11, 424:1, 424:2, 424:25, 452:3, 461:1, 514:1, 566:19
**violated** [1] - 503:17
**violation** [2] - 426:11, 472:2
**visit** [10] - 419:6, 425:10, 440:14, 442:10, 479:13, 480:16, 482:5, 482:24, 486:7, 486:24
**visited** [3] - 425:18, 432:15, 442:12
**Visits** [1] - 500:5
**visits** [11] - 418:9, 424:10, 425:18, 429:20, 431:7, 433:14, 440:11, 461:22, 478:23, 500:12
**vital** [1] - 402:14
**VOLUME** [1] - 389:7
**volumes** [1] - 402:15
**vs** [1] - 389:6

## W

**W-e-i-s** [1] - 517:22
**wait** [5] - 458:10, 509:12, 515:4, 557:15
**waiving** [1] - 394:1
**walked** [2] - 459:3, 459:10
**Walker** [1] - 454:10
**walker** [4] - 454:20, 455:7, 456:3, 456:5
**Walker's** [1] - 455:4
**walking** [1] - 460:17
**wants** [6] - 406:1, 481:6, 486:18, 505:5, 564:2, 568:24
**Wasser** [7] - 432:17, 433:15, 436:5, 436:8, 437:14, 445:6, 447:24
**WATSON** [4] - 508:3, 515:1, 516:6, 516:8
**Watson** [6] - 390:21, 502:9, 502:14, 515:2, 518:20, 518:21
**ways** [2] - 568:8, 569:3
**wear** [1] - 432:4
**Weathers** [2] - 479:21, 482:17
**Weathers'** [1] - 479:19
**Wednesday** [3] - 570:22, 571:8, 571:21
**week** [9] - 490:24, 529:17, 530:6, 558:8, 560:23, 563:24, 566:25, 567:7, 570:18
**weekend** [3] - 565:21, 570:10, 571:4
**weekends** [1] - 565:18
**weeks** [1] - 528:24
**Weis** [30] - 436:8, 508:2, 508:12, 508:18, 508:19, 508:23, 510:19, 512:4, 513:4, 513:25, 514:22, 515:21, 517:4, 517:16, 517:20, 519:20, 526:9, 528:2, 529:16, 530:3, 533:14, 537:2, 538:2, 541:13, 543:24, 548:16, 549:5, 550:25, 552:8, 556:7

**WEIS** [4] - 391:11, 518:1, 543:22, 550:23
**Weis'** [4] - 474:5, 509:8, 513:2, 547:8
**WESTERN** [1] - 389:2
**whisper** [1] - 550:15
**whit** [1] - 572:20
**whoa** [1] - 504:14
**whole** [3] - 452:19, 461:23, 565:19
**willing** [2] - 444:13, 512:25
**winners** [1] - 406:19
**wiretap** [1] - 540:21
**wish** [1] - 443:3
**withdraw** [5] - 459:15, 462:11, 485:3, 555:5, 555:11
**WITNESS** [6] - 478:14, 509:1, 517:7, 517:16, 517:19, 517:22
**Witness** [1] - 517:11
**witness** [13] - 435:16, 436:4, 446:22, 448:4, 448:24, 460:25, 461:5, 506:2, 507:23, 514:12, 514:15, 515:13, 516:5
**witnesses** [1] - 507:24
**WITNESSES** [2] - 391:2, 391:6
**word** [9] - 492:21, 547:22, 547:23, 548:2, 548:4, 548:13, 552:12, 569:7, 569:16
**worded** [1] - 463:8
**words** [5] - 411:24, 426:18, 489:5, 526:10, 530:24
**workable** [1] - 561:19
**works** [3] - 456:9, 532:15, 563:8
**world** [1] - 499:20
**worries** [1] - 509:1
**worry** [1] - 570:1
**worth** [1] - 566:6
**write** [2] - 553:6, 562:7
**writing** [5] - 490:14, 490:20, 491:12, 558:22, 560:25
**written** [4] - 560:4, 562:11, 564:14, 567:10
**wrongdoing** [1] - 498:4
**wrote** [2] - 488:21,

504:8

## Y

**Year** [2] - 531:17, 531:18
**year** [13] - 462:8, 465:15, 470:4, 470:19, 518:9, 531:5, 531:15, 531:17, 546:2, 546:15, 551:22, 553:6, 566:13
**years** [23] - 417:6, 432:1, 432:4, 449:23, 451:15, 451:19, 452:17, 472:20, 472:21, 472:23, 472:25, 473:1, 473:2, 473:4, 492:14, 534:17, 535:4, 535:18, 538:3, 541:17, 542:3, 543:5
**yellow** [1] - 520:3
**yes/no** [1] - 418:12
**yesterday** [1] - 555:6
**yourself** [1] - 496:24

## Z

**zero** [1] - 457:23