UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


KAM Development, LLC,                                   Case No. 3:20-cv-2024

               Plaintiff,

      v.                                              CORRECTED MEMORANDUM
                                      OPINION AND ORDER

Marco's Franchising, LLC,

               Defendants.


## I.  INTRODUCTION AND PROCEDURAL BACKGROUND

This case presents a contract dispute between Plaintiff KAM Development, LLC and

Defendant Marco's Franchising, LLC ("MFLLC").  The parties entered into two separate Area

Representative Agreements ("ARAs"): the Columbia, South Carolina ARA ("Columbia ARA") on

September 10, 2010, and the Charlotte, North Carolina ARA ("Charlotte ARA") on December 7,

2011.  (Doc. No. 68-2 at 962).[1]  Under these ARAs, KAM was responsible for soliciting potential

franchisees for MFLLC and servicing existing MFLLC franchisees within a defined geographic area.

(Doc. No. 39 at 2).  In turn, KAM would receive a commission for each initial franchise fee paid to

MFLLC by its franchisees as well as some portion of royalties paid to MFLLC by those franchisees.

---

[1]  In support of its motion for summary judgment, MFLLC submitted a two-part appendix which is
separately and continuously paginated at the bottom center of each page.  (Doc. Nos. 68-1 & 68-2).
KAM cites to these appendices as well.  (*See* Doc. No. 74).  For ease of reference, I will also cite to
these appendix page numbers.

(*Id.*).  Each ARA provided for an initial term of ten years and permitted up to four additional five-year terms at KAM's option, subject to certain conditions being met at the time of renewal.  (*Id.*).

On May 14, 2020, KAM sent MFLLC written notice of its intent to renew the Columbia ARA.  (Doc. No. 50 at 8).  On July 24, 2020, MFLLC sent KAM a Notice of Deficiency, in which it identified several material defaults under both ARAs.  (Doc. No. 68-1 at 284-86).  This Notice of Deficiency also informed KAM that it was ineligible for renewal of the Columbia ARA and may result in default on the Charlotte ARA.  (*Id.* at 286).  KAM alleged it took all the required steps to cure the noted deficiencies and again notified MFLLC of its intent to renew the Columbia ARA.  (Doc. No. 50 at 9).  But on August 13, 2020, MFLLC sent KAM a Notice of Default regarding the Columbia ARA; the categories of default listed in this notice were not the same as those mentioned in the earlier Notice of Deficiency.  (Doc. No. 68-1 at 287-89).  KAM disputed the allegations of default and demanded renewal of the Columbia ARA, but MFLLC refused.  (*See* Doc. No. 50 at 9; Doc. No. 68 at 8).

As a result, on September 9, 2020, KAM filed a complaint seeking declaratory judgment that it was not in default of the Columbia ARA.  (Doc. No. 1).  The next day KAM moved for a preliminary injunction with temporary restraints.  (Doc. No. 5).  On September 11, 2020, I conducted a hearing and granted the temporary restraining order while holding in abeyance any ruling on the preliminary injunction.  (Doc. No. 10).[2]

KAM filed its first amended complaint on September 23, 2020, again seeking declaratory judgment on the Columbia ARA but also adding allegations regarding the Charlotte ARA.  (Doc. No. 13).  MFLLC had sent a Notice of Default for the Charlotte ARA on September 15, 2020.  (Doc. No. 68-2 at 290-93).  KAM also filed another motion for preliminary injunction.  (Doc. No. 18).

---

[2]  I also ordered KAM to file an amended complaint to address jurisdictional issues.  (Doc. No. 10).

Over the course of three days in October 2020, I held a hearing on KAM's two pending motions for preliminary injunction ("Injunction Hearing").[3]  On October 20, 2020, I denied KAM's motions for preliminary injunction.  (Doc. No. 39).  Particularly, I held that although the ARAs are distinct contracts, a condition precedent to renewal of the Columbia ARA was that there could not be a material default on any other agreements between KAM and MFLLC.  (*Id.* at 5; *see also* Doc. No. 68-1 at 60, § 2.2.2 "Area Representative shall not be in material default of any provision of this Agreement . . . or any other agreement between Area Representative and Franchisor or its subsidiaries and affiliates.").  I concluded, "[t]herefore, if KAM was in default on the Charlotte ARA, it would not be entitled to renewal of the Columbia ARA."  (Doc. No. 39 at 5).  After reviewing the evidence presented at the hearing, I concluded that KAM had not shown "a strong likelihood of establishing it was not in default of the Charlotte ARA."  (*Id.* at 7).

Following my ruling, MFLLC terminated the Charlotte ARA.  (Doc. No. 74 at 1).  On April 30, 2021, KAM filed a second amended complaint alleging breach of contract for MFLLC's termination of the two ARAs.  (Doc. No. 50).

MFLLC filed a motion for summary judgment on September 24, 2021.  (Doc. No.  68).  MFLLC's argument on summary judgment is that a material default on the Charlotte ARA precluded renewal of the Columbia ARA and that default dooms both of KAM's breach of contract claims.  (*Id.*).  KAM opposed the motion for summary judgment, (Doc. No. 74), and MFLLC replied.  (Doc. No. 75).  For the following reasons, I grant the motion in part and deny the motion in part.

---

[3]  I accepted documentary and testimonial evidence from both parties.  Andy Hunter testified on KAM's behalf and Tony Libardi and Ashley Weis testified for MFLLC.  The transcript of the hearing and testimony is available at Doc. Nos. 57-67.

## II.    FACTUAL BACKGROUND

### A.  Charlotte ARA terms

Of central concern in this case is KAM's development obligations.  Section 5.3 of the

Charlotte ARA requires KAM to develop stores in the territory pursuant to a development schedule

("ARA Schedule").  (Doc. No. 68-1 at 17).  The failure to meet the ARA Schedule "shall be a

default" for which MFLLC has "the right to terminate this [ARA] or, at [MFLLC's] sole option, to

revise: (a) [KAM's] Promotion Rights and Obligations; or (b) [KAM's] protected rights in the

Territory . . .."  (*Id.*).

 The ARA Schedule called for 29 stores to be open by the close of the third quarter of 2020.

(*Id.* at 55).  A store would count toward KAM's obligations under the ARA Schedule in three

circumstances: (a) the store is open and the initial franchise fee is fully earned by MFLLC; (b) the

store is not yet open, but the entire franchise fee has been paid; and (c) MFLLC has signed an Area

Development Agreement ("ADA")[4] in the territory and MFLLC has received a non-refundable

development fee of at least $5,000 per store to be developed.  (*Id.* at 17, § 5.3.2).  Stores counted

toward KAM's ARA Schedule pursuant to subsections (b) and (c) are referred to as "provisional

credits".  (Doc. No. 68-2 at 963).

But the Charlotte ARA provided restrictions as to when the provisional credits could be

utilized.  Specifically, the credit in (b) could only be used once during the term of the ARA; and the

credit provided in (c) would "expire if the developer does not meet its development obligations

under the development agreement."  (Doc. No. 68-1 at 17, § 5.3.2).

### B.  Events preceding dispute

Although the parties have a contractual relationship stretching over a decade, the relevant

story begins at the close of 2018.  On December 27, 2018, MFLLC sent KAM a Notice of Default

---

[4] This is a distinct contractual arrangement from an ARA.

and Termination for the Charlotte ARA for failure to meet the ARA Schedule.  (Doc. No. 74 at 7).

Pursuant to the ARA Schedule, KAM was to have 22 stores "open"[5] by the end of 2018, but it only

had 16 "open" stores, consisting of 15 operating stores and one signed franchise agreement that

qualified for a provisional credit under (b).  (Doc. No. 68-1 at 55, 215).  The December 2018 Notice

contained the following:

> [MFLLC] will withhold executing the termination of [the Charlotte ARA] for 45
> days, conditioned upon [KAM's] presentation of a plan acceptable to [MFLLC] at
> [KAM's] January business review.  It is anticipated that in order for [KAM's] plan to
> be accepted by [MFLLC], it will need to present a development program that will
> cure the development default by the end of 2019, and is reasonably achievable.

(Doc. No. 74 at 7).

Contemporaneous with the December 2018 Notice, MFLLC was in the process of entering

into an ADA with BDM, LLC to develop eight stores in the Columbia and Charlotte territories

otherwise assigned to KAM ("BDM Agreement").  (*See* Doc. No. 68-1 at 127-51).  The BDM

Agreement required BDM to open one store in 2019, two each in 2020 and 2021, and the remainder

of the stores in 2022 ("BDM Schedule").  (*Id.* at 128).  BDM paid the required Development Fee

($40,000 total: $5,000 per store) on January 22, 2019.  (*Id.*; *see also* Doc. No. 68-2 at 878-79).

Following receipt of the Development Fee, MFLLC retroactively applied the BDM provisional

credits under (c) to KAM's ARA Schedule and considered KAM to be compliant with its obligations

for 2018.  (Doc. No. 68-1 at 215).

This cure was also allegedly premised on KAM's submission of a development plan as

required by the December 2018 Notice.  (*See id.* and Doc. No. 74 at 7).  KAM disputes it ever

submitted a development plan to MFLLC, but nevertheless, on February 26, 2019, MFLLC

President and COO Tony Libardi sent a letter to KAM purporting to accept KAM's proposed

---

[5] For the purposes of this Memorandum Opinion and Order only, I use the term "open", as
designated by quotation marks, as a shorthand for a store that counts toward KAM's obligations
under the ARA Schedule.

development plan ("Libardi Letter").  (Doc. No. 68-1 at 215).  The new development plan required KAM: "Open 4 new units by December 31, 2019 . . . Open additional 3 new units by December 31, 2020 . . . [and] Open additional 4 new units by December 7, 2021 ([Charlotte] ARA expiration date) . . ." ("Libardi Schedule").  (*Id.*).  The Libardi Schedule purported to modify the timeline of KAM's development obligations under the ARA Schedule, but it did not remove KAM's ultimate obligation to develop 29 stores under the Charlotte ARA. (*Id.*) (". . . your approved plan requires you to complete the following in order to meet your total commitment of 29 stores").

Thus, going forward there are three relevant documents which bear upon the parties' relationship and affect KAM's development obligations – the Charlotte ARA, the BDM Agreement, and the Libardi Letter.

### C.  Store development in 2019

On December 20, 2019, Mr. Libardi sent a letter to KAM congratulating it for meeting its Libardi Schedule requirement of opening four stores in 2019.  (Doc. No. 68-1 at 219).

With these openings, KAM had 19 stores in operation in the Charlotte territory.  (Doc. No. 68-2 at 585).  KAM also counted Closed Store #8298 as satisfying the Charlotte ARA definition of "open", which allegedly brought their store total to 20.  (*Id.* at 586).[6]  In the event the ARA Schedule still mandated yearly store totals, KAM alleged it satisfied the 26-store requirement in 2019 by counting six provisional credits under the BDM Agreement.  (*Id.* at 587; *see also* Doc. No. 68-1 at 55).

The BDM Schedule required BDM to open one store in 2019.  (Doc. No. 68-1 at 128).  On January 22, 2019, the same day BDM paid its Development Fee, BDM also paid a $25,000 franchise fee for Denver #8525.  (Doc. No. 68-2 at 879; *see also* Doc. No. 68-1 at 155).  Denver #8525 falls within the BDM Agreement's development area.  (Doc. No. 74-3 at 36-37; Doc. No. 68-1 at 127).

---

[6] Although MFLLC disputes KAM's right to credit Closed Store #8298, for purposes of this motion only, it will be counted among the required totals. (*See* Doc. No. 68 at 4 n.2).

Denver #8525 opened in November 2019.  (Doc. No. 68-2 at 964).  It was the only store BDM opened that year.  (*Id.*).

But the parties dispute whether any provisional credits were available under the BDM Agreement because the Charlotte ARA stated such provisional credits "expire if the developer does not meet its development obligations under the development agreement."  (Doc. No. 68-1 at 17, § 5.3.2(c)).  In the December 2019 letter, Mr. Libardi stated BDM had failed to comply with the BDM Schedule for 2019 and thus, the provisional credits "have been removed."  (Doc. No. 68-1 at 219). Despite MFLLC's position that BDM had failed to meet its obligations in 2019, it did not terminate the BDM Agreement or remove its exclusive right to develop in certain areas within KAM's overall Charlotte territory.  (Doc. No. 74-3 at 59-60).

### D.  Store development in 2020

Recall that during the first part of 2020, the parties' relationship was worsening, MFLLC had refused KAM's requests to renew the Columbia ARA and in early September 2020, KAM filed the first iteration of this lawsuit and sought injunctive relief against MFLLC.

On September 15, 2020, MFLLC sent KAM a Notice of Default regarding the Charlotte ARA.  (Doc. No. 68-2 at 290-93).  The notice stated unless KAM could provide reasonable assurances that it would meet the Libardi Schedule obligations for 2020, the Charlotte ARA would be subject to termination.  (*Id.* at 291).  The notice also disavowed the availability of provisional credits to satisfy KAM's development obligations in 2020 stating, "because none of the 2019 openings were under [the BDM Agreement], KAM did not maintain the benefit of potential provisional credit related to [the BDM Agreement] (as specifically provided in the [Libardi Letter])." (*Id.*).

At the time the Notice of Default issued, KAM had only opened one new store in 2020 (Huntersville #8426).  (*Id.*; *see also* Doc. No. 68-2 at 294).  This brought its total of operating stores to 20.[7]  (Doc. No. 68-2 at 294).

KAM had also received a signed and paid-for franchise agreement for Publix #8562 that it argued could be counted as "open" under (b) of the Charlotte ARA.[8]  (Doc. No. 68-2 at 551-52). Publix #8526 did not open until July 2021. (*Id.* at 965-66).

KAM principal Andy Hunter stated that but for MFLLC's premature termination in October 2020, KAM was prepared to open another location by converting a former Jet's Pizza.  (Doc. No. 18-1 at 2-3).  MFLLC had approved the use of the existing equipment installed at the location, KAM had requested the franchise agreement from MFLLC, and Mr. Hunter asserted the store would have been operational by the end of 2020.  (*Id.* at 3; *see also* Doc. No. 68-2 at 426).

MFLLC asserts otherwise.  On September 10, 2020, MFLLC had a call with KAM about its development obligations for 2020.  (Doc. No. 75 at 13).  A week later, MFLLC produced an excel sheet which summarized KAM's current store developments in progress.  (*Id* at fn. 3; *see also* Doc. No. 75-1).  This document noted KAM anticipated signing the lease for the Jet's Pizza by November 29, 2020 and could have the store operational by May 2021.  (Doc. No. 75-1 at 3-10). KAM did not object to any of the listed dates as incorrect.  (*Id.* at 2).  A franchise agreement was not signed nor was a franchise fee ever paid for this location.  (Doc. No. 68-2 at 967).

### III.  STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of "informing the district court of the basis

---

[7] There also remained the issue of Closed Store #8298, which KAM asserted should count towards its store totals.  *See* fn. 5, above.

[8] Neither party makes mention of whether the provisional credit under (b) had already been utilized.

for its motion, and identifying those portions of 'the [record] . . . ,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). Ultimately, I must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## IV. ANALYSIS

The contracts at issue in this case are interpreted under Ohio law. (Doc. No. 68-1 at 46, 99, & 144). "'To establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract; (2) performance by plaintiff; (3) breach by defendant; and (4) damages or loss resulting from the breach.'" *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (quoting *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 104 N.E.3d 1076, 1083 (Ohio Ct. App. 2018)). MFLLC argues KAM did not fully perform on the Charlotte ARA and thus, cannot establish a breach of contract. *See Bryan v. Bank of Am. Home Loans Serv'g, LP*, No. 3:10 CV 959, 2011 WL 5526071, at *4 (N.D. Ohio Nov. 14, 2011) (a breach of contract claim cannot survive unless the plaintiff presents evidence that it has performed its own contractual obligations).

MFLLC's motion is premised upon application of the ARA Schedule despite acknowledging that prior to the Injunction Hearing, it operated under the assumption that the

Libardi Schedule controlled.  (Doc. No. 68 at 9).  This about-face arises from Mr. Hunter's testimony at the Injunction Hearing where he denied that the Libardi Schedule was an agreed upon amendment.  (*Id.*).  In opposition, KAM argues Mr. Hunter's testimony did not repudiate the Libardi Schedule.  And even if it did, the Libardi Schedule was a unilateral change imposed upon KAM by MFLLC under § 5.3 of the Charlotte ARA.  (*See* Doc. No. 74 at 9-11).

### A.  Mr. Hunter's testimony did not establish the Charlotte ARA controlled

MFLLC's position relies upon Mr. Hunter's alleged admission at the Injunction Hearing that KAM's development obligations were found in the Charlotte ARA.  Mr. Hunter disputed that KAM presented the plan in the Libardi Letter, (Doc. No. 68-2 at 477-78), and instead testified that the Libardi Letter was a unilateral notice from MFLLC that did not represent a mutual agreement between the parties.  (*Id.* at 187, 484).  He further testified KAM's obligations were found in "our agreement," which he confirmed was the Charlotte ARA.  (*Id.* at 484, 533-34, 542-43).

Nevertheless, there is conflicting testimony.  KAM cites to Mr. Hunter's testimony that after receiving the Libardi Letter, KAM's understanding of its obligations was to develop "four [stores] in '19, three in '20, and four in '21."  (Doc. No. 68-2 at 423-24).  Mr. Hunter further explained in response to MFLLC's questions:

> Q:  So KAM's position is that Mr. Libardi's letter was only a unilateral thing from Marco's and that KAM's only obligation is to be in compliance with the AR Agreement and the development schedule; correct?
>
> A:  Well, I think it's hard to put those two issues together, that from a legal perspective, my understanding is that we are bound to the Area Rep Agreement. From a practical perspective, there is constant communication between us and the franchisor and coming up with action plans and other types of plans, that, you know, we align to achieve certain goals.
>
> Q:  Okay.  But versus Mr. Libardi's February 26th letter and the AR Agreement and development schedule, KAM's obligation is comply with the AR Agreement's development schedule and not Mr. Libardi's letter; right?
>
> A:  I think, again, from a legal perspective, I believe so, yes.

(*Id.* at 534).

In general, lay witnesses are not qualified to make legal conclusions. *In re Dickson*, 655 F.3d 585, 592 fn.4 (6th Cir. 2011) (citing Fed. R. Evid. 701(c)). When determining if a witness can testify on such topics, the court asks if the term has a "separate, distinct and specialized meaning in the law different from that present in the vernacular. If [it does], exclusion is appropriate." *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) (finding error in permitting lay testimony on question of discrimination because "'discrimination' has specialized meaning in the law, and in lay use the term has a distinctly less precise meaning.").

Obligation is just such a term. Mr. Hunter was repeatedly questioned about KAM's obligations but as acknowledged by Black's Law Dictionary, "[t]he word has many wide and varied meanings." BLACK'S LAW DICTIONARY (11th ed. 2019). "It may refer to anything that a person is bound to do or forbear from doing, whether the duty is imposed by law, contract, promise, social relations, courtesy, kindness, or morality." *Id.* This general definition is followed by another that defines obligation in the legal and more specifically, contractual sense. *Id.*; *cf. United of Omaha Life Ins. Co. v. Kay*, 751 F. App'x 636, 639 (6th Cir. 2018) (recognizing obligation has different meaning in the legal and financial contexts). Thus, the meaning of obligation varies depending on the context and in a contractual sense, has a specialized legal meaning.

Since Mr. Hunter is not qualified to provide legal opinions, his testimony is not dispositive on which document controlled KAM's development obligations. *See Am.'s Collectibles Network, Inc. v. MIG Broad. Grp., Inc.*, 330 F. App'x 81, 91-92 (6th Cir. 2009) (finding defendant's CEO provided improper legal opinion in his lay testimony and such opinion was not dispositive of his liability).

## B. The Libardi Letter is not a formal amendment to the Charlotte ARA nor could MFLLC unilaterally amend the Charlotte ARA

For an amendment to be binding, § 20 of the Charlotte ARA requires the change to be "mutually agreed to by the parties and executed by their authorized officers or agents in writing."

11

(Doc. No. 68-1 at 45).  The Libardi Letter does not meet these requirements.  Mr. Hunter testified the Libardi Letter was not agreed between the parties but rather MFLLC's unilateral notice to KAM. (*See* Doc. No. 68-2 at 477-78, 481, 483-84, 533-34).  And on its face the Libardi Letter does not evidence KAM's agreement to the terms by way of the signature of an authorized representative. (Doc. No. 68-1 at 215-16).

Nevertheless, § 20 does not apply to those amendments that MFLLC is "permitted to [make] unilaterally[.]"  (*Id.* at 45).  Under § 5.3, if KAM failed to meet the ARA Schedule, MFLLC "at [its] sole option," could revise "(a) [KAM's] Promotion Rights and Obligations; or (b) [KAM's] protected rights in the Territory as set forth in § 1.4."  (*Id.* at 17).

Promotion Rights and Obligations are found at § 1.2 and require KAM to "diligently solicit, screen, and evaluate individuals and entities to become Franchisees to operate Stores at locations within the Territory."  (*Id.* at 4).  The "protected rights in the Territory" secures KAM's exclusivity by preventing MFLLC from operating stores within the territory or licensing another to operate stores within the territory.  (*Id.* at 5, § 1.4).  By their terms, neither of these allows MFLLC to unilaterally change KAM's ARA Schedule.

The surrounding context of § 5.3 supports this conclusion.  Section 5.3 states KAM "shall exercise the Promotion Rights and Obligations and meet the [ARA] Schedule . . .."  (*Id.* at 17).  The use of the conjunction "and" indicates that "Promotion Rights and Obligations" are distinct from the "[ARA] Schedule."  *See Sutton Bank v. Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 552 (Ohio 2020) ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results . . ..") (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978), paragraph two of the syllabus); *see also State v. Hensly*, 2023-Ohio-119, 2023 WL 195627, at *6 (Ohio Ct. App. Jan. 17, 2023) ("The word 'and' is conjunctive, while the word 'or' is disjunctive . . . Under the conjunctive/disjunctive canon, *and* combines items while *or* creates

alternatives . . .[W]hen 'and' is used, both of the words joined by 'and' must be satisfied.") (citing Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 116–25 (2012) and *Judy v. Ohio Bureau of Motor Vehicles*, 797 N.E.2d 45, 48 (Ohio 2003) (emphasis in original) (internal citations omitted)). The plain language of the contract does not permit MFLLC to make unilateral changes to the ARA Schedule.

Since there is no formal amendment codifying the Libardi Schedule per § 20 and as MFLLC does not have the authority to unilaterally alter the ARA Schedule per § 5.3, the ARA Schedule controls KAM's development obligations unless the parties modified those obligations through other means. While the issue of modification was not addressed on summary judgment by either party, KAM cited to multiple instances where MFLLC applied the Libardi Schedule and thus, it has identified a genuine issue of material fact regarding which document controlled its development obligations.

### C. Modification to the Charlotte ARA

 "Parties may implicitly modify an agreement by their actions. A continued, different 'course of performance' between parties manifests a modification of the original agreement." *St. Marys v. Auglaize Cnty. Bd. of Comm'rs*, 875 N.E.2d 561, 568 (Ohio 2007) (internal citations omitted); *see also Barclay Petroleum, Inc. v. Bailey*, 96 N.E.3d 811, 820 (Ohio Ct. App. 2017) ("A contract can be modified when there is clear and convincing evidence of the parties' mutual intent to modify the contract through their course of dealing."). Even if the contract requires amendments to be in writing, oral modifications may be demonstrated by a course of conduct. *Barclay*, 96 N.E.3d at 820; *see also Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.,* 210 F.3d 672, 687 (6th Cir. 2000) ("[C]ourse of conduct can be considered in certain respects notwithstanding a 'written changes only' contractual provision, because the series of acts in question are evaluated only as evidence regarding a continuity of the purpose captured by the original contractual terms at the time of formation.").

1. **Even if the parties' course of performance modified the deadline for KAM's compliance to the end of 2020, KAM cannot demonstrate full performance of its development obligations under the ARA Schedule**

Before analyzing whether the Libardi Letter is an enforceable modification, it makes sense to address KAM's argument that the parties' course of performance has modified the deadline for KAM's compliance from quarterly to yearly targets.[9]  KAM's course of performance argument is relevant for two reasons: first, it raises the question of whether KAM could have met the ARA Schedule by the close of 2020; and second, in the event it did, was MFLLC's termination in October 2020 premature.  (*See* Doc. No. 74 at 14-15).  MFLLC did not address KAM's argument in its Reply. (*See* Doc. No. 75).

At the Injunction Hearing, Mr. Hunter testified, "[t]hat the development schedules have always been looked at annually[,]" despite the fact that the written ARA Schedule laid out development targets by quarter.  (Doc. No. 68-2 at 544; *see also* Doc. No. 68-1 at 55).  Mr. Hunter explained, "[w]hen we signed up, . . . there was no discussion on this development schedule as far as meeting the quarterly numbers, that was more of a guideline."  (Doc. No. 68-2 at 545).  KAM also cited to MFLLC's corporate counsel Ashley Weis' deposition where she confirmed when presented with MFLLC's internal business documents that each showed tracking of store development obligations by year, and not quarters.  (Doc. No. 74-3 at 78-79; *see also* Doc. Nos. 74-4 & 74-5). While Ms. Weis' testimony does not speak directly to MFLLC's relationship with KAM, KAM's development obligations are tracked on these documents as yearly requirements.  (*See* Doc. Nos. 74-4 & 74-5).

---

[9] This argument is independent from any dispute about the Libardi Letter's enforceability which also would modify KAM's time for compliance to the end of 2020.

But even taking the evidence in a light most favorable to KAM and accepting its position that the development obligations were evaluated yearly, KAM cannot demonstrate it could fully perform its ARA Schedule obligations by December 31, 2020.

In February 2021, MFLLC served Requests for Admission to KAM.  (Doc. No. 68-2 at 968, 970-76).  KAM did not respond to these requests.  (*Id.* at 977-78).  Federal Rule of Civil Procedure 36(a)(3) provides that unless a party timely responds or objects to a request for admission, the matter is admitted.  Fed. R. Civ. P. 36(a)(3).  KAM makes no argument that it either responded or objected to the Requests for Admission sent by MFLLC in February 2021.  (*See* Doc. No. 74).  As such, the Requests for Admission are deemed admitted.  *See Finfrock v. Ohio Dep't of Rehab. & Corrs.*, No. 3:17-cv-1264, 2018 WL 2095820, at *4 (N.D. Ohio May 7, 2018) (admissions included in request for admissions are deemed admitted when no responses are timely filed).

KAM admitted that "as of October 5, 2020": (a) there were 20 open and operating stores in the Charlotte Territory; (b) the Publix Store "was the only proposed MFLLC store in the Charlotte Territory not open for business for which a franchise agreement was signed and a franchise fee paid; (c) Closed Store #8298 was the only location in the Charlotte Territory that opened under the [ARA] Schedule and then ceased operation; (d) under the BDM Agreement, there were "five development targets or proposed stores to be developed in the Charlotte Territory"; and (e) "there was a maximum of 27 stores that KAM claimed should be credited towards KAM's development schedule under the terms of the Charlotte ARA."  (Doc. No. 68-2 at 972-73).

KAM admitted that as of October 5, 2020, it was still two stores short of the required 29 stores.  The only other potential development target identified by KAM was the Jet's Pizza location. (*Id.* at 426; Doc. No. 75-1).  Even assuming KAM could have "opened" the Jet's Pizza location by December 31, 2020, it would still be one store short of its development obligation under the ARA Schedule.  Therefore, absent an enforceable modification to KAM's development schedule, KAM

15

cannot establish it had or could fully perform its development obligations under the ARA Schedule even if the time for its compliance is modified to the end of 2020.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Shell v. Lautenschlager*, No. 1:15-cv- 1757; 2017 WL 4919206, at *4 (N.D. Ohio Oct. 31, 2017) ("Matters that are deemed admitted because of a party's failure to respond to a request for admission can form the basis for a grant of summary judgment.").

### 2.  An issue of fact exists as to whether the Charlotte ARA was modified by the Libardi Letter

Prior to the Injunction Hearing, MFLLC believed the development obligations laid out in the Libardi Schedule controlled KAM's requirements.  MFLLC demonstrated this belief in multiple writings to KAM.  (*See* Doc. No. 68-1 at 215-16 (Libardi Letter) ("We have reviewed your proposal [to cure the development default] in detail, and it has been approved as your committed development plan going forward."); *id.* at 219 (Dec. 20, 2019 Update on Development Plan) ("Congratulations on the development results in this market for 2019!  We recognize your team's effort in opening 4 new stores this year and meeting your development action plan."); Doc. No. 68-2 at 290-91 (Sept. 15, 2020 Notice of Defaults) ("Despite KAM's January 2019 proposal and MFLLC's agreement to it, confirmed in [the Libardi Letter], while KAM opened four stores in 2019, KAM has to date opened only one store in 2020 . . . it does not appear possible that KAM will meet its obligation to open three new stores (two additional stores as of the date of this letter) in 2020.")).

KAM's position on the Libardi Letter is not as evident.  Mr. Hunter's testimony at the Injunction Hearing is unclear. (*Compare* Doc. No. 68-2 at 423-24 (Q: So what was KAM's understanding of the requirements under that plan going forward of how many stores KAM had to develop in 2020? A: So there would be three in 2020. I believe it says four in '19, three in '20, and four in '21.") *with id.* at 483 (Q: And then you also have an obligation to open four more units by December 7, 2021, . . .? A: It's not an obligation; it's a notice from Marco's.")).

If I assume the Libardi Letter is an enforceable modification, unresolved issues relating to how the parties conducted themselves preclude summary judgment. For example, to what extent did the Libardi Letter re-define the parties' understanding of what "open" meant, including the availability and application of provisional credits under both (b) and (c); and considering that definition, could KAM have satisfied the Libardi Schedule by opening the Jet's Pizza location? To attempt to answer these questions at this stage, considering the evidence presented and taking it in a light most favorable to KAM, would require too much speculation.

Based upon the above, I conclude there is a genuine issue of material fact about whether the Libardi Letter was a mutually agreed upon modification. Until the issue of modification is addressed, any decision about KAM's compliance is premature. Because there remains a question regarding which document controlled KAM's development obligations, I deny MFLLC's motion for summary judgment on the issue of whether KAM performed those obligations.

### C. Provisional Credits under BDM Agreement

MFLLC's second question on summary judgment involves the application of provisional credits from the BDM Agreement. For KAM to count provisional credits towards its own development obligations, BDM was required to comply with all its own contractual obligations. (*See* Doc. No. 68-1 at 17, § 5.3.2(c)).

Under the BDM Schedule, BDM was required to open one store by December 31, 2019. (*Id.* at 128). The evidence shows that BDM signed a franchise agreement, paid a franchise fee of $25,000, and opened Denver #8525 in November 2019. (*Id.* at 152-214; Doc. No. 68-2 at 964). Denver, N.C., is listed explicitly in the BDM Agreement's development area. (Doc. No. 68-1 at 127). Aside from Denver #8525, BDM did not open any other stores in 2019. (Doc. No. 68-2 at 964). Why then does this not satisfy BDM's development requirements?

MFLLC disputes that Denver #8525 was opened *under* the BDM Agreement, but instead argues, it was opened independently of the BDM Agreement. Ms. Weis testified the structure of the deal "was always [a] nine store total deal . . . And we explain that to them at the time, that they would be signing a franchise agreement for one store then; and then the development agreement covered their eight remaining locations that were not fulfilled by that original [ ] franchise agreement." (Doc. No. 68-2 at 876).

Ms. Weis explained that it is procedure to give any developer under an ADA, such as BDM, a $5,000 credit towards the standard $25,000 franchise fee and if Denver #8525 was intended to be covered by the BDM Agreement, the initial franchise fee would be $20,000, with a notation citing the $5,000 ADA credit. (Doc. No. 68-2 at 875, 877). This procedure is evidenced on the franchise agreement for Candler #8574 which opened under the BDM Agreement in 2020 and shows a franchise fee of $20,000 with the ADA notation. (*Compare* Doc. No. 68-1 at 223 *with id.* at 155). Yet, on January 22, 2019, BDM paid both a $40,000 development fee ($5,000 for each store to be opened under the ADA) and a $25,000 initial franchise fee for Denver #8525. (Doc. No. 68-2 at 878-79; *see also* Doc. No. 68-1 at 128, 155).

Furthermore, on three separate occasions in 2019, MFLLC stated in writing to KAM that Denver #8525 did not satisfy BDM's obligation under the BDM Agreement to open one store in 2019. First, the Libardi Letter in February specifically noted: "This must include 1 additional location within [BDM's] development area other than #8525 (as required by that agreement's development schedule) in order to maintain the provisional credits under § 5.3.2." (*Id.* at 215).

Next, in a May email regarding BDM's development obligations for 2019, was the statement "[BDM's] first store #8525 (still under construction) does NOT qualify." (Doc. No. 68-1 at 217) (emphasis in original). Mr. Hunter replied "BDM is going to open Waynesville, [s]o they will meet their schedule. It's on track for a September/October opening." (*Id.*).

Finally, in December, Mr. Libardi wrote that BDM "did not open the 1 store required for 2019 (above and beyond #8525, which was not subject to the development agreement)." (*Id.* at 219). Mr. Libardi further wrote that because of this failure, the provisional credits under the BDM Agreement would not apply to KAM's development obligations for 2019. (*Id.*).

Mr. Hunter testified he was aware of MFLLC's position regarding Denver #8525 and he made no objection to the assertion that this store did not satisfy BDM's development obligations for purposes of KAM's provisional credits. (Doc. No. 68-2 at 597-98, 603-05). He also acknowledged that prior to the Injunction Hearing, KAM had never taken the position that Denver #8525 was opened under the BDM Agreement. (*Id.* at 605). MFLLC argues KAM's silence in the face of these statements serves as adoptive admissions that Denver #8525 was not opened under the BDM Agreement. (Doc. No. 68 at 18-19).

An adoptive admission is an exception to the general prohibition against hearsay. Pursuant to Federal Rule of Evidence 801(d)(2)(B), a statement may be excluded from hearsay and accepted as evidence if "[t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2)(B). "Adoption can be manifested by any appropriate means, such as language, conduct, or silence." *U.S. v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996) (citing *Marshall v. Young*, 833 F.2d 709, 716 (7th Cir. 1987)).

"When a statement is offered as an adoptive admission, the primary inquiry is whether the statement was such that, under the circumstances, [the party] would normally be induced to respond, and whether there are sufficient foundational facts from which the [fact finder] could infer that the [party] heard, understood, and acquiesced in the statement." *Jinadu*, 98 F.3d at 244. "Thus, the burden is upon the proponent of the statement . . . to show that the party heard the statement, understood the statement, was able to respond to the statement, and had the motive and opportunity to respond – i.e, the statement was made under circumstances reasonably calling for an

answer." *Huck v. Greenspan*, No. 06-CV-14562, 2009 WL 224682, at *9 (E.D. Mich. Jan. 30, 2009) (applying Fed. R. Evid. 801(d)(2)(B) in civil context) (internal citations omitted).

It is indisputable that KAM: received and read these communications from MFLLC, (Doc. No. 68-2 at 597-98, 603-04); understood that MFLLC did not consider Denver #8525 to be included, (*id.*); was able to respond and in fact, did respond on at least one occasion, (*id.*; *see also* Doc. No. 68-1 at 217); and at no point prior to the Injunction Hearing disputed MFLLC's statements. (Doc. No. 68-2 at 605).  Thus, the only remaining question is whether MFLLC's position regarding Denver #8525 reasonably called for an answer from KAM.

KAM argues that because the Libardi Letter amended the development schedule, it rendered provisional credits irrelevant to its development obligations; and as such, its failure to respond is not an adoptive admission.  (Doc. 74 at 18).  In support, KAM cites to Ms. Weis' testimony where she confirmed that provisional credits were independent from KAM's obligation to open new stores under the Libardi Schedule.  (Doc. No. 74-3 at 101) ("A: Correct, because [the Libardi Schedule was] predicated on store openings.  They did not factor in provisional credits in terms of the number of what was required.  That action plan is considered on stores opening.").  However, Ms. Weis' testimony is not as definitive as KAM claims.

MFLLC's communications make clear that KAM was still permitted to utilize provisional credits to satisfy its overall development obligation or there would be no reason to include the reference in the Libardi Letter or December 2019 Letter.  (Doc. No. 68-1 at 215, 219).  Further, Ms. Weis explained the interaction between the provisional credits and KAM's development obligations under the Libardi Schedule as follows:

> Q:  Going back to the [Libardi Letter], did KAM open four new units in 2019 in the Charlotte Territory?
>
> A:  I believe so, yes.
> . . .

> Q:  Did any of those four units that were opened in 2019 fall under [the BDM Agreement]?
>
> A:  No, but I think, as the bullet point says, one of those four has to be within Brad Davis' development area in order to maintain the provisional credits.  It was not a requirement that one of the four has to be one of those locations, it's if KAM wanted to preserve those additional credits, that location from the development area had to be one of the four.

(Doc. No. 74-3 at 98-99).  This makes sense because even if KAM met its yearly development obligations under the Libardi Schedule, it would still require provisional credits to satisfy its overall development obligations.

To do the math, in February 2019 (when the Libardi Letter issued), KAM had 16 "open" stores.  (Doc. No. 68-1 at 215).  The Libardi Schedule required KAM to "open" 11 new stores by December 7, 2021.  (*Id.*).  Thus, even if KAM fully complied with the Libardi Schedule, without provisional credits, it would have at most 27 stores against its 29-store obligation when the Charlotte ARA expired.

To justify not responding, KAM would need to anticipate not utilizing provisional credits for the remainder of its ongoing relationship.  This position preemptively forecloses an avenue to compliance with the contract and is hardly a reasonable business position, particularly when KAM needed the BDM Agreement's provisional credits to satisfy its 2018 development obligations.  If KAM intended to comply with its obligation to develop 29 stores, it would need to either exceed the Libardi Schedule requirements by two stores or utilize provisional credits.  As provisional credits under § 5.3.2(c) were available, and perhaps even essential, to KAM meeting its development obligation, KAM's assertion that such credits were irrelevant after the Libardi Letter issued is not supportable.[10]

---

[10] Although KAM was able to meet the yearly development goal in 2019 without reliance on the provisional credits, this is a post-hoc rationalization that does not render provisional credits, as a concept, irrelevant to KAM's overall development obligations.

Yet, it appears that KAM did not dispute the statements about Denver #8525 and the BDM Agreement, because it agreed with those statements.  In an apparent confirmation of BDM's requirement to open an additional store in 2019 beyond Denver #8525, Mr. Hunter confirmed, "BDM is going to open Waynesville, [s]o they will meet their schedule.  It's on track for a September/October opening."  (Doc. No. 68-1 at 217).  This is consistent with Mr. Hunter's testimony that he was aware of MFLLC's position and made no objection at any point prior to the Injunction Hearing.  (Doc. No. 68-2 at 597-98, 603-05).

Considering the evidence and context, MFLLC's written statements reasonably called for an answer from KAM if it disputed MFLLC's characterization of Denver #8525.  Since KAM did not do so, the writings serve as an adoptive admission which is properly excluded from hearsay and may be considered as evidence in support of summary judgment.  *See, e.g., Nekkanti v. V-Soft Consulting Grp., Inc.,* No. 3:18-cv-784, 2021 WL 1667964, at *2 fn. 2 (W.D. Ky. April 28, 2021) (collecting cases which admit non-hearsay evidence under Fed. R. Evid. 801(d)(2)); *Red Strokes Entm't, Inc. v. Sanderson,* 977 F. Supp. 2d 837, 845 (M.D. Tenn. 2013) (accepting adoptive admission of defendant under Fed. R. Evid. 801(d)(2) as non-hearsay evidence on summary judgment).

KAM has failed to present sufficient evidence to rebut MFLLC's argument that because BDM did not comply with its development schedule in 2019 by opening another store aside from Denver #8525, there were no provisional credits available to KAM in 2019. (Doc. No. 68-1 at 17, § 5.3.2(c)) (provisional credits under (c) would "expire if the developer does not meet its development obligations under the development agreement.").  I conclude MFLLC is entitled to summary judgment on this issue.

MFLLC seeks a further finding that BDM's 2019 failure also negated KAM's ability to utilize provisional credits in 2020.  (*See* Doc. No. 68 at 15).  But without more evidence, I cannot come to such a conclusion.  After BDM's 2019 breach, MFLLC took no action against BDM in 2020; for

instance, it did not terminate the BDM Agreement or adjust its exclusivity rights.  (Doc. No. 74-3 at

59).  While MFLLC did state in its September 2020 Notice that no provisional credits were available

under the BDM Agreement resulting from the 2019 breach, (Doc. No. 68-2 at 291), this statement is

not entitled to the same adoptive admission treatment as MFLLC's prior communications because

KAM actively took issue with the conclusions in the September 2020 Notice by way of filing a

lawsuit.   Accordingly, I deny MFLLC's motion for summary judgment as to this issue.

## V. CONCLUSION

I find a genuine issue of material fact exists as to whether the Libardi Letter is an enforceable

modification of the Charlotte ARA which altered KAM's development obligations.  Accordingly, I

cannot determine whether KAM has fully performed its contractual obligations to the extent

necessary to maintain an action for breach of contract until those same obligations are established.

Further, I conclude MFLLC has sufficiently demonstrated that provisional credits were not available

to KAM in 2019 due to BDM's failure to comply with the BDM Schedule.  But I cannot come to

the conclusion that provisional credits in 2020 were unavailable as a result of this breach, because

insufficient evidence was presented on this issue.  Therefore, and for the foregoing reasons, I grant

in part and deny in part MFLLC's motion for summary judgment.  (Doc. No. 68).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge